```
1              IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
2                        AT CLARKSBURG

3   -----------------------------x
    UNITED STATES OF AMERICA,        :
4                                    :
          Plaintiff,                 :
5                                    : CRIMINAL ACTION NUMBER:
       vs.                           : 1:23-CR-69
6                                    :
    CHRISTOPHER HARP,                :
7                                    :
          Defendant.                 :
8   -----------------------------x

9   PROCEEDINGS HAD IN **DAY 1** OF THE JURY TRIAL OF THE ABOVE-STYLED
    ACTION ON APRIL 23, 2024, BEFORE THE HONORABLE THOMAS S. KLEEH,
10                    CHIEF DISTRICT JUDGE.

11     APPEARANCES:

12     FOR THE UNITED STATES OF AMERICA:

13        David J. Perri, Esq.
          Jennifer T. Conklin, Esq.
14        U.S. Attorney's Office
          1125 Chapline Street, Suite 3000
15        Wheeling, WV 26003
          david.perri@usdoj.gov
16        jennie.conklin@usdoj.gov

17     FOR THE DEFENDANT:

18        J. Bryan Edwards, Esq.
          Cranston & Edwards, PLLC
19        1200 Dorsey Avenue, Suite II
          Morgantown, WV 26501
20        bedwards@cranstonedwards.com

21     The Defendant was present in person.

22     Proceedings recorded by mechanical stenography.
       Transcript produced by computer-aided transcription.
23

24

25
```

1                          I N D E X

2                                                        PAGE

3  **Opening Statement of Government                      13**

4  **Opening Statement of Defendant                       21**

5

6                       W I T N E S S E S

7  **ED RYAN**

8  Direct Examination by Mr. Perri                         30

9  Cross-Examination by Mr. Edwards                        72

10 Redirect Examination by Mr. Perri                       87

11 **CORY THIGPEN**

12 Direct Examination by Mr. Perri                         94

13 Cross-Examination by Mr. Edwards                       125

14 **JONATHAN FRIEND**

15 Direct Examination by Ms. Conklin                      147

16 Cross-Examination by Mr. Edwards                       155

17

18                       E X H I B I T S

19 IDENTIFICATION                                         PAGE

20 Government's Exhibit 1                                  119

21 Government's Exhibit 2                                  119

22 Government's Exhibit 3                                   98

23 Government's Exhibit 4                                   72

24 Government's Exhibit 5A                                  72

25 Government's Exhibit 5B                                  72

1                    E X H I B I T S (CONTINUED)

2    IDENTIFICATION                                        PAGE

3    Government's Exhibit 6A                                101

4    Government's Exhibit 6B                                101

5    Government's Exhibit 9A                                 62

6    Government's Exhibit 9B                                 62

7    Government's Exhibit 9C                                 63

8    Government's Exhibits 7A through 7R                    110

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        (Voir dire examination is sealed and filed under separate

2        cover.)

3        (Jury sworn.)

4            THE CLERK:  Thank you.

5            THE COURT:  Thank you, ladies and gentlemen.

6        Ladies and gentlemen in the back of the courtroom, this

7    concludes your time with us today.  Thank you very much for

8    your time, attention, and patience.  Have a wonderful day.

9    Thank you very much.

10        (Prospective jurors not selected for service excused.)

11            THE COURT:  All right.  Thank you very much, ladies

12    and gentlemen, again, for your time and, again, your continued

13    patience with me.

14        Just as a preview of where we are, there are some

15    preliminary instructions I'm going to review with you now.

16    Those will take a moment or two to go through.  Then we're

17    going to take a ten-minute break.  And during that time if you

18    need to let anyone know that you've been selected for jury

19    service, please feel free to do so.  But we'll take a quick

20    break and then come back and hear opening statements, and then

21    we'll take a lunch break after that.  But again, I -- there are

22    a few preliminary instructions I need to review with you now.

23    And now that you have been sworn, we are going to review those.

24        It will be your duty to find from the evidence what the

25    facts of this case are.  You, and you alone, are the judges and

1  will be the judges of the facts.  You will then have to apply

2  to those facts the law as the Court will give it to you.  You

3  must follow that law whether you agree with it or not.

4       Nothing that I may say or do during the course of this

5  trial is intended to indicate to you, nor should it be taken by

6  you as indicating what your verdict ultimately should be.

7       The evidence from which you will find the facts will

8  consist of the testimony of witnesses, documents, and other

9  things received into the record as exhibits, and any facts that

10  the lawyers agree to or stipulate to or that the Court may

11  instruct you to find.

12       Certain things are not evidence and may not be considered

13  by you as evidence.  I want to run through that list with you

14  now.

15       The statements, arguments, and questions by lawyers are

16  not evidence.  Objections to questions are not evidence.

17  Lawyers have an obligation to their clients to make objections

18  when they believe evidence being offered is improper under the

19  rules of evidence.  You should not be influenced either by the

20  objection or by the Court's ruling on it.  If the objection is

21  sustained, ignore the question.  If it is overruled, treat the

22  answer like any other.  If you are instructed that some item of

23  evidence is received for a limited purpose only, you must

24  follow that instruction.

25       Testimony that the Court has excluded or told you to

1  disregard is not evidence and must not be considered by you.

2  Anything you may have seen or heard outside of the courtroom is

3  not evidence and must be disregarded.  You are to decide the

4  case solely on the evidence presented here in the four walls of

5  this courtroom.

6      There are two kinds of evidence, direct and

7  circumstantial.  Direct evidence is direct proof of a fact,

8  such as testimony of an eyewitness.  Circumstantial evidence is

9  proof of facts from which you may infer or conclude that other

10  facts exist.  I will give you further instructions on these, as

11  well as other matters, at the end of the case.  But keep in

12  mind that you may consider both kinds of evidence, and the law

13  largely makes no distinction between direct and circumstantial

14  evidence.

15      It will be up to you to decide which witnesses to believe,

16  which witnesses not to believe, and how much of any witness's

17  testimony to accept or reject.  I will give you some guidelines

18  for assessing and determining the credibility of witnesses at

19  the end of the case.

20      As we've discussed, this is a criminal case.  And there

21  are three basic rules about a criminal case that I must ask you

22  to keep in mind throughout the trial.  First, a defendant is

23  presumed innocent until proven guilty.  The indictment against

24  the defendant, brought by the Government, is only an

25  accusation.  It is nothing more.  It is not proof of guilt or

1  anything else.  The defendant, therefore, starts out with a

2  clean slate.

3       Second, the burden of proof is on the Government until the

4  very end of the case.  The defendant has no burden to prove his

5  innocence or to present any evidence or to testify.  Because

6  the defendant has the right to remain silent, the law prohibits

7  you from arriving at your verdict by considering that the

8  defendant may not have testified.  Third, the Government must

9  prove the defendant's guilt beyond a reasonable doubt.  I'll

10 give you further instructions on this point later; but bear in

11 mind, in this respect, a criminal case is much different from a

12 civil case.

13      Now a few words about your conduct as jurors.  First, I do

14 instruct you that during the trial you are not to discuss the

15 case with anyone or permit anyone to discuss it with you.

16 Until you retire to the jury room at the end of the case to

17 deliberate on your verdict, you simply are not to talk about

18 this case with anyone.

19      After you retire to deliberate, you may begin discussing

20 the case with your fellow jurors, but you cannot and may not

21 discuss the case with anyone else until you have returned a

22 verdict and this case is at its end.

23      All of us have the so-called tools of modern convenience:

24 smart phones, iPhones, iPads, and all the rest.  A couple rules

25 about those items during trial.  You must not use any device,

1    computer, smart phone, tablet, or the rest to communicate or

2    talk to anyone about this case or use the tools to communicate

3    electronically with anyone about the case.  That does include

4    your family and friends.

5        You may not communicate with anyone about the case using

6    your cell phone; using email, text messages, instant message,

7    direct messages; using any blog or website or social media

8    application, including Twitter, Facebook, Instagram, Snapchat,

9    LinkedIn, YouTube, TikTok, or anything else that I just don't

10   know what it is or heard about it yet.  You may not use any

11   similar technologies of social media, even if I've not

12   specifically mentioned it here.  Please also refrain from any

13   social media activity about the fact you've been selected to

14   serve as a juror or any aspects of the case.  I will expect

15   that you inform me if you learn another juror has violated

16   these instructions.

17       Second, please do not read or listen to anything touching

18   on this case in any way.  That includes any media coverage or

19   news stories about the case, should there be any.  If anyone

20   should try to talk to you about this case, please bring it to

21   my attention immediately.

22       Third, please do not try to conduct any research or make

23   any investigative efforts about the case on your own.  You, as

24   jurors, must decide this case based solely on the evidence

25   presented here within the four walls of this courtroom.  This

1  means that during the trial you must not conduct any

2  independent research about the case, the matters in the case,

3  or the parties or individuals involved.

4      In other words, you should not consult dictionaries or

5  reference materials, search the internet, websites, blogs, or

6  use any other electronic tools, including Google, to obtain

7  information about this case or to help you decide the case in

8  any way.  Please do not try to find out any information from

9  any source outside the confines of this courtroom.

10      Finally, please do not form any opinions until all the

11  evidence is in.  Please keep an open mind until you start your

12  deliberations at the conclusion of the case.

13      We will -- when you return, you'll have notepads and

14  writing utensils.  You're free to take notes.  You're not

15  required to take notes.  Whenever you leave the courtroom

16  during breaks or at the end of the day, please just leave your

17  notepads face-down on the chairs.  We'll take care of them from

18  there.  I can assure you they will be secure and no one will

19  read or review anything you may have made a note about.

20      A little road map as to what to expect.  As I mentioned,

21  we're going to take a break here in a moment, and then we'll

22  return for opening statements.  First the Government will make

23  an opening statement.  Again, it's not evidence; it is simply

24  an outline to help you understand the evidence as it's

25  received, from the Government's perspective.  Then the defense

1 may, but does not have to, present an opening statement.

2 Again, it is not evidence; it is also merely an outline to help

3 you aid and understand the evidence as it comes in, from the

4 defense perspective.

5      The Government then will present its witnesses, and

6 counsel for the defendant may cross-examine them.  Following

7 the Government's case, the defendant may, if he so chooses,

8 present witnesses who the Government may cross-examine.

9      After that I will provide you the instructions of law that

10 you'll need to use during your deliberations.  Then you'll hear

11 the closing arguments of counsel, which, again, are not

12 evidence; are merely meant to summarize and interpret the

13 evidence for you from each party's perspective.  After that you

14 will retire to deliberate upon your verdict.

15      And looking at the clock, it's quarter 'til 12.  Why don't

16 we just go ahead and take a lunch break at this point, and

17 we'll do openings after that.  Scratch that, ladies and

18 gentlemen.  We're going to take a lunch break now.  Sorry.  I

19 just realized that it was 11:45.

20      We'll take an hour from your perspective.  If you could be

21 back and ready to resume at 12:45, we'll proceed with opening

22 statements at that point.

23      With the very limited exception of anyone you need to let

24 know that you've been selected for jury service, please

25 continue to refrain from discussing the case with anyone.  If

1  you do have to let folks know you've been selected, please keep

2  it to that, no details about the charges or anything you

3  believe you may know about the case at this point.  Please also

4  continue to refrain from any independent investigation or

5  research efforts about the case, and please continue to refrain

6  from any social media activity about your jury service or the

7  case.

8      With that, we'll see you in an hour to proceed with

9  opening statements.  Thank you all very much.

10      (Jury retired from the courtroom at 11:46 AM.)

11      THE COURT:  All right.  Thank you, everyone.  Please

12  be seated.

13      Ms. Conklin, Mr. Perri, how long does the Government

14  anticipate its opening statement will last?

15      MR. PERRI:  Probably around 20-25 minutes, something

16  like that, Your Honor.

17      THE COURT:  Understood.

18      Mr. Edwards?

19      MR. EDWARDS:  I believe about the same, about

20  25 minutes.

21      THE COURT:  Okay.  Well, let's get back together at

22  12:45.  We'll proceed with openings.  If it takes that long,

23  we'll probably head straight into our first witness.

24      Any motions to sequester witnesses at this point?

25      MR. EDWARDS:  Yes, Your Honor.

1           THE COURT:  Any objection?

2           MS. CONKLIN:  No, Your Honor.

3           THE COURT:  Without objection, motion granted.

4   Witnesses shall be sequestered.

5       I'd kindly ask counsel to help us police that.  Y'all know

6   your witnesses better than I do.

7       Yes, Mr. Perri.

8           MR. PERRI:  Your Honor, we would ask that the case

9   agent, Cory Thigpen, be designated United States'

10  representative.

11          THE COURT:  Any objection to that?

12          MR. EDWARDS:  No objection, Your Honor.

13          THE COURT:  Without objection, Mr. Thigpen excluded

14  from the sequestration order.  Otherwise, again, if I could ask

15  counsel to help us on that front, we'd appreciate it.

16      Anything else we need to take up at this point, then, from

17  the Government?

18          MS. CONKLIN:  No.

19          THE COURT:  No?

20      Mr. Edwards?

21          MR. EDWARDS:  No, Your Honor.

22          THE COURT:  All right.  Well, we'll be at ease until

23  12:45, keep our fingers crossed that our AV equipment is ready

24  to roll.

25      All right.  Thank y'all.  We'll see you here shortly.

**Opening Statement of Government (Mr. Perri)**

1      (Lunch break taken from 11:48 AM to 12:50 PM.)

2          THE COURT:  Thank you, everyone.  Please be seated.

3      Are we ready to proceed with openings?

4          MR. EDWARDS:  Yes.

5          THE COURT:  Yes?  Seeing yes.

6      Can we have our jurors, please, sir.  Thank you.

7      (Jury returned to the courtroom at 12:51 PM.)

8          THE COURT:  All right.  Good afternoon, everyone.

9  Thank you very much.  Please take your seats.  Thank you,

10  ladies and gentlemen.

11     All right.  The Government may proceed with its opening

12  statement.

13                      OPENING STATEMENT

14          MR. PERRI:  So good afternoon.  My name is

15  David Perri.  I represent the United States of America in this

16  matter, along with my co-counsel Jenny Conklin.  We're very

17  happy to be here with you today.  This is our first opportunity

18  to talk to you.  We don't get that many.  But this, at the

19  beginning of the case, is something that we look forward to

20  very much.  And we appreciate your attention.

21     So our job is to prove to you that this Defendant

22  committed the offenses with which he is charged beyond a

23  reasonable doubt.  Those offenses are receipt of child

24  pornography and possession of child pornography.  We look

25  forward to meeting that burden with you here today, and we

**Opening Statement of Government (Mr. Perri)**

1  wouldn't have it any other way.

2      I'm going to give you a preview of the elements of those

3  charges.  And that's kind of a special word, "element."  You're

4  going to hear more about that.

5      But first I want to give you a little bit of background as

6  to the nature of these charges, and I want to also talk about a

7  few concepts that are going to be important in this case, as

8  they are in almost every criminal case.

9      So, as I indicated, the charges are receipt of child

10  pornography and possession of child pornography.  And you might

11  be thinking, "Oh, my gosh.  Of all the cases I could have

12  drawn, I can't believe I have a child pornography case."  We

13  get that.  And remember, please, that the evidence in a

14  particular case is largely determined by the actions of the

15  defendant.  So in a drug case, you're going to have drug

16  evidence.  In a child pornography case, you're going to have

17  child pornography.  He determines the when, the where, the how,

18  and the how much by his own actions.  We don't get to pick

19  that.

20      So you already have probably a general idea what this

21  stuff is.  Some people might say it's bad pictures of kids.

22  That's not wrong.  But more precisely, child pornography is

23  capturing visually a moment in time when a child is being

24  sexually exploited.  It's a problem that's been around for a

25  long time.  It's an international problem.  Truly international

**Opening Statement of Government (Mr. Perri)**

1  problem.  And some countries are better than other countries in

2  cracking down on it.

3     This problem has been made 100,000 times worse by

4  something called the internet.  Due to the internet, people who

5  are interested in this stuff can now find it, look at it, talk

6  about it, transmit it, store it, without even having to deal

7  with a single person face to face.  These are crimes that can

8  be committed in privacy, with anonymity, in a bedroom, in a

9  basement, in a private office.

10     So that's the problem we're dealing with.  Fortunately, we

11  have law enforcement officers who are doing their best to

12  investigate these things.  And these investigations include

13  online investigations.  They're able to conduct these

14  investigations in such a way as that they don't reveal their

15  presence online.  And you're going to hear about that in this

16  case.  You're going to hear about an investigation conducted by

17  Agent Ed Ryan of the FBI.

18     So child pornography, it does have a definition.  And it

19  is, legally, the visual depiction of a minor engaged in

20  sexually explicit activity.  And we tend to think of child

21  pornography as, you know, involving real little kids.  But

22  actually, the definition of a minor is a child under the age of

23  18.

24     So this stuff is illegal.  But lots of things are illegal.

25  Child pornography is almost next level.  It's contraband.  It's

**Opening Statement of Government (Mr. Perri)**

1   almost, like, radioactive.  And I say that because pretty much

2   anything a person can do with respect to child pornography is

3   illegal; like, hands off.  You can't have it.  You can't store

4   it.  You can't send it.  You can't distribute it.  You can't do

5   anything, least of all make it.  Child pornography is illegal

6   under federal law and under the law of every state.  It is

7   contraband.

8        So I mentioned something called elements.  I'm going to

9   show you this charge, receipt of child pornography:  The

10  Defendant knowingly received any child pornography, and that

11  child pornography had been shipped or transported in interstate

12  commerce by any means, including by computer.

13       Possession of child pornography:  The Defendant knowingly

14  possessed a computer disc or other material containing one or

15  more images or videos of child pornography.  The Defendant knew

16  that the images or videos depicted a minor engaged in sexually

17  explicit conduct and what we call interstate nexus.  That's the

18  part of the charge that gives Congress the authority to

19  legislate, that it affects interstate commerce.  So when these

20  videos or images are shipped and transported in interstate

21  commerce, through the internet, by any means, that's what we

22  call interstate nexus.  That's one of the elements.

23       What are elements?  Elements are like building blocks of

24  charges.  They're the essential.  You see, the United States

25  doesn't have to establish every disputed fact in a case beyond

**Opening Statement of Government (Mr. Perri)**

1  a reasonable doubt.  We only have to establish the elements.

2  Not every factual detail is essential to the resolution of the

3  case.  The difference between an element and any other disputed

4  fact is like the difference between a cornerstone and a light

5  fixture in regards to the structure of a building.  You can

6  have a building without a light fixture; but if you're missing

7  a cornerstone, it's a problem.  That's the difference.

8      Now, the Judge, in his opening instructions to you, he

9  mentioned something, a concept that I want to touch on here in

10 opening.  And that is direct and circumstantial evidence, two

11 kinds of evidence that we have in pretty much every case.

12     Direct evidence, that's like a surveillance video that

13 catches the robber red-handed in the act of the robbery or a

14 semen sample in a rape case or an eyewitness.  Direct evidence

15 is like that, a direct connection.

16     Circumstantial evidence is a little bit different.

17 Circumstantial evidence involves drawing an inference from

18 circumstances or from other facts.  And you can use that to

19 reach a conclusion.  I want to give you an example of

20 circumstantial evidence so that when you hear it or see it in

21 this case, you may think to yourself, "Oh, I think that's what

22 he was talking about," and you'll recognize it as such.

23     The idea is that you can rely on circumstantial evidence

24 as a juror to the same extent as direct evidence.  It's just as

25 valid, just as important, just as reliable.  And you can rely

**Opening Statement of Government (Mr. Perri)**

1  on circumstantial evidence to reach a conclusion about the
2  Defendant's guilt.
3      Let me give you an example.  Let's say that you're heading
4  off to work in the morning.  And as you're driving down the
5  street, you notice that your neighbor's grass is looking kind
6  of overgrown.  It's getting kind of mangy and really needs cut.
7  You don't pay much attention.  You head out to work.  Well,
8  when you come home at the end of the day, you see that same
9  piece of property, your neighbor's front yard, and now there
10 are these nice, neat stripes, and the grass is short.  And you
11 say to yourself, "Oh, he must have mowed the grass while I was
12 at work."  There you go.  That's circumstantial evidence.  More
13 precisely stated, the presence of those lines created by the
14 mower are circumstantial evidence of the fact that it was mowed
15 while you were at work.  Simple as that.
16     Let's say you bake some cookies for your kids or your
17 grandkids, and you go out to the store to run an errand.  You
18 come home.  The lid is off the cookie jar, and there's crumbs
19 all over the counter.  And you say to yourself, "Somebody got
20 in the cookie jar."  You drew a conclusion based on
21 circumstantial evidence.  The crumbs and the displaced lid were
22 circumstantial evidence of the fact that somebody got into your
23 cookies.  There you go.
24     There's going to be some of that evidence in this case,
25 and you can rely on it.

**Opening Statement of Government (Mr. Perri)**

1        You might have noticed quite a bit of common sense in that

2    example, like, I can't believe he's telling us this example.

3    It's so stupid.  It's so obvious.

4        Yeah.  You don't have to leave your common sense at the

5    door to be a juror.  In fact, it will be one of the most

6    important tools that you have in this case.

7        So I do want to mention one other concept to you.  Since

8    one of the charges in this case is possession of child

9    pornography, I want to say something about possession.  There

10   are two types of possession.  One is actual possession.  I'm

11   holding this.  I'm in actual possession of it.

12       There's another kind of possession that's called

13   constructive possession.  Each one of you that drove here today

14   is right now in constructive possession of your car, even

15   though you're not in it.  That's constructive possession.  Or

16   if you had a coat back in the coat room, you're in constructive

17   possession of that coat even though it's not on you.

18       So I wanted to mention that, two different types of

19   possession.  Constructive possession has more to do with

20   dominion and control rather than having something in your

21   pocket or having something on your person.

22       Okay.  So opening statements is an overview.  It's not

23   argument.  It's an introduction.  And I was thinking, how could

24   I give an overview of this particular case?  Well, I'm just

25   going to cut to the chase and say that this case is about an

**Opening Statement of Government (Mr. Perri)**

1  individual who was using the internet to seek out and obtain

2  and receive the type of child pornography that he was

3  interested in.  And he was doing this over time.

4      So this investigation is going to involve testimony from

5  agents; not only investigative agents, but forensic agents.

6  You see, when the FBI does a search warrant and they obtain

7  items of computer equipment from a residence, the next step is

8  for those items to be forensically analyzed.  We can tell a lot

9  about a person's activity by analyzing the computer

10  forensically.  And you're going to hear some testimony from an

11  expert witness who did just that.  And you're going to hear

12  about something really cool called restore points which kind

13  of, like, open a window to show you what was going on and what

14  was present on a computer at a given point in time in the past.

15  Restore points.  It's like a window into the past.  And you're

16  going to hear about that.

17      You're going to hear about Agent Ryan's investigation on

18  special -- a special law enforcement internet software program

19  called GridCop.  I told you that we have law enforcement

20  officers who are conducting investigations online.  And you're

21  going to hear about one of those.

22      You're also going to hear from the case agent, Agent

23  Thigpen.  He's going to tell you about what was found on that

24  computer.  He's going to tell you about the video files, and

25  he's going to tell you how, in certain instances, the dots kind

**Opening Statement of Defendant (Mr. Edwards)**

1  of connect.  And you'll see what that means when you hear what

2  he has to say.

3      You're going to hear evidence about this Defendant,

4  Christopher Harp's, use of that computer.  And when you've

5  heard all the evidence, all the testimony, seen all the

6  exhibits, you're going to know that this Defendant committed

7  these offenses beyond a reasonable doubt.  Thank you.

8          THE COURT:  Thank you, Mr. Perri.

9      Mr. Edwards.

10         MR. EDWARDS:  Thank you, Your Honor.

11                   OPENING STATEMENT

12         MR. EDWARDS:  May it please the Court, counsel.

13     Good afternoon, ladies and gentlemen.  You've heard from

14  the Government's attorney that Chris Harp has been charged with

15  three counts of receipt of child pornography and one count of

16  possession of child pornography.

17     Chris Harp will not argue whether or not child pornography

18  was found on one of the computers in the home.  The Government

19  says that it found such material, and it was confirmed that it

20  was there.  We will stipulate that there was child pornography

21  found on the computer, as neither one of us -- nor I suspect

22  any of you -- have any real desire to actually have to see it.

23     Therefore, your job as members of the jury is not to

24  determine if child pornography was, in fact, present on the

25  computer in the home of Christopher and Amy Harp on

**Opening Statement of Defendant (Mr. Edwards)**

1   September 25th, 2020.  No.  What you will be charged with

2   determining is whether or not Chris Harp knowingly received

3   child pornography and whether Chris Harp did knowingly possess

4   child pornography.  The fact that it was on a computer in the

5   home is not determinative of whether or not Chris Harp had any

6   knowledge that it was even there.

7       There's a psychological principle called confirmation

8   bias.  Confirmation bias is a tendency to process information

9   by looking for or interpreting information that is consistent

10  with one's existing belief.  This biased approach to

11  decision-making is largely unintentional, and it results in a

12  person -- or in this case, a Government -- ignoring information

13  that is inconsistent with its belief.  These beliefs can

14  include one's expectations in a given situation and one's

15  predictions about a particular outcome.

16      The evidence will show that the Government's case against

17  Christopher Harp is, in fact, a result of confirmation bias, as

18  you will hear during the trial that the Government discovered

19  that suspected child pornography was being downloaded in the

20  area.  Thereafter, the Government discovered, through getting

21  information from Comcast, that the suspected child pornography

22  was being downloaded at an IP address associated with the

23  Comcast account for the Harps' home.

24      Since Chris Harp was, to the Government's knowledge, the

25  only male that had access to the home and the computer which

**Opening Statement of Defendant (Mr. Edwards)**

1  they found the pornography, they ignored and/or failed to

2  investigate any further to determine if Chris was the

3  individual who was, in fact, responsible for downloading that

4  pornography.

5      The Government searched the Harps' home on

6  September 25th, 2020, and took possession of a majority of

7  the computer/electronic equipment in the home, including the

8  subject computer as well as Chris Harp's phone.  However, other

9  than performing an analysis of that electronic equipment, the

10  evidence is going to show that no other real investigation was

11  performed.

12      The evidence will show that the Government failed to make

13  even the most basic investigation to determine who, in fact,

14  had access to this computer.

15      The Government took possession of the computer on

16  September 25th, 2020, which was just four days after they

17  allege that pornography had been downloaded, but they never

18  bothered to even fingerprint the computer to see who was, in

19  fact, using it.

20      Prior to these charges being brought, the Government

21  failed to interview any of the neighbors around Chris and Amy

22  Harp's home to see if they knew who had access to the home.

23      The Government failed to interview any of Amy Harp's

24  family, who lived next door to the Harps, to see if -- who had

25  lived with the Harps at any point in time and who had access to

**Opening Statement of Defendant (Mr. Edwards)**

1   the home.

2       As I stated, the Government took possession of Chris

3   Harp's phone on September 25th of 2020 but took no steps to

4   look at the information on the phone to determine whether Chris

5   was even home when this pornography was being downloaded.

6       As I've already stated, the Harps' home was searched on

7   September 25th, 2020.  This was the first time that Chris and

8   his family were first confronted regarding these allegations.

9   And you'll hear that Chris denied any knowledge of child

10  pornography being on any of the computers that he had operated.

11  Moreover, when the police asked Chris for the passwords for the

12  computers in the home, he readily provided the same.

13      You'll also hear during the course of this trial that

14  there was a Post-it note on a Microsoft Surface pad or ThinkPad

15  that actually had the passwords for the electronic devices in

16  the home written on it.  But for some unknown reason, the

17  Government didn't even take possession of that device.

18      Three years.  Three years after Chris Harp's home was

19  searched and the Government took possession of most of the

20  electronic equipment in the home, Chris was charged with this

21  four-count indictment in November of 2023.

22      Count One states that Chris Harp, on April 4th, 2019,

23  did unlawfully and knowingly receive child pornography.

24      Count Two states that Chris Harp, on September 18th -- a

25  year and a half after the first count -- did unlawfully and

**Opening Statement of Defendant (Mr. Edwards)**

1  knowingly receive child pornography.

2      Count Three states that Chris Harp, on September 21, 2020,

3  did unlawfully and knowingly receive child pornography.

4      And Count Four is sort of a catchall.  It says that on

5  September 25th, 2020, Chris Harp did knowingly possess child

6  pornography.  And that, of course, is the date when they

7  searched the home.

8      You'll hear from the Government's expert who performed the

9  analysis on the computer.  He will testify that the pornography

10  found on the computer was not something that was readily

11  accessible or even readily viewed.  It was only found by

12  digging into the computer's hard drive and getting to what is

13  known as restore points in order to even access the same or

14  looking into -- I think maybe in the recycle bin for something

15  that may have been deleted.

16      As I stated, the question you'll be tasked with

17  determining in this case is not whether or not child

18  pornography was on a computer found in the home on

19  September 25th of 2020.  There was.  The Government report

20  states that it's there, and neither I nor Chris nor, I suspect,

21  you have any desire to have to see it.  No.  The question is,

22  was Chris Harp the person who actually downloaded it?  Because

23  you're going to be instructed at the end of this case, if the

24  Government is unable to prove beyond a reasonable doubt that

25  Chris Harp was the one who downloaded the pornography, you

**Opening Statement of Defendant (Mr. Edwards)**

1  cannot find him guilty.

2      In that regard, you're going to hear evidence that on

3  April 4th, 2019, the date the Government is claiming in Count

4  One that Chris Harp was at his house and downloading child

5  pornography, when, in fact, that morning Chris left for work as

6  he typically did, around 7 -- between 7 and 7:30, drove to his

7  job in Waynesburg, Pennsylvania, worked there for a little bit,

8  and then actually went up to Robinson Township just outside of

9  Pittsburgh for a job interview with Steve Sellers of Newpark

10  Integrated Services.  And we'll actually see an email

11  confirming -- where Chris thanks Steve for the interview and

12  Steve responds back to him.  Chris wasn't home when this

13  pornography was being downloaded.

14      September 18th, a year and a half later, the date the

15  Government is claiming in Count Two that Chris Harp was

16  downloading child pornography, you're going to hear evidence

17  that on September 18th, during the time period that --

18      And you'll -- they have date stamps.  So we know the times

19  that they're saying that this occurred.

20      -- that during that day Chris was actually working with

21  his father-in-law, Robert Westwood, with Westwood General

22  Contracting, assisting with the construction -- or the remodel

23  of a home for Dr. David Fogarty in the Coopers Rock/Bruceton

24  Mills area of Preston County.

25      Now, unfortunately, because it was three years between the

**Opening Statement of Defendant (Mr. Edwards)**

1  search of the house and the actual charges being brought,

2  Mr. Westwood passed away.  But you're going to hear from his

3  wife as well as Amy Harp, Chris's wife -- and I guess it's

4  actually Chris's mother-in-law -- who confirm that Chris was

5  working with his father-in-law on the date and time in

6  question.

7       And finally, the final date of September 21, 2020.  That's

8  the last date the Government claims that Chris Harp downloaded

9  child pornography.  And you're going to hear evidence and see

10 the documents that Chris and his wife were actually purchasing

11 a new vehicle at Dan Cava Toyota that morning.  They got up

12 early, got there right when they opened up, took out a couple

13 cars, traded in a car, got financing, bought a new car.  They

14 left there around noon.  You'll hear that Amy was pregnant at

15 that point in time.  They took the long way home to enjoy their

16 new car.  She had to stop twice to use the restroom.  Got home

17 around 1:00.  Then Amy went on to a doctor's appointment.  And

18 you will hear that they were not home during the time that this

19 pornography was being downloaded.

20      There is no evidence that you're going to hear or see that

21 says someone ever saw Chris Harp using the computer and

22 downloading and viewing child pornography.  The evidence will

23 show that at times when the pornography was allegedly being

24 downloaded -- or I don't know why I'm saying downloaded --

25 allegedly being downloaded and viewed, Chris Harp was not at

**Opening Statement of Defendant (Mr. Edwards)**

1  home, but, in fact, was at work, other than on the 21st when

2  he was buying a car with his wife.

3      You heard the Government say that it will show you

4  evidence that indicates that pornography was actually found on

5  prior dates on the computer, dates which Chris has not been

6  charged, even before Chris moved into his current home.

7  However, you're going to hear evidence that another

8  individual -- in fact, Chris Harp's brother, Jeremy Harp -- had

9  ongoing access to the computer in question on all dates the

10  Government claims that pornography was being downloaded on the

11  same, as well as access to Chris's home, even living there for

12  a period of time.  Witnesses will testify that Jeremy Harp was

13  seen entering and leaving the home at times when neither Chris

14  nor his family were present and at times when Jeremy was no

15  longer even living there and supposed to be there.

16      Unfortunately for my client, the evidence is going to show

17  that the Government pretty much failed to do any investigation

18  once they searched the Harp's home and took possession of the

19  electronic equipment found therein, other than basically

20  analyzing the equipment itself.

21      No investigation was done to determine if Chris was even

22  home when the pornography was being downloaded.  Unfortunately,

23  even after it was disclosed to the Government that Chris Harp

24  wasn't at home during the times set forth in the indictment,

25  nothing was done to determine who else had access to his

**Opening Statement of Defendant (Mr. Edwards)**

1    computer.  Or his home, for that matter.

2        Moreover, you'll hear evidence about the characteristics

3    of individuals who are involved in child pornography.  And I'd

4    ask you all to pay close attention to that evidence and see if

5    it matches up with what you're presented by the Government in

6    this case regarding Christopher Harp.  This, too, raises a

7    reasonable doubt about Chris Harp.

8        MR. PERRI:  Objection, Your Honor.  This is argument.

9    Counsel is talking about reasonable doubt.  This is closing

10   argument stuff.

11       THE COURT:  Sustained.

12       MR. EDWARDS:  Our legal system demands more than

13   assumptions or probabilities for a conviction.  It demands

14   proof beyond a reasonable doubt.  And as you listen to the

15   evidence, we ask that you keep an open mind, remembering that

16   the burden of proof lies with the Government.  It is their

17   responsibility to prove, without a shadow of a doubt, that

18   Chris Harp committed the crimes he's accused of.

19       In conclusion, we are confident that after reviewing all

20   the evidence and testimonies, you will find that the Government

21   has not met their burden of proof and you'll return a verdict

22   of not guilty.

23       Ladies and gentlemen, thank you for your attention and

24   your dedication to justice in this matter.

25       THE COURT:  Thank you, Mr. Edwards.

### E. Ryan - Direct Examination (Mr. Perri)

1      The Government may call its first witness.

2          MR. PERRI:  United States calls Special Agent

3  Ed Ryan.

4          THE COURT:  Good afternoon, sir.  If I could ask you

5  to make your way all the way to the front of the courtroom.

6  You're going to pause with Madam Clerk so she can swear you in.

7  Then we'll ask you to take the witness stand.

8          **ED RYAN, GOVERNMENT'S WITNESS, SWORN**

9          THE CLERK:  Thank you.  Please have a seat at our

10  witness stand.

11      Our first witness is Ed Ryan, R-Y-A-N.

12          THE COURT:  Thank you, sir.  Once you're seated and

13  comfortable, if you wouldn't mind adjusting that mic so that

14  everyone can hear you.  Thank you very much.

15      Mr. Perri.

16          MR. PERRI:  Thank you, Your Honor.

17                      DIRECT EXAMINATION

18  BY MR. PERRI:

19  Q.   Sir, would you please state your name for the record.

20  A.   Ed Ryan.

21  Q.   Where do you work?

22  A.   For the FBI.

23  Q.   And how long have you been an FBI agent?

24  A.   I've been an agent since March of 2003.

25  Q.   Okay.  Are you assigned to a particular field office right

### E. Ryan - Direct Examination (Mr. Perri)

1  now?

2  A.   Our field office, our division is Pittsburgh.  And I work

3  out of the Clarksburg resident agency.

4  Q.   Okay.

5  A.   So Pittsburgh covers all of West Virginia, and it covers

6  it with smaller offices.

7  Q.   Okay.  Were you so employed back in April of 2019?

8  A.   Yes, sir.

9  Q.   And through your employment with the FBI, did you have the

10  opportunity to work on an online investigation relating to

11  child pornography?

12  A.   Yes, sir.

13  Q.   How long have you been working on child pornography

14  investigations -- or, rather, child exploitation investigations

15  as an agent?

16  A.   Since approximately 2010 I got started.

17  Q.   Okay.  And you were doing that back in April of 2019?

18  A.   Yes, sir.

19  Q.   Did you become involved, then, in an investigation that

20  culminated with the execution of a search warrant at the

21  residence of a Christopher Harp at --

22  A.   I did.

23  Q.   -- 904 Bloody Run Road in Morgantown?

24  A.   Yes, sir.

25  Q.   What kind of investigation was that?

**E. Ryan - Direct Examination (Mr. Perri)**

1  A.   It was a child pornography possession and distribution

2  investigation.

3  Q.   Okay.  And through what medium were your conducting your

4  investigation?

5  A.   It was through a peer-to-peer network.

6  Q.   Okay.  So you just mentioned a term there, "peer-to-peer

7  network."  I want to ask you some questions about that so that

8  we can understand what you're talking about.  What is

9  peer-to-peer?

10  A.   Peer-to-peer is a network of computers that are connected

11  together.  And it's private users.  They connect together and

12  they share digital files.  And you could share videos or music

13  or images, and it's free.

14  Q.   Okay.  So it's a means of sharing and obtaining electronic

15  files?

16  A.   Yes.

17  Q.   And when you -- when you obtain a file, where does it come

18  from?

19  A.   It comes from one of the peers.  It comes from another

20  computer.

21  Q.   So what's the name for the other computers in the network

22  that are all participating in this arrangement?

23  A.   The peers.

24  Q.   They're called peers.

25  A.   Correct.

**E. Ryan - Direct Examination (Mr. Perri)**

1  Q.   Okay.  So when that exchange happens, we say peer to peer?

2  A.   Correct.

3  Q.   Is that where the name comes from?

4  A.   That's where it comes from.

5  Q.   All right.  And this can be used to obtain images and

6  videos?

7  A.   Yes.

8  Q.   So you said that computers -- you -- one computer can

9  obtain something from another computer.  How is this different

10  from other ways of obtaining electronic files on the internet?

11  A.   To -- there's other ways you can obtain files.  You

12  could -- you know, you can use a website to obtain files.  You

13  can -- you can use Apple Music if you're looking for music.

14  You can -- Spotify.  You know, those are maybe paid sites,

15  where peer-to-peer it's other people out there who have files

16  that you may be interested in, and then you can just share

17  them.

18  Q.   Does that have any advantages for someone who is

19  interested in or seeking out child pornography, say?

20  A.   Yes.  Absolutely.  It's easy.  It's convenient.  You go in

21  there and you search for terms, and it will link you up with

22  other people with a similar interest based on their files.

23       You know, back before peer-to-peer you would have to maybe

24  go to a paid website and run the risk of that website being

25  taken down and you being -- your financial information being

### E. Ryan - Direct Examination (Mr. Perri)

1   there from paying.

2       And then, nowadays, the other ways you can do it are, you

3   know, through social media, through Dropbox or different

4   applications.  But all those applications have obligations to

5   report if they see child pornography.  So if Facebook or any

6   other social media sees you trading that in their -- in your

7   direct messaging or however you're going to trade it through

8   chats, they have an obligation to report that.

9   Q.    And if they report it, what would happen?

10  A.    It would go to -- normally it would go to NCMEC and be put

11  in a CyberTip and then be sent out to the field.

12  Q.    When you say NCMEC, are you referring to the National

13  Center for Missing & Exploited Children?

14  A.    Yes, sir.

15  Q.    Okay.  And then a lead comes -- gets distributed to a law

16  enforcement agency?

17  A.    Directly to law enforcement.

18  Q.    All right.  So are you able to give us an analogy to kind

19  of explain how this works, how one computer user on the

20  peer-to-peer network can get what he wants from other peers?

21  A.    Basically you just have to obtain software.  You have to

22  be willing to share your files and pick which network you want

23  to go onto.  There's several peer-to-peer networks.  And so

24  there's all these computers that are linked out there.  You

25  join their network, and then you can have access to any -- any

**E. Ryan - Direct Examination (Mr. Perri)**

1   of the files, whatever they have available in their share box.
2   Q.   Okay.  Is there any way that we can visualize how that
3   happens?
4   A.   I mean, when we're looking for this stuff, the way -- kind
5   of the way to look at it is, if you're looking at a
6   peer-to-peer case -- so I could get on there, and I can search
7   for these terms.  And it -- and me, I would be sending out
8   queries, and it would -- and it's like a cop riding down the
9   street and saying, "Hey, does anybody out here have drugs?" and
10  then somebody coming out their front door and saying, "I have
11  drugs."  And then I would say, "What kind do you have?"  And
12  that's kind of the same thing when you're doing a peer-to-peer.
13       So I put a query out there and -- on search terms, like
14  child pornography search terms.  Somebody says, "I have files
15  matching those search terms," and then we could send a request
16  to that user to send a list of what they have, what kind of
17  files they have.  And then they'd probably want to see our list
18  too.
19  Q.   Now, these aren't people talking to each other.  What's
20  talking to each other?
21  A.   The client software.
22  Q.   The computers.
23  A.   The computers are talking to each other.
24  Q.   Okay.  So as a peer-to-peer user, what do you need in
25  order to participate in this network?

### E. Ryan - Direct Examination (Mr. Perri)

1   A.   You need, like, a -- the client software, and then you

2   need an internet connection, either Wi-Fi or hard-lined.

3   Q.   Okay.  And so the computer has to be connected to the

4   internet --

5   A.   Yes.

6   Q.   -- in order for the sharing process to work.

7   A.   Yes.

8   Q.   And tell us about the software that you need.

9   A.   So there's -- depending on which network you're going to

10  try to gain access to, they have different types of software

11  for the different operating system you may have.

12  Q.   What was the peer-to-peer platform in this case?

13  A.   In this case it was a peer-to-peer platform called

14  Gnutella.

15  Q.   How do you spell that?

16  A.   And that's with a silent G.  It's, like, G-N-U-T-E-L-L-A.

17  Q.   Not the chocolate --

18  A.   Not the chocolate spread.

19  Q.   Not the chocolate spread.

20  A.   It's with a G in front of it, but it's pronounced

21  "Nutella."

22  Q.   Okay.  And was there a particular software being used in

23  this case?

24  A.   Shareaza.

25  Q.   How do you spell that?

### E. Ryan - Direct Examination (Mr. Perri)

1  A.   S-H-A-R-E-R-A-Z-A.

2  Q.   What role does the software play in the --

3  A.   I think I spelled that wrong, sir.  It's S-H-A-R-E-A-Z-A.

4  Q.   Okay.  Like Shareaza.

5  A.   Shareaza.  Correct.

6  Q.   What role does the software in this case, Shareaza, play?

7  A.   First of all, it gives you access to that network.  And

8  then it provides you a search tool so you can send those

9  queries out.  It provides you access to everybody else that's

10 on that network.

11      You send a query out.  Shareaza brings back the results

12 that it got.  And then you can also send a browse host request

13 out, to search that host to see if there's any other files.

14 And then it also -- Shareaza has a media player.  So if you get

15 partial files or if you download a full file, you can -- you

16 can watch it right on Shareaza.

17 Q.   Okay.  So when you say "search," does the software act as,

18 like, a search engine?  Or am I wrong about that?

19 A.   It works like a search engine.

20 Q.   Does it have any other special features?

21 A.   Yes.  It's unique that you can -- it's something you can

22 use while you're working or you're traveling or whatever.  You

23 could actually schedule Shareaza to download files while you're

24 not home or -- and that kind of helps.  That could save your

25 bandwidth too.  So when you're at home or if everybody is at

**E. Ryan - Direct Examination (Mr. Perri)**

1  home and you're trying to use the internet, you're not

2  downloading all these files.  So you could do it when you're

3  not there or when you're at work.  So you could actually

4  schedule.  And how much bandwidth it would use.

5  Q.    So wait.  Are you saying that the user doesn't have to be

6  home in order -- the user doesn't have to be home when the

7  files are downloaded?

8  A.    No.  You can -- the user could set the files to download

9  and then go somewhere, and they'll just download and be there

10  when they're done.  Or you could set the scheduler.  Or you

11  could do it while you're at home.

12  Q.    Okay.  Could you, for example, set the scheduler and then

13  go do an errand?

14  A.    Absolutely.  You could go on vacation if you wanted to.

15  Q.    What if you wanted to download a bunch of files, it was

16  going to take some time, but you're tired and want to go to

17  bed?

18  A.    That's -- you could do that.

19  Q.    And what would be waiting for you in the morning?

20  A.    Your files would probably be downloaded by the morning.

21  Q.    Okay.  How are individual computers on the peer-to-peer

22  network identified?

23  A.    Through their IP address first.

24  Q.    What is an IP address?

25  A.    So it's the internet protocol address.  It's --

**E. Ryan - Direct Examination (Mr. Perri)**

1  Q.   Why do they call it an address?

2  A.   Well, it's similar to an address for your house.  You

3  know, the way the mailman finds your house, the internet needs

4  a way to find your computer.  So just like Gmail would need to

5  find a way -- if somebody is sending you a Gmail, that mail

6  needs to find your computer.  So it's an address.  And it's a

7  series of numbers and dots that's unique, and it's assigned to

8  you by your internet service provider.  You don't -- you can't

9  access the internet without -- from a residence without your

10 internet service provider.  So they're providing you access,

11 and then they're -- they have the obligation to assign you an

12 IP so that anything that you request from the internet can be

13 directed back to you.  So that IP address is like your address

14 for the internet, showing the internet where to send stuff to

15 get to you.

16 Q.   So the average user on the -- on the internet, do we

17 know -- are we told what our IP address is?

18 A.   No.

19 Q.   This all happens on the level of the internet service

20 provider.

21 A.   Yes.  I mean, within -- I mean, as soon as you log on,

22 it's there.

23 Q.   Okay.  And can you give us some examples of internet

24 service providers that people might have?

25 A.   Like Comcast, Frontier.

**E. Ryan - Direct Examination (Mr. Perri)**

1  Q.   Okay.  How does the user of the peer-to-peer network

2  actually find and receive the files that they want?

3  A.   Like I was saying, you have to do -- you'd have to query a

4  search term.  And you'd want to query -- you'd want to come up

5  with a term that would actually find a file that you would

6  want.  So you're not -- you know, you don't want to make it

7  super general to where you're getting all kind of stuff you

8  have to go through.  So you kind of want to be specific in your

9  search term.

10 Q.   So let's say you put in a search term in a query.  How

11 does the system -- how does the software know which files to

12 pick that you might be interested in?

13 A.   It's going to run it against the file names.

14 Q.   So the names, the titles of those files.

15 A.   Correct.

16 Q.   And -- but what is the correlation between the search

17 terms and the file titles?

18 A.   It helps you find what you're looking for.

19 Q.   Why?  How?

20 A.   The search -- the file names will normally describe what

21 the file is so people that are interested in that file can find

22 it.

23 Q.   Okay.  Do the file names include search terms?

24 A.   Yes.

25 Q.   So after you make your query with certain search terms,

**E. Ryan - Direct Examination (Mr. Perri)**

1  what does Shareaza do?  What does it generate?

2  A.   It generates a list of files that are available to

3  download that meet your search criteria.

4  Q.   When you say it's available to download, what do you mean

5  by that in relation to the other computers?

6  A.   It gives you a list of files that are out there.  And you

7  would have to select where you -- where you want to download it

8  from.  It actually lists, you know, where the IP is -- or what

9  the IP is and what the file is.  And so you would go through.

10  You could pick whichever ones you want and then download those

11  files.

12  Q.   All right.  And when you're looking at the list, what are

13  you looking at?  Are you looking at the actual content of the

14  file, whatever it shows?  You know, the picture or the video?

15  A.   No.

16  Q.   Or what are you looking at when you look at the list?

17  A.   File names.  File names, probably file size, and the IP

18  where it's at.  So if you do want to download more from that

19  IP, you can.

20  Q.   So you're deciding which ones to pick based on the titles

21  of the files.

22  A.   Correct.

23  Q.   And do these titles -- you do these investigations all the

24  time; correct?  Do the titles reflect the content?

25  A.   Most -- most definitely, most of the time.

### E. Ryan - Direct Examination (Mr. Perri)

1   Q.   All right.  So the computer user, then, does he or she

2   just download one file?  Or do they have options as far as how

3   to proceed?

4   A.   On the peer-to-peer you can -- like I said, you can select

5   as many as you want.  You can just download them all and then

6   sort through them later and delete the ones you don't want, or

7   you can select somebody that appears to have files that you're

8   interested in and just download their whole -- all their files

9   that they have available to share and go through theirs.  So

10  it's up to the user.

11  Q.   So, then, is it correct that the investigation that you

12  conducted in this case was on the peer-to-peer network?

13  A.   Yes.

14  Q.   All right.  Can you tell us what you actually do in the

15  course of an investigation?

16  A.   I utilize a software or an investigative tool that's on

17  the GridCop site.

18  Q.   It's called GridCop?

19  A.   It's on the GridCop website.  GridCop was created by the

20  Child Rescue Coalition.  And there's a suite of software on

21  there that basically just helps investigators do what I was

22  describing earlier.  You know, me doing search terms and then

23  getting the results back and then figuring out where all these

24  people are, that software does it for us.  And it actually

25  tells us --

**E. Ryan - Direct Examination (Mr. Perri)**

1      And the hardest part is sorting out where everybody is at.

2  So it sorts out where everybody is at.  So the ones that are on

3  there that are in our -- my territory would -- I could go in

4  there and search and see who's out there utilizing peer-to-peer

5  with available files that are reflective of child pornography.

6  Q.    Okay.  So tell us about how you approach a GridCop

7  investigation and how you use this tool, this special tool.

8  A.    When I first go in there, like I said, I could see all of

9  West Virginia.  But I'm only interested in our territory,

10  which -- Clarksburg, which is 18 counties.  So I generally

11  search the bigger counties first, with the most population.

12  And then I'd make note of any IPs that had a substantial --

13  substantial amount of files that were available.

14  Q.    So if it shows that the files are available, what do you

15  know about where those files are?

16  A.    You know, so it will show you their IP and it will show

17  you their internet service provider -- you know, say it's

18  Comcast -- and it will tell you where it believes that that IP

19  is.  So it will say it's in Mon County.  And you can search by

20  city, too, so you can -- the ones that --

21  Q.    Do the electronic files, the videos or the images, do they

22  have to be actually on the computer in order to be offered for

23  sharing?

24  A.    No.  The -- our software doesn't -- doesn't see any images

25  or anything like that.  It doesn't download any images.

### E. Ryan - Direct Examination (Mr. Perri)

1  Q.    Okay.

2  A.    It's just reviewing the file names.

3  Q.    So you're not looking at the content at that point.

4  A.    No.

5  Q.    You're just looking at names.

6  A.    Correct.

7  Q.    Okay.  All right.  And does it do these -- does it run

8  searches only when you tell it to or something else?

9  A.    No.  It's running all the time.  And, you know, law

10  enforcement just checks it.  When you have a chance, you get in

11  there and check your territory and see what's out there.

12  Q.    All right.  So once you get --

13       All right.  Take us through how you approached the

14  investigation in this case.

15  A.    So we'd see a particular IP on there with files for

16  sharing.  We typically go back and check it multiple times to

17  see, is the IP changing?  Is any of the information about the

18  IP changing or the --

19       You know, if the IP changes, it could -- it could signify

20  that the person had moved.  Or, you know, we also want to

21  identify if they're using it at work, at home, you know, at a

22  family member's house or a friend's house.  So you want to

23  watch that IP for a period of time.

24       And you also want to collect as many file names and hash

25  values that you can.

### E. Ryan - Direct Examination (Mr. Perri)

1  Q.    Okay.  Let me stop you there.

2      Once you get a list of files that's being made available

3  for sharing by a particular computer at a particular IP

4  address, what do you -- what does the system do at that point?

5  A.    I click on that.  I click on that IP.  And then if I'm

6  going to open an investigation, I will mark that in the system

7  so other law enforcement officers will know that it's

8  deconflicted; that the FBI is working that IP.

9  Q.    You said something about hash values.

10  A.    Correct.

11  Q.    Can you explain what that is?

12  A.    It's a string of characters that's assigned to digital

13  files.  And it's like a -- it's like a digital fingerprint.

14  And the peer-to-peer client that we're talking about uses

15  SHA-1, which is Secure Hash Algorithms.  And it was developed

16  by the NSA.  And there's never been seen two files with the

17  same SHA-1 hash value.

18      It's a little confusing.  It's a big -- it's a 32-bit

19  string of numbers and letters.  It's assigned to a file, like a

20  video file.  And if you see that -- if you could find that

21  string of files -- that hash value somewhere else, it's

22  identical.  They'd be identical.  There's never been -- it's

23  more reliable than DNA.

24  Q.    Okay.  So every image has one?

25  A.    Yes.

**E. Ryan - Direct Examination (Mr. Perri)**

1  Q.   Every video has one?

2  A.   Every video, yes.

3  Q.   And it's like a digital fingerprint.

4  A.   Correct.

5  Q.   Okay.  What does the system -- and what do you call the

6  system again?

7  A.   Which system, sir?

8  Q.   The --

9  A.   Child Protection System?

10  Q.   Yes.

11  A.   Yes.

12  Q.   Is that the name of the law enforcement software?

13  A.   That is the name of the software that is stored on the

14  GridCop site.

15  Q.   Okay.  What does CPS do with the hash values?

16  A.   They run the hash values through their library.  So they

17  have a -- they have videos and images that were observed by

18  other law enforcement in other investigations.  They record

19  their hash values so they know exactly what that video is or

20  that image is.  And so the -- these new IPs that pop up, that

21  will run all the hash values that they're downloading against

22  their library, the ones that have already been seen.  And then

23  ones that are known by the library will be marked in the

24  network activity.  They'll be given a -- like, a -- either,

25  like, a known child pornography or age difficult or child

**E. Ryan - Direct Examination (Mr. Perri)**

1  expletive or -- they'll be given something to where -- so if

2  it's a known child pornography, you know that that hash value

3  has matched the library.  So you know that that is a known

4  child pornography file that -- this is what they're telling

5  you.

6  Q.   And how is it known?

7  A.   Through other investigations and through that hash value

8  being documented in that library.

9  Q.   Okay.  All right.  And then does it generate a list for

10  you?

11  A.   It does.

12  Q.   All right.  And what other kinds of helpful information

13  does the CPS software provide?

14  A.   It provides the date and time that it was observed, the IP

15  address.  It also provides the GUID, which is really important.

16  Q.   Okay.  That's another term that --

17  A.   Correct.

18  Q.   -- we haven't heard of.  How do you spell that?

19  A.   G-U-I-D.

20  Q.   Is it another acronym?

21  A.   It's another acronym, so it's all caps.  And it's just a

22  global unique -- globally unique identifier.

23  Q.   And what does it signify?

24  A.   It signifies -- in our case it would be the --

25       The software that's downloaded to get on the peer-to-peer

**E. Ryan - Direct Examination (Mr. Perri)**

1   network down- -- it puts a GUID on our account user, on his

2   account.  So this GUID is a -- it's a super-long string of

3   numbers that's assigned to our user of Shareaza.  So -- and

4   this is important.  Because when Shareaza goes out and gets

5   that file that you wanted, it needs to know first what IP to

6   send it to; and second, the GUID is going to tell it which

7   device you're using.  So if you have several devices in your

8   house and you want it to go to your laptop, Shareaza is already

9   going to know that through the GUID.  It's going to know that

10  that software was downloaded onto that laptop.  So we're

11  directing through the IP to that GUID is where that file is

12  going.

13  Q.   So the GUID, then, is specific to a particular device.

14  A.   Correct.

15  Q.   And not just an internet account, but actual device.

16  A.   Device.

17  Q.   Okay.  Did you say that CPS categorizes the files that it

18  finds for you?

19  A.   It does.

20  Q.   What are the categories?

21  A.   Child notable --

22  Q.   What is --

23  A.   -- which means child pornography.  Child erotica or child

24  exploitive, which is just child erotica, which means, like,

25  it's probably a naked child that's not -- the video is not

**E. Ryan - Direct Examination (Mr. Perri)**

1  zoomed in on their genitals or not doing anything sexual.

2  They're just -- they're naked or they're doing a sexual pose

3  but with clothes on.

4  Q.    Okay.  So you get lists; right?

5  A.    Yes.

6  Q.    And in this instance, what geographic territory were you

7  checking?

8  A.    Monongalia County.

9  Q.    In order to use this GridCop CPS software, do you need any

10  training for that?

11  A.    It's a three-day training course.

12  Q.    All right.  And if you successfully complete it, then

13  what?

14  A.    Then you get access to the CPS system and GridCop and --

15  Q.    Okay.

16  A.    -- the tools that are available there.

17  Q.    So in -- with respect to this investigation now in

18  particular, did you, in fact, identify any IP addresses

19  offering to share files of suspected child pornography in

20  Morgantown?

21  A.    I did.

22  Q.    Okay.  Are you able to tell us those two IP addresses off

23  the top of your head?

24  A.    I could tell you.  Not off the top of my head.

25  Q.    All right.  Would it help you to see your report?

### E. Ryan - Direct Examination (Mr. Perri)

1  A.   Yes, please.

2            MR. PERRI:  May I approach, Your Honor?

3            THE COURT:  You may.

4            THE WITNESS:  Thank you.

5       So the two IPs that I located in Morgantown were -- these

6  are IP addresses: 67.163.169.13.  The second IP was

7  73.154.105.164.

8  BY MR. PERRI:

9  Q.   Okay.  And those are the two IP addresses that your

10 investigation centered on?

11 A.   Correct.  Those were two IP addresses that were linked

12 together through the GUID.

13 Q.   Okay.  And obviously, you prepared that report when this

14 information was fresh in your mind.

15 A.   Correct.

16 Q.   Okay.

17           MR. PERRI:  Your Honor, we would request permission

18 to publish those two numbers so that the jury can see what

19 these numbers look like, as a demonstrative exhibit.

20           THE COURT:  The IP addresses themselves?

21           MR. PERRI:  Yes.

22           THE COURT:  Any objection to that, Counsel?

23           MR. EDWARDS:  No objection, Your Honor.

24           THE COURT:  Without objection, you may do so.

25

**E. Ryan - Direct Examination (Mr. Perri)**

1  BY MR. PERRI:

2  Q.   Is that what the -- what the first IP address looked like?

3  A.   Yes.

4  Q.   Okay.  And you said it was a series of numbers separated

5  by periods.

6  A.   Periods.  Correct.

7  Q.   And I want to show you the other one.

8       Was this the other IP address?

9  A.   Yes, it is.

10 Q.   Okay.  All right.  And through your investigation, did you

11 have the opportunity to observe whether each of those IP

12 addresses was making child pornography files available for

13 sharing?

14 A.   Yes.

15 Q.   And did you check the system on multiple dates with

16 respect to those two IP addresses?

17 A.   I did.

18 Q.   And if the file is available for sharing, what can you say

19 about whether it's actually on the computer?

20 A.   It would be on the computer, because the software is

21 seeing that it's there and it could be downloaded.

22 Q.   Okay.  That computer is essentially saying, "I have the

23 drugs.  I have the drugs."

24 A.   "I have the drugs."  Yes.  Exactly.

25 Q.   Okay.  And you can't share what you don't have.

**E. Ryan - Direct Examination (Mr. Perri)**

1  A.   Correct.

2  Q.   All right.  I want to direct your attention to some

3  particular dates.

4       Did you, in fact, check the CPS system on December 14th

5  of 2018?

6  A.   I did.

7  Q.   All right.  And this would be with respect to what I'm

8  going to call the 67 IP address.

9       Do you recall how many files you observed?

10  A.   One file.

11  Q.   One file?  And how was it categorized?

12  A.   As child notable.

13  Q.   And that means what?

14  A.   Child pornography known.

15  Q.   Okay.  I want to ask you about another date, March 28th of

16  2019, with respect to this same IP address.  Are you able to

17  recall how many files this computer was making available for

18  sharing on that day?

19  A.   I have my network activity log.  I can tell you.

20  Q.   Okay.

21  A.   If that would be all right.

22       What was the date, sir?

23  Q.   March 28th of 2019.

24  A.   Sixty files.

25  Q.   And how many of those were child notable?

**E. Ryan - Direct Examination (Mr. Perri)**

1  A.    I believe it was 19.

2  Q.    Okay.  And as to the ones that the CPS system did not

3  recognize as known child pornography, did you, nevertheless,

4  notice anything about their titles?

5  A.    Yeah.  So out of the 60, the system only had 19 in the

6  libraries and categorized them.  But the other file names were

7  very similar to the ones that were recognized by the software

8  and the library based on their hash values.

9  Q.    Could you just pick two at random, two file names, to read

10 them?

11 A.    So this one was not categorized.  But the file name is

12 "pedomom lil b" -- which means little boy -- "2 yo" -- which

13 means two-year-old -- "cute boy penis fondled by woman to full

14 erection.mp4."

15 Q.    And MP4 means what?

16 A.    A video file.

17 Q.    Okay.  And just pick another one.

18 A.    This one starts out "pthc" -- which means preteen

19 hardcore -- "toddler boy enjoy mom share more mom and kids boy

20 woman" -- again "pthc pedomom_mpeg2 video.mpg."

21 Q.    And that's the full title of the file.

22 A.    Correct.

23 Q.    All right.  Let me ask you about another date.

24       Wait.  First I want to ask you a question.  The fact that

25 a file isn't recognized by the CPS system -- in other words, it

**E. Ryan - Direct Examination (Mr. Perri)**

1  doesn't match anything in the library -- does it necessarily

2  follow from that that it's not child pornography?

3  A.    No.

4  Q.    Okay.

5  A.    It just hasn't been observed by law enforcement that is in

6  touch with the CPS.

7  Q.    It's just not in the library.

8  A.    It's not in the library.

9  Q.    Okay.  Let me ask you about another date, April 4th of

10  2019.  How many files was this computer making available for

11  sharing on that day?

12  A.    Forty-three files.

13  Q.    And how many of those were child notable?

14  A.    About half of them.

15  Q.    Okay.  So 20 -- at least 20 files.

16  A.    Yeah.  Yes, sir.

17  Q.    And could you pick two of those to read, please.

18  A.    Two of the ones that aren't --

19  Q.    Two uncategorized files.  I'm sorry.

20  A.    That's all right.

21  Q.    Any two.

22  A.    There's "pedomom latino boy

23  video_2017-04-02_09-42-47.mov."  And that's not noted as child

24  notable.

25        There's a lot that are in Spanish.

**E. Ryan - Direct Examination (Mr. Perri)**

1  Q.   So a lot of the files are in Spanish?

2  A.   Yes.

3  Q.   Okay.  All right.  We can move to the next one.

4       And when it's -- when it ends in .mov, what kind of file

5  is that?

6  A.   It's a video file.

7       There's another one here, "pthc" -- preteen hardcore is

8  what that stands for -- "webcam-mom, baby boy and lil boy

9  straight shot of pedomom.mp4."  And that's not noted as child

10 notable.

11 Q.   So we're seeing search terms in the titles; correct?

12 A.   Correct.

13 Q.   Let me ask you about another date, October 11th of 2019.

14 How many files was this computer, at this IP address, making

15 available for sharing on that day?

16 A.   Thirty-seven files.

17 Q.   How many of those were child notable?

18 A.   Only six.  Or wait a minute.  I'm sorry.  Seven.

19 Q.   Okay.  And as to the uncategorized files, did they have

20 similar titles?

21 A.   They do.

22 Q.   Could you read one or two, please.

23 A.   This is not categorized.  "New webcam mom plays with

24 herself and fondles a toddler young boy son new pthc pedomom

25 pedowoman pedomother 2015.mpg."

**E. Ryan - Direct Examination (Mr. Perri)**

1  Q.    And could you speak up just a little bit?

2  A.    Oh, my fault.

3          THE COURT:  All right.  And Special Agent, if you're

4  reading, if you could just try to remember to slow down a

5  smidge.  Thank you, sir.

6          THE WITNESS:  Yes, sir.

7      Okay.  I'll read that again.  "New webcam mom plays with

8  herself and fondles a toddler young boy son new pthc" --

9  preteen hardcore -- "pedomom pedowoman pedomother 2015.mpg."

10  BY MR. PERRI:

11  Q.    Okay.  And let me ask you about another date.

12  November 22nd, 2019.

13  A.    There were 43 files available.

14  Q.    So the computer was offering to share 43 files that were

15  suspected of being child pornography.

16  A.    Correct.  And it appears that seven were known by the

17  system as child notable, child pornography.

18  Q.    And as to the uncategorized files, could you read one or

19  two titles, please.

20  A.    This is uncategorized.  It starts with "pthc-pedomom-9

21  yo" -- nine-year-old -- "boy with 17 yr" -- 17 year --

22  "babysitter webcam.avi," which is another video file.

23      Here's another one that's not marked.  It starts out "pthc

24  pedomom-dad films mom and daughter (VIP) pedomom mom

25  nine-year-old daughter dad.mp4."

**E. Ryan - Direct Examination (Mr. Perri)**

1  Q.    Let me ask you about another date, June 23rd of 2020.

2       And these are all dates where you happened to check the

3  system; correct?

4  A.    They're dates -- I may not have checked it on that day.

5  But when I did check it, the log that was captured showed me

6  those dates.

7  Q.    So CPS saw the files being offered on that day.

8  A.    Correct.  Like I said, it's running all the time.

9  Q.    Okay.

10  A.    When I go in, it doesn't check when I'm going in.  I just

11  check and see what it provided.

12  Q.    Okay.  So as to June 23rd, 2020, what did the system see?

13  A.    There were 25 files.

14  Q.    And this is the same IP address; right?

15  A.    Same exact IP address that's on the board here.

16  Q.    Okay.

17  A.    And again, there were some that were marked child notable,

18  two that were marked age difficult, and then there were the

19  rest that were not categorized.

20  Q.    Could you read one or two, please.

21  A.    "YNG boy" -- young boy -- "pedomom pedo 2019 5 yo" --

22  means five-year-old -- "pthc pthc" again "_virgin.mkv."

23  Q.    Okay.

24  A.    And then there's another one, "pedomom baby boy

25  underage.mov."

**E. Ryan - Direct Examination (Mr. Perri)**

1  Q.   How about July 16th, 2020?

2  A.   Fifty-one files observed on that date.

3  Q.   Fifty-one files observed by CPS suspected of being child

4  pornography based on the titles.

5  A.   Based on the titles.  And then some were marked as seen

6  before.

7  Q.   Okay.  How many child notables?

8  A.   Twelve.

9  Q.   And so then there were some uncategorized files as well?

10 A.   Yeah.  There was one -- there was one -- or two age

11 difficult, it looks like, and then the rest were uncategorized.

12 And they had similar titles.

13 Q.   Could you read one, please.

14 A.   So there's "family" -- this is a short title, "family

15 pedomom.mp4."  Then there's one "pedomom-666.mp4."

16       And "pedo" means -- is signifying "pedophile."

17 Q.   Okay.  How about September 16th, 2020?

18 A.   Twenty-eight files observed.

19 Q.   Same IP address; right?

20 A.   Same IP address that's on the screen.

21 Q.   How many child notable?

22       MR. EDWARDS:  Your Honor, I'm going to make an

23 objection.  Can we approach?

24       THE WITNESS:  Eight.

25       THE COURT:  One second, Special Agent.

**E. Ryan - Direct Examination (Mr. Perri)**

1      Go ahead, Mr. Edwards.

2          MR. EDWARDS:  May I approach?

3          THE COURT:  You may.

4          MR. EDWARDS:  Thank you.

5      (The following proceedings were had at the bench, outside

6      the hearing of the jury, with counsel.)

7          THE COURT:  Go ahead, Mr. Edwards.

8          MR. EDWARDS:  Your Honor, the Government is setting

9  forth dates that basically aren't in the indictment and aren't

10 in -- wasn't in part of their request to bring in prior dates

11 as well.  I don't understand what the purpose of this is.  I

12 don't think it's proper to be brought before the jury.

13         THE COURT:  What are these dates?

14         MS. CONKLIN:  Sorry.  I didn't hear.

15         THE COURT:  The objection is the dates are neither in

16 the indictment nor covered by the 414 and 404(b) notice.

17         MS. CONKLIN:  Your Honor, this is part of the prior

18 investigation, and it's the investigation showing us about how

19 law enforcement got to the charged offenses.  We're seeking

20 to --

21         THE COURT:  Well, what's that relevant to?

22         MR. PERRI:  But it --

23      I'm sorry.

24         MS. CONKLIN:  Go ahead.

25         MR. PERRI:  It tells the story of how this defendant

E. Ryan - Direct Examination (Mr. Perri)

 1  came to the attention of law enforcement and how they zeroed in

 2  on him as a target.  So it's not really extrinsic evidence at

 3  all.  It's intrinsic evidence because it completes the story of

 4  the offense, explaining to the jury how law enforcement arrived

 5  at this guy as opposed to the other 200,000 people in the

 6  geographic area.

 7         THE COURT:  But the IP address is the same.

 8         MR. EDWARDS:  Right.  Right.

 9         THE COURT:  Objection sustained.  We need to

10  foreclose the telling of the story.

11         MR. PERRI:  Okay.

12         THE COURT:  I don't believe that it's intrinsic, and

13  it's not covered by the notice; therefore, I don't believe it's

14  admissible extrinsically either.  We've ruled on what is

15  admissible pursuant to the Government's notice.  We need to get

16  back to that and the charges in the indictment.

17     (Bench conference concludes.)

18         THE COURT:  Next question, Mr. Perri.

19  BY MR. PERRI:

20  Q.  Okay.  So would it be fair to say that the CPS system was

21  able to check and see what was being made available for -- from

22  this computer at this IP address on multiple occasions?

23  A.  Yes, multiple occasions.

24  Q.  From December of 2018 through September of 2020.

25  A.  That's correct.

### E. Ryan - Direct Examination (Mr. Perri)

1  Q.    Okay.

2        (Pause in proceedings.)

3              MR. PERRI:  Okay.  May I approach, Your Honor?

4              THE COURT:  You may.

5              MR. PERRI:  I would like to show you what's been

6  marked for identification purposes as United States Exhibit 9A.

7              THE COURT:  Is that 9A, Mr. Perri?

8              MR. PERRI:  Yes.  Correct, Your Honor.

9              THE COURT:  Okay.  Thank you.

10 BY MR. PERRI:

11 Q.    Could you tell us if you recognize that, sir.

12 A.    I do.

13 Q.    And what is it?

14 A.    This is a network activity log for the date April 4th of

15 2019 for the IP address that's on the screen: 67.163.169.13.

16 Q.    Okay.  And is that one of the dates charged for receipt in

17 this particular case?

18 A.    Yes.

19 Q.    All right.  And is that a fair, accurate, and correct

20 printout of what the CPS system displayed?

21 A.    It is.

22              MR. PERRI:  We'd move for the admission of 9A, Your

23 Honor.

24              THE COURT:  Any objection to 9A?

25              MR. EDWARDS:  No objection, Your Honor.

**E. Ryan - Direct Examination (Mr. Perri)**

1          THE COURT:  Without objection, 9A is hereby admitted.

2      (Government's Exhibit 9A received in evidence.)

3  BY MR. PERRI:

4  Q.   Similarly, I'd like to show you United States Exhibit 9B.

5  A.   This is the Child Protection System network activity log

6  for the same IP address, 67.163.169.13, on September 18th of

7  2020.

8  Q.   Okay.  And that's another date that's relevant to the

9  indictment for the charged offenses.

10 A.   Yes.

11 Q.   And is that also a fair, accurate, and correct copy of the

12 listing that you got from the CPS system on that date?

13 A.   Yes, sir.

14          MR. PERRI:  We'd move for the admission of 9B, Your

15 Honor.

16          THE COURT:  Any objection to 9B?

17          MR. EDWARDS:  No objection, Your Honor.

18          THE COURT:  Without objection, so admitted.

19      (Government's Exhibit 9B received in evidence.)

20 BY MR. PERRI:

21 Q.   Similarly, Agent Ryan, I want to show you United States

22 Exhibit 9C.  What is that one?

23 A.   This is the Child Protective System network activity log

24 for IP address 67.163.169.13 for the date of September 21st

25 of 2020.

**E. Ryan - Direct Examination (Mr. Perri)**

1  Q.   And is that also a date relevant to the indictment for the

2  charged offense of receipt?

3  A.   Yes, it is.

4        MR. PERRI:  We move for the admission of that exhibit

5  as well, Your Honor.

6        THE COURT:  And which number was that again?  I'm

7  sorry.

8        MR. PERRI:  9C.

9        THE COURT:  9C.

10     Any objection to 9C?

11       MR. EDWARDS:  No objection, Your Honor.

12       THE COURT:  Without objection, 9C is hereby admitted.

13     (Government's Exhibit 9C received in evidence.)

14  BY MR. PERRI:

15  Q.   And generally speaking, what do these three exhibits show?

16  A.   It shows the network activity that I would have seen when

17  I logged into the Child Protection System for those particular

18  dates.

19       MR. PERRI:  May we publish those, Your Honor?

20       THE COURT:  You may.

21  BY MR. PERRI:

22  Q.   Okay.  Can you tell us what we're looking at?

23  A.   That is a network activity log.  It's one page.

24  Q.   And it has columns; right?

25  A.   Correct.

**E. Ryan - Direct Examination (Mr. Perri)**

1  Q.   Can you tell us what the columns are?

2  A.   So your first column is going to be your IP.  The next one

3  is your port, which is going through the internet.  Your time

4  stamp is the date it was seen.  The next one is your hash

5  value.  That's the value that I was describing earlier that's

6  the 32-bit hash value.  And the type is the SHA-1, like I said,

7  that was developed by NSA.  And there's your GUID.  It's an

8  extremely long list of characters.  And that -- and you see

9  it's the same GUID.  That means it's the same device that's

10  downloading -- or that has these files available.  The next

11  would be the file name.  And those are some like that I read to

12  you guys.  And you can see they're very descriptive.

13  Q.   Okay.  And that's the same for all three of these

14  exhibits; right?

15  A.   Correct.

16  Q.   That's what it's showing you.  It's -- it's gen- -- it's

17  the listing that the CPS system generates.

18  A.   Yes.

19  Q.   All right.

20  A.   This is the activity that it has logged by doing the

21  searches for us.

22  Q.   So if it's listed on there, what does that tell you about

23  this IP address?

24  A.   That it was seen by our investigative software on these

25  dates having those files available.

**E. Ryan - Direct Examination (Mr. Perri)**

1   Q.   So the computer at that IP address was making those files

2   available for sharing.

3   A.   Correct.  Our investigative software was reaching out and

4   asking who has files with these -- you know, "pthc" with

5   different search terms: "pedo."  And then it was coming back

6   that, you know, he did on these dates.

7   Q.   Okay.  Did CPS indicate whether the other IP address was

8   also making files available for sharing?

9   A.   It did.

10  Q.   And what time period was that?

11  A.   It was April through June of 2018.

12  Q.   How many files were made available for sharing?

13  A.   I think there was -- I think there were 60.  Twenty-five

14  of those were tagged as child notable.

15  Q.   And as to the uncategorized files, the ones that didn't

16  make the grade as known CP --

17  A.   Yes.

18  Q.   -- did they have similar titles?

19  A.   Similar titles.

20  Q.   So from July of 2018 onward, was there any more

21  peer-to-peer activity associated with that IP address?

22  A.   There was not.  And that IP address, it should be noted

23  that it was utilizing the same GUID, so the same device.  So it

24  would have been the same computer or whatever was being used to

25  access -- to utilize Shareaza to download files or to have

**E. Ryan - Direct Examination (Mr. Perri)**

1    files available for sharing and to download.

2    Q.   Same GUID.

3    A.   Same GUID, that long string of numbers.

4    Q.   Two different IP addresses.

5    A.   Correct.

6    Q.   But one of those IP addresses was not used on peer-to-peer

7    after July of 2018; correct?

8    A.   That's correct.

9    Q.   All right.  Agent Ryan, you told us a lot about all the

10   different things that the CPS system can tell you, all the

11   information it can provide.  Does it tell you for sure

12   whether -- the actual content of the file?  That meaning what

13   the image is or what the video shows.

14   A.   It does not show the content.  We get the name and the

15   hash value.  Our system does not download any of the videos or

16   images.  That's a separate step.

17   Q.   Well, then what do you have to do?  I mean, do you have to

18   do something else, then, to verify that this file actually

19   contains child pornography?

20   A.   Yes.  You could -- you could -- there's several ways you

21   could do it.  The way that we choose to do that is by utilizing

22   the hash values that are listed in these network activity

23   reports.  Like I said, we try to -- you know, over a period of

24   time we collect all the different ones that we're seeing.  And

25   then I would provide that to our Internet Crimes Against

### E. Ryan - Direct Examination (Mr. Perri)

1  Children partners who have a library in the state of West

2  Virginia.

3  Q.    So this is the State Police library?

4  A.    State Police.  And it's run by the ICAC.  It's a special

5  unit.

6  Q.    What does ICAC stand for?

7  A.    Internet Crimes Against Children.

8  Q.    Okay.  So is this how you verified the content of the

9  files in this case?

10 A.    Yes.  So there's a library that is -- that exists, that

11 all the law enforcement in West Virginia feed into, with images

12 and videos that we see and that we have deemed them as child

13 pornography.

14 Q.    Okay.  What did you send to the ICAC?

15 A.    I sent them 261 hash values, the ones that were -- that we

16 collected during our investigation on the peer-to-peer.

17 Q.    And what did they do with those hash values?

18 A.    They ran them against a library.  And it's the same way

19 that the CPS system would run their hash values and get their

20 hits.  So --

21 Q.    It makes a comparison.

22 A.    Makes a comparison.

23 Q.    And if you have an exact match, what do you call that?

24 A.    It's like DNA evidence.  It's a direct -- it's the same

25 exact file.  There's never been two that were --

### E. Ryan - Direct Examination (Mr. Perri)

1  Q.    Just two copies of the same file.

2  A.    -- had the same name.

3        Two copies of the same file.

4  Q.    Okay.  And then what do you get in return?

5  A.    We get those files that -- so there were 16 files that

6  hit.  So the State Police -- the sergeant there who runs the

7  library sent me those files to view on a CD.

8        So I think the importance here is that we send all those

9  hash values.  Hash values can't be seen twice in two different

10 files.  And we had 16 hits.  So, I mean, these -- these files

11 are the files that we were seeing, the names, on this

12 peer-to-peer system.

13 Q.    Okay.  And this is a way for you to actually view the

14 content of the files and satisfy yourself that it meets the

15 definition of child pornography.

16 A.    Correct.

17 Q.    Okay.  Is there any in particular that you recall seeing

18 that would satisfy the definition?

19 A.    Yes.  There was -- there was a video on there, and it's

20 one of the most downloaded and traded series out there for

21 people that are interested in child pornography.  And it's

22 called the Vicky series.  And it was a -- it's a really graphic

23 video.  And it's -- it's named -- I don't recall the exact name

24 of it, but it's -- it's a -- it's an 11-year-old white female

25 performing oral on her father.  And this is a known victim that

### E. Ryan - Direct Examination (Mr. Perri)

1   the case has already been adjudicated.

2   Q.   So with respect to all of the child notable images and all

3   of the hits that you got back from ICAC and all of the

4   uncategorized, did you notice any pattern as far as content?

5   A.   Yes.  They were mostly -- mostly adult female on young

6   boy.  But there were also some older males in there or couples

7   in there with young kids.  And there were some young females as

8   well.  And it was sexual acts, child pornography.

9   Q.   All right.  So you have IP addresses.  You testified about

10  the two IP addresses that you focused on.  What good is that?

11  You've got a set of numbers.  What do you do with it?

12  A.   Well, that's -- like I said, that's the address for who's

13  receiving that stuff from the peer-to-peer.  So...

14  Q.   But how do you find out where that computer is?

15  A.   From the person who assigned that number, which would be

16  the internet service provider.  So you go right to Comcast with

17  a subpoena and ask them, who at that date and time had this IP?

18  Q.   Okay.  And how do you do that?  What do you send to

19  Comcast?

20  A.   I send them a subpoena with the date and time that that

21  Vicky file was observed on the network activity log.

22          MR. PERRI:  May I approach, Your Honor?

23          THE COURT:  You may.

24  BY MR. PERRI:

25  Q.   Agent Ryan, I'd like to show you what's been marked United

**E. Ryan - Direct Examination (Mr. Perri)**

1    States Exhibit Number 4, United States Exhibit Number 5A, and

2    United States Exhibit Number 5B.  Tell me if you recognize

3    those and, if so, what they are.

4    A.   Exhibit 4 is the first subpoena we sent to obtain

5    subscriber information for IP address 73.154.105.164.  And that

6    was sent to Comcast, the internet service provider.

7         Exhibit 5A is another subpoena -- or I'm sorry.  These are

8    subpoena returns.

9    Q.   Okay.

10   A.   So these are the returns that we got from the subpoena

11   that we sent.  The return on Exhibit 4 was dated April 8th.

12   The return on Exhibit 5A, which is the return from Comcast, is

13   dated April 8th.  And that is for IP address 67.163.169.13 on

14   4/1/2019.

15   Q.   That's the 67 IP address that you've been talking about;

16   right?

17   A.   Correct.  Exhibit 5 -- Exhibit 5B is a -- it's a fax cover

18   from Comcast with the return, dated July 21st, 2020,

19   regarding IP address 67.163.169.13.  And it has the port after

20   it, assigned on 6/23/2020.  And it has the results coming back

21   to Christopher Harp at 904 Bloody Run Road, Morgantown, West

22   Virginia 26508.

23   Q.   So is it by means of these subpoenas and this subscriber

24   information that you were able to figure out, as we say, how

25   the IP address resolves to a particular geographic physical

### E. Ryan - Direct Examination (Mr. Perri)

1  location?

2  A.    Yes.

3  Q.    And again, what was that location?

4  A.    904 Bloody Run Road in Morgantown.

5  Q.    And the residence of who?

6  A.    Christopher Harp and his wife, Amy Harp.

7  Q.    And is that in the Northern District of West Virginia?

8  A.    Yes.

9         MR. PERRI:  Thank you, Your Honor.  No further

10  questions.

11         THE COURT:  Cross, Mr. Edwards?

12         MR. EDWARDS:  Thank you, Your Honor.

13         MS. CONKLIN:  Oh.  No.  I don't think you admitted

14  those.

15      (Pause in proceedings.)

16         THE COURT:  One second, Mr. Edwards.

17      That last cluster of exhibits?  5A, 5B.

18         MR. PERRI:  Your Honor, I'm not sure if I actually

19  moved for the admission of those.  If I didn't, I would do so

20  at this time.

21         THE COURT:  And what are those again?  Just for

22  clarity of our record, please.

23         MR. EDWARDS:  The Comcast --

24         MR. PERRI:  I believe it was 4, 5A, and 5B.

25         THE COURT:  Any objection to any of those,

### E. Ryan - Cross-Examination (Mr. Edwards)

1  Mr. Edwards?

2          MR. EDWARDS:  Those are the Comcast?  Yeah, no

3  objection.

4          THE COURT:  All right.  Without objection, then

5  Government's 4, 5A, and 5B are hereby admitted.

6      (Government's Exhibits 4, 5A, and 5B received in

7      evidence.)

8                       CROSS-EXAMINATION

9  BY MR. EDWARDS:

10 Q.  All right.  Agent Ryan, my name is Bryan Edwards.  I have

11 some questions for you here today.

12 A.  Yes, sir.

13 Q.  You indicated that you basically started this

14 investigation as a result of the software you have showing hits

15 or pornography in an area in this -- in the Northern District

16 of West Virginia; is that correct?

17 A.  It's software that I don't have.  It's --

18 Q.  I'm sorry.

19 A.  I have access to.

20 Q.  That you utilize.

21 A.  Yes, sir.

22 Q.  Okay.  And that was back in 2019 or 2018 when you first

23 did this?

24 A.  2019.

25 Q.  2019.  Okay.  So -- and when did you stop?  When did

## E. Ryan - Cross-Examination (Mr. Edwards)

1  you -- when was your involvement in this investigation over

2  with?

3  A.   I mean, I'm still on the squad, so I'm still -- my direct

4  involvement stopped after the search warrant.

5  Q.   So on September 25th, 2020.

6  A.   Correct.

7  Q.   Okay.  And you were involved with the search warrant

8  itself; is that correct?

9  A.   Yes, sir.

10 Q.   Okay.  We -- or you've shown the jury Exhibits 9A, B, and

11 C, which have dates of downloaded pornography on this computer.

12 And just for a point of clarification, it also has times on

13 there.  And those are UTC times; is that correct?

14 A.   Correct.

15 Q.   Okay.  So if it says -- and I'm looking at 9C.  I don't --

16 do you have these exhibits in front of you?

17 A.   I don't.

18 Q.   Oh, okay.

19 A.   I do have the network activity log here.

20 Q.   Okay.  Well, if -- I'm looking on the date of, just for

21 simplistic purposes, 9/21/2020.

22 A.   Okay.

23 Q.   And the first one on that list has a time stamp of

24 9/21/2020, and then it has 1648 hours; is that correct?

25 A.   That's what it has.  I believe it's in GMT, sir.

**E. Ryan - Cross-Examination (Mr. Edwards)**

1  Q.   Okay.  All right.  So that's -- nevertheless, that's

2  four hours ahead of Eastern Standard Time; is that correct?

3  A.   Correct.

4  Q.   Okay.  So at least on this one here it would be -- if it

5  says 1648, that would actually be 12:48 PM Eastern Standard

6  Time.

7  A.   That makes sense.

8  Q.   Okay.  And if you go down to the bottom of that same

9  document, on 12/21/2020 it looks like that download occurred at

10 1554.  So that would actually be 11:54 AM; correct?

11 A.   This -- so you're at 9/21 of 2020, the bottom one?

12 Q.   Yes.

13 A.   Yes, 1554.

14 Q.   So 1554 actually converts into 11:54 AM.  Is that fair?

15 A.   Yes.

16 Q.   Okay.  And that would be the same time frame.  Basically,

17 you'd subtract four hours off each of these exhibits showing

18 the time when these downloads occurred; correct?

19 A.   Yes.

20 Q.   Okay.  Other than you being the individual or the agent

21 who was using Grid- --

22      I forget the name of it.  Was it GridCop?

23 A.   GridCop.

24 Q.   GridCop?

25 A.   Yes, sir.

**E. Ryan - Cross-Examination (Mr. Edwards)**

1    Q.    -- things of that nature, did you do any other

2    investigation into this matter?  Other than getting the dates

3    and finding the IP addresses where this pornography was being

4    downloaded.

5    A.    Yeah.  I mean, driving by the residence and obtaining

6    information about the people that lived there and --

7    Q.    Okay.

8    A.    -- just basic investigation.

9    Q.    All righty.  So in that matter, you were there for the

10    search of the residence; is that correct?

11    A.    Correct.

12    Q.    Okay.  And then that's when you actually got possession of

13    the subject computer; is that correct?

14    A.    Correct.

15    Q.    Okay.  Is there a reason why you didn't get fingerprinting

16    of that computer?

17    A.    We don't generally get fingerprinting on a computer.

18    Q.    Why not?

19    A.    Because there's no -- I don't see what it would show.

20    Q.    Wouldn't it show who was actually using the computer?

21    A.    We -- I've never seen anybody get fingerprints off a

22    computer in a child pornography case.

23    Q.    I'm sorry.  What was that answer?  You said you never saw

24    a way where you could get --

25    A.    No.  I've never seen anybody do that.

**E. Ryan - Cross-Examination (Mr. Edwards)**

1  Q.    Oh, okay.

2  A.    I'm sure I could have.  But it's --

3  Q.    Okay.

4  A.    It's not something that we do.

5  Q.    Okay.  Well, if you did, it would actually show, if you

6  got fingerprints off the computer, who may have actually been

7  using that computer.  Is that fair?

8  A.    It may -- it may show that, if there were fingerprints

9  there.

10 Q.    Okay.

11 A.    If somebody didn't wipe them down.

12 Q.    Could have.  Maybe not.

13 A.    Right.

14 Q.    Don't know.

15 A.    We don't know.

16 Q.    Okay.  And specifically, you knew, before you went to do

17 the search warrant on the 25th, that the last time that

18 pornography had been downloaded on this computer was four days

19 prior; correct?

20 A.    Correct.

21 Q.    Okay.  But you didn't feel -- think that you needed to do

22 any type of fingerprint analysis on the computer to determine

23 who may have actually been using it; is that correct?

24 A.    Correct.

25 Q.    Okay.  You also got Chris Harp's phone as a result of that

**E. Ryan - Cross-Examination (Mr. Edwards)**

1  search warrant; is that fair?

2  A.   That's fair.

3  Q.   Okay.  Yet you did no analysis -- or the FBI did no

4  analysis to determine if Chris Harp was even at the residence

5  at that time frame -- or any of the time frames -- when these

6  alleged downloads took place.  Isn't that true?

7  A.   I can't speak to the analysis on the phone.

8  Q.   Okay.  The FBI has that ability to do that, though, don't

9  they?  They can determine someone's -- at least a location of a

10  phone at a certain date and time.

11  A.   It depends on what data is available on the phone.  It's

12  not always there.

13  Q.   Okay.  Are you saying that you're not able to determine

14  where a computer -- where a phone pings off through cell towers

15  to see where its location is at a certain period in time?

16  A.   That would require additional court orders.

17  Q.   Okay.  But you-all didn't bother to get those court

18  orders, to your knowledge.

19  A.   I didn't see a need for them.

20  Q.   Because you had already made up your mind it was

21  Chris Harp who did this; correct?

22  A.   No.  No, not at all.  It was somebody in that residence.

23  Like I said, the IP address points to a house.  So we know the

24  files were going there.  And then we know they were going to a

25  GUID at that residence.  So the search determines who the

**E. Ryan - Cross-Examination (Mr. Edwards)**

1  subject is going to be.

2  Q.   Okay.  So in that regard, prior to these charges being

3  brought or prior to even doing the search warrant, did you do

4  any type of inter- --

5       Well, let me give you the benefit of the doubt.  You

6  wouldn't have done interviews of people before a search

7  warrant.  After the search warrant, to your knowledge, did you

8  interview any of the neighbors or any of the relatives or

9  people that lived around that house to see who had access to

10 it?

11 A.   No.

12 Q.   Other than looking -- well, what did you -- who -- what

13 did you do to determine who actually lived in the home?

14 A.   Ran law enforcement databases and databases that are

15 available on the internet.

16 Q.   Okay.  And which ones did you run?

17 A.   Accurint.  I think we looked at social media.  DMV.  NCIC.

18 Q.   Did you look at the Monongalia County property -- personal

19 property register to see who was listed as an --

20 A.   Yes.

21 Q.   You did?

22 A.   Yes.

23 Q.   Okay.  And what dates did you look at?

24 A.   I don't recall.

25 Q.   Did you look in 2019?

**E. Ryan - Cross-Examination (Mr. Edwards)**

1   A.   I'd have to see my report.  I know we started in April of

2   2019.  So it would have been close to -- it would have been in

3   2019 that we got those.

4   Q.   So you would have seen a receipt for property -- personal

5   property for a gentleman by the name of Jeremy Harp, who had

6   listed that address as his home.

7   A.   If it's in my report, I saw it.  I didn't --

8   Q.   Okay.

9   A.   I don't recall that.

10  Q.   Okay.  I didn't see it in your report.  So it's something

11  you may have just missed?

12  A.   Well, the -- what I would have observed would have been

13  attached to my report as a 1A.

14  Q.   Okay.  Other than looking into the computers, for the

15  three years between the time that -- from the search warrant

16  September 25th, 2020, until this indictment was returned in

17  November of 2023, are you aware of any other investigation,

18  other than looking at the computers, that was done in this

19  case?

20  A.   Say that again with the --

21  Q.   Sure.

22  A.   -- dates again.  I'm sorry.

23  Q.   You received -- you got a group of computers or electronic

24  equipment from the home on September 25th, 2020; fair?

25  A.   Yes.

## E. Ryan - Cross-Examination (Mr. Edwards)

1  Q.    Okay.  Other than actually looking at that material that

2  you -- that was obtained in the search warrant, are you aware

3  of any other investigation that was done in this matter?

4  A.    I mean, the investigation continued as far as looking at

5  everything that we had.

6  Q.    Okay.  And I understand that.

7  A.    Yeah.

8  Q.    You were looking at -- there was analysis done of the

9  computers that were taken and electronic devices that were

10  taken.  Anything beyond that?  Any type of interviews or

11  talking to people to see who had been living there or who had

12  access to the home or anything of that nature that you're aware

13  of?

14  A.    I wasn't involved in that.  But most of the time it's not

15  necessary because, you know, the -- I mean, the investigation

16  continues.  And the biggest -- the most important evidence is

17  what's on those computers -- what's on that computer that had

18  that GUID that received that child pornography.

19  Q.    Right.

20  A.    That's the most important evidence right there.

21  Q.    I'm not -- in fact, we stipulate there was pornography

22  found on that computer.  The question is, who put it there?  So

23  I guess my question was, was it your opinion, prior to even

24  getting the search warrant, that it was Chris Harp who did

25  this?

**E. Ryan - Cross-Examination (Mr. Edwards)**

1   A.   Well, from what we could see, it looked like Chris and

2   Amy Harp lived at the residence.

3   Q.   Okay.

4   A.   I didn't see that anybody else lived there.

5   Q.   And you didn't --

6   A.   And they didn't tell us anybody else lived there when we

7   were there.

8   Q.   And you didn't question anyone about anyone else, about

9   who had access to the home or the computer.

10  A.   We tried to talk to Mr. Harp.  And then I think we talked

11  to Mrs. Amy Harp.

12  Q.   Okay.  And in that regard, Amy Harp did tell you --

13       Well, let's back up for a second.  Chris Harp volunteered

14  the passcodes to the computers; is that correct?

15  A.   Correct.

16  Q.   Okay.  Amy Harp told you that on September 21, 2020, the

17  date the last downloads took place, that neither her or Chris

18  were even home, at least that morning; is that fair?

19  A.   I believe so.  I'd have to see the 302.  I didn't --

20  Q.   Okay.

21  A.   -- read it prior to coming on here today.

22  Q.   Do you recall her saying that they had been out and

23  purchased a car?  In fact, the car was in the garage?

24  A.   I recall that.

25  Q.   Okay.  Did she tell you where they purchased the car?

**E. Ryan - Cross-Examination (Mr. Edwards)**

1   A.    I think so.

2   Q.    So did you or anyone else, to your knowledge, go up to Dan

3   Cava's and see were they actually there or how long they were

4   there?

5   A.    It's -- it wasn't -- like I said, with that software you

6   can download that pornography no matter where you're at.

7   Q.    Okay.

8   A.    So that wasn't -- that didn't really make a big --

9   Q.    What do you mean you can download it no matter where

10  you're at?

11  A.    You could schedule it to download whenever you want, or

12  you could set it to download while you're gone.

13  Q.    Okay.  And in that regard, did you ever see anything in --

14       Well, you didn't perform the actual analysis of the

15  computer; is that correct?

16  A.    I did not.

17  Q.    Okay.  Did you look at the report?

18  A.    I have not.

19  Q.    Oh.  So you don't know whether there's any information in

20  there that indicates one way or the other whether there was any

21  scheduling of the downloads.

22  A.    I don't know that.  I don't know if it would capture that.

23  Q.    So you're just speculating whether that occurred or didn't

24  occur.  You don't know.

25  A.    I'm not.  I'm just saying that it's -- you don't have to

**E. Ryan - Cross-Examination (Mr. Edwards)**

1  be at the house to download child pornography with Shareaza.

2  Q.    Nevertheless, you knew on September 25th, 2020, that at

3  least on one of the dates that it's alleged that Chris Harp was

4  downloading pornography he wasn't even there at the house.

5  A.    On the 25th?

6  Q.    You knew that on the 25th.  On September 21, you were

7  told that he wasn't even in the home; is that correct?

8  A.    That's what we were told.  Correct.

9  Q.    And to your knowledge, nothing more was done to confirm or

10  deny that one way or the other.

11  A.    I think the digital forensics will speak to that.

12  Q.    Okay.  And of course, there was nothing done with regard

13  to determining if Chris Harp's phone was present when any of

14  these downloads took place, to your knowledge; is that correct?

15  A.    To my knowledge.  I mean, phones do have some location

16  data in them, but you don't always get that.  I don't believe

17  any court orders were sent to get cell tower data.

18  Q.    Okay.

19  A.    This wasn't a traveling case.

20  Q.    Well, but it was a case in which you-all were targeting an

21  individual saying that he was the one that was responsible;

22  fair?

23  A.    No.  It's -- it's a -- it's a pretty simple case where --

24  where you have child pornography that's -- that's available,

25  and it's available through an IP and through a GUID.  So it was

**E. Ryan - Cross-Examination (Mr. Edwards)**

1  in that residence and on that computer.

2  Q.    Fair.

3  A.    Yes.

4  Q.    But that doesn't say who actually put it there; correct?

5  A.    That's what the digital forensics does.  Yes, sir.

6  Q.    The digital forensics will tell you who put there.

7  A.    That's what they look -- that's what they look at.  I

8  don't know what's there.

9  Q.    So as you sit here today, you don't know anything that

10 ties Chris Harp specifically to being the individual who

11 downloaded pornography on that computer; is that correct?

12 A.    I do know that there's some things on the forensics.  I

13 don't want to speak to them because I can't.  I didn't -- I

14 didn't look that over.

15 Q.    Okay.  You would agree with me that both Amy and Chris

16 denied on September 25th, when you-all showed up at their

17 house at 7:00 AM, any involvement with child pornography.

18 A.    Yes.

19 Q.    Were you aware that the computer in question showed that

20 Amy Harp utilized that computer?

21 A.    I don't know.

22 Q.    Okay.  So you didn't look at the report at all.

23 A.    No, I did not look at the report.

24 Q.    Okay.  So you're unable to testify as to when these

25 downloads of pornography took place at all.  Is that fair?

## E. Ryan - Cross-Examination (Mr. Edwards)

1   A.   I can testify to what I saw in my part of the

2   investigation.  The investigation was assigned to another agent

3   after I did the initial part.

4   Q.   Okay.

5   A.   We have a lot of these investigations.  So I can speak to

6   the part that -- where I helped, or where I began the

7   investigation.

8   Q.   Were you made aware, as being a member on the team in this

9   investigation, that the Government was told that Chris Harp

10  wasn't present on the dates -- at least the dates contained in

11  the indictment, wasn't present in the home?

12  A.   I was unaware.  But like I said, it wouldn't surprise me.

13  Q.   You made a --

14       Yeah.  We talked a little bit about that.  And that's what

15  you were trying to say in that you don't necessarily have to be

16  in the home, that you can schedule these downloads; correct?

17  A.   You could -- there's several ways you could.  I mean, you

18  could schedule them, or you can set them to download before you

19  leave.  It's --

20  Q.   Okay.

21  A.   You don't have to be present.

22  Q.   Okay.  And as you sit here, you didn't look at the

23  analysis of the computer.  So you don't know whether that

24  occurred or not; is that fair?

25  A.   That's fair.

**E. Ryan - Cross-Examination (Mr. Edwards)**

1  Q.    Okay.

2  A.    It wasn't my job to look at the analysis.

3  Q.    Okay.  In your involvement --

4        You said you've been doing -- you've been an agent since

5  2003.  How long have you been doing the pornography work?

6  A.    The crimes against children?

7  Q.    Yeah.

8  A.    2010.

9  Q.    Since 2010.  So the last 14 years.

10  A.    Correct.

11  Q.    Fair enough.  Okay.

12        You would agree with me that typically individuals that

13  are involved, that like this sort of stuff, I guess, that want

14  to get this sort of material --

15  A.    Yes.

16  Q.    -- they do so on a fairly regular basis, continual basis.

17  A.    Yes, they do.  And their material, like in this case, is

18  very specific.

19  Q.    Okay.  So basically once you start, it's something that

20  they typically do over and over again until they get caught or

21  something else happens.  Fair?

22  A.    Well, some of them do; some of them don't.  And some of

23  them will use different platforms.  You know, it's -- I can't

24  speak to every single -- every single case.

25  Q.    Okay.  You would agree with me that, in this case, the

**E. Ryan - Redirect Examination (Mr. Perri)**

1  only platform or the only thing that you saw active pornography

2  being brought on was this subject computer and nothing else; is

3  that fair?

4  A.   I would agree that what I saw, in my part of the

5  investigation, was the subject computer's GUID and IP having

6  child porn available --

7  Q.   Okay.

8  A.   -- through a peer-to-peer network.

9  Q.   And there were other computers in the home that you-all

10  took possession of; fair?

11  A.   Right.  Yeah.

12  Q.   No other information or pornography on those computers.

13  A.   I can't speak to that.  I didn't go through the reports.

14  Q.   Okay.

15      MR. EDWARDS:  Give me just a second.  Thank you, Your

16  Honor.

17     No further questions.  Thank you, Your Honor.

18      THE COURT:  Redirect, Mr. Perri?

19      MR. PERRI:  Just one, maybe two questions, Your

20  Honor, for clarification.

21                   REDIRECT EXAMINATION

22  BY MR. PERRI:

23  Q.   The logs that you got from the CPS system --

24  A.   Yes.

25  Q.   -- generated lists of files that were available for

**E. Ryan - Redirect Examination (Mr. Perri)**

1    sharing; correct?

2    A.    Correct.

3    Q.    And they have dates associated.  Like the date that it was

4    available.

5    A.    That's correct.

6    Q.    That's not the same as the date --

7    A.    No.

8    Q.    -- necessarily that it was downloaded.

9    A.    That's correct.

10   Q.    Right?

11   A.    It was available for download that day.

12   Q.    So it's being offered to you.  If you want it, you can

13   download it.

14   A.    Correct.

15   Q.    Okay.  And in order to be offered, the file has to be

16   where?

17   A.    On the per- -- on their share folder for that client

18   software.

19   Q.    It has to be -- in other --

20   A.    In their computer.

21   Q.    It has to be on the computer.

22   A.    Yes.

23         MR. PERRI:  Nothing further.  Thank you, Your Honor.

24         THE COURT:  Recross?

25         MR. EDWARDS:  No, Your Honor.

```
 1              THE COURT:  All right.  Is the Special Agent subject
 2    to recall?
 3              MR. PERRI:  Possibly for rebuttal, Your Honor.
 4              THE COURT:  Okay.  Understood.
 5         Sir, you're free to step down.  But you may be recalled,
 6    so you can't talk with anybody about your testimony.  Thank
 7    you, sir.
 8              THE WITNESS:  Thank you, Your Honor.
 9              THE COURT:  Thank you very much.
10         Ladies and gentlemen of the jury, we're going to go ahead
11    and take our afternoon break at this point.  We'll take ten
12    minutes.  Please continue to refrain from discussing the case
13    with anyone.  That includes between or among any of your fellow
14    jurors.  And please continue to refrain from any independent
15    investigation or research efforts about the case.
16         With that, we'll see you all in a few minutes.  Thank you
17    very much.
18         (Jury retired from the courtroom at 2:48 PM.)
19              THE COURT:  All right.  Thank you, everyone.  Please
20    be seated.
21         We'll take a few ourselves.  We'll see you in ten minutes
22    or so.
23              MS. CONKLIN:  Judge.
24              THE COURT:  Yes.
25              MS. CONKLIN:  And I do need to address something
```

```
 1   after the last -- or Mr. Ryan's testimony.  There was a
 2   question by defense counsel as to whether Mr. Harp had advised
 3   law enforcement that he wasn't home and that sort of thing.
 4        The issue that the Government is presented with is that
 5   when law enforcement arrived on the scene, they initially spoke
 6   to Mr. Harp.  Mr. Harp said he had been living at the address
 7   for a certain period of time, and then he invoked his right to
 8   remain silent and have a lawyer.  And now we're getting into
 9   things that would have been said post-invocation by Mr. Harp,
10   might have been possibly --
11             THE COURT:  Is that sequence correct?
12             MS. CONKLIN:  I'm sorry, Your Honor?
13             THE COURT:  Is that sequence correct?
14             MS. CONKLIN:  Yes, Your Honor.  He invoked --
15             THE COURT:  After he invoked his right to remain
16   silent, he then continued to make statements?
17             MS. CONKLIN:  Your Honor, he invoked his right to
18   remain silent.  Officers then spoke to Mrs. Harp.  Mrs. Harp
19   would then tell Mr. Harp to answer certain things that the FBI
20   was discussing with her.  And that's where those answers came
21   out.
22        I don't believe that Mr. Harp had gone through with the
23   FBI and explained to them where he was, that he wasn't there on
24   that date, and that sort of thing as well.
25        My only concern is the Government's ability to respond
```

1   when that question is asked of its witnesses.  You know, our --
2   Mr. Ryan -- or Agent Ryan did an incredibly great job of, you
3   know, not saying that "Mr. Harp invoked his right to remain
4   silent, and I didn't ask him any more questions."  So it's kind
5   of putting us in a very difficult spot.
6           MR. PERRI:  I think, essentially, the defense has
7   opened the door, Your Honor.
8           THE COURT:  To what?
9           MR. PERRI:  They've opened the door by talking about
10  things that Mr. Harp has allegedly said, most of which we
11  disagree with and would want to refute.  But normally we would
12  stay away from that because he invoked his right to remain
13  silent.
14      So we wanted to bring that to your attention so that we
15  could at least address some of the claims that were made on
16  cross-examination -- through cross-examination with our
17  witnesses, without running afoul of that -- the Defendant's
18  right to remain -- respecting the Defendant's right to remain
19  silent.
20          THE COURT:  Okay.  Mr. Edwards?
21          MR. EDWARDS:  Your Honor, according to their own
22  investigative report, they asked and Mr. Harp provided the
23  passwords; then Amy Harp was the one who talked about Dan Cava
24  Toyota.  I don't believe I asked any questions saying that
25  Mr. Harp said they had been purchasing a car.  That was all

1  under Amy.

2          THE COURT:  No.  You did.  You did.

3          MR. EDWARDS:  Oh, I did?  Well --

4          THE COURT:  Uh-huh.

5          MR. EDWARDS:  -- then my bad.  I didn't mean to.  But

6  it's my introspection that I thought it was relating only to

7  what Amy Harp had said in that regard.

8      Because my understanding was that Mr. Harp was questioned;

9  he provided some information, said, you know, "We weren't

10  involved in this," gave them the passcodes, and then invoked

11  his right to not be questioned any longer.

12      Amy Harp was questioned and provided her information.

13  Judge, if I misspoke, I guess I did.  I didn't think I did.  I

14  thought I kept that to Amy.

15          THE COURT:  Well, I'm still unsure as to how that

16  opens the door to anything that's permissible at this point

17  from the Government's perspective.

18          MS. CONKLIN:  Judge, it's just putting us in the

19  wrong -- the spot where defense counsel is suggesting that

20  Chris Harp has told law enforcement that he wasn't home and

21  that he didn't do it; and therefore, law enforcement officers

22  did nothing to investigate it, when Christopher Harp invoked

23  his right to remain silent, which he has every right to do.

24          THE COURT:  Uh-huh.

25          MS. CONKLIN:  But he never told the officers, I

1  wasn't there on the 21st; I wasn't there on this date; I

2  wasn't there on that.

3      Amy Harp, whose testimony -- or whose statement would be

4  hearsay and not admissible, said that she wasn't home on the

5  21st and that they were buying a car that -- I'm sorry -- the

6  morning of the 21st she was buying a car; on the 18th, she

7  wasn't home, so she couldn't say if Christopher -- where

8  Christopher was at that point; and I don't believe that she

9  gave any statement as to where she was or Christopher Harp was

10 on April 19th.  And Mr. Harp definitely did not.

11             THE COURT:  Okay.

12             MS. CONKLIN:  So...

13             THE COURT:  Yes, I would agree you're in a

14 predicament, but I don't think there's anything you can do

15 about it other than refute the anticipated alibi defense which

16 was noticed previously in the case.

17             MS. CONKLIN:  And we will, Your Honor.  But the

18 suggesting that Mr. Harp is the one who made the statement,

19 that's where the problem lies for us.

20             THE COURT:  I don't think we're going to hear that

21 again.

22             MS. CONKLIN:  Okay.

23             MR. EDWARDS:  Yes, Your Honor.

24             THE COURT:  All right.  Understood.  We'll take five.

25 Thank you all.

### C. Thigpen - Direct Examination (Mr. Perri)

1        (Recess taken from 2:53 to 3:10 PM.)

2            THE COURT:  Thank you, everyone.  Please be seated.

3        Can we have our jurors, please, sir.  Thank you.

4        (Jury returned to the courtroom at 3:11 PM.)

5            THE COURT:  Thank you, ladies and gentlemen.  Please

6    be seated.  Thank you.  All right.  Thank you all.

7        The Government may call its next witness.

8            MR. PERRI:  United States calls Special Agent Cory

9    Thigpen.

10           THE COURT:  Special Agent, if you would step forward,

11   sir, so Madam Clerk could swear you in.  Then we'll ask you to

12   take the witness stand.  Thank you.

13           **CORY THIGPEN, GOVERNMENT'S WITNESS, SWORN**

14           THE CLERK:  Thank you.  Please have a seat at our

15   witness stand.

16       Our next witness is Agent Cory, C-O-R-Y; Thigpen,

17   T-H-I-G-P-E-N.

18           THE COURT:  Thank you, sir.  Once you're seated and

19   comfortable, if you wouldn't mind adjusting that mic so

20   everyone can hear you.  Thank you much.

21       Mr. Perri.

22           MR. PERRI:  Thank you, Your Honor.

23                     DIRECT EXAMINATION

24   BY MR. PERRI:

25   Q.  Sir, please state your name for the record.

## C. Thigpen - Direct Examination (Mr. Perri)

1   A.    Cory Thigpen.

2   Q.    Where do you work?

3   A.    At the FBI.

4   Q.    How long have you been an FBI agent?

5   A.    Since 2016.

6   Q.    And which field office and resident agency are you

7   assigned to?

8   A.    So like Special Agent Ryan, I'm under the Pittsburgh

9   headquarters field office, and I'm currently assigned to the

10  Clarksburg resident agency.

11  Q.    Were you so employed in 2019 and 2020?

12  A.    I was still under Pittsburgh at that time.  I was assigned

13  to the Wheeling resident agency, which is another resident

14  agency in the Northern District of West Virginia.

15  Q.    Okay.  And what types of offenses were you investigating

16  at that time?

17  A.    At that time, being in a small office, you have to

18  investigate kind of any crime that comes through your doors.

19  At that time I was mainly investigating child exploitation,

20  financial crimes, white collar crimes, and counterterrorism.

21  Q.    And were you personally involved in an investigation that

22  culminated with the execution of a search warrant at the

23  residence of a Christopher Harp, 904 Bloody Run Road, in

24  Morgantown?

25  A.    I was.

**C. Thigpen - Direct Examination (Mr. Perri)**

1  Q.   And are you, in fact, the case agent for that case?

2  A.   I am.

3  Q.   And what kind of investigation was it?

4  A.   This was a child exploitation case that involved the

5  receipt of child pornographic files over the internet through

6  peer-to-peer networks.

7  Q.   How did you get involved with the investigation?

8  A.   So Special Agent Ryan initially opened this investigation,

9  and then he requested my assistance with -- I guess helping him

10  out with that case.  He had a lot of these cases that he was

11  working, and he asked me to assist and take this case over for

12  him, which I did.

13  Q.   And at some point in your investigation did you decide to

14  seek a search warrant for the residence at 904 Bloody Run?

15  A.   I did.  At the time that I took this case over, which I

16  believe was in September of 2020, Special Agent Ryan had done a

17  lot of the groundwork.  He had already identified, as he

18  discussed, the IP addresses, a lot of the peer-to-peer data

19  through GridCop and CPS.  He had done extensive research into

20  the residence at those addresses he had identified, who would

21  probably be living there.  He had run background checks on

22  them: Accurint reports, LexisNexis reports, all sorts of

23  things.

24       So by the time I became involved in this investigation, it

25  was my duty to just update the things that had happened between

**C. Thigpen - Direct Examination (Mr. Perri)**

1   the time I started and September 23rd, when I swore out the

2   search warrant for the residence.

3   Q.   Okay.  So you were the one that obtained authorization for

4   that search warrant?

5   A.   I was.

6   Q.   And where did you seek authorization for that?

7   A.   In the Northern District of West Virginia through a

8   federal magistrate judge.

9        (Pause in proceedings.)

10        MR. PERRI:  May I approach, Your Honor?

11        THE COURT:  You may.

12  BY MR. PERRI:

13  Q.   I'd like to show you what's been marked as United States

14  Exhibit Number 3.  Tell me if you recognize that.

15  A.   Yes, sir.  This is the search warrant.  It appears the

16  search warrant return, the attachments for the search warrant,

17  which basically is the premises that I'm requesting to search

18  and then the items that I'm requesting to seize.

19       So those items in this case would be electronic devices,

20  anything that can hold digital media: images, videos; any

21  indications of occupancy to the residence, who might live

22  there, who has access to it; any other documents or objects

23  that would lend access to these computers, such as papers with

24  passwords written on them, anything like that.  These are all

25  listed in Attachment B to the search warrant as items to be

**C. Thigpen - Direct Examination (Mr. Perri)**

1  seized.  And then my affidavit, which is where I swear to the

2  probable cause that I'm presenting to the judge in my request

3  for a search warrant.

4  Q.   Okay.  And is that a correct copy of the search warrant

5  that you submitted in this case?

6  A.   Yes, it appears so.

7  Q.   And this is a search warrant that was filed in this

8  district; correct?

9  A.   Correct.

10        MR. PERRI:  All right.  We'd move for the admission

11 of United States Exhibit Number 3, Your Honor.

12        THE COURT:  Any objection to 3?

13        MR. EDWARDS:  No objection, Your Honor.

14        THE COURT:  Without objection, 3 is admitted.

15    (Government's Exhibit 3 received in evidence.)

16 BY MR. PERRI:

17 Q.   So when did you actually execute that search warrant?  In

18 other words, when did you serve it on the house?

19 A.   On September 25th, 2020, which was a Friday.

20 Q.   Okay.  And the address again?

21 A.   904 Bloody Run Road, Morgantown, West Virginia.

22 Q.   And that's in the Northern District of West Virginia?

23 A.   It is.

24 Q.   Can you describe that location for us?

25 A.   Yes.  So the address is off of a pretty remote road,

**C. Thigpen - Direct Examination (Mr. Perri)**

1    dirt -- I think it was dirt at the time with a lot of ruts.

2    When you approached the residence, there was a mailbox at the

3    road that indicated the number and name of the residents.  The

4    driveway then led up into the woods, up on a hill.

5        There was another residence along that driveway, which we

6    identified as the Westwoods' house, which were the in-laws to

7    Mr. Harp.

8        And then Mr. Harp's residence was at the top of the hill

9    in the -- in a wooded area.

10   Q.   So how close are the two houses together, the Defendant's

11   house and his in-laws' house?

12   A.   They're relatively close.  I believe that if you were

13   standing -- if I remember correctly, if you were standing on

14   the front porch of Mr. Harp's residence, you might be able to

15   see the Westwoods' residence.  They're pretty close.

16   Q.   Okay.  And is this a situation where they live on the

17   street and there's neighbors in front of them and beside them

18   and on either side and then across the street?

19   A.   No.  Like I said, it was a pretty remote area.  And when

20   you pull up that driveway, to the best of my recollection,

21   those were the only two residences on that part -- or that

22   parcel.  I think the parcel was noted at around 4 acres.  I

23   believe I noted it in my search warrant that it was a pretty

24   remote parcel.

25   Q.   All right.  Are there woods around the houses?

**C. Thigpen - Direct Examination (Mr. Perri)**

1  A.    There are woods, yes.

2              MR. PERRI:  May I approach, Your Honor?

3              THE COURT:  You may.

4  BY MR. PERRI:

5  Q.    I'd like to show you what's been marked for identification

6  as United States Exhibits 6A and 6B.  Please take a look at

7  these and tell me if you recognize them from your

8  investigation.

9  A.    Yes.  So these are aerial photographs that were taken of

10  the property 904 Bloody Run Road.  In preparation for executing

11  the search warrant, I had made a request to the FBI aviation

12  unit due to the fact that, driving on this road, I could not

13  see the residence; I couldn't tell, you know, how many doors it

14  had, what the features of the residence were, which we like to

15  know before we approach a house to conduct a search warrant.

16  Q.    Why?

17  A.    For safety, mainly, for the officers, to know there are

18  areas where people can exit/enter.  We like to know if there

19  are any animals.  We like to know what vehicles are there to

20  indicate who might be there.  There are numerous reasons that

21  we like to be able to see the residence.

22       In addition, I have to be able to describe that residence

23  in the search warrant with particularity so I can say to the

24  judge, "This is the address.  This is the house.  This is what

25  it looks like," so we know that we're going to the right place.

**C. Thigpen - Direct Examination (Mr. Perri)**

1    In this instance, I could not see the residence from the

2    road.  So I requested the FBI's aviation unit to fly over and

3    take some still images and videos of the residence in

4    preparation for me writing the search warrant.

5    Q.  Are 6A and 6B fair, accurate copies of the images that you

6    got from the aviation unit of the Defendant's residence?

7    A.  Yes.

8         MR. PERRI:  We move for the admission of 6A and 6B,

9    Your Honor.

10         THE COURT:  Any objection to either?

11         MR. EDWARDS:  No objection, Your Honor.

12         THE COURT:  Without objection, both 6A and 6B are

13    hereby admitted.

14    (Government's Exhibits 6A and 6B received in evidence.)

15         MR. PERRI:  May we publish these, Your Honor?

16         THE COURT:  You may.

17    BY MR. PERRI:

18    Q.  Which one are we looking at here, Agent?  Which one?

19    Which exhibit?

20    A.  6A.

21    Q.  Okay.  What does it show?

22    A.  This shows the residence at 904 Bloody Run Road.

23    Q.  Okay.  And you don't see any houses around it; correct?

24    A.  No.

25         MR. PERRI:  Could we see the other one, please.

**C. Thigpen - Direct Examination (Mr. Perri)**

1  BY MR. PERRI:

2  Q.   Okay.  So this is a more distant view; right?

3  A.   Correct.

4  Q.   Does it also show the Defendant's residence?

5  A.   Correct.  Just to the left of the crosshairs in the middle

6  of the screen.

7  Q.   I think if you use your finger you can actually circle the

8  Defendant's residence.

9       Okay.  And do we see another structure there to the left?

10  A.   Correct.  Here.

11  Q.   And whose house is that?

12  A.   I believe that's the Westwoods' residence.

13  Q.   Okay.  And what do we see surrounding both of those

14  houses?

15  A.   Woods.

16  Q.   All right.  So who-all was involved in this search, Agent

17  Thigpen?

18  A.   So involved in the search on the 25th were numerous

19  agents from the Clarksburg resident agency, support staff from

20  the Clarksburg resident agency, as well as some state and local

21  officers from I believe the Mon County Sheriff's Department and

22  Bridgeport Police.

23  Q.   And how did you approach the search of the residence?

24  A.   On the morning of the search warrant?

25  Q.   Yes.

**C. Thigpen - Direct Examination (Mr. Perri)**

1  A.   So we typically -- prior to executing a search warrant, we

2  will all meet at a designated area where we will -- I will

3  conduct a pre-warrant briefing.  I'll go over the status of the

4  case for everybody, since some of them might not have been as

5  involved with the case prior to the warrant.  We'll discuss any

6  safety concerns.  There will be a -- an outline of what each

7  person's responsibilities are prior to the search, as we

8  approach the residence, and then once we are there and while

9  we're conducting the search.  We do some other policy things.

10 We have to read our deadly force policy every time we do a

11 search warrant.  These things all happen at a location prior to

12 executing the warrant.

13      We then will drive, in typically as few of cars as we can,

14 to the residence.  We will park somewhere safe.  We will

15 designate usually several officers to be perimeter officers, to

16 cover the exterior of the home for the safety of the officers

17 approaching the residence and to see if there's anybody that

18 tries to flee from the home.  And then we will designate a

19 certain number of agents and officers to actually approach

20 the -- in this case the front door, to knock and announce our

21 presence and what we are there for.

22 Q.   And what time did you arrive?

23 A.   I believe it was around seven in the morning.

24 Q.   Okay.  Was anybody home?

25 A.   Yes.

**C. Thigpen - Direct Examination (Mr. Perri)**

1  Q.   Did you approach with weapons drawn or anything like that?

2  A.   So I was the first one to move onto the porch.  I was the

3  first one to go to the door.  In these types of situations you

4  never know what you're going to encounter.  Typically, when you

5  execute a search warrant, you do have your guns drawn.  In this

6  instance, I can't speak for the officers behind me.  I don't

7  believe I had mine out.  Because when I looked through the

8  front door, which was -- had a glass partition, I could see

9  Mr. Harp inside the residence.  I could see that his hands were

10 empty; there was no weapons in them.  I knocked on the door,

11 and Mr. Harp came to the door, and I engaged him at that time.

12 Q.   Okay.  So you mention that Mr. Harp was home.  Is the

13 person you referred to as Christopher Harp, is he in the

14 courtroom today?

15 A.   Yes.

16 Q.   Where is he seated?

17 A.   He's seated at the defense table with the suit and light

18 blue tie.

19 Q.   The suit and the light blue tie?

20 A.   Yes, sir.

21       MR. PERRI:  Your Honor, please let the record reflect

22 identification of the Defendant.

23       THE COURT:  So reflected.

24 BY MR. PERRI:

25 Q.   And who else was home?

**C. Thigpen - Direct Examination (Mr. Perri)**

1  A.   The -- Mr. Harp's wife, Amy, was home.  I believe she was

2  still asleep in bed.  And their young child was also present,

3  their daughter.

4  Q.   And what did you tell them -- so did they both come to the

5  door?

6  A.   No.  Initially just Mr. Harp came to the door.

7  Q.   What did you tell him about why you were there?

8  A.   So initially, when we arrive and we encounter somebody, we

9  just tell them that -- who we are.  So I would say, "FBI.  We

10  have a search warrant."

11      We would then -- assuming that there's no issue or any

12  altercation with that person, we would move them out of the

13  way, allow the rest of the agents to move into the house and

14  clear that residence for any threats, meaning any other people

15  that might be inside that might pose a danger to any of the

16  officers that are entering, any animals that might pose a

17  threat, anything like that.  So initially we just say who we

18  are and why we're there:  We have a search warrant.

19      Once the residence is cleared and we are sure that

20  everybody is safe, there's no other people that we haven't

21  found, then we usually get into the why we are there.

22  Q.   And what did you tell them about why you were there?

23  A.   So after the residence was cleared, we then explained that

24  we were there seeking evidence of child pornography.

25  Q.   Okay.  What was the layout of the house?

**C. Thigpen - Direct Examination (Mr. Perri)**

1   A.   So when you -- when we walked up to the front door,

2   there's a long covered front porch that ran, I believe, the

3   length of the house.  When you open the front door, it opened

4   into a living room; which behind it was, I guess, a dining

5   area.  The kitchen would have been off to the back right.  On

6   the right side of the living room there was a -- a little

7   office.  Or I believe it was -- appeared it was being used as a

8   craft room at the time.

9       Over that were a set of stairs that led up to a loft that

10  was -- if you were in the living room, you could look up and

11  see where there was a loft that was open to the living room.

12  Upstairs there were also some storage areas and attics.  And

13  then when you moved past the living room, by the kitchen, there

14  was a hallway.  And I believe that hallway contained all three

15  bedrooms and a laundry room, and that led to the garage.  And

16  then there were, obviously, closets and the like throughout.

17  Q.   So you had the opportunity to go through the house and

18  observe this?

19  A.   I did.  And then we also photograph every part of the

20  house.  So when we enter a residence, before we do anything --

21  well, I should say after we clear to make sure there's nobody

22  there, we do that safety clear, everybody will then typically

23  either come out of the house or move to a certain area of the

24  house, and we will have a photographer go through and take

25  pictures of every part of that house as it was before we touch

**C. Thigpen - Direct Examination (Mr. Perri)**

1  it, before we search anything.  And those pictures are all

2  maintained in our case file as well.

3  Q.   Did that happen in this case?

4  A.   It did.

5         MR. PERRI:  May I approach, Your Honor?

6         THE COURT:  You may.

7  BY MR. PERRI:

8  Q.   Agent Thigpen, I'd like to show you what's been marked for

9  identification purposes United States Exhibit 7A through R.

10 A.   Yes, sir.

11 Q.   7A through 7R.  And I want you to tell me if you recognize

12 those pictures.

13 A.   Would you like me to go through them one at a time or --

14 Q.   Yes.  Just tell us what each one of them shows, being sure

15 to specify what the exhibit number is.

16 A.   Okay.  So Exhibit 7A depicts the exterior of the residence

17 at 904 Bloody Run Road from the side of the garage.

18     7B depicts the living room.  You can see the front door

19 and the stairs that go up toward the loft.

20     7C is a photograph taken from the kitchen that depicts the

21 living room and part of the dining area.

22     I believe 7D is similar, taken from the kitchen into the

23 dining area and living room.

24     I'm sorry.  Some of these are a little dark.

25     7E would be taken from the dining area to show the living

**C. Thigpen - Direct Examination (Mr. Perri)**

1  room as well as the front door, the front porch, and I believe

2  the stairs to the loft.

3      7F is the photograph of the kitchen.

4      7G is a photograph taken from the living room that depicts

5  the living room, kitchen, and I believe the office under the

6  loft.  And it might depict the loft.  The paper is a little

7  dark, but I believe it shows up better digitally.

8      7H is a photograph of the loft area.

9      And in these photographs you can -- you can see we -- as

10  we take these photographs, we label each room with a letter.

11  So we start with letter A.  And however many rooms there are,

12  we put something on the wall that says this is Room A, this is

13  Room B, this is Room C, so then we're -- later on that will

14  help us keep track of where things were found and where these

15  rooms were.

16      7I is a picture taken I believe from the loft, which shows

17  the staircase leading up to it as well as a storage area.

18      7J is a photograph of the workstation that was set up in

19  the loft, with two computer screens, a work laptop --

20  Mr. Harp's work laptop and mouse and keyboard.

21      7K is a photograph of an HP Pavilion laptop that was

22  located in the loft.

23      7L is a photograph of a piece of paper that was located in

24  that loft where the workstation was that notated Christopher

25  Harp's new-hire information from what appeared to be a new job

**C. Thigpen - Direct Examination (Mr. Perri)**

1  that he had gotten.  And on that were things such as his user

2  name, his password, his email, his phone extensions regarding

3  his job and his work computer, which was located on the desk in

4  the loft.

5      7M is the office or the craft room that was designated as

6  Room B underneath the loft.

7      7N is the same, the office or craft room.

8      7O is a picture of seven thumb drives that were located in

9  that room.

10     And 7P is a photograph of Evidence Item 34, which is a

11  green PNY Attache thumb drive.

12     7Q is a photograph of the receipt for property which I

13  complete after the search warrant is done, is completed, we've

14  located all the items that we're going to locate.  And it's

15  basically an inventory of everything that we're taking out of

16  that residence, listed, described, that I fill out, and then I

17  have whoever is in control of that premises or whoever has a

18  possessory interest of those items review as well.  I sign it

19  saying this is the things that I'm taking.  They sign it saying

20  I agree that these are the things that you're taking.  A copy

21  of that is left at the residence when we leave.

22     And then 7R is a photograph of the front porch, which

23  would have been, probably, the last exit photo that we take.

24  So after we do our search, we also take after photographs.  We

25  take photographs before; we take photographs of everything

**C. Thigpen - Direct Examination (Mr. Perri)**

1  during the search that we're seizing or that we think has

2  evidentiary value; and then after we're done, we take another

3  round of photos of every room in the house after we've left it,

4  to show how we left it.  So before we started, during, and then

5  after we left it.

6      And this photo, 7R, appears to be the last photo.  You can

7  see the evidence boxes on the front porch that we are taking

8  with us when we leave.

9  Q.   Okay.  Are those all fair, accurate, and correct copies of

10  photos that were actually taken during the search?

11  A.   Yes.

12          MR. PERRI:  We move for the admission of United

13  States Exhibits 7A through R, Your Honor.

14          THE COURT:  Any objection to any of those?

15          MR. EDWARDS:  No objection, Your Honor.

16          THE COURT:  No objection, Government's 7A through 7R

17  are hereby admitted.

18      (Government's Exhibits 7A through 7R received in

19      evidence.)

20          THE COURT:  You may publish --

21          MR. PERRI:  Thank you, Your Honor.

22          THE COURT:  -- as you deem appropriate, Mr. Perri.

23          MR. PERRI:  I'd like to draw your attention to the

24  living room in particular, Agent Thigpen.

25      Could we please see 7B.

**C. Thigpen - Direct Examination (Mr. Perri)**

1    We might need to dim the lights, because some of these are

2  dark, Your Honor.

3        THE COURT:  Understood.  I'll leave that to Madam

4  Clerk's discretion.

5  BY MR. PERRI:

6  Q.    Okay.  Do you see any of the features that you were

7  describing?

8  A.    Yes.  So you can see here is the staircase that leads up

9  to the loft.  There's the office or craft room is right here.

10  Your kitchen would be off to this side.  Dining room here.  And

11  then here are your living room furniture right there.  Front

12  door is right here.

13        MR. PERRI:  Okay.  Could we please see 7C.

14  BY MR. PERRI:

15  Q.    What room does this show again?

16  A.    Again, this photo appears to be taken from the kitchen,

17  showing the living room.  And the dining area would be off to

18  the right.  And the office and stairs to the loft would be

19  around the corner to the left there.

20  Q.    How about 7D?

21  A.    Yeah, that appears to be about the same photograph.

22  Q.    Similar view?

23  A.    Yeah.

24  Q.    7E?

25  A.    Again, this shows the living room, the stairs to the loft,

**C. Thigpen - Direct Examination (Mr. Perri)**

1   the office/craft room, and the front door.

2   Q.   And 7F.

3   A.   And this is the kitchen.

4   Q.   Okay.  You also mentioned a --

5        MR. PERRI:  Can we please see 7G as in George.

6   BY MR. PERRI:

7   Q.   Does this also show the living room?

8   A.   It does.

9   Q.   Okay.  Can you also see -- what is up there towards the

10  ceiling?

11  A.   So this here would be the loft, which is where that

12  workstation was located, along with that leather loveseat that

13  you saw in one of the photographs.  The stairs would be over

14  here on this side, leading up to that, over the office or craft

15  room.

16  Q.   All right.

17       MR. PERRI:  Can we see 7M, please.

18  BY MR. PERRI:

19  Q.   Is this what you were referring to?

20  A.   Yeah.  So this was what I was referring to as the office

21  or craft room.

22  Q.   And how about 7N?

23  A.   The same.  The same room, just depicting that there was a

24  closet on the right side.

25  Q.   Okay.  All right.  At some point did you have the

**C. Thigpen - Direct Examination (Mr. Perri)**

1  opportunity to speak to Amy Harp?

2  A.    I did.

3  Q.    Where did that conversation take place?

4  A.    In the living room.

5  Q.    And where exactly in the living room?

6  A.    Amy -- Mrs. Harp and Mr. Harp were seated on one of the

7  sofas in the living room.  Myself and Special Agent Ryan were

8  facing them, interviewing them.

9          MR. PERRI:  May we see United States Exhibit 7G as in

10 George again.

11 BY MR. PERRI:

12 Q.    Do you see the couch there?

13 A.    I do.

14 Q.    Can you circle it?

15 A.    Yeah.  I believe they were sitting here.

16 Q.    Okay.  All right.

17          MR. PERRI:  Can we leave that up for a second?

18 BY MR. PERRI:

19 Q.    So while you are interviewing her, where is

20 Christopher Harp?

21 A.    Seated next to her.

22 Q.    On the same couch.

23 A.    On the same couch.

24 Q.    And what else is happening around you while this interview

25 is taking place?

**C. Thigpen - Direct Examination (Mr. Perri)**

1  A.   So at this point we would have already completed most

2  of -- or we would have completed all of the pre-search

3  photographs.  And the special agents and police officers that

4  were there would have broken out into their respective teams or

5  their respective duties for searching that residence.  So there

6  would have been agents starting to conduct their search,

7  looking through things, taking note of items.

8       There's a designated photographer for the day.  So every

9  time somebody finds something that they think is of evidentiary

10 value or that we're going to seize, before they do anything

11 with it, they say, "Hey, I found something.  We need to

12 photograph it."  Then the items are labeled, they're tagged,

13 they're photographed before anybody removes them.

14      So all that would have been going on while me and Special

15 Agent Ryan would have conducted the interviews there in the

16 living room.

17 Q.   While you were talking to Amy Harp, did you have the

18 opportunity to observe the Defendant and his behavior?

19 A.   I did.  As I said, I was facing both of them.

20 Q.   Did anything catch your attention?

21 A.   It did.  While I was speaking to Mrs. Harp -- and she was

22 very animated and very adamant about the things that we were

23 discussing with her -- I noticed Mr. Harp was more, I guess,

24 cognizant of what the agents were doing, where they were

25 looking, and kept looking up towards the loft, which would have

**C. Thigpen - Direct Examination (Mr. Perri)**

1   been directly in front of him towards -- I guess towards the

2   ceiling.

3   Q.   Okay.  So he's sitting on that couch looking up toward

4   where we see that wooden railing.

5   A.   Right.

6   Q.   And he did this repeatedly.

7   A.   Yes.

8   Q.   Was he paying attention to what the other officers were

9   doing?

10  A.   It appeared, yes, that he was taking stock of where

11  everybody was and what they were doing.

12  Q.   All right.  As a result of the search, what-all was seized

13  from the residence?

14  A.   So I believe we seized 36 -- I believe 36 items, which is

15  all noted in my report that I complete after we do the search

16  warrant.  I believe there was 5 computers, 15 thumb drives,

17  4 telephones, an iPad, at least one iPod, and several CDs --

18  writable CDs and writable DVDs that were capable of containing

19  digital media.  Again, I believe that's accurate.  It's all

20  noted in my report exactly what those items were.

21  Q.   And which of these items ended up having some significance

22  for the investigation?

23  A.   There were two items.  One of them was Evidence Item 1B9.

24  The 1B is just the designation that they get when they are

25  entered into evidence at Pittsburgh.  It would have been Item 9

**C. Thigpen - Direct Examination (Mr. Perri)**

1  and then Item 34, which was then entered into evidence as Item

2  1B34.

3          MR. PERRI:  May I approach, Your Honor?

4          THE COURT:  You may.

5  BY MR. PERRI:

6  Q.   I'd like to show you what's been marked as United States

7  Exhibit Number 1.  Just tell me if you recognize what this item

8  is in the context of your investigation.

9  A.   Yeah.  So this is the HP Pavilion laptop, which is

10  Evidence Item 1B9.  It's noted on the back of the envelope,

11  along with my case number and the chain of custody here.  And

12  there's a label on it that notes where it was found, that it

13  was found in Room N, which was the label for the loft.  It also

14  notes the description and the serial number, along with who

15  found this item.

16  Q.   And what is the make and model of that laptop?

17  A.   It is an HP Pavilion Entertainment PC.  The serial number

18  is C as in Charlie, N as in Nora, F as in Frank, 8452, J as in

19  John, 3, Q as in Queen, if I'm reading his handwriting

20  correctly.

21  Q.   Okay.  And you can recognize that from the markings on the

22  packaging?

23  A.   Yes.

24  Q.   All right.  And so that is the laptop that was seized

25  during the search?  One of them?

## C. Thigpen - Direct Examination (Mr. Perri)

1  A.    Correct.

2  Q.    Is that the one that you referred to earlier as the work

3  laptop?

4  A.    No.

5  Q.    Okay.  And this one came out of, did you say, the loft?

6  A.    The loft, Room N, yes.  I believe there was a photo of it

7  in one of the 7 exhibits.

8  Q.    Okay.  All right.  Similarly, I'd like to show you what's

9  been marked as United States Exhibit Number 2.

10  A.    Yes, sir.

11  Q.    Please check the markings on here and the item itself

12  inside the bag.  Let me know if you recognize it.

13  A.    Yeah.  So this is Item 34.  It's been designated as

14  Evidence Item 1B34, as is written on the bag.  It also has an

15  evidence label on the front which denotes the case number, the

16  date, the address it was taken from, which room it was taken

17  from, which in this case was Room B.  It describes the item,

18  which is an Attache green thumb drive.  There -- with thumb

19  drives, typically there's no serial number written on the

20  outside.  That is determined later by a computer forensic

21  expert who can digitally retrieve the serial number.  And then

22  it is also labeled who found it, and there's a chain of custody

23  on the back.

24  Q.    Okay.  And like the laptop, was that item also recovered

25  during the search of 904 Bloody Run Road?

**C. Thigpen - Direct Examination (Mr. Perri)**

1   A.   Yes.

2          MR. PERRI:  Could we see Image Number 7O, please.

3   BY MR. PERRI:

4   Q.   What does this show, Agent Thigpen?

5   A.   This is a photograph of seven thumb drives, I believe,

6   that were found in the office.

7   Q.   Craft room?

8   A.   Craft -- yeah, craft room/office.

9          MR. PERRI:  And 7P, please.

10  BY MR. PERRI:

11  Q.   And what is this?

12  A.   That is a photograph of Item 34, Evidence Item 1B34.

13  Q.   Which is United States Exhibit Number 2.

14  A.   Correct.

15  Q.   That's, like, a close-up; right?

16  A.   It is.

17  Q.   And what did -- I don't know if I asked you.  What was the

18  make and model of the thumb drive?

19  A.   It was a PNY, and it said Attache on the outside.  It's

20  labeled on the item description as Attache green thumb drive.

21         MR. PERRI:  Okay.  Your Honor, I think it's covered

22  by stipulation, but I'll move for the admission of United

23  States Exhibits 1 and 2.

24         THE COURT:  Any objection to those?

25         MR. EDWARDS:  No objection, Your Honor.

### C. Thigpen - Direct Examination (Mr. Perri)

1          THE COURT:  Without objection, they're deemed

2    admitted.

3       (Government's Exhibits 1 and 2 received in evidence.)

4    BY MR. PERRI:

5    Q.   Was there any item that was seized that you did not take

6    with you from the house to be entered into evidence?

7    A.   Yes.  There was an item there that typically we would

8    seize as evidence; but in that instance, we elected to leave it

9    there.

10   Q.   What item was that?

11   A.   That was Mrs. Harp's cell phone.

12   Q.   And why did you elect to leave that?

13   A.   At the time, as Mrs. Harp explained to me and as you could

14   see, she was pregnant.  And we didn't feel like we should

15   neglect her her phone in case she needed to communicate with

16   her doctors or anything of that nature.  So she agreed to have

17   the phone forensically imaged on scene.  So we were able to do

18   that.

19          And typically what we do in those instances is we do a

20   cursory search of it to make sure that there's no blatant child

21   pornography or any contraband on that phone that we can tell

22   from a cursory search.  If we don't find any, we'll allow that

23   phone to be hooked up through a Cellebrite machine, which is a

24   machine that can basically make a forensic image of that phone

25   and capture all the data.  We can do that on scene.  It takes a

**C. Thigpen - Direct Examination (Mr. Perri)**

1  while, which is why we can't do it for all devices.  But in

2  certain special circumstances, if we need to do it, we can do

3  it.  In that case we did that with her cell phone, and we

4  allowed her to retain that cell phone.

5  Q.   So when you say you made an image of it, what does that

6  mean?

7  A.   So basically it takes an exact copy of that phone, of all

8  the files, photographs, videos, text messages, everything

9  that's contained on that phone.  Then it's created in a digital

10 image that we can later load into review software and review.

11            MR. PERRI:  May we please see United States

12 Exhibit 7L.

13 BY MR. PERRI:

14 Q.   Now, Agent Thigpen, I think you mentioned during your

15 testimony that you found a piece of paper near the work

16 computer.

17 A.   Yes.

18 Q.   Christopher Harp's work computer.  And you told us a

19 little bit about that.  Is that this piece of paper?

20 A.   It is.

21 Q.   And what does it show?

22 A.   So you can see from reading the top it's a new-hire sheet

23 for Christopher Harp.  And then it goes through to explain

24 things that we deemed were relevant to the -- there was a

25 computer hooked up at this -- at the desk workstation with the

**C. Thigpen - Direct Examination (Mr. Perri)**

1  dual screens, which was where this sheet was located.  It is

2  basically explaining to a new hire how to access your new

3  computer, how to access your new systems, what your user name

4  will be, what your passwords are, what your email is going to

5  be, your phone extension, voicemail passwords, so on and so

6  forth are all contained on this piece of paper that was located

7  by the workstation.

8  Q.   Okay.  And does that piece of paper give the password for

9  the HP computer, United States Exhibit Number 1?

10  A.   No.

11  Q.   Did you find any other pieces of paper in that house that

12  had passwords on it?

13  A.   No, we didn't.  And it's specifically listed in my search

14  warrant, when we list items that we're interested in that we

15  want to seize, is things of that nature: lists of passwords so

16  that we can have access to electronics that might be password

17  protected when we seize them.

18  Q.   So if I can interrupt you.

19  A.   Sure.

20  Q.   Is it fair to say that you were specifically looking for

21  that kind of thing?

22  A.   We were specifically looking for that kind of thing.

23  Q.   If it had been there, would you have found it?

24  A.   If it had been there, we would have found it.  We do a

25  very thorough search.  We do it the same way every time.  I

**C. Thigpen - Direct Examination (Mr. Perri)**

1  believe there was hundreds of photos taken during this search,

2  with numerous agents and police officers searching that

3  residence to find things as small as thumb drives and little SD

4  cards and other things that can house digital media.

5      In this case, if there was a sheet like this with

6  passwords written on it, that is something that is of great

7  evidentiary value to us, and we would have taken it.

8  Q.   And is it true that thumb drives can be quite small?

9  A.   They can be very small.

10 Q.   And because they're small, does that present any problems

11 for when you're looking for them?

12 A.   It does.  That means they can be found in virtually any

13 small area of the house or small compartment or small drawers.

14 It creates a lot more places that you have to search to find.

15     And thumb drives aren't even the smallest thing that we

16 find.  I mean, we can find micro SD cards that are, you know, a

17 quarter of an inch big, that are very small.  So we have to be

18 diligent in looking for small items.

19 Q.   So what did you do with the items you seized from the

20 house?

21 A.   So once we seize -- once our search is complete, we take

22 all the items.  I then list all those items, as I mentioned, on

23 the inventory or the receipt for property.  List every single

24 item that we're taking, go over that with -- in this case I

25 went over it with Mr. Harp.  He signed that piece of paper

## C. Thigpen - Direct Examination (Mr. Perri)

1    saying, "Okay.  These are the things that you're taking."

2         I leave a copy of that, and I leave a copy of my search

3    warrant at the residence when we depart.  Then I take all that

4    evidence back to the FBI office in Clarksburg, where we secure

5    it, we finish doing all the paperwork, and then that is taken

6    to -- I have to take all that to Pittsburgh.  That's where our

7    evidence control room is.  So I take that personally to

8    Pittsburgh, to the evidence control room, and enter all of

9    those items into Pittsburgh evidence control.

10   Q.   Did your investigation reveal when Amy and Christopher

11   Harp moved into that house, the one that you searched at

12   904 Bloody Run Road?

13   A.   Yes.  It was in July of 2018.

14   Q.   July of 2018.  And where were they living before that?

15   A.   Prior to that they had been living with Mrs. Harp's

16   parents, the Westwoods.

17   Q.   And that's the other house that you showed us on the

18   aerial photograph?

19   A.   Correct.

20   Q.   Was the laptop, United States Exhibit Number 1, was it, in

21   fact, password protected?

22   A.   It was.

23   Q.   And was the Wi-Fi for the residence, the Wi-Fi account,

24   was it also password protected?

25   A.   It was.  The Wi-Fi was encrypted so you would have to

**C. Thigpen - Direct Examination (Mr. Perri)**

1  enter a password in order to access it.

2          THE COURT:  Do you mean the Wi-Fi network at the

3  house, Mr. Perri, as opposed to, like, logging into the Comcast

4  account, for example?

5          MR. PERRI:  The Wi-Fi network at the house.

6          THE COURT:  Okay.  I just want to make sure.  Thank

7  you, sir.

8  BY MR. PERRI:

9  Q.   What did your investigation reveal about who had access to

10  the house at that point in time?

11  A.   So at that point in time our investigation revealed that

12  Mrs. Harp, Mr. Harp, and their small daughter were the

13  occupants of that house.

14          During the search there was no other indication or indicia

15  of occupancy of another person.  There was a guest bedroom

16  there that was -- appeared to be mainly used for storage.

17  Mrs. Harp, during my talk with her, did not indicate there was

18  anybody else staying there.  So there was no indication during

19  our investigation that anybody else was residing at that

20  residence except -- but for Mr. Harp, Mrs. Harp, and their

21  child.

22          THE COURT:  Your Honor, this witness's testimony

23  pertains to two different parts of the case.  We would ask

24  permission to recall him after the forensic examiner so that he

25  can testify about other involvement that he had in the matter.

## C. Thigpen - Cross-Examination (Mr. Edwards)

1  That way it's not confusing to the jury.

2          THE COURT:  No.  Understood.

3      Any objection to that proposed plan, Mr. Edwards?

4          MR. EDWARDS:  It may cause me some confusion, Your

5  Honor, but it's okay.

6          THE COURT:  Okay.  Understood.

7      With that, Mr. Edwards, cross, sir.

8          MR. EDWARDS:  Thank you, Your Honor.

9                    CROSS-EXAMINATION

10 BY MR. EDWARDS:

11 Q.  All right.  Agent Thigpen, we've met before.  I'm

12 Bryan Edwards.

13 A.  Yes, sir.

14         MR. EDWARDS:  I need to look at the photos.

15     (Pause in proceedings.)

16         THE COURT:  6B.  Okay.

17 BY MR. EDWARDS:

18 Q.  Agent Thigpen, it's -- you testified that the house with

19 the -- I'll put the cross on it, or the thing.  That is the

20 Harp home, you believe?

21 A.  Here.  Yes.

22 Q.  And where do you believe the Westwood home is?

23 A.  I believe that the Westwood home was one of these, either

24 this one here or this one here.  I know that you had to pass

25 the -- I believe you had to pass the Westwood home to get to

## C. Thigpen - Cross-Examination (Mr. Edwards)

1   the Harp home.  I know that it was -- like I said, it was

2   close, but I wasn't sure that you would be able to see it from

3   904 Bloody Run.

4   Q.    Okay.  And did you make that determination based on your

5   investigation prior to the search warrant being executed?

6   A.    So this was done prior to -- I guess prior to my

7   involvement with the case.  Agent Ryan did a lot of the

8   preliminary work as far as identifying the residence and

9   looking at county mapping software as far as where these

10  residences were located.

11  Q.    Okay.  So it was your belief -- and it's still your

12  belief -- that, of course, the one there with the straight line

13  across is the Harp home, and the one in parentheses and/or the

14  one with the circle is where their -- Amy Harp's parents lived,

15  the Westwoods.  Is that correct?

16  A.    What I would say is that it was noted early investigation

17  in the report.  I'm looking at it.  I know that the house was

18  somewhat close.  I cannot say 100 percent sure which house.  I

19  can say 100 percent this was the Harp's house.  I cannot say

20  which one 100 percent was the in-laws' house.

21  Q.    Okay.  And with regard to where the Exhibit Number 1 --

22  Government's Exhibit Number 1, the HP laptop --

23  A.    Yes, sir.

24  Q.    -- that was found --

25        And I don't recall -- I'm sorry -- the letter.  I think it

## C. Thigpen - Cross-Examination (Mr. Edwards)

1   was 7 something.

2       -- where that was found in the home, but that was

3   basically found on the couch up in the loft; is that correct?

4   A.   It was in the loft.  Correct.

5   Q.   Just sitting out on a couch?

6   A.   It is noted, and I believe there was a photograph of it.

7   Q.   There was.  And I --

8   A.   Noted where found:  On chair.

9       I did not find this particular item, but it is noted that

10  it was found in Room N on chair.

11           MR. EDWARDS:  Pull up 7K.

12  BY MR. EDWARDS:

13  Q.   Is that the item that we're referring to?

14  A.   That would be Item Number 9.  Correct.

15  Q.   Okay.  So that's the laptop.  And it was just sitting --

16  that's the chair that was -- is up in the loft; is that

17  correct?

18  A.   In the loft.

19  Q.   Okay.  And then Item -- I think it's either Exhibit 2 or

20  3, the thumb drive.

21  A.   Yes.

22  Q.   That was found in the craft room, you indicated?

23  A.   In the craft room.

24  Q.   Okay.

25  A.   Well, I believe in my search warrant report I refer to

**C. Thigpen - Cross-Examination (Mr. Edwards)**

1  that room as an office.

2  Q.    Okay.

3  A.    Room B, I believe, is referred to in my report as the

4  office.  It appeared to be used as a craft room.  I just don't

5  want there to be any confusion.

6  Q.    And that's the little room that's kind of below the

7  stairs.

8  A.    Correct.

9  Q.    Okay.  And that was sitting with, it looked like, a group.

10  I saw the picture with like five or six other thumb drives?

11  A.    Yes.

12  Q.    Okay.  Neither one of these items appeared to be hidden in

13  any way, shape, or form.  They were just kind of sitting out.

14  Fair?

15  A.    From the -- again, the -- from the visual depiction on the

16  photos, yes.  I did not find the computer.  The thumb drives

17  appeared to be sitting on the shelf.

18        What I will say about that is if an item is found

19  somewhere where it is tucked away or hidden under something and

20  we cannot get a photograph of it, sometimes those items are

21  pulled out so that we can get a photograph of it.

22  Q.    Okay.  But I thought you testified before that you

23  don't -- you take photos of everything before --

24  A.    We do.

25  Q.    -- you pull anything out.

### C. Thigpen - Cross-Examination (Mr. Edwards)

1  A.    We do.

2  Q.    Okay.

3  A.    And those are captured in all the before photos.  But in

4  order to get a photograph of the actual evidence item, we have

5  to occasionally move it to get the photograph of the evidence

6  item.

7  Q.    Okay.  And with regard to Item Number 1, the computer, you

8  indicated it was password protected.  Chris Harp gave you that

9  password; is that correct?

10  A.    So I asked Mrs. Harp for any of the passwords that were

11  pertaining to the computers that were seized.  She could give

12  me some.  I believe for that one she didn't know it.  She asked

13  Mr. Harp what the password was, and he provided it.

14  Q.    Okay.  With regards to that computer, you said you took

15  possession of it and then entered it into evidence up in

16  Pittsburgh.

17  A.    Correct.

18  Q.    The Pittsburgh office.  You did nothing further with that

19  computer?

20  A.    With the actual physical computer?

21  Q.    Yes.

22  A.    After seizing it and transporting it to the FBI office,

23  and then it gets transported to evidence control.

24  Q.    Okay.  You didn't make any request that it be

25  fingerprinted to determine who was actually using the computer

## C. Thigpen - Cross-Examination (Mr. Edwards)

1   at any point in time?

2   A.   We did not do a request for fingerprints, no.

3   Q.   You also took possession of Chris Harp's phone during the

4   search warrant; is that correct?

5   A.   We did.

6   Q.   Okay.  Other than -- did you find any pornography on that

7   phone?

8   A.   There was no indication of child pornography on his cell

9   phone.

10  Q.   Okay.  And you took no steps to determine the location of

11  that cell phone, where it may have been at any point in time

12  when these downloads were -- had been taking place; is that

13  correct?

14  A.   Well, no, that's not correct.  What I did with that phone,

15  that phone, once it goes to the CART examiner, the computer

16  forensic examiner in Pittsburgh, he loads that into a system

17  that I can then review it.

18       So I reviewed that phone.  I went through that whole phone

19  to search for contraband, any evidence of child pornography,

20  which I did not find in the phone.  Other things I look for in

21  that phone would be indications of where a subject would be at

22  a particular date or a particular time.

23       In his phone I didn't note anything specifically that

24  would either go to show his location during a particular date

25  and time of a download or not.  As Special Agent Ryan

## C. Thigpen - Cross-Examination (Mr. Edwards)

1  testified, subjects do not have to be with the computer; they

2  don't have to be home when these downloads are occurring.  So

3  getting phone records or historical phone records typically

4  doesn't definitively show anything.  A phone record could show

5  that somebody is at Kroger while contraband is being downloaded

6  on their computer, and that doesn't really go to show -- one is

7  not an indication of another I would say.

8  Q.   Okay.  But you'll agree that you have the ability to do

9  that, or the FBI has the ability to track a location of a

10  phone, and that wasn't done here.

11  A.   Correct.  Yeah.

12  Q.   Okay.  One of the last questions that was asked to you by

13  the Assistant U.S. Attorney was "Who had access" -- "Did you

14  make a determination who had access to the home?"

15  A.   Uh-huh.

16  Q.   And your answer was, "Well, we knew who lived there."

17  That's a little different, isn't it?  There's a difference

18  between someone who lives in a home and someone who has access

19  to the home.  Fair?

20  A.   Correct.  Fair.

21  Q.   You made no determination who, in fact, had access to

22  their home; correct?

23  A.   Correct.  To the -- to the point that when we -- when I'm

24  speaking with Mrs. Harp and asking her, "Who is in your house?

25  Who lives here?" I give them every opportunity --

### C. Thigpen - Cross-Examination (Mr. Edwards)

1    Once they know why we're there, once they see what we're

2   taking, once they know what we're looking for, I give them

3   every opportunity to say, "Does anybody else live here?  Does

4   anybody else stay here?"  Again, we look for anything in the

5   house that would indicate that somebody stays there, that

6   somebody crashes on the couch or stays in the guest room or has

7   any items about.

8    And then once we leave, I always tell people, "If you

9   think of anything, if you think of anything that I should know,

10  you know where to reach us.  Give me a call.  Let me know."

11  That was never done.

12  Q.   You know, you bring up an interesting point, Agent.  You

13  indicated that you take photographs of everything.  And then

14  you were -- you're telling us about a conversation that you

15  allegedly had with Ms. Harp.

16   You-all have access to body cameras, don't you?

17  A.   No.  We do not wear body cameras.

18  Q.   You don't have body cam.

19  A.   No.

20  Q.   You don't have access to them.

21  A.   No, we don't.

22  Q.   Okay.  What about any of the police departments that were

23  there with you?  It wasn't just the FBI agents.

24  A.   I do not recall if any of the police officers that were

25  there had access to body cams.  I don't believe that they did.

### C. Thigpen - Cross-Examination (Mr. Edwards)

1  They were detectives.  And I don't -- I can't testify as to

2  police department policies, but there were no body cam videos

3  submitted in this case.

4  Q.   Okay.  Other than looking at the material that was taken

5  from the home on September 25th, 2020, was anything else

6  done -- or did you do anything else to investigate this matter

7  prior to the indictment being brought in November of 2023?

8  A.   Other than --

9  Q.   Analyzing the material that was taken from the search

10  warrant.

11  A.   So a couple things.  Number one, that is a big part of

12  this is the computer analysis.  And that tends to be a -- if

13  you want to say that's a building block to further

14  investigation.

15      So once the computer forensics are done, if there's

16  indications within a device that contains contraband that there

17  is another -- another avenue to look, another person to talk

18  to, another place to look, another individual -- for lack of a

19  better word -- that is identified, those are things that we

20  build our investigative steps on, and then we would take those

21  steps.

22      In this case, there wasn't.  Again, I gave Mrs. Harp and

23  Mr. Harp every chance to say, "Hey, look, if anything comes up,

24  you think of anything, please give us a call.  Let us know."

25  That did not happen.  And then looking into the phone

## C. Thigpen - Cross-Examination (Mr. Edwards)

1   records -- or not the phone records -- but the data that was

2   taken from Mrs. Harp's phone and Mr. Harp's phone, confirming

3   that with what Mrs. Harp said the day of the search warrant,

4   that was basically where the investigation went up to that

5   point.

6   Q.   Well, prior to the search warrant, you had already

7   determined it was Chris Harp who was downloading the

8   pornography.  Isn't that true?

9   A.   Actually, no, it's absolutely not.  And if you read my

10  search warrant, I had listed in there --

11      Typically, in a search warrant, you have to say that we

12  are looking for -- or we have probable cause that a certain

13  person committed a certain crime.  So we would list, in a

14  different kind of case or a drug case, you know, Joe Smith

15  violated this section of U.S. Code.

16      In my search warrant I write, Person yet to be identified

17  has violated U.S. Code.

18      So prior to executing that search warrant, we know that

19  the child pornography has passed that IP address.  We know that

20  it's going to that physical address.  We know the device GUID

21  that Mr. Ryan -- or Special Agent Ryan spoke about.  But we

22  don't know who within that house is the actual person

23  downloading it, which is why I have to list in my warrant,

24  Person yet to be identified has committed these crimes.

25      Furthermore, after these items are collected, I have to do

**C. Thigpen - Cross-Examination (Mr. Edwards)**

1  a request to the forensic examiner to examine these items.  And

2  part of that request is I ask him to look for indications of

3  who was using that computer, who was accessing that computer,

4  other evidence in that computer for command and control of

5  those devices.  Not just the computer, but all the devices that

6  were seized.

7  Q.  Didn't you, in fact, tell Amy Harp that morning of

8  September 25th, 2020, "You don't know who your husband is and

9  what he's done"?

10  A.  I do not recall that at all.

11  Q.  Okay.  You indicated that -- and it's already been

12  introduced as an exhibit in this case, your affidavit in

13  support for the search and seizure warrant.  Correct?

14  A.  Yes, sir.

15  Q.  Okay.  And in that affidavit you state, "As a result of

16  the above-mentioned training and experience, your Affiant has

17  learned the following characteristics are generally found to

18  exist, in varying combinations to be true, in cases involving

19  offenders who send, cause to be sent, distribute, exhibit,

20  possess, display, transport, manufacture, or produce material

21  which depicts minors engaged in sexually explicit conduct."

22  Correct?

23  A.  Can you tell me what page that is on?

24  Q.  If you go to page 2 of your affidavit, "The

25  characteristics of persons who traffic in child pornography."

## C. Thigpen - Cross-Examination (Mr. Edwards)

1   A.   Yes, sir.

2   Q.   That would be the very first sentence that's on that

3   paragraph; is that correct?

4   A.   Yes, sir.

5   Q.   Okay.  And thereafter you put down that those

6   characteristics include, "A, for sexual arousal or sexual

7   gratification; B, use to feed sexual fantasies; C, use as a

8   means of reliving fantasies or actual encounters with children;

9   D, to lower children's inhibitions; E, use as blackmail; F, as

10  a commodity for exchange; G, for profit."

11       Are those the things that you listed in your affidavit?

12  A.   Yes.

13  Q.   Okay.  And Agent Thigpen, in the three years that passed

14  between the time that you charged -- I'm sorry -- that you

15  searched the Harps' home until November of 2023, other than

16  finding pornography on the computer, you found no evidence that

17  Chris Harp used pornography for sexual arousal or sexual

18  gratification, to feed sexual fantasies, use as a means of

19  reliving fantasies or actual encounters with children, to lower

20  children's inhibitions, to use as blackmail, or as commodity

21  for exchange, or for a profit; correct?

22  A.   After this investigation was completed?

23  Q.   Other than finding actual pornography on the computer,

24  there's no other evidence that Chris Harp used pornography --

25  or you found anything that Chris Harp was using pornography for

## C. Thigpen - Cross-Examination (Mr. Edwards)

1  any of these things listed.  Fair?

2  A.   No, not necessarily.  As Special Agent Ryan testified to

3  with these peer-to-peer networks, in order to access other

4  peers' files, you generally have to share your own.  I would

5  say that that falls under a commodity for exchange.

6      As far as the rest of the reasons or the motives for

7  somebody, I didn't -- I didn't get a chance to hear that.

8  Q.   Okay.  In addition, in your affidavit, you state, "These

9  offenders view their child pornographic materials as valuable

10 commodities, sometimes even regarding them as prized

11 collections.  Consequently, these offenders prefer not to be

12 without their child pornographic material for any prolonged

13 time period and often go to great lengths to conceal and

14 protect their illicit collections from discovery, theft, or

15 damage."

16     "To safeguard their illicit materials or digital devices

17 which contain their illicit materials, these people may employ

18 the following security measures: A, the use of safes or safe

19 deposit boxes; B, the use of concealed compartments or

20 concealed rooms within the premises or other structures that

21 they occupy or have control of; the use of storage facilities

22 outside of their immediate residence, including outbuildings,

23 motor vehicles, animal cages, recreational vehicles, vessels,

24 et cetera; the use of internet-based storage devices or

25 services; rental of storage facilities; F, recording in a media

## C. Thigpen - Cross-Examination (Mr. Edwards)

1    that contains false, misleading, or no titles; H, the

2    application of digital security technologies, including, but

3    not limited to, password protection, encryption, and

4    stenography."

5        Did I read that correctly?

6    A.    I believe you did.

7    Q.    Okay.  You would agree with me that in the three years

8    that you had to investigate this matter after the search

9    warrant, and even during the time of the search warrant, that

10    you found no use of safes or safe deposit boxes on behalf of

11    Mr. Harp.

12    A.    Right.  This would -- the safe and safe deposit boxes

13    typically refers to child pornography that's being trafficked

14    in physical form or in -- with physical photographs.  It's kind

15    of an outdated practice now, but --

16    Q.    Okay.

17    A.    -- with physical --

18    Q.    "The use" --

19    A.    -- items.

20    Q.    I'm sorry.

21    A.    That's all right.

22    Q.    "The use of concealed compartments or concealed rooms

23    within the premises or other structures they occupy or have

24    control of."  There was none of that in the Harp home; correct?

25    A.    No.

### C. Thigpen - Cross-Examination (Mr. Edwards)

1  Q.   "The use of storage facilities outside their immediate

2  residence: outbuildings, motor vehicles, animal cages,

3  recreational vehicles, vessels, et cetera."  You found no

4  pornography in anything like that, did you?

5  A.   No, we did not.

6  Q.   You didn't find any evidence that Chris Harp was using any

7  type of internet-based storage services.

8  A.   Well, the internet-based program that he was using, the

9  Shareaza program, I would say is a type of that, a storage

10  facility, in that when you log into that client your files are

11  there; other peers' files are there.  Whether you want to say

12  that that's a storage service, it is internet-based and -- you

13  know, that's, I guess, semantics.

14  Q.   Agent Thigpen, I'm a little confused.  Because I thought

15  Agent Ryan testified and you testified that, actually, the

16  pornography has to be on the computer on peer-to-peer in order

17  to pull it off.  Correct?

18  A.   Correct.

19  Q.   It's not on a cloud or something.

20  A.   It's not on -- no, it is not on a cloud.  It is accessed

21  through the internet.

22  Q.   Okay.

23  A.   Correct.

24  Q.   So there is no external storage device that you found here

25  regarding Chris Harp using any of that; correct?

### C. Thigpen - Cross-Examination (Mr. Edwards)

1  A.    Of --

2  Q.    Other than the computer or --

3  A.    -- internet-based storage, no.  Just the computer and the

4  storage device of the thumb drive.

5  Q.    Okay.  No evidence of any rental or storage facilities

6  being used by Mr. Harp?

7  A.    No.

8  Q.    No recording in a media that contains false, misleading,

9  or no titles?

10 A.    I don't believe so.  I believe most of the media and the

11 files that we found were very, very descriptive.

12 Q.    Okay.  And other than a password on the computer itself --

13       And that password, as you testified to, was actually

14 provided to you by Chris the day of the search.  Fair?

15 A.    Through Amy.  Correct.

16 Q.    Okay.

17 A.    And the Wi-Fi being password protected as well.

18       And again, these are not absolutes.  They are things that

19 are listed in search warrants because that is what's been seen

20 historically in other cases.  It is not a -- an end-all, be-all

21 list, fully inclusive of every type of offender that is

22 possible.

23 Q.    And I know -- well, you stated also in your affidavit that

24 "Offenders often have material known as child erotica that may

25 not meet the definition of child pornography but is often

## C. Thigpen - Cross-Examination (Mr. Edwards)

1  present and probative of an offender's sexual interest in

2  children and criminal intent."

3      You found no evidence of child erotica in the house.

4  A.    I believe I did --

5  Q.    Okay.

6  A.    -- on the computer.  I believe it's noted in a report.

7  Q.    No.  I meant other than the computer.  Anything else,

8  anywhere else other than the computer, did you find any

9  evidence of that whatsoever?

10  A.    Of child erotica not on an electronic device?

11  Q.    Not on anything other than Exhibit A.

12  A.    Correct.  All of the --

13  Q.    Or Exhibit 1.  Sorry.

14  A.    All of the contraband was on this one item and the thumb

15  drive, Exhibit 2.

16  Q.    Well, there's actually no pornography on the thumb drive,

17  is there?

18  A.    Not in -- and again, that's something that the CART

19  examiner is better suited to explain than me.  Not in a

20  video -- a playable video or a playable image, no.

21  Q.    In the over three years between the time of the search of

22  the Harps' home and the time that this indictment was brought

23  on November 7th of 2023, was any attempt made -- or no

24  attempt was made to determine who had access to the computer

25  other than Chris Harp; is that fair?

### C. Thigpen - Cross-Examination (Mr. Edwards)

1 A.   The access to the computer, again, as I previously

2 discussed, was determined -- or was investigated during the

3 search warrant.  And there was the opportunity given to the

4 residents of that house to explain anybody else that had access

5 to that computer.  They did not.  And there was no --

6    Again, we'll get into this with the examination.  But

7 there was no indication in that -- in the forensic examination

8 of that computer to lead me in a direction to go ask somebody

9 about their access to the computer.

10 Q.   Well, let's back up for a second.

11    Chris Harp told you he knew nothing about any pornography

12 on anything.

13 A.   No, he did not.

14 Q.   Okay.  So how would he be able to tell you who had access

15 or who -- he didn't know anything about the pornography; fair?

16 A.   Well, you asked if --

17 Q.   According to what he stated.

18 A.   Right.  You asked if they said anything about who had

19 access to the computer.  Which I would think that either one of

20 them would be able to tell me who had access to the computer.

21 Q.   Okay.

22 A.   And did not.

23 Q.   Other than the time frame that Chris Harp lived with his

24 in-laws, no investigation was done to determine where Chris

25 lived prior to or who he lived with; is that fair?

## C. Thigpen - Cross-Examination (Mr. Edwards)

1  A.    No, that's not fair.  Special Agent Ryan did the checks

2  that he discussed, the law enforcement database checks.  It is

3  a very comprehensive list of addresses associated with

4  Mr. Harp; I believe Mrs. Harp; I believe the Westwoods.  There

5  were several individuals that Special Agent Ryan ran database

6  checks on to determine their current and past residencies.

7  Q.    It's your testimony that the reason that neither you or

8  any other law enforcement officer made any attempt to determine

9  that Chris Harp was even home when these downloads were taking

10 place is because, well, they could have been timed or

11 scheduled.

12 A.    Can you say that one more time?

13 Q.    Sure.

14     Is it your testimony that why neither you nor anyone else

15 in this investigation took any steps to try to determine if

16 Chris Harp was even present at the home when these downloads

17 were taking place is because it's possible that they were

18 scheduled, the downloads were scheduled?

19 A.    No.  I would say that we did take steps.  In fact, we had

20 identified where Mr. Harp was working.  Special Agent Ryan

21 identified where he was working during the early stages of this

22 investigation, prior to the search warrant.  I don't recall the

23 exact date.  It's noted in a report that I wrote.  I -- we did

24 issue a subpoena to that company to get Mr. Harp's work

25 records, to show what days he would have been at work, what

## C. Thigpen - Cross-Examination (Mr. Edwards)

1   days he would have been working remotely.  By the time the

2   recent downloads occurred, they indicated he was already

3   terminated.

4        Again, during my time at the house on the date of the

5   search warrant, it was indicative by both the setup in the loft

6   and what Mrs. Harp said that Mr. Harp was working remotely.

7        And again, with her statement about going to the car

8   dealership but then coming home and her leaving to go to a

9   doctor's appointment, all of that seemed to corroborate her

10  facts and what we saw in the phones that we seized after the

11  search warrant.

12  Q.   Prior to Mr. Harp being charged in November of 2023, did

13  anyone go and knock on the door of the Westwoods' and ask them

14  anything?

15  A.   Not back then.  Again, nobody ever reached out to give me

16  any additional information.

17       Recently I did call Mrs. Westwood, and she refused to

18  speak about it.

19  Q.   Recently meaning last week?

20  A.   Correct.

21  Q.   When this trial was actually scheduled to go, that's the

22  first time you tried to reach out to her?

23  A.   Correct.  I mean, at any point up until a trial, if

24  information comes to light --

25       Which it did that she might have information pertinent to

**C. Thigpen - Cross-Examination (Mr. Edwards)**

1    this case.  That wasn't relayed to me directly.  She didn't

2    reach out to me directly.  But information got to me that she

3    might have information relevant to this case.  It is my duty as

4    an FBI agent, as an investigator, to reach out to her to ask

5    her what that information might be.  It's prior to trial.  It's

6    prior to us being here today.  So I did that.  I called.  And

7    she refused to speak to me.

8    Q.   Okay.  And what about anyone else in the neighborhood?

9    Did you go knock on anyone else's door prior to the charges

10   being brought in this case?

11   A.   Again, this is not your typical neighborhood.  It was a

12   house in the middle of the woods.  I didn't see a relevance or

13   a need to knock on somebody's door at the bottom of the hill

14   and ask them if they knew who had access to Mr. and Mrs. Harp's

15   home up in the woods.

16   Q.   So the Government was well aware of who-all lived in the

17   fairly recent vicinity of the Harps' home; is that correct?

18   A.   I would say that the records check -- to the best that we

19   can do with our records checks, Mr. -- or -- I'm sorry --

20   Special Agent Ryan did that prior to my involvement in this

21   case.

22            MR. EDWARDS:  I have no further questions of the

23   officer.

24            THE COURT:  Redirect?

25            MR. PERRI:  No further questions, Your Honor.

### C. Thigpen - Cross-Examination (Mr. Edwards)

1        THE COURT:  All right.  Special Agent, you can step

2   down, sir.  Thank you much.  You can leave all those exhibits

3   there.

4        THE WITNESS:  Yes, sir.

5        THE COURT:  We'll tidy up.  Thank you.

6     Madam Clerk, if I could ask you to grab Exhibits 1 and 2.

7   Thank you.

8     The Government may call its next witness.

9        MS. CONKLIN:  The Government would call

10  Jonathan Friend.

11       THE COURT:  All right.

12    Good afternoon, sir.  If you wouldn't mind making your way

13  all the way to the front of the courtroom.  You're going to

14  pause with Madam Clerk so she can swear you in.  Then we'll ask

15  you to take the witness stand.  Thank you.

16       **JONATHAN FRIEND, GOVERNMENT'S WITNESS, SWORN**

17       THE CLERK:  Thank you.  Please have a seat at our

18  witness stand.

19       THE WITNESS:  Thank you.

20       THE CLERK:  Our next witness is Jonathan Friend,

21  F-R-I-E-N-D.

22       THE COURT:  Thank you, sir.  Once you're seated and

23  comfortable, if you wouldn't mind adjusting that mic so

24  everybody can hear you.

25       THE WITNESS:  Yes, sir.

**J. Friend - Direct Examination (Ms. Conklin)**

1          THE COURT:  Don't worry, you can't break it.  Thank

2    you.

3       Ms. Conklin, go right ahead.

4          MS. CONKLIN:  Thank you.

5                     <u>DIRECT EXAMINATION</u>

6    BY MS. CONKLIN:

7    Q.   Good afternoon, Detective.  Who do you work for?

8    A.   I work for the Monongalia County Sheriff's Office.

9    Q.   And actually, what is your position there at the

10   Monongalia Sheriff's Office?

11   A.   So I'm currently the detective supervisor for the

12   sheriff's office.  So I'm in charge of our detectives division.

13   Q.   Now, as part of your work with the Monongalia Sheriff's

14   Office, do you also work with the FBI?

15   A.   I do.

16   Q.   And how is it that you wind up working with them?

17   A.   So our detectives are also a part of the Internet Crimes

18   Against Children Task Force.  And so we work hand-in-hand with

19   members of the FBI whenever they have child sexual assault

20   material cases.

21   Q.   Now, I want to draw your attention back to

22   September 25th, 2020.  Were you working that day?

23   A.   I was.

24   Q.   And were you assisting with the service of a search

25   warrant at 904 Bloody Run Road?

### J. Friend - Direct Examination (Ms. Conklin)

1  A.    I was.

2  Q.    And was that an FBI investigation that was going on?

3  A.    Yes, ma'am, it was.

4  Q.    Okay.  Have you served other search warrants with them as

5  well?

6  A.    I have, yes.

7  Q.    And what's the general process of when you're serving a

8  search warrant?  Or I guess what did you do that day at 904

9  Bloody Run Road?

10  A.    Sure.

11       So prior to this day I was contacted by -- I believe it

12  was Agent Thigpen who had told me that they had a search

13  warrant that they needed to serve at 904 Bloody Run Road.  And

14  so we had made arrangements to meet -- I believe it was in the

15  parking lot of Walmart -- to have a briefing the morning before

16  it had taken place.  And we went over what the search warrant

17  was for, what the plan was whenever we got there, who was

18  responsible for what duties.  And then after we were done

19  briefing, then we drove directly over to that location to

20  execute the search warrant.

21  Q.    And what was your duty that day?

22  A.    I was there primarily just to assist with searching the

23  residence.  I know typically they like to take local law

24  enforcement officers with them, and so we were there just as

25  the local assistant with the search warrant.

### J. Friend - Direct Examination (Ms. Conklin)

1  Q.    Let me just stop you real quick.

2       Morgantown, West Virginia, or the location -- the 904

3  Bloody Run Road, Morgantown, West Virginia, that's in

4  Monongalia County?

5  A.    It is in Monongalia County, yes, ma'am.

6  Q.    And that's in the Northern District of West Virginia?

7  A.    It is.

8  Q.    Okay.  So when you got to the residence and you started

9  searching, I guess I want to draw your attention to two

10 specific things.  Did you -- let me back up.

11      Did you search multiple rooms at that location?

12 A.    I did.  One of the protocols that they had was they would

13 put these lettered signs up throughout the residence to signify

14 each room by a letter.  And then whenever you went into a room

15 to search that room, you would put your name on this letter

16 sheet.  That way it kept track of who searched which room.  And

17 so as we broke up to do the search of the house, we would go

18 into a room, put our name on it, and then move on to the next

19 part of the house.

20 Q.    I specifically want to ask you about the loft area, or

21 what was known as Room N.  Is that one of the locations that

22 you searched?

23 A.    It is.

24 Q.    And if I could show you what's been previously marked for

25 iden- -- or previously marked as Government's Exhibit 7H, I

**J. Friend - Direct Examination (Ms. Conklin)**

1  believe.  And you should see it come up on your screen.

2          THE COURT:  That's 7H?

3          MS. CONKLIN:  H as in horse.

4  BY MS. CONKLIN:

5  Q.   Do you recognize that?

6  A.   I do.

7  Q.   And what is that?

8  A.   So this is the upstairs of the residence in question.  As

9  soon as you go to the top of the steps, there was, like, a wood

10 railing on your left-hand side which went all the way back to

11 this wall that you look at.  And it appeared to be this little

12 office kind of setup to the left.  And I believe there were

13 some rooms and, like, an unfinished attic area, kind of, to the

14 right.

15         MS. CONKLIN:  And if you could please pull up 7I as

16 in igloo.

17 BY MS. CONKLIN:

18 Q.   And if you could tell me what 7I shows.

19 A.   Sure.

20      So this is kind of the reverse of that last photo.  So on

21 the right-hand side of the photo there is the steps that would

22 bring you upstairs to this loft area.  And then to the right

23 there is, like, a unfinished closet/kind of attic area.

24         MS. CONKLIN:  Okay.  If we could go back to 7H,

25 please.

**J. Friend - Direct Examination (Ms. Conklin)**

1  BY MS. CONKLIN:

2  Q.    Now, did you search that area for computers?

3  A.    Yes, ma'am.  For any kind of digital technology is what we

4  were searching for.  So thumb drives, computers, external hard

5  drives, things of that natures.

6  Q.    And did you find computers in those locations?

7  A.    We did.

8  Q.    If you could please, I guess, circle --

9          MS. CONKLIN:  Do we have the little marker thing

10 there?

11 BY MS. CONKLIN:

12 Q.    If you could please use your finger to -- on the screen to

13 identify the areas that you found the computers in.

14 A.    Yes, ma'am.

15        So specifically, there was two laptops that I remember.

16 One was underneath where these monitors are on the left-hand

17 side.  And then there was another one that was kind of

18 beneath -- I'm sorry -- beside of this chair here, between the

19 wall and the chair.

20        You can kind of see underneath this sticker here that

21 there's a laptop cord down there.  So it was a laptop and a

22 cord that was between that chair and the wall.

23 Q.    And when you found that laptop that was down there, tucked

24 kind of behind the chair, between the -- I guess would you say

25 it was between the chair and those items piled up on the floor?

## J. Friend - Direct Examination (Ms. Conklin)

1  A.   If I remember correctly, like, behind the clothing or the

2  items, there was, like, a little gap where there's carpeting

3  and stuff.  I think that's where it was located at.  But yeah,

4  either under those clothing but between that chair and the

5  wall.

6  Q.   And when you observed that laptop there, what did you do

7  with it at that point?

8  A.   I had taken it and sat it on the arm of this chair, kind

9  of where that arrow is pointing to.

10       MS. CONKLIN:  If I could have Exhibit 7J, please.

11  BY MS. CONKLIN:

12  Q.   And do you recognize this picture?

13  A.   I do.

14  Q.   And what does this picture show?

15  A.   So this is one of the laptops that was found in that loft

16  area, underneath those monitors as I had circled before.  It

17  was labeled as 8 by the agents.  And once these items were

18  found, I had called for a photographer to come and take

19  pictures of them before they were secured.

20       MS. CONKLIN:  And then let me go to Exhibit K -- 7K,

21  please.  K as in king.

22  BY MS. CONKLIN:

23  Q.   And what does 7K depict?

24  A.   This is that laptop that I had previously stated that was

25  between that armchair and the wall in that loft area.  That

**J. Friend - Direct Examination (Ms. Conklin)**

1  carpeted area down there where that red clothing is, down in

2  that general area is where that laptop and that cord was

3  located at.  So whenever it was found, I had taken it, sat it

4  up on the chair, and then asked for a photographer to come to

5  take pictures of what was found thus far.

6  Q.    Okay.

7           MS. CONKLIN:  And if I can have 7L.  L as in lion.

8  BY MS. CONKLIN:

9  Q.    And do you recognize what that is as well?

10  A.    I do.  I believe we had determined that this was a -- kind

11  of a welcome letter for Christopher Harp.  And it had what his

12  user name, password, how to get on his email/voicemail for his

13  computer was.

14           MS. CONKLIN:  And if we can just back out from that

15  letter.

16  BY MS. CONKLIN:

17  Q.    And can you see indications from looking at that picture

18  that it was up in the loft area when it was photographed?

19  A.    Yes.  Where it was photographed here is the material from

20  the chair that was pushed into that white desk where that

21  laptop was previously just shown.

22  Q.    Okay.  Now, just to clarify, you didn't go through any of

23  the computers or anything like that when you found them at the

24  location.  Your job was just to look for them; correct?

25  A.    That is correct, ma'am.

**J. Friend - Direct Examination (Ms. Conklin)**

1   Q.   And when you found the computer that was tucked down in

2   the side of the chair and the work computer that was on the

3   table there, were either of those computers running at the time

4   that you observed them?

5   A.   Not that I recall, ma'am, no.

6   Q.   Okay.

7           MS. CONKLIN:  If I could have one moment, Your Honor.

8           THE COURT:  You may.

9       (Pause in proceedings.)

10          MS. CONKLIN:  And Your Honor, if I could briefly

11   approach the witness.

12          THE COURT:  You may.

13   BY MS. CONKLIN:

14   Q.   I'll give you this.

15   A.   Yes, ma'am.

16   Q.   All right, Detective.  What I've handed you is Exhibit 1.

17   Do you recognize that computer?

18   A.   I do, ma'am.

19   Q.   And is that the same computer that you had observed in

20   the -- on the scene at 904 Bloody Run Road and also in the

21   pictures?

22   A.   Yes, ma'am.

23          MS. CONKLIN:  I would tender the witness, Your Honor.

24          THE COURT:  Understood.

25          MR. EDWARDS:  Thank you, Your Honor.

**J. Friend - Cross-Examination (Mr. Edwards)**

1          THE COURT:  One second.

2      Okay.

3          THE WITNESS:  Thank you.

4                          <u>CROSS-EXAMINATION</u>

5    BY MR. EDWARDS:

6    Q.   Detective Friend, how you doing?

7    A.   Wonderful, sir.  How are you?

8    Q.   Good.  It's been a while since we've seen each other.

9    A.   Yes, sir.

10         MR. EDWARDS:  Can I ask your indulgence in putting up

11   7I for me, please.

12      No, that's not the one I want, then.  Try 7K.

13      (Pause in proceedings.)

14         MS. CONKLIN:  It would be H.

15         MR. EDWARDS:  There we go.  Okay.

16   BY MR. EDWARDS:

17   Q.   All right.  Detective Friend, you indicated that when you

18   first came up to the loft, this is what, basically, it looked

19   like before you pulled out any evidence or anything of that

20   nature; is that correct?

21   A.   That is correct.  So before any searching begins,

22   typically a -- overall photographs are taken of the entire

23   residence before anything is moved, anything is touched,

24   anything like that.

25   Q.   And right underneath the sticker that says Government

**J. Friend - Cross-Examination (Mr. Edwards)**

1  Exhibit 7H, it appears that there is a cord there in front of
2  that chair; is that correct?
3  A.   Yes, sir.
4  Q.   Okay.  And that was the cord for the computer that's been
5  marked as Government's Number 1; is that fair?
6  A.   Yes, sir.
7  Q.   Okay.  So that was just laying out there on the floor.
8  You knew that there was -- it was attached to something, or at
9  least there was an electronic cord there.  Fair?
10  A.   Yes, sir.
11  Q.   Okay.
12         MR. EDWARDS:  And now if we go to 7K.
13  BY MR. EDWARDS:
14  Q.   And you indicated, I believe -- and correct me if I'm
15  wrong -- that the actual computer, if you take it off where
16  that open carpet -- the triangle of carpet, that's where the
17  computer itself was laying.  Is that correct?
18  A.   Yes.  I can't remember if it was under the clothing there
19  a little bit or not.  But that general vicinity, yes, is where
20  it was located at.
21  Q.   All right.  Nevertheless, it wasn't too hard for you to
22  find.
23  A.   Correct, sir.
24  Q.   Okay.  You saw the cord going to it?
25  A.   Yes, sir.

**J. Friend - Cross-Examination (Mr. Edwards)**

1   Q.   And the computer itself may have been visible.  You're

2   just not sure as you sit here today?

3   A.   Yes, sir.

4   Q.   Okay.  You showed back on, I think -- there was a picture.

5          MR. EDWARDS:  And I'm sorry.  I'm not doing a very

6   good job, Your Honor, of writing down and descripting what

7   these photos are.

8   BY MR. EDWARDS:

9   Q.   But up in that loft area, it looked like there was an

10  unfinished area of the home, an attic area.

11  A.   That is correct, sir.

12  Q.   Okay.  Did you search that area as well?

13  A.   Specifically, I can't remember if I -- I believe I did, if

14  it's the one that you're talking about that has, like, just a

15  kayak and a cooler in it.  I remember going into there as well.

16  Q.   Okay.

17  A.   But without going through the actual letters of each and

18  every room, I can't remember off the top of my head if I had

19  searched that one or not.

20  Q.   Do you recall if you found any electronic devices in that

21  area?

22  A.   In that unfinished area?

23  Q.   Yeah.

24  A.   I don't recall finding any in that one.

25  Q.   Any of the electronic devices that you found in the home,

1   did any of them appear to be hidden?  Meaning that they were

2   kind of tucked away, trying to be hidden from someone.  That

3   you looked.

4   A.    Not that I recall.

5   Q.    Okay.  I have nothing further.  Thank you, Detective.

6   A.    Thank you, sir.

7           THE COURT:  Redirect, Ms. Conklin?

8           MS. CONKLIN:  No, Your Honor.  I don't have any.

9           THE COURT:  All right.  May the officer be excused?

10          MS. CONKLIN:  Yes, Your Honor.

11          THE COURT:  Thank you, sir.  You can go ahead and

12  step down.

13          THE WITNESS:  Thank you, Your Honor.

14          THE COURT:  Thank you much.

15      Another relatively short witness?  Or --

16          MS. CONKLIN:  We don't have any other relatively

17  short.  The next witness would be Mr. Hammer.

18          THE COURT:  Okay.

19          MS. CONKLIN:  He's going to be a longer.

20          THE COURT:  Okay.

21          MS. CONKLIN:  So I don't know what the Court wants to

22  do.

23          THE COURT:  Understood.  Why don't we just go ahead

24  and save him for tomorrow morning, then, given his

25  qualification and the rest.

1        Okay.  Ladies and gentlemen of the jury, given the time of
2  day and the anticipated length of the next witness, we're going
3  to go ahead and call it a day from your perspective.  Thank you
4  very much for your time and patience today.
5        Please continue to refrain from discussing the case with
6  anyone.  That does include between or among any of your fellow
7  jurors.  Also, this evening, as you travel home or elsewhere
8  and chat with curious family, friends, and neighbors and the
9  like, please blame me for when you have to tell them you're not
10 allowed to talk about it yet, because that's true.  So please
11 feel free to use me as an excuse.  You're simply not at a point
12 where you can talk about any aspect of the case.
13       Also, please continue to refrain from any independent
14 investigation or research about the case, the parties, or any
15 of the issues we've touched upon, and please continue to
16 refrain from any social media activity about your jury service
17 or the case at all.
18       With that, have a very pleasant evening.  We'll see you
19 all tomorrow morning at 9:30 AM.  Thank you very much.
20       And also, again, please feel free to leave your notepads
21 face-down on your chairs, and they will be secured and
22 undisturbed.  Thank you.
23       (Jury retired from the courtroom at 4:41 PM.)
24            THE COURT:  All right.  Thank you, everyone.  Please
25 be seated.

1        We made a couple tinkers to the jury charge that counsel

2    was previously provided.  If it isn't in your inboxes already,

3    it will be shortly.  Let's plan to use part of our lunch break

4    tomorrow to start our work on the charge, assuming we'll still

5    be hearing from witnesses by the time we hit lunch.  But I feel

6    good about where our charge is.  But I'll wait for feedback

7    from counsel about that.

8        With that, anything from the Government we need to take up

9    at this point of the day?

10            MS. CONKLIN:  I can't think of anything, Your Honor.

11            THE COURT:  Okay.  Great.

12        From the defense?

13            MR. EDWARDS:  Your Honor, there's been some ongoing

14    testimony or things about Mr. Harp had the opportunity; he

15    could have called us at any point in time.  I think that needs

16    to kind of stop.  I don't believe that -- I mean, he has a

17    right not to speak to the police if he doesn't -- if he wishes

18    to.  And to have comments that he didn't or that he didn't call

19    them after the fact or after he, you know, basically said he

20    didn't wish to speak to them I think is improper.

21            THE COURT:  Well --

22            MR. EDWARDS:  And I would ask that the witnesses be

23    advised not to do that.

24            THE COURT:  We'll deal with that if it comes up

25    again.  I get the vibe it may not.  But we'll deal with it if

1   necessary.  Understood.  I'll be ready to deal with it.

2            MR. EDWARDS:  Thank you, Your Honor.

3            THE COURT:  Mr. Harp, could I ask you to stand so

4   that Madam Clerk can swear you in, please.  There's a couple

5   things I want to talk with you about --

6            THE DEFENDANT:  Yes.

7            THE COURT:  -- so you have the evening to think about

8   it.  Thank you, sir.

9        (Defendant sworn.)

10           THE CLERK:  Thank you.

11           THE COURT:  Thank you, sir.  You can take your seat,

12  Mr. Harp.  Thank you very much, sir.

13       A couple things.  One, obviously, you've been sworn in,

14  sir, so you are under oath.  Please keep in mind any false

15  statements you make or false answers you give to any of my

16  questions, those can form the basis of a separate criminal

17  action against you for false swearing or for perjury.

18       Do you understand that, sir?

19           THE DEFENDANT:  Yes.

20           THE COURT:  All right.  With that said, if I say

21  anything or ask you anything that prompts you to want to have a

22  conversation with Mr. Edwards before you respond to my

23  question, please let Mr. Edwards know or let me know, and we'll

24  take a break so you gentlemen can talk.

25       Do you understand that?

1              THE DEFENDANT:  Understood.

2              THE COURT:  All right.  Finally, along those lines,

3    none of my questions do I intend to, nor would I ever, effort

4    to invade your attorney-client privilege with Mr. Edwards.  I

5    do not want you to tell me about any substantive conversations

6    you've had with your counsel.

7         Do you understand that, sir?

8              THE DEFENDANT:  Understood.

9              THE COURT:  Okay.  And let me also offer this.  The

10   conversation that we've started having, that's going to

11   progress, is common.  And what I mean by common is it's a

12   conversation I have with every defendant who's been charged

13   with a crime by the Government of the United States of America

14   at any trial.  So this isn't unusual or special or anything

15   like that.  This is a conversation I have with every defendant.

16   And it's to ensure that you have a good grasp on a decision

17   looming for you, that I have no doubt you and Mr. Edwards have

18   been talking about.

19        And that decision, sir, is at some point -- most likely

20   tomorrow -- the Government is going to rest.  And that means

21   they're going to conclude presenting their case-in-chief

22   evidence.  At some point after that you're going to have to

23   make a decision about whether or not you wish to waive your

24   rights under the Fifth Amendment.

25        As you've heard me tell the jury a couple times already,

1   you have rights under the Fifth Amendment that continue through

2   this trial.  And that includes refusing to testify, invoking

3   your right to remain silent, and refusing to offer any

4   testimony or answer any questions that you believe may tend to

5   incriminate yourself.

6       Do you understand that?

7           THE DEFENDANT:  Yes, I do.

8           THE COURT:  Okay.  That is a right that is yours

9   that, again, remains throughout trial.

10      As I have told the jury, and as I will tell the jury, if

11  you do not waive your right under the Fifth Amendment, they

12  cannot in any way consider your declination to testify during

13  this trial during their deliberations, and they most certainly

14  cannot base any verdict they find or they reach in this case

15  based on your decision, should it be, not to testify.

16      Do you understand that?

17          THE DEFENDANT:  Yes, I do.

18          THE COURT:  Okay.  Of course, like most of our rights

19  under the constitution, that is a right that you can waive.  In

20  other words, you can choose to testify in this case if you

21  believe it your best interest.

22      I would, of course, strongly encourage you to continue

23  those conversations on that subject with Mr. Edwards as we near

24  the time to make that decision.

25      I do want to make sure that you understand how that

1   process would work if you did choose to testify.  You would

2   take the stand like every other witness has so far.  In other

3   words, I'd ask Mr. Edwards to call his next witness.  He would

4   say your name.  You'd hear me say the same thing, "Come on up.

5   Get sworn in.  Take the stand."

6       It doesn't work like a press conference.  You don't get to

7   address the jury and then say, "There are no questions," step

8   down.  In other words, it's a question-answer exchange just

9   like you've seen with every other witness during this trial,

10  such that Mr. Edwards would call you and then he would ask you

11  questions.  You have to answer those questions.  When he's

12  finished, the Government gets a chance to ask you questions as

13  well under oath.

14      Do you understand that, sir?

15          THE DEFENDANT:  Yes, Your Honor.

16          THE COURT:  Okay.  The Government is limited in the

17  questions they can ask to the scope of the questions that

18  Mr. Edwards asks while you're on the stand.

19      A lot of folks -- primarily lawyers -- misunderstand what

20  that means.  It does not mean the Government has to repeat the

21  very same questions Mr. Edwards asks.  It's more of a

22  topic-based or subject area determination, such that any topic

23  or subject area that Mr. Edwards asks you a question about, the

24  Government gets to ask you whatever questions they believe are

25  appropriate, subject to the Rules of Evidence that govern this

1    trial, while you're on the stand.

2        Do you understand that?

3            THE DEFENDANT:  Yes, Your Honor.

4            THE COURT:  If you do waive your right under the

5    Fifth Amendment, sir, my instruction to the jury at the close

6    of the case would simply be that they are to weigh and assess

7    any testimony that you offer the same way they weigh and assess

8    the testimony of every other witness in this case.

9        Do you understand that?

10           THE DEFENDANT:  Yes, Your Honor.

11           THE COURT:  Okay.  Do you have any questions for me,

12   sir, about either your rights under the Fifth Amendment or how

13   the process works either way, if you decide to testify or not

14   testify, and what my instructions of law would be to the jury

15   in either scenario?

16           THE DEFENDANT:  No, I don't, Your Honor.  Thank you.

17           THE COURT:  All right.  I wanted to have that

18   conversation today, sir, so that you had the evening to think

19   about it and the opportunity to sleep on it.  I would, again,

20   strongly encourage you to continue discussing that decision

21   with your competent and capable counsel.

22       Anything else we need to take up, then, today,

23   Mr. Edwards?

24           MR. EDWARDS:  No, Your Honor.

25           THE COURT:  Okay.  We'll see you all at 9:30 tomorrow

1   morning.   Thank you very much.

2           (Proceedings adjourned at 4:48 PM.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE

     I, Rachel Kocher, a Registered Professional Reporter and Official Reporter of the United States District Court for the Northern District of West Virginia, do hereby certify that the foregoing is a true and correct transcript of the proceedings had in the above-styled action as reported by me stenographically, all to the best of my skill and ability.

     I certify that the transcript fees and format comply with those prescribed by the Court and the Judicial Conference of the United States.

     Given under my hand this 5th day of August 2024.


                                    *Rachel Kocher*
                                    _____
                                    Rachel Kocher, RPR/CRR