```
1              IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
2                      AT CLARKSBURG

3    ------------------------------x
     UNITED STATES OF AMERICA,      :
4                                   :
          Plaintiff,                :
5                                   :  CRIMINAL ACTION NUMBER:
       vs.                          :  1:23-CR-69
6                                   :
     CHRISTOPHER HARP,              :
7                                   :
          Defendant.                :
8    ------------------------------x

9    PROCEEDINGS HAD IN DAY 2 OF THE JURY TRIAL OF THE ABOVE-STYLED
     ACTION ON APRIL 24, 2024, BEFORE THE HONORABLE THOMAS S. KLEEH,
10                      CHIEF DISTRICT JUDGE.

11      APPEARANCES:

12      FOR THE UNITED STATES OF AMERICA:

13         David J. Perri, Esq.
           Jennifer T. Conklin, Esq.
14         U.S. Attorney's Office
           1125 Chapline Street, Suite 3000
15         Wheeling, WV 26003
           david.perri@usdoj.gov
16         jennie.conklin@usdoj.gov

17      FOR THE DEFENDANT:

18         J. Bryan Edwards, Esq.
           Cranston & Edwards, PLLC
19         1200 Dorsey Avenue, Suite II
           Morgantown, WV 26501
20         bedwards@cranstonedwards.com

21      The Defendant was present in person.

22      Proceedings recorded by mechanical stenography.
        Transcript produced by computer-aided transcription.
23

24

25
```

```
 1                      W I T N E S S   I N D E X

 2                                                          PAGE

 3   PETER HAMMER

 4   Direct Examination by Ms. Conklin                         5

 5   Cross-Examination by Mr. Edwards                         60

 6   Redirect Examination by Ms. Conklin                     113

 7   Recross-Examination by Mr. Edwards                      119

 8   Redirect Examination by Ms. Conklin                     120

 9   CORY THIGPEN

10   Direct Examination by Ms. Conklin                       121

11   Cross-Examination by Mr. Edwards                        149

12   AMY HARP

13   Direct Examination by Mr. Edwards                       156

14   Cross-Examination by Ms. Conklin                        188

15   Redirect Examination by Mr. Edwards                     210

16   Recross-Examination by Ms. Conklin                      215

17   REBECCA BODKIN

18   Direct Examination by Mr. Edwards                       222

19   Cross-Examination by Ms. Conklin                        229

20   BRENDA WESTWOOD

21   Direct Examination by Mr. Edwards                       231

22   Cross-Examination by Ms. Conklin                        238

23   BEVERLY SHEETS

24   Direct Examination by Mr. Edwards                       243

25
```

1             W I T N E S S   I N D E X (continued)

2                                                        PAGE

3  Cross-Examination by Ms. Conklin                      247

4  Redirect Examination by Mr. Edwards                   250

5

6                E X H I B I T   I N D E X

7  IDENTIFICATION                                        PAGE

8  Defendant's Exhibit 1                                 185

9  Defendant's Exhibit 2                                 176

10 Defendant's Exhibit 7                                 213

11 Government's Exhibits 8A through 8O                    126

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                April 24, 2024, 9:33 AM

 2      (In open court without the jury.)

 3           THE COURT:  All right.  The Government ready to

 4   proceed?

 5           MS. CONKLIN:  Yes, Your Honor.

 6           THE COURT:  All right.  Mr. Edwards, you ready to

 7   proceed, sir?

 8           MR. EDWARDS:  Yes, Your Honor.

 9           THE COURT:  Great.

10      Can we have our jurors, please, sir.  Thank you.

11           MS. CONKLIN:  Your Honor, while we're waiting for

12   them to come in, just a logistical issue.

13      After Mr. Hammer testifies --

14           THE COURT:  Yes.

15           MS. CONKLIN:  -- I know the Court usually likes to

16   give the jurors a break.  And we would ask that the Court do

17   that so we can make sure our equipment is working right before

18   Agent Thigpen testifies.

19           THE COURT:  No.  Understood.

20           MS. CONKLIN:  We've already tested it, but...

21           THE COURT:  I'll keep my fingers crossed.

22      (Jury returned to the courtroom at 9:34 AM.)

23           THE COURT:  Good morning, ladies and gentlemen.

24   Thank you very much.  Please take your seats.  Thank you all.

25      The Government may call its next witness.

**P. Hammer - Direct Examination (Ms. Conklin)**

1    MS. CONKLIN:  The United States would call Mr. Peter
2  Hammer.
3    THE COURT:  Good morning, sir.  If I could ask you to
4  make your way all the way to the front of the courtroom.  I'm
5  going to ask you to pause with Madam Clerk so she can swear you
6  in.  Then you'll take the witness stand.  Thank you.
7    **PETER HAMMER, GOVERNMENT'S WITNESS, SWORN**
8    THE CLERK:  Thank you.  Please have a seat at our
9  witness stand.
10    Our next witness is Peter Hammer, H-A-M-M-E-R.
11    THE COURT:  Good morning, sir.
12    THE WITNESS:  Good morning.
13    THE COURT:  Once you're seated and comfortable, if
14  you wouldn't mind adjusting that mic so everyone can hear you.
15  Thank you so much.
16    Ms. Conklin.
17    MS. CONKLIN:  Thank you.
18                  DIRECT EXAMINATION
19  BY MS. CONKLIN:
20  Q.  Good morning, Mr. Hammer.  If you could please tell me, I
21  guess -- well, let's back this up.
22    Are you currently employed right now?
23  A.  I am currently retired.
24  Q.  And what did you do before you retired?
25  A.  Generally, I worked for the FBI for 37-plus years, various

**P. Hammer - Direct Examination (Ms. Conklin)**

1  jobs.

2  Q.   What was it that you did with the FBI prior to your

3  retirement?

4  A.   Immediately prior to my retirement I was a system admin at

5  the Quantico OTD facilities.

6  Q.   And what does that entail?

7  A.   It entails managing all the different Windows and Linux

8  VMs for some applications that were run internally to the FBI

9  to provide support for case agents in the field.

10 Q.   And prior to that, what was it that you did at the FBI?

11 A.   Prior to that, for 20 years -- roughly 20 years, I did

12 computer forensics.  I worked about nine years for OTD,

13 operational technology division, out of Linthicum, Maryland.

14 And I worked the last 11-12 years at the Pittsburgh field

15 office.

16 Q.   What was it that you did at the Pittsburgh field office?

17 A.   As -- in digital forensics, we would examine computers.  I

18 would make forensic images of cell phones, computers, loose

19 media: USB/SD cards.  I also processed automobiles for digital

20 content.

21 Q.   Are you familiar with the term "CART examiner"?

22 A.   I was officially regarded as a CART examiner.  CART would

23 be the acronym for the FBI Computer Analysis Response Team.

24 Q.   Okay.  Do you have any degrees that relate to your work in

25 information technology or as a, you know, forensic examiner of

**P. Hammer - Direct Examination (Ms. Conklin)**

1  computers?

2  A.   I have a bachelor of science degree from Millersville

3  University in computer science, and I have a master's of

4  science degree from Johns Hopkins -- Baltimore, Maryland --

5  also in computer science.

6  Q.   Apart from your degrees, did you do additional educational

7  kind of things to keep yourself up to date on computer

8  technology?

9  A.   As a member of the CART program, we constantly had

10  trainings on different softwares, different forensic

11  techniques.  Additionally, I used to provide a lot of training

12  for Linux systems over the years.

13  Q.   Approximately how many computer systems would you say that

14  you've analyzed in a forensic manner?

15  A.   Oh, hundreds.

16  Q.   About how many computer crime investigations have you

17  conducted or participated in?

18  A.   Again, I would say hundreds.

19  Q.   Okay.  Have you ever been found to be an expert in the

20  field of computer analysis or computer -- forensic analysis of

21  a computer by a court of law?

22  A.   I testified in Pittsburgh about a year ago at the federal

23  courthouse.

24  Q.   And was that as an expert?

25  A.   That was as an expert.

**P. Hammer - Direct Examination (Ms. Conklin)**

1          MS. CONKLIN:  Your Honor, the Government would move

2     that Peter Hammer be declared an expert in the field of

3     computer forensics.

4          THE COURT:  Any voir dire or objection to the motion?

5          MR. EDWARDS:  I have no objection, Your Honor.

6          THE COURT:  All right.  Motion granted, then.

7       Ladies and gentlemen, Mr. Hammer, given his training,

8     education, and work experience, qualifies as an expert

9     witnesses -- an expert witness -- excuse me, singular -- for

10    purposes of this trial.  What that means from your perspective

11    is under our rules of evidence he is permitted to share with

12    you opinion testimony based on that training, education, and

13    experience.  Nonexpert witnesses usually are not permitted to

14    share their opinions with you.

15      With that, Ms. Conklin, you may proceed.

16         MS. CONKLIN:  Thank you.

17    BY MS. CONKLIN:

18    Q.   Now, first things first.  Are you being paid or are you

19    supposed to be paid or compensated for your testimony today?

20    A.   I was supposed to collect a nominal amount of money for

21    being here today.

22    Q.   Okay.  And are you collecting or are you supposed to

23    collect, I guess, compensation for the time that you spent

24    driving down here and trial prep as well?

25    A.   I believe so.

### P. Hammer - Direct Examination (Ms. Conklin)

Q.    Okay.  Has -- is the fact that you're being paid for your testimony here today or for your trial prep time or your travel down here for this trial, is that affecting your opinion in this case?

A.    That has no affect on my opinion in this case.

Q.    Okay.  And actually, let's talk about when your opinion was documented.  Did you write a report in this case?

A.    I did, in fact, write a report for this case.

Q.    And does that report pretty much summarize what you're going to be testifying to today?

A.    That report is exactly what I would testify to today.

Q.    Okay.  And was that completed while you were still working for the FBI?

A.    That was completed while I was still at the Pittsburgh field office as a CART examiner.

Q.    Okay.  So let's talk briefly about how you work on a case. When you conduct an analysis, do you take notes as you're going along?  Or what's your process that you do?

A.    Definitely notes are taken.  We also take logs.  So once we start working on a computer, it's all digital evidence.  So it's processed digitally for the most part.  And there's logs that are taken, and there's notes that are taken by me personally.

Q.    And did you do that as you went through the computer and processed the computer?

**P. Hammer - Direct Examination (Ms. Conklin)**

1  A.    We did.  That would always occur.

2  Q.    And were those notes what you based your report or what

3  you put into your report?

4  A.    The report reflects my notes.

5  Q.    Okay.  So let's talk about your involvement in this case.

6  Was this case assigned to you as part of your position as a

7  CART examiner?

8  A.    This case was assigned to me as part of my position as a

9  CART examiner.

10  Q.    Okay.  And when you initially got the items that you went

11  to review in this case, what was that process that you did,

12  generally?

13  A.    Generally, the -- generally speaking -- and I wouldn't say

14  generally.  I would say in this particular case the evidence

15  was logged into the evidence control room at the FBI Pittsburgh

16  facilities.  That happened to be on the same floor that I

17  actually worked.  So it's just a matter of me walking down the

18  hall, signing the evidence out, taking the evidence back to my

19  lab/office, and then beginning processing procedures.

20  Q.    Okay.  Approximately how many items did you review as part

21  of your entire investigation -- or part of your entire analysis

22  of this case?

23  A.    In this case I believe there was something in the

24  neighborhood of 30 items.

25  Q.    Okay.  And did those items range from four computers to

**P. Hammer - Direct Examination (Ms. Conklin)**

1   various thumb drives and even SD cards?

2   A.   There was four computers, and there was a number of SD

3   cards, loose -- what we would normally refer to as loose media.

4   Q.   And for all those 30 items that were reviewed, in how many

5   items did you find indications of possession of child

6   pornography?

7   A.   We found indications of child pornography on two items.

8          MS. CONKLIN:   Okay.  If I could approach the witness,

9   Your Honor.

10          THE COURT:   You may.

11  BY MS. CONKLIN:

12  Q.   All right.  Mr. Hammer, do you recognize that?  Exhibit 1,

13  I should clarify for the record.

14  A.   I do recognize this item.

15  Q.   And is that the HP laptop that you had examined?

16  A.   My initials would be under here.  And yes, there are my

17  initials and the date that I received it from evidence.

18  Q.   Okay.  What was the process that you did when you reviewed

19  that HP laptop?  Or what did you do when you reviewed it?

20  A.   So initially, upon receiving numerous items of evidence,

21  it would be my standard practice to make forensic images of all

22  of the devices, all of the media devices associated with the

23  request or the case.  And that's what we did on this -- what I

24  did on this case was to make forensic images of the media

25  associated with this laptop computer.

**P. Hammer - Direct Examination (Ms. Conklin)**

1  Q.   Now, when you made the forensic image of the media or of

2  that computer, how can you be sure that, like, it's an

3  identical matching image of the computer?

4  A.   So the imaging processes calculate a verification -- a

5  verification signature, if you will, for that piece of media.

6  So each piece of media is given -- is -- has this -- it's

7  called an MD5 sum, but it's really a verification signature for

8  that piece of media.

9  Q.   So you've made an identical duplicate, and the two numbers

10 ver- -- match up with each other.

11 A.   That is correct.

12 Q.   Okay.  Once you -- why do you make a duplicate image of

13 the media?

14 A.   The biggest reason is I've had a lot of cases where media

15 was going bad.  And so you would want to make an image as

16 quickly as possible, because some media will deteriorate,

17 especially, in all honesty, if people smoke.  It really makes

18 the media go south, start -- begin to not function properly.

19 Q.   Now, in the duplicate copy that you made, could you

20 tell -- or I guess was it the duplicate copy that you made that

21 you did all the research on?

22 A.   Yes, we would work exclusively from the forensic image

23 once it was created.

24 Q.   Okay.  And could you tell what kind of operating system

25 the computer was running on?

**P. Hammer - Direct Examination (Ms. Conklin)**

1  A.    This computer had a Windows Vista operating system

2  installed on it.

3  Q.    And Windows Vista, is that part of, like, the Microsoft

4  Windows that everybody knows about?

5  A.    That is an earlier version of Microsoft.

6  Q.    Okay.  Now, once you make your duplicate image, what is it

7  that you do with that duplicate image to analyze it?

8  A.    So the forensic image is processed with software that

9  is -- that the FBI uses.  It's a -- it's a product that's

10  available, you know, to anybody who wants to do forensic image

11  analysis.  And the FBI buys copies for the investi- -- the

12  examiners such as myself to use.  And so that forensic image is

13  loaded into that software.  That software will parse apart the

14  entire file system that is represented by the hard drive in

15  this computer.

16  Q.    Now, when you say it parses apart the file system, could

17  you explain to the jury what that means?  Like, what kind of

18  results do you get?

19  A.    So the parsing apart is it literally reads the file system

20  and then it makes it available in terms of different

21  categories.  It might make a category available as "email."  It

22  would make a category available as "images."  It would make a

23  category available as "videos."  It allows you to do keyword

24  searches within the -- within the file system itself.

25        And so when I say it parses apart, it literally breaks it

**P. Hammer - Direct Examination (Ms. Conklin)**

1    apart into hundreds of fields that you could look for various
2    evidence of any kind of -- any kind of activity that you're
3    looking for, really.
4    Q.    So when you parsed it out, did you find indications that
5    there was child pornography on the computer?
6    A.    We did find child pornography on specimen 1B9.
7    Q.    And where was it that you found the child pornography on
8    that computer?
9    A.    Initially we found the child pornography files in what
10   would be the recycle bin for the admin user.
11   Q.    I'm sorry.  And I just want to go back.
12         You mentioned specimen 1B9.
13   A.    Oh.
14   Q.    Is specimen 1B9 the same as the exhibit that's in front of
15   you?
16   A.    Yes.
17         So when the evidence comes in to me, the Pittsburgh
18   evidence control group, they assign evidence items.  And they
19   assign them as 1B and then a number that's sequential.  So the
20   evidence group assigned this item, when it came into the
21   evidence control unit, 1B9.  So I always refer to it as 1- -- I
22   always refer to this laptop as 1B9.  And this would be your
23   Evidence Item 1, I believe.
24   Q.    Yes.
25         Okay.  So let's get back to the videos that you found in

## P. Hammer - Direct Examination (Ms. Conklin)

 1  the recycle bin.  Once you found the videos containing child
 2  pornography in the recycle bin, what did you do at that point?
 3  A.    When the -- upon initial review and identifying the
 4  child -- potential child pornography in the recycle bin, those
 5  were all copied out of the original image and written to
 6  optical media for case agent review.  We provide those on -- or
 7  I provide those on optical media because it's a forensic --
 8  it's a forensic platform so that it can't be overwritten.  So
 9  the case agent wouldn't be able to alter the image in any way,
10  shape, or form.
11      And so all of the -- initially, all of the child porn
12  videos I found in the recycle bin were provided out to case
13  agent for further review on optical media.
14  Q.    So let's talk a little bit about a recycle bin.  What is a
15  recycle bin?
16  A.    So the recycle bin is -- to the best of my knowledge, it's
17  a Windows-only construct.  And Windows uses it as a means -- as
18  a stopgap mean in case you delete a file but you didn't really
19  want it deleted, you accidentally deleted it, or maybe later
20  you wanted to recover that file.
21      So every account on a Windows system has their own recycle
22  bin.  And so when you delete a file, it would go to the recycle
23  bin for your account.  And it would remain there until you
24  either emptied the trash or you recov- -- tried to maybe
25  recover that file.

**P. Hammer - Direct Examination (Ms. Conklin)**

1    There might also be, like, a date frame.  So Windows might

2  say, well, this has been in the recycle bin for six months, and

3  it might start to flush them.

4  Q.    So the files that are in the recycle bin, are they easily

5  accessible to anybody who's using the computer?

6  A.    The files in the recycle bin are easily accessible to the

7  user account.  So, like, my user account, I would -- if I

8  signed on, I think I would easily have access to my recycle

9  bin.  But I might not have easy access to someone else's.

10  Q.    Okay.  Videos and documents that are in the recycle bin,

11  can you actually access those?  Like, can you play those videos

12  or open those Word documents?

13  A.    This is, I think, Microsoft version specific.  So I

14  actually tried this on a Microsoft 11 computer I have at my

15  house.  And I don't think you can play them directly from the

16  recycle bin.  However, on the older versions of Microsoft

17  Windows I believe you could play them directly from the recycle

18  bin.

19  Q.    So when you send things to the recycle bin, does the -- do

20  they go away?  Or can you put them back into your system and

21  reuse them all over again?

22  A.    So from the Microsoft Windows Explorer, which allows you

23  to navigate a file system in Microsoft, you can click on that

24  recycle bin and you should be able to see -- excuse me -- you

25  should be able to see those files as they were at their

**P. Hammer - Direct Examination (Ms. Conklin)**

1  original location on the file system.

2  Q.    There's some water up there, too, if you need some, by the

3  way.

4  A.    Oh, thanks.

5  Q.    So when you receive a file or when you create a file, like

6  if you make a Word document or if you download a video or

7  something like that, how does that show up on your computer,

8  just generally speaking?

9  A.    Generally speaking, if you create a file on your computer,

10  you have a file name.  And then you usually have a set of

11  time/date stamps, which would be the created time, the access

12  time, the modified time.  And you generally get to see the size

13  of the file.

14  Q.    And does that work for either creating a Microsoft Word

15  document or for downloading a video or something along those

16  lines?

17  A.    Yeah.  It would be type spec- -- it would be type

18  nonspecific.

19  Q.    Okay.  Now, will that show -- when you save a document or

20  create a document or something along those lines, will that

21  save in a file structure in some way?  Or a file listing?

22  A.    So Microsoft uses the tree structure, which is a bunch of

23  folders.  That tree -- there's a tree built for every device.

24  So if you have a USB drive, it's going to have its own tree

25  structure.  If you have a floppy drive, it's going to have its

P. Hammer - Direct Examination (Ms. Conklin)

1   own tree structure.  And certainly a hard drive would have its

2   own tree structure.

3   Q.   And when you either download a video or save a document,

4   does the name -- does it get a name in that file structure or

5   that tree structure?

6   A.   You have to create the names, generally speaking.

7   Q.   What about if -- so I guess, you know, if you hit that you

8   want to download something on your Microsoft structure --

9   A.   Then the download software would create the name for you.

10  Q.   Okay.  When you send something to the recycle bin because

11  you, I guess -- well, let me reask that.

12       In order to send something to the recycle bin, do you have

13  to delete it from that computer, from that tree structure?

14  A.   I'm 90 -- I'm really sure that you could literally copy a

15  file directly to the recycle bin.  I don't think that's

16  disallowed in Microsoft.

17       But generally speaking, the way things get to the recycle

18  bin is you hit the delete button, and then it goes to the

19  recycle bin.

20  Q.   Now, when it goes to the recycle bin, does the computer

21  change the way that it's listed or stored in the tree?

22  A.   So what you see from Windows Explorer is you see the file

23  in the recycle bin.  But what happens at the file system layer

24  is the file actually gets moved to a special folder for each

25  user account; and within that folder, the file name is changed,

**P. Hammer - Direct Examination (Ms. Conklin)**

1  and there's also created an information file.  And the file

2  name is changed to a $R and then six random characters.  And

3  the information file that's given is a $I, and it's the same

4  six random characters.  And that's how it's actually stored out

5  on the file system.

6      But that's all hidden from Microsoft Explorer.  If you

7  look in Microsoft Explorer, you won't see any of this.  All you

8  see is a file in the recycle bin.

9  Q.   So that $I file, what's the purpose of that $I file?

10 A.   The $I file maintains the original path and the original

11 file name for -- that is required to restore the $R file.  The

12 $R file has the file content.  So the $I file has the original

13 path and original file name to restore that $R file.  And it

14 also maintains a date of deletion, I believe.

15 Q.   So would it be fair to say that if I delete something, it

16 gets moved from where it is on the structure to the recycle bin

17 system; and then if I undelete something, it gets moved back to

18 where it originally was?

19 A.   It gets moved to the account in the recycle bin for the

20 user that deleted it.  And it gets re- -- if you restore that,

21 it gets restored back to the original path, as specified in the

22 $I file.

23 Q.   Okay.  Okay.  Now, with all this information about the

24 videos in the recycle bin and the $I files and the $R files

25 themselves, the videos themselves, was all that information

**P. Hammer - Direct Examination (Ms. Conklin)**

1   provided to Agent Thigpen?

2   A.   It was provided on the original review media that was

3   actually entered as an ev- -- new evidence item for this case.

4   Q.   Okay.

5        MS. CONKLIN:  If I could approach the witness, Your

6   Honor.

7        THE COURT:  You may.

8   BY MS. CONKLIN:

9   Q.   Mr. Hammer, I'm handing you what's been marked as

10  Government's Exhibits 8A through 8O.  Do you recognize these?

11  A.   I do recognize these.

12  Q.   And did you assist in creating these exhibits?

13  A.   I did assist in creating these exhibits for this trial.

14  Q.   And was the data that was placed on each of those thumb

15  drives the R$ video -- or the $R video and the $I information?

16  A.   So each one of these USBs has a $R file, and some of them

17  have the corresponding $I file.  And when I say some of them

18  have the corresponding $I file, some of the $I files were not

19  found.

20  Q.   Okay.  So the information that would be on those thumb

21  drives would be the original video file and then the $I file

22  that lists the original location that the file came from and

23  when it was deleted.

24  A.   So, yes, these are taken from the admin account of 1B- --

25  what I refer to as 1B9, your Item 1.

**P. Hammer - Direct Examination (Ms. Conklin)**

1  Q.    Okay.

2  A.    Do you want these back?

3  Q.    I can take these back, yeah.  Thank you.  Thanks.

4        And just to clarify, the R$ file and the I$ file were your

5  contribution to these thumb drives; correct?

6  A.    I copied them over from the original evidence.

7  Q.    Okay.  So were you then asked to do additional analysis of

8  the HP laptop?

9  A.    So after the initial review CD was produced, I was asked

10  to do a more thorough investigation of the laptop contents

11  itself.

12  Q.    And did you do that additional investigation to find out

13  who had used the computer and how it was used?

14  A.    We processed all the files and tried to determine, you

15  know, who was associated with the admin account.

16  Q.    Okay.  And did you do that in 2021?

17  A.    Yes, it was 2021.  My report, I think, is February 2nd

18  of 2022.  So I worked several months.  So it would have been

19  '21 and into January of 2022.

20  Q.    Okay.  Now, in your evaluation -- or in your examination,

21  did you determine when the operating system was installed on

22  this computer?

23  A.    There are registry files that show that the original boot

24  of this computer dated to April of 2011.

25  Q.    Okay.  So when you say "the original boot," does that mean

**P. Hammer - Direct Examination (Ms. Conklin)**

1    that you got the computer new and you installed the first

2    operating system on it?

3    A.    That would certainly look to be the case.  Obviously, if

4    you replaced a hard drive, you could have booted it prior,

5    replaced the hard drive, and rebooted it, reinstalled it.  But

6    it looked to be the case where it was brand-new and powered on

7    for the first time.

8    Q.    Okay.  And again, you said that it was a Microsoft Windows

9    Vista system?

10   A.    That is correct.

11   Q.    Okay.

12   A.    Home Premium, I believe.

13   Q.    And when the system was installed, did there appear to be

14   a primary account?

15   A.    Most of the -- most of the use appeared to be associated

16   with the admin account.

17   Q.    Okay.  Okay.  And when you started looking through all

18   these -- or all the information on the computer, did you find

19   something called "restore points"?

20   A.    We did identify restore points within the file system

21   structure of this laptop.

22   Q.    And were those restore points able to help you determine

23   how the laptop had been used historically?

24   A.    The restore points provided a lot of historical

25   information for the use of this computer.

**P. Hammer - Direct Examination (Ms. Conklin)**

1    Q.    So what is a restore point?

2    A.    A restore point is a Microsoft concept.  Back in the

3    Windows Vista era there was a check box in the settings that

4    was, by default, on.  And so if you didn't go in and uncheck

5    that, Microsoft would provide you with what is known by

6    Microsoft as restore points.  And restore points get generated

7    if some software update occurs or if some maybe operating

8    system update occurs.  Microsoft can generate this restore

9    point; and it allows Microsoft that if the update caused the

10   program or the operating system to crash, you had a vehicle

11   where you could undo that update, kind of step back in time,

12   and then get to a new lo- -- the previous location before you

13   had problems.  And it's basically a -- what's known as an

14   incremental backup of the system at some point in time.  And

15   it -- again, Microsoft built this so that it could roll back in

16   case of problems.

17   Q.    So would it be fair to compare a restore point to, like, a

18   Polaroid picture?  Like an instant Polaroid picture?  That it's

19   an instant snapshot of the state of the computer and what's on

20   it at the time that the restore point is made?

21   A.    There is validity in calling it a snapshot of that point

22   in time.

23   Q.    And the -- I guess the way it differentiates from a

24   snapshot, it's not just showing you what's there; everything

25   that's in the computer at that restore point -- or from one

P. Hammer - Direct Examination (Ms. Conklin)

1  restore point to the next -- all those video files, Word files,
2  all the documents and that sort of stuff -- that would be saved
3  in the restore point as well.
4  A.   It maintains changes in the restore point from the last
5  restore point.  So if you -- on the last restore point you
6  added some file, per se, when the new restore point happens, it
7  sees that new file and says, hey, I want to make a -- I'm going
8  to roll this into the restore point so that, if I have to fall
9  back, that file is still here.
10 Q.   So does the FBI have special software to help you review
11 these restore points?
12 A.   So the software I used to process the forensic image of
13 this computer does allow for the review of these restore points
14 individually.
15 Q.   So when you reviewed these restore points individually,
16 were you actually able to access videos and open documents that
17 were in the restore points?
18 A.   You can open up documents and see videos in the restore
19 points that may not be around in the current system anymore.
20 Q.   Okay.  But are those videos and documents actually
21 playable?
22 A.   Some of them were.
23 Q.   Okay.  So would it be fair to say that you found multiple
24 restore points for this computer?
25 A.   I examined a number of restore points.  I think there was

**P. Hammer - Direct Examination (Ms. Conklin)**

1   near 20.

2   Q.   And would you say that you found multiple things and

3   connections with these various restore points?

4   A.   There was definitely data in each of the restore points --

5   Q.   Okay.

6   A.   -- to be reviewed.

7   Q.   Would it aid you in testifying and helping you explain to

8   the jury what you found if we displayed your report for

9   reference?

10  A.   Certainly, if you want to pick out any specifics.

11  Q.   Okay.

12          MR. EDWARDS:  Your Honor, I'll object.  He can review

13  it, but I don't think it -- it's not evidence; it's hearsay.

14  If he needs it to refresh his memory --

15          MS. CONKLIN:  Your Honor, he will be testifying to

16  it.  It's just to help follow along.

17          THE COURT:  If he needs it to refresh his

18  recollection, that's fine.  But he can't read from the report

19  itself --

20          MS. CONKLIN:  All right.

21          THE COURT:  -- verbatim.  I realize the witness is

22  here.  Obviously, he can answer these questions.  But the

23  objection to the extent we're going to read directly from or

24  seek admission of the report is sustained.  It is hearsay.

25          MS. CONKLIN:  Okay.

**P. Hammer - Direct Examination (Ms. Conklin)**

1  BY MS. CONKLIN:

2  Q.   Well, let's talk about these restore points.  Was the

3  first restore point that you found July 8th, 2016?

4       And I would refer you to page 8 of your report if that

5  helps.

6  A.   July 8th, 2016.  The time on -- time stamp on that was

7  18:13:09.

8  Q.   Okay.  And in that restore point did you find data that an

9  individual who utilized the account charp51@yahoo.com had

10 logged into the system?

11 A.   For Google Chrome?

12 Q.   Yes.

13 A.   I did find a log-in for Google Chrome of charp --

14 chrisharp51 -- oh, there is a charp51@yahoo.com.  I see that.

15 Q.   And did you also see that an individual named charp51 --

16 or who used the handle charp51 had signed into usajobs.gov?

17 A.   I see "careers" -- I'm not seeing -- could you repeat

18 that?  Charp51@yahoo?

19 Q.   Google Chrome.  A Google Chrome --

20 A.   Oh, yes, I did.  Oh, that was chrisharp51.

21 Q.   Chrisharp.  I'm sorry.  Chrisharp51.

22 A.   Yeah, that's -- yeah, I see a Google Chrome chrisharp51,

23 and that signed into usajobs.gov.

24 Q.   Did you also find that an individual using the

25 identification awestwood had used the computer and signed into

### P. Hammer - Direct Examination (Ms. Conklin)

1  a bswift.com and pressleyridge.org?

2  A.    There was a Google Chrome account for awestwood, sign-in

3  for both bswift and portal.pressleyridge.org.

4  Q.    Okay.  Now, did you also find indication that there was

5  child pornography that was on the computer between June 12th

6  and September -- I'm sorry -- June 2012 and September 2012?

7           MR. EDWARDS:  Your Honor, I understand the Court's

8  prior ruling.  But just for the record, I renew my objection.

9           THE COURT:  Understood.  Overruled consistent with

10 the prior orders of the Court.

11     You may continue, Ms. Conklin.

12 BY MS. CONKLIN:

13 Q.    Did you find indications that there was child pornography

14 accessed or on the computer between June 2012 and

15 September 2012?

16 A.    So we found a -- we found an IE history file that

17 indicated that there were download files -- downloads between

18 June 12th and September 12th [sic].  And those downloads

19 contained the PTHC acronym in the file name itself for the

20 download.

21 Q.    Approximately how many downloads did you find at that

22 time?

23 A.    It looks -- my number is 14.

24 Q.    Okay.  Did you also find evidence of another video of

25 child pornography with a last written time of July 12th, 2013?

**P. Hammer - Direct Examination (Ms. Conklin)**

1  A.   We did find a video reference for July 12th, 2013.

2  Q.   And was that video -- I'm going to redact her real name

3  for the record, but it's K.F. "pthc pedo nine-year-old

4  Vicky-full.mpg"?  Is that the name of the --

5  A.   That -- that is in the -- that is the file name that was

6  referenced.

7  Q.   Okay.  And the last written time of July 12th, 2013, what

8  does that indicate?

9  A.   If the file was edited on this computer, then that would

10  be reflected.  If the file was just downloaded from some other

11  system or some network, then that last modified -- that time

12  would be reflected in the download time.

13  Q.   So that would be the last time that it was modified on the

14  computer.

15  A.   Correct.

16  Q.   Okay.  Did you find additional restore points after those?

17  A.   Again, I processed, like, nearly 20 restore points on this

18  one.  So that was the first -- July 16th was the first

19  restore point that I had access to using the software that we

20  use to process these forensic images.

21  Q.   Did you find a restore point for July 12th, 2016?

22  A.   We did.

23  Q.   And did you find any additional information there?

24  A.   I didn't note any information there with regard to this

25  case.

**P. Hammer - Direct Examination (Ms. Conklin)**

1  Q.   And what about an additional restore point on July 15,

2  2016?

3  A.   There was a restore point there for July 15th, 2016.

4  Q.   And you found restore points for July 17th, 2016;

5  July 19th, 2016; July 24th, 2016; and July 25th, 2016;

6  correct?

7  A.   That is correct.

8  Q.   And you noted the administrative -- or the admin log-in

9  count for those as well.

10 A.   I did note that, the admin log-in counts for each one of

11 those restore points.

12 Q.   And what is the admin log-in count?

13 A.   It's a -- it's a -- just a number that's retained by

14 the -- one of the registry files.  And I'm assuming it just

15 keeps count of how many times the system has been signed onto.

16 Q.   So for your restore point on July 17th, 2016, you have an

17 admin log-in count of 2,123.  Would that indicate that the

18 computer had been logged in 2,123 times at that point?

19 A.   Yes.

20 Q.   And for the July 19th, 2016, your log-in count reflects

21 2,124.

22 A.   Correct.

23 Q.   So that would be one up from the last restore point.

24 A.   Correct.

25 Q.   And the July 24th, 2016, you have a log-in count of

**P. Hammer - Direct Examination (Ms. Conklin)**

1    2,125?

2    A.    Correct.

3    Q.    And then for July 28th, 2016, you have a log-in count of

4    2,127.

5         I'm sorry.  Did I say July 25th, 2016?  2,126.

6    A.    Correct.

7    Q.    So it appears that each time that the restore point was

8    made, that was also the next log-in time.

9    A.    That's what it certainly does look like.

10   Q.    All right.  Let's talk about the restore point of

11   July 28th, 2016.  Did you review -- does it appear that the

12   individual utilizing the computer is using a peer-to-peer

13   sharing system?

14   A.    There was inferences to what's known as the Shareaza

15   program.  It's spelled S-H-A-R-E-A-Z-A.  And it's a sharing

16   program or peer-to-peer software program.

17   Q.    Now, does the computer -- when you -- when you go to do a

18   search in the Shareaza account, does the computer remember the

19   search terms you used?

20   A.    Shareaza itself, the application itself documents the

21   terms that are used for the searches of the Shareaza network

22   for content.

23   Q.    Now, were you able to determine any terms that were used

24   in the Shareaza account to search for media?

25   A.    Yeah.  The Shareaza search terms documents that -- in the

**P. Hammer - Direct Examination (Ms. Conklin)**

1    July 28th, 2016, restore point, it documents the search terms

2    as "pedomom" and "PTHC."

3    Q.   Now, did you also find evidence or indications on

4    July 28th, 2016, that files indicating child pornography had

5    been downloaded onto the computer?

6    A.   I list here there was eight potential incomplete in the --

7    eight potential video partial downloads in what is known as the

8    Shareaza incomplete folder.  And I also noted there was five

9    download videos indicating potential CP.

10   Q.   Okay.  And are the date and time stamps for the downloaded

11   and partially downloaded files July 28th, 2016, after

12   4:00 PM?

13   A.   That is correct.

14   Q.   Okay.  And your log-in count for that restore point, did

15   you find that log-in count to be 2,127?

16   A.   That is correct.

17   Q.   And would that be the next log-in count number from the

18   July 25th, 2016, log-in?

19   A.   That is correct.

20   Q.   Okay.  So let's talk about the next restore point that you

21   found.  And that would be July 29th, 2016; correct?

22   A.   That is correct.

23   Q.   Was that the day after the last restore point you found?

24   A.   It would be one day later.

25   Q.   Okay.  Did you find -- in that new July 29th, 2016,

P. Hammer - Direct Examination (Ms. Conklin)

1  restore point, did you find anything connected to the prior

2  restore point?

3  A.    The eight -- so the eight partial downloads in the

4  Shareaza incomplete had been marked for deletion, and the five

5  download videos from the previous restore point were also

6  marked for deletion.

7  Q.    Did you see a difference in the search terms that were

8  used in Shareaza?

9  A.    July 26th.

10    There was one additional search term added to the search

11  term list for Shareaza.

12  Q.    And what was that one?

13  A.    And that one is "PTHC mom."

14  Q.    And would it be -- and is it accurate to say that the

15  log-in count for that date was one higher than the log-in count

16  for the date -- the previous restore point?

17  A.    That is accurate.   The log-in count went up by one.

18  Q.    Now, did you find other information in the computer as to

19  who had used the computer or had documents in the computer?

20  A.    Well, the recycle bin does contain a spreadsheet for

21  Amy Westwood.

22  Q.    Okay.   Now let's talk about the next restore point.   Would

23  that be August 3rd, 2016?

24  A.    That would be August 3rd, 2016.

25  Q.    Okay.   Did it appear that an individual had used Shareaza

**P. Hammer - Direct Examination (Ms. Conklin)**

1   to access videos indicating potential child pornography?

2   A.    There are some files in the Shareaza incomplete.  I

3   believe there's two.

4   Q.    And what are those file names, if you have those?

5   A.    The file names are "pedomom-mother son compilation 02."

6   And that's an MPEG file.

7        And the second file is "mother$son.avi."

8   Q.    And actually does it start "pedomom mother$son.avi"?

9   A.    "Pedomom-mother$son.avi."

10  Q.    And did you find any other full downloads on that date --

11  reflected on that date, I should say?

12  A.    There was one full download in that restore point, and

13  that would be "pedomom yogurt.avi."

14  Q.    Okay.  And is there a date and time stamp for the

15  downloaded and partially downloaded files on that August 3rd,

16  2016, date?

17  A.    It says after 12:00 PM.

18  Q.    And the administrative -- or the admin log-in count, is

19  that one more than the last restore point?

20  A.    The log-in count is now 2,129, which is one more than the

21  previous restore point.

22  Q.    So let's go to the next restore point you found.  Is that

23  August 5th, 2016?

24  A.    That is August 5th of 2016.

25  Q.    And did you find that -- let me rephrase that.

**P. Hammer - Direct Examination (Ms. Conklin)**

1    Did you find reference to the videos that were indicated
2  on the August 3rd, 2016, restore point in the August 5th,
3  2016, restore point?
4  A.   It was noted that the files that were previously in the
5  incomplete area -- in the Shareaza incomplete folder were
6  marked for deletion.  It was also noted that the
7  user/admin/downloads were also marked for deletion.
8  Q.   And did you notice that there was a difference in the
9  search terms for that restore point?
10 A.   There are numerous additional search terms from the
11 previous mention of search terms.
12 Q.   And do you know what those additional search terms that
13 were added to the Shareaza search terms in the August 5th,
14 2016, restore point?
15 A.   One was "pae," spelled P-A-E.  One is "Vicky."  One is
16 "private pae 2."  And then the other three are the same from
17 the previous references.
18 Q.   Okay.  Did you recognize the term "Vicky" from one of the
19 videos that you first saw on the computer or logged on the
20 computer or indicated on the computer from 2013?
21 A.   Vicky is a -- Vicky is a name I recognize from other child
22 porn cases.  And it is a name that is referenced in the video
23 file name from, I believe, 2013.
24 Q.   Okay.  So let's move through.  Were there two other
25 restore points?  One on August 5th again, just later in the

**P. Hammer - Direct Examination (Ms. Conklin)**

1   day; and then, again, another on August 13th, 2016?

2   A.   August 20- -- August 5th, 2016, and then August 13 of

3   2016.

4   Q.   Okay.  And do the admin log-in counts roll up one each

5   time?

6   A.   The admin accounts -- the log-in counts roll up one each

7   time.

8   Q.   Okay.  So now we've got a -- I believe your next restore

9   point is August 16th, 2016.  Is that correct?

10  A.   That is correct.

11  Q.   And if I'm -- and to clarify, there's two restore points

12  for August 16th, 2016; is that correct?

13  A.   That is correct.  They're separated by ten hours.  Oh, no.

14  They're sep- -- August 16th the first one is at 16:24, and

15  the second one is at 17:20.  So they would be separated by

16  almost an hour.

17  Q.   Okay.

18          MR. EDWARDS:  Your Honor.  I'm sorry.  Just for

19  clarification, the witness is testifying in UTC time, not

20  Eastern Standard Time.

21      Is that correct?

22          THE COURT:  Well, you can cover that on redirect --

23          MR. EDWARDS:  Okay.  I just didn't want to cause any

24  confusion.

25          THE COURT:  -- Mr. Edwards.

**P. Hammer - Direct Examination (Ms. Conklin)**

1          MR. EDWARDS:  Thank you.

2          THE COURT:  Objection overruled at this point.

3    BY MS. CONKLIN:

4    Q.    Okay.  Does that first August 16, 2016, restore point have

5    any indication that child pornography videos were downloaded?

6    A.    There was four partial downloads in the Shareaza

7    incomplete, and there was one download video in the

8    user/admin/downloads folder.

9    Q.    And what was the name of that video, if you have it noted?

10   A.    It starts with the acronym "PHANT," P-H-A-N-T.  And then

11   it's "pedomom," and then the rest is in Spanish.  I could spell

12   it out.  I-N-T-E-N-T-A, S-E-D-U-C-I-R, just the letter A,

13   H-I-J-O, D-E, the number 1, A-N-O, P-A-R-T-E, 2, and the last

14   word is "hard.avi."

15   Q.    And is the date/time stamp for those files August 16th,

16   2016, at approximately 12:00 PM Eastern Standard Time?

17   A.    That is correct.

18   Q.    Does the search terms in the Shareaza list -- is there a

19   change in those search terms?

20   A.    It looks to be several new search terms in the list.  The

21   last list shows six terms.  This list shows eight terms.

22   Q.    Can you see which the new terms are in this list?

23   A.    The one term is "cbaby."  The term is literally the letter

24   C and the word B-A-B-Y, baby.  "Cbaby."

25         The other term I believe that has been added is "a family

**P. Hammer - Direct Examination (Ms. Conklin)**

1  affair."

2  Q.   And the admin log-in count at that point, has that only

3  gone up one since the last time that the restore point was

4  made?

5  A.   That has gone up one from the last instance.

6  Q.   Okay.  Let's talk about the second August 16, 2016,

7  restore point.  Does that indicate anything about that video,

8  that "PHANT pedomom" video that you just spelled?  In the

9  second restore point, what can you tell about that video?

10  A.   That video was marked for deletion.

11  Q.   Okay.  And are the search terms the same in that second

12  restore point on August 16, 2016?

13  A.   From the 17:20 time frame?

14  Q.   From the August 16 -- yes.

15  A.   I'm not seeing the -- listed out a difference in the

16  search terms.  So I would assume they were the same.

17  Q.   Okay.  So let's move forward to April 24th, 2018.  We've

18  got an admin log-in count of 2,140; is that correct?

19  A.   That is correct.

20  Q.   And is that up a few from the last time your admin log-in

21  count was indicated?

22  A.   The last log-in count indicated was 2,132.  So that

23  indicates eight new log-ins --

24  Q.   Okay.

25  A.   -- from the last restore point.

**P. Hammer - Direct Examination (Ms. Conklin)**

1  Q.   So would that mean that eight times since the last restore

2  point, somebody used the computer?

3  A.   It would indicate eight times that someone signed in as

4  the admin account --

5  Q.   Okay.

6  A.   -- using the admin account.

7  Q.   Okay.  For the April 24th, 2018, did you see activity

8  for specific users in that restore point?

9  A.   We seen a Google Chrome log-in for charp51, and we seen

10 Chrome log-in -- Google Chrome log-in for charp.

11 Q.   Okay.  And are those just for government -- like a

12 government jobs website and stradenergy.com?

13 A.   The one -- the first one, charp51, was for a

14 governmentjobs.com website.  And the charp log-in was for

15 stradlink.stradenergy.com.

16 Q.   Okay.  Does it show that -- in the file system directory

17 that there were any videos that suggested child pornography as

18 being logged as downloaded or partially downloaded?

19 A.   There were three files noted in the Shareaza incomplete

20 folder.  There were four -- there were an additional four

21 partial downloads in the admin downloads folder.

22 Q.   And the restore point for the April 24th, 2018, those

23 initial three partial downloads with file names indicating

24 child pornography, were those downloads dated August 16, 2016?

25 A.   That is correct.  August 16, 2016.

**P. Hammer - Direct Examination (Ms. Conklin)**

1  Q.   And the additional four partial download files indicating

2  child pornography, did those have a date of January of 2014?

3  A.   My report shows January 2014.

4  Q.   Okay.  Let's go to the next restore point, which is

5  April 24th, 2018.  What does that report indicate -- or that

6  restore point indicate happened on the computer?

7  A.   There was -- it looks to be a new version of Shareaza was

8  loaded, or at least downloaded to the computer.

9  Q.   Okay.  Your next restore point is April 24th, 2018.  And

10 you didn't notice anything at that restore point; correct?

11 A.   No additional information was noted.

12 Q.   Okay.  So let's move forward to the April 3rd, 2018,

13 restore point.  At that point do you have a user -- an admin

14 log-in count of 2,142?  Correct?

15 A.   That is correct.  2,142.

16 Q.   And that would reflect the two log-ins on April 24th,

17 2018, and April 24th, 2018.  I guess that would be up two

18 numbers from the original April 24th, 2018, where we were at a

19 log-in count of 2,140.

20 A.   Correct.

21 Q.   Okay.  In the April 30th, 2018, restore point, did you

22 find any indications that files with names referencing child

23 pornography had been downloaded?

24 A.   We did.

25 Q.   And what did you find for those?

P. Hammer - Direct Examination (Ms. Conklin)

1  A.    We found three partial downloads in the incomplete.

2  Q.    And did those have a date associated with them as being

3  downloaded?

4  A.    August 16th of 2016.

5  Q.    Okay.  And then did you find additional reference to other

6  images of child pornography?

7  A.    We found 24 potential child pornography videos in the

8  recycle bin at that time.

9  Q.    And was that -- were they dated as being in the recycle

10 bin on April 24th, 2018?

11 A.    That is correct.

12 Q.    Or being placed in the recycle bin April 24th, 2018.

13 Would that be accurate?

14 A.    I would have to go back and probably look at the original

15 evidence.

16 Q.    But it was either downloaded or put in the recycle bin on

17 the 24th.

18 A.    It was either downloaded or, you know, put to the recycle

19 bin on the 24th.

20 Q.    Okay.  And April 24th, again, 2018, was that the last

21 restore date before this April 30th restore date?

22 A.    That is correct.

23 Q.    Now, did you see something in the Shareaza search terms?

24 A.    The Shareaza search terms had -- it looked like it was

25 replaced with a new list.

**P. Hammer - Direct Examination (Ms. Conklin)**

1  Q.   And would that be consistent with a new version of

2  Shareaza being downloaded, as is reflected?

3  A.   I would think it would be consistent with a previous

4  version of Shareaza being deleted and then a new version of

5  Shareaza being installed, as opposed to a version of Shareaza

6  being updated.

7  Q.   Okay.  What are the search terms that are now in the

8  restore point for the Shareaza searches for April 30th, 2018?

9  A.   The -- there's three search terms.  It's "pedomom boy,"

10  "pedomom," and "a family affair."

11  Q.   Let's talk about your next restore point, which is

12  April 4th, 2019.  Are there indications on that April 4th,

13  2019, date that videos and images of child pornography -- or

14  videos of child pornography had been downloaded to the

15  computer?

16  A.   I have noted that there was just numerous downloads in the

17  Shareaza incomplete folder.  And in the users/admin/downloads

18  folder there were 15 downloaded video files containing

19  potential child pornography.

20  Q.   Okay.  Did you note anything about the recycle bin in that

21  restore point picture on April 24th, 2018?

22  A.   There was 24 potential child porn videos dated

23  April 24th, 2018.

24  Q.   And is that consistent with what you found, with the 24

25  potential child porn videos in the recycle bin on April 30th,

### P. Hammer - Direct Examination (Ms. Conklin)

1   2018?

2   A.   I believe so.  The --

3   Q.   I'm sorry.

4   A.   The date is the same.  The number is the same.

5   Q.   Okay.  Now, did you notice a difference in the search

6   terms?

7   A.   There were numerous search terms added that were

8   identified in this restore point.

9   Q.   And what were those new search terms, if you can find

10  them?

11  A.   One is "PTHC car."  "PTHC family."  "Vicky" is there.

12  "PTHC teen."  "PTHC."  "Kylie talk."  "Kylie."  "QQAAZZ."

13  "PTHC mom."  It would be the last one that looks to be added to

14  that list.

15          MR. EDWARDS:  Your Honor, I need a recess, please.

16          THE COURT:  Understood, sir.

17      We're going to take ten minutes, then.  Please continue to

18  refrain from talking about the case with anyone, and please

19  continue to refrain from any independent research about the

20  case.  We'll take a break.  Thank you.

21      (Jury retired from the courtroom at 10:37 AM.)

22          THE COURT:  All right.  Thank you, everyone.  Please

23  be seated.

24      Mr. Hammer, given that you're midstream on your testimony,

25  sir, you're sort of a man without a country.  No one can talk

**P. Hammer - Direct Examination (Ms. Conklin)**

1  to you while you're midstream.  I just wanted to let you know

2  in case anyone ran the other way from you in the hallway.  But

3  you're free to step down.  But no one can talk to you, sir.

4            THE WITNESS:  I was just going to stretch.

5            THE COURT:  That's cool.  That works.

6       Ms. Walters, could I impose upon you to plug the computer

7  in at this point and see if things work.

8            MS. CONKLIN:  We did already this morning.

9            THE COURT:  Okay.  All right.  That works.  We'll

10 find out.  Let's live dangerously.

11      Okay.  Well, if we're going to have a break, if it's

12 convenient, let's give it a try --

13           MS. CONKLIN:  Well, I mean --

14           THE COURT:  -- now.

15           MS. CONKLIN:  -- we already tested.  Yeah, we've

16 already tested it --

17           THE COURT:  Okay.

18           MS. CONKLIN:  -- this morning.  It just might --

19           THE COURT:  All right.  That's cool.  All right.

20 We'll take a break too.  All right?  Thank you all.

21      (Recess taken from 10:39 to 10:55 AM.)

22           THE COURT:  Thank you, everyone.  Please be seated.

23      All right.  We ready to proceed?

24           MS. CONKLIN:  Yes.

25           THE COURT:  All right.  Can we have our jurors,

**P. Hammer - Direct Examination (Ms. Conklin)**

1    please, sir.

2         (Jury returned to the courtroom at 10:56 AM.)

3              THE COURT:  All right.  Thank you, ladies and

4    gentlemen.  Please be seated.  Thank you.

5         Thank you, sir.

6         Ms. Conklin.

7              MS. CONKLIN:  Thank you.

8    BY MS. CONKLIN:

9    Q.   So we were last talking about the April 4th, 2019,

10   Shareaza terms that were saved on the Shareaza terms.

11        When was -- I guess does -- do your notes -- does the

12   computer reflect the last written time for those Shareaza -- or

13   the Shareaza search terms?

14   A.   It does.

15   Q.   And what time is that?

16   A.   11:53 UTC on April 4th of 2019.

17   Q.   Do you know what that would be in relation to Eastern

18   Standard Time?

19   A.   April 4th I believe would be daylight savings time for

20   that day of that year.  So you would have to basically subtract

21   four hours from 11:53.  So it would be 7:53 in the morning, I

22   believe.

23   Q.   Subtract or add for Eastern Time?

24   A.   UTC would be four hours ahead.  So if you wanted local

25   time, you would have to subtract.

**P. Hammer - Direct Examination (Ms. Conklin)**

1  Q.   Okay.  All right.  So let's talk about -- I believe that

2  we already talked about the downloaded and partially downloaded

3  files on that date.  And the admin log-in count was 2,154 for

4  that date?

5  A.   Correct.

6  Q.   Okay.  So let's talk about the current restore point.

7  What's the current restore point?

8  A.   The current restore point would be the current state of

9  the operating system and the file system.

10  Q.   Okay.  So does the current state of the operating system

11  show that there are multiple files marked deleted as of

12  April 4th, 2019?

13  A.   It has numerous partial downloads files marked deleted,

14  and it has 15 downloaded video files marked as deleted.

15  Q.   And is that somewhat consistent with what you found, that

16  there were multiple videos indicating child pornography in the

17  recycle bin of the computer when you analyzed it?

18  A.   That would be correct.

19  Q.   Let's talk about the search terms that were used or that

20  are saved in the Shareeza -- or Shareaza system.  Are there

21  additional search terms in the, quote, "current restore point"

22  than there were on the April 4th, 2019, restore point?

23  A.   So the April 4th, 2019, references 12 search terms.  The

24  current system refers to 13 search terms.  And it looks like

25  the search term that is added is "Vicky American pie."

**P. Hammer - Direct Examination (Ms. Conklin)**

1  Q.   Okay.  So from --

2       Sorry.  And again, I guess, what was the time that it was

3  last written -- the Shareaza search terms was last written?

4  A.   On the current state, the last time written was 9/21 of --

5  September 21 of 2020.  And the time would be 16:25 UTC, which

6  would be -- September would still be daylight savings time, so

7  it would be minus four hours.  So it would be 12:25 in the

8  afternoon.

9  Q.   Your admin log-in count for the current restore point, or

10 the way the computer is the day that you duplicated it, how --

11 what was the log-in count at that point?

12 A.   The log-in count at that point was 2,162.

13 Q.   So that's a difference of eight log-ins, would it be fair

14 to say, from that --

15 A.   That shows eight log-ins from the previous restore point.

16 Q.   Okay.  All right.  So now we're talking about the computer

17 in the state that it's in; correct?  At this restore -- the

18 current restore point?

19 A.   That is correct.

20 Q.   Okay.  Were you able to find a GUID number associated with

21 that computer?

22 A.   So I did identify a GUID associated with this Shareaza

23 program.  So there could be numerous GUIDs, but there is a GUID

24 that's referenced in my report that deals specifically with the

25 Shareaza program.

**P. Hammer - Direct Examination (Ms. Conklin)**

1    Q.   And did you compare the GUID that you found in the

2    Shareaza program on the computer to the GUID number that was on

3    the activity logs?

4    A.   I did compare that number with the network activity logs

5    that were provided to me with the case, and that number is the

6    same.

7    Q.   The same number.  Okay.

8         Now, did you find evidence that any other individual

9    besides charp or awestwood had used that computer to log into

10   Chrome or to save documents or anything like that?

11   A.   I did not find any other user references within this

12   computer.

13   Q.   And when you were looking at the computer, were you

14   actually looking to see if you could find user references?

15   A.   I did a good deal of research on the internet history for

16   this computer.

17   Q.   Okay.  So would it -- were you able to find information

18   about Chris Harp using the computer?

19   A.   We found references to Chris Harp in the Skype accounts.

20   There were two Skype accounts set up on this laptop, and they

21   both referenced Christopher Harp.

22   Q.   Okay.  Were you able to find additional log-in data for

23   Christopher Harp to log into various programs?

24   A.   Any of the log-in data that I found I listed in this

25   report.

**P. Hammer - Direct Examination (Ms. Conklin)**

1  Q.   Okay.  Did you find log-in information for Christopher

2  Harp to log into a Strad Energy account?

3  A.   I believe I did.

4  Q.   And would that have been on June 15th, 2018?

5  A.   There -- my report does reflect a June 15th, 2018,

6  log-in for charp at stradenergy.com.

7  Q.   Okay.  Is there also information that charp had logged

8  into his email at yahoo.com -- charp51 had logged into his

9  email on -- at yahoo.com on December 14th, 2018?

10  A.   My report does reflect a log-in for

11  charp51@mail.yahoo.com.

12  Q.   And your report is based on your notes.  And your notes

13  were taken at the time that you made the observations; is that

14  correct?

15  A.   My report is based on my examination and the notes from

16  that examination.

17  Q.   Okay.  Now, you had mentioned that you had examined

18  another device -- or another item, I guess I should say, and

19  that you had found indications that child pornography was

20  connected to that device.

21  A.   That is correct.

22  Q.   Okay.

23        MR. EDWARDS:  Your Honor, I'd just renew my prior

24  objection again.

25        THE COURT:  Understood.  Overruled.

**P. Hammer - Direct Examination (Ms. Conklin)**

1    You may proceed, Ms. --

2                MS. CONKLIN:  May I approach?

3                THE COURT:  You may.

4    BY MS. CONKLIN:

5    Q.    I'm handing you what's been previously marked as

6    Government's Exhibit 2.  Do you recognize that?

7    A.    I do recognize this USB media drive.

8    Q.    And is that something that you had examined pursuant to

9    your investigation in this case and your analysis in this case?

10   A.    I did examine this USB device.

11   Q.    What's the process -- is the process that you use with the

12   USB device, to examine the USB device, is that similar to what

13   you do with the computer?

14   A.    There are a lot of similarities.  Whether it's a hard

15   drive or whether it's a USB device, it's a -- what's regarded

16   as a block device.  It's a finite structure of memory that you

17   read from sector zero to sector end, whatever the end is.  And

18   then normally I would -- my normal course of business when I

19   worked at the CART group, the CART lab, was I would document

20   all the hardware information associated with this particular --

21   with every particular USB device that was provided for

22   evidence.

23   Q.    Okay.  And did you do that in this -- or you did that in

24   this case?

25   A.    I did do that in this case.

**P. Hammer - Direct Examination (Ms. Conklin)**

1  Q.    Okay.  Did you make a duplicate of it?

2  A.    I made a forensic image of this device after I documented

3  all the hardware information associated with this device.

4  Q.    And did you look at the forensic image of that device?

5  A.    I processed that forensic image with the same forensic

6  tools that we used to process the hard drive in this case.

7  Q.    And did you find any indications that child pornography

8  had been associated with that thumb drive?

9  A.    We found file names for deleted files that were still

10 maintained in the file allocation table that indicated

11 potential child pornography.

12 Q.    Can you explain to the jury how you could find file names

13 but -- or I guess what it is that you found and how it got

14 there or how it's still there?

15 A.    So the file allocation table on any Microsoft Windows file

16 system maintains a file name and it maintains a finite number

17 of metadata items: file size, date created, date modified, date

18 accessed.  That file, if it's marked for deletion by Microsoft,

19 it will -- it can maintain the file name and that data in the

20 file allocation table, but it will allow the data blocks that

21 are associated with the file content to be reused by other

22 programs, other files that are going to get written to that

23 file system.

24 Q.    So would it be fair to describe it like if you go to the

25 library and you go to the card catalog, you would still -- you

**P. Hammer - Direct Examination (Ms. Conklin)**

1  could still see -- if somebody had taken a book off the shelf

2  and the book was no longer there, you could still see that file

3  name in the card catalog?

4  A.   The file name could be still in the card catalog,

5  presumably.

6  Q.   Okay.  And is that what you found in this case?

7  A.   We did find file entries in the file table that indicate

8  child pornography that were deleted.

9  Q.   And what were those file entries that you found?

10  A.   I don't remember where they're listed.

11  Q.   I think it's page 5 of your report, if that would help

12  you.

13  A.   Yeah.  Oh, yes, here they are.

14      So the -- there were three file name entries.  The first

15  file name entry was "! Pthc 7-year-old" -- "7yo my little

16  girls-part 1.mpg."

17      The second entry was "Preview-T-100399616-Pthc webcam-3yo

18  family_of 4 mom blows 7yo boy 3yo girl mast (1).avi."

19      And the third file, the file name looks exactly the same

20  except -- as the second file except it doesn't have the word

21  "preview" in the file name.

22  Q.   Okay.  Now, could you tell when those file names were

23  associated with that file directory?

24  A.   Those files, the file allocation table maintained

25  modified, access, and created times for those three files on

**P. Hammer - Direct Examination (Ms. Conklin)**

1  the file system.

2  Q.    And what time frame was that from?

3  A.    November 22nd of 2009 it looks to be.

4  Q.    For the AV files?

5  A.    The AV files are November 22nd of 2009.  The MPG file is

6  January 7th of 2010.

7  Q.    Okay.  Did you look for other documents or anything else

8  on that thumb drive from around that time frame that could tell

9  you who the thumb drive was being used by?

10 A.    I provided other files within that time frame for case

11 agent review.

12 Q.    Okay.  Do you have -- did you note some of the names of

13 those files?

14 A.    I did note those names.  One of the files I noted was

15 "anchart.pdf."  One of those files was "Chris Harp IHS 528 Mid

16 Term Essays.docx."

17     "Chris Harp Mid-term Takehome assignment November 9.xlsx,"

18 which would be generally a Microsoft spreadsheet.

19     "Chris Harp Vent Lab 12-18-09.docx."

20 Q.    Now, when you're reviewing the thumb drive and the HP

21 laptop, were you able to determine whether the thumb drive has

22 ever been used in the HP laptop?

23 A.    So part of the process where I would examine the hardware

24 itself of the thumb drive --

25     USB media -- not all USB media, but a lot of USB media

**P. Hammer - Direct Examination (Ms. Conklin)**

1  maintains a digital serial number that is only available

2  through software means to access.  And I always document those

3  serial numbers on USB media whenever possible.  And I searched

4  that USB serial number in the forensic image I made of this

5  laptop, and it did show up as a registry, which means to me

6  that this USB at one point in time was plugged into this

7  laptop.

8  Q.   Now, did you also find that some of the files unrelated to

9  child pornography on the thumb drive were actually created on

10  the laptop?

11  A.   We found files that were on this thumb drive that matched

12  identically in content to files that were placed on the laptop

13  itself.

14  Q.   And do you know which files those were and when they were

15  moved to the laptop or placed on the laptop?

16  A.   I would have noted it, but...

17  Q.   I believe it might be on page 14 of your report, if that

18  helps you.

19  A.   So I have files previously identified on 1B34, copied to

20  1B9: Chris Harp IHS 528 Mid Term Essays.docx.

21      Chris Harp Mid-Term Takehome assignment November 09.xlsx.

22      Chris Harp Vent Lab 12-18-09.docx.

23      And then ING360.docx and ING 561 exam 2.doc.

24  Q.   And were those placed on the laptop on July 16th, 2016?

25  A.   They were created on the laptop July 16th of 2016.  So

**P. Hammer - Direct Examination (Ms. Conklin)**

1  that would indicate that's the day they were actually

2  physically copied to the laptop.

3  Q.    Now, we had briefly talked about the admin log -- let me

4  make sure I'm using the right term -- the log-in count.  The

5  admin log-in count.  What causes the admin log-in count number

6  to increase?  Like, how does that initiate?

7  A.    As far as I know, it's when you sign in -- you physically

8  enter your password and sign in.

9  Q.    Okay.

10         MS. CONKLIN:  Can I have just a moment, Your Honor?

11         THE COURT:  You may.

12     (Pause in proceedings.)

13  BY MS. CONKLIN:

14  Q.    And Mr. Hammer, based on the totality of the evidence that

15  you found on the computer, both from the information in the

16  restore points and the current state of the computer as it was

17  examined, did you notice patterns in that use of the computer?

18  A.    The most significant pattern I noticed was probably the

19  association of file names themselves with a very small window

20  of interest in child pornography in that so many of the file

21  names all indicated family sexual content with extremely young

22  individuals.  But so many of the file names indicated family of

23  one sort or another.

24  Q.    Did you also notice a pattern as to how the person was

25  accessing or using the computer?

**P. Hammer - Direct Examination (Ms. Conklin)**

1  A.   All of the activity we've seen was downloaded either

2  via -- there was -- early on in 2012 there were downloads using

3  a program called FrostWire, which is another peer-to-peer

4  software.  And then all of the activity was -- after that was

5  Shareaza.

6      All of the downloads were videos.  This is a -- was a case

7  where we didn't -- I didn't see -- if any -- I didn't see many

8  still shots of child pornography.  All of the downloads were

9  videos, playable videos: MPEGs, AVIs, files like that.  And all

10 the downloads, there were indications that the downloads were

11 reviewed.  In the current state there's what they call VLC MRU

12 lists, a most recently used list, that were updated.

13     So the videos were downloaded.  The videos were accessible

14 to programs like VLC.  And then the -- upon review, the videos

15 were all moved off to the recycle bin via the delete function

16 of Windows.

17 Q.   You mentioned the VLC MRU list.  What is an MRU list?

18 A.   An MRU list is just a most recently used list.  A number

19 of programs have them.  For instance, if you were using a

20 drawing program like Paint and you clicked on, you know, open a

21 file, it might list a bunch of files that you had previously

22 used.  And that list you'd be able to pick one of those from,

23 if you so chose.  But that list is maintained typically in

24 what's referred to as an MRU list, or a most recently used

25 list.

P. Hammer - Direct Examination (Ms. Conklin)

1  Q.   In the production of information as to what was going on

2  in this computer and the videos and the files and the programs

3  and all that that you provided to Agent Thigpen, did you also

4  provide him information where he could access the MRU list for

5  VLC media player?

6  A.   I provided a separate reviewable Blu-ray media disk that

7  had a lot of content that was not on the original CD or DVD.

8  And it included, I believe, MRU list information.  It included

9  other videos that were able to be played from the different

10 restore points I was able to recover.  I don't recall all of

11 the data that was on that.  But it was a Blu-ray, so it was a

12 lot of data for review.

13 Q.   And the MRU was on there.

14 A.   The MRU lists were on that CD.

15      And thinking back now, on that Blu-ray, I broke out all of

16 the restore points individually.  So he would be able to look

17 at each restore point and see what data was available for each

18 restore point.

19 Q.   And would it be fair to say that whatever is contained on

20 the MRU would reflect what -- the MRU for VLC media player

21 would reflect what was played on the VLC media player?  Or at

22 least loaded --

23 A.   Certainly the MRU list had accessed and initiated that

24 file.

25           MS. CONKLIN:  If I could have just one more moment,

1   Your Honor.

2          THE COURT:  You may.

3      (Pause in proceedings.)

4   BY MS. CONKLIN:

5   Q.  One more question, Mr. Hammer.

6      So when you look at the MRU list for the VLC media player,

7   does the list indicate whether the video was actually played or

8   started to be played on the computer?

9   A.  I believe it's started to be played.

10  Q.  Okay.  So you can tell that it was accessed, that it was

11  opened, but not how long it was played; is that fair?

12  A.  That's fair to say.

13  Q.  Okay.

14  A.  It would be in- -- it would be some initiation process

15  would update the MRU list.  So you -- the initia- -- the video

16  was initiated, and then that would update the MRU list.  And

17  then you don't know if the video was completed or terminated or

18  whatever.

19          MS. CONKLIN:  I would tender the witness.

20          THE COURT:  All right.  Before we proceed to cross,

21  I'm just going to give our limiting instruction with respect to

22  the non-charged dates.

23          MR. EDWARDS:  Oh.  Sure.

24          THE COURT:  Ladies and gentlemen of the jury, you've

25  heard testimony both this morning from Mr. Hammer and from

1  witnesses yesterday related to dates where alleged child

2  pornography was either downloaded, partially downloaded, or was

3  otherwise present on the computer and thumb drives that we've

4  discussed, Exhibits 1 and 2.

5      As you may recall, the indictment in this case charges the

6  Defendant with the crime of receipt of child pornography on

7  April 4, 2019; September 8, 2020; September 21, 2020; and then

8  possession of child pornography on September 25, 2020.

9          MS. CONKLIN:  Judge, I'm sorry.  It's

10 September 18th.

11         THE COURT:  Eighteenth?  I'm sorry.  Yes.  Let me

12 review those dates again.

13     April 4, 2019; September 18, 2020; and September 21 of

14 2020 with the alleged offense of receipt of child pornography.

15 September 25, 2020, is the allegation of possession of child

16 pornography.

17     You've heard evidence with respect to child pornography

18 downloads, partial downloads, and other testimony for dates

19 other than those charged in the indictment.  The Defendant is

20 only on trial for the offenses charged in the indictment, those

21 four counts.  You may consider the evidence with respect to the

22 other dates only if you unanimously find that it is more likely

23 than not true, and you decide that by considering all the

24 evidence and deciding what evidence is more believable.  It is

25 a lower standard than proof beyond a reasonable doubt, which is

1   the standard that applies to the charges in the indictment.

2       If you find that these acts have not been proved, the

3   non-charged acts, you must disregard them.  If you find that

4   those acts have been proved, you may consider them to help you

5   decide any matter to which those uncharged acts are relevant.

6   You should give them the weight and value you believe they are

7   entitled to receive.  You may consider that evidence of such

8   other acts for its tendency, if any, to show the Defendant's

9   propensity to engage in the acts charged in the indictment, to

10  determine the Defendant's intent, to determine the identity of

11  the person who committed the acts charged in the indictment, to

12  determine the Defendant's opportunity to commit the acts

13  charged in the indictment, and to rebut any contention of the

14  Defendant that his participation in the offense as charged in

15  the indictment was the result of accident, mistake, or to rebut

16  the issue of any alibi.

17      Remember again Mr. Harp is only on trial for the crimes

18  alleged and charged in the indictment.  You may not convict a

19  person simply because you believe he may have committed similar

20  acts in the past.

21      And bear in mind at all times the Government has the

22  burden of proving that the Defendant committed each of the

23  elements of the offenses charged in the indictment beyond a

24  reasonable doubt.

25      Cross, Mr. Edwards.

**P. Hammer - Cross-Examination (Mr. Edwards)**

1       MR. EDWARDS:  Thank you.

2                   CROSS-EXAMINATION

3    BY MR. EDWARDS:

4    Q.   Mr. Hammer, I'm going to apologize.  At least initially

5    I'm going to be jumping around just a little bit.

6    A.   That's fine.

7    Q.   And then we'll hopefully get into a little bit more of a

8    pattern and you'll -- you won't have any difficulty following

9    where I'm going.

10      You were asked by the Government that basically you

11   don't -- you no longer work for the FBI, and you're here as a

12   private citizen at this point in time.

13   A.   I am retired.

14   Q.   Okay.  And you indicated you are getting paid a nominal

15   amount to be here; is that correct?

16   A.   That is correct.

17   Q.   Okay.  That nominal amount being $75 an hour for court

18   time?

19   A.   I think that's what they quoted me.

20   Q.   Okay.  Now, in this regard, you indicated that you were

21   tasked with reviewing four computers taken from -- as a result

22   of the search warrant on September 25th of 2020 and various

23   what you referred to as "loose media"; is that correct?

24   A.   That is correct.

25   Q.   Okay.  And out of those -- and I think there were about

### P. Hammer - Cross-Examination (Mr. Edwards)

1  30 items -- you indicated that you found or -- found

2  pornography or suspect to have found something that indicated

3  pornography on two of those items; is that correct?

4  A.   That is correct.

5  Q.   That would be the computer, where you found pornography.

6  A.   Correct.

7  Q.   And the thumb drive which had -- in the metadata it looked

8  like there were -- possibly, at some point in time, there had

9  been pornography on it.

10 A.   There was --

11      Yeah.  On the USB we found file names in the file

12 allocation table.

13 Q.   Okay.  Those files, other than the names, there was

14 nothing on there that you were able to review; is that correct?

15 A.   There was no data associated with those files.

16 Q.   Okay.  And if one would plug in that thumb drive into a

17 computer, the only thing that would show up would be the actual

18 files that are still there; correct?

19 A.   Correct.  Under a standard Windows Explorer, you would not

20 see those deleted entries.

21 Q.   Okay.  And I think the Government got into this a little

22 bit.  But it seemed, from all the testimony you've provided

23 through the different restore points that you reviewed, that

24 the pornography, it appeared to be -- basically, there was a

25 search, there was a download, and then deletion.  Is that

**P. Hammer - Cross-Examination (Mr. Edwards)**

1  pretty correct?

2  A.    That looks to be the pattern with the --

3  Q.    And --

4  A.    -- with the computer.

5  Q.    Okay.  And those all took place pretty much on the dates

6  that you indicated.  If there was a date, there was a search;

7  there was either a review of it and a deletion all at that time

8  frame.  Correct?

9  A.    I don't recall seeing a big time difference between the

10  downloads and the deletes.

11  Q.    Okay.  So that meant, on the dates and times that this was

12  occurring, someone was basically there at the computer doing

13  this.

14  A.    Someone would have to be operating the Shareaza program

15  and typing in the search ter- -- the search terms or the search

16  items that you're looking for within Shareaza.

17  Q.    Okay.  There's no indication in your review and your

18  analysis that any of these took place as a result of delaying

19  the download or scheduling the download, then watching it, and

20  then deleting it.

21  A.    I don't believe I would have any access to seeing any

22  delays from the search request to whenever the -- the

23  searches -- the downloads actually transpired.

24  Q.    Okay.  But the deletions themselves, that is something you

25  physically are at the computer to do.  Having something

**P. Hammer - Cross-Examination (Mr. Edwards)**

1  deleted.

2  A.    Somebody would have to physically delete those videos.

3  Q.    Okay.  And you've gone through there -- and we'll go

4  through that a little bit more here today -- the dates of these

5  deletion of the videos, and the times; correct?

6  A.    Excuse me?  Somebody --

7  Q.    You -- we'll go through the -- we'll go through that

8  information --

9  A.    Okay.

10  Q.    -- in a little bit more detail later on in your

11  questioning.  But basically, the date and the times of those

12  deletions are marked on your report; correct?

13  A.    I believe so.

14  Q.    Okay.  You made a statement that I wasn't quite sure

15  about, and that's why I made a note of it here.

16       You said, "Most of the use of the computer appeared

17  affiliated with the admin account."

18  A.    Correct.  So when -- on these Windows systems, you would

19  sign in as a particular user.  This computer had -- I think it

20  showed like three users.  The first user was the administrator

21  user.  The records showed that the administrator user was used,

22  I believe, for the initial boot.  The administrator user I

23  think is a Windows construct.  So when you open up a Windows

24  computer for the first time, it -- it's just there.  I think

25  the other user was, I believe, guest.  And I don't believe that

**P. Hammer - Cross-Examination (Mr. Edwards)**

1  account was ever used.

2  Q.   Okay.  So there was -- there's an admin user.  And that's

3  basically, when you turn on the computer -- if you buy a

4  computer, you turn it on, boot it up, that's the default, the

5  admin; correct?

6  A.   Administrator is the default.  I don't know if the admin

7  was actually opted for.  I don't know that admin is a default

8  user.

9        Administrator, I believe, is the initial default user

10  account.  The admin user that was used, I don't know that that

11  was a default Microsoft account or if it was put in.

12  Q.   Okay.  You would agree with me that basically you don't

13  have to sign in.  If I have a computer and you wish to use it,

14  if I have it turned on for you, if it's password-protected and

15  I give you the password, it's not going to differentiate who's

16  using the computer.

17  A.   That is correct.

18  Q.   Okay.  I believe there was testimony that the log-in count

19  on this computer when you got it on -- sometime after

20  September 25th of 2020 was 2,162.

21  A.   I'd have to refer to my notes, but I'll accept that that's

22  correct.

23  Q.   Okay.

24  A.   That would be the last count prior to me getting access to

25  that computer.

**P. Hammer - Cross-Examination (Mr. Edwards)**

1  Q.    Okay.  And so that indicated to you that that computer had

2  been turned on or used 2,162 times; correct?

3  A.    Signed into via the admin account 2,162 times.

4  Q.    Okay.  And if my count is correct in going through your

5  restore points, it was on 11 of those log-ins that child

6  pornography was searched, downloaded, ultimately deleted.  Does

7  that sound correct?

8  A.    So child pornography was searched, downloaded, and deleted

9  going back to 2012.  But there was significant history or

10 significant remnants of data coming in on those probably 11

11 that you're talking about.

12 Q.    Okay.  So going back nine years, you have 11 different

13 times that apparently child pornography was searched,

14 downloaded, and ultimately deleted.  Is that correct according

15 to your report?

16 A.    At least nine times.

17 Q.    Oh, I'm sorry.  Let me say over nine years.  I had

18 11 times according to the report and my count.

19 A.    Now I'm confused.

20 Q.    Okay.

21 A.    So --

22 Q.    All right.

23 A.    -- over the period of how many years?  Eleven years.  From

24 2000- -- April of 2011 until I got the computer, which was

25 September of 2020.  So that's roughly nine years.

**P. Hammer - Cross-Examination (Mr. Edwards)**

1  Q.   Correct.

2  A.   Over that nine-year period you see 11 log-ins from, like,

3  2016 up until the end.  Is that what you're saying?

4  Q.   No.  I'm saying from all your restore points -- and I

5  think you indicated -- and we'll go through this.

6  A.   Okay.

7  Q.   Maybe it will be clearer if -- maybe it's easier -- it may

8  be easier for the jury, so we're not throwing all kind of dates

9  out there confusing you guys, if we do it in a little bit more

10  chronological order.

11  A.   That's fine.

12  Q.   So let's start with this.  You were tasked with analyzing

13  the electronic devices taken from the Harp home on

14  September 25th, 2020; is that correct?

15  A.   Correct.

16  Q.   Okay.  You weren't asked to do any other investigation

17  into this matter.

18  A.   It was my job function just to process digital evidence --

19  collect digital evidence, process digital evidence, and then

20  generate a report of my findings.

21  Q.   Okay.  You weren't asked to ever do a fingerprint analysis

22  on the computer; is that correct?

23  A.   That would not be my job.

24  Q.   Okay.  You weren't -- you were provided Chris Harp's

25  phone; is that correct?

**P. Hammer - Cross-Examination (Mr. Edwards)**

1  A.   I believe so.  That's an item in the -- in the report.

2  Q.   Okay.  You did not perform any type of analysis to try to

3  determine the location, where that phone had been located at

4  any certain points in time, were you?

5  A.   I processed the phone for review, and I turned the phone

6  over for review to the case agent.

7  Q.   Okay.  Would the processing of the phone that you did

8  provide that information?

9  A.   The processing of the phone.  The phone would be --

10  there's different software to read content from phones.  And so

11  typically what we would do is we would use the software.  We

12  would pull the content of the phone off.  And then we would

13  process that phone content into an interactive report that --

14  the case agent would be able to use that interactive report to

15  look up any particular information associated with that phone.

16      If the case agent found information on the phone and he

17  wanted further analysis of that phone, then he would -- he or

18  she would come back to me and say, "I need further analysis of

19  the phone."

20  Q.   That never occurred here, though, did it?

21  A.   I did not do -- other than processing the phone initially

22  and making it available for case agent review, I did not do

23  anything else with the phone.

24  Q.   Okay.  And you never made a determination on your own who

25  even had access to the Harps' home; is that correct?

**P. Hammer - Cross-Examination (Mr. Edwards)**

1  A.   That would not be my job.  So that would be correct.

2  Q.   Okay.  And you did no investigation to see who actually

3  lived in the home at any certain point in time; is that

4  correct?

5  A.   That would be correct.

6  Q.   So the only investigation that you did was basically

7  looking at the computers that -- or the infor- -- the

8  electronic equipment that was brought to you from the search

9  warrant on September 25th, 2020, up until the point in time

10 that the indictment was returned against Mr. Harp; is that

11 correct?

12 A.   My job would be to process all the digital evidence that

13 was submitted in the case.

14 Q.   Okay.  Did you ever make any inquiry as to where Chris

15 Harp worked and the hours he worked?

16 A.   I did not.

17 Q.   Were you involved in this case at all prior to the search

18 of the Harps' home?

19 A.   I did not -- a lot of times I would do searches.  I did

20 not assist in this search.  So the answer to that would be no.

21 Q.   And I believe you testified -- or maybe it's shown in your

22 report -- that on October 5th of 2020, that's when you were

23 requested to perform an examination of all the seized

24 electronic equipment from the Harps' home.  Is that correct?

25 A.   I would have to go back and look, but I will assume that

**P. Hammer - Cross-Examination (Mr. Edwards)**

1  that's a correct statement.

2  Q.   Okay.  And your report was not completed until

3  February 2nd, 2022?

4  A.   That is correct.  I do know the report date.

5  Q.   And you didn't perform any additional investigation after

6  authoring the report dated February 2nd, 2022, which is

7  titled "Report of Examination"; is that correct?

8  A.   The last week or two I was up at the Clarksburg resident

9  agency.  We reviewed some things up there, so that's not

10 100 percent correct.  But we did review some of the evidence in

11 the last two weeks.  But certainly from February -- after

12 February I moved down to Quantico.  And until two weeks ago I

13 did not look at this case at all.

14 Q.   And your review of the material a couple weeks ago didn't

15 change anything in your report; is that correct?

16 A.   No.  My report from February 2nd of 2022 is --

17 Q.   Now --

18 A.   -- unchanged.

19 Q.   Oh, I'm sorry.  I didn't mean to interrupt you, sir.

20 A.   That's all right.

21 Q.   It appears from your report that you examined 30 separate

22 electronic and/or electronic storage devices taken from the

23 home.  Does that --

24 A.   That's --

25 Q.   -- match with your memory?

**P. Hammer - Cross-Examination (Mr. Edwards)**

1  A.    -- correct.  Yes.

2  Q.    Okay.  And out of those 30 devices, you've testified that

3  you found evidence of suspected child pornography on two of

4  them.

5  A.    That is correct.

6  Q.    And in fact, as you indicated here, you didn't actually do

7  an examination of the actual computer, but you made a forensic

8  image of it.

9  A.    That is correct.  That is standard operating procedure by

10  virtually every forensic examiner, whether -- regardless of

11  what agency they work for.

12  Q.    Okay.  And with regard to the thumb drive -- we've gone

13  over this a little bit -- you, through looking at the metadata,

14  found a title of a file that you suspected could be

15  pornography; is that correct?

16  A.    I identified a file name that indicated child pornography

17  of the file content, had the file content still been there.

18  Q.    Okay.  And I think you've already testified that

19  basically, if someone would have just plugged in that thumb

20  drive onto the side of a computer, like most normal people

21  would do, there would be no indication; you wouldn't be able to

22  see that data or that information.  Is that --

23  A.    That information is only available via specialized

24  software tools that are made to process file systems such as

25  the FAT12, FAT16, FAT32 file systems.

**P. Hammer - Cross-Examination (Mr. Edwards)**

1  Q.   And again, no analysis, to your knowledge, was done to

2  fingerprint that thumb drive or anything of that nature;

3  correct?

4  A.   That -- not to my knowledge.

5  Q.   And as you sit here today, you have no idea who may have

6  had access to that thumb drive over its life.

7  A.   That would be correct.

8  Q.   There was no pornography or even child erotica found in

9  the other 28 items that you reviewed; is that correct?

10 A.   That is correct.

11 Q.   In addition, there was not any legal pornography found on

12 any of the items you reviewed.

13 A.   That is also correct.

14 Q.   In your report you set forth multiple restore points,

15 which you've talked about.  In that you were able to access

16 information from the HP computer, which is Exhibit Number 1,

17 and see what was contained on the subject computer even if the

18 files had been deleted; fair?

19 A.   That's true.

20 Q.   Okay.  And you indicated that the information or the

21 downloads from that computer indicated it was basically -- the

22 only person to ever use that computer was an admin.

23 A.   The only account that was used was the admin account.

24 Q.   Okay.  Actually, you did a much better job of wording that

25 than I did.

**P. Hammer - Cross-Examination (Mr. Edwards)**

1    So the only account on it was the admin account that

2  showed any use of the computer.

3  A.   Yeah.  The administrator account showed use early on in

4  the powering-up of the computer.  But I think the administrator

5  account shows last sign-on to, like, within a week of the

6  original install date, which went back to April of 2011.

7  Q.   And you would agree that it's not uncommon at all for a

8  home computer or a home laptop to show only one user or one

9  admin regardless of the amount of individuals who may be using

10  it.

11  A.   It was more common years ago.  Now Microsoft really more

12  wants to box you into using an account with your name.  But

13  years ago it was very common for, you know, an admin account to

14  be set up on a computer and that was, you know, pretty much it.

15  Q.   And this was an old Windows Vista operating system.

16  A.   This was an older Windows Vista account.  So this goes

17  back several generations of Windows operating systems.  There's

18  at least -- we're on Windows 11 now -- Windows 10, Windows 7.

19  So this would have predated Windows 7.

20  Q.   Okay.  And as you've already stated, I believe, that one

21  does not need to set up a profile on a computer such as this in

22  order to access it or use it.

23  A.   You'd need to set up an account.  So an account needed to

24  be set up.

25  Q.   I'm sorry.  At least one account, the admin account.

**P. Hammer - Cross-Examination (Mr. Edwards)**

1  A.    You need to set up an account to sign onto it.

2  Q.    Okay.

3  A.    You can't go accountless.

4  Q.    Correct.  And I -- maybe I, again, didn't word my question

5  properly.

6      Basically, the fact that once it was set up with an

7  account, it was able to be used by whomever was using the

8  computer.

9  A.    It would be able to be used by whomever, provided that

10  they had the password --

11  Q.    Sure.

12  A.    -- for that account.

13  Q.    Okay.  Now, I think you testified that -- well, I'm sure

14  you did -- that on your examination of the image of the

15  computer in question, that computer began operation

16  April 23rd, 2011.  Is that correct?

17  A.    Correct.

18  Q.    In addition, you would agree -- or you have no knowledge

19  that the program that was used to download the pornography

20  doesn't necessarily have to -- it wasn't shown as an icon on

21  the Windows screen.

22  A.    So I've never personally used Shareaza, so I don't know

23  how the program is started.  I don't know if it's run from a

24  DOS Shell or if it's run from an icon.  I've never particularly

25  used it.  So I don't know how it's started.  I don't know how

**P. Hammer - Cross-Examination (Mr. Edwards)**

1  it's initiated.

2  Q.   Okay.  So -- and I understand you don't know that.  You've

3  just testified as such.

4      If it doesn't require an icon but requires a DOS, which is

5  basically going in and typing that you wish to get that thing

6  started or that program started, if one would turn on the

7  computer and a normal Windows screen would come up, not

8  necessarily would they even see the icon or know that that

9  software was on there; correct?

10 A.   Would the user know that the software is available?  Not

11 necessarily.

12 Q.   Okay.

13 A.   So even if it's started from an icon, you -- the icon

14 could be deleted, and you could still navigate to the program

15 file if you wanted to do it in a -- kind of a hidden manner.

16 Q.   Okay.  And your review of the image of this computer

17 didn't show any type of icon for Shareaza on it; is that

18 correct?

19 A.   I do not -- I did not document any kind of Shareaza icon.

20 Q.   Okay.  Or any other peer-to-peer software icon on the

21 computer.

22 A.   I did not document a FrostWire.  I only seen two instances

23 of peer-to-peer software.  One was FrostWire, and one was

24 Shareaza.  And I did not see an icon for either one of them.

25 Q.   All right.  So if this computer would be powered up, when

**P. Hammer - Cross-Examination (Mr. Edwards)**

1  I turn it on I may not necessarily know that that software was

2  ever on that computer.

3  A.    That could be correct.  You might not know that it's on

4  there unless you're -- you have some background knowledge of

5  it.

6  Q.    Okay.  Now, although the computer was first started being

7  used in -- April 23, 2011, the first restore point that you

8  show in your report is July 16th of 2016; is that correct?

9  A.    I believe so.  Correct.

10  Q.    So the first restore point that you looked at on the

11  image -- the forensic image that you examined on the computer

12  was five years after the computer had started operating.

13  A.    That would be correct.

14  Q.    And in your report you state that between June 12th and

15  June -- I'm sorry -- June 2012 and September 2012 you found 14

16  files that had the term "PTHC" in the file name; is that

17  correct?

18  A.    That is correct.

19  Q.    Okay.  And you also found that the last written time that

20  you saw in that restore point was July 8th, 2016.  And that

21  was a file dated July 12th, 2013; is that correct?

22  A.    I believe so.

23  Q.    Okay.  So the log-in count on the computer at that time

24  was 2,121.

25  A.    Okay.

**P. Hammer - Cross-Examination (Mr. Edwards)**

1  Q.    Okay?  And of course, we've already said that that's

2  basically the amount of times that the computer had been

3  powered up or turned on.

4  A.    The admin account was signed into.

5  Q.    Signed into.  I'm sorry.  Yes.  You're right.  At least it

6  was signed into.

7      And as we sit here, we have no way of knowing who was

8  actually using the computer at any point in time; correct?

9  A.    The user would have to still have access to the password

10  for the admin account.

11  Q.    Fair enough.  And I'll give you that as we go through

12  these questions.

13  A.    Okay.

14  Q.    That as long as someone had the passcode, they could log

15  in, and we wouldn't know exactly who it was.

16  A.    That is correct.

17  Q.    You found evidence on a restore point of July 8th, 2016,

18  that, at that time, both Chris Harp and Amy Westwood Harp had

19  performed some work-related things on the computer.

20  A.    Correct.

21  Q.    However, none of those things that you found, the

22  work-related items by Chris Harp and Amy Westwood, were done

23  contemporaneously with any of the alleged downloads of the

24  child pornography; correct?

25  A.    I would guess that that would be correct.  I haven't

**P. Hammer - Cross-Examination (Mr. Edwards)**

1  really compared the dates, but I would guess that you're right.

2  Q.   Okay.  And thereafter, according to your report, there

3  were two restore points, dated July 12th, 2016 -- and that had

4  a log-in count of 2,122 -- and then July 15, 2016 -- log-in

5  count of 2,123 -- and neither showed any additional information

6  on the computer at that time.

7  A.   Well, I just didn't note any information.  So they would

8  have showed information, but I didn't think at the time that

9  was pertinent to the investigation.  There was no -- I didn't

10 note any additional information.  There may be information

11 there.  I just -- I didn't note any -- anything of

12 importance --

13 Q.   Okay.

14 A.   -- to the request of reviewing this case.

15 Q.   So at least from your recollection there was -- on those

16 two restore points there would have been nothing that gave you

17 any indication of any suspected pornography being there.

18 A.   Correct.  Yeah.  If there was suspected pornography or if

19 there was log-ins of any individuals noted at that time, I

20 certainly would have noted them here in this report.

21 Q.   Okay.  Your next restore point was July 17th, 2016; is

22 that correct?

23 A.   Yes.

24 Q.   And it showed an admin log-in count of 2,123; is that

25 correct?

**P. Hammer - Cross-Examination (Mr. Edwards)**

1  A.   That is correct.

2  Q.   Okay.  So you stated that the log-in count on July 12th,

3  2013, was 2,122; is that right?

4  A.   I don't see July.  You said July 13th?

5  Q.   No.  July 12th, 2013.

6  A.   I see July 8th.  I see a log-in count of 2,121.

7  Q.   Okay.  Maybe I have my date wrong.

8  A.   And then I see July 12th.  I see no additional.

9  July 15th, no additional.  And then July 17th, log-in count

10  2,123.

11  Q.   Okay.

12  A.   So --

13  Q.   So I guess that's -- so I'm going from July 8th, 2013.

14  A.   July 8th of 2016 --

15  Q.   No.  I'm going -- I'm going back a little bit further.

16  A.   Oh, okay.

17  Q.   So let's go to...

18  A.   July 8th, 2016, that looks like the first restore point,

19  doesn't it?  Yeah, July 8th, 2016, is the first restore point

20  that I processed.

21  Q.   Okay.

22  A.   Or I should say the oldest restore point that I processed.

23  And on that July 8th, 2016, I have a log-in count -- a

24  documented log-in count of 2,121.  And then the next documented

25  log-in count that I have in my report is July 17th of 2016.

**P. Hammer - Cross-Examination (Mr. Edwards)**

1  A.   That is correct.

2  Q.   Okay.  So you stated that the log-in count on July 12th,

3  2013, was 2,122; is that right?

4  A.   I don't see July.  You said July 13th?

5  Q.   No.  July 12th, 2013.

6  A.   I see July 8th.  I see a log-in count of 2,121.

7  Q.   Okay.  Maybe I have my date wrong.

8  A.   And then I see July 12th.  I see no additional.

9  July 15th, no additional.  And then July 17th, log-in count

10  2,123.

11  Q.   Okay.

12  A.   So --

13  Q.   So I guess that's -- so I'm going from July 8th, 2013.

14  A.   July 8th of 2016 --

15  Q.   No.  I'm going -- I'm going back a little bit further.

16  A.   Oh, okay.

17  Q.   So let's go to...

18  A.   July 8th, 2016, that looks like the first restore point,

19  doesn't it?  Yeah, July 8th, 2016, is the first restore point

20  that I processed.

21  Q.   Okay.

22  A.   Or I should say the oldest restore point that I processed.

23  And on that July 8th, 2016, I have a log-in count -- a

24  documented log-in count of 2,121.  And then the next documented

25  log-in count that I have in my report is July 17th of 2016.

**P. Hammer - Cross-Examination (Mr. Edwards)**

1  And the log-in count is 2,123.  So it looks like there's two

2  log-ins from the time of the July 8th to the July 17th

3  restore points being created.  Does that help?

4  Q.   A little bit.  And I think I know what my problem is here.

5  You indicated that the July 12th, 2016, and July 15, 2016,

6  didn't show anything -- or at least didn't show anything that

7  you --

8  A.   Yeah, I didn't note anything.

9  Q.   Didn't note anything.

10 A.   But obviously there -- if you look, there might be a

11 log-in count change there that I didn't note.

12 Q.   Right.  And you indicated -- I think you testified before

13 that the log-in count on July 12th, 2016, was 2,122?

14 A.   I don't recall saying that.  But I -- if I said that, I

15 was in error.  Because I'm not seeing that in my report.  So I

16 shouldn't have said that.

17 Q.   Okay.  All right.  According to your report there was

18 restore points dated July 19th, 24th, and 25th, 2016; is

19 that correct?

20 A.   July 19th, July 24th, and July 25th of 2016.  That

21 is correct.

22 Q.   2016.  And none of those showed anything new; is that

23 correct?

24 A.   Those I did reference the log-in count going up each

25 instance --

**P. Hammer - Cross-Examination (Mr. Edwards)**

1   Q.   Okay.

2   A.   -- by one.

3   Q.   Okay.  So --

4   A.   But other than that, no other -- no other files were noted

5   in those three restore points.

6   Q.   Okay.  The next restore point was July 28th, 2016, at

7   4:26 PM; is that correct?

8   A.   So that 20:26 is UTC.  So that would be -- that would be

9   8:00 minus four.  Yeah.  So that would be 6:00 PM, I believe,

10  Eastern Time.

11  Q.   If it's --

12  A.   So the restore -- we're talking restore point 2016,

13  July 28th.

14  Q.   Correct.

15  A.   I have a time on that as 20:26, which would be UTC.

16  Q.   Correct.

17  A.   So that would be 8:00 PM UTC.  It would be four hours

18  less --

19  Q.   So that would be --

20  A.   -- Eastern Standard Time.

21  Q.   Right.

22  A.   So it would be --

23  Q.   4:00.

24  A.   -- 4:00 PM.

25  Q.   Yeah.

**P. Hammer - Cross-Examination (Mr. Edwards)**

1  A.   Is that what --

2  Q.   You said 6:00.  So that's why --

3  A.   Oh.

4  Q.   It's 4:20- -- so it would be at 4:26 PM; correct?

5  A.   It would be 4:26 PM.  Correct.

6  Q.   Okay.  And on this restore point you found evidence of

7  potential pornography.  Partial downloads, full downloads,

8  and -- along with searches of potential child pornography;

9  correct?

10 A.   There are keywords in the search list --

11 Q.   Okay.

12 A.   -- at this time.

13 Q.   And you would agree, however, you found no evidence of any

14 other contemporaneous work or searches that would indicate that

15 Chris Harp was the operator of the computer at that point in

16 time.

17 A.   I didn't note anything, so I didn't find anything.

18 Q.   Okay.  The next restore point was July 29th, 2016, at

19 3:11 PM; is that correct?

20 A.   Eastern Time?

21 Q.   Yes.

22 A.   That would be correct.

23 Q.   Okay.

24 A.   That would be 3:11 PM Eastern Time.

25 Q.   And at that time you found that the downloads of

**P. Hammer - Cross-Examination (Mr. Edwards)**

1  July 28th, 2016, were marked to be deleted; correct?

2  A.   That is correct.

3  Q.   Okay.  And again, you found no evidence of any

4  contemporaneous work or searches that would indicate that

5  Chris Harp was the operator of the computer at that point in

6  time.

7  A.   That is correct.

8  Q.   The next restore point is August 3rd, 2016, at 12:26 PM;

9  is that correct?

10  A.   That would be correct.

11  Q.   And at this restore point you found evidence of two

12  partial downloads of suspected pornography and one complete

13  download of pornography; is that correct?

14  A.   I believe -- that is correct.

15  Q.   Again, you found no evidence of any contemporaneous work

16  or searches that would indicate that Chris Harp was the

17  operator of the computer at that point in time.

18  A.   That is correct.

19  Q.   Your next restore point is August 5th, 2016, at 4:07 PM;

20  is that correct?

21  A.   That would be correct.  4:07 PM local time.

22  Q.   And at that time you found two files from the

23  August 3rd, 2016, were marked for deletion.  And it showed

24  searches for potential pornography; correct?

25  A.   That is correct.

**P. Hammer - Cross-Examination (Mr. Edwards)**

1   Q.   And again, you found no evidence of any contemporaneous

2   work or searches that would indicate that Chris Harp was the

3   operator of that computer at that point in time.

4   A.   That is correct.

5   Q.   Your next restore point is Saturday, August 13th, 2016,

6   at 3:01 AM.

7   A.   Saturday, August 13th.  It's showing seven -- eight --

8   now you're -- you said Saturday.  That's what's confusing me.

9   We're on August 13th?

10  Q.   August 13th.

11  A.   Of 2016.

12  Q.   Of 2016.

13  A.   Seven minus four would be -- that would be 3:00 AM.

14  Q.   Okay.  Nothing was indicated there; is that correct?

15  A.   Nothing was indicated there.

16  Q.   Okay.  Your next restore point is August 16th at 2- --

17  I'm sorry -- August 16th, 2016, at 12:24 PM; is that correct?

18  A.   That is correct.

19  Q.   Your report indicates you found four partial downloads,

20  one video file, and searches for potential pornography; is that

21  correct?

22  A.   That is correct.

23  Q.   Again, you found no evidence or any contemporaneous work

24  or searches that would indicate that Chris Harp was the

25  operator of the computer at that point in time.

**P. Hammer - Cross-Examination (Mr. Edwards)**

1  A.    That is correct.

2  Q.    Thereafter, at 1:20 PM that same day, those files are

3  marked for deletion; is that correct?

4  A.    According to the restore point for that same day, they are

5  marked for deletion.

6  Q.    And that's something that someone actually has to be at in

7  order to delete them on the computer; correct?

8  A.    Somebody would have had to delete those files using the

9  standard Windows Explorer program.

10  Q.    The log-in count on the computer is 2,132 on August 16th,

11  2016; is that correct?

12  A.    At the -- at the 12:24 time it's 2,132.  At the -- 17

13  minus 4 would be -- at the 1:20 time it looks like it changes

14  to 2,140.

15        So there's two restore points for that day, August 16th.

16  So you have one restore point being at 12:24 in the afternoon

17  Eastern Time, and the re- -- the log-in count then is 2,132.

18  And then you have a second restore point at -- you have a

19  second restore point at 1:20 in the afternoon, and the log-in

20  count there is 2,140.

21  Q.    So someone had to log into that computer eight times in

22  less than an hour?

23  A.    That's what the log-in count shows, yes.

24  Q.    Okay.  Your next restore point is April 24th of 2018 at

25  8:24 AM; is that correct?

**P. Hammer - Cross-Examination (Mr. Edwards)**

1  A.    April 24th, 2018.

2  Q.    And that time is at 8:24 AM?

3  A.    That would be 8:24 AM Eastern Standard Time.

4  Q.    Okay.  So there were no restore points between

5  August 16th, 2016, until April 24th, 2018?

6  A.    So it looks like I was in error when I said the 2,140.  I

7  associated the 2,140 account with August 16th.  I was in

8  error.  That 2,140 count is actually for the April 24th,

9  2018.  I was in error when I said that.  So you were right when

10 you said the August 16th was 2,132.  And that looks

11 consistent for the whole day.

12 Q.    All right.

13 A.    And the 2,140 count is actually for April 24th, 2018.

14 My apologies.

15 Q.    Okay.  So in the year-and-a-half time frame between

16 August 16th, 2016, and April 24th, 2018, we know that the

17 computer was logged into eight times.  But there's nothing in

18 your report that shows that any type of pornography or anything

19 like that was being downloaded; correct?

20 A.    If I would have seen pornography downloaded, I would have

21 noted it in my report.

22 Q.    Okay.  Your next two restore points are both April 24th

23 of 2018, around 9:30 AM; is that correct?

24 A.    April 24th would be -- the first one looks to be 8:24 AM

25 Eastern Standard Time.  The second one looks to be 9:28 Eastern

**P. Hammer - Cross-Examination (Mr. Edwards)**

1  Standard Time.

2  Q.   Okay.  And the first of these restore points had a

3  download for the software Shareaza, and the second had no

4  additional information; is that correct?

5  A.   That is -- the second one, it just shows that the file was

6  actually downloaded -- the Shareaza program Version 2.7.10.2

7  was actually downloaded, was present in the downloads folder.

8  Q.   Okay.  You found no evidence of any contemporaneous work

9  or searches that indicate that Chris Harp was the individual

10  operating the computer on that date; is that correct?

11  A.   Well, the April 24th, 2018, there are the charp51

12  log-ins and the charp for stradlink.stradenergy.com.

13  Q.   Right.  And those log-ins, those go back from the eight

14  log-ins that we had that you had no information; correct?

15  Between April 16th, 2016, and April 24th, 2018?

16  A.   So the April 24th restore point shows two log-ins for

17  Chris Harp: charp51 and charp.

18  Q.   Okay.

19  A.   That's what those restore points show.

20  Q.   Show the log-in.

21  A.   They show log-ins for those accounts: charp51 and charp.

22  And the charp is logged into stradlink.stradenergy, and charp51

23  is logged into www.governmentjobs.com/careers/westvirginia.

24  Q.   Okay.  Your next restore point is April 30th, 2018, at

25  7:58 AM; is that correct?

**P. Hammer - Cross-Examination (Mr. Edwards)**

1   A.    That is correct.   7:58 AM.   That's Eastern Standard Time.

2   Q.    And this restore point shows three partial downloads of

3   potential pornography, dated August 16th, 2016.   And the

4   recycle bin contained 24 potential pornography, downloaded on

5   April 24th, 2018.   And in addition, there were searches for

6   pornography at 10:30; is that correct?

7   A.    That would be 10:30 Eastern Standard Time.

8   Q.    Eastern Standard Time.

9   A.    That would be correct.

10  Q.    And you would agree with me that at that download you

11  found no evidence of any other contemporaneous work or searches

12  that indicate that Chris Harp was the operator of that

13  computer.

14  A.    I did not document any other Chris Harp activity at that

15  time.

16  Q.    On April 30th, 2018, the log-in count for the computer

17  was 2,142; is that correct?

18  A.    April -- what was the date?

19  Q.    April 30th, 2018.

20  A.    Okay.   I'm here.

21  Q.    Is that right?   The log-in count was 2,142?

22  A.    The log-in count was 2,142 at that time.

23  Q.    Okay.   So your next restore point is almost a year later.

24  It's April 4th, 2019, at 8:11 AM; is that correct?

25  A.    That is -- 8:11 AM would be Eastern Standard Time.

**P. Hammer - Cross-Examination (Mr. Edwards)**

1  Q.   And there were no restore points between April 30th,

2  2018, and April 4th, 2019; is that correct?

3  A.   There were no restore points noted that -- so I would

4  believe that that would be correct.  There were no restore

5  points.

6  Q.   And we know from your report that the log-in count on

7  April 30th, 2018, is 2,142.  And then your next reported

8  restore point, on April 4th, 2019, is 2,154.  Correct?

9  A.   Correct.

10  Q.   But your report is silent as to anything that was on the

11  computer during that time -- during that year; is that correct?

12  A.   There were no files that were identified that were germane

13  to the request for that time period -- noted for that time

14  period.

15  Q.   Your April 4th restore point shows nothing

16  contemporaneous or any other work done by Chris Harp on that

17  date; is that correct?

18  A.   That's correct.

19  Q.   In addition, there's no information on the computer

20  showing contemporaneous work or other non-pornographic searches

21  done on the computer on April 4th, 2019, which is Count

22  One -- the date in Count One of this complaint;

23  September 18th, 2020, which is Count Two; or

24  September 21st, 2020.  Is that correct?

25  A.   I believe there was a significant number of downloads

**P. Hammer - Cross-Examination (Mr. Edwards)**

1  marked for April 4th, 2019.

2  Q.   No.  I'm sorry.  I -- you misunderstood my question.  I

3  understand that pornography was downloaded on those dates.

4  A.   Oh.

5  Q.   My question is:  There's nothing showing any other

6  contemporaneous work or other non-pornographic searches that

7  would tie -- or would indicate that Chris Harp was the

8  individual who was operating the computer on those dates.

9  A.   I didn't note anything.

10  Q.   Were you aware that on September 21st, 2020, some of the

11  downloads for pornography were bait files?

12  A.   I did.  When I reviewed some of the videos I did.  And

13  I've worked a lot of CSAM cases.  I have never seen bait files.

14  So I did see those.  And they stick out as -- in my memory

15  because I had never seen those in any other cases.  So I did

16  see bait files in this case.

17  Q.   And we're using a term that we both know, but I doubt the

18  jury understands what we're talking about.

19      Bait files are actual videos that, when someone is

20  searching for pornography, you believe that you're looking for

21  pornography, but they're actually things from law enforcement

22  that basically says, "Guess what?  You just downloaded a file,

23  and we know who you are and what you're doing."

24  A.   Well, the bait -- what he refers to in this case, the bait

25  files, are from foreign law enforcement, probably partners,

**P. Hammer - Cross-Examination (Mr. Edwards)**

1    that set up files that ind- -- the file name indicates

2    potential child pornography in the content.  And when you look

3    at the content, you see the police are making a statement that

4    -- in this particular case they make a statement saying "You

5    have a problem, and we have identified your IP address as the

6    location.  And your IP address will be forwarded on to other

7    law enforcement partners."

8    Q.    So whoever --

9           THE COURT:  I'm sorry, Mr. Edwards.  When you say

10   bait, it's B-A-I-T?

11          MR. EDWARDS:  Correct.

12          THE COURT:  Okay.  Understood.  Thank you.

13          THE WITNESS:  Right.  Bait.

14          MR. EDWARDS:  Bait.

15   BY MR. EDWARDS:

16   Q.    So if someone had seen that file come through, they would

17   know at that point in time that their IP address has been

18   identified as downloading pornography.

19   A.    Well, the bait file suggests that it -- or the bait file

20   states that the IP address has been -- for lack of better

21   terminology, the bait -- the address has been compromised to

22   law enforcement.  However, those law enforcement agencies are

23   overseas.  And so it would be suspect to think is this, you

24   know, going to ever get routed to the law enforcement over in

25   this country.

**P. Hammer - Cross-Examination (Mr. Edwards)**

1    So it's -- it's foreign -- it's foreign, overseas agencies

2  that are saying, "We have your IP address, and we're going to

3  turn it over to corresponding authorities."

4  Q.   You understand that the Harps' home was searched four days

5  after these bait files were downloaded.

6  A.   I -- I don't understand that.  I didn't -- I didn't

7  compare the bait file time and date stamps to the search time.

8  So...

9  Q.   Okay.  I thought that you'd testified that you realized

10 that the bait files had been downloaded on September 21, 2020.

11 A.   I may have testified to that.  But I never recognized that

12 those dates and the search dates were in close proximity.  I

13 never -- I never checked the dates and said, "Oh.  Well, this

14 happened and this happened and this happened."

15 Q.   Okay.  Understood.

16    But you understood that the home was searched on

17 September 25th, 2020; is that correct?

18 A.   I do understand that the home was searched on

19 September 25th.

20 Q.   Okay.  And the computer was -- well, the jury has already

21 seen where the computer was found in the home.  Do you -- did

22 you know where the computer was found at in the home?

23 A.   I did not participate on this search.  Oftentimes case

24 agents would ask for CART assistance on searches.  We were

25 not -- we were not asked to assist.  And so I did not attend

**P. Hammer - Cross-Examination (Mr. Edwards)**

1  this search.

2  Q.   Mr. Hammer, you noticed that when I was questioning you

3  about each of the restore points I mentioned the date and time;

4  correct?

5  A.   That's correct.

6  Q.   Did you ever go back and determine what days of the week

7  each of these dates were?

8  A.   I did not reference days of the week.  And to be honest,

9  you mentioned the one date Saturday.  And that's what confused

10  me, because I did not reference any days of the week with the

11  dates and times associated with the computer files themselves.

12  Q.   Okay.  Well, Mr. Hammer, actually, I did.  And other than

13  the restore point on August 13th, which was 2016, which fell

14  on a Saturday, a restore point in which you indicated in your

15  report that nothing was indicated, every other date in your

16  restore point analysis was on a weekday --

17       MS. CONKLIN:  Objection, Your Honor.  Counsel is

18  testifying.  He's providing evidence to the Court and to the

19  jury.

20       THE COURT:  Overruled.

21  BY MR. EDWARDS:

22  Q.   Every other restore point was on a weekday and times

23  during the workday.  Do you have any reason to dispute that?

24  A.   So I have no reason to dispute that.  But it's important

25  to recognize that restore points are generated by Microsoft.

**P. Hammer - Cross-Examination (Mr. Edwards)**

1  It's a Microsoft operating system function.  And so Microsoft

2  is a company that does not tell you -- does not -- it's not an

3  open source operating system.  They do things according to

4  their rules.  And what their rules are aren't published.

5  Microsoft is a -- like, I'm used to more Linux systems.  Linux

6  are all open source.  So the rules are all stated openly.

7  Microsoft rules are not stated openly, and they have their own

8  rules as to when -- when these restore points are needed and

9  when these restore points are generated and how they're

10  actually managed.

11  Q.   So are you trying to tell this jury that we can't rely on

12  the date and times that you have listed in your report?

13  A.   No.  I'm saying the dates and times are accurate.  But

14  you're asking me a question as to why the -- it seems like

15  you're asking me a question as to why the dates and times

16  correspond to days of the week as opposed to some other day.

17  And what I'm saying is Microsoft determines when those restore

18  points happen.

19  Q.   No, I'm not.

20  A.   Okay.  Well, then --

21  Q.   I'm basically asking you --

22  A.   -- I'm sorry.  I misunderstood the question.

23  Q.   You testified to dates and times when pornography was

24  downloaded on these -- on this computer; correct?

25  A.   I testified to when the downloads occurred.  Correct.

**P. Hammer - Cross-Examination (Mr. Edwards)**

1   Q.   And my question was simply, did you ever go back and check

2   and see what days of the week these dates and times fell on?

3   A.   And I've already stated that the answer to that is no.

4   Q.   Okay.  Do you think that's pretty important information

5   when you're trying to determine who was actually operating the

6   computer?

7   A.   I do not think that's particularly important when it's --

8   for me, at any rate.  It would be more -- if it was important,

9   I would think the investigator would need to say, "Okay.  This

10  particular date is a Tuesday.  What happened on a Tuesday?"

11       As me, just looking through the digital evidence, it's

12  just not something I would do.

13  Q.   Okay.  So it's important that someone should have looked

14  at it.  Fair?

15  A.   I can't say that.  You would have to ask that question to

16  the investigator.

17  Q.   Okay.  You never inquired as to what Chris Harp was doing

18  for a living or where he was working during the time frames

19  reported under your report; correct?

20  A.   I have no information of Chris Harp at all.

21  Q.   You would agree that there are significant gaps in times

22  between the alleged downloads and the viewing of the

23  pornography on the computer.  Meaning that you have one in

24  2012; then there's a gap to, like, maybe 2013, and then all the

25  way up to 2016, and then you have again to 2018 and one in 2019

**P. Hammer - Cross-Examination (Mr. Edwards)**

1  and not again until September of 2020.

2  A.    There is absolute truth in the fact that the child porn

3  downloads came in waves, if you will.  So you would see a

4  period of time with no activity, and then you would see a

5  period of -- a short period of time with extensive activity,

6  and then you would see a long period of time with no activity

7  again.

8  Q.    You've investigated numerous computers with suspected

9  pornography and looked at numerous computers that had

10  pornography on them in different investigations; correct?

11  A.    I've worked a lot of cases with child -- that involve

12  child pornography.

13  Q.    And you would agree with me that most individuals, once

14  they start looking at child pornography, they do so on a fairly

15  regular basis once they start.

16  A.    I would probably agree with that.

17  Q.    However, as you just testified, the pattern of alleged

18  downloads on this computer was pretty much kind of hit or miss

19  over the nine-year-plus time frame; correct?

20  A.    It was as I described.  There's periods of no activity,

21  and then there's periods of a lot of activity.  And the periods

22  of a lot of activity are short windows, and the periods of

23  long -- no activity are much longer time frames.

24  Q.    Wouldn't you agree with me it's almost as if someone only

25  had limited access to this computer at different times?

**P. Hammer - Cross-Examination (Mr. Edwards)**

1  A.   I wouldn't agree to that.

2  Q.   Why not?  I mean, you just testified that there were gaps

3  of years in between, and there was a lot of activity on these

4  certain dates, and then there would be gaps of three years or

5  one year or a year and a half.

6  A.   I --

7  Q.   So --

8  A.   Sorry.

9        THE COURT:  One second, gentlemen.

10       Questions, Mr. Edwards.  No more argument.

11        MR. EDWARDS:  Yes, sir.

12        THE WITNESS:  I simply wouldn't agree to that.

13  BY MR. EDWARDS:

14  Q.   Okay.  The subject computer indicates that the operating

15  system was initiated April 23rd, 2011; correct?

16  A.   That is correct.

17  Q.   And thereafter, the first indication in your report of

18  pornography being found on the computer was June 12th -- June

19  of 2012.

20  A.   The IE history logs show there was activity in June of

21  2012.

22  Q.   Okay.  And then again in September of 2012.

23  A.   I believe it was June, July, August, and September.  It

24  was three or four months of activity using both FrostWire and

25  Shareaza.

**P. Hammer - Cross-Examination (Mr. Edwards)**

1  Q.   And then nothing until July 12th, 2013, after September of

2  2012; correct?

3  A.   There was no documented downloads from that -- those --

4  that period of time.

5  Q.   Okay.  So nothing for over a year after the computer was

6  activated on April 23rd, 2011, until June 2012.  And then any

7  activity there stopped in September 2012.  And then we had

8  another year until July 12th, 2013, when there was any

9  activity; correct?

10  A.   I believe so.

11  Q.   Okay.  And then it wasn't until three years later,

12  July 28th and 29th of 2016, that pornography was

13  downloaded.

14  A.   To this computer.  Correct.

15  Q.   Okay.  And then again on August 3rd and August 16th of

16  2016; correct?

17  A.   Correct.

18  Q.   And thereafter, nothing was found until -- from

19  August 2016 until April of 2018; correct?

20  A.   Correct.

21  Q.   So we have a year and a half for no searches of any

22  potential pornography.

23  A.   We have a year and a half with no downloads activity.

24  Q.   Well, if you would have seen search information for -- or

25  I guess searches for pornography, you would have documented

**P. Hammer - Cross-Examination (Mr. Edwards)**

1   that as well; correct?

2   A.   So the search terms are documented.  Theoretically you

3   could do a search term and not download something.  But

4   certainly, you see no downloads.

5   Q.   Okay.

6   A.   I documented no downloads in that -- in those time frames

7   that you're talking about.

8   Q.   Okay.  So April 2018.  And then another year passes until

9   April 4th, 2019, until there's another download.

10  A.   Okay.

11  Q.   And then we have another year and a half, until

12  September 18th, 2020, of any -- before there's another

13  download; correct?

14  A.   Correct.

15  Q.   Other than the investigation or your analysis of this

16  computer, you have no information with regard to what other

17  investigation was done to determine where Chris Harp may have

18  been living or where he was working throughout these -- this

19  nine-year time frame.

20  A.   I was told that -- I was shown on the -- and I looked at

21  the original IP traffic logs that showed two IP addresses.  And

22  it was made mention that the two IP addresses corresponded to

23  two different house locations.  One was, I believe, temporary

24  housing, and one was the permanent housing location.

25  Q.   Okay.  And I --

1  A.   So I was given that information as far as where Chris Harp

2  resided throughout the entirety of the lifespan of this

3  computer.

4  Q.   Okay.  I'm sorry.  What did -- what was the last thing

5  that you just stated?

6  A.   The -- so I was looking at -- my -- I thought your

7  question revolved around did I know where Chris Harp lived

8  throughout the entire lifespan of this computer.  And I know

9  that he was at a permanent house location and a temporary house

10  location, according to the network logs that I did review when

11  this case came in.

12  Q.   Okay.  But that's not -- that's just the two places that

13  you know of.

14  A.   That's just two locations that I know.  I wouldn't have --

15  I wouldn't know of any other locations that he might have lived

16  prior to those two locations.

17          MR. EDWARDS:  Your Honor, if I can have just a

18  second.

19          THE COURT:  You may.

20          MR. EDWARDS:  Mr. Hammer, thank you for your time.

21          THE WITNESS:  Thank you.

22          THE COURT:  Ladies and gentlemen of the jury, we're

23  going to go ahead and take a lunch break at this point.  We'll

24  take just short of an hour.  If you could be back by 1:15 or

25  so, we'll be ready to resume.

1          Please continue to refrain from discussing the case with

2    anyone, and please continue to refrain from any independent

3    investigation or research about the case and any social media

4    activity related to the case or your jury service.

5          We'll see you in about an hour.  Thank you all very much.

6          (Jury retired from the courtroom at 12:22 PM.)

7              THE COURT:  All right.  Thank you, everyone.  Please

8    be seated.

9          Sir, I've got good news for you.  You remain midstream on

10   your testimony, so you're off limits to human contact during

11   that time.  So you get a peaceful lunch break yourself.

12             THE WITNESS:  Thank you.

13             THE COURT:  All right.  You can go ahead and step

14   down if you'd like.  You can leave all the exhibits and whatnot

15   there.  And we'll be ready to resume with redirect at 1:15.

16         Why don't we get back together at 1:00.  We can start

17   discussing the jury charge at that point.  Everyone should have

18   the updated version -- or current version of it, I should say.

19   But let's go ahead and start that process at 1:00.

20         Otherwise, we'll see everyone then.  Thank you.

21         (Lunch break taken from 12:23 to 1:03 PM.)

22             THE COURT:  Thank you, everyone.  Please be seated.

23         All right.  Does everyone have a hard copy of the charge?

24             MR. EDWARDS:  Yes, Your Honor.

25             MR. PERRI:  Yes.

1          THE COURT:  Okay.  Perfect.  I think, just for our

2    record's sake, it's version three that everyone should have.

3       Any objections or concerns from the Government?

4          MR. PERRI:  Your Honor, on page 15, the recitation of

5    elements for the receipt charge.

6          THE COURT:  Uh-huh.

7          MR. PERRI:  The third one I think is missing some of

8    the interstate nexus language.

9          THE COURT:  Okay.  And what specifically is that?

10         MR. PERRI:  That talks about being shipped or

11   transported by using any means or facility of interstate or

12   foreign commerce.  And you can see it -- well, I guess we have

13   to reference the statute in the code.

14      So in 2252A(2) -- no, I'm sorry -- (3)(B) it says --

15         MS. CONKLIN:  "...mailed or shipped or transported

16   using any means or facility of interstate or foreign

17   commerce..."

18         MR. PERRI:  Yeah, I think it's missing the shipped

19   and transported language, Your Honor.

20         MS. CONKLIN:  Let's see.  It "had been mailed or

21   shipped or transported" --

22         COURT REPORTER:  I'm sorry.  I can't hear you,

23   Ms. Conklin.

24         THE COURT:  Yeah.  Microphones.

25         MS. CONKLIN:  Sorry.

1          THE COURT:  And a little bit slower when we're

2    reading, please.

3          MS. CONKLIN:  Okay.  In the Government's -- just as

4    to the interstate language, in the Government's proposed jury

5    instructions we said that it "had been mailed or shipped or

6    transported using any means or facility of interstate or

7    foreign commerce or in or affecting interstate or foreign

8    commerce by any means, including by computer, or was produced

9    using materials that had been mailed or shipped or transported

10   in or affecting interstate or foreign commerce by any means,

11   including by computer."

12         THE COURT:  Okay.  And which proposed instruction is

13   that, Ms. Conklin?

14         MS. CONKLIN:  It would be Number 3.  I'm sorry.  The

15   possession of child pornography.  Let me --

16         MR. PERRI:  Receipt.

17         MS. CONKLIN:  The receipt.  Let me see.

18     Oh.  It's because it's in -- it's incorrect in the

19   Government's proposed --

20         MR. PERRI:  It's wrong in our --

21         THE COURT:  In fact, yes.

22         MR. PERRI:  It's wrong in our submission, Your Honor.

23         MS. CONKLIN:  There it is.  I'm wrong.  I'll be the

24   first to admit.

25         MR. PERRI:  So it's our mistake, not yours, Your

1    Honor.  But at least we caught it.  So if you reference the

2    actual statutory language.  And the correct citation is

3    2252A(2).

4                MS. CONKLIN:  I believe it's correct.

5                MR. PERRI:  Yeah.

6                MS. CONKLIN:  And I know defense counsel's

7    proposed -- I know defense counsel's proposed instruction also

8    shows that it had been shipped or transported or in or

9    affecting interstate or foreign commerce by any means,

10   including by computer.

11               THE COURT:  Okay.  So it would be 18 U.S.C. 2252A.

12               MR. PERRI:  Capital A(2).  Capital A(a)(2).

13               THE COURT:  (a)(2).  And so we would need to add

14   "mailed" --

15       Where was I?  I just lost it.

16       "...mailed, or has been shipped or transported in or

17   affecting interstate or foreign commerce by any means,

18   including by computer."

19       Any objection to just tracking the language of 18 U.S.C.

20   2252A(a)(2)(A)?

21               MR. EDWARDS:  No objection.

22               THE COURT:  Any objection from the Government?

23               MR. PERRI:  No, Your Honor.  We apologize for that

24   oversight.

25               THE COURT:  All right.  So we'll swap out lines 16

1  through 19 on page 15 of the current version of the charge

2  verbatim for 2252A(2)(A) and go from there.

3       Okay.  Any other objections or concerns from the

4  Government?

5            MR. PERRI:  Your Honor, one other small thing.  I

6  don't know if it's going to become an issue or not, but I'm

7  just going to throw it out there.

8       A couple of times yesterday there were mentioned about the

9  amount of time that it took for this case to come to court and

10  culminate in an indictment.  I don't know -- I have no idea

11  what defense counsel intends to say, obviously, in closing

12  argument or whatever.  But if that is something that's going to

13  come up again, we would ask the Court for a special instruction

14  that the length of time that may have passed between the

15  alleged commission of the offense and the date of any

16  indictment is not relevant to your determination of guilt or

17  innocence in this case.

18       So it may not -- it may not be an issue.  But if it is, we

19  would ask for that, Your Honor.

20            THE COURT:  Mr. Edwards.

21            MR. EDWARDS:  I don't know if that's necessary, Your

22  Honor, to be honest with you.  I mean, you know, the only

23  comment is that's the time.  I mean, basically, the -- their

24  house was searched.  I was setting forth the two dates.  I

25  didn't really make an argument one way or the other --

```
 1              THE COURT:  Right.
 2              MR. EDWARDS:  -- other than what was the timeline.
 3              THE COURT:  No.  But are we going to hear one?
 4  Because I do think Mr. Perri's --
 5              MR. EDWARDS:  I have to go back to my closing.
 6              THE COURT:  -- Mr. Perri's --
 7              MR. EDWARDS:  I don't believe that I am, though.
 8              THE COURT:  Okay.
 9              MR. EDWARDS:  And I will -- I will inform the Court
10  if that changes.  But I don't believe that's part of my --
11              THE COURT:  Okay.  Because I think Mr. Perri is
12  correct in terms of what the law is; that it is not a relevant
13  consideration.  I'm not convinced it warrants specific
14  instruction at this juncture.  So if your plan changes, please
15  let us know.
16              MR. EDWARDS:  I will.  I will let you know, Your
17  Honor.
18              THE COURT:  Okay.  We'll keep a pin in that for now,
19  Mr. Perri.  Anything else from the Government?
20              MR. PERRI:  I didn't notice anything else, Your
21  Honor.
22              THE COURT:  Okay.  Mr. Edwards, any objections or
23  concerns from your perspective?
24              MR. EDWARDS:  Yes, Your Honor.  Page 12.  Location
25  and dates.
```

1              THE COURT:  Hold on one second.

2        Page 12, starting on line 22, through line 5 on page 13.

3   Yes, sir.

4              MR. EDWARDS:  Yes, Your Honor.

5        I understand that the indictment says "on or about," but

6   the evidence in this case is very specific.  In fact,

7   Mr. Hammer just testified it's this date when, you know, these

8   alleged events took place, and times.  So I don't think the "on

9   or about" instruction is proper, because it's been brought

10  forth by the State -- I mean by the Government's own expert

11  that it was on this date and time.

12             THE COURT:  Understood.

13             MS. CONKLIN:  Your Honor, the Government's witnesses

14  have testified to the dates that certain things occurred on the

15  computer.  However, the witnesses have also testified that

16  while certain things may have occurred at one specific time,

17  that additional things could have occurred on the computer

18  afterwards.

19        I believe that this is a standard instruction, that it's a

20  standard instruction in pretty much every jury trial, that it's

21  the standard rule.  It's charged on or about.  And while

22  defense counsel can argue, it's up to the jury to make a

23  determination.

24             THE COURT:  No.  I'm going to overrule the objection.

25  This instruction is largely meant to address the wording of the

1  indictment in this particular case, which does include "on or

2  about."

3      I think that this particular section -- again, page 12,

4  line 22, through line 5, page 13, of the current version of the

5  charge -- is an accurate statement of the law.  And I do

6  believe it necessary given the language of the indictment,

7  which the jury, of course, will be told in the charge as well,

8  recognizing the significance of particular dates and times in

9  light of the anticipated alibi defense.  But that's, I think,

10  more appropriately addressed during closings.  So for those

11  reasons the Court would overrule that objection.

12      Anything else, Mr. Edwards?

13          MR. EDWARDS:  Yes, Your Honor.  Page 15.  The

14  instruction in Counts One through Three, Receipt of Child

15  Pornography.

16          THE COURT:  Yes.

17          MR. EDWARDS:  Starting at line 11 it says -- or I'm

18  sorry.  It's starting at line 9.  "For you to find the

19  Defendant guilty, the Government has to prove each of the

20  following beyond a reasonable doubt: one, that the defendant

21  received or distributed."

22      And Your Honor, I think it needs to be placed in there

23  "knowingly received or knowingly distributed."  I understand

24  that line 21, subparagraph 4, says the defendant acted

25  knowingly.  But right below that it states, "The Government is

1  required to prove that the defendant knew that the visual

2  depiction portrayed a person under the age of 18 and that the

3  minor was engaged in sexually explicit conduct."

4      It doesn't -- "knowingly" doesn't read that knowingly

5  received and knowingly distributed.  And I think that needs to

6  be placed in there because that is what is required under the

7  code by which he's been charged.

8          THE COURT:  Understood.

9      Any objection to that?

10         MS. CONKLIN:  Your Honor, it's already in there.

11  It's element four.  It says that the Government -- "defendant

12  received" -- or I'm sorry -- "the defendant received or

13  distributed any child pornography that had been mailed in

14  interstate commerce; four, that the defendant acted knowingly."

15  So the "knowingly" is already there.

16         THE COURT:  Understood.

17     We're going to include it in that first elements line, 11.

18  We'll change that to read "that the defendant knowingly

19  received or distributed."  I think the -- I hate to talk about

20  trends, but making clear the required mens rea is something

21  we've been quite -- become quite familiar with in other cases,

22  under other statutes.  I see no harm in clarifying that with

23  respect to the receipt or distribution element, which tracks

24  directly with 2252A(a)(2).

25     Yes, Mr. Perri.

1          MR. PERRI:  Your Honor, we would recommend taking out
2     the word "distributed."  This isn't a distribution case.  You
3     know, there are different verbs that apply under the (a)(2),
4     and this is a receipt-type case.  We did not say "distribute"
5     in the indictment.  So...
6          THE COURT:  Okay.  Any objection, Mr. Edwards, to
7     striking "or distributed" from line 11?
8          MR. EDWARDS:  Not at all, Your Honor.
9          THE COURT:  Okay.  So we'll strike "or distributed"
10    and insert "knowingly" between "defendant" and "received" on
11    line 11 of page 15.
12       Okay.  Mr. Edwards, anything else?
13       MR. EDWARDS:  Your Honor, the same objection I have
14    for the possession count on page 16, line 6.  The defendant --
15    I would ask that it read "that the defendant knowingly
16    possessed or knowingly accessed with intent..."
17         THE COURT:  Okay.  Same objection, I assume,
18    Ms. Conklin.
19         MS. CONKLIN:  Yes, Your Honor.
20         THE COURT:  Same ruling.  We'll add "knowingly" on
21    line 6, page 16, such that that line reads "that the defendant
22    knowingly possessed or accessed."  And again, it tracks the
23    statutory language.
24       Okay.  Anything else, Mr. Edwards?
25         MR. EDWARDS:  Your Honor, the only other objection I

1    think I've made numerous times would be with regard to the

2    prior bad acts.  There's an instruction there -- which, of

3    course, I want it to be read, but just the fact that it's been

4    allowed.

5            THE COURT:  That it's been admitted?  No.

6    Understood.  And I wanted to make sure counsel has had a chance

7    to read and process the Court's other acts instruction.

8    Recognizing an objection to the admission of the evidence, I

9    wanted to make sure there were no concerns about it being an

10    accurate statement of the law.

11        From the Government's perspective, any concerns about the

12    other acts portion of the charge?

13            MR. PERRI:  I think it sounded okay to me, Your

14    Honor.

15            THE COURT:  Okay.  Mr. Edwards?  Other than, of

16    course, the admission of the evidence.

17            MR. EDWARDS:  I'd say the same thing.  It sounded

18    okay to me, Your Honor.

19            THE COURT:  Okay.  Great.  All right.  Well, we will

20    make those revisions.  We will revisit the charge one more time

21    at some point so that we can make sure we've got final

22    clarification on everything.

23        Anything from the Government we need to take up at this

24    point?

25            MR. PERRI:  No.  Thanks, Your Honor.

```
 1              THE COURT:  Okay.  Mr. Edwards, anything from your
 2    perspective?
 3              MR. EDWARDS:  No, Your Honor.  Thank you.
 4              THE COURT:  Okay.  So we have to finish Mr. Hammer.
 5    And then Special Agent Thigpen is going to resume his
 6    testimony; correct?
 7              MS. CONKLIN:  Correct.
 8              THE COURT:  All right.  Does the Government intend to
 9    rest at that point, or are there other witnesses?
10              MS. CONKLIN:  Yes, Your Honor.
11              THE COURT:  I'm sorry.  That was an "or."  So the
12    Government intends to rest?
13              MS. CONKLIN:  The Government intends to rest.  Sorry.
14              THE COURT:  Okay.  Got it.
15         Witnesses in the hole, Mr. Edwards, to proceed with any
16    defense case?
17              MR. EDWARDS:  Yes, Your Honor.
18              THE COURT:  Okay.  Great.  Anything we need to do
19    before we bring the jury back in, including, but not limited
20    to, any last-minute personal comfort breaks for counsel?  Or
21    Mr. Harp, of course.
22              MR. EDWARDS:  I think I'm okay, Your Honor.  Thanks.
23              THE COURT:  All right.
24              MS. CONKLIN:  I just need to go get...
25              THE COURT:  Well, just shout out if you need one.
```

1  That's the vibe we're on the day.  Okay.

2          MS. CONKLIN:  Judge, I guess just logistically

3  speaking, if we get through all our witnesses today and the

4  defense witnesses today, is the Court thinking about doing

5  closings today?  Will the Court give us a little bit of time to

6  collect our thoughts for closings between --

7          THE COURT:  We'll see how we go.  If we can get it

8  all in today, I'd like to.  If not, we'll be here tomorrow, I

9  suppose.

10          MS. CONKLIN:  That's fine.

11          THE COURT:  Yeah, we'll do it -- yeah, we'll probably

12  give a couple minutes, but I wouldn't expect a long strategy

13  session being made available, if we can get to that point

14  today.

15          MS. CONKLIN:  Yeah.  No.  I -- we would just

16  appreciate five or ten minutes.

17          THE COURT:  No.  Understood.  Okay.

18      With that, can we have our jurors, please, sir.  Thank

19  you.

20      And can we track down Mr. Hammer?

21          MS. CONKLIN:  Yes.

22          THE COURT:  Okay.  Thank you.

23      (Jury returned to the courtroom at 1:18 PM.)

24          THE COURT:  Thank you, everyone.  Please take your

25  seats.  Thank you, ladies and gentlemen.

**P. Hammer - Redirect Examination (Ms. Conklin)**

1    Mr. Hammer, if you wouldn't mind resuming the witness

2  stand, sir.  Thank you.

3    Thank you very much, sir.

4    All right.  Redirect, Ms. Conklin?

5      MS. CONKLIN:  Thank you.

6           REDIRECT EXAMINATION

7  BY MS. CONKLIN:

8  Q.  Now, Mr. Hammer, in your review of the thumb drive, did

9  you find any evidence that anybody else besides Christopher

10  Harp had been utilizing that?

11  A.  So the file system on the thumb drive wouldn't be

12  associated with any individual.  There's no account information

13  on the USB thumb drive, so there would be -- there would be no

14  acc- -- there would be no information on who accessed that

15  thumb drive.

16  Q.  In reviewing the documents contained on that thumb drive,

17  did you notice documents for anybody else besides -- with names

18  of other people submitting them?

19  A.  I don't recollect looking at the -- I looked at the

20  documents that were within the time frame of the suspected

21  child porn files.  I don't recall looking past those files.

22  Q.  But as to the files that were associated with the date of

23  the suspected child pornography, you didn't see anybody else

24  utilizing that thumb drive to save other documents.

25  A.  Those, I believe, were all attributed to Christopher Harp.

**P. Hammer - Redirect Examination (Ms. Conklin)**

1  Q.    Okay.

2  A.    And when I say attributed to Christopher Harp, the file

3  content had the Christopher Harp name information in there --

4  Q.    Okay.

5  A.    -- as, like, standard -- standard files for homework or

6  some kind of educational program.

7  Q.    Okay.  Now, defense counsel had asked you about an icon

8  for Shareaza and was there an icon on the computer and did you

9  see the icon.

10     This computer, did you actually, like, turn on the

11  computer and make it start running its little Windows thing?

12  A.    So that computer has not booted the Windows operating

13  system since it was shut down, if it was shut down at the -- if

14  it was shut down.  But it has not been booted since the search.

15  Q.    So --

16  A.    To the Windows operating system.

17  Q.    So you wouldn't know what his computer would display when

18  he opened it up and started running.

19  A.    I -- that could be found out in -- there's a -- there's a

20  startup programs folder, and there's -- certainly you would see

21  icons on the desktop.  I don't recall looking for any of that.

22  Q.    And you wouldn't have viewed his computer as he would have

23  viewed it when he was using it.

24  A.    I did not boot that with Windows -- with that Windows

25  op- -- I didn't boot that with any Windows operating system,

### P. Hammer - Redirect Examination (Ms. Conklin)

1    but I certainly did not reboot that with his existent Windows

2    operating system.

3    Q.   Okay.  Now, we've talked a lot about restore points.  And

4    counsel had asked about the restore points.  We've described

5    restore points as a snapshot of the computer at that time;

6    correct?

7    A.   It has snapshot capabilities where, yeah, you will retain

8    files as they exist at that point in time.

9    Q.   At that point.  So would it document things that happened

10   before the restore point was made, or would it document things

11   after the restore point was made?

12   A.   So the documentation is going to be -- it's going to

13   document file data up until the point of the restore point.

14   Q.   Again, what is it that causes a restore point to trigger

15   or to be made?

16   A.   That's all dependent on Windows.  Windows makes all the

17   rules for that.  But definitely you will see -- on certain

18   files that do system updates, you will see a restore point

19   triggered.

20   Q.   And is it a process that Microsoft does automatically once

21   it's going to be making an update?

22   A.   Microsoft has rules.  And what those rules are I wouldn't

23   know.  But you definitely see there's software being updated

24   and it triggers -- it triggers a restore point at that time.

25   Q.   Okay.  If a file was deleted from the recycle bin, would

**P. Hammer - Redirect Examination (Ms. Conklin)**

1  that still show in a restore point?  Let me rephrase that.  If

2  a -- if a file had been deleted from the recycle bin, when a

3  restore point was made subsequent to that, would that file

4  still show in the recycle bin?

5  A.    So the file is in the recycle bin.  The restore point

6  happens?

7  Q.    The file is in the recycle bin, and it's deleted from the

8  recycle bin.

9  A.    From the recycle bin.  And then the restore --

10  Q.    And then sometime --

11  A.    And then the restore point happens.

12  Q.    Sometime after.

13  A.    The restore point would not have access to that file.

14  Q.    Okay.  Let me clarify with the restore points as well.

15  Could there have been restore points that were made prior to

16  the first restore point you reviewed from July 8th, 2016?

17  A.    So the software -- the software we use breaks out the

18  restore points.  The software we use is very good.  I doubt

19  strongly that there were restore points prior to that first one

20  I listed.  Could be, but I would -- I would doubt it.

21  Q.    Okay.  And that computer was nine years old, correct, at

22  the time that you were first initially looking at it?  Or it

23  had been used for nine years.

24  A.    So if -- yeah, I -- if the search was September of 2020,

25  it was first booted in April of 2011.  So that would make it

**P. Hammer - Redirect Examination (Ms. Conklin)**

1  nine years old.

2  Q.   And you -- when you reviewed -- through all the various

3  restore points and looking through all the various other

4  aspects of the computer, were you looking to find information

5  about who had used that computer and accessed various websites

6  and did things on that computer?

7  A.   I looked through extensively all of the internet history,

8  which would include Google Chrome, IE history, which would show

9  any kind of log-in activity.  But again, all of the Windows

10 log-in activity is associated with the admin account.

11 Q.   And in that admin account did you see that certain users

12 or profiles would access, like, Yahoo Mail or Shutterfly or

13 different other programs?

14 A.   We'd seen, you know, as I document in my report, the charp

15 accounts and the amywestwood account.

16 Q.   And you didn't see information for anybody else accessing

17 any other accounts.

18 A.   Had I seen other accounts, I would have documented it.

19        MS. CONKLIN:  If I could have a moment, Your Honor.

20        THE COURT:  You may.

21 BY MS. CONKLIN:

22 Q.   So I'm just not sure if I went over this correctly.  So

23 let me just double-check again.

24        So a restore point only documents -- does a restore point

25 only document what's on the computer since the last restore

**P. Hammer - Redirect Examination (Ms. Conklin)**

1  point?

2  A.   A restore point is what is really regarded as an

3  incremental backup.  And so the incremental backup is it

4  notices files that have changed from the last restore point.

5  And it rolls those up into the restore point construct, to save

6  that information should it be needed to be recovered.

7  Q.   It doesn't look forward; correct?

8  A.   It's impossible to look forward.

9  Q.   And if something had been permanently deleted or deleted

10  from the recycle bin prior to that restore point being taken,

11  it likely would not have appeared in the restore point.

12  A.   Yeah.  It would not be an active file, so the restore

13  point would not have access to that file.

14  Q.   Okay.  And I know defense counsel had asked you about what

15  your compensation is from the Government.  And I believe that

16  he said that it was $75 an hour to testify.

17  A.   I believe that's what I've been told.

18  Q.   Would it be correct if it was $100 an hour that you were

19  being paid to testify?

20  A.   I don't know.  I don't know what I'm getting paid to

21  testify, to be honest.  I haven't received a check.  It's

22  impossible for me to look forward.

23         MS. CONKLIN:  I have nothing further, Your Honor.

24         THE COURT:  Understood.

25      Any recross, Mr. Edwards?

### P. Hammer - Recross-Examination (Mr. Edwards)

1      MR. EDWARDS:  Very briefly, Your Honor.

2                  RECROSS-EXAMINATION

3  BY MR. EDWARDS:

4  Q.  Mr. Hammer, you were questioned briefly with regard to the

5  thumb drive.  And you indicated that there was evidence of

6  other files on the thumb drive that had been deleted, but you

7  didn't make note of those; is that correct?

8  A.  I don't think I said that.  I said there might have

9  been -- there may have been -- there may be other files on that

10 thumb drive.  I don't recollect.  I know I seen the files that

11 indicated child pornography in the file name, and I grabbed the

12 files that corresponded in the same date/time frame as those

13 files and put them out on media for case agent review.  I don't

14 recall what other files are on the USB thumb drive.

15 Q.  Okay.  Well, just so there's no confusion for the jury

16 here, the files that you found that were related to Chris Harp

17 weren't done contemporaneously when you -- on the dates of

18 these alleged -- of the -- I guess the names of pornography

19 on -- the titles for the pornography on the thumb drive;

20 correct?

21 A.  No.  That's incorrect.  The dates that were -- the files

22 that were associated with child pornography, the other files

23 that I copied out were associated with Chris Harp.  They looked

24 to be, like, homework papers from WVU, if I recall.

25 Q.  I understand that.  But in looking at your report, it's

**P. Hammer - Redirect Examination (Ms. Conklin)**

1  not showing that these were done on the same date and time.

2  A.   They were not done on the same date and time, but they

3  were done in close proximity.

4  Q.   Okay.  Fair enough.

5     And there were other files that were on this thumb drive,

6  but you didn't note those files; correct?

7  A.   There may be other thumb -- files on the thumb drive.  I

8  don't recall.

9  Q.   Okay.  That's all the questions I have for you.  Thank

10  you.

11           THE COURT:  Re-re-redirect, Ms. Conklin?

12           MS. CONKLIN:  Just to clarify.

13                 REDIRECT EXAMINATION

14  BY MS. CONKLIN:

15  Q.   The homework-related files, were they -- were they

16  down- -- were they created around the same time that the

17  suspected child pornography file was created on the thumb

18  drive?

19  A.   The dates and times are all retained, and you'd have to go

20  check the actual dates and times.  But if I recall, they were

21  in close proximity.  And when I say close proximity I'm talking

22  a month or two within the dates of the child pornography files.

23           MS. CONKLIN:  Thank you.

24           THE COURT:  Re-re-recross, Mr. Edwards?

25           MR. EDWARDS:  If I can have just a second.

## C. Thigpen - Direct Examination (Ms. Conklin)

1          (Pause in proceedings.)

2              MR. EDWARDS:  Nothing further, Your Honor.  Thank

3    you.

4              THE COURT:  All right.  May Mr. Hammer be excused,

5    then?  Is he subject -- is the witness subject to recall?

6              MS. CONKLIN:  No, Your Honor.

7              THE COURT:  All right.  Mr. Hammer, thank you so

8    much, sir.  You can step down.  You're free to go.  Thank you.

9          You can -- whatever is yours, feel free to take.  Whatever

10   is ours, we'll tidy up.  Thank you.

11             THE WITNESS:  Thank you.

12             THE COURT:  All right.  The Government may call its

13   next witness.

14             MS. CONKLIN:  The Government would recall

15   Agent Thigpen.

16             THE COURT:  Understood.

17         Agent Thigpen, if you wouldn't mind coming forward.  You

18   can go ahead and take the witness stand, sir.  I'll remind you

19   you remain under oath from yesterday.

20         Thank you, sir.

21         You may proceed whenever you're ready, Ms. Conklin.

22             MS. CONKLIN:  Thank you, Your Honor.

23                      DIRECT EXAMINATION

24   BY MS. CONKLIN:

25   Q.   Good afternoon again.

## C. Thigpen - Direct Examination (Ms. Conklin)

1  A.    Good afternoon.

2  Q.    Sorry.  I grabbed the wrong papers.

3      All right.  So, Agent Thigpen, let's pick up where

4  Mr. Hammer left off.  Mr. Hammer was the person who conducted

5  the computer examination for the computer; correct?

6  A.    Correct.

7  Q.    And in the process of what he did with his computer, did

8  he provide to you specific items that were extracted from the

9  computer?

10  A.    He does.  He provides an optical media that he described

11  that relates to things that he found in the computer.  He also

12  makes that forensic image available to me through one of our

13  FBI systems.

14  Q.    Now, is part of your job, when you're investigating a case

15  involving child pornography, to review the extractions from the

16  computer and make determinations as to whether the images

17  appear to meet the definition of child pornography?

18  A.    Yes.

19  Q.    And in this case did you actually review the images

20  extracted from the recycle bin of the computer?

21  A.    I did.

22  Q.    Now, when you were going through the extraction, did you

23  review the videos in the recycle bin?

24  A.    Yes.

25  Q.    Did you associate the videos in the recycle bin with

**C. Thigpen - Direct Examination (Ms. Conklin)**

1    specific dates that you had seen in connection with the

2    activity log?

3    A.    I did.  So when I conduct these reviews after I'm provided

4    data from a CART examiner, typically what I'll do is I will

5    review the items that they provide me, and then I will write a

6    report of my review of those items provided to me by the CART

7    examiner and what I found in those -- in those items.

8        So in this instance I would note that the GUID that was

9    spoken about for the computer, the CART examiner was able to

10    find that, and that matched the network logs.  I would go

11    through and document each of the videos that I reviewed.  I

12    would document the dates that they were downloaded, the length

13    of each video, the title of each video, and then I would

14    provide a brief description in my report of the video to keep

15    track.  And I was able to associate all of those videos and

16    dates and times and match them to dates and times of the

17    network IP logs that Special Agent Ryan had discussed

18    previously.

19        In that report I would also take note of any other items

20    found in the 1B9 computer that would relate to command and

21    control or ownership of that computer, which I did note in the

22    report that I wrote.

23    Q.    Okay.  Now, let's talk about some of the -- actually, let

24    me show you these.

25            MS. CONKLIN:  If I could approach, Your Honor.

### C. Thigpen - Direct Examination (Ms. Conklin)

1          THE COURT:  You may.

2     BY MS. CONKLIN:

3     Q.    Now, I've handed you what's been marked as Government's

4     Exhibits A -- 8A through 8O.  Do you recognize those items?

5     A.    Yes, ma'am.

6     Q.    And, now, how do you recognize those items?

7     A.    These are thumb drives that I assisted in preparing in

8     preparation for this trial.

9     Q.    Okay.  When you assisted in preparing these thumb

10    drives -- let me back up a little bit.

11         Let's talk about some of the terms that are associated in

12    this case.  Do you know -- associated in this case and

13    associated with the images in this case.  Do you know what PTHC

14    stands for?

15    A.    I do.  It stands for preteen hardcore.

16         And again, this is, I believe, documented in the report

17    that I wrote of the review.

18    Q.    And what about "pedomom"?

19    A.    So pedomom, again, it was a common search term that we

20    saw.  "Pedo" refers to pedophile or pedophilia, and

21    specifically with a mother.  We're depicting what would be a

22    mother and her child.

23    Q.    And in some of these videos and titles that were on the IP

24    logs, there's the term "Y-O."  Do you -- are you familiar with

25    what that Y-O is?

## C. Thigpen - Direct Examination (Ms. Conklin)

1   A.    Yeah.  So typically you would see Y-O after a number, such
2   as two or four or six.  And that just denotes "years old."  So
3   it would be two-year-old, three-year-old, six-year-old.
4   Q.    In your observations of looking at these videos, when an
5   age -- for example, "8YO" or "5YO" -- was associated with these
6   images, did the individuals appearing in the videos seem
7   consistent with what was the age listed in the description?
8   A.    Yes.
9   Q.    Now, when you were preparing these thumb drives for trial
10  or preparing -- working on preparing these exhibits, did you
11  have access to the entire video in these cases?
12  A.    I did.
13  Q.    And did you make excerpts of these entire videos in a
14  shorter clip?
15  A.    I did.  So in this case of the I believe 30 video files
16  that were found in the recycle bin, they ranged in length from
17  ten seconds to I believe almost an hour.  I think 56 minutes
18  long was the longest video that we had.  So in preparation for
19  this, I pared that down to approximately 15 to 20 seconds of
20  however long the original video was.
21  Q.    And do these clips fairly and accurately reflect what is
22  contained in the longer, full-length video?
23  A.    They do.  And obviously, in an extremely long video,
24  paring it down to 15 seconds will capture a portion of that.
25  There might be other acts or other things that take place

## C. Thigpen - Direct Examination (Ms. Conklin)

1  during that video that cannot be captured in 15 seconds.  But

2  the clips that we made are representative of the entire video.

3  Q.   And the clips that are contained in Government's

4  Exhibits 8A through 8O, are they all images or videos and clips

5  from the videos that were contained in the recycle bin on the

6  Government's Exhibit 1, the HP computer?

7  A.   Correct.  On the current state recycle bin, yes.

8            MS. CONKLIN:  Your Honor, the Government would seek

9  to move in Government's Exhibit 8A through 8O.

10           THE COURT:  8A through 8O?

11           MS. CONKLIN:  Yes.

12           THE COURT:  All right.  Any objection to any of

13  those?

14           MR. EDWARDS:  Other than the prior objection, Your

15  Honor.

16           THE COURT:  Understood.

17     Without objection, Government's 8A through 8O are hereby

18  admitted.

19     (Government's Exhibits 8A through 8O received in

20     evidence.)

21           MS. CONKLIN:  I'm sorry?

22           THE COURT:  They are hereby admitted.

23           MS. CONKLIN:  Thank you.  And Your Honor, permission

24  to publish?

25           THE COURT:  Can I ask counsel to approach --

**C. Thigpen - Direct Examination (Ms. Conklin)**

1          MS. CONKLIN:  Yes.

2          THE COURT:  -- before we do that, please.  Thank you.

3       (The following proceedings were had at the bench, outside

4          the hearing of the jury, with counsel and the Defendant.)

5          THE COURT:  Okay.  Are these the actual video clips?

6          MS. CONKLIN:  These are the clips we're planning on

7    showing.  They're 15-second clips.

8          THE COURT:  Is the audio off?

9          MS. CONKLIN:  We can do it with the audio off.  Only

10   one of the clips actually has -- I mean, only one of the clips

11   the audio is really disturbing.  On most of the clips it's just

12   kind of like somebody's background noise or an adult woman

13   moaning.  But we can play it without the clips [sic] if the

14   Court wishes.

15         THE COURT:  Any objection to muting the audio?

16   They're admitted.

17         MR. EDWARDS:  I have no objection to muting the

18   audio.

19      I have objection to it being published, Your Honor.  We've

20   stipulated in opening statement that there's pornography on the

21   computer.  I don't know what purpose this serves.  But if

22   that's what they want to do, that's what they want to do.

23         THE COURT:  They're admitted.  The jury still has to

24   make the determination that the images constitute child

25   pornography under the law in accordance with the elements as

### C. Thigpen - Direct Examination (Ms. Conklin)

1  we've just discussed with respect to the charge.  So I'll

2  overrule the objection.

3      We also cover the natural 403 concerns -- Rule 403

4  concerns with graphic evidence of this kind, again, in the

5  instructions that we've already discussed.

6      How many are we going to play?

7          MS. CONKLIN:  Judge, we were looking to play three

8  for each count.  And again, they're just 15-second clips.

9  There's not a 15-minute video or...

10         MR. PERRI:  There are a lot more than three, Your

11  Honor.

12         MS. CONKLIN:  Yeah.  We've pared it down.

13         MR. PERRI:  We've tried to limit ourselves not only

14  as to the number, but also as to the duration of these clips.

15         MS. CONKLIN:  And I want to just clarify.  There's

16  only 12 images that contain child pornography.  Three images

17  are bait files.  So there's nothing offensive about the bait

18  files unless -- I mean, there's no graphic depictions of any

19  child or anything.

20         THE COURT:  Right.  The bait file is what it is.

21      Any objection to the number, Mr. Edwards?

22         MR. EDWARDS:  Same objection as before.

23         THE COURT:  Same objection?

24      So three 15-second clips for each of the three counts of

25  receipt?

**C. Thigpen - Direct Examination (Ms. Conklin)**

1        MS. CONKLIN:  Yes.  And then separate clips for the

2   possession count.

3        THE COURT:  And then three for Count Four of

4   possession.

5        MS. CONKLIN:  And then the bait files, yes.

6        THE COURT:  And then the bait files.

7     And each of those are 15 seconds.

8        MS. CONKLIN:  Fifteen.  One might be 16 because we

9   might --

10        THE COURT:  Okay.  Somewhere in that neck of the

11   woods.

12        MS. CONKLIN:  It's close, yeah.

13        THE COURT:  Okay.  And then we can mute the audio

14   completely for each.

15        MS. CONKLIN:  We can.

16        THE COURT:  Okay.  We're going to mute the audio.

17   I'm going to tell the jury that these files have been admitted,

18   they're part of the record, that they will be able to review

19   them, if they wish, during their deliberations, including the

20   audio; but for presentation in the courtroom, we've elected to

21   mute the audio.  There are -- and I'm going to tell them what

22   we're about to see, brief clips.

23     Any objection to the Court giving its -- I hate to call it

24   a limiting instruction, but basically a clarifying instruction

25   that "What you're about to see is disturbing and graphic, but

### C. Thigpen - Direct Examination (Ms. Conklin)

1    it is necessary and" --

2            LAW CLERK:  It's the nature and type of evidence

3    instruction.

4            THE COURT:  Yeah.  I forgot.  One second.

5            LAW CLERK:  Nature and type.

6            THE COURT:  Yeah.  Nature and type of evidence

7    presented, which is "You're about to view some evidence in this

8    case you may find personally offensive.  Even though this

9    evidence may be offered" -- "or may offend you" -- excuse me --

10   "you cannot let the subject matter or the nature of the

11   evidence itself influence any decisions in this case.  Finding

12   the evidence distasteful is no substitute for proof beyond a

13   reasonable doubt as to all the elements of the offenses charged

14   in the indictment."

15       Any objection to the Court offering that instruction

16   before we play these?

17            MS. CONKLIN:  No.

18            THE COURT:  Any objection from the defense?

19            MR. EDWARDS:  None from the defense, sir.

20            THE COURT:  Okay.  All right.  Let's proceed that

21   way.

22            MS. CONKLIN:  We'll make sure that the video -- that

23   our sound is off.

24            THE COURT:  Yeah.  Just make sure it's muted.  Thank

25   you.

**C. Thigpen - Direct Examination (Ms. Conklin)**

1      (Bench conference concludes.)

2          THE COURT:  All right.  Thank you, counsel.

3      Ladies and gentlemen of the jury, the Government --

4      And what number again is this, Ms. Conklin?  I'm sorry.

5          MS. CONKLIN:  It's 8A through 8- --

6          THE COURT:  8O?

7          MS. CONKLIN:  Yes.

8          THE COURT:  Okay.  Government's Exhibits 8A through

9      8O have been admitted into evidence.  They are video files that

10     were retrieved from Exhibit 1, the laptop.  We're going to view

11     15-second clips of the videos that were retrieved from the

12     laptop without the audio playing.  Each of these clips, again,

13     has been received into evidence.  They will be available to you

14     to review during your deliberations if you find that necessary

15     during your deliberations and discussions about the case.  But

16     for presentation here in the courtroom, we are going to mute

17     the clips so that the audio is not playing.  But there are --

18     these, again, are clips, 15 or so seconds in length.

19         Some of the evidence we've already discussed and some of

20     the evidence we will see you may find personally offensive.

21     Even though this evidence may offend you, you cannot let the

22     subject matter or the nature of the evidence itself influence

23     the decisions that lie ahead for you in this case.  Finding the

24     evidence distasteful is no substitute for proof beyond a

25     reasonable doubt as to all of the elements of the offenses

**C. Thigpen - Direct Examination (Ms. Conklin)**

1    charged in the indictment.

2        With that, Ms. Conklin, you may publish.

3            MS. CONKLIN:  Okay.

4    BY MS. CONKLIN:

5    Q.   And Government's Exhibit 1 is listed as recycle file name

6    RDB1FTE.

7        Now, did you review the I$ file for this exhibit -- or for

8    this one video?

9    A.   That would have been the original file name, yes.

10   Q.   And is the original file name for that exhibit "pthc mom

11   suck pedomom amateur russian suck julyjailbait raygold hussyfan

12   pedomom 2017 translate English video hurtcore preteen boy"?

13   A.   Yes.

14   Q.   And was that video associated with a download of

15   April 4th, 2019?

16   A.   Yes.

17   Q.   And again, you made a short clip of that video; correct?

18   A.   Correct.

19   Q.   Is the full length of the video 2 minutes and 28 seconds?

20   A.   It would be noted in my report.  I don't recall the exact

21   length off the top of my head.

22   Q.   If looking at your report would help you to refresh your

23   recollection, you can go ahead and do that.

24   A.   It's 2 minutes and 28 seconds?

25   Q.   Yes.

## C. Thigpen - Direct Examination (Ms. Conklin)

1   A.    Correct.

2        MS. CONKLIN:  Okay.  If we could please publish

3   Exhibit 8A.

4        (Video playing.)

5   BY MS. CONKLIN:

6   Q.    And what does that video depict?

7   A.    It depicts an adult female performing oral sex on a

8   toddler boy.

9   Q.    Okay.  If we can move on to the next exhibit, which is 8B.

10  And I believe that that is from the recycle bin with a file

11  name of RACYQGR.

12       Does that -- did you make a determination as to what the

13  original title of that video was?

14  A.    Yes, I would have.  That would have been in the --

15  contained in the $I file.

16  Q.    And is that "pedomom joven de Moldavia mermelada con nina

17  de A-0" -- or "A-o y medio"?

18  A.    Yes.  That sounds right.

19  Q.    Okay.  And was that file in the recycle bin being marked

20  as being downloaded on April 4th, 2019, at approximately

21  7:55 AM?

22  A.    I believe so.

23       MS. CONKLIN:  If we could publish 8B, please.

24       (Video playing.)

25

## C. Thigpen - Direct Examination (Ms. Conklin)

1  BY MS. CONKLIN:

2  Q.   And what is it that that video depicts?

3  A.   It depicts a young toddler female and an adult spreading

4  what appears to be some sort of jelly on her genitals and then

5  performing oral sex.

6  Q.   Okay.  Let's speak about Exhibit 8C.  And I believe that

7  is listed as recycle bin file RBA93YT?

8  A.   Yes.

9  Q.   And is that -- did you -- were you able to determine the

10  title of that video file?

11  A.   By looking at the $I file, yes.

12  Q.   And is that titled "PHANT pedomom madre de la" -- or

13  "madre le da placer a la vagina de su hija"?

14  A.   Yes.

15  Q.   And was that downloaded on April 4th, 2019, at 7:55 AM?

16  A.   Yes.

17       MS. CONKLIN:  If we could please publish 8C.

18       (Video playing.)

19  BY MS. CONKLIN:

20  Q.   And for the record, what does that video depict?

21  A.   It depicts an adult female performing oral sex and

22  manually manipulating the genitals of a toddler female.

23  Q.   All right.  Let's move on to Exhibit 8D.  Was this in the

24  recycle bin as well, as R50VW8X?

25  A.   Yes.  And it might have been in there under the original

**C. Thigpen - Direct Examination (Ms. Conklin)**

1  file name as well.  If it's -- if it's there, yes.  If I

2  created it on here, it was in the recycle bin.

3  Q.   Do you have an original -- or do you have a -- did you

4  review the I$ files for these cases?

5  A.   Yes.

6  Q.   And is the full name of this video "five-year-old latina

7  fucked by big and little bros and mom pedomom amazing"?

8  A.   Yes.

9  Q.   And was that showing as downloaded on September 18th,

10  2020, at 3:12 PM?

11  A.   Yes.

12        MS. CONKLIN:  If we could publish Exhibit 8D.

13     (Video playing.)

14  BY MS. CONKLIN:

15  Q.   Are you aware of how long the original file was -- or how

16  long the original video was?

17  A.   I believe it was 5 minutes and 21 seconds long.

18  Q.   And what does the entire video depict?

19  A.   It depicts a toddler female that's being subjected to

20  vaginal sex with both a prepubescent male and an adult male,

21  while she is on an adult female's lap.  And the adult male also

22  is touching and fondling the adult female in the video.

23  Q.   All right.

24        THE COURT:  Could I ask counsel to approach for a

25  second, please.

### C. Thigpen - Direct Examination (Ms. Conklin)

1      (The following proceedings were had at the bench, outside

2      the hearing of the jury, with counsel.)

3          THE COURT:  We're finished publishing.  They've been

4  admitted.  I'll tell the jury that, again, they can review them

5  during deliberations if they believe it necessary and

6  appropriate.  But we're done playing these.

7          MS. CONKLIN:  May I play the bait files?

8          THE COURT:  Yes.

9      Hold on.

10     Mr. Edwards.  Mr. Edwards.

11         MS. CONKLIN:  Can --

12         THE COURT:  Just one second.

13         MS. CONKLIN:  Can I still go through and discuss --

14  just verbally discuss the exhibits themselves?

15         THE COURT:  Yes.  We're not playing any more, though.

16  It's enough.  It's enough.  They've been admitted.  They have

17  them.  We've shown enough.  Y'all can walk through in closing

18  with the testimony, but we're not watching these anymore.

19         MS. CONKLIN:  Okay.

20         THE COURT:  No.  It's enough.  Thank you.

21         MS. CONKLIN:  Okay.  Can we --

22         THE COURT:  One second.

23     Mr. Edwards.

24         MS. CONKLIN:  I'm sorry.

25     Do you mind just letting the jury know that --

**C. Thigpen - Direct Examination (Ms. Conklin)**

1          THE COURT:  Yes.

2          MS. CONKLIN:  Thank you.

3       (Bench conference concludes.)

4          THE COURT:  Ladies and gentlemen of the jury, as I

5  mentioned, each of these exhibits --

6       What number are those again, Ms. Conklin?

7          MS. CONKLIN:  8A through 8O.

8          THE COURT:  -- 8A through 8O, have been admitted into

9  evidence.  We're not going to publish any more of those

10  exhibits.  They have been admitted.  And therefore, they will

11  be available to you during your deliberations if you find it

12  necessary and appropriate to review those, and also with the

13  audio that comes with those clips as well.

14      There are two other videos you heard reference earlier to,

15  the bait files, B-A-I-T.  The Government is going to present

16  those -- or publish those, I should say, here in court.

17      The Special Agent is going to be asked questions about the

18  contents of the remaining files of 8A through 8O, but we're not

19  going to play the videos here in court.  But again, they are

20  available to you to review if you find that necessary during

21  deliberations.

22      Ms. Conklin.

23          MS. CONKLIN:  Thank you.

24  BY MS. CONKLIN:

25  Q.   Agent Thigpen, I believe that the next exhibit was

**C. Thigpen - Direct Examination (Ms. Conklin)**

1  Government's Exhibit 8E, which is referenced as recycle file

2  R500DXZT, if I can read my notes correctly.

3  A.   Okay.  And again, some of these are listed with their

4  original file names.

5  Q.   And does the I$ file reflect that that video is titled

6  "PHANT 2019-07-27 Pedomom China Chucapndo a hijo"?

7  A.   Yes.  I believe that was close to the title, yes.

8  Q.   And was that video downloaded on September 18th, 2020,

9  at approximately 3:12?

10  A.   Yes.

11  Q.   And about how long is that video?

12  A.   It looks like approximately 37 seconds long.

13  Q.   And what does that video depict?

14  A.   Again, it depicts an adult female performing oral sex on a

15  toddler boy.

16  Q.   Okay.  And let's go to Exhibit 8F, which is recycle bin

17  file number RW4KQDV.  And I believe the I$ file references that

18  as "pedomom and boys new yay very mature Spanish mom sucks

19  little boy outside and pulls out tits neo."

20  A.   Yes.

21  Q.   Approximately how long is that video?

22  A.   I believe that one was 37 seconds long.

23  Q.   And was that video downloaded on September 18th, 2020?

24  A.   Yes.

25  Q.   And was that downloaded at approximately 3:19 PM?

## C. Thigpen - Direct Examination (Ms. Conklin)

1  A.    Yes.

2  Q.    Let's discuss Government's Exhibit 86 [sic], which is file

3  PDMRWY if my notes are correct.  And I believe that the I$ file

4  references that file as "2013 Pthc Polaroid Family Slidemovie."

5  A.    Yes.

6  Q.    Approximately how long is that video?

7  A.    I have noted that it's two minutes and three seconds.

8  Q.    And what does that video depict?

9  A.    So that video was a video file, but it consisted of still

10  shots that were being set to some sort of play.  The still

11  shots would rotate through while there was music or a

12  soundtrack being played.  And the still shots that would rotate

13  through were of an adult male that was performing very sexual

14  acts with two prepubescent females, to include vaginal sex,

15  among other items.

16  Q.    All right.  Let's move on to Government's Exhibit 8H,

17  which is titled RRXRCOJ, with an I$ file of "(PHANT) pedomom

18  special-8."  How long is that video?

19  A.    I believe it's 20 -- approximately 23 seconds long.

20  Q.    And what does that video depict?

21  A.    Once again, it is an adult female performing oral sex on a

22  prepubescent male, very close up.

23  Q.    And was that downloaded on September 21st, 2020, at

24  approximately 12:34 PM?

25  A.    Yes.

**C. Thigpen - Direct Examination (Ms. Conklin)**

1   Q.   Let's talk about Government's Exhibit 8I, which is recycle

2   file RFCRCIN.  And the I$ file gives it a title of "A family

3   affair part two pthc incest family pedo."

4        Approximately how long is that video?

5   A.   So this video was approximately 45 minutes and 35 seconds

6   long.

7   Q.   And what does this video depict?

8   A.   It was a very long video.  It depicted an adult male and

9   an adult female that were present with a prepubescent male and

10  a prepubescent female.  There was a lot of things going on in

11  the video.  The adult male and female were performing sexual

12  acts with each other.  They were performing sex with the

13  prepubescent male and female.  There was a lot of masturbation

14  and touching with the prepubescent male and female by the

15  adults as well.

16  Q.   Let's talk about Government's Exhibit 8J.  Now, this file

17  was in the recycle bin as well; correct?

18  A.   Which file was it?

19  Q.   Sorry.  I should probably tell you the name.  That would

20  be RT57Q2, with an I$ file associated with it of "pthc pedomom

21  mom and son."

22  A.   Yes.

23  Q.   And approximately how long is that video?

24  A.   Is this -- which date is this one?

25  Q.   I believe it was originally downloaded on the 18th.

**C. Thigpen - Direct Examination (Ms. Conklin)**

1  A.    The 18th?  I see 3 minutes and 24 seconds.

2  Q.    And was that video on the computer on September 25th and

3  accessible in the recycle bin?

4  A.    Yes.

5  Q.    And what does that video depict?

6  A.    This is a nude adult female in a bed with a toddler male

7  with no pants and having the toddler touch the adult female's

8  genitals and breasts.

9  Q.    Now let's talk about Government's Exhibit 8K, which is a

10  recycle file of R44AKAG and an I$ file name of "Pedomom Please

11  share more PTHC 2018."

12      Was that file in the recycle bin on September 25th?

13  A.    Yes.

14  Q.    And about -- approximately how long was that video?

15  A.    This was approximately ten minutes long.

16  Q.    And what does that video depict?

17  A.    So this video depicted an adult female that was utilizing

18  a fake penis to insert into the vagina and the anus of a female

19  toddler, while that female -- the adult female is nude and

20  masturbating.

21  Q.    And let's talk about Government's Exhibit 8L.  And that is

22  an R$ file name of RHGMZK1 with an I$ file name of "OPVA

23  American Family pthc USA dad fuck toddler 4yo or 5yo girl."

24      Was that video in the recycle bin on April 25th, 2020?

25  A.    Yes.

**C. Thigpen - Direct Examination (Ms. Conklin)**

1  Q.   And approximately how long is that video?

2  A.   Approximately 47 seconds long.

3  Q.   And what does that video depict?

4  A.   So that video depicted an adult male having sexual

5  intercourse with a toddler female, while that toddler was

6  screaming and crying.

7  Q.   Okay.  Now if we could go to 8M.

8          MS. CONKLIN:  And Your Honor, the Government is

9  moving to pub- -- well, actually...

10 BY MS. CONKLIN:

11 Q.   8M is titled R63XGCZ.  And that one has a file name

12 associated with it "9yo Tori pthc 12yo boy 7yo 10yo family sex

13 diaper NABULT nymphets."

14      Did you review that file as well?

15 A.   I did.

16 Q.   And was that file on the computer on -- or in the recycle

17 bin on September 25th, 2020?

18 A.   Yes.

19 Q.   And what does that video depict?

20 A.   So this is one of the previously described bait videos,

21 for lack of a better term.  I don't know exactly which country

22 this one was from, but it would depict a foreign law

23 enforcement official explaining to the viewer of that video,

24 number one -- I think the first thing that comes up is "Do you

25 have a sexual interest in children?"  And then it goes on to

**C. Thigpen - Direct Examination (Ms. Conklin)**

1  discuss that you basically have downloaded a file from a police

2  computer and law enforcement may now be aware of your location

3  and your IP address and so on and so forth in that vein.

4          MS. CONKLIN:  If we could please publish 8M.

5      (Video playing.)

6  BY MS. CONKLIN:

7  Q.  Let's talk about the next exhibit, which is Government's

8  Exhibit 8N.  And that has a recycle bin file name of RQJL63.

9  And I believe it's an unknown title.

10  A.  Yes.

11  Q.  Was that video on the HP computer, Government's Exhibit 1,

12  on September 25th, 2020?

13  A.  Yes.

14  Q.  And is that another one of the bait videos?

15  A.  It is.

16          MS. CONKLIN:  If we could please publish Government's

17  Exhibit 8N.

18      (Video playing.)

19  BY MS. CONKLIN:

20  Q.  And then, finally, we have one more exhibit, which is

21  Government's Exhibit 8O, which is listed as recycle file

22  R2G647T.  And it has an I$ file of "9 anos babyshi pedomom

23  incest family fun.avi."

24      Was that video in the recycle bin on September 25th,

25  2020?

**C. Thigpen - Direct Examination (Ms. Conklin)**

1  A.    Yes.

2         MS. CONKLIN:   If we could please publish 8O.

3      (Video playing.)

4  BY MS. CONKLIN:

5  Q.    Now let me ask you a question about those bait files.   Did

6  you get your tip to investigate this case from those bait

7  files?

8  A.    No.

9  Q.    Was this investigation started somewhere else unconnected

10  to the bait files?

11  A.    Yes.   The -- when we reviewed these after the CART

12  examination was the first time I had ever seen these files.

13  Q.    And in fact, have you ever gotten an investigation as a

14  tip from a bait file that you know of?

15  A.    No.

16  Q.    Okay.   So let's talk about these videos.   In your review

17  of the videos, were you able to determine where the videos were

18  downloaded or where the videos were obtained?

19  A.    Yes.   So the videos that we located -- or that were

20  located in the review of this computer matched the network IP

21  logs for the videos that were downloaded through the

22  peer-to-peer site Shareaza.

23  Q.    And did the I$ files, which Mr. Hammer had testified

24  about, explaining the file path, did those indicate that those

25  were downloaded through Shareaza?

**C. Thigpen - Direct Examination (Ms. Conklin)**

1  A.   I believe they did.

2  Q.   Okay.  Now, the videos that were in these exhibits, did

3  some of the videos have titles that were consistent with the

4  search terms that were used at various points in the Shareaza

5  app?

6  A.   Yeah.  So a lot of them had references to "pedomom" -- a

7  good bit of them actually did -- as well as the "PTHC," preteen

8  hardcore acronym, that we saw a lot during this investigation.

9  Q.   And I want to draw your attention specifically to

10  Government's Exhibit H -- I'm sorry -- 8I.  And that video is

11  called "A family affair part 2 pthc incest family pedo."

12       Did you review Agent Harp's -- Agent Hammer's report as to

13  the search terms in Shareaza?

14  A.   I did.

15  Q.   And did you find an association to when the term "a family

16  affair" and "PTHC family" were utilized in the Shareaza search

17  terms -- or documented in the Shareaza search terms?

18  A.   I do believe that Mr. Hammer documented when "a family

19  affair" was added to the search terms for Shareaza.

20  Q.   And in your review of those documents, was the search term

21  "family affair" and "PTHC family" utilized on the same date

22  that "A family affair part 2," Government's Exhibit 8I, was

23  downloaded?

24  A.   I believe it was.

25  Q.   Okay.  Now, Mr. Hammer had talked about an MRU, or a most

**C. Thigpen - Direct Examination (Ms. Conklin)**

1  recently used file.  And I believe that he had indicated that

2  he had provided you information about the MRU for the VLC media

3  player.

4  A.    Correct.

5  Q.    Did you review the MRU, or most recently used files, for

6  the VLC media player?

7  A.    I did.

8  Q.    And did you find some of these files in the MRU video

9  player?

10 A.    Yes.  So there were some files that were contained in the

11 current state of the laptop when it was seized that were also

12 present on the VLC MRU list.

13 Q.    And was one of them the "PHANT 2019-07-27 Pedomom China,"

14 which was Government's Exhibit 8E?  Was that in the MRU?

15 A.    Yes.

16 Q.    And was Government's Exhibit HG -- I'm sorry -- 8G, the

17 "2013 Pthc Polaroid Family Slidemovie," was that in the MRU?

18 A.    Yes.

19 Q.    And the 8H, "PHANT Pedomom Special-8," was that in the MRU

20 video list?

21 A.    Yes.

22 Q.    And was also Government's Exhibit H -- 8L, which was

23 present on the computer on September 25th at the time that it

24 was seized, entitled "OPVA American Family pthc USA," was that

25 video in the MRU video player?

### C. Thigpen - Direct Examination (Ms. Conklin)

1   A.   Yes.

2            MS. CONKLIN:  If I can have a moment, Your Honor.

3            THE COURT:  You may.

4       (Pause in proceedings.)

5   BY MS. CONKLIN:

6   Q.   Agent Thigpen, the types of images that we saw today and

7   that were contained on the HP computer, are those the typical

8   types of CP that you see in your investigations?

9   A.   We do see that quite a bit.  Specifically in this

10  investigation, they were the same type that were noted on the

11  network logs.  Going all the way back to 2018, it was the same

12  types of videos.

13  Q.   Would you say that this is a discrete style of child

14  pornography that is -- I guess are there -- let me rephrase

15  that.

16       Are there different -- do people who view child

17  pornography have different interests?

18  A.   They do.

19  Q.   And these types of images and videos that we saw today,

20  would you say that it is a distinct type?

21  A.   It is.  It's definitely a niche and very specific type

22  that -- and they all followed that same type.

23  Q.   Okay.  Would you agree that all people who seek out child

24  pornography are not seeking out the same type of material?

25  A.   Yes.

## C. Thigpen - Direct Examination (Ms. Conklin)

1  Q.   You reviewed -- you reviewed the restore points as well;

2  correct?

3  A.   Correct.

4  Q.   Agent Harp had pro- -- or -- "Agent Harp."

5       Mr. Hammer had indicated to you that -- or had indicated

6  that he had provided you copies of the restore points that you

7  could review.

8  A.   He did.

9  Q.   And I'll notice that on the re- -- he mentioned some of

10 the titles that were listed in the restore points.  But did you

11 actually review the videos that were indicative of possessing

12 child pornog- -- or pertaining to child pornography?

13 A.   I did.  So with the media that I was provided by CART

14 Examiner Hammer that was broken down into the restore points, I

15 could go back and look at the titles of the videos that were

16 present on the computer at those various restore points.  And

17 within those I could actually click on the file and it would

18 play the video.  And I was able to review those and determine

19 that they were, in fact, both child pornography and of the same

20 type as was found on the day of the search.

21          MS. CONKLIN:  If I could have one more minute, Your

22 Honor.

23          THE COURT:  You may.

24 BY MS. CONKLIN:

25 Q.   When you say "type," what kind of type are you talking

**C. Thigpen - Cross-Examination (Mr. Edwards)**

1    about?

2    A.    I would say genre.  Or the content of the videos was in

3    the same vein of small children, incest/family-related,

4    pedophilia-type videos.

5           MS. CONKLIN:  I would tender the witness.

6           THE COURT:  Cross, Mr. Edwards?

7                    CROSS-EXAMINATION

8    BY MR. EDWARDS:

9    Q.    Officer Thigpen -- Agent Thigpen -- sorry -- the bait

10   files that we actually were able to watch in full, those were

11   downloaded on September 21st?

12   A.    I believe that is correct.

13          THE COURT:  Of 2020?

14          MR. EDWARDS:  Of 2020.  Sorry, Your Honor.

15          THE COURT:  Okay.  Thank you.  Sorry.  Just making

16   sure.

17          MR. EDWARDS:  Thank you, Your Honor.

18          THE COURT:  Thank you.

19          THE WITNESS:  Yes.

20   BY MR. EDWARDS:

21   Q.    September 21st of 2020.

22          And the search of the residence was September 25th,

23   2020; is that correct?

24   A.    Correct.

25   Q.    Okay.  And the Exhibit Number 1 that you -- let's back up

1    for a second.

2        In those bait files it states specifically that "You've

3    downloaded this, and we now know your IP address."  Correct?

4    A.    That is what they say.  Correct.

5    Q.    Okay.  And when you searched the home on September 25th,

6    2020, any indication of any type of attempt to destruct or

7    disable that computer at all?

8    A.    No.

9            MR. EDWARDS:  Nothing further.

10           THE COURT:  Any redirect, Ms. Conklin?

11           MS. CONKLIN:  No, Your Honor.

12           THE COURT:  All right.  Special Agent, thank you,

13   sir.  You can step down.

14       The Government may call its next witness.

15           MS. CONKLIN:  At this time, Your Honor, the

16   Government rests its case.

17           THE COURT:  All right.  Understood.

18       Ladies and gentlemen of the jury, the Government has now

19   rested, which means they have completed presenting evidence in

20   their case in chief.  So it's probably a good time for us to

21   take our afternoon break.  Why don't we go ahead and take

22   15 minutes at this point.

23       Please continue to refrain from discussing this case with

24   anyone, and please continue to refrain from any independent

25   investigation or research efforts about the case.

1      With that, we'll see you here in a few moments.  Thank you
2  very much.
3      (Jury retired from the courtroom at 2:22 PM.)
4          THE COURT:  All right.  Thank you, everyone.  Please
5  be seated.
6      Any motions from the defense at this point?
7          MR. EDWARDS:  Yes, Your Honor.  Subject to Rule 29,
8  the Defendant would make a motion for a judgment of acquittal.
9  We don't believe that there's been sufficient evidence to
10  sustain a conviction in this case.
11      The evidence that's been presented by the Government in
12  this case is very similar to that of -- that was presented in
13  the case of *United States v. Pothier* -- it's P-O-T-H-I-E-R --
14  cited as 919 F.3d 143.  It's a 2019 case out of the Fifth
15  Circuit.  I'm sorry.  It's out of the First Circuit.  As well
16  as *United States v. Moreland*, cited as 665 F.3d 137.  It's a
17  2011 case out of the Fifth Circuit.  Both of those cases
18  involved a -- charges of possession of child pornography with
19  regards to a computer where there were multiple people that had
20  access to the same.  It was insufficient showing that it was,
21  in fact, the defendant that had knowingly possessed and
22  knowingly downloaded said pornography.  So the courts in both
23  of those cases found that the evidence was insufficient and
24  overturned the convictions on those matters.  And I would ask
25  the Court to do the same.  In this case, well, not overturn,

 1   but of course grant the motion of acquittal.

 2          THE COURT:  No.  Understood.  Thank you.

 3      Counsel?

 4          MS. CONKLIN:  Your Honor, at this point reviewing the

 5   evidence in the light most favorable to the Government, I

 6   believe that we have met our burden in this case.  I believe

 7   that there is circumstantial evidence -- and extensive

 8   circumstantial evidence -- of the Defendant's possession and

 9   continued use of this laptop for a long period of time.

10          Cross-examination is not evidence.  Questions are not

11   evidence.  The only evidence that has been presented is that

12   this is a laptop that belongs to Christopher Harp; that

13   Christopher Harp has had this laptop for ten years; that the IP

14   address associated with the download of the information is

15   Christopher Harp; that the thumb drive that belongs to

16   Christopher Harp has access to the emails; and the only person

17   that has used this computer to access any other websites is

18   Christopher Harp, except for one occasion or two occasions

19   where his wife had accessed the laptop.  The laptop was also

20   found up in his study with his work computer and connected to

21   his work computer.

22          I believe that there is sufficient evidence for the jury

23   to find that Christopher Harp is the person who committed this

24   offense.

25          THE COURT:  Okay.  Understood.

1          The Court will deny the motion under Rule 29.  Of course,

2     the Court is required to construe all the evidence presented in

3     the light most favorable to the Government and make any and all

4     reasonable inferences therefrom in favor of the Government as

5     well.

6          I must concur with Ms. Conklin with respect to the

7     circumstantial evidence here, including the physical location

8     of the devices, the computer in particular; also, the file

9     names found on the devices close in time, if not the same date,

10    I believe, with one or two.  But I'll leave it at close in

11    time.  Not child pornographic materials, but indicative of

12    belonging to Mr. Harp himself, recognizing there is a factual

13    issue for the jury to resolve here as to who else may have had

14    access to not only the house, but also that particular computer

15    and/or thumb drive.  But that's not for the Court to decide at

16    this juncture.

17         So the Court will deny that motion with respect to each of

18    the counts in the indictment, but noted.

19         Any other motions at this point from the defense,

20    Mr. Edwards?

21              MR. EDWARDS:  No, Your Honor.

22              THE COURT:  Okay.

23         Mr. Harp, can I ask you to please stand, sir, so Madam

24    Clerk can swear you in.  Thank you very much.

25         (Defendant sworn.)

1           THE CLERK:  Thank you.

2           THE COURT:  All right.  Thank you so much, sir.

3      Mr. Harp, obviously, you've been sworn in again today, so

4  you are under oath.  Please keep in mind any false statements

5  you may make or false answers you give in response to any of

6  the Court's questions, those can form the basis of a separate

7  criminal action against you for false swearing or for perjury.

8      Do you understand that, sir?

9           THE DEFENDANT:  Yes, Your Honor.

10          THE COURT:  All right.  And if I say anything or ask

11 any question that prompts you to want to have a conversation

12 with Mr. Edwards, please let him know or let me know, and we'll

13 take a break so you gentlemen can talk.

14     Do you understand that?

15          THE DEFENDANT:  Yes, Your Honor.

16          THE COURT:  Okay.  I won't repeat everything we

17 talked about yesterday, Mr. Harp.  I just wanted to first ask

18 you if you had any questions for me about your rights under the

19 Fifth Amendment, the decision that now lays before you about

20 whether or not to waive those rights and testify and how that

21 process would work.

22     Are there any questions I might be able to help you answer

23 or any other information I can provide to you, sir?

24          THE DEFENDANT:  No, Your Honor.

25          THE COURT:  All right.  Do you believe you've had

 1  sufficient time to not only think about this important

 2  decision, but also discuss it fully with Mr. Edwards?

 3              THE DEFENDANT:  Yes, Your Honor.

 4              THE COURT:  Okay.  Why don't we go ahead and take a

 5  few moments.

 6      Who's the defense's first witness going to be,

 7  Mr. Edwards?

 8              MR. EDWARDS:  It will be Amy Harp.

 9              THE COURT:  Okay.  Understood.  If you wouldn't mind

10  making sure she's ready to go, we'll take a couple minutes and

11  then resume with her testimony.  Thank you all very much.

12              MR. EDWARDS:  Your Honor, any problem for me to go

13  ahead and bring her in?

14              THE COURT:  No.  Go right ahead.  Go right ahead.

15              MR. EDWARDS:  Thank you.

16              THE COURT:  Thank you.

17      (Recess taken from 2:28 to 2:41 PM.)

18              THE COURT:  Thank you, everyone.  Please be seated.

19      All right.  We ready to proceed, everybody?

20              MR. EDWARDS:  Yes, Your Honor.

21              THE COURT:  Okay.  May we have our jurors, please,

22  sir.  Thank you.

23      (Jury returned to the courtroom at 2:42 PM.)

24              THE COURT:  All right.  Thank you, ladies and

25  gentlemen.  Please be seated.  Thank you very much.

**A. Harp - Direct Examination (Mr. Edwards)**

1    Defense may call its first witness.

2         MR. EDWARDS:  Thank you, Your Honor.

3    Defense calls Amy Harp.

4         THE COURT:  Ms. Harp, ma'am, can I ask you to make

5    your way all the way to the front of the courtroom?  Come on up

6    here, ma'am.  I'm going to ask you to pause with Madam Clerk

7    when you get up here.  She'll swear you in.  Then we'll ask you

8    to take the witness stand.  Thank you.

9         **AMY HARP, DEFENDANT'S WITNESS, SWORN**

10        THE CLERK:  Thank you.  You can have a seat at our

11   witness stand.

12   Our next witness is Amy Harp, H-A-R-P.

13        THE COURT:  Thank you, ma'am.  Once you're seated and

14   comfortable, if you wouldn't mind adjusting that microphone.

15   Don't worry, you can't break it.  Thank you, ma'am.  Don't

16   worry.  People have tried.  You can't, I promise.  Thank you.

17   Mr. Edwards.

18        MR. EDWARDS:  Thank you.

19                   <u>DIRECT EXAMINATION</u>

20   BY MR. EDWARDS:

21   Q.   Amy, will you please state your full name for the jury,

22   please.

23   A.   Amy Beatrice Harp.

24   Q.   And how old are you, Amy?

25   A.   I am 36.

**A. Harp - Direct Examination (Mr. Edwards)**

1  Q.   Okay.  Amy, are you married?

2  A.   Yes.

3  Q.   Who is your husband?

4  A.   Christopher Harp.

5  Q.   Okay.  How long have you and Chris been married?

6  A.   Almost nine years.

7  Q.   Okay.  And how long have you and Chris been together?

8  A.   Almost 12 years.

9  Q.   Okay.  Did y'all get together in 2012?

10 A.   Yes.  June of 2012.

11 Q.   Okay.  Do you and Chris have children?

12 A.   Yes.

13 Q.   What are their names and ages?

14 A.   Adaline Beatrice Jean is -- will be eight next month.  And

15 William Thomas Westwood Harp is three.

16 Q.   Okay.  Amy, where do you and Chris live?

17 A.   904 Bloody Run Road, Morgantown, West Virginia.

18 Q.   And how long have you lived there?

19 A.   Almost six years.

20 Q.   Okay.  Did you move in sometime in 2018?

21 A.   Yes.

22 Q.   Okay.  And prior to that, where did you live?

23 A.   We lived with my parents.

24 Q.   Okay.  And do your parents live close to you?

25 A.   Yes.  They --

**A. Harp - Direct Examination (Mr. Edwards)**

1  Q.   I should say parent.  I'm sorry.  So it's your parent.

2  You lost your father; correct?

3  A.   Yes.

4  Q.   Okay.  So your mother lives in close proximity?

5  A.   Yes.

6  Q.   Okay.  Who else lives near you?

7  A.   Who else lives near me?

8  Q.   Yeah.  Is there anyone else of your family that lives near

9  you?

10 A.   My sister and her husband.  We share a driveway.

11 Q.   Okay.  What's your sister's name?

12 A.   Becky.

13 Q.   And your brother-in-law's name?

14 A.   Brad.

15 Q.   Okay.  Was that Brad?

16 A.   Brad, yes.

17 Q.   All right.  Okay.

18        MR. EDWARDS:  At this time I would ask if the

19 Government would be so nice to show me their Exhibit 6B?

20 BY MR. EDWARDS:

21 Q.   Okay.  Amy, can you see the screen there in front of you?

22 A.   Yes.

23 Q.   Okay.  Does this appear to be an overview of your home?

24 A.   Yes.

25 Q.   I believe if you touch that monitor, can you circle your

**A. Harp - Direct Examination (Mr. Edwards)**

1  home?

2         THE COURT:  One second, ma'am.

3      Okay.  Go ahead.

4         MR. EDWARDS:  Sorry.

5         THE COURT:  No.  That's all right.  Go ahead.

6  BY MR. EDWARDS:

7  Q.  Can you circle --

8         THE COURT:  It will come back.  Hold on.

9         MR. EDWARDS:  All right.  Thank you.

10  BY MR. EDWARDS:

11  Q.  Can you circle your home there on the monitor?

12  A.  Yes.

13  Q.  Okay.  And where does -- where is your parents' home?  Or

14  at least where your mom lives now, if you can see it.

15  A.  Yeah, you can't see it.  But that way.

16  Q.  Okay.  And how about your sister?

17     Okay.  So it's your sister's home that's there, I'll say,

18  at the beginning of the road.  You-all share a driveway.  It

19  goes up to your home.

20  A.  Yeah.

21  Q.  Correct?

22  A.  Yes.

23  Q.  Okay.  And your mom doesn't live down at the bottom.  She

24  lives at the one up on the top; correct?

25  A.  Yes.

**A. Harp - Direct Examination (Mr. Edwards)**

1  Q.    Okay.  All right.  Amy, 2019-2020, were you employed?

2  A.    All of 2019 and the beginning of 2020.

3  Q.    Okay.  What is your profession?

4  A.    I am a teacher.

5  Q.    Okay.  And where did you teach in 2019?

6  A.    I was teaching at Pressley Ridge, an alternative school.

7  And my kids were sexual assault victims and teenage sex

8  offenders.

9  Q.    Okay.  All right.  Let's go to -- and then at some point

10 in time in 2020 you stopped being employed full time?

11 A.    Yes.  I had taken a part-time teaching job and then was

12 laid off due to COVID.

13 Q.    Okay.  All right.  You know why we're here today.  Your

14 husband has been charged with four different counts: three

15 counts of receipt of child pornography and one count of

16 possession.  And in that regard, it's stated that this

17 pornography was on an HP computer that was in your home.

18       Are you familiar with that computer?

19 A.    Yes.

20 Q.    Okay.  Where, typically, was it kept while it was at --

21 while at your home?

22 A.    It was a laptop, so we used -- we had it wherever we used

23 it: our kitchen counter, dining room table, on the couch,

24 upstairs in our loft.  Wherever we needed it, we used it.

25 Q.    Okay.  When you lived at your parents' home, where did you

**A. Harp - Direct Examination (Mr. Edwards)**

1  keep that computer?

2  A.   In the one room that we lived in.

3  Q.   Okay.  Did you ever use this computer?

4  A.   Yes.

5  Q.   Okay.  What did you typically use it for?

6  A.   I used it for Word documents.  I used it to grade papers.

7  It had the older operating system, Windows, and it matched up

8  with the operating system at my work.  So I could remotely

9  sign-in to my desktop at work.  And I would take it to work.  I

10  made wedding invitations on it, and our wedding address book

11  was on it.  And every time we threw a birthday party or holiday

12  or anything, I would just get on that address book and get my

13  addresses I needed.

14  Q.   Okay.  Did Chris ever ask you not to use that computer?

15  A.   No.

16  Q.   Okay.  Did he ever seem uncomfortable about you using the

17  computer?

18  A.   No.  I used it more than he did.

19  Q.   Okay.  I want to go to September 25th, 2020.  That's the

20  date that the officers came and searched your home.  Can you

21  tell the jury what you recall about that morning?

22  A.   Yes.  I was six months pregnant.  I was still in bed.

23  Chris usually woke our daughter up and was getting her ready

24  for school because I -- I didn't sleep very well.

25       And I heard somebody yelling, "Get up, Amy.  You need to

**A. Harp - Direct Examination (Mr. Edwards)**

1  get up.  You need to get up right now."

2      And I was half asleep.  I turned my head, and there were

3  three people in my room.  And they just kept yelling, "Get up.

4  You need to get up right now."

5      And I looked.  There was two men and a woman.  And the two

6  men had their guns kind of, like, at the ready.  And I -- I

7  didn't know what was going on.  I reached over for my glasses,

8  and they pulled their guns on me.  And I sat up in bed, and

9  they just kept saying, "Get up.  You need to get up."

10      And so I pulled the covers away from me.  And the woman

11  said, "Oh, shit.  She's pregnant."

12      And then the two guys put their guns away, and they said,

13  "Do you have something to cover up with?"

14      And I said, "Yes.  I have my robe."

15      So they let me put my robe on.  They said, "You need to

16  follow us."  So I did.

17      As we were walking out of my bedroom, I grabbed my phone

18  off the side table.  I then met my four-year- -- then

19  four-year-old in the hallway.  I don't know if she came out of

20  her room or a bathroom or whatnot.  And she just came and clung

21  to me.  And I kind of -- I just kind of shielded her and

22  covered her head.

23      And I looked down the hallway.  There were two guys

24  standing with Chris, kind of blocking his view from the

25  hallway.  And one of the guys said, "Amy, you can take your

**A. Harp - Direct Examination (Mr. Edwards)**

1   daughter to school."

2        And I said, "Well, if I'm leaving the house, I'm coming

3   back."

4        And he said, "No.  If you leave, you aren't allowed to

5   come back."

6        And I said -- I was talking with my hands, and I said --

7            MS. CONKLIN:  Objection, Your Honor.  We're going

8   into a lot of hearsay here.

9            THE COURT:  Overruled.

10           THE WITNESS:  Continue?

11       So I -- he said I could leave.  And I said, "No.  I'm" --

12       I got confused.  I'm sorry.

13  BY MR. EDWARDS:

14  Q.   Go ahead.  Start over.

15  A.   -- to take her to school.

16       And I said, "If I'm leaving, I'm coming back."

17       And he said, "No.  You cannot come back if you leave."

18       And at that point, when I was talking with my hands, I

19  still had my phone in my hand.  The guy that was in my bedroom

20  with me took my phone out of my hand.  And I looked at him, and

21  I said, "Well, now I'm especially not leaving, because you just

22  took my phone away.  I'm pregnant and I'm disabled and you just

23  took my safety away."  And I said, "So I need to get ahold of

24  somebody to take my daughter and get her out of this house."

25       And he said, "Well, you're not getting your phone back."

**A. Harp - Direct Examination (Mr. Edwards)**

1      And I said, "Well, I need to get my daughter away."

2      And so they let me use their phone.  And I tried to call

3  my sister, my mom, and my dad.  Finally I got ahold of my mom.

4  And I said, "Mom, there's a bunch of people here at my house.

5  I don't know what's going on.  Nobody has said anything.  Don't

6  ask questions.  Just come please get Adaline."

7      So I got her ready for school.  I got dressed.

8          MS. CONKLIN:  Objection, Your Honor.  Still hearsay

9  and narrative.

10          THE COURT:  We've reached a point we're narrative at

11  this point, Mr. Edwards.  We need to get back to a Q-and-A

12  exchange.  Sustained to that extent.

13          MR. EDWARDS:  Sure.

14          THE WITNESS:  Okay.

15  BY MR. EDWARDS:

16  Q.  Was someone able to come get your daughter and take her to

17  school?

18  A.  Yes.

19  Q.  Okay.  At that point in time, were you still in the home?

20  A.  I -- I -- after she was picked up, I walked back in the

21  house, yes.

22  Q.  Okay.  What, if anything, did you say or do when you got

23  back into the house?

24  A.  I walked back in the -- in my house.  I walked to my

25  living room so that I could see everything and everything going

**A. Harp - Direct Examination (Mr. Edwards)**

1   on.  I was still in shock, and I used some words that I don't

2   normally use.  And I said, "What the F is going on in my

3   house?"  Nobody answered.  And so I yelled, "What the F is

4   going on?"

5       Someone stepped forward, who I now know was the guy in

6   charge, the head agent.  And he said, "I don't think you want

7   to know what's going on."

8       And I looked at him.  I said, "Excuse me.  Tell me what's

9   going on."

10      And he said --

11          MS. CONKLIN:  Judge, I'm objecting again.

12          THE COURT:  Sustained.  Questions, Mr. Edwards.

13          MR. EDWARDS:  Okay.

14          THE COURT:  No more narratives.

15  BY MR. EDWARDS:

16  Q.   Were you ever told what was going on?

17  A.   Finally, yes.

18  Q.   Okay.  And what exactly was your understanding of what was

19  going on at that point in time?

20  A.   That child pornography was being downloaded from the IP

21  address.

22  Q.   Okay.  Did you have any questions as to what led them to

23  that conclusion?

24  A.   I'm sorry.

25  Q.   Did you ask them -- did you ask them, "Well, what do you

**A. Harp - Direct Examination (Mr. Edwards)**

1  mean?" or "How did" --

2  A.   Yeah.

3  Q.   -- "What" -- "What made you think" -- "What makes you" --

4  "Did you" -- let me stop.  Now I'm starting to go bad.

5      Did you make any inquiry as to what, I guess, the agent's

6  belief?  What led to the agent's belief that that was occurring

7  at your home?

8  A.   Yes, I did ask questions.

9  Q.   Okay.  Were you provided any information in that regard?

10  A.   I said, "Well, how do you -- how do you know?  How does

11  this lead us to -- lead you to our house?"

12      He said, "The IP address."

13      And I said, "Well, I don't -- I don't understand.  Like,

14  how do you" -- I don't understand IP addresses or anything.

15      And he said, "Well, we have a whole list.  We have a whole

16  list."

17  Q.   Okay.

18  A.   And --

19  Q.   Were you ever given that list?

20  A.   Yes.  I asked for it, and he gave it to me.

21  Q.   Okay.  And what exactly did that list show you?

22  A.   There were dates and weird timing and then awful,

23  disgusting child -- stuff dealing with child pornography.

24  Q.   Okay.  Those dates, do you recall any of those that --

25  when you saw the list, did any of those dates stick out to you?

**A. Harp - Direct Examination (Mr. Edwards)**

1   A.    Yeah.  I asked them, you know, "When was the last time

2   this happened?"  And they showed me the last page.  And the

3   last date that it had happened was September 21st of 2020,

4   which was just a few days earlier.

5   Q.    Okay.  Did you respond anything when you saw that date?

6   A.    Yes.

7   Q.    What did you say?

8   A.    I said, "Well, we weren't even home on this date.  So I

9   don't -- I don't understand how these are here when I know for

10  a fact that we were not home."

11  Q.    Okay.  Well, did anyone give you any indication that --

12  who they believed was responsible for this pornography?

13  A.    Not right -- not as soon as I looked at the list.

14  Q.    Okay.  But at some point in time --

15  A.    Yes.

16  Q.    -- while they were there.

17  A.    Yes.

18  Q.    Okay.  And what indication were you given?

19          MS. CONKLIN:  Objection again, Your Honor.  Calls for

20  hearsay.  It also is irrelevant.

21          MR. EDWARDS:  Not for the -- offered for the matter

22  of the truth, Your Honor.  It's just her --

23          THE COURT:  Overruled.

24      Repeat your question, please, Mr. Edwards.

25          MR. EDWARDS:  Sure.

**A. Harp - Direct Examination (Mr. Edwards)**

1  BY MR. EDWARDS:

2  Q.    Were you ever -- did anyone ever give you any indication

3  of who they believed was responsible for the child pornography?

4  A.    They harassed me, and they said, "I don't think you know

5  your husband."  And at that point I knew that they were blaming

6  him.

7  Q.    Okay.

8  A.    And they -- I said, "Excuse me."  And I was -- I got very

9  angry.

10      And he said, "I don't think you know what your husband is

11 capable of."

12 Q.    Okay.  How long were they there in the home with you-all?

13 A.    A few hours.

14 Q.    Okay.  When they left, did you see what they took?

15 A.    Some of what they took, yes.

16 Q.    Okay.  After they left, what did you and Chris do?

17 A.    The first thing I did, I called my sister.  I was allowed

18 to keep my phone.  They had somebody from the Morgantown Police

19 Department make a copy of my phone.  So I called my sister.

20 And then we started cleaning up our house, because they left a

21 giant mess.

22 Q.    Okay.  As you were cleaning up your house, did you find

23 any electronic devices that they did not take?

24 A.    Yes.

25 Q.    What were those devices?

**A. Harp - Direct Examination (Mr. Edwards)**

1   A.   The first thing I saw was my Kindle tablet.

2   Q.   Where was that located?

3   A.   Beside our refrigerator with a bunch of cookbooks.

4   Q.   Okay.  What else?

5   A.   There was a Microsoft Surface tablet.

6   Q.   And where was that located?

7   A.   On our side table in our living room.

8   Q.   Okay.  Anything else?

9   A.   There were multiple flash drives, and then there were two

10  laptops left.

11  Q.   Okay.  Where were those laptops located?

12  A.   They were upstairs in the attic space.

13  Q.   Were they in storage?

14  A.   They were in my college tote, so yeah.

15  Q.   Okay.  Okay.  All right.  Let's go through the dates that

16  they are saying that Chris downloaded this pornography.  The

17  first in Count One of the indictment is April 4th, 2019.

18  Were you working on April 4th, 2019?

19  A.   Yes.

20  Q.   Okay.  And typically, what time would you leave for work?

21  A.   That I would leave?

22  Q.   Yes.

23  A.   Between 7:30 and 7:45.

24  Q.   Okay.  Was Chris working outside the home on April 4th

25  of 2019?

**A. Harp - Direct Examination (Mr. Edwards)**

1  A.    Yes.

2  Q.    Where was he working at that point in time?

3  A.    He was working for Strad in Waynesburg, Pennsylvania.

4  Q.    Okay.  And when would Chris typically leave for work in --

5  when he was working for Strad?

6  A.    He would leave between 7:00 and 7:30 and --

7  Q.    Okay.  So he would typically leave before you?

8  A.    Yes.

9  Q.    Okay.  And what was his normal work hours during that time

10 period?

11 A.    He would -- he would leave around 7:00 or 7:30 and be back

12 5:00 to 6:00.

13 Q.    Okay.  Of course, you know that's one of the dates now

14 that he is being charged with receiving child pornography.  In

15 that regard, were you and Chris able to pin down any better

16 what he was doing that day?

17 A.    Yes.  He had found an email that he was at a job

18 interview --

19 Q.    Okay.

20 A.    -- that day.

21 Q.    Where was that job interview?

22 A.    In Pittsburgh.

23 Q.    Okay.  So to your understanding, he had went to work and

24 then went for a job interview?

25 A.    Yes.

**A. Harp - Direct Examination (Mr. Edwards)**

1  Q.    Okay.  But still a normal workday otherwise?

2  A.    Normal workday.

3  Q.    Okay.  Let's go to the next date.  Count Two of the

4  indictment is September 18th of 2020.

5       Do you know where Chris was working on September 18th of

6  2020?

7  A.    Yes.

8  Q.    What was he doing?

9  A.    He was working for my dad.  My dad owned Westwood General

10 Contracting.

11 Q.    Okay.  And what was he doing specifically with your dad?

12 A.    They were remodeling --

13        MS. CONKLIN:  Objection, Your Honor.  Calls for

14 speculation and relies on hearsay.

15        THE COURT:  Sustained.  I think we need a little more

16 foundation before we get there, Mr. Edwards.

17        MR. EDWARDS:  Okay.

18 BY MR. EDWARDS:

19 Q.    You indicated that he was working with your father at that

20 point in time?

21 A.    Yes.

22 Q.    Okay.  Did you have any understanding as to what specific

23 job they were on at that point in time?

24 A.    Yes.  I saw the job.

25 Q.    Okay.  Oh, you saw the job.

**A. Harp - Direct Examination (Mr. Edwards)**

1  A.   Yes.

2  Q.   Had you actually visited that job site?

3  A.   Yes.  Multiple times.

4  Q.   Okay.  Where was that job site at?

5  A.   Off the Coopers Rock exit.

6  Q.   Okay.  Is that in the -- I'll say the Preston County side?

7  A.   Preston County side, yes.

8  Q.   Okay.  And what specific -- what was that job?

9  A.   They were remodeling a bathroom and bedroom.

10 Q.   Okay.  And do you re- -- do you know who that job was for?

11 A.   Yes.

12 Q.   Who was that?

13 A.   Dr. Fogarty.

14 Q.   Okay.  And is there a reason, to your knowledge, of why

15 Chris was working with your father at that point in time?

16 A.   Yes.

17 Q.   And what was that?

18 A.   He was laid off due to COVID.  My dad needed help with the

19 job, and I suggested that Chris go to work with my dad.  And

20 Chris did.

21 Q.   Okay.  And did Chris have another job lined up, to your

22 knowledge?

23 A.   Not when he started with my dad.

24 Q.   Okay.  Do you recall when he started?

25 A.   He was offered a job September 14th, I believe.

**A. Harp - Direct Examination (Mr. Edwards)**

1  Q.   Okay.  Did he continue to work on the job on

2  September 14th, the new job, or start -- or did he continue to

3  work with your dad?

4  A.   No.  He continued that week with my dad.  It was a remote

5  job, so they had to send him equipment.  And they hadn't sent

6  it yet, so they -- so he just finished out the week with my

7  dad.

8  Q.   Okay.  Was he actually working on September 18th, to

9  your knowledge?

10  A.   To my knowledge, yes.

11  Q.   Okay.  And when would Chris and your dad typically leave

12  for work?

13  A.   Between 9:00 and 10:00.

14  Q.   Okay.  And how long would they typically work?

15  A.   Five to six.  But it depended on what the job, what they

16  needed to do and what they needed to accomplish.

17  Q.   Okay.  Did Chris typically come home once he had left for

18  the job when he was working for your father?

19  A.   No.

20  Q.   Okay.

21  A.   No.

22  Q.   Do you recall what you were doing on September 18th of

23  2020?

24  A.   It was a Friday.  So I knew that I would be picking my

25  daughter up between 3:00 and 4:00.  And I did not recall any

**A. Harp - Direct Examination (Mr. Edwards)**

1   other information until two weeks ago when the Government

2   decided to pull up my text messages.

3          MS. CONKLIN:  Objection, Your Honor.

4          THE COURT:  Sustained.  The jury will disregard the

5   last statement from the witness.

6   BY MR. EDWARDS:

7   Q.   As you sit here today, do you recall any other thing that

8   you did other than pick up your daughter on September 18th of

9   2020?

10  A.   From the text messages or --

11  Q.   Just what you recall at this point in time.

12  A.   I was taking an old car seat to get a coupon at Target.

13  Q.   Okay.  So you were out that afternoon?

14  A.   Yes.

15  Q.   As you sit here today, do you recall, when you got home

16  that day, was Chris back from the job yet?

17  A.   No.

18  Q.   All right.  Let's go to September 21st, 2020, the date

19  that is in Count Three of the indictment.

20       Do you recall -- and you've already said that you-all were

21  purchasing a car that day?

22  A.   Yes.

23  Q.   Okay.  Can you tell us, what time did you leave the home?

24  A.   Probably -- we would have dropped our daughter off at 8:00

25  that morning at school, so...

**A. Harp - Direct Examination (Mr. Edwards)**

1  Q.    Okay.  Where were you purchasing a car at?

2  A.    Dan Cava's in White Hall.

3  Q.    Okay. Was this a car that you knew?  I mean, had you

4  already picked -- had you already had the car picked out, or

5  were you going to look for one?

6  A.    We -- we had picked out, like, two or three online, and we

7  were looking at those.

8  Q.    Okay.  Do you recall about what time you got to Dan

9  Cava's?

10  A.    Maybe around 9:00.

11  Q.    Okay.  And can you just tell the jury briefly about the

12  process of what happened when you got -- I mean, what you did.

13  I'm sure everyone has bought a car, but just briefly what you

14  went through when you got to the car lot.

15  A.    We were trading in my Jeep, so they inspected my Jeep.  We

16  got a trade-in value.  We looked at two cars.  We test drove

17  both of them.  We picked out -- I picked -- it was going to be

18  my primary vehicle, so I picked out the color I wanted.  I was

19  excited.  I had Chris take a picture of me.  And then we went

20  back in and we signed the paperwork.  And we switched over all

21  our belongings and --

22  Q.    I'm going to show you --

23  A.    -- bought the car.

24  Q.    -- what I'm going to mark as Defendant's Exhibit 2.

25        (Pause in proceedings.)

## A. Harp - Direct Examination (Mr. Edwards)

1          MR. EDWARDS:  Your Honor, may I approach?

2          THE COURT:  You may.

3    BY MR. EDWARDS:

4    Q.   Amy, I'm going to show you what's been marked as

5    Defendant's Exhibit Number 2.  Can you tell the jury basically

6    what that -- what those documents entail.

7    A.   Sure.  The first page says "Personal Loan Agreement."  The

8    second, "Motor Vehicle Purchase Agreement."  Third page,

9    "Dealer's Notice of Lien."  And fourth is a copy of a check to

10   Dan Cava's.

11   Q.   All right.  And in these documents, are they dated?

12   A.   Yes.

13   Q.   What's the date on them?

14   A.   9/21/2020.

15   Q.   Okay.  And is Chris Harp's signature, your husband's

16   signature, on these documents?

17   A.   Yes.

18          MR. EDWARDS:  Okay.  Your Honor, at this time I'd

19   move for admission of Defendant's 2.

20          THE COURT:  Any objection to 2?

21          MS. CONKLIN:  No legal objection, Your Honor.

22          THE COURT:  All right.  Without objection, then, so

23   admitted.

24       (Defendant's Exhibit 2 received in evidence.)

25

**A. Harp - Direct Examination (Mr. Edwards)**

1  BY MR. EDWARDS:

2  Q.   What time did you-all -- well, let's back up for a second.

3  I'm going to show you what's been marked as Defendant's

4  Exhibit 6.

5        MR. EDWARDS:  Your Honor, if I may approach again.

6        THE COURT:  You may.

7  BY MR. EDWARDS:

8  Q.   Amy, can you tell me what's been marked as Defendant's

9  Exhibit 6?  What that shows?

10  A.   This is a picture of me and the color of the new car that

11  I picked out.

12  Q.   And who took that picture of you?

13  A.   Chris did.

14  Q.   Okay.  And do you recall about what time that you left the

15  dealership that day?

16  A.   Around noon.

17  Q.   Okay.  And when you left, where did you go?

18  A.   Well, we were headed home.  We took all back roads home.

19  We wanted to drive our new car.  We had to stop twice because I

20  was six months pregnant and I had to go to the bathroom.  So we

21  went -- we went through downtown Fairmont and got on Old 73 and

22  drove to Goshen Road and then to Bloody Run and...

23  Q.   Okay.  About what time did you get home that day?

24  A.   About one.

25  Q.   Okay.  What else did you have going on that day?

**A. Harp - Direct Examination (Mr. Edwards)**

1  A.   At 1:30 I had a pregnancy checkup.

2  Q.   Okay.  Did you go to that checkup by yourself?

3  A.   Yes.

4  Q.   Is there any reason why?

5  A.   Chris was not allowed to because of COVID.

6  Q.   Okay.  Did you get to that appointment early?

7  A.   No.

8  Q.   Is there a reason why you didn't?

9  A.   I did not want to go early because I didn't want to sit in

10  a mask because of COVID.  So I got to my appointment right on

11  time.

12  Q.   All righty.  Amy, let's talk a little bit about who had

13  access to your home in 2019 and 2020.

14  A.   My mom, my dad, my brother, my sister, her husband; our

15  neighbor, Bev Sheets; and Jeremy Harp, my brother-in-law.

16  Q.   Okay.  When I say "access," I mean, could those

17  individuals actually get in your home if you weren't there?

18  A.   Yes.

19  Q.   How did they do that?

20  A.   Most of the time they just punched in the garage code.

21  And we left our mudroom door unlocked.

22  Q.   Okay.  Was there ever a period of time that Jeremy Harp

23  stayed with you?

24  A.   Yes.

25  Q.   And can you tell us -- the jury a little bit about that?

**A. Harp - Direct Examination (Mr. Edwards)**

1  A.    Yeah.   2018 and 2019 he lived -- he stayed with us on and
2  off.  He was homeless and told us he was camping out behind the
3  old mall and sleeping on a bench down by the river.  So we had
4  a spare bedroom and we let him stay.
5  Q.    Okay.  What's your understanding of what Jeremy Harp's
6  education?
7  A.    He is a chemical engineer.
8  Q.    Okay.  To your knowledge, did he ever work in that field?
9  A.    Not that I know of.
10 Q.    Did you ever hear a period of time -- well, let's back up
11 for a second.
12     Did you ever hear about Jeremy coming to your house when
13 he wasn't supposed to be staying there?
14 A.    Yes.
15 Q.    And how did you become aware of that?
16 A.    My mother was passing our house, our driveway, and she
17 called and she said, "Did you know Jeremy is sitting in your
18 driveway?"  I said no.
19     And then there was another time that I called our
20 neighbor, Bev, to go check up on the house.  And as she was
21 coming up the driveway, he was coming down.  And she called me,
22 and she said, "Is he supposed to be there?"  And I said no.
23 Q.    Okay.  Did your sister ever express any concerns about
24 Jeremy being around the home?
25 A.    Yes.

**A. Harp - Direct Examination (Mr. Edwards)**

1  Q.   And tell the jury about that.

2        MS. CONKLIN:  Objection, Your Honor.  This is hearsay

3  on hearsay.

4        THE COURT:  Sustained.

5  BY MR. EDWARDS:

6  Q.   Did you have any concerns regarding Jeremy Harp being --

7  A.   Yeah.

8  Q.   -- at your house?

9  A.   Yes.

10 Q.   What caused you to have those concerns?

11 A.   He was staying there -- he was supposed to be there -- and

12 he asked for security -- the app information for our security

13 cameras.  We only had two security cameras, on the front door

14 and the back door.  And we said, "No, you don't need those."

15      Another time that he was supposed to be there, he was

16 texting Chris while we were out of town.  I was holding Chris's

17 phone because Chris was driving.  And he said, "I F'd up.  I

18 really screwed up this time.  I just really F'd up."

19        MS. CONKLIN:  Objection, Your Honor.  This is

20 hearsay.

21        THE COURT:  Sustained.

22        MS. CONKLIN:  Move to strike.

23        THE COURT:  Granted.

24      The jury will disregard the last answer from the witness.

25

**A. Harp - Direct Examination (Mr. Edwards)**

1  BY MR. EDWARDS:

2  Q.    Anything ever occur in your home that resulted in you

3  saying that you didn't want Jeremy to be there anymore?

4  A.    Yes.

5  Q.    Can you tell what occurred -- what caused you to make --

6  feel that way?

7  A.    We had come home from a trip, and my jewelry boxes were

8  moved.  And I noticed that my underwear drawer was gone

9  through.  And I -- I didn't think anything of it.  And then

10  Jeremy let Chris know that he had searched our --

11  Q.    Hold on for a second.  I'm going to stop you before we

12  get --

13  A.    All right.

14        THE COURT:  Thank you, Mr. Edwards.  Go ahead.  Next

15  question, sir.

16        MR. EDWARDS:  Okay.

17  BY MR. EDWARDS:

18  Q.    Did you come to learn or did you ever find out that he had

19  been at your home when you weren't supposed -- when he wasn't

20  supposed to be?  Or he had gone through your things in your

21  home?

22  A.    Yes.

23  Q.    Okay.  Did you make any statements to Chris about whether

24  Jeremy was welcome in the home anymore at that point in time?

25  A.    I told Chris I didn't want him to stay any longer.

**A. Harp - Direct Examination (Mr. Edwards)**

1  Q.   Do you have any personal knowledge with regard to if

2  Jeremy had any computer knowledge?

3  A.   Yes.

4  Q.   Okay.  What led you to believe that Jeremy knew computers?

5  A.   While we were dating, he had an internship with Research

6  and Computer Connections.

7  Q.   Amy, you said "while we were dating."  You never dated

8  Jeremy, did you?

9  A.   I'm sorry.

10 Q.   While you and Chris were dating?

11 A.   It was while Chris and I were dating.

12 Q.   Okay.

13 A.   I'm sorry.

14 Q.   Okay.  You knew that Jeremy had an internship where?

15 A.   With Research and Computer Connections.

16 Q.   Was there anything else that led you to believe that

17 Jeremy knew how to work computers?

18 A.   Yes.

19 Q.   What was that?

20 A.   We were traveling to Toledo for Thanksgiving, and he was

21 on his computer the whole time.  Chris was driving, I was in

22 passenger, and he was in the back seat with his dad.  And I

23 kept wondering, how is he on the -- how is he on the internet?

24 Because I couldn't be on the internet.  And I asked him, and he

25 said --

**A. Harp - Direct Examination (Mr. Edwards)**

1         MS. CONKLIN:  Objection, Your Honor.  Hearsay.

2         MR. EDWARDS:  Don't tell me what he said.

3         THE COURT:  Sustained.  Next question, Mr. Edwards.

4   BY MR. EDWARDS:

5   Q.   All right.  Let's go a little bit back to the electronic

6   devices you-all had in your home.

7        Prior to the search on September 25th, 2020, where did

8   you-all -- was there anything -- any place in particular that

9   you kept any of your electronic devices?

10  A.   We just kept them everywhere where we used them.

11  Q.   Okay.  You indicated earlier there was a Microsoft Surface

12  Pro that was left behind after the search.

13        MR. EDWARDS:  Your Honor, if I may.

14      (Pause in proceedings.)

15        MR. EDWARDS:  Your Honor, may I approach?

16        THE COURT:  You may.

17  BY MR. EDWARDS:

18  Q.   Amy, can you tell the ladies and gentlemen of the jury

19  what that is.

20  A.   This is the Microsoft Surface tablet.

21  Q.   Okay.  And where was that located in the home on

22  September 25th, 2020?

23  A.   On our side table in our living room.

24  Q.   Okay.  Is there a Post-it note on that?

25  A.   Yes.

**A. Harp - Direct Examination (Mr. Edwards)**

1  Q.   Okay.  What's contained on that Post-it note?

2  A.   Passwords.

3  Q.   Okay.  As in passwords to what?

4  A.   It's listed black HP laptop, big Aces laptop, small Aces

5  laptop, Microsoft Surface.  And the last one, work computer.

6  Q.   Okay.  Are all those written at the same time?

7  A.   No.

8  Q.   Which one is not written at the same time?  Or ones?

9  A.   The last one that says "work computer."

10 Q.   Okay.  What computer, do you know, is that referring to?

11 A.   Chris's new work computer.

12 Q.   Okay.  Was that the one that he just got from the new job

13 that you testified to?

14 A.   Yes.

15 Q.   Okay.  How long have you had that computer, the one in

16 Exhibit Number --

17          THE COURT:  Which --

18          MR. EDWARDS:  Defendant's Exhibit.  I'm sorry.  I

19 think it's --

20          THE WITNESS:  One?

21          MR. EDWARDS:  One?

22          THE COURT:  The Surface?

23          MR. EDWARDS:  The Surface computer, yes.

24          THE COURT:  Okay.

25

**A. Harp - Direct Examination (Mr. Edwards)**

1  BY MR. EDWARDS:

2  Q.   How long have you had that computer, if you can recall?

3  A.   2015.

4  Q.   Okay.

5       MR. EDWARDS:  Your Honor, I'd move for the admission

6  of Defendant's 2.  Is that 2?  Sorry.

7       THE COURT:  Let's find out.  You're referring to the

8  Surface?

9       MR. EDWARDS:  The Surface.  I'm sorry.  It's

10 Exhibit 1.  Yeah, the Surface computer.

11      THE COURT:  Which is the Surface?

12     Any objection to that?

13      MS. CONKLIN:  No, Your Honor.

14      THE COURT:  Without objection, Defendant's 1 is

15 hereby admitted.

16    (Defendant's Exhibit 1 received in evidence.)

17      THE COURT:  Does that include the Post-it note?

18 MR. EDWARDS:  Yes.

19      THE COURT:  Any objection to the Post-it note?

20      MS. CONKLIN:  It's technically hearsay.

21      THE COURT:  What's the purpose of the Post-it note's

22 proposed admission?

23      MR. EDWARDS:  Your Honor, that's just how it was

24 found.  That's how it was kept in their home.

25      MS. CONKLIN:  Your Honor, that's how it was found.

**A. Harp - Direct Examination (Mr. Edwards)**

1   But the purpose that the defense is using it for is actually

2   for the actual writing that's on the Post-it note.

3           THE COURT:  Sustained.  I think the tangible object

4   itself is admissible, but the Post-it note will need to be

5   removed.  It is hearsay.

6   BY MR. EDWARDS:

7   Q.   Do you know whose handwriting that is?

8   A.   Yes.

9   Q.   Whose handwriting is on it?

10  A.   My husband's.

11  Q.   Okay.

12          MR. EDWARDS:  I'll lay the foundation through

13  Mr. Harp, then, Your Honor.

14          THE COURT:  So for the record, Defendant's 1, the

15  Surface laptop itself, is deemed admitted.  The blue Post-it

16  note is not part of Exhibit 1.

17  BY MR. EDWARDS:

18  Q.   Amy, you're here testifying on behalf of Chris, of course.

19  You're his wife.  And was September 25th, 2020, the first

20  time that you found out about any of this involvement?

21  A.   Yes.

22  Q.   Okay.  On the computer itself, the HP computer which you

23  indicated that you used a decent amount, did you ever see

24  anything on that computer that led you to believe that there

25  was pornography on it?

**A. Harp - Direct Examination (Mr. Edwards)**

1  A.   No.

2  Q.   Okay.  Did you ever see any type of icon or I guess

3  something you could click on for a program called Shareaza?

4  A.   No.

5  Q.   What about Gnutella?

6  A.   No.

7  Q.   Okay.  Do you know what those programs are?

8  A.   I have no idea.

9  Q.   Do you recall Chris ever discussing with you being on

10  Shareaza or Gnutella?

11  A.   No.

12  Q.   Do you believe Chris was involved in child pornography?

13  A.   No.

14       MS. CONKLIN:  Objection, Your Honor.  Calls for an

15  opinion.

16       THE COURT:  Sustained.

17       MS. CONKLIN:  Move to strike any answer.

18       THE COURT:  Granted.  The jury will disregard the

19  last question and answer.

20       MR. EDWARDS:  I have no further questions.  Thank

21  you, Your Honor.

22       THE COURT:  Understood.

23     Cross, Ms. Conklin?

24       MS. CONKLIN:  Thank you, Your Honor.

25

## A. Harp - Cross-Examination (Ms. Conklin)

1                                CROSS-EXAMINATION

2    BY MS. CONKLIN:

3    Q.   All right.  So, Mrs. Harp, you and Mr. Harp got married in

4    2015?

5    A.   Yes.

6    Q.   Okay.  And when was it that you moved in with your

7    parents?

8    A.   With Chris?

9    Q.   Yes.

10   A.   In the summer of 2016.

11   Q.   Summer of 2016.  And then you moved into your residence at

12   904 Bloody Run in 2018?

13   A.   Yes.

14   Q.   And when was that that you moved into there in 2018?

15   A.   It was a process of moving in.  So the process con- --

16   started in April, when we could lock things up, and then we

17   officially moved in in July.

18   Q.   July of 2018.

19   A.   Yes.

20   Q.   Okay.  And you mentioned that Chris's brother, Jeremy,

21   moved in with you in 2019?

22   A.   I did not say he moved in.

23   Q.   You didn't say that he moved in.

24   A.   I said he stayed with us on and off.

25   Q.   Oh, he stayed with you on and off.

**A. Harp - Cross-Examination (Ms. Conklin)**

1    A.    Yes.

2    Q.    Starting in 2019.

3    A.    Starting in 2018.

4    Q.    Starting in 2018.  When in 2018?

5    A.    On and off at random times, when he would show up at

6    random times.

7    Q.    In January 2018 or July 2018 or September 2018?

8    A.    I can't recall a date.  He would just show up at random

9    times.  And when he said where he was staying, we let him stay

10   so that he wasn't homeless.

11   Q.    Okay.  Where had he been staying before he came to stay

12   with you guys occasionally?

13   A.    I have no idea.

14   Q.    Where did he live when you and Chris were getting married?

15   A.    When we got married, he lived with his parents.

16   Q.    And where was that?

17   A.    In Harvest Ridge in Morgantown.

18   Q.    And did he go to college?

19   A.    Yes.

20   Q.    Where did he go to college at?

21   A.    WVU.

22   Q.    And did he ever live in Ohio?

23   A.    I don't know.

24   Q.    Did you talk to him much?

25   A.    No, I didn't talk to him very much.

**A. Harp - Cross-Examination (Ms. Conklin)**

1  Q.   Did you know him very well?

2  A.   Yes.

3  Q.   But you didn't talk to him.

4  A.   Not very much.

5  Q.   Okay.  So you let somebody that you, quote, "know very

6  well," but barely ever talk to, come stay with you and your

7  child and your husband.

8  A.   He was my brother-in-law, and he was very hard to talk to.

9  And he didn't talk very much.  But yes, I knew him as well as I

10 could have, yes.

11 Q.   So how often would he stay with you?

12 A.   Again, it was random times.

13 Q.   Did he have a key?

14 A.   At times, yes.

15 Q.   When did he have a key?

16 A.   Mostly when we were out of town we gave him a key.

17 Q.   When you were out of town.

18 A.   Yes.

19 Q.   Okay.  Would you give him the key when you would be going

20 out of town?  Or would he just have the key, just regular, on

21 him?

22 A.   No.  We would give him the key when we were out of town.

23 Q.   And then when you came back in town, you would get the key

24 back from him?

25 A.   Yes.

**A. Harp - Cross-Examination (Ms. Conklin)**

1  Q.    Okay.  Now, you mentioned that you have security cameras.

2  A.    Yes.

3  Q.    And you mentioned that you had concerns that he had gotten

4  into your house; correct?

5  A.    Yes.

6  Q.    Did you check the security cameras to see if he had gotten

7  into your house?

8  A.    The security cameras go off on my phone.  So I don't have

9  to check them.

10  Q.    So did you see him get into your house on your phone?

11  A.    He has access to our garage as well.  And the mudroom is

12  always unlocked because it is attached to our garage.  So when

13  you put the passcode in, you can get into our house.

14  Q.    Right.  But you said that you have security cameras set up

15  at your house; correct?

16  A.    Correct.

17  Q.    To protect unknown people from coming into your house;

18  correct?

19  A.    Correct.

20  Q.    And you mentioned that your security cameras alert to your

21  phone when somebody comes into your house; correct?

22  A.    Yes.

23  Q.    Okay.  So I asked you, did you get an alert from your

24  security cameras when Jeremy Harp tried to come into the house?

25  A.    Our security cameras are pointed at our front door and our

**A. Harp - Cross-Examination (Ms. Conklin)**

1  back door.  Our garage is on the side.  So you cannot see who

2  goes in the garage.

3  Q.   So you don't know for sure if he ever went into your house

4  without your permission.

5  A.   I guess not for sure.

6  Q.   Okay.  You mentioned that you had other family members who

7  warned you that he was in your area; correct?

8  A.   Yes.

9  Q.   And all the places that they had told you that they had

10 seen him were outside your residence; correct?

11 A.   Yes.

12 Q.   Okay.  So starting 2018, that's when he was coming to stay

13 with you.

14 A.   I'm sorry.  Can you say that again?

15 Q.   So starting 2018 he would randomly come and stay with you

16 when you gave him permission.

17 A.   Yes.

18 Q.   Okay.  So would you be there at the house with him when he

19 was hanging out in your house?

20 A.   Sometimes.  Sometimes.

21 Q.   Okay.  If you were out of town, you don't know what he was

22 doing on those dates; correct?

23 A.   No.  I have no idea.

24 Q.   Because you didn't see him on the security cameras.

25 A.   Right.

**A. Harp - Cross-Examination (Ms. Conklin)**

1  Q.   And you weren't there to see where he was; correct?

2  A.   Right.

3  Q.   So you tried to make it so that when Jeremy Harp was

4  there, you knew where he was and what he was doing; correct?

5  A.   I'm not understanding your question.  Can you --

6  Q.   You wanted to know when Jeremy Harp would be at your house

7  and when he wasn't at your house; correct?

8  A.   Yes.

9  Q.   And you wanted to have some sort of say in when he was

10  there.  Yes?

11  A.   Well, yes.

12  Q.   He didn't just randomly come in and out, sneaking in and

13  out that you know of.

14  A.   Not that I know of.

15  Q.   Okay.  So let's talk about -- let's talk about

16  April 4th, 2019.  You said that you usually went to work at

17  7:30 or 7:45?

18  A.   Between 7:30 and 7:45, yes.

19  Q.   Okay.  And you mentioned that Chris usually left between

20  7:00 and 7:30.

21  A.   Yes.

22  Q.   Okay.  Was there ever a time that you would sometimes

23  leave for work late or Chris would sometimes leave for work

24  late or something along those lines?

25  A.   I mean, probably there were times --

### A. Harp - Cross-Examination (Ms. Conklin)

1  Q.   Okay.

2  A.   -- that that happened.

3  Q.   Do you -- how do you remember -- 2019 -- would you agree

4  that 2019 is quite a long time ago?

5  A.   Yes.

6  Q.   And would you agree that 2019 came into your reference

7  only within the last year or so that you had to think about

8  what happened in 2019?

9  A.   Yes.

10 Q.   Okay.  So how do you remember that you went -- left for

11 work on time on April 4th, 2019, five years later?

12 A.   Well, I actually have a picture I took of my daughter, a

13 few pictures, because she was singing and dancing.  And they

14 are timestamped at 7:00 in the morning, and Chris is not in

15 them.

16 Q.   And Chris is not in them.

17 A.   No.  He's not around.

18 Q.   Well, could that be because he hadn't left for work and he

19 was in the bathroom?

20 A.   It could.  But it was most likely because he had already

21 left.

22 Q.   Did you want Chris to -- do you remember specifically

23 taking those pictures of your daughter?

24 A.   Yes.  I have them framed.

25 Q.   Okay.  Do you remember specifically -- well, do you

## A. Harp - Cross-Examination (Ms. Conklin)

1  remember specifically asking Chris to be in the pictures or

2  thinking that Chris couldn't be in those pictures?

3  A.   No.

4  Q.   Do you remember Jeremy being at your home on April 4th,

5  2019?

6  A.   No.

7  Q.   He wasn't?

8  A.   I -- I don't know.  I was at -- I went to work --

9  Q.   Well, you --

10  A.   -- that day.

11  Q.   You said that you specifically remember that day.  And you

12  said --

13  A.   I --

14  Q.   And you said that you would give Jeremy a key to have

15  access to your house.

16  A.   When I was not in -- at home, as in home in Morgantown.

17  Q.   So Jeremy didn't have a key to get into your house on

18  April 4th, 2019, then.

19  A.   He did not have a key all the time.

20  Q.   Okay.

21  A.   No.

22  Q.   All right.  So let's go back to September 18th, 2020.

23  And that's the date that you're shopping at Ulta and Target;

24  right?

25  A.   Yes.

### A. Harp - Cross-Examination (Ms. Conklin)

1  Q.   Okay.  And you said that's the date that Chris was working

2  for your dad.

3  A.   Yes.

4  Q.   Okay.  Did you see your dad -- see Chris at his [sic]

5  dad's work site that afternoon?

6  A.   Not that afternoon.  I would have been picking up my

7  daughter at school.

8  Q.   Okay.  And you were shopping, too, that afternoon as well;

9  correct?

10  A.   Yes.

11  Q.   Okay.  And you were talking to other people; correct?

12  A.   Yes.

13  Q.   But you weren't talking to Chris that afternoon; correct?

14  A.   Correct.

15  Q.   So you don't know exactly where Chris was.

16  A.   I can't say that I know exactly where he was, but I knew

17  where he should have been.

18  Q.   Where he should have been; correct?  But not where he

19  actually was.

20          MR. EDWARDS:  Your Honor, argumentative.

21          THE COURT:  Overruled.

22          THE WITNESS:  Can you say that again?

23  BY MS. CONKLIN:

24  Q.   You knew where he should have been, but not where he

25  actually was.

**A. Harp - Cross-Examination (Ms. Conklin)**

1   A.    No.  But why would I not believe that he was at work with

2   my dad?

3   Q.    Could he have finished the job early?

4   A.    No.

5   Q.    Could it have -- could -- he couldn't have finished a job

6   early.  It's physically impossible for him to finish that job

7   early.

8   A.    He would have been home when I was.  And he was not.

9   Q.    Okay.  Was Jeremy at your house that day?

10  A.    I was outside of the house, so I don't know.

11  Q.    You don't know.  Was Jeremy at your house when you got

12  home that day?

13  A.    No.

14  Q.    Okay.  So let's talk about September 21st.

15  September 21st you went and purchased a car at Dan Cava;

16  correct?

17  A.    Yes.

18  Q.    And Dan Cava is, what, about a half an hour from where

19  your house is?

20  A.    If you take the interstate.

21  Q.    Yes?

22  A.    Yes, if you take the interstate.

23  Q.    Okay.  You were really excited about buying that car;

24  correct?

25  A.    Yes.

## A. Harp - Cross-Examination (Ms. Conklin)

1  Q.   Okay.  You texted your mom that morning about buying the
2  car; correct?
3  A.   Yes.
4  Q.   You texted your mom that they gave you a certain amount of
5  money for your Jeep?
6  A.   Yes.  We were trading in my Jeep.
7  Q.   Okay.  And then you told your mom, "I've got the car."
8  And she told you to come over -- or to go over and see her;
9  correct?
10 A.   I don't believe that that's what the text message says.  I
11 believe it says, "Yes, we got the car."
12      And then she says, "Okay.  Come over and show me."
13 Q.   Okay.  And you told her, "Okay.  I'll drop Chris off so he
14 can start work."
15 A.   Yes.
16 Q.   Okay.  Do you remember what time you sent the text
17 message?
18 A.   10:00.
19 Q.   10:00?
20 A.   10:30.
21 Q.   Okay.  And what time did you finish wrapping up your
22 transaction with Dan Cava?
23 A.   Around noon.
24 Q.   So you texted your mom at 10:30 that you were on your --
25 you were dropping Chris off and you were on your way to her

**A. Harp - Cross-Examination (Ms. Conklin)**

1    house, but you actually didn't leave there until noon.

2          MR. EDWARDS:  Objection, Your Honor.

3    Mischaracterized what was said.

4          THE COURT:  Sustained.

5       Let's try that question again, Ms. Conklin.

6          MS. CONKLIN:  Sure.

7    BY MS. CONKLIN:

8    Q.   So you just said that you texted your mom at 10:00 that

9    you were going to drop Chris off and head over to her house;

10   correct?  Correct?

11   A.   Can -- can you say that again, please.

12   Q.   You tes- -- you just said -- you just testified that you

13   texted your mom at 10:00; correct?

14   A.   That's what the message says, yes.

15   Q.   Okay.  And you told her that you were going to be going

16   over -- you were going to drop Chris off at home and go over to

17   show her the car that morning.

18   A.   Yes.

19   Q.   Okay.  Presumably, before your doctor's appointment.

20   A.   Yes.

21   Q.   And your doctor's appointment was at 1:30.

22   A.   Yes.

23   Q.   Okay.  So you just testified a little while ago that you

24   didn't leave the dealership at least until noon.

25   A.   Yes.

**A. Harp - Cross-Examination (Ms. Conklin)**

1  Q.    And that it took you a really long time to go home.

2  A.    I did not say a really long time to go home.

3  Q.    Well, you had to stop and pee twice; right?

4  A.    I -- I'm just saying I did not say those exact words.  But

5  yes.

6  Q.    But that's the gist of what you said; correct?

7  A.    Yes.

8  Q.    Okay.  And then you barely made it to your doctor's

9  appointment right on time.

10  A.    I never said I barely made it to my doctor's appointment.

11  Q.    Well, you made it to your doctor's appointment right on

12  time at 1:30.

13  A.    Yes.

14  Q.    So you didn't show your mom the car.

15  A.    Yes, I did.

16  Q.    You showed your mom the car.

17  A.    Yes.

18  Q.    And was Chris with you?

19  A.    No.

20  Q.    You had dropped him off at home.

21  A.    Yes.

22  Q.    You dropped him off at home at what time?

23  A.    Around 1:00.

24  Q.    1:00.  Right before your doctor's appointment.

25  A.    That's like a half hour before my doctor's appointment.

### A. Harp - Cross-Examination (Ms. Conklin)

1   Yes.

2   Q.   So you actually finished your transaction at Dan Cava

3   closer to 11:00; correct?

4   A.   I don't know when the exact time was that we finished.  We

5   did not leave the car lot until around noon.

6   Q.   It was actually closer to 11:00 once everything was all

7   said and done there; correct?

8   A.   I -- again, that -- I don't remember the exact time, but

9   we did not leave the car lot until around noon.

10  Q.   Okay.

11  A.   And I know that because Chris had texted to get a

12  temporary insurance card.  Or emailed.  I'm sorry.

13  Q.   Okay.  So you didn't leave the car dealership -- you're

14  saying you didn't leave the car dealership until almost 1:00 --

15  or 'til noon.

16  A.   Noon.  We left around noon.

17  Q.   Okay.  When you were talking to your mom about the soccer

18  nets and the soccer balls, were you still at the dealership?

19  A.   I believe those came in later.

20  Q.   Were you still at the dealership?

21  A.   I don't remember.

22  Q.   You don't remember?

23  A.   Can you tell me the time?

24  Q.   I'm asking you if you remember the context.

25  A.   I don't remember.  That wasn't important to me.

**A. Harp - Cross-Examination (Ms. Conklin)**

1  Q.   Okay.  Okay.  When you dropped Chris off at the home on

2  September 21st, Jeremy wasn't there that day; right?

3  A.   I didn't see him, no.

4  Q.   You didn't see him?

5  A.   No.

6  Q.   Okay.  When you were staying with your parents -- when you

7  and Chris were staying with your parents, was Jeremy staying

8  with you then?

9  A.   No.

10 Q.   Okay.  Now, you indicated that you're a teacher who deals

11 with abused children; correct?

12 A.   Correct.

13 Q.   So I'd imagine that being told that there was child

14 pornography coming into your IP address, that would be very

15 disturbing.

16 A.   Yes.

17 Q.   And knowing the impact that child pornography has on

18 children, you would want to assist law enforcement.

19 A.   Of course.

20 Q.   And you would want to do everything that you could do to

21 make sure that the person who was accessing that was held

22 responsible.

23 A.   Yes.

24 Q.   And you have a four-year-old daughter.

25 A.   No.  She is eight.

**A. Harp - Cross-Examination (Ms. Conklin)**

1  Q.    Well, she's eight now.  She was four years old at the
2  time; correct?
3  A.    Yes.
4  Q.    Okay.  And you wouldn't want her to be exposed to that
5  sort of thing.
6  A.    No.
7  Q.    So when the FBI came by and they told you if you thought
8  of anybody or if you knew of anything, if you heard of
9  anything, let them know so that they can make sure that they
10 follow up their investigation --
11        MR. EDWARDS:  Your Honor, I'm going to object to
12 being outside the scope of direct.  And moreover, that's
13 never -- that testimony has never been brought in.
14        THE COURT:  Overruled.
15 BY MS. CONKLIN:
16 Q.    You never contacted them; correct?
17 A.    I was never told to.
18 Q.    They never told you if you think of anything or if you
19 know anything to let them know.
20 A.    No.  I had no idea what was going on that day.
21 Q.    Okay.  You had no idea what was going on that day at all.
22 A.    Other than what they said.
23 Q.    You weren't informed that they had evidence and that the
24 court had granted a search warrant because there was evidence
25 that child pornography was connected to the IP address at your

## A. Harp - Cross-Examination (Ms. Conklin)

1   house.

2   A.    Yes.  That is what they told me, and then they left.  They

3   took everything and left.

4   Q.    And actually, you did talk to the police at one point;

5   correct?  Or to law enforcement at one point; correct?

6   A.    That day?

7   Q.    Yes.

8   A.    Yes.  I said I answered their questions.

9   Q.    And you told them that maybe it was the sex offender who

10  lived across the hill who was getting onto your IP.

11  A.    I don't know.  I was confused --

12  Q.    Okay.

13  A.    -- that morning.  They came in.  I was already traumatized

14  from having guns in my face.  I did not know what was going on.

15  And I said, yeah, could someone have hacked our IP address?  I

16  did not say it was a sex offender.  I said, could someone have

17  hacked this?

18      And they actually said, "Yeah, that could be.  That could

19  happen."

20  Q.    They did say that.

21  A.    Yes.

22  Q.    Oh.

23  A.    They said that could happen, but not likely.

24  Q.    And you told them -- you never told them that there was a

25  sex offender that lived across the hill.

## A. Harp - Cross-Examination (Ms. Conklin)

1  A.    Yes, I did.  I just explained that.  Yes.

2  Q.    Oh, you did tell them that there was a sex offender who

3  lived across the hill and maybe he --

4  A.    Yes.

5  Q.    -- hacked in.

6  A.    I did.  I said, "Well, you know, there is a sex offender

7  that lives across the hill.  Could they have hacked into our IP

8  address?"

9        And he said yes.

10 Q.    I'm going to stop you right there.  Because I'm only

11 asking you what you asked.

12 A.    That is what I asked.

13 Q.    Okay.  So you actually did provide the law enforcement

14 officers the passwords; correct?

15 A.    Me?

16 Q.    Yes, you.

17 A.    I -- I don't remember.

18 Q.    You don't remember telling them the passwords for any of

19 the computers?

20 A.    I don't remember.  It sounds like something I'd do.

21 Q.    Okay.

22 A.    But I don't remember.

23 Q.    Okay.  Wouldn't it have been easier to give them a piece

24 of paper that was in the house that had passwords written on

25 it?

**A. Harp - Cross-Examination (Ms. Conklin)**

1   A.    I suppose.

2   Q.    Or show them a copy of it?

3   A.    I suppose, but...

4   Q.    Okay.  And again, as a teacher of children who have been

5   abused and having a four-year-old daughter yourself, you didn't

6   do anything to follow up with law enforcement to let them know

7   about anyone you had any concerns about.

8   A.    With child pornography?  No.

9   Q.    You never told them that Jeremy came into your house and

10  he was the one who accessed -- he might have accessed your

11  house?

12  A.    I -- I would never have thought that -- child pornography

13  was never in my radar.  I -- it just --

14  Q.    Well, once the police came to your house, I'd imagine it

15  would have been on your radar.

16  A.    Right.

17  Q.    And again, you would probably have -- I'd imagine that you

18  would want to assist law enforcement to make sure that no

19  children are hurt?

20  A.    Right.  Well, he was not around my home anymore.  I --

21  Q.    So it's only your child you care about.

22  A.    Absolutely not.  I would put myself in harm's way of

23  anybody's child.

24  Q.    And that's --

25  A.    I am a teacher.  I would literally put myself in front of

**A. Harp - Cross-Examination (Ms. Conklin)**

1  somebody else's child so that they did not get hurt.

2  Q.   And that's why you told the police about Jeremy coming to

3  your house.

4  A.   They didn't ask.  Nobody said anything.  They came in,

5  they blamed my husband, and they took our stuff and they left.

6  Q.   And you never followed up to make sure that the right

7  person who accessed the pornography was the one who was caught.

8  A.   I did not know anything was on computers until November of

9  2023.  Nothing was said to us for years.

10  Q.   You didn't look at the search warrant that they left at

11  your house?

12  A.   It was -- there's no proof on the electronics that nothing

13  was there.  I said, "Take everything.  Yes, find whatever is on

14  there."  But nobody -- nobody said anything.  I said to them,

15  "Are you going to follow up with me?  Can you let me know?"

16  Nobody let me know.  I knew nothing.

17  Q.   You told them to take everything?

18  A.   Yes.  I said, "If you want -- whatever electronics that

19  you need, take them."

20  Q.   Then why didn't you call them about the two computers that

21  you found upstairs or the other Surface tablet that you found

22  in your house?

23  A.   Because they didn't take them.

24  Q.   But you said, "Take everything."  Why didn't you follow up

25  your investiga- -- or follow up with law enforcement to make

**A. Harp - Cross-Examination (Ms. Conklin)**

1  sure the investigation was complete?

2  A.   Why didn't law enforcement follow up with us?

3  Q.   Agent Thigpen tried to contact you, didn't he?

4  A.   Last week.

5  Q.   And he asked.  Well, he -- did he try and speak to you?

6  A.   Me?  No.

7  Q.   Yeah.

8  A.   No, he did not.

9  Q.   He did not try and speak to you.

10 A.   Not to me.

11 Q.   You did not hang up on him.

12 A.   I did hang up on him.  He did not try and speak to me at

13 all.

14        MS. CONKLIN:  If I can have a moment, Your Honor.

15        THE COURT:  You may.

16 BY MS. CONKLIN:

17 Q.   When did you decide to bring up Jeremy as the individual

18 who was coming into your house?

19 A.   What do you mean when did I decide?

20 Q.   When did you guys dec- -- when did you and -- decide to

21 mention him to your attorney -- or Chris's attorney,

22 Mr. Edwards?

23        THE COURT:  Let's try that whole question again,

24 Ms. Conklin.

25

## A. Harp - Cross-Examination (Ms. Conklin)

1  BY MS. CONKLIN:

2  Q.   When -- when did you come to the conclusion that Jeremy

3  was the person who was involved in this possession of child

4  pornography?

5  A.   Well, we just tried to figure out -- we thought maybe it

6  would be -- it was remote accessing being done to the computer.

7  We knew that Jeremy was there.  We knew my brother was there.

8  My brother had some issues.  So we kind of just went down the

9  list.

10  Q.   What issues did your brother have?

11  A.   My brother was a -- he did drugs, and he had an overdose.

12  Q.   I'm sorry for your loss.

13       What part of using drugs make you addicted to child

14  pornography?

15  A.   I didn't say anything, connection.  I didn't make that

16  connection.

17  Q.   So you didn't make the connection for your brother, but

18  you made that connection from Jeremy Harp.

19  A.   I -- I did not make any connection.  I just was trying

20  to -- we went down a list of possible people.

21  Q.   In 2019 and 2020.  A list of possible people, of people

22  who could get in your house in 2019 and 2020; correct?

23  A.   Throughout the years, yes.

24  Q.   Okay.

25            MS. CONKLIN:  If I can have one more moment, Your

**A. Harp - Redirect Examination (Mr. Edwards)**

1   Honor.

2           THE COURT:  You may.

3           MS. CONKLIN:  I have nothing further, Your Honor.

4           THE COURT:  Redirect, Mr. Edwards?

5           MR. EDWARDS:  Yeah.

6                   REDIRECT EXAMINATION

7   BY MR. EDWARDS:

8   Q.   Amy, Ms. Conklin asked you some questions about when you

9   moved into your parents' home in 2016.  And that was sometime

10  in the summer?  Or when -- tell me.  I'm sorry.  Do you recall

11  when you started moving into your parents' home?

12  A.   We started moving in in June 2016.  And then we were there

13  in July, after my daughter was born.

14  Q.   Who-all helped you move into your parents' home?

15  A.   Move-in was mostly Jeremy.  My brother helped move my

16  parents' stuff into their shed.

17  Q.   Okay.  So Jeremy assisted you-all moving into your

18  parents' home?

19  A.   Yes.

20  Q.   You and Chris?

21       What about moving out?  Who helped you-all move out of

22  your parents' home?  And when did that take place?

23  A.   We started moving out April of 2018.  My brother helped

24  us.  Chris's brother, Jeremy, helped us.  And then a few guys

25  from our church group would come over on the weekends and help.

## A. Harp - Redirect Examination (Mr. Edwards)

1   Q.    Okay.  Was that a prolonged process?

2   A.    Yes.  It took a few months.

3   Q.    Okay.  There was some question about there were times when

4   you knew Jeremy was at your home and you had -- basically he'd

5   have permission to; correct?

6   A.    Correct.

7   Q.    Okay.  And then there were other times when, at least from

8   what you were told from your mother and neighbors, that Jeremy

9   was at least at the house -- not necessarily in, but at your

10  house or at your residence -- that you weren't expecting him to

11  be there.

12  A.    Correct.

13  Q.    Okay.  The security cameras that you spoke about, do they

14  show your entire house or are they just on the doors -- front

15  doors?

16  A.    They are just on the front doors.  You can just see the --

17  basically the welcome mat and the door --

18  Q.    Okay.

19  A.    -- on them.

20  Q.    Sort of like a Ring camera?

21  A.    Yes.

22  Q.    Okay.  But if someone was accessing your house through the

23  garage, would they necessarily pick that up?

24  A.    No, they would not pick those up.

25  Q.    You were questioned regarding the time that you were at

## A. Harp - Redirect Examination (Mr. Edwards)

1  the car dealership.  And the -- one of your answers you gave

2  was that you knew that an insurance card -- a temporary

3  insurance card had been sent to you-all before you left.

4  A.    Yes.

5  Q.    Do you recall that testimony?

6  A.    Yes.

7        (Pause in proceedings.)

8  BY MR. EDWARDS:

9  Q.    I'm going to show you what's been marked as Defendant's

10  Exhibit --

11            MR. EDWARDS:  May I approach, Your Honor?

12            THE COURT:  You may.

13  BY MR. EDWARDS:

14  Q.    -- Defendant's Exhibit 7.  Can you tell us what that

15  document shows?

16  A.    This is an email from Stacy L. Hall at State Farm to

17  charp51 -- which is Chris -- Monday, September --

18            MS. CONKLIN:  Objection, Your Honor.  This is

19  hearsay.

20            THE COURT:  Sustained.  Can't just read it.

21            THE WITNESS:  Oh, I'm sorry.

22            THE COURT:  One second, ma'am.  It's okay.  It's all

23  right.

24  BY MR. EDWARDS:

25  Q.    Does that email have a time on it?

**A. Harp - Redirect Examination (Mr. Edwards)**

1  A.    Yes.

2  Q.    When did you receive it?  Or when was it received?  Sorry.

3  A.    Monday, September 21st, 2020, at 11:57 AM.

4  Q.    To your knowledge, was that received prior to you-all

5  leaving the car dealership that day?

6  A.    Yes.

7        MR. EDWARDS:  Your Honor, I'd move for the admission

8  of Exhibit Number 7.

9        THE COURT:  Any objection to 7?

10        MS. CONKLIN:  Judge, my objection is that Exhibit 7

11  is hearsay.

12        THE COURT:  Understood.  Overruled.  It will be

13  received to demonstrate date and time of the communication, not

14  the truth of the matter asserted therein.

15     (Defendant's Exhibit 7 received in evidence.)

16        THE COURT:  Ladies and gentlemen of the jury, Defense

17  Exhibit Number --

18     Is it 7, Mr. Edwards?

19        MR. EDWARDS:  Seven.

20        THE COURT:  -- 7 has been admitted into evidence for

21  the limited purpose of showing what time that communication was

22  sent.  It may not be considered for any other purpose,

23  including the substance of the communication.

24     Which I assume is simply the insurance card itself?

25        MR. EDWARDS:  Yes, Your Honor.

## A. Harp - Redirect Examination (Mr. Edwards)

1          THE COURT:  Okay.  All right.  Objection overruled to

2    that extent.

3    BY MR. EDWARDS:

4    Q.   Ms. Conklin asked you a lot of questions about texting to

5    your mother and notices that you got or saw on that same date,

6    the 21st of September.  Was there anything in your text

7    messages that led you to believe that you got home around 1:00

8    that day as you sit here?

9    A.   Something -- I'm sorry.

10   Q.   When you were provided a copy of the text messages from

11   your phone on September 21st, 2020, was there anything that

12   led you to believe that -- or gave credence to the time of 1:00

13   being about the time that you got home that day?

14   A.   Yes.

15   Q.   What was that?

16   A.   I received a text from Sirius Radio canceling my old

17   sub- -- I was in the process of moving my old subscription to

18   my new vehicle.

19   Q.   Okay.  And when did you do that?

20   A.   When I got home.

21   Q.   Okay.  And do you recall the time of that text?

22   A.   Around 12:50.

23   Q.   Okay.  That's all the questions I have.  Thank you, ma'am.

24          THE COURT:  Any recross, Ms. Conklin?

25          MS. CONKLIN:  Yes.

### A. Harp - Recross-Examination (Ms. Conklin)

1                              RECROSS-EXAMINATION

2    BY MS. CONKLIN:

3    Q.    So you got home at now 12:50; correct?

4    A.    Correct.

5    Q.    And you called Sirius at 12:50?

6    A.    I don't know if I called them.

7    Q.    Well, you just said that you called and canceled your --

8    A.    I texted.

9    Q.    You texted Sirius.

10   A.    Yes.

11   Q.    And you told them that you wanted to cancel your account.

12   A.    Apparently.  I mean, that's what the text message says.

13   Q.    But that's what you just testified to.

14   A.    Yes.  I was switching subscriptions.

15   Q.    So you just testified that you contacted Sirius and told

16   them that you wanted to cancel and they texted you at 12:50.

17   A.    Yes.

18   Q.    Okay.  So --

19   A.    That's what I said.

20   Q.    And you were at home when you contacted them.

21   A.    When -- they --

22   Q.    You just testified to that.

23             MR. EDWARDS:  Your Honor, can she be allowed to

24   answer?

25             THE COURT:  Yes.

## A. Harp - Recross-Examination (Ms. Conklin)

1        THE WITNESS:  They texted me at 12:50.  I...
2    BY MS. CONKLIN:
3    Q.    When did you contact them?
4    A.    Sometime that -- in between getting the new car and
5    getting home.
6    Q.    Okay.  So you don't know -- you were home when you got the
7    message from Sirius.  Is that what you testified to earlier?
8    A.    Yes.
9    Q.    Okay.  So -- and you had gotten the message from Sirius at
10   12:50, you said; correct?
11   A.    Yes.
12   Q.    So that means that you were home before 1:00 now; correct?
13   A.    Yes.
14   Q.    Okay.  And your appointment was at 1:30.
15   A.    Yes.
16   Q.    How far was it to your doctor's appointment?
17   A.    Like ten minutes.
18   Q.    Ten minutes to your doctor's appointment.
19   A.    Yeah.
20   Q.    What time did you leave the house to go to your doctor's
21   appointment?
22   A.    I would have dropped Chris off, did -- I did the Sirius
23   stuff, and I showed my mom my car, and I went to my doctor's
24   appointment.  I mean, I don't have exact times.
25   Q.    You don't know when you left to go to your doctor's

**A. Harp - Recross-Examination (Ms. Conklin)**

1    appointment.

2    A.    Why would I know the exact time I left my home?

3    Q.    So it's now you got home, you did a couple of stuff, you

4    texted Sirius, you went to visit your mom, and then you made it

5    to your doctor's appointment at 1:30.

6    A.    Yeah.

7    Q.    Okay.  So it's not that you went from the dealership,

8    dropped Chris off, went to your doctor's appointment like we

9    first started with today; right?

10   A.    Well, I never said that.  I never went into detail.  But

11   yeah.  I came home, did Sirius stuff, showed my mom my car, and

12   went to town.

13   Q.    So you could have been home earlier than 1:00.

14   A.    No, I could not have been.  Because Sirius does not let

15   you install while you are driving.  So I would have had to have

16   been home at around 1:00 when that text came in.

17   Q.    How long did it take to install your Sirius on the car?

18   A.    I don't know.

19   Q.    Two seconds?

20   A.    I have no idea how long it took me.

21   Q.    Two minutes?

22   A.    Again, I have no idea.

23   Q.    So you know you were there long enough to have to install

24   Sirius.

25   A.    Sure.

**A. Harp - Recross-Examination (Ms. Conklin)**

1  Q.   Yeah?

2  A.   I mean, I don't understand what you're getting -- what the

3  question.

4  Q.   Well, time is important in some cases.

5  A.   Yeah, time is important.

6  Q.   And your story about the time is moving.

7        THE COURT:  Ms. Conklin, questions.  No arguments.

8  BY MS. CONKLIN:

9  Q.   So let's clarify.  First you said that you left -- got

10 home at 1:00.

11 A.   I did not say at 1:00.  I said around 1:00.

12 Q.   Okay.  And now you're saying that it was before that and

13 it was long enough for you to actually do all the install on

14 your Sirius XM Radio on your new car and other stuff, because

15 you mentioned that you had other stuff to do, and then go to

16 your mom and then leave.

17 A.   I'm sorry.  Can you ask that again?

18 Q.   Sure.  We'll break it down.

19      So you earlier testified that you got home close to 1:00.

20 A.   Yes.

21 Q.   Okay.  And you said that you took the long way home from

22 the car place, and you left at noon.

23 A.   Yes.

24 Q.   Okay.  And then you went -- dropped Chris off, went to

25 your mom's, and then went to your doctor's appointment.

## A. Harp - Recross-Examination (Ms. Conklin)

1  A.   Yes.

2  Q.   Okay.  So now you're saying that at 12:50 you got the

3  confirmation from your Sirius.  So would Chris have been

4  dropped off before you got your confirmation from your Sirius?

5  A.   No.  The car was parked, like I said.  Sirius was

6  installed.  I didn't -- I don't have to go anywhere to show my

7  mom my car.  It -- we -- she lives right there.  So on my way

8  out, I said, "Hey, Mom, here's my new car," and I went to my

9  baby appointment.

10 Q.   So you didn't have to park anywhere to install your

11 satellite --

12 A.   I just said that, yes, at my house, when Chris was dropped

13 off.

14 Q.   Okay.  So when Chris was dropped off, that's when you sat

15 in your car to do the Sirius; correct?

16 A.   He was with me.

17 Q.   He was with you when you were doing the Sirius.

18 A.   Yes.

19 Q.   Okay.  All right.  So you're not really exactly sure of

20 the times.  You're just using guesstimates or your best guess.

21 A.   What times are we talking about?

22 Q.   The times of where you were on September 21st.

23 A.   No.  I --

24 Q.   You're using your best guess.

25 A.   I mean, yeah, around.  I mean, I don't know exact times

1  down to the second.  I don't think anybody does.  But yes, we

2  got -- we left the car lot in White Hall around noon.  We got

3  home around 1:00.  I showed my mother my new car as I drove

4  into town for my pregnancy checkup.

5          MS. CONKLIN:  I have nothing further, Your Honor.

6          THE COURT:  Redirect?

7          MR. EDWARDS:  No.

8          THE COURT:  Re-redirect?  I'm sorry, Mr. Edwards.

9          MR. EDWARDS:  No, Your Honor.

10          THE COURT:  All right.  May Mrs. Harp be excused?

11          MR. EDWARDS:  Your Honor, I'm going to hold off

12  just -- so not at this time.  She's subject to recall.

13          THE COURT:  Okay.  Understood.

14      Ma'am, you can go ahead and step down.  Before you do

15  that, I will let you know that you remain under subpoena.  You

16  may be subject to be recalled as a witness, so you can't talk

17  with anybody about your testimony.  Do you understand that?

18      I need you to answer out loud for me, ma'am.

19          THE WITNESS:  Yes.  Yes.  Sorry.

20          THE COURT:  Okay.  Great.  Thank you so much.  But

21  you're free to step down and free to go today.  Thank you.

22      And Officer, if you wouldn't mind helping Mrs. Harp.

23  Thank you.

24          THE WITNESS:  Oh, thank you.

25          THE COURT:  Thank you, sir.

```
 1        Ladies and gentlemen of the jury, let's go ahead and take
 2   a ten-minute break at this point.  Please continue to refrain
 3   from discussing the case with anyone.  And please continue to
 4   refrain from any independent investigation or research.  We'll
 5   see you here in a few minutes.  Thank you very much.
 6        (Jury retired from the courtroom at 4:05 PM.)
 7          THE COURT:  All right.  Thank you, everyone.  Let's
 8   take a few moments ourselves.
 9        (Recess taken from 4:05 to 4:18 PM.)
10          THE COURT:  Thank you, everyone.  Please be seated.
11   Sorry.
12        Mr. Edwards, you ready to call your next witness, sir?
13          MR. EDWARDS:  Yes.
14          THE COURT:  All right.  Can we have our jurors,
15   please, sir.  Thank you.
16        (Jury returned to the courtroom at 4:19 PM.)
17          THE COURT:  Thank you, ladies and gentlemen.  Please
18   be seated.  Thank you very much.
19        Defense may call its next witness.
20          MR. EDWARDS:  Your Honor, I call Becky Bodkin.
21          THE COURT:  I'm sorry.  Who was that, Mr. --
22          MR. EDWARDS:  Becky Bodkin.
23          THE COURT:  All right.  Good morning -- good
24   afternoon, ma'am.  Sorry.  If I could ask you to make your way
25   all the way to the front of the courtroom.  You're going to
```

## R. Bodkin - Direct Examination (Mr. Edwards)

1  pause with Madam Clerk so she can swear you in.  Then we'll ask

2  you to take the witness stand.  Thank you.

3        **REBECCA BODKIN, DEFENDANT'S WITNESS, SWORN**

4        THE CLERK:  Thank you.  Please have a seat at our

5  witness stand.  Our next witness is Becky Bodkin, B-O-D-K-I-N.

6        THE COURT:  Thank you, ma'am.  Once you're seated and

7  comfortable, if you wouldn't mind adjusting that microphone.

8  Don't worry, you can't break it.  Thank you very much.

9     Mr. Edwards.

10        MR. EDWARDS:  Thank you.

11                    DIRECT EXAMINATION

12  BY MR. EDWARDS:

13  Q.   Ms. Bodkin, will you please introduce yourself to the

14  jury.

15  A.   My name is Rebecca Esta Bodkin.

16  Q.   And how old are you, Ms. Bodkin?

17  A.   I'm 40.

18  Q.   Are you married?

19  A.   I am.

20  Q.   And what's your husband's name?

21  A.   Brad.

22  Q.   How long have you and Brad been married?

23  A.   Ten years in May.

24  Q.   Okay.  Do you and Brad have any children?

25  A.   We do.

**R. Bodkin - Direct Examination (Mr. Edwards)**

1  Q.   What's their names and ages?

2  A.   Aubrey, and she's seven.

3  Q.   Becky, you are Amy Harp's sister; is that correct?

4  A.   Correct.

5  Q.   Okay.  Where do you live in relation to Amy and Chris?

6  A.   We share a driveway.

7  Q.   Okay.  Would your house be basically -- as you pull in the

8  driveway, your house is there, and then you go on up to Chris

9  and Amy's?

10  A.   Mine is the first house, and they're up the hill.

11  Q.   Okay.  Do you know Chris Harp?

12  A.   I do.

13  Q.   Okay.  How long have you known Chris?

14  A.   Since 2007.

15  Q.   Do you know when Chris and Amy started dating?

16  A.   Yes.

17  Q.   When was that?

18  A.   2012.

19  Q.   Okay.  Did you introduce them?

20  A.   I did not.

21  Q.   Okay.  Do you know how they met?

22  A.   They met at a friend's wedding.

23  Q.   Okay.  But you've actually known Chris longer than Amy has

24  known Chris.

25  A.   Yes.

**R. Bodkin - Direct Examination (Mr. Edwards)**

1  Q.   All right.  When did Chris and Amy get married?

2  A.   2015.

3  Q.   Okay.  Were you aware of any point in time when Chris and

4  Amy came to live with your parents?

5  A.   Yes.

6  Q.   Do you recall when that was?

7  A.   I do.

8  Q.   When was that?

9  A.   2016, after my niece was born, until they moved into their

10 home.

11 Q.   Okay.  When did they move into their home?

12 A.   2018.

13 Q.   When they moved into your parents' home, do you know who

14 helped them move in?

15 A.   My brother and Chris's brother.

16 Q.   Okay.  What's your brother's name?

17 A.   Robbie.

18 Q.   Okay.  And Chris's brother's name?

19 A.   Jeremy.

20 Q.   Jeremy Harp?  Okay.

21      And with regard to when they moved into the home and

22 Jeremy moved in -- helped them move into the home, are you

23 aware of any other time that Jeremy was ever at your parents'

24 home?

25 A.   Yes.

**R. Bodkin - Direct Examination (Mr. Edwards)**

1   Q.   Okay.  What can you tell us about that?

2   A.   He -- I remember him at a cookout for my niece.

3   Q.   Okay.  Any other times as you sit here that you can

4   recall?

5   A.   I don't recall.

6   Q.   Okay.  How did you get along with Jeremy?

7   A.   I don't know that I ever really talked to him.

8   Q.   Okay.  Is there a reason why?

9   A.   Anytime I would say hello, he would try to get away from

10  me.

11  Q.   Okay.  Is there any particular reason why that you know

12  of?

13  A.   Not that I know of.

14  Q.   Okay.  You indicated that Chris and Amy moved out of your

15  parents' home in 2018.

16  A.   Uh-huh.

17  Q.   Do you recall about when that was?

18  A.   Julyish.

19  Q.   Okay.

20  A.   Because it was exactly one year after we moved into our

21  home.

22  Q.   Okay.  Who helped them move out of their home -- out of

23  your parents' into their home, if you recall?

24  A.   I don't recall.

25  Q.   Okay.  So you don't -- you're not sure who helped them

**R. Bodkin - Direct Examination (Mr. Edwards)**

1  move?

2  A.    I'm not sure, no.

3  Q.    Okay.  Chris and Amy's home, once they moved in in 2018,

4  did you have access to their home?

5  A.    Yes.

6  Q.    How would you typically access their home if you needed to

7  get in?

8  A.    A key or their garage code.

9  Q.    Okay.  Who else had access to their home that you know of?

10 A.    My husband.  My mother.  My father.  My brother until he

11 moved.  And Jeremy was staying there as well.

12 Q.    So were you aware that Jeremy stayed with Chris and Amy

13 for a period of time?

14 A.    Yes.

15 Q.    Okay.  Was that a set period of time, or was that on and

16 off, or do you know?

17 A.    I don't recall.

18 Q.    Okay.  Did there ever come a point in time that you know

19 of that Jeremy was no longer staying there and was not supposed

20 to be there?

21 A.    Yes.

22 Q.    Okay.  Did you ever see him at the residence or near the

23 residence thereafter?

24 A.    Yes.

25 Q.    What can you tell us about that?

**R. Bodkin - Direct Examination (Mr. Edwards)**

1  A.   I saw someone sitting on their hill up from their house,

2  towards the wood line.  And I called my sister.  Because we

3  live in an area that people don't just randomly show up or

4  drive up.  So I called my sister, and I said, "Hey, there's

5  some man sitting on your hillside."  And it was Jeremy.  And

6  they were not aware that he was there.

7  Q.   Do you -- as you sit here today, do you have any idea what

8  time frame that may have been?

9  A.   I don't.

10 Q.   Okay.  It's not something you wrote down.

11 A.   No.

12 Q.   Okay.  With regards to your father, I understand he's

13 since passed.  Is that correct?

14 A.   Correct.

15 Q.   Okay.  What did he do for a living?

16 A.   He had a construction business.

17 Q.   Okay.  Was that Westwood Construction?

18 A.   Yes.

19 Q.   Okay.  Were you ever aware of a time when Chris worked for

20 your father?

21 A.   Yeah.

22 Q.   Do you recall when that was?

23 A.   It was around the time that they raided their house.

24 Q.   Okay.  That was in September of 2025.

25 A.   2020.

**R. Bodkin - Direct Examination (Mr. Edwards)**

1    Q.    I'm sorry.  2020.  Sorry.  So around September of 2020?

2    A.    Yes.

3    Q.    Do you recall -- do you have -- as you sit here today, do

4    you have any knowledge about what Chris was helping your father

5    with or what project he was helping your father with?

6    A.    Yes.  They were working for a family friend in Bruceton

7    Mills.

8    Q.    Okay.  Do you know who that family friend was?

9    A.    Dr. Fogarty.

10   Q.    You -- are you aware of what hours your dad typically

11   worked?

12   A.    Yeah.  It was --

13        MS. CONKLIN:  Objection, Your Honor.  This calls for

14   a hearsay answer unless she was actually there herself.

15        THE COURT:  Overruled.

16   BY MR. EDWARDS:

17   Q.    Go ahead.

18   A.    He would typically work from nine until there was no sun.

19   Q.    Okay.  What days of the week would he typically work?

20   A.    Every day for my life.

21   Q.    Okay.  As you sit here today, do you know if Jeremy was

22   working with your dad on September 18th, 2020?

23   A.    Jeremy?

24   Q.    I'm sorry.  I've got too many people's names in my head.

25        If Chris was working with your dad on September 18th of

**R. Bodkin - Cross-Examination (Ms. Conklin)**

1  2020.

2  A.   I don't recall the specific date, but I know it was that

3  time frame.

4  Q.   Okay.  So you don't -- you can't sit there and tell this

5  jury that you know for certain he was working.  You just know

6  it was in that time frame.

7  A.   No.  It was three -- over three and a half years ago.

8  Q.   You're aware of the charges that Chris has been brought;

9  is that correct?

10  A.   Correct.

11  Q.   Is Chris still welcome in your home?

12  A.   He would be.

13       MS. CONKLIN:  Objection, Your Honor.  Irrelevant

14  actually.

15       THE COURT:  Sustained.

16       MR. EDWARDS:  I have nothing further.  Thank you.

17       THE COURT:  Cross?

18                    CROSS-EXAMINATION

19  BY MS. CONKLIN:

20  Q.   Good afternoon, Ms. Bodkin.  Very briefly.

21       You didn't see Chris at the job site on the days that he

22  was working with your dad.

23  A.   No.

24  Q.   And you don't personally know what time he was there on

25  the job site; correct?

```
 1   A.   I was not working with them.  No.
 2   Q.   Okay.  And you don't know specifically when it was that
 3   Jeremy was on the hill outside their house.
 4   A.   I don't recall.
 5   Q.   Okay.
 6           MS. CONKLIN:  If I can have just one moment, Your
 7   Honor.
 8           THE COURT:  You may.
 9   BY MS. CONKLIN:
10   Q.   Do you remember when the last time Jeremy came to visit?
11   A.   I don't recall specifically.  I do remember seeing him at
12   one of my niece's birthdays at their home.  I don't know what
13   year.
14   Q.   Okay.  He wasn't by himself in the house at that time that
15   you saw him.
16   A.   No.
17   Q.   Okay.  So you don't have any personal knowledge of where
18   Chris was on the dates in question in this case.
19   A.   No.
20   Q.   Okay.  Nothing further.  Thank you.
21           THE COURT:  Redirect?
22           MR. EDWARDS:  No, Your Honor.
23           THE COURT:  May the witness be excused?
24           MR. EDWARDS:  She may.
25           THE COURT:  Ms. Bodkin, thank you for being here,
```

**B. Westwood - Direct Examination (Mr. Edwards)**

1  ma'am.  You can step down.

2          MR. EDWARDS:  I call Brenda Westwood.

3          THE COURT:  What's that, sir?

4          MR. EDWARDS:  Brenda Westwood.

5          THE COURT:  Okay.

6      Good afternoon, ma'am.  If I could ask you to make your

7  way all the way to the front.  Come on up.  You're going to

8  pause here with Madam Clerk so she can swear you in.  Then

9  we'll ask you to take the witness stand.  Thank you.

10         **BRENDA WESTWOOD, DEFENDANT'S WITNESS, SWORN**

11         THE CLERK:  Thank you.  Please have a seat at our

12  witness stand.

13     Our next witness is Beverly Westwood.

14         THE WITNESS:  No.  Brenda.

15         THE CLERK:  Brenda Westwood.  That is

16  W-E-S-T-W-O-O-D.

17         THE COURT:  All right.  Thank you, ma'am.  If you

18  could try and stay close to that mic so everyone can hear you.

19         THE WITNESS:  Uh-huh.

20         THE COURT:  Thank you very much.

21     Mr. Edwards.

22         MR. EDWARDS:  Thank you.

23                     DIRECT EXAMINATION

24  BY MR. EDWARDS:

25  Q.  Ms. Westwood, will you please introduce yourself to the

## B. Westwood - Direct Examination (Mr. Edwards)

1    jury.

2    A.    I'm Brenda Westwood.

3    Q.    Okay.  And Ms. Westwood, I -- we already know that your

4    husband passed away recently.  Is that correct?

5    A.    Yes.

6    Q.    Okay.  How long were you and your husband married?

7    A.    Thirty-nine years.

8    Q.    Okay.  And what children did you and Robert Westwood have?

9    A.    Rebecca Bodkin now and Amy Harp now and Robbie --

10   Q.    Okay.

11   A.    -- Westwood.

12   Q.    Where do you live in relation to Chris and Amy -- I'm

13   sorry -- yes, in relation to Chris and Amy Harp's home?

14   A.    Okay.  About a hundred yards from each of them.

15   Q.    Okay.  Does Rebecca also live in the general area?

16   A.    Yes.

17   Q.    Okay.  Who built those homes?

18   A.    My husband.

19   Q.    Okay.  Whose home was built first?

20   A.    Rebecca's.

21   Q.    Okay.  And after Rebecca's home was done, then he built

22   Chris and Amy's?

23   A.    Yes.

24   Q.    Okay.  You know -- you know Chris Harp.

25   A.    Yes.

**B. Westwood - Direct Examination (Mr. Edwards)**

1  Q.    Okay.  How long have you known Chris?

2  A.    Since 2012.

3  Q.    Okay.  Was that when he and Amy started dating?

4  A.    Yes.

5  Q.    Okay.  Do you recall when they were married?

6  A.    Yes.

7  Q.    When was that?

8  A.    August of 2015.

9  Q.    Okay.  Did there ever come a period in time when Chris and

10 Amy moved into you and your husband's home?

11 A.    Yes, they did.

12 Q.    Who-all was living at the home at that point in time?

13 A.    My husband, Robert, and myself.  My son, Robbie.  We three

14 were there.  And then, of course, they moved in.

15 Q.    Okay.  Do you recall who helped them move into your home?

16 A.    His brother, Jeremy; and my son, Robbie.

17 Q.    Okay.  And while they were living there, was there ever a

18 period of time after they moved in that you recall Jeremy being

19 at your house?

20 A.    Well, he helped them move in.  Then he helped them move

21 out.  He also was in my house because he had to take things out

22 of the area that they were going to be living in, to other

23 places in my house and to a storage area.

24 Q.    Okay.  They moved out in 2- -- sometime in 2018?

25 A.    Let me think here.  Yes.

**B. Westwood - Direct Examination (Mr. Edwards)**

1   Q.   Okay.  And in that regard, was that a one- or two-day

2   process, or was that a process that took some time?

3   A.   Moving in or out?  I'm sorry.

4   Q.   Moving out.  How long of a time period?

5   A.   Oh, my.  Several days, from what I can remember.

6   Q.   Okay.  Was their home complete before they started to move

7   into it?

8   A.   No.

9   Q.   Okay.  So did Jeremy and other people help them move over

10  periods of time?

11  A.   Into their house?

12  Q.   Into their new home, yes.

13  A.   Yes.

14  Q.   Okay.  Was there ever a period of time that you were aware

15  that Jeremy Harp was staying at Chris and Amy's home?

16  A.   Off and on for short periods and when they were away on

17  vacation.

18  Q.   Okay.  Was there ever a period of time you became aware

19  that he wasn't welcome to stay there anymore?

20  A.   Yes.

21  Q.   Okay.  Who made you aware of that?

22  A.   Amy.

23  Q.   Okay.  After that time frame, did you ever have occasion

24  to see Jeremy Harp around their home?

25  A.   I did.

**B. Westwood - Direct Examination (Mr. Edwards)**

1  Q.   Okay.  Did you tell Amy or Chris about that?

2  A.   I told Amy.

3  Q.   Okay.  Do you recall, as you sit here today, when that may

4  have been?

5  A.   I can't recall the date or when it was.  But he was -- he

6  was sitting in the driveway -- their driveway in a car.  And I

7  didn't know it was him.  I pulled over to see who it was, and

8  it was him.  And I asked him why he was there.  And I don't

9  recall what he said.

10           MS. CONKLIN:  Objection, Your Honor.

11       Sorry.  I'll withdraw my objection.

12           THE COURT:  Understood.

13       Next question, Mr. Edwards.

14           MR. EDWARDS:  Thank you.

15  BY MR. EDWARDS:

16  Q.   Did you have or do you have access to Chris and Amy's

17  home?

18  A.   Yes.

19  Q.   Okay.  How do you typically access their home?

20  A.   Through their passcode with the garage.

21  Q.   Okay.  Do you know anyone else who has access to their

22  home?

23  A.   My husband had access.  My son had access.  Rebecca.  Her

24  husband.  Jeremy had access.  He knew the codes.  And some

25  other contractors when my husband wasn't able to be with them.

**B. Westwood - Direct Examination (Mr. Edwards)**

1  Q.    Okay.  Are you familiar or are you aware if there was ever

2  a period of time that Chris worked with your husband?

3  A.    Yes, he did.

4  Q.    Okay.  Do you recall when that may have been?

5  A.    It was probably late August into September 2020.

6  Q.    Okay.  Do you have any recollection of what job they may

7  have been working on?

8  A.    Yes.  They were working on a bathroom and part of a

9  bedroom for Dr. Fogarty.

10        MS. CONKLIN:  Objection, Your Honor.  I don't know if

11  she's got personal knowledge of this or if this is what she's

12  heard from other people.

13        THE COURT:  Sustained.  Probably need a little more

14  foundation, Mr. Edwards.

15  BY MR. EDWARDS:

16  Q.    Okay.  Let's go back.  When -- what work hours did your

17  husband -- well, when did he typically leave the home for --

18  A.    Around nine in the morning.

19  Q.    Okay.  And when would he typically come home?

20  A.    Late.

21  Q.    Okay.

22  A.    It would be at dark or when he got finished.

23  Q.    Okay.  What days of the week would he typically work?

24  A.    Oh, golly.  He worked almost every day.

25  Q.    Okay.  As you sit here today, can you say with any

**B. Westwood - Direct Examination (Mr. Edwards)**

1  certainty that Jeremy was -- I'm sorry -- Chris was working

2  with your husband on September 18th of 2020?

3  A.   I can't recall that specific day.

4  Q.   Okay.  You just know that they were working sometime in

5  September.

6  A.   Yes.

7  Q.   Give me just a second, ma'am.

8      Ms. Westwood, do you recall Chris and Amy purchasing a new

9  car?

10  A.   Yes.

11  Q.   Do you recall when that may have been?

12  A.   I can't recall the date.

13  Q.   Okay.

14  A.   It was probably in September, I think.  Because I --

15  Q.   Do you re- -- did you see Amy at any point in time during

16  that day?

17  A.   Yes.

18  Q.   Okay.  What was -- what was the facts and circumstances

19  around that?

20  A.   She wanted to show me her new car.

21  Q.   Okay.  Do you have any idea, as you sit here today, about

22  what time that may have been during the day?

23  A.   Well, it was probably midday.  Noon, maybe.  Around in

24  there.

25  Q.   Okay.

**B. Westwood - Cross-Examination (Ms. Conklin)**

1   A.    Simply because I was working earlier, so...

2   Q.    Okay.  So when you say you were working earlier, so you

3   had to be back home by a certain --

4   A.    No.  I was home.  I was doing some patient calls.

5   Q.    Okay.  Do you recall if Amy had a doctor's appointment

6   that day?

7   A.    She did.

8   Q.    Okay.  Do you know if she went directly from showing you

9   the car to the doctor's appointment?

10  A.    I can't recall.

11  Q.    Okay.  Do you recall anything about that other than her

12  showing you the car that day?

13  A.    No.  I don't recall.

14  Q.    Okay.  Thank you, ma'am.  That's all the questions I have.

15  A.    Okay.

16          THE COURT:  Cross?

17          MS. CONKLIN:  Very briefly.

18                  CROSS-EXAMINATION

19  BY MS. CONKLIN:

20  Q.    Good afternoon, Mrs. Westwood.

21  A.    Good afternoon.

22  Q.    Just to clarify:  Did you ever go to the job site where

23  Mr. Harp was working with your husband?

24  A.    Not when they were working at that time.

25  Q.    Okay.

## B. Westwood - Cross-Examination (Ms. Conklin)

1  A.    I've been to that job site for previous jobs.

2  Q.    But not when they were working on that job in September.

3  A.    No.  No.

4  Q.    So you don't know for sure if Christopher Harp was there

5  any specific times.  Let me rephrase that.  You never saw him

6  there for any specific times.

7  A.    No.

8  Q.    Okay.  And the day that your daughter came to see you with

9  her new car, you had mentioned that you had patient

10 appointments that day.  Do you remember about what time you

11 were back at home?

12 A.    I never left home.

13 Q.    Oh.  You had patient -- but you had patient appointments

14 that morning, you said.

15 A.    I did say I made calls to patients.

16 Q.    Oh, I'm sorry.  I misunderstood your -- what you had said.

17       What -- about what time did you finish that up?  Do you

18 remember?

19 A.    Probably midmorning.

20 Q.    Okay.  So you don't have a specific memory of what time

21 things occurred that day.

22 A.    Not a specific time.

23 Q.    And again, that day that you saw Jeremy Harp by your

24 daughter and Christopher Harp's home, you don't remember

25 specifically when that was.

## B. Westwood - Cross-Examination (Ms. Conklin)

1    A.    I don't recall the day or the time.

2    Q.    Okay.  Do you remember if it was close to September or if

3    it was a while before that?

4    A.    I can't recall that.

5    Q.    Okay.  When you found out -- I'll withdraw that question.

6              MS. CONKLIN:  If I can have just a moment, Your

7    Honor.

8              THE COURT:  You may.

9    BY MS. CONKLIN:

10   Q.    Sorry.  And I know you -- I asked you this before, but I'm

11   going to just try and clarify again.  I believe earlier that

12   you had testified that you believe Amy came to show you her new

13   Jeep around noonish?  Around midday?

14   A.    Somewhere around in there.  I can't give you a specific

15   time.

16   Q.    Okay.  And when your daughter and Mr. Harp were living

17   with you back in 2016 to 2018, you mentioned that Jeremy had

18   come by to help them move.

19   A.    Yes.

20   Q.    Did you ever give Jeremy the Wi-Fi password or your Wi-Fi

21   information to access your computer or your internet?

22   A.    No.

23   Q.    Okay.

24             MS. CONKLIN:  I have nothing further, Your Honor.

25             THE COURT:  Any redirect, Mr. Edwards?

1              MR. EDWARDS:  No, Your Honor.

2              THE COURT:  May the witness be excused?

3              MR. EDWARDS:  She may.

4              THE COURT:  All right.  Ma'am, thank you so much.

5    You can go ahead and step down.  Thank you.  Thank you, ma'am.

6         Could I ask counsel to approach for a second.

7         (The following proceedings were had at the bench, outside

8         the hearing of the jury, with counsel.)

9              THE COURT:  Any other witnesses, Mr. Edwards?

10              MR. EDWARDS:  I have one more short witness that we

11   can get done before five.  It's about the same time as this.

12              THE COURT:  Okay.  All right.  Let's go ahead and do

13   that, then.  I do want to break at five.

14         Also, I'll let you know I'm going to have the jury come

15   back at ten tomorrow morning to start.  I know that we've got a

16   deadline for Ms. Conklin.

17              MS. CONKLIN:  Yeah.

18              THE COURT:  But I've got a -- I've got an appointment

19   in the morning I can't move.

20              MR. EDWARDS:  Sure.

21              MS. CONKLIN:  As long as I can leave by 4:30

22   tomorrow, I can make my flight.

23              THE COURT:  You can leave whenever you'd like.

24   Mr. Perri, you be ready.

25         Okay.  We'll just go ahead and call the next witness,

```
 1   then.
 2               MR. EDWARDS:  Thanks.
 3               MS. CONKLIN:  Thanks.
 4               THE COURT:  Thank you.
 5        (Bench conference concludes.)
 6               THE COURT:  All right.  Defense may call its next
 7   witness.
 8               MR. EDWARDS:  Thank you, Your Honor.  I call
 9   Beverly Sheets.
10               THE COURT:  Hi.  Good afternoon, ma'am.
11               THE WITNESS:  Hi.
12               THE COURT:  Hi.  Could I ask you to make your way all
13   the way to the front of the courtroom.  You're going to pause
14   with Madam Clerk so she can swear you in.  Then I'm going to
15   ask you to take the witness stand.  Thank you.
16            BEVERLY SHEETS, DEFENDANT'S WITNESS, SWORN
17               THE CLERK:  Thank you.  If you would have a seat at
18   our witness stand.
19          Our next witness is Beverly Sheets.  That's S-H-E-E-T-S.
20               THE COURT:  Thanks, ma'am.  I know it's a circuitous
21   route.  My apologies.  Thank you.
22          All right.  And if I could ask you to scooch up, stay
23   pretty close to that mic if you don't mind so everyone can hear
24   you.  And you can adjust it if necessary.
25          Mr. Edwards.
```

**B. Sheets - Direct Examination (Mr. Edwards)**

1        MR. EDWARDS:  Thank you.

2                    DIRECT EXAMINATION

3   BY MR. EDWARDS:

4   Q.   Ms. Sheets, will you please introduce yourself to the

5   jury.

6   A.   Yes.  I'm Beverly Ann Sheets.

7   Q.   Okay.  Ms. Sheets, where do you live?

8   A.   520 Hornbeck Road in Morgantown.

9   Q.   Okay.  Ms. Sheets, we've had a lot of testimony about the

10  residence at 904 and 944 Bloody Run Road.  Where is your home

11  in relation to those?

12  A.   About a mile from the Bloody Run residences.

13  Q.   Okay.  How long have you lived there?

14  A.   About 23 years.

15  Q.   Okay.  And are you familiar with the Westwood family?

16  A.   Yes, I am.

17  Q.   How long have you known the Westwood family?

18  A.   About 50 years.

19  Q.   Okay.  What about the Harp family?

20  A.   Yes.

21  Q.   How long have you known -- let's back this up a little

22  bit.  How long have you known Amy Harp -- Amy Westwood Harp?

23  A.   Since she was born.

24  Q.   Okay.  What about Chris Harp?

25  A.   Since he started dating Amy.

### B. Sheets - Direct Examination (Mr. Edwards)

1  Q.   Okay.  Are you friends with the Westwoods?

2  A.   Yes, I am.

3  Q.   Okay.  How close of friends are you?

4  A.   I would say a close family friend.

5  Q.   Okay.  Do you go to their home on occasions?

6  A.   Yes, I do.

7  Q.   Have you ever been to Chris and Amy Harp's home?

8  A.   Yes.

9  Q.   In 2019-2020, are you familiar or do you know who lived at

10 the Harp residence?

11 A.   Yes.

12 Q.   Okay.  Who do you re- -- what was your understanding about

13 who was living at the home at that point?

14 A.   Chris, Amy, Adaline.  And I believe Jeremy, Chris's

15 brother, stayed there some.

16 Q.   Okay.  Do you know how long a time period he stayed there?

17 A.   No, I don't.

18 Q.   Okay.  Do you know Jeremy Harp?

19 A.   Yes.  I have met him a few times.

20 Q.   Okay.  Where have you met him at?

21 A.   Family gatherings, birthday parties, holiday dinners.

22 Q.   Okay.  Was that at the Westwood home?

23 A.   Westwood home and Chris and Amy's house.

24 Q.   Okay.  Have you had much interaction with Jeremy Harp?

25 A.   Some.

## B. Sheets - Direct Examination (Mr. Edwards)

1  Q.   Okay.  Has that been positive?

2  A.   No.  I found him to be an odd person, strange, not very

3  sociable.

4  Q.   Okay.  Was there ever a point in time that you know that

5  Jeremy was no longer welcome to stay at Chris and Amy's home?

6  A.   Yes.

7  Q.   Okay.  Who informed you of that?

8  A.   Amy.

9  Q.   Okay.  Was there ever a point in time thereafter that you

10  were aware of that Chris was at the residence?

11          THE COURT:  Jeremy, you mean?

12          MR. EDWARDS:  I'm sorry.  Did it again.  I apologize.

13  BY MR. EDWARDS:

14  Q.   Was there ever a point in time after that that you were

15  aware that Jeremy was at Chris and Amy's home?

16  A.   Yes.

17  Q.   Can you tell us what you recall about that incident?

18  A.   Yes.  Chris and Amy were away, and Amy called me to go

19  check on their home.  And in doing so, I was on the way up to

20  their house, and I found Jeremy coming down out of their

21  driveway in his vehicle.

22  Q.   Okay.  Did you speak with him at all?

23  A.   No, I did not.

24  Q.   Did he acknowledge -- any acknowledgment whatsoever?

25  A.   No.

**B. Sheets - Direct Examination (Mr. Edwards)**

1  Q.    Did you inform anyone of this?

2  A.    Yes.  I called Amy and let her know that this had

3  happened.

4  Q.    Are you aware of who-all had access to Chris and Amy's

5  home?

6  A.    Well, the two of them.  Both of Amy's parents, Bob and

7  Brenda.  Robbie, who is Amy's brother.  Myself, if they were

8  away and they needed me to take care of their animals.  I guess

9  that would be about it.

10 Q.    Okay.  And you indicated at least there was a point in

11 time that you know that Jeremy was staying there.

12 A.    Yes.  Well, and he would have access at that point in

13 time.

14 Q.    Do you know when -- and maybe we've already asked this.

15 And I apologize, Ms. Sheets, if I have.

16      There was a point in time where Chris and Amy lived with

17 her parents; correct?

18 A.    Yes.

19 Q.    Okay.  Do you -- can you -- do you have a recollection of

20 when that was?

21 A.    Not particularly.

22 Q.    Okay.  Were you around when they were moving in at all?

23 A.    Yes.

24 Q.    Okay.  Do you recall who helped them move into the home?

25 A.    I believe it was Jeremy and then Robbie, which is Amy's

**B. Sheets - Cross-Examination (Ms. Conklin)**

1   brother.

2   Q.   Okay.  Do you recall when they moved out of the Westwoods'

3   home?

4   A.   Yes.

5   Q.   Okay.  And do you -- can you tell the jury when that may

6   have been?

7   A.   No.  I'm not sure of dates.

8   Q.   Okay.  As far as who helped them move out, were you around

9   when they were moving out at any point in time?

10  A.   Yes.

11  Q.   And who do you recall helping them move?

12  A.   I believe it was the same two boys.

13  Q.   Okay.  So it was Robbie Westwood and Jeremy Harp?

14  A.   Yes.

15  Q.   Okay.  Ms. Sheets, that's all the questions I have for

16  you.  Thank you.

17           THE COURT:  Any cross?

18                     CROSS-EXAMINATION

19  BY MS. CONKLIN:

20  Q.   Good afternoon, Mrs. Sheets.  Mrs. Sheets?

21  A.   Yes.

22  Q.   So you -- you're family friends with the Westwoods.

23  A.   Yes.

24  Q.   And you've known Amy since she was a little girl.

25  A.   Yes.

**B. Sheets - Cross-Examination (Ms. Conklin)**

1  Q.    And Chris is her husband, so that means he's important to

2  you guys; correct?

3  A.    Absolutely.

4  Q.    When was the first time you met Jeremy?

5  A.    I can't tell you a specific time.  It would have been at a

6  family gathering.

7  Q.    You mention that you knew that Jeremy was staying with Amy

8  and Chris Harp.

9  A.    Yes.

10 Q.    When you say that he was staying with them, do you mean,

11 like, a night here or there?  Or he was living there?

12 A.    I know that he would stay there from time to time.

13 Q.    Okay.  Do you remember any of the dates or times that he

14 stayed there?

15 A.    Oh.  No.

16 Q.    And the day that you saw Jeremy coming down out of the

17 driveway, you just saw him on the driveway; correct?

18 A.    Yes.  In his vehicle.

19 Q.    You didn't see him in the house or anything like that?

20 A.    No.

21 Q.    You don't know whether he had acc- -- went into the house

22 or not?

23 A.    No.

24 Q.    Okay.  And you had also mentioned that you take care of

25 Chris and Amy's animals sometimes when they're gone.

**B. Sheets - Cross-Examination (Ms. Conklin)**

1  A.   Yes.

2  Q.   How long have you been doing that for?

3  A.   Since they've been married and living in their home.

4  Q.   So from the time that they moved into their home at 904

5  Bloody Run Road, you were the person who would come take care

6  of the animals when they were on vacation?

7  A.   Yes.

8  Q.   Would Jeremy be there at those times as well?

9  A.   No.

10 Q.   So you -- how often did they go on vacation that you would

11 take care of their animals?

12 A.   It would vary.  Sometimes they went on weekend trips.

13 Sometimes they would go on a week trip as a regular vacation.

14 Q.   But you were the one who always went and took care of the

15 animals; correct?

16 A.   Well, not only me.  They had other friends that helped

17 them out also.

18 Q.   But would you say frequently that was you when they were

19 on vacation?

20 A.   Yes.

21 Q.   Okay.  And you never saw Jeremy there when you were taking

22 care of the animals and they were gone.

23 A.   I don't recall.

24 Q.   Okay.

25       MS. CONKLIN:  If I can have one moment.

1          THE COURT:  You may.

2          MS. CONKLIN:  I have nothing further, Your Honor.

3          THE COURT:  Any redirect?

4          MR. EDWARDS:  Just briefly.

5                    REDIRECT EXAMINATION

6  BY MR. EDWARDS:

7  Q.   Ms. Sheets, when you were asked to come over and watch the

8  animals, did you spend the -- I mean, did you stay there?  Or

9  did you just come and take care of them and leave?

10 A.   No.  I would come and go to my own home.

11 Q.   Okay.  Thank you, ma'am.  That's all I have.

12         THE COURT:  Any recross?

13         MS. CONKLIN:  No, Your Honor.

14         THE COURT:  All right.  May the witness be excused?

15         MR. EDWARDS:  She may.

16         THE COURT:  Ms. Sheets, thank you very much for being

17 here, ma'am.  You can step down.  You're free to go.  Thank

18 you.

19         THE WITNESS:  Thank you.

20         THE COURT:  All right.  Ladies and gentlemen of the

21 jury, given the time of the day, we're going to go ahead and

22 break before we hear from any additional witnesses, if any.

23     Please continue to refrain from discussing the case with

24 anyone.  That does include any of your fellow jurors and also

25 any curious family, friends, or neighbors this evening.  Again,

1   blame me.  Also, please continue to refrain from any

2   independent investigation or research efforts about the case,

3   as well as any social media activity related to your jury

4   service or the case.

5        Given an appointment that I have to tend to early in the

6   morning, if I could ask you to be here at 10:00 tomorrow to

7   resume.  My apologies for the delay, but I've got an

8   appointment I've got to tend to that I can't move.  But we

9   should be ready to go by 10:00.  Okay?  Thank you so much, with

10  my apologies.

11       With that, have a very pleasant evening.  We'll see you

12  all tomorrow morning.  Thank you.

13       (Jury retired from the courtroom at 4:54 PM.)

14            THE COURT:  Okay.  Thank you, everyone.  Please be

15  seated.

16       What's our lineup going forward, Mr. Edwards?

17            MR. EDWARDS:  I anticipate calling Chris and then

18  resting.

19            THE COURT:  Okay.  Any rebuttal at this point the

20  Government anticipates?

21            MS. CONKLIN:  We may, Your Honor.

22            THE COURT:  Okay.

23            MS. CONKLIN:  I don't believe that it will be very

24  extensive, but...

25            THE COURT:  Okay.  All right.  Understood.  Good

1  stock answer, Ms. Conklin.

2      Okay.  Well, let's resume at 10:00 tomorrow.  Counsel

3  should have our revised --

4          MS. CONKLIN:  Yes.

5          THE COURT:  -- charge that reflects our changes we

6  discussed previously.  The only additional change, I believe,

7  at this point necessary will be upon Mr. Harp's decision about

8  whether or not to testify.  But if you wouldn't mind, take

9  another look at that this evening just to make sure.  And then

10  we'll find a spot tomorrow to finalize the charge.

11      Mr. Harp, sir, you remain under oath from earlier.  Again,

12  I don't want to rehash any ground.  But I'll go ahead and

13  offer.  Are there any questions you believe I might be able to

14  help answer with respect to your rights under the Fifth

15  Amendment and your decision whether or not to testify, sir?

16          THE DEFENDANT:  No, Your Honor.  Thank you.

17          THE COURT:  Okay.  I would encourage you, sir, to

18  continue to consult with and rely upon your counsel over the

19  evening.

20      We'll see everyone tomorrow morning.  I should be here by

21  my announced start time of ten.  And we'll go from there.  You

22  guys have a great evening.  We'll see you tomorrow.  Thank you.

23      (Proceedings adjourned at 4:55 PM.)

24

25

```
1                          CERTIFICATE

2

3        I, Rachel Kocher, a Registered Professional Reporter and

4   Official Reporter of the United States District Court for the

5   Northern District of West Virginia, do hereby certify that the

6   foregoing is a true and correct transcript of the proceedings

7   had in the above-styled action as reported by me

8   stenographically, all to the best of my skill and ability.

9        I certify that the transcript fees and format comply with

10  those prescribed by the Court and the Judicial Conference of

11  the United States.

12       Given under my hand this 25th day of August 2024.

13

14

15                          _____
                            Rachel Kocher
16                          Rachel Kocher, RPR/CRR

17

18

19

20

21

22

23

24

25
```