1          IN THE UNITED STATES DISTRICT COURT
       FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
2                    AT CLARKSBURG

3    ------------------------------x
     UNITED STATES OF AMERICA,      :
4                                   :
          Plaintiff,                :
5                                   : CRIMINAL ACTION NUMBER:
       vs.                          : 1:23-CR-69
6                                   :
     CHRISTOPHER HARP,              :
7                                   :
          Defendant.                :
8    ------------------------------x

9    PROCEEDINGS HAD IN **DAY 3** OF THE JURY TRIAL OF THE ABOVE-STYLED
     ACTION ON APRIL 25, 2024, BEFORE THE HONORABLE THOMAS S. KLEEH,
10                   CHIEF DISTRICT JUDGE.

11     APPEARANCES:

12     FOR THE UNITED STATES OF AMERICA:

13        David J. Perri, Esq.
          Jennifer T. Conklin, Esq.
14        U.S. Attorney's Office
          1125 Chapline Street, Suite 3000
15        Wheeling, WV 26003
          david.perri@usdoj.gov
16        jennie.conklin@usdoj.gov

17     FOR THE DEFENDANT:

18        J. Bryan Edwards, Esq.
          Cranston & Edwards, PLLC
19        1200 Dorsey Avenue, Suite II
          Morgantown, WV 26501
20        bedwards@cranstonedwards.com

21     The Defendant was present in person.

22

23

24     Proceedings recorded by mechanical stenography.
       Transcript produced by computer-aided transcription.
25

1                        W I T N E S S   I N D E X

2                                                              PAGE

3    **CHRISTOPHER HARP**

4    Direct Examination by Mr. Edwards                            5

5    Cross-Examination by Mr. Perri                              27

6

7                            E X H I B I T S

8    IDENTIFICATION                                             PAGE

9    Defendant's Exhibit 3                                        15

10

11

12   **Closing Argument of Government                            93**

13   **Closing Argument of Defendant                            113**

14   **Rebuttal Argument of Government                          123**

15

16

17

18

19

20

21

22

23

24

25

                                          April 25, 2024, 10:07 AM

1

2          (In open court without the jury.)

3              THE COURT:  All right.  We've convened for day three

4    of trial in U.S. v. Harp.  Counsel is present, as is Mr. Harp.

5        Anything we need to take up before we proceed from the

6    Government's perspective?

7              MS. CONKLIN:  No, Your Honor.  I can't think of

8    anything.

9              THE COURT:  All right.  Mr. Edwards?

10             MR. EDWARDS:  Nothing, Your Honor.

11             THE COURT:  Okay.  Mr. Harp, can I ask you to stand

12   so that Madam Clerk can swear you in, sir.  Thank you.

13             THE DEFENDANT:  Yes.

14         (Defendant sworn.)

15             THE CLERK:  Thank you.

16             THE COURT:  Thank you so much, sir.

17       Obviously, again, Mr. Harp, you are under oath.  So please

18   keep in mind any false statements you may make or false answers

19   you give in response to any of my questions, those can form the

20   basis of a separate criminal action against you for false

21   swearing or for perjury.

22       Do you understand that, sir?

23             THE DEFENDANT:  Yes, Your Honor.

24             THE COURT:  All right.  And as before, if I pose a

25   question or say anything that prompts you to want to have a

1  conversation with Mr. Edwards, please let him know or let me

2  know.  We'll take a break so you gentlemen can talk.

3      Do you understand that?

4          THE DEFENDANT:  Yes, Your Honor.

5          THE COURT:  I'll just renew my offer, sir.  If there

6  are any questions you have about your rights under the Fifth

7  Amendment, the decision that you have this morning as to

8  whether to waive those or invoke them, or how that process will

9  work, I'm happy to answer them at this time.

10          THE DEFENDANT:  I have no questions, Your Honor.

11          THE COURT:  All right.  Do you believe you've had

12  sufficient time to consider this decision and discuss it fully

13  with your counsel?

14          THE DEFENDANT:  Yes, Your Honor.

15          THE COURT:  Okay.  Great.

16      Can we have our jurors, please, sir.  Thank you.

17      (Jury returned to the courtroom at 10:09 AM.)

18          THE COURT:  Hi.  Good morning, everyone.  Thank you.

19  Please be seated.  Thank you very much, ladies and gentlemen.

20  Again, my apologies for being a little off schedule today.

21  That was entirely and solely my responsibility.  So my

22  apologies for the schedule disruption.

23      With that, Mr. Edwards, defense may call its next witness.

24          MR. EDWARDS:  Thank you, Your Honor.  Defense calls

25  Chris Harp.

## C. Harp - Direct Examination (Mr. Edwards)

1    THE COURT:  Mr. Harp, sir, if I could ask you to

2  approach, you're going to pause with Madam Clerk so she can

3  swear you in.  Then we'll ask you to take the witness stand.

4  Thank you.

5    **CHRISTOPHER HARP, DEFENDANT, SWORN**

6    THE CLERK:  Thank you.  Please have a seat at our

7  witness stand.

8    Our next witness is Christopher Harp, H-A-R-P.

9    THE COURT:  All right.  Good morning, sir.  Once

10  you're seated and comfortable, if you wouldn't mind adjusting

11  that mic so everyone can hear you.

12    THE WITNESS:  Yes.

13    THE COURT:  Thank you.

14    Mr. Edwards.

15    MR. EDWARDS:  Thank you.

16    <u>DIRECT EXAMINATION</u>

17  BY MR. EDWARDS:

18  Q.   Chris, will you please introduce yourself to the jury.

19  A.   Yes.  Christopher Aaron Harp.

20  Q.   And how old are you, Chris?

21  A.   I am 39 years old.

22  Q.   Chris, you've sat through this entire trial, so we're not

23  going to rehash everything that's already been done.  Let's

24  just get right to it.

25    The first thing I wanted to talk to you about is what I

**C. Harp - Direct Examination (Mr. Edwards)**

1  think is the Government's Number 2, or the green thumb drive.

2  Do you know where that green thumb drive came from?

3  A.   I saw that there were a couple of homework assignments on

4  it from school.  So it would have come from our family home at

5  the time.

6  Q.   Okay.  And where was that?

7  A.   That was with my mother, my father, and my brother.

8  Q.   Okay.  Did you live here -- where did you live at at that

9  point in time?

10 A.   At that point I -- we lived in Eastgate in Morgantown.

11 Q.   Okay.  And with regard to that thumb drive, there was

12 evidence that there were some homework assignments on it from

13 around 2009?

14 A.   Yeah.

15 Q.   Okay.  Is that the reason why you believe that's where it

16 would have came from?

17 A.   Yes.

18 Q.   Okay.  In regard to that thumb drive, did you ever see any

19 child pornography on it?

20 A.   No.

21 Q.   Did you ever download child pornography on it?

22 A.   No.

23 Q.   All right.  Let's go to the subject computer, which I

24 think is Government's Number 1.  Are you familiar with that

25 Hewlett-Packard computer?

**C. Harp - Direct Examination (Mr. Edwards)**

1   A.   I am.

2   Q.   Okay.  And when did you get that computer?

3   A.   That would have been in the spring of 2011.

4   Q.   Okay.  And when you got the computer, where did you get it

5   from?

6   A.   I bought it from a used computer website.

7   Q.   Okay.  Did you set it up?

8   A.   I did not.

9   Q.   Okay.  Who set it up for you?

10  A.   My dad and my brother helped me set it up.

11  Q.   Okay.  Where were you living in -- during the time frame

12  when you bought that computer?

13  A.   I was still living with my family at that time.

14  Q.   Okay.  Is there any particular reason why your brother and

15  your dad set up the computer for you?

16  A.   I had no idea how to set it up or install the Windows

17  system, so they helped me install it.

18  Q.   Okay.  Did -- to your -- do you have any knowledge about

19  Jeremy's computer abilities?

20  A.   Yes, I do.

21  Q.   Okay.  What knowledge do you have about his computer

22  abilities?

23  A.   Ever since high school he's had the ability to build

24  computers from spare parts laying around and make them work.  I

25  know he's had computer science classes in college as part of

**C. Harp - Direct Examination (Mr. Edwards)**

1    his chemical engineering degree.  I know that as part of his

2    internship he would set up computer connections in laboratories

3    that he was doing research in.  He had the ability to log onto

4    Wi-Fi systems with no ability to get their passwords.  And he

5    had the ability to hack as well.

6    Q.    Let's back up for a second.  With regard to the setup of

7    this computer, what specifically did Jeremy do to help you set

8    that up?

9    A.    He installed the operating system, the Windows system, and

10   he set the password for the computer.

11   Q.    Okay.  Was that a password that you assisted with him in

12   naming?

13   A.    He just picked something that he thought would be easy to

14   remember.

15   Q.    Okay.  To your knowledge, did that password ever change?

16   A.    It has not.

17   Q.    All right.  You were here and heard Mr. Hammer testify

18   with regards to the first evidence of pornography being found

19   on that computer around June of 2012; is that correct?

20   A.    That's correct.

21   Q.    Okay.  Can you tell us what -- let's back up for a second.

22         When did you move out of your parents' home?

23   A.    That would have been in July of 2011.

24   Q.    Okay.  So you were there -- I think they indicated this

25   computer came online in April of 2011.  You lived there for a

**C. Harp - Direct Examination (Mr. Edwards)**

1  couple months, and then you moved.  Where did you go to?

2  A.   At that point I moved out to Maryland to take a job and

3  then worked out there for a few months.  And then in October of

4  2011 I moved near Pittsburgh.

5  Q.   Okay.  So the first date when pornography was found on

6  this computer was in June of 2012.  What was going on in your

7  life in June of 2012?

8  A.   Well, in the end of June of 2012, I met my wife, Amy, at a

9  mutual friend's wedding, and after that started coming back

10  into town nearly every weekend for a few months after that to

11  continue our relationship.

12  Q.   Okay.  And when you came into town, did you travel with

13  your computer?

14  A.   I did.

15  Q.   Where did you stay when you came into town?

16  A.   I would stay at my parents' house, their new house at the

17  time.

18  Q.   Okay.  And how long did that last?  You said for -- how

19  long were you traveling back and forth on the weekends or

20  whenever to come and visit Amy?

21  A.   So for the first few months of our relationship I was

22  traveling back and forth nearly every weekend.  After that it

23  became more sporadic since she would come up to visit me most

24  weekends.

25  Q.   Okay.  And when you traveled, did you typically travel

**C. Harp - Direct Examination (Mr. Edwards)**

1   with your computer?

2   A.   When I came home to stay, yes.

3   Q.   Okay.  And for what reason?

4   A.   Just to have access to email and really just to be able to

5   stay in correspondence with work and things like that.

6   Q.   Okay.  All right.  According to Mr. Hammer's testimony

7   here, the next time that there was child pornography downloaded

8   on the computer after September of 2012 was nine months and

9   11 days later.  That would have been July 12th, 2013.

10       Do you recall what was going on in your world on

11  July 12th, 2013?

12  A.   I couldn't tell you exactly what was happening that day,

13  no.

14  Q.   Okay.  And do you know if you were in town or staying with

15  your parents or have any idea at that point in time?

16  A.   I could have been.  I believe that was a Friday.  So if I

17  was traveling back into town, I would have come in on a Friday

18  and left on a Sunday.

19  Q.   Okay.  When you came in and stayed with your parents, was

20  your brother still living at their residence?

21  A.   Yes, he was.

22  Q.   All right.  So if you came in -- besides yourself -- your

23  brother, your mom, and your dad would have had access to that

24  computer if you left it there at their house; correct?

25  A.   Yes, that's correct.

**C. Harp - Direct Examination (Mr. Edwards)**

1  Q.   Okay.  All right.  Now we're going to move forward to the

2  next time that Mr. Hammer has indicated there was pornography

3  downloaded on the computer.  And that was three years and

4  27 days later, not until July 28th of 2016.  And I believe he

5  testified that there were downloads on July 28th,

6  July 29th, August 3rd, and August 16 of 2016.

7       What was going on at that point in time with you in your

8  life?

9  A.   During that period of time, Amy and I were in the process

10 of moving out of our townhouse into my in-laws' house.

11 Q.   Okay.  How long did you and Amy -- had you and Amy been

12 living in a townhouse before that?

13 A.   Approximately a year.

14 Q.   Okay.  Okay.  And during that time frame, who had access

15 to the computer?

16 A.   Just -- during --

17 Q.   I'm sorry.  I just want to clarify my question.

18      Prior to you moving into your in-laws' home, who would

19 have had access to your computer?

20 A.   Just myself and my wife.

21 Q.   Okay.  So you're moving into your in-laws' house towards

22 the end of July and first part of August.  Who-all assisted

23 with that move?

24 A.   Amy's brother, Robbie, helped us move some of the

25 furniture and other personal belongings of her parents to

**C. Harp - Direct Examination (Mr. Edwards)**

1   storage areas and other areas around their home.  And

2   Jeremy Harp, my brother, helped us move our actual belongings

3   from the townhouse to the -- to our in-laws' house.

4   Q.   How long did that process take?

5   A.   It took a couple of weeks.

6   Q.   Okay.  In that regard, were you also working during that

7   time frame?

8   A.   Yes, I was.

9   Q.   Who were you working for in July and August of 2016?

10  A.   I was working as a safety consultant for the oil and gas

11  field.

12  Q.   Was that something that you -- was that in person?  I

13  mean, were you working remotely, or were you working -- I know

14  this is well before COVID, so I -- but was this a job that you

15  had to attend to or --

16  A.   Yes.  It was on various oil and gas drilling pads

17  throughout mostly Doddridge and Ritchie Counties in

18  West Virginia.

19  Q.   All right.  Let's move again, to one year and eight months

20  and 14 days later.  That would be April 30th, 2018.  And I

21  believe that's when Mr. Hammer testified that was the next time

22  that pornography had been downloaded on the computer.

23        What was going on with you at that point in time?

24  A.   We were in the process of moving all of our belongings

25  into our newly constructed home from my in-laws' home.

**C. Harp - Direct Examination (Mr. Edwards)**

1  Q.   Were you also working during that time frame?

2  A.   Yes, I was.

3  Q.   Okay.  Who-all helped you move out of your in-laws' into

4  your new home?

5  A.   Amy's brother, Robbie, helped us move.  My brother,

6  Jeremy, helped us move.  And we had a couple of guys from our

7  church group come over and help us move as well.

8  Q.   All right.  Let's move forward 11 months and three days,

9  when Mr. Hammer testified that the next download took place.

10  That would be on April 4th, 2019.

11       What were you doing on April 4th, 2019?

12  A.   Well, upon learning of the charge, I looked back at some

13  of my emails and found that I had attended a job interview with

14  Newpark Resources in Pittsburgh that day.

15  Q.   Okay.  Were you employed otherwise?

16  A.   Yes, I was.

17  Q.   Who were you employed with?

18  A.   I was working as a health and safety advisor for Strad.

19  Q.   Okay.  And do you recall, as best you can recall, what

20  your itinerary was that day?

21  A.   I would have left early in the morning, probably around

22  7:00, gone to the office up at Strad to take care of a few

23  things, and then from there continue on to the job interview.

24            MR. EDWARDS:  Your Honor, may I approach the witness?

25            THE COURT:  You may.

**C. Harp - Direct Examination (Mr. Edwards)**

1  BY MR. EDWARDS:

2  Q.   Jeremy [sic], I'm going to show you what's been marked as

3  Defendant's Exhibit 3.  Can you tell me what that document

4  reflects?

5  A.   This is the email chain between myself and the individual

6  that I interviewed with for Newpark.

7  Q.   Okay.  Did you -- does it indicate in there that you sent

8  an email to Mr. Sellers at Newpark?

9  A.   Yes, it does.

10       MR. PERRI:  Objection, Your Honor.  Move to strike.

11  The question called for hearsay as to the content of the

12  message.

13       MR. EDWARDS:  I didn't --

14       THE COURT:  Sustained.  The jury will disregard the

15  last question and answer.

16       MR. EDWARDS:  Okay.

17  BY MR. EDWARDS:

18  Q.   Was this a document that -- or at least initially that you

19  drafted --

20  A.   Yes.

21  Q.   -- and sent?

22  A.   Yes.

23  Q.   Okay.  And did you receive a response?

24  A.   Yes, I did.

25       MR. EDWARDS:  Your Honor, I'd move for the admission

**C. Harp - Direct Examination (Mr. Edwards)**

 1  of Defendant's 3.

 2          THE COURT:  Any objection to Defendant's 3?

 3          MR. PERRI:  Unless it's being admitted for a

 4  non-hearsay purpose, it's hearsay, and we would object, Your

 5  Honor.

 6          THE COURT:  What's the purpose of its admission,

 7  Mr. Edwards?

 8          MR. EDWARDS:  Your Honor, the purpose is just to show

 9  that that's -- to confirm where he was that day.

10          THE COURT:  So the truth of the matter asserted in

11  the communication?

12          MR. EDWARDS:  Well, I guess it's -- to the extent

13  that he's the one who drafted the email, he has personal

14  knowledge of that.  There was a response back, but, I mean, you

15  know, I'll concede that that portion of it is considered

16  hearsay.  But it's not for the truth of the matter asserted,

17  just that he received a response.

18          THE COURT:  Overruled.  Defendant's 3 is hereby

19  admitted.

20      (Defendant's Exhibit 3 received in evidence.)

21          MR. EDWARDS:  Your Honor, may I publish?

22          THE COURT:  You may.

23  BY MR. EDWARDS:

24  Q.   Okay.  And the April 4th, 2019, date, that's the date of

25  the first count charged against you; is that correct?

**C. Harp - Direct Examination (Mr. Edwards)**

1  A.    Yes, that's correct.

2  Q.    Okay.  All right.  On April 4th, 2019, who -- where were

3  you living?

4  A.    I was living at our home at 904 Bloody Run Road.

5  Q.    And at that point in time, who was living with you?

6  A.    My wife, Amy, and our daughter, Adaline.

7  Q.    As you sit here today, do you have any knowledge

8  whatsoever whether your brother was staying with you at that

9  point?

10  A.    I can't say whether he was staying on that day or not,

11  because I wasn't home on that particular day.  It was within

12  the time period that he was staying with us off and on.

13  Q.    Okay.  Let's move forward one year, five months, and

14  13 days, which would be the next time that Mr. Hammer indicated

15  that there was pornography downloaded on this computer.  And

16  that would be September 18th of 2020.

17       Can you tell the jury what was going on with you on

18  September 18th, 2020?

19  A.    Yes.  I was working with my father-in-law, Robert

20  Westwood, for Westwood General Contracting.  And we were doing

21  a gut and remodel of a bedroom and bathroom en suite for

22  Dr. David Fogarty.

23  Q.    And where was that job being performed at?

24  A.    The address was in Bruceton Mills.  Dr. Fogarty's house is

25  right off of the Coopers Rock exit.

**C. Harp - Direct Examination (Mr. Edwards)**

1  Q.    Okay.  This was September 8th, 2020; correct?

2  A.    September 18th, yes.

3  Q.    Eighteenth.  Sorry.  September 18th of 2020.

4        How long had you been working for your father-in-law at

5  that point in time?

6  A.    Roughly a month at that point.

7  Q.    Did you have any other employment as well?

8  A.    I'd just received an offer for a new job earlier that

9  week.

10 Q.    Okay.  And is there a reason why you were still working

11 with your father-in-law if you had gotten an offer for a new

12 job?

13 A.    The new job was a remote job.  They had not sent the

14 equipment to perform that job yet.  And I figured I'd go ahead

15 and finish out the week with him.

16 Q.    Okay.  Do you recall what day of the week

17 September 18th, 2020, was?

18 A.    That was a Friday.

19 Q.    Do you recall what time you-all -- well, let me back up.

20 Generally, what time did you leave in the morning when you were

21 working with your father-in-law?

22 A.    We left between nine and ten in the morning and generally

23 got home between five, six, or later in the evening.

24 Q.    As you sit here today, do you have any reason to think

25 that your workday was different on September 18th of 2020?

**C. Harp - Direct Examination (Mr. Edwards)**

1  A.   No, I don't.

2  Q.   Okay.  All right.  The next date is September 21st,

3  2020, that pornography was alleged -- well, not alleged -- was

4  downloaded.  And we've heard some testimony from your wife

5  regarding the purchase of a vehicle on that morning.

6      Can you tell the jury what you recall about that day?

7  A.   Yes.  We left our house in the morning, dropped our

8  daughter off at school.  We drove down to Dan Cava's in White

9  Hall, checked out a couple of vehicles, test drove a couple,

10 picked the one we wanted, went through the buying process.  And

11 after that was all done, we drove home.

12 Q.   Do you recall about what time you left that morning?

13 A.   Left in the morning probably around 7:30 or so in the

14 morning.

15 Q.   Okay.  Do you recall what time you left -- or generally

16 about what time you left the car dealership that day?

17 A.   Yeah.  It was around noon.

18 Q.   Okay.  Any particular reason why you have that memory that

19 it was around noon?

20 A.   I remember that I didn't want to leave the car lot until

21 we had our insurance in place.  And I had called State Farm in

22 order to get a temporary insurance card.  And they had sent

23 that insurance card over by email.  And that was directly

24 before noon.

25 Q.   And do you recall generally what time you got home that

**C. Harp - Direct Examination (Mr. Edwards)**

1  day?

2  A.   It was around 1:00 in the afternoon.

3  Q.   Okay.  There's -- we've heard testimony -- and you

4  actually said it -- that your brother lived with you and Amy on

5  and off in 2018 and 2019.

6       Is that your recollection as well?

7  A.   Yes, it is.

8  Q.   Was there any type of rhyme or reason about the dates that

9  he would be there or not be there?

10  A.   There was no rhyme or reason to it other than times when

11  we had allowed him to stay.  He would show up randomly at

12  different times, and we'd give him something to eat, give him a

13  place to sleep.  He would not indicate when he was coming,

14  ever, to the house.  He would just kind of show up.  And we'd

15  try to help him out.

16  Q.   Did he have access into your home?

17  A.   Yes, he did.

18  Q.   And how did he access your home?

19  A.   He would have been able to access the home through the

20  garage, punching in a code to bring the garage door up, and

21  enter through the mudroom of the house.

22  Q.   Do you have any knowledge of your brother ever listing

23  your residence there on Bloody Run Road as his residence?

24  A.   Yes, he did.

25  Q.   Okay.  And how do you gain -- how did you gain that

### C. Harp - Direct Examination (Mr. Edwards)

1  knowledge?

2  A.   We began receiving his mail at our address.  It started

3  off with some insurance documents.  After that it progressed to

4  letters from the West Virginia DHHR.  He was attempting to sign

5  up for Medicaid from what I understand.  And we received his

6  personal property tax receipt in the mail as well.

7           MR. EDWARDS:  Your Honor, may I approach?

8           THE COURT:  You may.

9  BY MR. EDWARDS:

10  Q.   Chris, I want to show you what's been marked as

11  Defendant's Exhibit Number 4.  Do you -- can you explain what

12  that document shows?

13  A.   Yes.  This is a personal property tax --

14           MR. PERRI:  Objection, Your Honor.  May we approach?

15           THE COURT:  You may.

16      (The following proceedings were had at the bench, outside

17      the hearing of the jury, with counsel.)

18           THE COURT:  What's the objection, Mr. Perri?

19           MR. PERRI:  I anticipate making an authenticity

20  objection.  I think that this is going to be presented as a

21  public record from the tax office.

22           THE COURT:  Okay.

23           MR. PERRI:  In which case it would satisfy a hearsay

24  objection.  But in order to pass muster for authenticity

25  purposes, it needs to be certified.  I don't think it is.  And

### C. Harp - Direct Examination (Mr. Edwards)

1  I don't think -- I don't think it's relevant.  So we would

2  object on those two bases.

3          THE COURT:  Okay.  Mr. Edwards?

4          MR. EDWARDS:  I think it is a business record, and I

5  think it should be an exception to hearsay.

6          THE COURT:  Well, it strikes me it's being offered

7  for something other than the tax bill that was sent to the

8  Defendant's brother.  It's sent to establish -- or it's being

9  introduced to establish he was receiving mail at the

10  Defendant's house; correct?

11          MR. EDWARDS:  It's showing that he -- yeah, that he

12  at least listed that residence as a residence of his.

13          THE COURT:  Okay.  Understood.  I would overrule it

14  on hearsay grounds and would give a limiting instruction.

15      But how is it authentic- -- how are we going to

16  authenticate it?

17          MR. EDWARDS:  Well, I don't have anything other than

18  that's where we got it.  He's going to testify we -- you know,

19  he got it from the website, from the assessor's office website.

20          THE COURT:  Well, I'd sustain the objection with

21  respect to authentication absent any other foundation.  I don't

22  think that's sufficient under the rule.  But if you can

23  convince me otherwise, I'm happy to reconsider.

24          MR. EDWARDS:  That's fine, Judge.

25          THE COURT:  Okay.  Sustained.

**C. Harp - Direct Examination (Mr. Edwards)**

1              MR. EDWARDS:  Your Honor.

2              THE COURT:  Oh.  Wait.

3          Come back, Mr. Perri.  Mr. Perri.

4              MR. EDWARDS:  Just to be clear, Your Honor, I don't

5    want to --

6              THE COURT:  Yes, sir.

7              MR. EDWARDS:  -- be outside of the Judge here.  It's

8    sustained as to admissibility.  I mean, can I question him any

9    more about it?

10             THE COURT:  Sure.  Yeah.

11             MR. EDWARDS:  Okay.

12             THE COURT:  But the document itself, the objection to

13   the document is sustained.  Yes.

14             MR. EDWARDS:  Okay.

15          (Bench conference concludes.)

16             THE COURT:  All right.  Mr. Edwards.

17             MR. EDWARDS:  Thank you.

18   BY MR. EDWARDS:

19   Q.   Mr. Harp, with regard to the document you have in front of

20   you -- I think it's 4, Defendant's 4 -- what is your

21   understanding as to what that document shows?

22   A.   I understand that this shows Jeremy Harp as the owner of

23   an 09 Yama XV25 543 property.

24             MR. PERRI:  Objection, Your Honor.  He's reading the

25   document.

**C. Harp - Direct Examination (Mr. Edwards)**

1          THE COURT:  Sustained.

2      The jury will disregard the witness's last answer.

3  BY MR. EDWARDS:

4  Q.    Okay.  I don't want you to read the document.  What's your

5  understanding of what that document is?

6  A.    It's a personal property tax receipt.

7  Q.    And who is the personal property tax receipt for?

8  A.    Jeremy Harp.

9  Q.    And where does it show that that personal property receipt

10  was sent?

11  A.    My --

12          THE COURT:  One second, sir.

13      I think we need to reword that question based on the

14  Court's ruling with respect to the exhibit itself.

15          MR. EDWARDS:  I got you.

16  BY MR. EDWARDS:

17  Q.    With regard to that exhibit -- let me rephrase that.

18      Was that a document that was sent to your home?

19  A.    The document was sent to my home.

20  Q.    Okay.  Thank you.

21      All right.  Chris, did you ever download or view child

22  pornography?

23  A.    No.  What was shown yesterday to all of us was one of the

24  most vulgar and disturbing things I've ever seen.  And if I had

25  any idea this was around my home or my family, this would be a

## C. Harp - Direct Examination (Mr. Edwards)

1  much different situation.

2  Q.   Was there ever -- or did you ever see any indication that

3  there was, in fact, pornography on that computer?

4  A.   No.  Never.

5  Q.   And Chris, to be fair, did you ever see your brother

6  downloading or viewing child pornography?

7  A.   No, I didn't.

8  Q.   Chris, let's go through again briefly the dates that these

9  downloads took place.

10      The computer became operational on April 23rd, 2011.  Is

11  that your understanding?

12  A.   That is my understanding.

13  Q.   Okay.  And there was a one year and one month and nine

14  days, until June of 2012, before the first report of

15  pornography being downloaded.  You were living, I think you

16  testified, for a period of time in Maryland and then went to

17  Pittsburgh.  Is that correct?

18  A.   That is correct.

19  Q.   Okay.  And in 2012 is when you met Amy and started coming

20  down and visiting her.

21  A.   Yes, that's correct.

22  Q.   Okay.  And you did that for a couple months?

23  A.   Yes.

24  Q.   Okay.  And then, thereafter, where did you go between

25  September and -- September of 2012 and July of 2013?  Where

**C. Harp - Direct Examination (Mr. Edwards)**

1  were you living?

2  A.    Still living in Pittsburgh.

3  Q.    Okay.  And still coming down occasionally?

4  A.    Periodically, yeah.

5  Q.    Okay.  As -- did you come down as often as you had when

6  you first started dating Amy?

7  A.    No.  She started coming up to visit me at that time more

8  often.  Much more often.

9  Q.    Okay.  Between July of 2013 and when you moved into your

10 parents' -- I'm sorry -- your in-laws' home in July of 2016,

11 where were you living?

12 A.    Amy and I moved in together in September of 2014.  And

13 from there we had an apartment and then moved into our

14 townhouse in 2015.

15 Q.    Okay.  Was that here in Mon County?

16 A.    In Mon County, yes.

17 Q.    Okay.  Who had access to your apartment and your townhome?

18 A.    Just myself and my wife.

19 Q.    So in July of 2016 and through August you're moving into

20 your in-laws'.  And you were there for a little over a year?

21 A.    Yeah.  That sounds correct.

22 Q.    Okay.  So until around April of 2018.  And that's when you

23 moved into -- let me back up for a little bit for context.

24         So it was July 28th, July 29th, August 3rd, and

25 August 16th that the pornography was downloaded again on your

**C. Harp - Direct Examination (Mr. Edwards)**

1  computer.  And that was a time frame when you were moving?

2  A.   Yes, it was.

3  Q.   Okay.  And then we go one year, eight months, and 14 days,

4  until April of 2018.  What was going on at that point in time

5  when the next download took place?

6  A.   At that point we were in the process --

7       MR. PERRI:  Objection, Your Honor.  I think this

8  is -- these are the same questions that were asked earlier.  So

9  the objection would be cumulative.

10      THE COURT:  Overruled.

11      THE WITNESS:  At that point we were in the process of

12  moving from my in-laws' house into our newly constructed home.

13  BY MR. EDWARDS:

14  Q.   And then we go another 11 months and three days, until

15  April 4th, 2019, which is the download as to Count One.  And

16  you've already testified what was going on then; correct?

17  A.   Yes.

18  Q.   Okay.  And then the following -- we have another year and

19  five months and 13 days until the September 18th date.  And

20  you've already covered that topic as well; correct?

21  A.   Yes.

22  Q.   Mr. Harp, do you know where your brother is living at now?

23  A.   If I told you he was living in the state of Kentucky, that

24  would be as close as I can understand where he's living now.

25  Q.   And what makes you think that that's where he's living at

## C. Harp - Cross-Examination (Mr. Perri)

1   now?

2   A.   He is still homeless as far as I know.  I know he shows up

3   randomly to what's now my dad's home down there.  But beyond

4   that, I couldn't tell you where he is or how to contact him.

5   Q.   Did you ever confront him with regard to your suspicions

6   about his involvement in this case?

7   A.   Yes, I did.

8   Q.   When was that?

9   A.   That was at the end of January at -- or right directly

10  after our mother's funeral.

11  Q.   January of this year?

12  A.   Yes.

13  Q.   What was his reaction?

14  A.   His reaction was to essentially blow up, leave, and I did

15  not see him again and did not know where he went at that point.

16  Q.   Have you had any interaction with him since?

17  A.   No, I have not.

18           MR. EDWARDS:  Thank you, Mr. Harp.  That's all the

19  questions I have.

20           THE COURT:  Cross, Mr. Perri?

21                    CROSS-EXAMINATION

22  BY MR. PERRI:

23  Q.   Good morning, Mr. Harp.

24  A.   Good morning, sir.

25  Q.   So who lives in your dad's house now?

**C. Harp - Cross-Examination (Mr. Perri)**

1  A.   As far as I know, just my dad.

2  Q.   How long have you known that your dad lived there?

3  A.   A couple of years.

4  Q.   Okay.  How long have you known that your brother was

5  staying there?

6  A.   Same time.  Couple of years.

7  Q.   Couple years?  All right.  I'll come back to that.

8       So, all right.  We heard yesterday from your wife about

9  all the people that have had access to your house over -- you

10  know, in that time frame -- in the time frame we were talking

11  about in this case.

12       She mentioned your father-in-law; right?

13  A.   Are you referring to access?

14  Q.   Uh-huh.

15  A.   To which home?

16  Q.   To your house at 904.

17  A.   At 904 Bloody Run Road.

18  Q.   Yes.  Right?

19  A.   You're asking if my father-in-law had access to that home?

20  Q.   Yes.

21  A.   He did.

22  Q.   Okay.  Just trying to keep track of all these people.

23       How about your brother-in-law?  Did he have access?

24  A.   My brother-in-law Robbie Westwood?

25  Q.   Yes.

## C. Harp - Cross-Examination (Mr. Perri)

1  A.   He did.

2  Q.   Okay.  And how about your sister-in-law, Becky?  Did she?

3  A.   Rebecca Bodkin.

4  Q.   Yes.

5  A.   She did, yes.

6  Q.   Okay.  How about your neighbor, Beverly, that testified

7  yesterday?

8  A.   Beverly Sheets.  Yes, she did.

9  Q.   Okay.  So how about your mother-in-law?  Did she have

10 access?

11 A.   Brenda Westwood?

12 Q.   Yes.

13 A.   Yes, she did.

14 Q.   Do you have another mother-in-law?

15 A.   I do not.

16 Q.   Okay.

17 A.   No.  I'm just making sure that we're on the same page,

18 sir.

19 Q.   Okay.  Good.  Thank you.  We're talking about one and the

20 same mother-in-law.

21      Did you -- let me ask you about each one of these people.

22 Do you suspect that your mother-in-law is responsible for the

23 child porn being on your computer?

24 A.   I do not.

25 Q.   Do you suspect your father-in-law of being responsible?

**C. Harp - Cross-Examination (Mr. Perri)**

1    A.    I do not.

2    Q.    Do you suspect your sister-in-law of being responsible?

3    A.    I do not suspect her, no.

4    Q.    Do you suspect your brother-in-law of being responsible?

5    A.    He could not have been.  My brother-in-law Robbie Westwood

6    is who you're referring to; correct?

7    Q.    Yes.

8    A.    I don't believe he would have, no.

9    Q.    How about Beverly?  Do you suspect her?

10   A.    I do not suspect her, no.

11   Q.    Okay.  What about your brother, Jeremy?  Do you suspect

12   him?

13   A.    I do.

14   Q.    Okay.  All right.  So now that we've narrowed it down a

15   little bit, to be clear, you believe that your brother put

16   child porn on your computer.  Is that what you're saying today?

17   A.    I am saying that, yes.

18   Q.    Okay.  You're seriously trying to blame this on your

19   brother.

20   A.    I'm not trying to blame anyone.

21   Q.    Okay.  All right.  How old is your brother?

22   A.    He is 32.

23   Q.    And let's see here.  So this -- according to the

24   witnesses, this evidence of child pornography on your computer

25   goes back to 2013.  How old would he have been then?

## C. Harp - Cross-Examination (Mr. Perri)

1  A.    2012.

2  Q.    2012?  How old would Jeremy have been in 2012?

3  A.    He would have been 20 years old at that point.

4  Q.    Twenty?  And he did the install on your computer; right?

5  A.    That is correct.

6  Q.    And that was in 2011, you said?

7  A.    2011, yes.

8  Q.    How old would he have been there?

9  A.    Subtract one year.  So 19 years old.

10 Q.    Okay.  When did you -- when did you come to suspect your

11 brother?

12 A.    When all the facts of this case were provided in

13 discovery.

14 Q.    Okay.  But according to Amy, you guys have had problems

15 and concerns about him having access to the house.

16 A.    Yep.  That is correct.

17 Q.    Did Amy tell the FBI about Jeremy?

18        MR. EDWARDS:  Objection, Your Honor.  I mean, how --

19 I mean, I think we need a little bit more foundation about how

20 would my client know what Amy said one way or the other.

21        THE COURT:  Overruled.

22        THE WITNESS:  Sorry.  Could you repeat the question,

23 sir?

24 BY MR. PERRI:

25 Q.    Did Amy tell the FBI about Jeremy?

**C. Harp - Cross-Examination (Mr. Perri)**

1   A.    Why would that be her responsibility?

2           THE COURT:  Sir, you just need to answer the

3   questions, please.

4           THE WITNESS:  She did not.

5   BY MR. PERRI:

6   Q.    Were other members of your family aware that you were

7   being accused and that your house had been searched?

8   A.    The immediate family in the area, yes.

9   Q.    And some of these family members, to be fair, are the same

10  family members that observed Jeremy around your house.

11  A.    That is correct, yes.

12  Q.    Did any of these family members or friends ever think,

13  "Maybe we should tell the FBI about Jeremy"?

14  A.    No, nobody ever contacted them.  And they would not have

15  had any reason at that time to suspect him of downloading child

16  pornography.

17  Q.    Because they weren't concerned; right?

18  A.    They were concerned about him being around the house, not

19  about that specific subject.

20  Q.    And none of them saw him in the house.

21  A.    Well, they weren't always there.  But nobody could say

22  that he was within the house or outside -- nobody could say he

23  was inside of the house, only around the house.

24  Q.    And you would agree with me that if he was seen in the

25  driveway, that doesn't mean he's in your loft searching for

**C. Harp - Cross-Examination (Mr. Perri)**

1  child porn on your computer.

2  A.   I guess you could make that point, yes.

3  Q.   And if he's seen on the -- sitting out on the hill, I

4  don't know, eating a popsicle, that doesn't mean that he was in

5  your house downloading porn in the loft on your computer.

6  A.   That statement is true.  We can't say that for an exact

7  fact.

8  Q.   And even if, by some chance, he was the person responsible

9  for moving around your wife's jewelry boxes, that doesn't mean

10  that he's into child porn.

11  A.   Well, he was in her underwear drawer as well, and he was

12  searching our home.

13  Q.   So you take it necessarily from that that he's responsible

14  for using the peer-to-peer network to search out child

15  pornography and download it on your computer.

16  A.   I can only say that he had access to our home throughout

17  the entire period and it's very possible that he could have.

18  Q.   All things are possible.

19  A.   Is that a question?

20  Q.   Yes.

21  A.   Maybe I should say probable instead.

22  Q.   Oh, you think it's probable.  What's your basis for

23  thinking it's probable?

24  A.   Would you like me to go through the whole explanation

25  or...

## C. Harp - Cross-Examination (Mr. Perri)

1  Q.    Anything new other than what you've already said?

2  A.    Hm.  So what I can say is that at times and places where

3  he would not have had access to the home or the computer, there

4  is no evidence of child pornography.  But in places and times

5  when he did have access to the house and the computer, there

6  was.

7  Q.    Okay.  We'll talk about that.  So you were here in the

8  courtroom.  You heard about all the different days that Agent

9  Ryan, using the CPS system, observed that your computer, this

10  computer, United States Exhibit Number 1 -- and we know it's

11  your computer because the GUIDs match up; right?

12  A.    So you'll have to rephrase that statement a little bit.

13  It's that computer.

14  Q.    Okay.  Let me finish the question, then.

15      And all the different days that Agent Ryan, using the CPS

16  system, observed that your computer was offering to share many,

17  many, many child pornographic files, videos, you don't have any

18  reason to dispute that; right?

19  A.    No, I do not.

20  Q.    Okay.  And in fact, we have admitted into evidence United

21  States Exhibit 9A, 9B, 9C of the files that your computer was

22  offering to share on the specific dates of the indictment.  You

23  don't dispute that; right?

24  A.    On the dates of the indictment, I do not dispute that.

25  Q.    Which are just some of the many dates; right?

**C. Harp - Cross-Examination (Mr. Perri)**

1  A.   You'll have to be more specific.  Which dates are those,
2  sir?
3  Q.   Well, all the many days that Agent Ryan testified about.
4  A.   For me to give you an answer, you have to be specific
5  about the dates.
6  Q.   Because you remember those dates?
7  A.   You'll have to be very specific about those dates if
8  you're trying to ask me --
9  Q.   Let me --
10  A.   -- to remember.
11  Q.   Let me ask you --
12       THE COURT:  Sir.  Sir.  Mr. Harp, please just answer
13  the questions that are posed to you, sir.
14       THE WITNESS:  Okay.
15       THE COURT:  Thank you.
16       THE WITNESS:  So repeat your question.
17  BY MR. PERRI:
18  Q.   Do you remember specific days in April of 2019 and
19  September of 2020?
20  A.   Only because I've found clues about what was happening
21  those days.  The 18th and the 21st were pretty clear to me.
22  Because there very soon after, the search warrant was executed.
23  Q.   Okay.  So Agent Ryan testified about December 14th,
24  2018.  Do you specifically remember that day?
25  A.   No, I do not.

## C. Harp - Cross-Examination (Mr. Perri)

1  Q.   Agent Ryan testified about March 28th, 2019.  Do you
2  specifically -- I'm sorry.  The first date was December 14th,
3  2018.  If I misspoke, I apologize.
4       And Agent Ryan testified about March 28th, 2019.  Do you
5  remember that day?
6  A.   March 28th of 2019.  No, I don't have any specific
7  recollection of that date.
8  Q.   That's a long time ago; right?  To be fair.
9  A.   Four years, five years, yes.
10 Q.   How about October 11th, 2019?  Do you have a specific
11 recollection about that date?
12 A.   I do, actually.
13 Q.   You do.
14 A.   Uh-huh.
15 Q.   Okay.  What is it?
16 A.   My wife and I took a trip out to -- out to her friend's
17 house in Virginia.  We remember that because we took a couple
18 of pictures from that weekend.
19 Q.   Have you done some research to try and reconstruct where
20 you were on different days?  And the only reason I ask is
21 because I have trouble remembering what I had for lunch two
22 days ago.  So that's why I'm asking you.
23 A.   Yeah.  That's what we did a couple specific days, only if
24 we -- only if we could find something that we had been doing on
25 those days.

## C. Harp - Cross-Examination (Mr. Perri)

1   Q.   So you did research into your schedules and, you know,

2   planners and calendars and all that stuff?

3   A.   Yes.

4   Q.   Okay.  To try and reconstruct where you might have been

5   and what you might have been doing.

6   A.   That is correct.

7   Q.   But you don't have -- absent that, you don't have memories

8   that you associate with, you know, "Oh, yes.  As I sit here

9   right now, yes, that was a Tuesday," not without checking your

10  calendar and planner; right?

11  A.   Upon checking the calendars and the photos and the emails

12  on a few of the days jogged our memory and we were able to

13  reconstruct what we were doing on those days --

14  Q.   Okay.

15  A.   -- in some cases.

16  Q.   How about --

17       "In some cases."

18       How about November 22nd, 2019?  Agent Ryan testified

19  about that day.

20  A.   He test- --

21  Q.   Do you have specific recollection about that day?

22  A.   He testified about November 22nd, 2019?

23  Q.   Yes.

24  A.   I remember reading in the -- well, I guess I can't say

25  that.  But the Government said that there was no child porn

**C. Harp - Cross-Examination (Mr. Perri)**

1  downloaded from January until -- of the next year until October
2  of the year before.
3          MR. PERRI:  Your Honor, may the witness be instructed
4  to answer the question?
5          THE COURT:  Yes.
6       Please answer the questions posed to you.
7          THE WITNESS:  Yeah.  I --
8          THE COURT:  Mr. Harp -- one second, sir -- your
9  counsel will have a chance to ask any additional questions he
10  believes are appropriate on redirect.  Your role at this point
11  is to answer the questions posed to you.  Thank you.
12      Mr. Perri --
13          THE WITNESS:  Yes, sir.
14          THE COURT:  -- please repeat your question.
15          MR. PERRI:  Yes, Your Honor.
16  BY MR. PERRI:
17  Q.   Mr. Harp, do you have a specific recollection of what was
18  going on on the specific date of November 22nd, 2019?
19  A.   On November 22nd of 2019, I was traveling for work that
20  week.
21  Q.   And you knew that from looking at the calendar.
22  A.   Hotel receipts.
23  Q.   Oh.  So you -- you even went through your receipts from
24  that time period.
25  A.   Yes.

**C. Harp - Cross-Examination (Mr. Perri)**

1  Q.    Okay.  And how about June 23rd of 2020?

2  A.    I don't have any specific recollection of that date.

3  Q.    How about July 16th of 2020?

4  A.    None of that date either.

5  Q.    How about September 16th of 2020?

6  A.    That was the same week I was working with my father-in-law

7  up at Dr. Fogarty's house.

8  Q.    Okay.  But you don't have any reason to dispute Agent

9  Ryan's testimony about the activity that your computer was

10 engaged in on those days.

11 A.    No, I don't have any reason to dispute that.

12 Q.    All right.  And you do understand that a computer

13 participating in the peer-to-peer network has to be connected

14 to the internet in order to do its thing.  You understand that;

15 right?

16 A.    I do understand, yes.

17 Q.    It doesn't just -- the computer doesn't just turn on by

18 itself in the closet and start downloading porn.  You

19 understand that; right?

20 A.    I do understand that computers do have to be connected to

21 the internet.

22 Q.    In order to share files, it has to use the internet.  Do

23 you understand that also?

24 A.    I am aware of that, yes.

25 Q.    And do you understand also, according to Agent Ryan's

**C. Harp - Cross-Examination (Mr. Perri)**

1  testimony, that those files actually had to be present on your

2  computer in order to be available for sharing?  You understand

3  that.

4  A.    I think that's pretty clear.

5  Q.    And you don't dispute that testimony; right?

6  A.    No, sir, I do not.

7  Q.    And you heard the testimony from Agent Ryan about the

8  Shareaza software and the features of the Shareaza software;

9  right?

10  A.    Some of them, yes.

11  Q.    Okay.  And you heard Agent Ryan say that you don't need to

12  be home when a download occurs because of the scheduler

13  function.  You heard him say that; right?

14  A.    I did hear him say that, yes.

15  Q.    Do you dispute that?

16  A.    No.  If he says that's a feature of the software, then we

17  have no reason to doubt him.

18  Q.    So essentially the user can schedule that download to

19  occur whenever they want to.  Fair?  Is that a fair statement?

20  A.    That is a fair statement, yes.

21  Q.    And you have no reason to dispute the testimony about the

22  restore points showing what was on your computer, this

23  computer -- I don't want there to be any confusion.  I want to

24  be precise.  This computer.  You have no reason to dispute the

25  testimony about the restore points showing what was on your

**C. Harp - Cross-Examination (Mr. Perri)**

1  computer on certain dates.

2  A.    I'll take the testimony of the expert, yes.

3  Q.    And you heard Agent Hammer -- Forensic Analyst Hammer

4  testify about a lot of dates.

5  A.    I'm sorry?

6  Q.    He testified about a lot of restore points, didn't he?

7  A.    Yes, he did.

8  Q.    Not just the dates of the indictment, but a lot of

9  different dates.

10  A.    Yes, he did.

11  Q.    And do you dispute that -- the testimony that files with

12  child pornography suggestive titles had been downloaded onto

13  your thumb drive at around the same time as personal stuff like

14  work documents and homework documents?  Do you dispute that?

15  A.    I have no reason to dispute that.  Homework documents get

16  copied onto flash drives all the time, and I'm no different.

17  Q.    Do you have any reason to question Examiner Hammer's

18  testimony that there was activity related to child pornography

19  going on in that laptop going back all the way to 2013?  Do you

20  dispute that?

21  A.    2012, actually.

22  Q.    Okay.

23  A.    Yes, I do not dispute that.

24  Q.    All right.  So you testified and Amy testified that

25  sometimes Jeremy would show up and he would stay at your house.

### C. Harp - Cross-Examination (Mr. Perri)

1  A.   Yes, that is correct.

2  Q.   When was he last at your house?

3  A.   He was last at our house sometime in 2020 that we knew of.

4  Q.   When?

5  A.   Later in the year.  Probably summertime that we knew of.

6  Q.   Maybe once in the summer of 2020?

7  A.   Once, twice.  A couple of times.  We couldn't tell when he

8  was going to show up or not.

9  Q.   Okay.  So I don't want to mischaracterize you.  Would it

10 be fair to say that he was at your house once or twice in the

11 summer of 2020?

12 A.   That we knew of, yes.

13 Q.   Okay.  And that would be the last time.

14 A.   That we knew of, yes.

15 Q.   All right.  And by summer you mean what?  Like June?

16 July?  August?

17 A.   Late August, I believe --

18 Q.   Okay.

19 A.   -- may have been the latest time he was there that we knew

20 of.

21 Q.   So the last time Jeremy was at your house that you know of

22 was August of 2020.

23      How many times did he stay with you in 2019, Mr. Harp?

24 A.   In 2019?  Are you talking about days or just instances of

25 him staying?

**C. Harp - Cross-Examination (Mr. Perri)**

1    Q.    Well, if a stay is an overnight --

2    A.    Yeah.

3    Q.    -- how many times did he stay?

4    A.    In 2019?

5    Q.    Yes.

6    A.    Probably a dozen or -- dozen or so.

7    Q.    A dozen times.  Why do you think it was a dozen times?

8    A.    I mean, it averaged about, I'd say, once or twice a month.

9    Q.    Okay.  And how about 2018?  How many times did he stay

10   with you?

11   A.    Calendar year of 2018?

12   Q.    Yes.

13   A.    So from the time that we began moving in April, he

14   probably stayed at the house seven, eight, nine times, maybe.

15   Q.    All right.  Were you completely moved into the new house

16   by July?

17   A.    By July of 2018, we were completely moved in.

18   Q.    Okay.  And in fact, is it true, as Amy testified, that

19   your brother was forbidden from staying at your house in

20   September of 2020?

21   A.    He was not forbidden from coming to the house.  We did not

22   allow him to stay overnight at the house.

23   Q.    So he could come and visit.  He could see you.  You could

24   talk to him.  But he wasn't allowed to stay; correct?

25   A.    That's correct.  We did not allow him to stay at the house

## C. Harp - Cross-Examination (Mr. Perri)

1  by himself.

2  Q.   All right.  So was he staying at your house on

3  April 4th, 2019?

4  A.   I couldn't say whether he was staying or not.  Because I

5  wasn't home most of that day, I couldn't say whether he was

6  staying or not.  But it was within the time frame that he was

7  staying at the house with us.

8  Q.   And you remember that.  You remember a specific month five

9  years ago.

10  A.   Within the time frame of 2018-2019.

11  Q.   You -- are you just speaking in generalities about how

12  often he would stay?

13  A.   Could you rephrase that?

14  Q.   Are you -- are you just speaking in generalities about

15  your understanding of how often he would stay?  Or do you have

16  specific recollections?

17  A.   I do not have specific recollections of specific days.  It

18  was within the time frame that he was staying with us on and

19  off.

20  Q.   Okay.

21  A.   And I should say housesitting for us as well.

22  Q.   Sometimes he would stay for the purpose of housesitting

23  for you guys?

24  A.   Yes.

25  Q.   So you bought this laptop in 2011?

## C. Harp - Cross-Examination (Mr. Perri)

1    A.    That is correct.

2    Q.    And what were you using this laptop for in 2018?  Do you

3    remember?

4    A.    I did not use it in 2018 for anything specific.

5    Q.    What about 2019?  What were you using it for?

6    A.    Again, nothing specific.  I did not access the laptop very

7    much during that time period.

8    Q.    What about 2020?  What were you using it for?

9    A.    Nothing in 2020.

10   Q.    And you kept it in the loft?

11   A.    I didn't keep it any specific place.  Amy was using it

12   more often than I was at the time, and she kept it wherever --

13   wherever she wanted, basically.

14   Q.    How many computers did you have in your house, Mr. Harp?

15   A.    Nine, maybe.  Nine or ten.

16   Q.    Nine or ten.

17        And is your brother -- he's very savvy when it comes to

18   computers; right?

19   A.    Yes, he is.

20   Q.    Okay.  Would you agree with me that this is an outdated

21   computer?

22   A.    I couldn't make that assertion.

23   Q.    Do you dispute Forensic Examiner Hammer's testimony that

24   the operating system is outdated?

25   A.    I have no reason to dispute that.

**C. Harp - Cross-Examination (Mr. Perri)**

1  Q.   And you did have another computer in your loft; right?

2  A.   A work computer, yes.

3  Q.   In fact, there were computers all over the house; right?

4  A.   Yes, that's correct.

5  Q.   And iPads too; right?

6  A.   I believe there was one iPad.

7  Q.   So of all the computers in the house, your brother chose

8  to use the most outdated one.  Is that what you're suggesting?

9  A.   You would have to ask him that.

10 Q.   So when is the last time you talked to Jeremy?

11 A.   It was directly after our mother's funeral at the end of

12 January of this year.

13 Q.   And you went out to Kentucky for that?

14 A.   That is correct.

15 Q.   And your dad still lives in that house?

16 A.   He does.

17 Q.   Does your brother know that you're here in federal court

18 accusing him of a federal crime?

19 A.   No, he does not.

20 Q.   Didn't feel the need to share that with him?

21 A.   I have no way of contacting him.

22 Q.   Well, you know that he stays with your dad; right?

23 A.   I know that he shows up on occasion there.

24 Q.   Fair to think that maybe your dad could get ahold of him?

25 A.   No, that's not a fair statement.

**C. Harp - Cross-Examination (Mr. Perri)**

1  Q.   Well, if he shows up occasionally, that would be an

2  opportunity for your dad to talk to him, would it not?

3  A.   Whenever my dad attempts to speak with him about anything

4  negative or anything that he's doing, he leaves.

5  Q.   In which case he can't stay the night; right?

6  A.   That's correct.  He doesn't let him stay there.

7  Q.   And nobody gave the FBI your dad's contact information.

8  A.   I don't think they would have.

9  Q.   Have you ever used a peer-to-peer network, Mr. Harp?

10  A.   No, I've not.

11  Q.   Let me ask you about an email address that they found.

12  Charp51@yahoo.com, is that yours?

13  A.   I use that email address, and my wife does as well.

14  Q.   Did you use that email address to log in right after a

15  child porn video was downloaded on your system?

16  A.   I can't say that I logged into an email at any particular

17  time.

18  Q.   How long have you had that email address?

19  A.   I couldn't say a number of years.

20  Q.   Years; right?  Plural.  Years, plural; right?

21  A.   Uh-huh.  Number of years.

22  Q.   Did you have Wi-Fi at your house back in the dates that

23  are pertinent to this case?

24  A.   Wireless?

25  Q.   Yes.

**C. Harp - Cross-Examination (Mr. Perri)**

1  A.   Yes.

2  Q.   Was it password-protected?

3  A.   You'll have to be more specific.  We lived in several

4  places.

5  Q.   How about at your in-laws' house?  Was the Wi-Fi

6  password-protected?

7  A.   I couldn't say for sure.

8  Q.   How about at 904?  Was it password-protected?

9  A.   It did have the default password that came set up from

10 Comcast.

11 Q.   You didn't change it to personalize it?

12 A.   No.

13 Q.   Okay.  The laptop also had a password?

14 A.   It did, yes.

15 Q.   Your house locked when you're not home?

16 A.   Our front door and our back door are locked.  We leave our

17 mudroom open.

18 Q.   You leave the -- you have a door open to your house when

19 you're --

20 A.   Unlocked, yes.

21 Q.   -- when you're not home.

22 A.   That is correct.

23 Q.   Hm.  Did Amy say anything about that?

24 A.   I can't testify to what my wife said.

25 Q.   Well, you were here.  Did she -- do you recall her saying

**C. Harp - Cross-Examination (Mr. Perri)**

1  anything about that?

2  A.   I mean, I do recall her saying that, yeah, our house was

3  left unlocked.

4  Q.   All right.  Maybe I missed it.  If I did, I apologize.

5       But at some point Amy became concerned about your brother

6  coming to the house and possibly getting in.

7  A.   She was concerned about him staying at the house by

8  himself.

9  Q.   Well, it was more than that.  She thought that her stuff

10  had been rummaged through; right?

11  A.   That is correct.

12  Q.   And she got to the point where she flat-out refused to

13  have him stay there in September of 2020; right?

14  A.   To have him stay there by himself.  That is correct.

15  Q.   So when did you change the locks?

16  A.   We never changed the locks.

17  Q.   Well, when did you change the code for the garage door?

18  A.   We never changed the garage door codes.

19  Q.   Well, when did you start locking the mudroom door?

20  A.   It's unlocked right now.

21  Q.   Well, then it must not have been much of a concern; right?

22  A.   We were not much concerned with him coming back to the

23  house since he disappeared.

24  Q.   I want to ask you about some of the personal stuff that

25  was found on your computer.  I asked you about the thumb drive.

**C. Harp - Cross-Examination (Mr. Perri)**

1  I want to ask you about the laptop now, United States Exhibit
2  Number 1.
3      Would it surprise you to hear that Examiner Hammer found
4  on that laptop pictures of you going back to 2019?
5  A.    That would not be surprising.
6  Q.    How about pictures of you going back to 2009?
7  A.    2009?  I would not be surprised by that.
8  Q.    How about videos of -- involving you, personal videos,
9  going back to 2009?
10  A.    No, I wouldn't be surprised by that.
11  Q.    And in fact, hundreds of personal pictures and videos on
12  the same computer that was being used for child porn activity.
13  Would that surprise you?
14  A.    That I had personal documents on a computer that I owned?
15  Q.    The question is would it surprise you that there were
16  hundreds of pictures and videos personal to you on that
17  computer?
18  A.    Nope, that would not surprise me.
19  Q.    Would it surprise you to hear that there were
20  administrative files containing your name?
21  A.    What's an administrator file?
22  Q.    Administrative files.
23  A.    What's an administrative file?
24  Q.    I -- I get to ask the questions.
25          THE COURT:  Mr. Perri, he asked for a clarification

**C. Harp - Cross-Examination (Mr. Perri)**

1  of the question.  Don't argue with the witness.  Repeat your
2  question.
3  BY MR. PERRI:
4  Q.   Would it surprise you to know that there were files
5  related to the use of the computer that had your name in them?
6  A.   You'll still have to clarify, sir.  I'm not sure what you
7  mean.
8  Q.   Okay.  Do you not want to answer that question, Mr. Harp?
9  A.   I'll answer the question.  I need to know what the
10 question is and what it means.
11 Q.   Well, I don't have Examiner Hammer's skill to phrase the
12 question to your liking.  So I'll move to the next one.
13      Would it surprise you to know that there was a Skype
14 account on that computer with your name in it?
15 A.   No, that wouldn't surprise me.
16 Q.   Would it surprise you to know that there were email
17 addresses connected to your time at WVU as a student?
18 A.   Email addresses?
19 Q.   Yes.
20 A.   No, that wouldn't surprise me.
21 Q.   Would it surprise you to know that there were cover
22 letters you wrote for job applications on that computer?
23 A.   Nope, that would not surprise you.
24 Q.   How about expense reports written by you?
25 A.   Expense reports?

**C. Harp - Cross-Examination (Mr. Perri)**

1  Q.   Yes.

2  A.   No, that would not surprise me.

3  Q.   How about time sheets written by you?

4  A.   Time sheets for work?

5  Q.   Yes.

6  A.   Nope, that would not surprise me.

7  Q.   How about copies of your resume?  Would that surprise you?

8  A.   There are probably a couple copies of the resume on there.

9  Old resumes, I should add.

10 Q.   Would it surprise you to hear that Examiner Hammer found

11 transcripts requests for you from your university?

12 A.   No.  I'm sure there was that on there.

13 Q.   And wedding pictures as well?

14 A.   Yes, those were on there as well.

15 Q.   So this was a computer that you were using at least to

16 store and retrieve personal files.

17 A.   On occasion, yes.

18 Q.   And you never noticed any indication of child porn

19 activity.

20 A.   No, I never noticed any indication of that at all.

21 Q.   Activity that went back all the way to 2012.

22 A.   No.  Never.

23 Q.   Does your brother have a computer?

24 A.   I couldn't testify to that at the moment.

25 Q.   But you don't have a problem testifying that he

**C. Harp - Cross-Examination (Mr. Perri)**

1   deliberately comes to your house just to use your computer to

2   download porn.

3   A.    You'll have to rephrase that question.

4   Q.    Are you suggesting that he comes to your house to use your

5   computer -- you're his brother -- to use your computer to

6   implicate you in a federal crime?

7   A.    I'm suggesting that simply he's the only one who had

8   consistent access to it throughout the years and could have

9   pulled it off.

10  Q.    Does your brother hate you?

11  A.    I'm not sure what my brother's feelings are towards me

12  right now because of our confrontation.

13  Q.    He could -- if -- he's very savvy; right?

14  A.    With computer?

15  Q.    Yes.

16  A.    Computers?  Yes.

17  Q.    This is a guy who could use any computer he wants.  He

18  could -- right?  According to your testimony.

19  A.    You would have to ask him that.

20  Q.    And yet he comes to your house surreptitiously and gets on

21  your computer and uses the peer-to-peer network routinely and

22  accesses child pornography.

23  A.    Is that --

24  Q.    Is that what you're suggesting?

25  A.    Sorry.  I was -- is that a question or a statement?

**C. Harp - Cross-Examination (Mr. Perri)**

1          THE COURT:  Sir, answer the question.

2          THE WITNESS:  As I testified before, he's the only

3    one who had consistent access to the computer throughout the

4    years and then the home in the recent years.

5    BY MR. PERRI:

6    Q.    So your whole accusation against your brother is based on

7    the mere fact that he had access to your house.

8    A.    To the house and the computer.

9    Q.    And he picks this computer, the oldest one in the house,

10   to do it.

11   A.    You would have to ask him why he chose that.

12   Q.    So let's just talk about the car dealership thing.  You

13   left the house early in the morning that day?

14   A.    That is correct.

15   Q.    And you claim that you left the car dealership at noon; is

16   that correct?

17   A.    That is correct.

18   Q.    And you claim that you got home at 1:00.

19   A.    That is correct.

20   Q.    And did you go with Amy to the doctor's appointment?

21   A.    I did not.

22   Q.    So she dropped you off, essentially; right?

23   A.    Yeah.  We got back home, and she dropped me off at the

24   house.  Correct.

25   Q.    Okay.  So, all right.  When you got home, who was there?

**C. Harp - Cross-Examination (Mr. Perri)**

1  A.   I did not know who would have been in the house in the
2  time we was gone.
3  Q.   No, that's not what I asked you.
4  A.   I'm sorry, sir.  Ask it again.
5  Q.   When you got home, who was there?
6  A.   When we got home, I did not see anyone in the house.
7  Q.   To your knowledge, was your brother visiting that day?
8  A.   I couldn't say for certain, because I was not home to tell
9  if he was there or not.
10  Q.   So you left at 7:30 in the morning, and you got home at
11  1:00 -- or you got home, yeah, at 1:00, by your testimony; is
12  that right?
13  A.   As I've said, yes.
14  Q.   So are you suggesting, then, that your brother swooped
15  into town, got into your house, surfed porn on your computer,
16  and then hightailed it out before you got back?
17  A.   I can only say that we were not there at the home to
18  either confirm or deny his presence there.
19  Q.   So when you got home on September 21st, 2020, one of the
20  dates in the indictment, nobody was home.
21  A.   At the time that we got home, we did not see anybody
22  there.
23  Q.   And you didn't find food on the kitchen table, he had
24  helped himself to a sandwich, anything like that?
25  A.   I wouldn't have noticed such a thing, but I didn't observe

**C. Harp - Cross-Examination (Mr. Perri)**

1  that.

2  Q.   You didn't find the bed unmade like maybe he had taken a

3  nap?

4  A.   I don't recall going into a bedroom that day.

5  Q.   Didn't find the bathroom wet like maybe he helped himself

6  to a shower?

7  A.   I couldn't say that I observed that, no.

8  Q.   Didn't find a note saying, "Hey, Chris.  Stopped by to say

9  hi, but you're not home"?  Didn't find that?

10  A.   Not that he would have left something like that.

11  Q.   You understand what a -- you have some computer

12  understanding; right, Mr. Harp?  For your job?

13  A.   Very little.

14  Q.   I'm sorry?

15  A.   Very little.

16  Q.   Very little.  Okay.

17        MR. PERRI:  One moment, Your Honor.

18     (Pause in proceedings.)

19  BY MR. PERRI:

20  Q.   Mr. Harp, isn't it true that over quite a long period of

21  time you were searching out files of child pornography,

22  watching the videos, and then deleting them?  Is that correct?

23  A.   No, that's not correct.

24        MR. PERRI:  Thank you, Your Honor.  I have no further

25  questions.

1          THE COURT:  Understood.

2          MR. EDWARDS:  I have nothing.

3          THE COURT:  Any redirect?

4          MR. EDWARDS:  No, Your Honor.

5          THE COURT:  No?  Mr. Harp, sir, you can go ahead and

6    step down.  Thank you.

7       Defense may call its next witness.

8          MR. EDWARDS:  Defense rests, Your Honor.

9          THE COURT:  All right.  Understood.  Ladies and

10   gentlemen, the defense has rested.  So we're at a good spot to

11   take our morning break before we transition to the next phase

12   of this trial.  We'll go ahead and take ten minutes at this

13   point.

14      Please continue to refrain from discussing the case with

15   anyone, and please continue to refrain from any independent

16   investigation or research efforts about the case.  We'll see

17   you all in a few moments.  Thank you very much.

18      (Jury retired from the courtroom at 11:21 AM.)

19          THE COURT:  All right.  Thank you, everyone.  Please

20   be seated.

21      Ms. Russell has been kind enough to hand the parties -- or

22   hand counsel, I should say, the revised version of our jury

23   charge.

24      For reference, from the last version you had yesterday,

25   lines 21 through 23 on page 8 and lines 1 through 6 on page 9

1 describing the Defendant's Fifth Amendment rights have been
2 stricken, as has the word "alternatively" in the parentheticals
3 on line 7 of page 9.  And also the title of that section of the
4 charge on page 8, at line 20, has been changed to read
5 "Defendant's Testimony."
6      I'll give you a chance to look at that to confirm.  But
7 anything other than what we talked about thus far from the
8 Government?  Objections or concerns with the charge?
9           MR. PERRI:  Yes, Your Honor.  With respect to the
10 elements for the receipt charge and the possession charge, when
11 we -- when we made the change yesterday, it was my
12 understanding that we were going to take out number four that
13 says "the defendant acted knowingly" in favor of putting the
14 word "knowingly" in number one.  But I see both here.  I
15 think --
16           THE COURT:  That wasn't my understanding that we
17 were -- that those were alternatives.  Is that the -- a request
18 to remove element number four?
19           MR. PERRI:  That is a request, Your Honor.  And if I
20 may just explain.  I think having it twice, that redundancy,
21 possibly suggests to the jury that that element is to have
22 double weight.  And that's not what the law is.
23      I think in number four when you say "the defendant acted
24 knowingly," the act, of course, is receipt.  And that's exactly
25 what number one says, that the defendant knowingly received.

1  So you're essentially stating it twice.  And I'm concerned that
2  that redundancy would lead the jury to think that the Court
3  intends that word to have some kind of extra emphasis, when
4  really it's just one of the elements and all the elements are
5  of equal weight.
6          THE COURT:  Any objection to removing the fourth
7  element?  And let me clarify the record.  Hold on.
8      So it would be line 11 on page 15 and line also 11 on
9  page 16 with respect to Counts One through Three and Count
10  Four.
11          MR. EDWARDS:  Your Honor, yes, I would object to
12  that.  Because I read it -- and that's the reason I had brought
13  the concern initially, was under line 11 on page 15 "the
14  defendant acted knowingly."  And then it goes down to line 13,
15  "The Government is required to prove defendant knew that the
16  visual depiction portrayed a person" -- more of it seemed like
17  that it was almost kind of like that -- those two went hand in
18  hand, not that it was emphasizing "knowingly" beyond, I guess,
19  you know -- I guess saying that it has double weight.  It was
20  more of descriptive.
21          MR. PERRI:  The requirement that the defendant know a
22  visual depiction portrays a person under the age of 12 --
23          THE COURT:  And that's lines 13 through 15 on
24  page 15.
25          MR. PERRI:  Yes.

1      -- that's an -- that's an additional knowledge

2  requirement, Your Honor.

3           THE COURT:  Right.  And the same is spelled out on

4  lines 13 through 15 of page 16 with respect to Count Four.

5           MR. PERRI:  So I've never seen it with "knowingly"

6  twice, Your Honor.  And I don't have a model jury instructions

7  copy with me today, because I just saw that this morning.  So I

8  don't have that to show the Court.  But I'm pretty sure that

9  it's not stated twice like it is here.  And I apologize.  I

10 would have brought it up yesterday except I misunderstood what

11 the change was going to be.

12          THE COURT:  The knowing requirement is imposed upon

13 the receipt and possession under the statute.  Is there any

14 dispute as to that, Mr. Edwards?

15          MR. EDWARDS:  No, Your Honor.

16          THE COURT:  Mr. Perri?

17          MR. PERRI:  No, Your Honor.

18          THE COURT:  All right.  With that, we will remove

19 line 11 on page 15 and line 11 on page 16.

20     The first element for both charges -- the receipt charge

21 indicates the requirement the Government prove beyond a

22 reasonable doubt that the defendant knowingly received.  And

23 then the possession count, starting on line 26 on page 15,

24 makes it clear the Government must prove beyond a reasonable

25 doubt that the defendant knowingly possessed or accessed with

1    the intent to view.

2        And I think it's a valid concern Mr. Perri raises that

3    including the word "knowingly" twice would possibly lead to

4    jury confusion, again, just based on recent experience being in

5    the weeds, different statutes.  But there's been a clear

6    renewed focus from the Supreme Court and also the Fourth

7    Circuit with appropriate, I'll say, distribution of

8    requirements the Government prove a knowing action or

9    intentional action specifically in the elements.  And I think

10   including the "knowing" requirement that the burden rests upon

11   the Government for in elements -- in the first element, for

12   both charges at stake here, is more clear.  And I think the

13   fourth element is really repetitive.  So we'll take out the

14   fourth element on line 11, page 15, and line 11 again on

15   page 16.

16       Objection noted.

17       Anything else from the Government with respect to the

18   charge?

19           MR. PERRI:  No.  Thank you, Your Honor.

20           THE COURT:  Okay.  Mr. Edwards, sir, anything else

21   with the charge?

22           MR. EDWARDS:  Nothing with the charge, Your Honor.

23           THE COURT:  Okay.  So we will make those changes as

24   indicated and remove the line numbers from the charge and also

25   the version, which is in the heading on the first page.

1          And then were there any issues with the verdict form from

2    the Government?

3                    MS. CONKLIN:  I didn't -- was it emailed or...

4                    THE COURT:  Yes.  It was sent last week.

5                    MS. CONKLIN:  Oh, I looked at it last week.  I don't

6    have any issues.

7                    THE COURT:  Okay.  Mr. Edwards?

8                    MR. EDWARDS:  No issues, Your Honor.

9                    THE COURT:  Okay.  So we'll roll with that.

10         It would be my proposal, recognizing that contingent upon

11   the jury's verdict with Counts One through Four that we will

12   have to offer instructions and a special verdict for the --

13   verdict form to them on forfeiture, that after the jury is

14   excused to begin their deliberations we'll talk about those

15   instructions and that verdict form at that point in time.

16         Any rebuttal evidence from the Government?

17                   MR. PERRI:  Your Honor, may we have a few minutes to

18   consider that possibility?

19                   THE COURT:  You can have a couple, yes.

20         Anything else other than that question we need to take up

21   at this point?

22                   MR. PERRI:  No.  Thank you, Your Honor.

23                   THE COURT:  Okay.  Mr. Edwards?

24                   MR. EDWARDS:  Well, I guess I'll have to wait to see

25   what they do, Your Honor, before I renew my Rule 29 motion.

1          THE COURT:  Yes.  Obvi- --

2      Yes.  At the conclusion of all evidence, we'll take that

3  up.

4      Okay.  So we'll revise the charge as indicated and get the

5  hamsters in the printer working on that.  Y'all can have a few

6  moments to make a decision with respect to any rebuttal.  And

7  we'll be at ease otherwise.  Thank you.

8      (Recess taken from 11:30 to 11:48 AM.)

9          THE COURT:  Thank you, everyone.  Please be seated.

10      All right.  The Government made a decision on any

11  rebuttal?

12          MS. CONKLIN:  Yes, Your Honor.  We will not be

13  presenting a rebuttal case.

14          THE COURT:  I'm sorry?

15          MS. CONKLIN:  We will not be presenting a rebuttal

16  case.

17          THE COURT:  Not?  Okay.

18      Mr. Edwards, any motions?

19          MR. EDWARDS:  Yes, Your Honor.  At this point in time

20  I would renew my motion under Rule 29 for a judgment of

21  acquittal for the same reasons as set forth prior.

22          THE COURT:  All right.  Understood.

23      The Court would deny that motion as well for similar

24  reasons.  I think there are factual disputes; there are

25  certainly factual defenses that are at issue here.  But that,

1    under Rule 29, is compulsion to submit each of the counts here
2    to the jury for their consideration.  The Court is required to
3    view all the evidence in the light most favorable to the
4    Government and take all reasonable inferences therefrom in the
5    light most favorable to the Government and both with respect
6    to, what I'll say collectively, the alibi defense and also the
7    factual defense advanced that other individuals may have been
8    responsible for the presence of the child pornography on
9    Government's Exhibit Number 1.
10        There's certainly something for counsel to discuss in
11   closing arguments.  But given that there is something to
12   discuss, the Court does conclude there is a sufficient factual
13   basis for a reasonable fact finder on each of the four counts
14   in the indictment.  So that motion will be denied.
15        Any other motions from the defense?
16            MR. EDWARDS:  No, Your Honor.
17            THE COURT:  Okay.  We do have the stipulations still.
18   Should I read those at this point?  Should we just tell the
19   jury they're coming back?
20            MR. PERRI:  My experience, Your Honor, is usually the
21   Court reads them.  And candidly, I forgot.  I'm glad the Court
22   brought that up.
23            THE COURT:  That's what I'm here for, Mr. Perri.  A
24   backstop, if you will.
25        Any objection to that, Mr. Edwards?

1          MR. EDWARDS:  No, Your Honor.  Actually, I thought

2    most of the stipulations just dealt with authenticity.  They've

3    all been admitted anyway, but...

4          MS. CONKLIN:  Yeah.

5          THE COURT:  Yeah, all the exhibits have been

6    admitted.  There is the one stipulation, I believe, with

7    respect to -- it's Government 8 on interstate commerce.  But

8    I -- they have been reached.  And I think all the exhibits

9    covered have been admitted.

10       But again, any objection to the Court reviewing those

11   stipulations with the jury?

12         MR. EDWARDS:  No, Your Honor.  That's fine.

13         THE COURT:  Okay.  We'll do that, then.

14       So my proposed plan would be to have the jury come back

15   in.  I'll tell -- I'll read the stipulations to them.  Then

16   we're going to proceed immediately to jury instructions.  While

17   we're doing that, we're going to order lunch for the jurors so

18   that that will be available to them at the conclusion of the

19   jury charge.  We'll take an abbreviated lunch break so that

20   they can grab something to eat and then proceed a little more

21   efficiently into closing arguments.  But that will also give

22   you all a few moments to get your thoughts together for

23   closings during that lunch break.

24       Any objection to that plan from the Government?

25         MR. PERRI:  No, Your Honor.

1          MS. CONKLIN:  No, Your Honor, not from the

2   Government.

3          THE COURT:  Mr. Edwards?

4          MR. EDWARDS:  No, Your Honor.

5          THE COURT:  Okay.  Well, if I could ask, do you want

6   to throw copies of the charge on the jurors' chairs, please.

7   Thank you so much.

8       (Pause in proceedings.)

9          THE COURT:  Okay.  With that, can we have our jurors,

10  please, sir.  Thank you.

11      (Jury returned to the courtroom at 11:54 AM.)

12          THE COURT:  Thank you very much, ladies and

13  gentlemen.  Please take your seats.  Thank you.

14      Ladies and gentlemen, just to give you a road map of where

15  we are now, with the defense resting, you've heard all the

16  evidence in the case.  So we are ready to proceed to the next

17  phase of the trial, which are the Court's instructions of law

18  to you that we're going to review in a moment.  A hard copy of

19  those you probably have discovered in your chairs.

20      What my plan is is to review that jury charge, and then

21  we're going to take a lunch break from your perspective after I

22  do that.  Lunch will be waiting for you, when we're done with

23  the jury charge, back in the jury room.  And we'll take a

24  shorter lunch break than usual and then proceed to closing

25  arguments from there.

1    Before we do formally transition to the next phase of the

2    Court's instructions of law, there are some stipulations the

3    parties have reached in this case.  They primarily deal with

4    evidentiary issues with some of the exhibits that have already

5    been admitted.  But just so that you're aware of them.  And

6    these stipulations will be brought back to the jury room, along

7    with the exhibits, for your review.

8        But the parties have stipulated to the authenticity, chain

9    of custody, and admissibility of both Government's Exhibit 1,

10   the HP laptop computer, model Pavilion dv5; and Government

11   Exhibit 2, the PNY Attache green USB media drive.  They are the

12   items recovered from the residence at 904 Bloody Run Road on

13   September 25, 2020, during the search.

14       The parties have also stipulated to the authenticity,

15   chain of custody, and admissibility of Government's Exhibit 4,

16   which are the Comcast subscriber records; that they are a true

17   and accurate copy and that those records are admissible

18   pursuant to Federal Rule of Evidence 8036 as business records.

19   Specifically, the parties stipulate that the records were made

20   at or near the time by an individual with knowledge, that the

21   records were kept in the course of regularly conducted business

22   activity, and that they were made in the regular practice of

23   business.

24       The parties have also stipulated to the authenticity,

25   chain of custody, and admissibility of Government Exhibit 5, a

1  true and accurate copy of Comcast subscriber records, again, as
2  business records admissible and kept in the regular course of
3  business.
4      The parties have stipulated to the authenticity, chain of
5  custody, and admissibility of Government Composite Exhibit 6
6  and 7, which are photographs of the residence at 904 Bloody Run
7  Road, and the search of that residence on September 25, 2020.
8  The parties stipulate that Exhibit 6 and 7 fairly and
9  accurately depict the residence at the time of the search, as
10  well as items located and documented during the search, and
11  that Exhibits 6 and 7 are admissible.
12      The parties have stipulated to the authenticity, chain of
13  custody, and admissibility of Government's Composite Exhibit 8,
14  which consists of true and accurate copies of videos found on
15  the HP laptop computer, model Pavilion dv5 hard drive, and the
16  corresponding clips fairly and accurately represent a portion
17  of each video.
18      The parties have stipulated to the authenticity, chain of
19  custody, and admissibility of Government's Exhibit 9, which
20  consists of true and accurate copies of Child Protective
21  System, CPS, reports.  Those records are admissible pursuant to
22  Federal Rule of Evidence 8036 as business records, as I
23  previously described.
24      And lastly, the parties have stipulated that the videos in
25  Government's Exhibit 8 have traveled in or affect interstate or

1   foreign commerce by any means, including by computer.

2        All right.  And again, ladies and gentlemen, these

3   stipulations will be brought back to the jury room with the

4   exhibits, which you may review and consider during your

5   deliberations.

6        With that, we're ready to transition to the instructions

7   of law that you'll need to consult and use during your

8   deliberations in this case.  Again, there's a hard copy in your

9   chair for you to review.  We realize that some folks process

10  better reading as opposed to listening.  So you're, of course,

11  welcome to follow along as we go.

12       Now that you have heard the evidence, ladies and

13  gentlemen, it is my job to tell you about the laws that apply

14  to this case.  As jurors, you have two jobs.  First, you must

15  determine from the evidence what the facts of this case are.

16  Second, you must apply the rules of law, which I will give you,

17  to those facts in order to determine whether Christopher Harp

18  is guilty or not guilty with respect to the crimes charged in

19  the indictment.

20       I will be sending a copy of these instructions to the jury

21  room with you.  However, you are not to single out any one

22  instruction as stating the law, but must consider the

23  instructions as a whole.

24       I have no right to tell the jury what the facts -- what

25  facts -- excuse me -- have been established by the evidence.

1   In turn, the jury has no right to make decisions as to what the
2   law is that applies to this trial.

3        There are two types of evidence which are generally
4   presented during a trial: direct evidence and circumstantial
5   evidence.  Direct evidence is the testimony of a person who
6   asserts or claims to have actual knowledge of a fact, such as
7   an eyewitness.  Circumstantial evidence is proof of a chain of
8   facts and circumstances indicating the existence of some
9   further fact which, in a criminal case, may bear on the guilt
10  or innocence of a defendant.

11       As a general rule, the law makes no distinction between
12  the weight to be given to either direct or circumstantial
13  evidence, but simply requires that, before convicting an
14  accused, the jury be satisfied of the accused's guilt beyond a
15  reasonable doubt from all the evidence in the case.
16  Furthermore, no greater degree of certainty is required of
17  circumstantial evidence than is required of direct evidence.

18       Inferences are deductions or conclusions that reason and
19  common sense lead you to draw based on the facts that have been
20  established by the evidence in the case.  Common sense is no
21  substitute for evidence, but common sense should be used by you
22  to evaluate what reasonably may be inferred from circumstantial
23  evidence.  Therefore, you are permitted to use your common
24  sense in evaluating all of the evidence, including
25  circumstantial evidence, that the Government has presented to

1   you in an attempt to prove beyond a reasonable doubt the guilt

2   of Christopher Harp.

3        The evidence in this case consists of the sworn testimony

4   of all witnesses, regardless of who may have called them; all

5   exhibits received in evidence, regardless of who may have

6   produced them; and all facts that were admitted.

7        The questions, statements, and arguments of counsel are

8   not evidence in the case.

9        Any evidence as to which an objection was sustained by the

10  Court and any evidence ordered stricken by the Court must be

11  entirely disregarded or considered only for the limited

12  purposes for which the evidence was admitted.  This includes

13  any hearsay objections overruled because the testimony was not

14  offered for the truth of the matter asserted.  Such evidence

15  may only be considered for the stated purpose of its admission.

16       Anything you may have seen or heard outside of the

17  courtroom is not evidence and must be entirely disregarded.

18       You are to consider only the evidence in this case.  But

19  in your consideration of the evidence, you are not limited to

20  the mere statements of the witnesses.  In other words, you are

21  not limited solely to what you have seen and heard as the

22  witnesses testified.  You are permitted to draw, from the facts

23  that you find have been proven, such reasonable inferences as

24  you feel are justified in light of your experience.

25       Neither by these instructions nor by any ruling that I

1    have made have I meant to indicate any opinion as to the facts

2    of this trial.  The true facts of this trial are for you, the

3    jury, to decide.

4        You, as jurors, are the sole judges of the credibility of

5    the witnesses and the weight their testimony deserves.  You are

6    free to believe all, a portion, or none of a witness's

7    testimony.

8        You should carefully scrutinize all of the testimony

9    given, the circumstances under which each witness has

10   testified, and every matter in evidence that tends to show

11   whether a witness is worthy of belief.  Consider each witness's

12   intelligence, motive, and state of mind, as well as his or her

13   demeanor and manner while on the stand.  Consider the witness's

14   ability to observe the matters as to which he or she has

15   testified and whether he or she impresses you as having an

16   accurate recollection of these matters.  Consider also any

17   relation each witness may bear to either side of the case, the

18   manner in which each witness might be affected by the verdict,

19   and the extent to which, if at all, each witness's testimony is

20   either supported or contradicted by the evidence in the case.

21       Inconsistencies or discrepancies in the testimony of any

22   witness or between the testimony of different witnesses may or

23   may not cause you, the jury, to discredit such testimony.  Two

24   or more persons witnessing an incident or a transaction may see

25   or hear it differently.  Innocent misrecollection, like failure

1  of recollection, is not an uncommon experience.  In weighing

2  the effect of a discrepancy, always consider whether it

3  pertains to a matter of importance or an unimportant detail and

4  whether the discrepancy results from innocent error or

5  intentional falsehood.

6      The testimony of a witness may be discredited or impeached

7  by showing that the witness previously made statements that are

8  inconsistent with the witness's present testimony.  The earlier

9  contradictory statements are admissible only to impeach the

10 credibility of the witness and not to establish the truth of

11 these statements.  It is the province of the jury to determine

12 the credibility, if any, to be given the testimony of a witness

13 who has been impeached.

14     If you believe that any person testifying in this trial

15 has not told the truth, you may believe such parts of his or

16 her testimony as you believe to be true and reject such parts

17 as you believe to be false.  The jury's duty is to determine

18 from all the evidence presented and all the circumstances

19 surrounding this trial which witnesses have testified

20 truthfully and which ones, if any, have testified falsely.

21     Certainly, this Court does not mean to imply that any

22 witness who has testified before you has testified falsely or

23 untruthfully.  All of the witnesses may have been giving you

24 their very best judgment and honest opinion as to those matters

25 to which they have testified.

1        You are not required to accept testimony, even though the

2    testimony is uncontradicted and the witness is not impeached.

3    You may decide, because of the witness's bearing and demeanor

4    or because of the inherent improbability of his or her

5    testimony or for other reasons sufficient to you, that such

6    testimony is not worthy of belief.

7        You, the jury, will have to determine which testimony is

8    more satisfactory to you.  Naturally, you may take into

9    consideration the opportunity of each witness to observe and to

10   know the facts concerning which his or her testimony was given.

11       During the course of this trial, you have heard the

12   testimony of people employed by the Government, including law

13   enforcement agents.  Such witnesses do not stand in any higher

14   station in the community than other persons, and their

15   testimony is not entitled to any greater weight than that given

16   to other witnesses.

17       A law enforcement agent who takes the witness stand

18   subjects his or her testimony to the same examination and the

19   same tests that any other witness does.  In considering the

20   testimony of a law enforcement agent, you, the jury, should

21   recall his or her demeanor on the stand, his or her manner of

22   testifying, and the substance of his or her testimony and then

23   weigh and balance it just as carefully as you would the

24   testimony of any other witness.

25       Your decision on the facts of this case should not be

1  determined by the number of witnesses testifying for or against

2  a party.  You should consider all of the facts and

3  circumstances in evidence to determine which of the witnesses

4  you choose to believe or not believe.  You may find that the

5  testimony of a smaller number of witnesses on one side is more

6  credible than the testimony of a greater number of witnesses on

7  the other side.

8      The rules of evidence ordinarily do not permit witnesses

9  to testify as to opinions or conclusions.  An exception to this

10 rule exists as to those whom we call expert witnesses.  Expert

11 witnesses are witnesses who, by education and experience, have

12 become an expert in some art, science, profession, or calling,

13 and who may state their opinions as to relevant and material

14 matters in which they profess to be expert, and who may also

15 state the reasons for their opinion.

16     When a party wishes to call an expert witness, the judge

17 must first determine as a matter of law whether that person

18 qualifies as an expert in the matters about which he or she is

19 to testify.  If the expert is allowed to testify, it is then up

20 to you, the jury, to determine what weight or value to give the

21 expert testimony itself.

22     In weighing an expert's testimony, you may consider the

23 expert's qualifications, opinions, reasons for testifying, as

24 well as all the other considerations that ordinarily apply when

25 you are deciding whether to believe a witness.  You may give

the expert testimony whatever weight, if any, you find it
deserves in light of all the evidence in this case.  You should
not, however, accept a witness's testimony merely because he or
she is an expert, nor should you substitute it for your own
reason, judgment, and common sense.  If you should decide that
the opinion of an expert witness is not based upon sufficient
education and experience, or if you should conclude that the
reasons given in support of the opinion are not sound, or if
you feel that it is outweighed by other evidence, you may
disregard the opinion entirely.  The determination of the facts
in this case rests solely with you.

You have heard the testimony of the Defendant, Christopher
Harp.  You should judge the testimony of the Defendant in the
same manner as you judge the testimony of any other witness.

As I earlier indicated to you, an indictment is but a
formal method of accusing a defendant of a crime.  It is not
evidence of any kind against the defendant and does not create
any presumption or permit any inference of guilt.  It is merely
the formal means by which the Government accuses an individual
of a crime in order to bring that individual to trial.  The
defendant has answered the charges in this trial by pleading
not guilty, and you must not be prejudiced against the
defendant because an indictment has been filed.

In resolving the issues before you, you must keep in mind
that, under the law of the United States, a defendant is

1   presumed to be innocent, and this presumption of innocence goes
2   with the defendant at every stage of the trial.  Thus, a
3   defendant, although accused, begins the trial with no evidence
4   against him.  The presumption of innocence alone is sufficient
5   to acquit a defendant unless you are satisfied beyond a
6   reasonable doubt of the defendant's guilt after careful and
7   impartial consideration of all the evidence in the case.
8        In this case, as in every criminal case, the burden of
9   proof is upon the Government to establish, first, the fact that
10  the crimes charged were committed; and second, that the
11  defendant on trial is guilty of the commission of the
12  particular crimes with which he is charged in the indictment
13  beyond a reasonable doubt.  This burden never shifts to the
14  defendant.  It remains upon the Government throughout the
15  trial.
16       If you find there is a conflict in the evidence on a fact
17  or circumstance tending to establish the guilt or innocence of
18  the defendant, a part of which is in favor of the theory of the
19  Government and a part of which is in favor of the theory of the
20  defendant, and the jury should entertain a reasonable doubt as
21  to which is true, then it is your -- then it is the duty of the
22  jury in arriving at your verdict to adopt the evidence, theory,
23  and conclusion most favorable to the defendant.
24       You have heard evidence that the defendant may have
25  previously committed other acts which may constitute receipt of

1   child pornography.  The defendant is not charged with these

2   other offenses.  You may consider this evidence only if you

3   unanimously find it is more likely true than not true.  You

4   decide that by considering all the evidence and deciding what

5   evidence is more believable.  This is a lower standard than

6   proof beyond a reasonable doubt.

7       If you find that these offenses have not been proved, you

8   must disregard them.  If you find that these defenses [sic]

9   have been proved, you may consider them to help you decide any

10  matter to which they are relevant.  You should give them the

11  weight and value you believe they are entitled to receive.  You

12  may consider the evidence of such other acts for its tendency,

13  if any, to show the defendant's propensity to engage in the

14  acts charged in the indictment, to determine the defendant's

15  interest -- I'm sorry -- intent, to determine the identity of

16  the person who committed the acts charged in the indictment, to

17  determine the defendant's opportunity to commit the acts

18  charged in the indictment, and to rebut the contention of the

19  defendant that his participation in the offenses charged in the

20  indictment was the result of accident, mistake, or to rebut the

21  issue of the defendant's alibi.

22      Remember, the defendant is on trial only for the crimes

23  charged in the indictment.  You may not convict a person simply

24  because you believe he may have committed similar acts in the

25  past.  Bear in mind at all times the Government has the burden

1  of proving that the defendant committed each of the elements of

2  the offenses charged in the indictment.

3      You may have viewed some evidence in this case that you

4  may find personally offensive.  Even though this evidence may

5  offend you, you cannot let the subject matter or the nature of

6  the evidence itself influence your decision.  Finding the

7  evidence distasteful is no substitute for proof beyond a

8  reasonable doubt as to all the elements of the offenses charged

9  in the indictment.

10      It is not required that the Government prove guilt beyond

11  all possible doubt.  The test is one of reasonable doubt.  A

12  reasonable doubt means in law just what the words imply, a

13  doubt based upon reason and common sense.  The meaning of

14  reasonable doubt is self-evident.  Therefore, the Court will

15  not attempt to further define the term.

16      You will note that the indictment charges that the

17  offenses were committed on or about a certain date.  The proof

18  need not establish with certainty the exact date of the alleged

19  offense.  It is sufficient if the evidence in the case

20  establishes beyond a reasonable doubt that the offense was

21  committed on a date reasonably near the date alleged.

22      The indictment in this case charges the Defendant,

23  Christopher Harp, with the following offenses:  Count One of

24  the indictment charges that on or about April 4, 2019, in

25  Monongalia County, in the Northern District of West Virginia,

1  Defendant Christopher Harp did unlawfully and knowingly receive
2  child pornography as defined in Title 18, United States Code,
3  Section 2256(8)(A), that had been shipped or transported in or
4  affecting interstate commerce by any means, including by
5  computer, in violation of Title 18, United States Code, Section
6  2252A(a)(2)(A) and 2252A(b)(1).

7      Count Two of the indictment charges that on or about
8  September 18, 2020, in Monongalia County, in the Northern
9  District of West Virginia, Defendant Christopher Harp did
10 unlawfully and knowingly receive child pornography as defined
11 in Title 18, United States Code, Section 2256(8)(A), that had
12 been shipped or transported in or affecting interstate commerce
13 by any means, including by computer, in violation of Title 18,
14 United States Code, Sections 2252A(a)(2)(A) and 2252A(b)(1).

15     Count Three of the indictment charges that on or about
16 September 21, 2020, in Monongalia County, in the Northern
17 District of West Virginia, Defendant Christopher Harp did
18 unlawfully and knowingly receive child pornography as defined
19 in Title 18, United States Code, Section 2256(8)(A), that had
20 been shipped or transported in or affecting interstate commerce
21 by any means, including by computer, in violation of Title 18,
22 United States Code, Sections 2252A(a)(2)(A) and 2252A(b)(1).

23     Count Four of the indictment charges that on or about
24 September 25, 2020, in Monongalia County, in the Northern
25 District of West Virginia, Defendant Christopher Harp did

1    knowingly possess or access with intent to view matter that
2    contained an image of child pornography as defined in Title 18,
3    United States Code, Section 2256(8), which had been transported
4    in interstate and foreign commerce by computer and that was
5    produced using material that had been and transported in
6    interstate and foreign commerce by computer, and that was
7    produced using material that had been and transported in
8    interstate and foreign commerce by computer, and which involved
9    a prepubescent minor and a minor who had not attained 12 years
10   of age, in violation of Title 18, United States Code, Sections
11   2252A(a)(5)(B) and 2252A(b)(2).

12        The Defendant, Christopher Harp, is charged in Counts One
13   through Three of the indictment with receipt of child
14   pornography, in violation of Title 18, United States Code,
15   Sections 2252A(a)(2)(A) and 2252A(b)(1).  Title 18, U.S.C.,
16   Section 2252A(a)(2) makes it a crime to transport in interstate
17   commerce, receive or distribute, sell or possess with intent to
18   sell child pornography.

19        For you to find the defendant guilty, the Government must
20   prove each of the following elements beyond a reasonable doubt:
21   that the defendant knowingly received any child pornography, or
22   any other material that contained child pornography, using any
23   means or facility of interstate or foreign commerce or that has
24   been mailed or has been shipped or transported in or affecting
25   interstate or foreign commerce by any means, including by

1    computer.

2        The Government is required to prove that the defendant

3    knew that the visual depictive -- the visual depiction

4    portrayed a person under the age of 18 and that the minor was

5    engaged in sexually explicit conduct.

6        The Defendant, Christopher Harp, is charged in Count Four

7    of the indictment with possession of child pornography, in

8    violation of Title 18, U.S.C., Sections 2252A(a)(5)(B) and

9    2252A(b)(2).  Title 18, U.S.C., Section 2252A(a)(5)(B) makes it

10   a crime to transport in interstate commerce, receive or

11   distribute, sell or possess with intent to sell child

12   pornography.

13       For you to find the defendant guilty, the Government must

14   prove each of the following beyond a reasonable doubt: that the

15   defendant knowingly possessed or accessed with intent to view a

16   computer disk or any other material that contained an image of

17   child pornography that had been mailed or shipped or

18   transported using any means or facility of interstate or

19   foreign commerce or in or affecting interstate or foreign

20   commerce by any means, including by computer, or was produced

21   using materials that had been mailed or shipped or transported

22   in or affecting interstate or foreign commerce by any means,

23   including by computer, which involved a prepubescent minor and

24   a minor who had not attained age 12 -- or attained 12 years of

25   age.

1    The Government is required to prove that the defendant

2    knew that the visual depiction portrayed a person under the age

3    of 12 and that the minor was engaged in sexually explicit

4    conduct.

5    I will now define certain terms relevant to the charges

6    set forth in the indictment.  You should apply these

7    definitions as you deliberate on the evidence and seek to reach

8    a verdict.  If I do not further define words or terms, you

9    should apply their ordinary, everyday meanings.

10    "Child pornography" means any visual depiction, including

11    any photograph, film video, picture, or computer or

12    computer-generated image or picture, whether made or produced

13    by electronic, mechanical, or other means, of sexually explicit

14    conduct where the production of such visual depiction involves

15    the use of a minor engaging in sexually explicit conduct; such

16    visual depiction is a digital image, computer image, or

17    computer-generated image that is, or is indistinguishable from,

18    that of a minor engaging in sexually explicit conduct; or such

19    visual depiction has been created, adapted, or modified to

20    appear that an identifiable minor is engaging in sexually

21    explicit conduct.

22    "Computer" means any electronic, magnetic, optical,

23    electrochemical, or other high-speed data processing device

24    performing logical, arithmetic, or storage functions, and

25    includes any data storage facility or communications facility

1   directly related to or operating in conjunction with such

2   device.

3        "Foreign commerce" includes commerce with a foreign

4   country.

5        "Graphic" means that a viewer can observe any part of the

6   genitals or pubic area of any depicted persons or animal during

7   any part of the time that the sexually explicit conduct is

8   being depicted.

9        "Interstate commerce" includes commerce between one state,

10  territory, possession, or the District of Columbia and another

11  state, territory, possession, or the District of Columbia.

12       Transmission of photographs, images, or videos by means of

13  the internet constitutes transportation in interstate commerce.

14  The internet and a computer with internet access are considered

15  to be facilities of interstate commerce.

16       To act "knowingly" means to do an act voluntarily and

17  intentionally and not because of mistake or accident or other

18  innocent reason.

19       "Minor" means any person under the age of 18 years.

20       "Sexually explicit conduct" means actual or simulated

21  sexual intercourse, including genital-to-genital,

22  oral-to-genital, anal-to-genital, or oral-to-anal, whether

23  between persons of the same or opposite sex; bestiality;

24  masturbation; sadistic or masochistic abuse; or lascivious

25  exhibition of the genitals or pubic area of any person.

1      "Visual depiction" includes undeveloped film and
2   videotape, and data stored on a computer disk or by electronic
3   means which is capable of conversion into a visual image.

4      The intent of a person or the knowledge that a person
5   possesses at any given time may not ordinarily be proved
6   directly because there is no way of directly scrutinizing the
7   workings of the human mind.  In determining the issue of what a
8   person knew or what a person intended at a particular time, you
9   may consider any statements made or acts done or omitted by
10  that person and all other facts and circumstances received in
11  evidence which may aid in your determination of that person's
12  knowledge or intent.

13     As to this case, the United States must show that the
14  defendant had knowledge of the general nature of the contents
15  of the images.  Although the defendant need not have specific
16  knowledge as to the sexual acts depicted in the images, the
17  defendant must have had knowledge or reason to know, or an
18  awareness or notice, or a belief or ground for belief
19  warranting further inspection or inquiry, that the images
20  visually depict sexually explicit conduct.  Similarly, it is
21  not necessary that the defendant have specific knowledge of the
22  identity or precise age of the person depicted.  It is
23  sufficient for Counts One through Three if he knows or is aware
24  that the image depicts a child under the age of 18; and for
25  Count Four, if he knows or is aware that the image depicts a

1   child under the age of 12.

2       The defendant's knowledge may be shown by direct or

3   circumstantial evidence or both.  Eyewitness testimony of the

4   defendant's person- -- perusal of the images is not necessary

5   to prove his awareness of the contents; the circumstances may

6   warrant the inference that the defendant was aware of what the

7   image depicts.

8       You may infer, but you are certainly not required to

9   infer, that a person intends the natural and probable

10  consequences of acts knowingly done or knowingly omitted.  It

11  is entirely up to you, however, to decide what facts to find

12  from the evidence received during this trial.

13      Furthermore, the defendant's belief as to the legality or

14  illegality of the images is irrelevant.  The United States need

15  not prove that the defendant knew that the images themselves or

16  the portrayals in them were illegal.

17      Some or all of you may have seen popular television shows

18  such as CSI or Law & Order.  The TV standards and the

19  capabilities of law enforcement as portrayed on TV and in the

20  movies do not apply here to this trial.  Witness testimony, if

21  believed by you, is sufficient to establish the charges in this

22  case.  Specific investigative techniques, such as DNA and

23  fingerprints, are not required to be presented in order for you

24  to find the defendant guilty of the charges in this case.  Your

25  concern is whether the evidence which was admitted proved the

1   defendant's guilt beyond a reasonable doubt.

2       Finally, ladies and gentlemen, the verdict must represent

3   the considered judgment of each juror.  In order to return a

4   verdict, it is necessary that each juror agree with it.  Your

5   verdict must be unanimous.

6       It is your duty, as jurors, to consult with one another

7   and to deliberate with a view toward reaching an agreement, if

8   you can do so without sacrifice of conscientious conviction.

9   Each of you must decide the case for yourselves, but do so only

10  after an impartial consideration of the evidence in the case

11  with your fellow jurors.  In the course of your deliberations,

12  do not hesitate to re-examine your own views and change your

13  opinion, if convinced it is erroneous.  But do not surrender

14  your honest conviction as to the weight or effect of the

15  evidence solely because of the opinion of your fellow jurors or

16  for the mere purpose of returning a verdict.

17      Some of you have taken notes during the course of this

18  trial.  Notes are only an aid to memory and should not be given

19  precedence over your independent recollection of the facts.  A

20  juror who did not take notes should rely on his or her

21  independent recollection of the proceedings and should not be

22  influenced by the notes of other jurors.

23      If any reference by the Court or by counsel to matters of

24  evidence does not coincide with your own recollection, it is

25  your recollection which should control during your

1   deliberations.

2       Remember at all times you are not partisans.  You are

3   judges - judges of the facts.  Your sole interest is to seek

4   the truth from the evidence in the case.

5       You must not permit yourself to be influenced by sympathy,

6   passion, prejudice, or public sentiment for or against the

7   accused or the Government.

8       If the accused be proved guilty of the crimes alleged in

9   the indictment beyond a reasonable doubt, say so.  If not so

10  proved guilty, say so.

11      Under the federal system of criminal procedure, you are

12  not to concern yourself in any way with the sentence that the

13  defendant might receive if you should find him guilty.  Your

14  function is solely to decide whether the defendant is guilty or

15  not guilty of the charges against him.  If, and only if, you

16  find the defendant guilty, does it then become the duty of the

17  Judge to pronounce sentence.

18      If it does become necessary during your deliberations to

19  communicate with the Court, you may send a note by the United

20  States Marshal, signed by your foreperson, or by one or more

21  members of the jury.  No member of the jury should attempt to

22  communicate with me by any means other than a signed writing.

23  The Court will not communicate with any member of the jury on

24  any subject touching the merits of the case otherwise than in

25  writing or orally here in open court.  Also, the Court will not

1   be able to give you transcripts of the evidence or testimony

2   presented at trial.  Therefore, you must make your findings

3   upon the evidence as you remember it.

4        Remember, I can only answer questions of law.  Therefore,

5   you should initially discuss the instructions of law among

6   yourselves before writing a question on the law.  As well, the

7   jury's duty is to judge the facts only on the evidence

8   presented before you.  I cannot answer questions of fact or

9   reopen the case for additional evidence after the evidence is

10  closed.

11       Bear in mind also that you are never to reveal to any

12  person, not even to me, how the jury stands numerically or

13  otherwise on the questions of the innocence or guilt of the

14  defendant until after you have reached a unanimous verdict.

15       During your deliberations you must not communicate with or

16  provide any information to anyone, by any means, about this

17  case.  You may not use any electronic device or media, such as

18  a telephone, cell phone, smart phone, iPhone, iPad, tablet, or

19  computer; the internet, any internet service, or any text or

20  instant messaging service; or any internet chat room, blog, or

21  website such as Facebook, LinkedIn, Snapchat, Instagram,

22  YouTube, Twitter, or TikTok to communicate to anyone any

23  information about this case or to conduct any research about

24  this case until the Court accepts your verdict.

25       In addition, the local rules of this court provide that

1    after conclusion of a trial, no party, his agent, or his
2    attorney shall communicate or attempt to communicate with you
3    concerning the jury's deliberations or verdict without first
4    obtaining permission from me.  This rule does not prevent you,
5    the jury, from communicating with anyone concerning your
6    deliberations or verdict, but it prevents you from being
7    contacted by others.
8         Upon retiring to the jury room, you should first select
9    one of your members to act as your foreperson, who will preside
10   over your deliberations and who will be your spokesperson here
11   in open court.
12        You should not begin your deliberations until the clerk
13   delivers to your jury room the verdict forms and exhibits.
14        We have prepared a verdict form for your use.  We'll
15   review that specifically after closing arguments.  This form
16   will be brought to you in the jury room.  When you have reached
17   a unanimous verdict -- or unanimous agreement, excuse me, as to
18   your verdict, you will have your foreperson fill in and sign
19   the form that sets forth the verdict upon which you have
20   unanimously agreed.  You will then return with your verdict to
21   the courtroom.
22        As I mentioned, ladies and gentlemen, we're going to hit
23   pause now, and hopefully lunch is waiting for you back in the
24   jury room.  I'm getting a nod and I heard the door, so your
25   lunch should be back there.  Even though we've now heard the

1   instructions of law and the evidence is closed, I must again

2   ask you to continue to refrain from discussing this case with

3   anyone.  That does include between your fellow -- between and

4   among your fellow jurors during this lunch break.  We're simply

5   not at the point where you can begin your deliberations as of

6   yet.

7       Please also continue to refrain from any independent

8   investigation or research about the case, the parties, or any

9   of the issues in the case.  And please continue to refrain from

10  any social media activity about your jury service or the case.

11      We'll go ahead and take 30 minutes for lunch.  Like I

12  said, it's back there for you.  If pizza is not your vibe and

13  you want something else, you are free to go grab something.

14  But in an effort to be as efficient as we could with your time,

15  we had lunch brought in.  But we'll be ready to resume and hear

16  closing arguments at 1:00.  We'll see you then.  Thank you very

17  much.

18      (Jury retired from the courtroom at 12:30 PM.)

19          THE COURT:  All right.  Thank you, everyone.  Please

20  be seated.

21      Anything we need to take up from the Government's

22  perspective?

23          MS. CONKLIN:  No, Your Honor.

24          THE COURT:  Defense?

25          MR. EDWARDS:  No, Your Honor.

1          THE COURT:  How long does the Government anticipate

2    its closing argument to take?

3          MS. CONKLIN:  For both, Your Honor; right?

4          THE COURT:  Sure.

5          MS. CONKLIN:  I would say probably 45 minutes total.

6          THE COURT:  Okay.  Understood.

7      Mr. Edwards?

8          MR. EDWARDS:  Your Honor, I would anticipate about

9    30 minutes.

10          THE COURT:  All right.  Understood.  We'll -- let's

11    resume at 1:00.  We'll proceed with closing arguments.  I'll

12    continue to observe the vibes and see if we need to take a

13    break between any portion of those.  We'll see you all here in

14    30 minutes.  Thank you very much.

15      (Recess taken from 12:31 to 1:02 PM.)

16          THE COURT:  Thank you, everyone.  Please be seated.

17      Everyone ready to proceed with closing arguments?

18          MS. CONKLIN:  We are, Your Honor.

19          MR. EDWARDS:  Yes, Your Honor.

20          THE COURT:  Okay.  Can we have our jurors, please,

21    sir.  Thank you.

22      (Jury returned to the courtroom at 1:03 PM.)

23          THE COURT:  Thank you very much, ladies and

24    gentlemen.  Please be seated.  Thank you, everyone.

25      The Government may proceed with its closing statement.

**Closing Argument of Government (Ms. Conklin)**

1          MS. CONKLIN:  Thank you, Your Honor.

2                    <u>CLOSING ARGUMENT</u>

3          MS. CONKLIN:  Good afternoon.  And again, I want to

4    thank you for your time and for your attention during this

5    case.  Jury service is one of the most important things that a

6    citizen in the United States can do.  Our justice system

7    depends on your time and participation.  And we truly do

8    appreciate it.

9          I also know that this was a very difficult case to sit

10   through, very challenging and very emotional.  And I do

11   understand that.  And I appreciate even more the hard work that

12   you've put in as jurors.

13         In my opening -- or in my co-counsel's openings he told

14   you that we, as the Government, have the burden to prove this

15   case beyond a reasonable doubt.  And that's -- that's how our

16   system of justice is founded.  What we'll do and what we did do

17   is we present to you evidence.  And we present to you evidence

18   to prove the elements of the charged offenses.

19         In this case, there's two main charged offenses.  One is

20   receipt of child pornography, and one is possession of child

21   pornography.  Even though there's four counts, the first three

22   counts are the receipt counts; the fourth count is the

23   possession count.  And I'm going to go through the elements and

24   go through the evidence that we've presented to you.

25         The first thing that we did present -- well, not the first

**Closing Argument of Government (Ms. Conklin)**

1   thing that we did present.  But where it all starts is this

2   big, heavy, clunky laptop, this laptop that's ten years old.

3        Law enforcement received information that child

4   pornography was being downloaded by a computer with a specific

5   GUID number.  And law enforcement testified and told you that a

6   GUID number is a very unique identifying number that -- it

7   identifies specifically a computer, and it's highly, highly

8   effective in identifying things.  It's almost as good as DNA, I

9   believe is what they said.  One computer has a GUID number, and

10  that's the GUID number.  And what they testified to was that

11  the GUID number that was found on that computer was the same

12  GUID number that was being used to download child pornography.

13  And that's why they started this investigation.

14       So I told you that receipt of child pornography was the

15  first three counts.  The elements are the same for each of the

16  three counts.  The only difference is the dates of these

17  counts.  The Government has three things that we have to prove.

18  We have to prove that the defendant knowingly received any

19  child pornography and that the child pornography had been

20  shipped or transported in interstate commerce by any means,

21  including by computer.

22       All right.  So we've got this number three checked off.

23  We know that everything that was being sent and everything that

24  was being received on those computers was computer files.  And

25  in fact, the parties have stipulated that the videos that were

**Closing Argument of Government (Ms. Conklin)**

1   presented to you as evidence have been in interstate commerce.

2   They've been moved through interstate commerce.  So that's not

3   an element you're going to have to worry about.

4       Child pornography.  Well, you've seen the evidence.

5   Government's Exhibit 8A through 8O were all exhibits of child

6   pornography.

7       Let me see if I can zoom this in a little bit more.

8       All right.  So we presented to you three exhibits related

9   to the first count, dated April 4th, 2019.  We presented to

10  you the "pthc mom."  We presented the "pedomom joven."  And we

11  presented to you "PHANT pedomom."  All three videos relate to

12  the 4/4/2019 date.  We indicated that the videos were

13  downloaded, and the videos themselves indicated that they were

14  downloaded on April 4th, 2019, at 7:56 AM, 7:55 AM, and

15  7:55 AM.

16      How do we know that these were the videos that were sought

17  out?  Well, we saw the information on the computer about the

18  use of the Shareaza app to find these files.  We saw evidence

19  and you saw -- heard evidence about the computer, how it would

20  use Shareaza; that there were certain search terms that were in

21  the computer, documented in the Shareaza logs, that showed that

22  there were search terms that were repeated over and over again.

23  Those search terms are, for those first three videos, "PTHC

24  mom," "pedomom," "pedomom boy," and "PTHC" for that first

25  video.  All those search terms appear in that first title of

**Closing Argument of Government (Ms. Conklin)**

1   the file.  Second one, "pedomom."  And the third one,

2   "pedomom."  Those are the files from 2019 -- April 4th, 2019.

3        So what evidence do we have of child pornography on the

4   second date, September 18th?  Those are the files titled "5 yo

5   Latina," "PHANT 2019-07-27," and "pedo mom and boys."  We know

6   that those three files were downloaded at 9:18 -- or on

7   9/18/2020, and we know that those files were downloaded at

8   3:12 PM and 3:19 PM, respectively.

9        There's search terms in the Shareaza app that are -- or

10  Shareaza file structure that shows that those terms were

11  utilized in the Shareaza search, just like if you do a Google

12  search on your own home computer.  Once you do a Google search

13  on your own home computer, "Where's the best restaurant to

14  eat?" the next time you go to your Google computer and you type

15  "Where's the best," Google is going to fill in on your computer

16  "restaurant" for you, because it knows that you've done it

17  before.  That's why it tracks your history, and that's why

18  Shareaza tracks your history.

19       So we know that those counts associated with Count Two --

20  "pedomom," "pedomom," and "pedomom pedo mom boy," those search

21  terms that were in the Shareaza on that computer connected to

22  the files that were on that computer in the recycle bin.

23       Do we know for sure that any of those videos have been

24  played on that computer?  Well, you heard testimony about the

25  VLC media player.  And the VLC media player will list out the

**Closing Argument of Government (Ms. Conklin)**

1   videos that have gone through the system so that when you go to

2   play other videos again, those are going to pop up in the file

3   list.  And we know for a fact that the "PHANT 2019-07-27" was

4   in that MRU, just like when you go to a video player on your

5   own computers and you know -- or any com- -- any system on your

6   computer.  I believe Agent -- Mr. Hammer testified that when

7   you go to Microsoft Word and you save a document and you use

8   that document and then you close that document, but when you

9   click open with that Microsoft Word, it will show you the list

10  of common names that have been played.  That's what the MRU is.

11  That's that most recently used list.

12      The next count is the count related to September 20th,

13  2021 [sic].  And we know that there were files that were

14  accessed on September 21st at approximately 11:59, 12:34, and

15  11:59 on that computer.  On September 21st, 2020.  Those

16  files are titled "2013 PTHC Polaroid Family Slideshow,"

17  "Pedomom Special-8," and "A family affair part two."  We know

18  that those videos were searched for and downloaded, therefore

19  received, again, based on the information that's in the

20  Shareaza search terms and based on the information in the

21  computer that those files were downloaded.

22      The search terms in these cases that pop up are "PTHC,"

23  "pedomom," "PTHC family."  And you also heard testimony from

24  Mr. Hammer that the newest search term in the Shareaza listing

25  of search terms -- or Shareaza listing of search terms was "a

**Closing Argument of Government (Ms. Conklin)**

1    family affair."  That was the newest search term in relation to

2    that date on the computer.

3        We know also that the "Polaroid family slideshow" movie

4    had been played in the MRU, and we also know that the "Pedomom

5    Special-8" had been played in the MRU.  And again, those files

6    were downloaded at 11:59, 12:34.  Those are the files connected

7    to the receipt of child pornography.

8        And the question that -- you know, is it child

9    pornography?  You, as jurors, have seen some of the videos, and

10   you've heard descriptions of the others.  You don't need an

11   expert opinion to decide whether that's child pornography.  You

12   can make that determination.  You can determine the age of the

13   children involved in that.  And that's something that was well

14   within your ability to decide.  Is it child pornography?  I

15   submit to you that it is.

16       But again, the question comes down to the Defendant's

17   knowledge.  Did he knowingly possess the search -- or did he

18   knowingly possess the child pornography?  Did he knowingly

19   receive the child pornography?  And I'm going to get to that

20   knowingly part in just a minute.

21       Let me back it up a little bit.

22       As I mentioned, Count Four, the second main charge -- or

23   the second group of charges, is the possession of child

24   pornography.  And again, we have to show that the Defendant

25   knowingly possessed a computer disk or other material

**Closing Argument of Government (Ms. Conklin)**

1    containing one or more images/videos of child pornography.  The

2    same rules apply.  You can make the determination as to whether

3    it's child pornography.

4         The Defendant knew that the images/videos depicted a minor

5    engaged in sexually explicit conduct.  I submit to you that

6    just looking at the titles of the videos is enough.  But we

7    know that Shareaza was used to type in "pedomom" to get hits of

8    files that included the name "pedomom."  That shows that

9    whoever was using the computer knew what they were getting.

10   And I submit to you that the fact that the videos are found on

11   the computer and have been played is enough to prove that

12   element.

13        And again, the interstate nexus.  Have these files moved

14   by computer?  Yes, they have.  There's no question about that.

15   They show up on the computer that way.  And the parties

16   stipulate that they have moved through interstate commerce.

17   But you can also make a determination that it moved through

18   interstate commerce just based on some of the names and the

19   titles of these files.

20        I submit to you that the files associated 8J through 8L

21   all represent files of child pornography that were on the

22   computer on September 25th, 2020: "PTHC pedomom - mom & son,"

23   "pedomom please share more," "American Family PTHC."  Those are

24   all files that contain images of child pornography, and they

25   were all files that were downloaded and moved through the

**Closing Argument of Government (Ms. Conklin)**

1   computer.

2       The other files are bait files.  And those are also files

3   that were associated with being downloaded on September 21st.

4   But they also demonstrate to you the nature of where these

5   files come from when they're on the computer; that they can

6   come to you from anywhere across the country, in other

7   countries.  And as you've noticed from those videos, those were

8   all law enforcement agencies in Europe or somewhere else.

9       So how do we prove the knowing aspect?  How do we prove

10  that it was Chris Harp and that Chris Harp knew that it was on

11  there?  It was Chris Harp's computer.  It was in Chris Harp's

12  loft.  It was plugged into the outlet up in Chris Harp's loft,

13  right next to Chris Harp's chair.  That's control over it.  He

14  had control over that laptop.

15      Did he know what files were on it?  Well, that's hard to

16  tell.  And the reason that it's hard to tell is because what he

17  knew was in his head, it's an operation of his mind.  It's

18  impossible to tell what people are thinking.

19      If you ask -- if you ask a female sometimes, "How are you

20  feeling?  Is everything okay?" she'll say, "Fine.  Just fine,"

21  even though the world could be burning down behind her.  But

22  she's saying, "Fine.  Just fine."  You don't know what's going

23  on in her head.

24      We don't know exactly what was going on in Christopher

25  Harp's head.  But we can tell what was going on in his head,

**Closing Argument of Government (Ms. Conklin)**

1   what he knew and what he didn't know, by his behavior, by his

2   actions, and what actions and behavior we have evidence of.

3       What do we have that shows control and use and dominion

4   over that computer?  The computer itself.  You heard from

5   Mr. Hammer that he reviewed all the evidence.  And he reviewed

6   two things of evidence, and those two pieces of evidence have a

7   long history - not just a couple days, not just a couple

8   months, but a long history.  What's the history?  Well, on

9   November 22nd, 2009, the first file, "PTHC 7yo My Little

10  Girls - Part 1," was written to that thumb drive that

11  Christopher Harp testified, well, he couldn't dispute that it

12  had his college papers on; that he had had that thumb drive

13  back when he was living with his family and when he was in

14  college.

15      On January 7th, 2010, that's when the next files were

16  loaded onto that thumb drive: "Preview-T-100399616."  But

17  here's the "PTHC webcam-3yo family_of4 (mom blows 7yo boy 3yo

18  girl)."  Around those times we have lots of other things.  We

19  have Chris Harp's midterm essays, we've got his take-home

20  assignment, and we've got his vent lab dated, oh,

21  December 18th, 2009.

22      For those of you who have been to college or those of you

23  who have used thumb drives with your work or various other

24  different things, when you have a thumb drive for your

25  computer, you keep your thumb drive.  You don't just put it

**Closing Argument of Government (Ms. Conklin)**

1    anywhere.  You don't just leave it lying around.  You have that

2    thumb drive because you're going to need to have access to it.

3    Christopher Harp had access to that thumb drive.  That was his

4    thumb drive.  And he had the access to download it.

5        So let's move on.  We know that that computer,

6    Government's Exhibit 1, the new operating system was installed

7    on it on April 23rd, 2011.  That's when the Microsoft Windows

8    Home Vista Home Premium operating system was initiated.

9        What other information about the history do we have?  From

10   June 2012 through September 2014, 14 files identified as having

11   "PTHC" in the file name were in the computer history index as

12   reflected by the July 8th, 2016, restore point.

13       We know that on July 12th, 2013, there was a video

14   called "PTHC pedo 9yo Vicky" downloaded onto that computer.

15   And you heard what that Vicky video is.  You heard that Vicky

16   is, unfortunately, one of the most famous and most sought after

17   images of child pornography.

18       Then we go through to the July 8th, 2016, restore point.

19   We've got chrisharp51@yahoo.com accessing websites.  We've got

20   christopherharp51 accessing USA Jobs.  We've got Amy Westwood

21   accessing bswift and Pressley Ridge Portal.  And we've got an

22   administrative log-in count 2,021 [sic].  That shows that as of

23   that date that that restore point was made, that computer had

24   been powered on and the password had been put in 2,121 times.

25       You also heard testimony about the July 12th restore

**Closing Argument of Government (Ms. Conklin)**

1   point, no new information; the July 15th, 2016, restore

2   point, no new information; but the July 17th, 2016, restore

3   point, we know that the administrative log-in count has now

4   gone up to 2,123.  Well, yeah, that would incorporate the July

5   20- -- July 12th and July 15 log-ins.

6       We've got a July 12th, July 15th, July 17th, 2023.  Now

7   we've got a July 19th.  No new information there.

8   July 24th, no new information.  July 25th, no new

9   information.  But you see the administrative log-in counts

10  going up.

11      Now we get to the July 28th, 2016, restore point.  And

12  let's just say again briefly about these restore points.  These

13  restore points are triggered by the Microsoft operating system

14  when a new file is going to be installed.  It's not something

15  that the user controlled.  It's because the computer is trying

16  to protect itself.  It makes a duplicate of where it's at right

17  at that time that the installation is supposed to happen so

18  that, god forbid something happens, we can roll it back.

19      The thing about that duplicate is it is not a full picture

20  of the use of that computer at that time.  It's not a full

21  picture of everything that's going on at that time.  It's that

22  brief, instant snapshot.  So as the bird is sitting on the

23  branch, you take a picture; but two seconds later, that bird

24  has flown away.  The only thing you have left to prove is

25  that -- or to show that the bird was there is that picture.

**Closing Argument of Government (Ms. Conklin)**

1  But it's also flown away.  So you don't see what happens after

2  these restore points until something significant happens again

3  and now you've got a new restore point.  There's information

4  between those restore points that will show up in the next

5  restore point.

6      But Mr. Hammer told you that things could be permanent

7  deleted out of the computer.  So in these restore points where

8  he noted no new information, no new information related to

9  child pornography, but there could have been other things that

10 were going on, other videos that were played, other things that

11 were downloaded.  We don't know for sure.  What we do know for

12 sure is what is left in the system for those restore points.

13     And that brings us to the July 28th restore point.  On

14 July 28th there were eight partial files indicating potential

15 child pornography and five full downloaded files indicating

16 potential child pornography.  They were noted to be downloaded

17 on July 28th, 2016.  We know that the Shareaza search terms

18 in that computer for that date were "pedomom" and "PTHC."  And

19 we know the administrative log-in for that count was 2,127.

20 So, again, it's consistent of each use.

21     Next we go to July 29, 2016.  But that should say "now."

22 So the eight partial files and the five full files downloaded

23 on July 28th, 2016, restore points -- that's a typo -- it

24 should say "now" marked for deletion.  The Shareaza search

25 terms are "pedomom," "PTHC," and "mom."  The recycle bin

**Closing Argument of Government (Ms. Conklin)**

1  contains files for Amy Westwood.  And the log-in count is

2  2,128.  So we know that it's gone up one since the last use.

3      August 3rd, 2016, restore point.  Two partial downloaded

4  files: "Pedomom - mother son compilation," "Pedomom - mother $

5  son.avi."  One full download: "Pedomom Yogurt."  The files show

6  a date stamp of August 3rd, 2016, being downloaded, and we've

7  got an administrative log-in -- or an admin log-in count of

8  2,129.  Yep, that jibes.  It's up one since the last time the

9  computer was used.

10     Let's move forward to August 5th, 2016, restore point.

11  We have two partially downloaded files and one downloaded file

12  from August 3rd.  The "Pedomom Yogurt" and the "Pedomom -

13  mother son compilations" are marked for deletion.  We've got

14  new Shareaza terms: "PAE," "Vicky."

15     Oh, did we see Vicky before?  I think that was from 2013.

16     "Private PAE."  And we've got an admin log-in count of

17  2,030.  Yep, that jibes.  That's the next boot-up.

18     August 13th, 2016.  Nothing notable there.  But we do have

19  an admin log-in count which shows that it again logged --

20  restarted.  Somebody typed their password in.  So we've got

21  another log-in that somebody typed their password in.

22     August 16th, 2016.  There's two restore points on that

23  day.  So that means that the computer made two restore points

24  because of the loading of programs.  The loading of programs.

25  We've got four partial downloads and one downloaded file

**Closing Argument of Government (Ms. Conklin)**

1  indicating potential child pornography because they used "PHANT

2  pedomom."  The Shareaza new search terms recognized there are

3  "family affair" and "cbaby."  And we've got an administrative

4  log-in count of 2,132.  Yep, it goes up one.

5      August 16th, 2016.  The video that was downloaded

6  earlier, an hour later is now marked for deletion.  So that

7  video was there, downloaded, and marked for deletion within an

8  hour.

9      2014 -- or I mean April 24th, 2018, restore point.

10 Mr. Hammer testified that there's evidence that charp51 logged

11 into a website.  Charp logged into the Strad Energy website.

12 Three partial downloads of files indicating child pornography.

13 And the downloads section has an additional four partial

14 downloads dated back to January 2014.  And our admin log-in

15 count at this point is 2,040 [sic].  That suggests that

16 somebody used the computer and didn't install new programs,

17 didn't install new updates, didn't make any changes to the

18 operating system of the computer.  That's why there's no

19 restore points for those eight different log-ins.

20      All right.  So let's get more going through the history.

21      We've got April 24th, 2018.  The Shareaza program was

22 downloaded.  April 24th, 2018, a little bit later, there was

23 no additional information.

24      April 30th, 2018, restore point.  We've got three

25 partial downloads dated on April 16, 2016, reflecting in that

**Closing Argument of Government (Ms. Conklin)**

1   restore point.  At that time, on April 30th, 2018, there are

2   24 potential child pornography videos in that recycle bin.  And

3   the Shareaza search terms are "pedomom boy," "pedomom," and "a

4   family affair."  The log-in count is now up to 2,142.

5       On December 14th, 2018, Mr. Hammer testified as to that

6   date.  He said that charp51 logged into a Yahoo email account.

7   That same date, Agent Ed Ryan indicated that his system showed

8   that there was videos, files containing child pornography

9   available for sharing from the GUID number for that computer.

10  Both things happened on the same date.

11      March 28th, 2019.  Ed Ryan testified here that he noted

12  files available for sharing from the GRID -- GUID.

13      And then that brings us to April 4th, 2019.  That's a

14  restore point, but that's also the date in Count One of the

15  indictment.  This shows that -- numerous partially downloaded

16  files indicating child pornography and 15 fully downloaded

17  files indicating child pornography.  At that time the recycle

18  bin already contained 24 potential child pornography videos

19  that had been marked for deletion on April 24th, 2018.  New

20  terms in the Shareaza search: "PTHC," "PTHC family," "pedomom

21  boy," "Vicky."  It goes on.  And the admin log-in count is up

22  to 2,154.

23      Again, what that means is that between the last admin

24  log-in date on 2,142 -- or I'm sorry -- on April 30th, 2018,

25  and April 4th, 2019, about a year, it means that somebody

**Closing Argument of Government (Ms. Conklin)**

1   restore point.  At that time, on April 30th, 2018, there are

2   24 potential child pornography videos in that recycle bin.  And

3   the Shareaza search terms are "pedomom boy," "pedomom," and "a

4   family affair."  The log-in count is now up to 2,142.

5       On December 14th, 2018, Mr. Hammer testified as to that

6   date.  He said that charp51 logged into a Yahoo email account.

7   That same date, Agent Ed Ryan indicated that his system showed

8   that there was videos, files containing child pornography

9   available for sharing from the GUID number for that computer.

10  Both things happened on the same date.

11      March 28th, 2019.  Ed Ryan testified here that he noted

12  files available for sharing from the GRID -- GUID.

13      And then that brings us to April 4th, 2019.  That's a

14  restore point, but that's also the date in Count One of the

15  indictment.  This shows that -- numerous partially downloaded

16  files indicating child pornography and 15 fully downloaded

17  files indicating child pornography.  At that time the recycle

18  bin already contained 24 potential child pornography videos

19  that had been marked for deletion on April 24th, 2018.  New

20  terms in the Shareaza search: "PTHC," "PTHC family," "pedomom

21  boy," "Vicky."  It goes on.  And the admin log-in count is up

22  to 2,154.

23      Again, what that means is that between the last admin

24  log-in date on 2,142 -- or I'm sorry -- on April 30th, 2018,

25  and April 4th, 2019, about a year, it means that somebody

**Closing Argument of Government (Ms. Conklin)**

1  only used that computer 12 times.  Twelve times in a one-year

2  period did somebody turn on that computer, type in their

3  password, and use that computer.

4      Well, we know what happened on at least a couple of those

5  dates.  We know that child porn was downloaded on

6  December 14th and that Chris Harp logged into the computer on

7  that date to check his email.  And we also know that child porn

8  was available on March 28th, 2019.

9      Now, Ed Ryan also testified about the logs.  I apologize

10  that the writing is so small.  It might have to be some young

11  eyes that look at it if you want to look at it in the jury

12  room.  But you can look through these logs, and you can look at

13  the names of the files that are on these logs and see that the

14  names of the files that are on these logs are contained -- or

15  the Government's Exhibit 8A, B, and C are contained on the

16  4/4/19 log.

17      But let's keep moving, because this is a lot of history.

18      We're now up to October 11th, 2019.  Agent Ryan

19  testified that there were files available for sharing from the

20  GRID [sic].

21      June 23rd, 2020, Agent Ryan testified that files were

22  available for sharing from the GRID [sic].

23      July 16th, 2020, files were available for sharing from

24  the GUID on that computer.

25      Let's go up to September 18th, 2020.  And that's the

**Closing Argument of Government (Ms. Conklin)**

1    date of Count Two.  The activity log reflects that the files

2    were available for sharing from the GUID on that computer.  And

3    you can see what the files were that were available for sharing

4    on that computer.  And you can also see that the Government's

5    Exhibits 8D through 8F are listed in the activity log.

6          Then we get to Count Three, which is September 21st,

7    2020.  The activity log, 9C, you'll get to look at that, and

8    you'll get to see that files located in the recycle bin had

9    been downloaded on that day, made available for sharing, and

10   then sent to the recycle bin.  And those are the videos that

11   you had looked at.

12         Finally, we get to September 25th, 2020.  And that's the

13   date of Count Four.  And that's the date that the search

14   warrant occurred.  And again, you heard the testimony of the

15   agents coming to the house.  You heard that they searched the

16   house.  You heard the process that they did; that they put up

17   stickers or papers on the wall to mark the rooms and that they

18   diligently went through and searched for things.  Well, they

19   did, they found things.  They didn't know what they were

20   looking for except that they were looking for computers.

21   That's all they knew.  They knew a GUID number.  But Mr. Hammer

22   testified that the GUID number is contained within the

23   computer.  They couldn't look at the computer and be like,

24   "Aha, that's the GUID."  It's not on there.  There's a serial

25   number on there, but there's no GUID number.

**Closing Argument of Government (Ms. Conklin)**

1    So how would they know that they had found what they

2  wanted to find until they sent it for review?  And Mr. Hammer,

3  who was able to utilize the FBI's tools, was able to extract

4  that information from the computer and extract a lot of

5  information from that computer.

6    The defense has posed their theory of the case that it

7  wasn't Christopher Harp; it was Jeremy Harp.  How long did it

8  take us to go through this history?  That's a lot of history.

9  That's not somebody coming over to your house and using your

10  computer once.  That's not somebody coming over to your house

11  and using your computer twice.  That is long-term use of the

12  computer.

13    The Defendant said that Jeremy Harp was the only one with

14  access to the computer.  He was the only one who could have

15  done that to the computer and the thumb drive.  Well, I submit

16  to you that there is somebody else who could have done

17  something else to the computer and the thumb drive, and that's

18  the Defendant.  He had just as equal, if not more, access to

19  the computer than Jeremy Harp.

20    Agent Ryan testified that as part of this investigation,

21  when he saw that files were being downloaded from a specific

22  GRID -- GUID number, that he was able to obtain the IP

23  information associated with that computer; in other words, what

24  IP address that computer was being -- was using to access the

25  internet.  And he submitted to subpoenas -- submitted subpoenas

**Closing Argument of Government (Ms. Conklin)**

1   to Comcast for this information.  The results are in evidence.

2   We've got evidence that Christopher Harp was using the

3   67.163.169.13 IP address from his house.  That's the IP address

4   that was associated with the house.  Start of service was

5   May 14th of 2018.  So that was before he moved into the new

6   house.

7        We also have IP information for the address of 944 Bloody

8   Run Road, Robert Westwood, where Christopher Harp and Amy Harp

9   lived with her parents prior to moving into the house at Bloody

10  Run Road.  Why is that important?  That's important because

11  this second IP address, 73.154.105.164, started service on

12  11/29/2017.  That IP address was associated with the 944 Bloody

13  Run Road, and that was one of the IP addresses that child porn

14  was being delivered to in 2018.  And once they moved, it never

15  showed up at that address again.  Why is that important?

16  Jeremy Harp never lived with the Westwoods.  Yes, he might have

17  gone there to help them move, but he never lived there.

18       Accessing child pornography is a private thing.  It's not

19  something you do in a crowded room.  It's not something you do

20  at the library.  It's not something you do at the Starbucks

21  cafe.  If you're going to be accessing child pornography,

22  you're going to be doing it from someplace where you're not

23  going to be disturbed.  Who had the access to the Westwoods'

24  house to be able to do that?  Would Jeremy have had access to

25  go into a back bedroom and sit, grab Chris's computer, remember

**Closing Argument of Government (Ms. Conklin)**

1   the log-in from all those years before that he had set up for

2   his brother just because he thought it would be easy to

3   remember, and go through, "pedomom."

4        "Oh, wait.  No.  Yeah, sure, I'll help you with that

5   couch."

6        Who had control?  He did.  He did.  I'm not -- what we

7   lawyers do in our closing argument is not tell you the

8   evidence.  What we say isn't evidence per se.  What we do is

9   present to you what the evidence presented from that witness

10  box was.  That's what we do.  And we'll summarize it, and we'll

11  go over the certain points that we believe support our argument

12  to you.  So, again, please don't take the words that I say as

13  the evidence.  Remember the evidence that you heard.  And I

14  want you to look at that evidence that you heard, and I want

15  you to analyze it, and I want you to use your common sense.

16       Again, this is a long history of use.  Think about how it

17  would have to be used.  Think about how this computer would

18  have to be used.  Think about all those different things.  Who

19  had the motive?  Who had the opportunity?  Who had the ability?

20       Okay.  Jeremy Harp was a computer person.  That's great.

21  Clearly, he must not have been a very good computer person,

22  because he left this whole trail of child pornography for the

23  FBI to find on the laptop.  I submit to you if you're going to

24  go use somebody's laptop and you're a computer hacker, that

25  you're so good at computers that you know everything about

**Closing Argument of Defendant (Mr. Edwards)**

1    computers, you're not going to leave a trail.  There was a

2    trail.  There was a trail.  The files are in the recycle bin.

3    The files are accessible.  The files were sought out, and the

4    files were deleted - not permanently deleted; just everyday,

5    common computer user deleted.  That's what the evidence of

6    knowledge is.

7        Again, knowledge, what Christopher Harp knew, it's in his

8    head.  Just like a woman can say, "I'm fine.  It's fine,"

9    behavior, demeanor, mannerisms, and other evidence can prove

10   knowledge despite what people say.  And I submit to you that

11   the Government has proved that Christopher Harp is the person

12   who knowingly sought out, downloaded, viewed, and deleted child

13   pornography.  He just didn't realize that when he deleted it,

14   it stayed in the recycle bin and he could get it back anytime

15   he wanted.  It was there.  It was accessible.  He knew.

16       I'm going to ask you to take a little more time on jury

17   duty and review the evidence that we presented.  Look at it.

18   See how it all matches up.  See how it all connects.  It's all

19   interwoven.  And once you do, I'm going to ask you to find the

20   Defendant guilty beyond a reasonable doubt.

21           THE COURT:  Thank you, Counsel.

22       Mr. Edwards.

23           MR. EDWARDS:  Thank you, Your Honor.

24                        CLOSING ARGUMENT

25           MR. EDWARDS:  May it please the Court, counsel.

## Closing Argument of Defendant (Mr. Edwards)

1        Ladies and gentlemen, before I get into my closing

2    argument too much, I want to clarify a couple things that you

3    were just presented that weren't factually correct, just so

4    we're all on the same page here.

5        You were just told that --

6        Oh, I'm sorry.  I'll wait to have that turned on.

7        -- that there were -- the first findings of pornography on

8    the computer was June 12th.  And it was just argued on a piece

9    of paper showing through September 14th.  That's not correct.

10   Actually, the report stated that the dates of those downloads

11   was June 2012 and -- between -- and September 2012, not

12   September 2014.  And there was a reason why I wanted to clarify

13   that point.  Because there's a timeline of when these events

14   occurred.

15       In addition, you were told that on December 14th, 2018,

16   pornography was downloaded.  Again, that's not correct.  That's

17   not in Mr. Hammer's report.  He never testified to that.

18   Mr. Ryan testified that there were files that could be shared

19   with Shareaza or pornographic files on the computer at that

20   point in time, but not -- there was no downloads that occurred

21   during that point in time.

22       And that's important in this case, because dates and times

23   are very important, especially in a case such as this.

24       Ladies and gentlemen, as we approach the conclusion of

25   this trial, it's imperative that we reflect on the foundational

**Closing Argument of Defendant (Mr. Edwards)**

1  principles that guide our legal system.  At the core of these

2  principles lies the presumption of innocence.  It's an

3  essential right that ensures that every individual is

4  considered innocent until proven guilty beyond a reasonable

5  doubt.  And it's within this framework that I ask you to

6  consider the evidence that has been presented against Chris,

7  charged with serious offenses that demand rigorous scrutiny.

8      Now, the only evidence that has been brought against Chris

9  was that there was child pornography found on that computer, a

10 computer that the Government, she just stated again, was

11 accessed by other people besides Chris Harp.

12     And during the Government's case, they felt the need to

13 actually show you the child pornography.  And I wondered why.

14 I stood up here in opening statement at the beginning of this

15 case and said that Chris Harp did not dispute that the

16 Government found pornography on the computer.  We verified that

17 it was there.  So what purpose did it serve to actually make

18 you watch --

19        MS. CONKLIN:  Objection, Your Honor.  The Government

20 has a burden of proving its case.

21        THE COURT:  Overruled.

22        MR. EDWARDS:  What purpose did it serve to make you

23 watch that disgusting material?  I will tell you why.  Because

24 that's the only thing the Government has in this case.  They're

25 hoping that that disgusting material in and of itself will

**Closing Argument of Defendant (Mr. Edwards)**

1  cause you to forget what your job is here and what it is that

2  they, the Government, is required to prove - that being that

3  Chris Harp knowingly received child pornography and knowingly

4  possessed child pornography.  And there is no evidence that you

5  have been presented to show that, because Chris Harp didn't

6  know about it.

7      The evidence has unequivocally shown that, despite the

8  presence of that disgusting material on the computer, there is

9  substantial doubt regarding who is actually responsible for its

10 presence.  This doubt is not abstract; it's grounded in

11 concrete evidence and significant investigative oversights.

12 Had the Government actually conducted a thorough investigation

13 in this case, Chris Harp would not have been charged at all.

14     Firstly, we have demonstrated beyond dispute that my

15 client was not present -- even present -- at the home on the

16 dates and times the downloads occurred in the indictment.  This

17 fact alone introduces a critical element of doubt, further

18 substantiated by the testimony that other individuals had

19 access to the home and, by extension, the computer in question

20 during the relevant time periods.

21     You heard where Chris Harp was on Count One, on

22 April 4th, 2019.  He left early for work, which was up in

23 Waynesburg, Pennsylvania.  He was there for a little bit and

24 then went to a job interview in Pittsburgh, shown by an email,

25 came back home around six.  He wasn't home on the date and

**Closing Argument of Defendant (Mr. Edwards)**

1   times this download occurred.  Was that refuted?  Did anyone

2   come in here and say that didn't occur?  Did the Government

3   present any evidence to show that that wasn't true?  No.

4        The next date is September 18th, 2020, with a date and

5   time -- because I think, actually, she showed you up there

6   earlier when these occurred.  That was, I think, around 3:00 in

7   the afternoon.  Where was Chris?  He was working with his

8   father -- father-in-law, Robert Westwood, at a home --

9   remodeling a home in the Coopers Rock, Bruceton Mills area.  He

10  didn't get home until around five or six.  And in fact, Amy

11  Harp testified she wasn't at home during the time frames that

12  this occurred.  She was picking up her daughter and then going,

13  I think, to Target or Ultra [sic].  And she said when she came

14  home, Chris wasn't there; he came home later.  Was that

15  refuted?  Did anyone say that -- did someone show that that

16  didn't occur?  No.  Chris wasn't there.

17       And the final date of September 21, 2020.  Where were

18  they?  Chris and Amy testified they got up, they dropped off

19  their daughter, they went and purchased a car.  Do they know

20  pretty much the times that they were there?  Yeah.  In fact, we

21  showed you in the evidence when they got an insurance card, at

22  11:57 that morning before they left the car dealership.  Made

23  sure they had insurance on the car.  Amy was pregnant.  They

24  had to make a couple stops.  They took the long way home.  She

25  said she got home around one.  I think there was even evidence

**Closing Argument of Defendant (Mr. Edwards)**

1    that said, "Well, we know we" -- "I did my Sirius Radio.  It

2    was somewhere close to 1:00."

3        When were those downloads?  They weren't home.  It wasn't

4    Chris or Amy.  And was that refuted?  No one refuted that.

5    That was told to them that -- the Government knew about that

6    car purchase the day that they showed up and did the search.

7    Did they go out and go to Dan Cava and say, "Well, were they

8    here?"  Did they pull security cameras and say, "Wait a minute.

9    They weren't here"?  Because they were there.  There's no

10   evidence to refute that.  It hasn't been refuted.

11       Moreover, my client's -- or Chris's proactive cooperation

12   at the time of the search.  He told the officers the passwords

13   to the computer.  That speaks of his transparency and the

14   absence of guilt.

15           MS. CONKLIN:  Objection, Your Honor.

16           THE COURT:  To what?

17           MS. CONKLIN:  Chris's testimony to -- or statements

18   to the police.  It's not in evidence.

19           THE COURT:  That is sustained.

20           MR. EDWARDS:  All right, Your Honor.  I'm sorry.  I

21   thought that's what the officer testified to.

22           THE COURT:  Well, we had a conversation about that.

23   Those statements were not admitted.

24           MR. EDWARDS:  Okay.

25       Significantly, the Government's investigation into this

**Closing Argument of Defendant (Mr. Edwards)**

1   matter, and the lack thereof, have been marked by glaring

2   omissions.  A failure to conduct simple fingerprint analysis of

3   the computer, this step which is fundamental in most cases

4   involving physical evidence of this nature, was overlooked.

5   Such an analysis could have provided critical evidence about

6   who, in fact, was using the computer, thereby clarifying the

7   issue at hand.  The absence of this evidence is not merely an

8   oversight, but a substantial gap in the prosecution's case that

9   you, the jury, must consider.

10      In addition, you heard that even though the Government had

11  my client's phone for over three years before it brought the

12  charges against him, there was no analysis done to determine if

13  Chris Harp was even home when the pornography was being

14  downloaded.  Had the FBI simply performed a tracking of the

15  phone, the location of his cell phone after they took

16  possession of it September 25th, 2020, it would have shown

17  that Chris wasn't, in fact, at home.  Again, ladies and

18  gentlemen, as I stated at the beginning of this case,

19  confirmation bias.

20      Moreover, there was no investigation by the Government to

21  determine who even had access to Chris and Amy's home, no

22  investigation to see if Chris was even at home when the

23  pornography was even being downloaded, no evidence of any other

24  work or searches being done on the computer when the alleged

25  pornography was being downloaded that would indicate that it

### Closing Argument of Defendant (Mr. Edwards)

1   was Chris Harp who was, in fact, operating the same.

2       And I asked that question directly to Pete Hammer on every

3   date of the download:  "Was there any other contemporaneous

4   work being done or being shown on that computer, sir, that

5   indicates that it was Chris Harp operating it?"  And each time

6   he indicated that there was not.

7       Ladies and gentlemen, the Government didn't even have who

8   lived in the homes around Chris Harp's house correct.  Remember

9   the testimony?  They said that the home at the beginning of the

10  driveway was his in-laws'?  Well, it wasn't his in-laws'.  That

11  was Becky Bodkin's house.  His in-laws were up on the other

12  side.

13      Basically, the Government found out that pornography was

14  being downloaded, and it took no further steps to try to

15  determine who, in fact, was downloading it.

16      I'd ask you to consider again when the times that these

17  downloads took place, how it was on random dates and there were

18  large gaps of time between the downloads.  Agent Thigpen told

19  you about the traits of individuals who are involved in child

20  pornography.  Remember, he said that they try to hide the

21  pornography and take steps such as renting storage units to

22  hide it.  Well, where did they find the pornography in this

23  case?  On a computer lying beside a couch up in the room, on a

24  computer that Amy Harp used and even took with her to work.

25  This wasn't on a computer that Chris Harp was trying to hide

**Closing Argument of Defendant (Mr. Edwards)**

1  from anyone.

2     Agent Thigpen said that people who are involved with child

3  pornography view it as prized possessions and want to keep it

4  with them and not be away from it.  Well, look at the time

5  frames when this pornography was being downloaded and then

6  immediately -- almost immediately, always, deleted after.

7  There are several-year gaps between the downloads.  That's not

8  consistent with someone who always had access to the computer

9  and wanted to keep it with them at all times, but was someone

10 who only had limited access to this computer.

11     There were 11 downloads over a 9-year time period.  Yeah,

12 there's a long history, but a very sporadic history.  Eleven

13 downloads and I think 2,162 times this computer was turned on.

14 This was done by someone who only had limited access to the

15 computer.

16     Agent Thigpen said that people who are involved in child

17 pornography often have other child erotica in their possession.

18 Any evidence that any of that was found in the Harps' home on

19 all those other devices and materials and disks that they took

20 out?  There wasn't.

21     In fact, I asked Mr. Hammer, "Are the downloads consistent

22 with someone who had limited access to the computer?"  I think

23 he indicated that he -- that they were.

24     And the other thing that came up were these bait files

25 that were shown.  We saw them with the -- I think it was a

**Closing Argument of Defendant (Mr. Edwards)**

1  Polish police officer and someone else.  But they had the
2  English titles on them.  And they were allegedly viewed on
3  September 21 of '20.  That would be when they -- Chris and Amy
4  were out buying their car.  If Chris Harp had seen these bait
5  files that said, "Guess what?  We know your IP address, and
6  we're going to" -- you know, "we know where we can get you," do
7  you think he would just put the computer down and walk away
8  from it?  It was four days later when the police showed up.
9  There was no indication he tried to destroy that computer or do
10 anything.  It just doesn't make sense.
11      The burden of proof in any criminal case rests squarely on
12 the shoulders of the Government.  They must prove the
13 defendant's guilt beyond a reasonable doubt.  Given the
14 evidence presented in this trial or, notably, the lack of
15 evidence, this burden has not been met.  In your deliberations,
16 I urge you to weigh the facts before you with the seriousness
17 they deserve.  Consider the evidence that supports Chris's
18 innocence and the significant gaps in the Government's case.
19      Remember, a verdict of guilt in the absence of conclusive
20 evidence not only undermines the integrity of our legal system,
21 but it also risks irreparable miscarriage of justice.
22 Therefore, based on the evidence and the principles that
23 underpin our legal system, I respectfully request that you
24 return a verdict of not guilty on all counts against Chris, and
25 such a verdict would reaffirm our commitment to justice,

### Rebuttal Argument of Government (Ms. Conklin)

1  ensuring that no individual is wrongfully convicted on

2  insufficient evidence.

3      Ladies and gentlemen, thank you for your attention and

4  your diligence and your service in this matter.

5          THE COURT:  Thank you, Counsel.

6      Rebuttal?

7          MS. CONKLIN:  Yes, please.

8                    REBUTTAL ARGUMENT

9          MS. CONKLIN:  Let's talk a little bit about this

10  alibi.  Amy Harp said, "April 4th, 2019, yes, my husband left

11  for work at that time that day, and I know I was home."

12      "Okay.  How do you remember that day?"

13      "I took my daughter's picture that day."

14      Okay.  It was a while ago.  It was a while ago.  We have

15  no -- nothing else except her vague memory of it.

16      Amy Harp testified that on September 18th her husband

17  was working with her father and he wasn't home.  Because, you

18  know, she was picking up her daughter from school; and then

19  when she finally got home that night, he wasn't there.

20      Well, she also testified that she was out shopping that

21  day and that she hadn't talked to her husband that day, on

22  September 18th, and that he was supposed to be working, but,

23  well, he could have left the workplace, and he could have been

24  somewhere else.  And what she actually knows and what she

25  actually thinks are sometimes two different things.

### Rebuttal Argument of Government (Ms. Conklin)

1    Let's talk about September 21st.  They were buying a

2  car.  Well, yeah, they bought a car on September 21st.  But

3  you heard Amy Harp's mother saying that Amy got to her house

4  about noon, which means that Amy would have dropped Chris off

5  at home a little before noon.  But Amy, knowing what the

6  timeline is, said that she didn't get home until 1:00.  Oh,

7  wait.  And then she said, "No, no, no.  I got home at ten

8  minutes to one, because I was home when I got my information

9  that Sirius was canceled."

10    Okay.  And then when we talked to her a little bit more,

11  Amy said, "Well, I actually had to install my new radio system

12  before I could get my cancellation from Sirius, and I got my

13  cancellation from Sirius then."

14    Okay.  Amy admitted that she texted her mom about 10:00 in

15  the morning to say, "Yay, I got the car.  I'll come show it to

16  you.  I'm going to drop Chris off."  And then they sat in the

17  car dealership for two hours, just sitting there: Do, do, do,

18  do, do.  I'm waiting for my insurance card before I drive off

19  the lot even though I'm an insured driver.  I'm not moving.

20    What Amy testified to is contradicted by her own mother.

21  But the times are flexible.  Why are the times flexible?  The

22  times are flexible because you heard about Shareaza.  You heard

23  how Shareaza works.  And you heard you can set up a download

24  for Shareaza at a time in the future.

25    What do we know about September 21st?  We know that Amy

**Rebuttal Argument of Government (Ms. Conklin)**

1   Harp had a doctor's appointment at 1:30.  And we know that
2   Christopher Harp knew that he wasn't going with her because of
3   COVID; she'd be gone.  While the cat is away, the mouse will
4   play.

5       September 18th.  Again, while the cat is away, the mouse
6   will play.  Amy Harp was gone.  She was shopping.  And then she
7   had to pick up her daughter at 3:30.  So she wasn't home that
8   afternoon.  She admits she wasn't home that afternoon and she
9   doesn't know where Chris was.

10      And again on April 4th, 2019.  She insists she remembers
11  that day because she took a picture.  Well, we take lots of
12  pictures lots of different days.  How do we know it was
13  April 19th [sic]?

14      Here's the other thing about this "alibi."  Amy and
15  Christopher Harp got home from the car dealership.  There was
16  nobody at the house.  Just given even Amy's own revised
17  testimony by the end of it that they got home early enough that
18  she could go ahead and install the radio and Chris helped her
19  and all this kind of stuff, nobody was at their house.  Nobody
20  was at their house.  Nobody was there.  So who's this person
21  that came into their house to access the computer and turn it
22  on and download porn?

23      Same thing on April 4th.  Amy was at the house -- or
24  April 18th.  She wasn't there at the house.  How do they
25  know?  How do they know who was there?

**Rebuttal Argument of Government (Ms. Conklin)**

1    Let's talk about April 4th, 2019.  This happened -- the

2   downloads of the porn happened -- the porn was available for --

3   at -- what was it?  8:00 in the morning?  7:00 in the morning?

4   You can look at those logs.  You can look at your notes.  Amy

5   would have been home.  Amy would have been home, and she would

6   have known if somebody was in the house using the computer to

7   get porn.  She didn't tell you anybody else was there.

8       They're telling you now that Jeremy Harp, this mad

9   computer hacker, this crazy ninja kind of guy, would sneak into

10   the house to access porn, download porn, look at porn, and then

11   he'd run away, again, leaving this trail behind him on the

12   computer.

13       I submit to you that Jeremy Harp is a convenient excuse.

14   Nobody saw him in the house.  Nobody saw him in the area.  And

15   in fact, Jeremy Harp had been banned from the house.  He had

16   been told by Amy, "No, you're not allowed to stay here unless

17   I'm not here."

18       Well, yeah, we can talk about Jeremy Harp now, because we

19   need something to explain this all away.  It's a red herring.

20   They want you to look at something else.  Jeremy Harp wasn't in

21   the house September 21st.  They got there right when the

22   videos were being -- right after the videos were being

23   downloaded according to this, you know, new time frame.

24       Again, April 4th, 2019, nobody knows Jeremy Harp was at

25   the house that day.

**Rebuttal Argument of Government (Ms. Conklin)**

1    September 18th, 2020, nobody knows Jeremy Harp is at the
2  house that day.

3    Jeremy Harp's not in the Westwood house when the computer
4  is making child pornography available.  And I submit to you
5  common sense dictates that if a peer-to-peer system can share
6  computer on the -- can share pornography on the computer,
7  somebody has to be able to access it, another user has to be
8  able to access that.  And in order for that other user to be
9  able to access the computer, the home computer that it's going
10  to get the porn from, that computer has got to be on.  It
11  doesn't magically sneak in through a closed computer.  That
12  computer has to be on, and that computer has to be accessible.
13  And that com- -- that -- those images can't be in the delete
14  file.  They can't be in the recycle bin.  They've got to be in
15  the active downloads.

16    MR. EDWARDS:  Your Honor, I'm going to object.  I
17  think she's testifying to something that was not in evidence.

18    THE COURT:  Sustained.

19    MS. CONKLIN:  Use your common sense.  I'm asking you
20  to use your common sense.

21    This computer, note it's a two-handed lift for this
22  computer.  You can see it back in the jury room.  This is old.
23  This is outdated.  It's using an operating system that is not
24  even considered, like, you know, usable anymore.  Why would
25  somebody keep a ten-year-old computer up in their little nook?

## Rebuttal Argument of Government (Ms. Conklin)

1  There's other computers at the house.  I can't even remember.

2  Christopher testified that there was, what, seven, eight

3  computers in the house?  And yet this ten-year-old, clunky,

4  super-old computer is with him in his office area, plugged in.

5  Use your common sense.  Why would that computer be there when

6  they have all these other new and technologically more advanced

7  computers?  They're going to use this ten-year-old clunker?

8      They're going to use this ten-year-old clunker because he

9  wants something that he can use that would be more private.

10          MR. EDWARDS:  I think we're beyond the scope of

11  rebuttal at this point in time, Your Honor.

12          THE COURT:  Overruled.

13          MS. CONKLIN:  Defense counsel was pointing out that

14  there's all these gaps; that there's all these gaps in the use

15  of -- or the finding of the child pornography.  I submit to you

16  that if you've ever noticed an addict, you'll notice that they

17  swear it off:  "I'm never going to do it again."

18      Shopping addict:  "I'm never going to do it again.  I'm

19  going to delete my Amazon app.  I'm never going to touch it

20  again.  I don't really need it."  And then the stress builds up

21  and the stress builds up and then the stress builds up and,

22  "God, I need those shoes."  So you download the Amazon app

23  again and you buy the shoes.  And then you use it again and you

24  use it again and you use it again.  And then you're like, "I

25  swear I'm never going to do it again."  I submit to you that

**Rebuttal Argument of Government (Ms. Conklin)**

1  that's the explanation for the gap here.

2      Look at it.  The computer was used, was used, was used,

3  stopped.  Used, evidence of it, stopped.  Shareaza was reloaded

4  again.  Why would Shareaza have to be reloaded again?  And you

5  can consider that it could be because he's like, "I got to

6  download this Amazon app again.  I need those shoes."

7      He needed to see that child pornography.  He knew it was

8  wrong.  Well, yeah, he knew it was wrong.  It's disgusting.

9  Most people know it's wrong.  And that's why he tried to stop.

10 And then that's where the gaps come in.

11     Look at it.  It's -- all the dates are associated with

12 significant things that he told you about that was going on:

13 moving, moving, new job, unemployed.  Yeah, there's gaps.

14 Those gaps can have an easy explanation sometimes.  And those

15 gaps don't necessarily mean that the ninja computer hacker

16 would sneak into the house and use the computer for child

17 pornography and then unsuccessfully delete the stuff --

18 because, again, he's a computer hacker -- and then run away

19 before anybody saw him.

20     This laptop was found up in the loft area where Chris

21 Harp's laptop -- or where Chris Harp's office computer was.

22 And you heard from Agent Thigpen telling about the search and

23 that he was sitting down in the living room talking with Chris

24 and Amy, and Chris kept looking up to the loft until the

25 computer was found.  And then it stopped.

## Rebuttal Argument of Government (Ms. Conklin)

1    Here's the thing.  At that point, none of the FBI agents

2    knew where the bad computer was.  None of them knew where the

3    bad computer was, again, because the computer was identified by

4    the GUID number, and we all know that the GUID number is in the

5    computer, not outside of the computer.  Who knew where the bad

6    computer was?  The Defendant.  And that's why the Defendant

7    kept looking up to the loft.

8    Let's talk about -- a little bit about credibility of

9    witnesses.  When you're weighing this evidence, you get to look

10   at the credibility of witnesses.  You get to look and see if

11   there's consistencies in the testimony, inconsistencies in the

12   testimony.  And you also get to look at who has what to gain.

13   Who has what to gain?

14   I submit to you that Amy Harp has a lot to gain.  And she

15   has a lot to lose if he's found guilty of this.

16   And I submit to you that Christopher Harp feels like he

17   has a lot to lose in this case.  You can consider that when you

18   weigh their testimony.  What do they have to lose, and what do

19   they have to gain?

20   I mean, when Christopher Harp was testifying, he wouldn't

21   give a straight answer.  He was defensive.  He wouldn't give a

22   straight answer.  He wasn't -- he was argumentative.  He wasn't

23   very forthcoming.  And you can consider that.

24   You can consider Amy's testimony.  It seems like she

25   doesn't grasp the seriousness of the situation.  Here's the

**Rebuttal Argument of Government (Ms. Conklin)**

1    thing.  She's a teacher.  She made sure to tell you that she

2    was a teacher of children who have been abused and that she has

3    kids.  If there was a concern about Jeremy Harp, why didn't she

4    report it to law enforcement?  Why didn't she do something?

5    "Oh, well, they didn't call me, so I'm not going to call them."

6         Well --

7              MR. EDWARDS:  Your Honor, I'm going to object.  She's

8    making it sound like we had some duty here.  We had no duty.

9              THE COURT:  Sustained.

10        You've got five minutes left in your allotment,

11   Ms. Conklin.

12             MS. CONKLIN:  Thank you.

13        She had no duty.  I'll admit it.  No legal duty.  But you

14   can consider what was done and what people said.

15        Again, this is not a crime that's committed in public.

16   This is not a crime where you can catch it on video cameras,

17   somebody goes into a bank.  This is a crime that people do

18   behind closed doors in the privacy of their own home or

19   somewhere where they can be very private.

20        Again, Jeremy Harp didn't have that opportunity at the

21   Westwood home where the child porn was available on the

22   computer because it wasn't deleted.  Jeremy Harp didn't have

23   the privacy when he was sitting up in the loft, not knowing

24   when Christopher and Amy could come back in.

25        The evidence that does remain, the evidence that truly is

1    there -- because, again, there's no evidence that Jeremy Harp
2    was ever around that computer on the dates and times of this
3    offense.  What the evidence does show is that Christopher Harp
4    was the one who had this computer, the one who controlled the
5    computer, the one who owned the computer, the one who used the
6    computer, the one who accessed the website whenever the
7    computer was used, and the one who kept this big, clunky,
8    ten-year-old laptop -- that's a miracle that it actually works
9    after ten years -- in his loft after multiple moves.

10        After he's purchased multiple computers and has better
11   technology, this laptop is still there.  Why is it still there?
12   Well, counsel had been suggesting that people who like child
13   pornography like to keep their child pornography close to them.
14   He kept his access to his child pornography close to him.  He
15   didn't need to keep the files, because he could download them
16   anytime he wanted with this little device here.

17        When you weigh the evidence, all the evidence, Christopher
18   Harp is the person beyond a reasonable -- and I mean reasonable
19   doubt.  Could you force yourself to believe something
20   different?  Yes.  But beyond a reasonable doubt, Christopher
21   Harp is the person who is guilty of three counts of receipt of
22   child pornography and possessing child pornography by accessing
23   with intent to view.  Thank you.

24        THE COURT:  Thank you, Counsel.

25        Ladies and gentlemen of the jury, as we discussed before

1   closings and before our lunch break, here in a moment you'll be
2   conducted back to your jury room where you may begin your
3   deliberations.  Madam Clerk will be right behind you with the
4   exhibits in this case, with the exception of Government's
5   Exhibit 8A through O.  Those exhibits, which are the video
6   clips, are on a separate device.  If you find during your
7   deliberations it would be helpful for you to review those
8   exhibits, just notify Madam Clerk via a note, and we can make
9   arrangements to bring those exhibits back to you.

10      She'll also bring you back a clean copy of the jury charge
11  that we reviewed prior to lunch.  If you could leave the copies
12  that y'all had as we went through that on your chair, we'll
13  collect those.  Madam Clerk will bring you a clean copy as well
14  as the verdict form.  I do want to review that with you
15  briefly.

16      Counts One through Three, each are separate allegations of
17  unlawful receipt of child pornography.  And they read as
18  follows:  As to Count One, Receipt of Child Pornography, on or
19  about April 4, 2019, in Monongalia County, in the Northern
20  District of West Virginia, in violation of Title 18, United
21  States Code, Sections 2252A(2)(A) and 2252A(b)(1), we, the
22  jury, on the issue joined, find beyond a reasonable doubt that
23  the Defendant, Christopher Harp, is -- and you'll see there are
24  two lines for guilty and not guilty and then a date -- the date
25  and then a spot for your foreperson's signature.

1        Each of the first three pages read exactly the same with

2   the exception of the count number and the date, Count One being

3   April 4, 2019; Count Two, September 18, 2020; and Count Three,

4   September 21, 2020.

5        Count Four reads as follows.  It's the fourth page.  As to

6   Count Four, Possession of Child Pornography, on or about

7   September 25, 2020, in Monongalia County, in the Northern

8   District of West Virginia, in violation of Title 18, United

9   States Code, Sections 2252A(a)(5)(B) and 2252A(b)(2), we, the

10  jury, on the issue joined, find beyond a reasonable doubt that

11  the Defendant, Christopher Harp, is -- and again, a line for

12  guilty, a line for not guilty, a line for the date and your

13  foreperson's signature.

14       With that, I'll ask court security to conduct you back to

15  your room where you may begin your deliberations.  Thank you

16  very much.

17            MR. EDWARDS:  Your Honor, the alternates, do they go

18  back as well?

19            THE COURT:  Yes.  I'm sorry.  Thank you, Mr. Edwards.

20  I'm sorry.

21       Mr. Smith and Mr. Mitter, if you could hold tight, we'll

22  have you escorted to the conference room across the hall.

23  Thank you.

24       The -- our principal jurors can -- you can take them back.

25            JUROR NO. 8:  Take our notebooks back?

1          THE COURT:  You may.  Yes, please.  Take your notes

2    with you.  But just leave the jury charge there, and we'll

3    collect those.  Thank you.

4        (Jury retired from the courtroom at 2:28 PM.)

5          THE COURT:  All right.  Thank you all.  Please be

6    seated.

7        And I'm sorry, Mr. Smith and Mr. Mitter.  Noting that all

8    of our principal jurors are alert and able to proceed, court

9    security will escort you to a conference room across the hall

10   to wait until such time as you may be called into service.  But

11   you can also take your notes but leave the jury charge there.

12       And Officer, if I could ask you to conduct those gentlemen

13   across the hall.  Thank you.

14       (Alternate jurors retired from the courtroom at 2:29 PM.)

15          THE COURT:  Thank you, Mr. Edwards.  We were down to

16   a singular alternate juror in our last trial, and I blanked on

17   that.  Thank you, sir.

18       Why don't we take a few moments, and we'll be in touch

19   here in a second so we can review the instructions on the

20   forfeiture issue and special interrogatories on that issue if

21   it becomes necessary.

22       You, of course, are not required to be in the courtroom,

23   if you could just let Ms. Russell know a good cell number to

24   get ahold of you.  But give us a few minutes to get that ready.

25   We'll go through that, and then otherwise you can become

1  free-range chickens.

2        Yes, Ms. Conklin.

3            MS. CONKLIN:  No.  I was just going to say should I

4  separate the video files from the rest of the evidence and --

5            THE COURT:  Yes, please.  And we'll leave those here.

6  If the jury requests those, we'll make arrangements to send

7  that back.

8        All right.  Thank you all.

9        (Recess taken from 2:30 to 4:37 PM.)

10           THE COURT:  Thank you.  Please be seated.

11       The Court will note counsel is present, as is Mr. Harp.

12       We received a note from the jury.  It reads, "Are there

13  dates and times of deletion of files on 4/4/2019 or closing

14  statement?"

15       My inclination is to respond in writing advising the jury

16  that they should rely upon their recollection as to the

17  evidence presented to them during trial.

18       Any objection to that from the Government?

19           MR. PERRI:  No, Your Honor.

20           THE COURT:  Mr. Edwards?

21           MR. EDWARDS:  No, Your Honor.

22           THE COURT:  Okay.  Well, I'm going to try and write

23  down what I just said out loud, and then we'll review it to

24  make sure it comports with that.

25           MS. CONKLIN:  And Judge, I can let the Court know

1    that there -- the thumb drives -- we discussed that the thumb

2    drives contained the I$ information along with the videos.  But

3    that's the only thing I can think of.

4            THE COURT:  Right.

5        "You should rely upon your recollection of the evidence

6    presented during the trial."

7        Any objection to that as a response?

8            MS. CONKLIN:  No, Your Honor.

9            MR. EDWARDS:  No, Your Honor.

10           THE COURT:  Okay.  All right.  Great.  Well, I'm

11   going to initial that.  Then I'll ask Madam Clerk to deliver

12   that to the jury.  And we'll stand at ease until we hear from

13   them further.  Thank you.

14       (Recess taken from 4:39 to 5:52 PM.)

15           THE COURT:  All right.  Thank you, everyone.  Please

16   be seated.  We have received another note from our jurors.  It

17   says, "We have reached a verdict."

18       Anything we need to take up before we have our jurors come

19   in?  From the Government?

20           MR. PERRI:  No, Your Honor.

21           THE COURT:  All right.  Mr. Edwards?

22           MR. EDWARDS:  No, Your Honor.

23           THE COURT:  Okay.  And we've got agreement with

24   respect to the forfeiture issue, that that will be by

25   stipulation.  So we don't need to re- -- we don't need to

1    instruct or ask any special interrogatories.

2         Is that correct, Mr. Perri?

3              MR. PERRI:  That's my understanding, Your Honor.

4              THE COURT:  Okay.  Mr. Edwards?

5              MR. EDWARDS:  Yes, Your Honor.

6              THE COURT:  Okay.  Understood.

7         Can we have our jurors, then, please, sir.  Thank you.

8         (Jury returned to the courtroom at 5:53 PM.)

9              THE COURT:  Thank you very much, ladies and

10   gentlemen.  Please be seated.  Okay.  We've got everybody.

11        Ladies and gentlemen of the jury, it's my understanding

12   that you've reached a verdict.  Let me ask first, have you

13   selected a foreperson?

14        Oh.  Yes, sir.  Thank you.  And is that correct the jury

15   has reached a verdict?

16             JUROR NO. 3:  Yes, sir.

17             THE COURT:  All right.  Could I ask you to pass the

18   verdict form to court security?  Thank you.

19        Ladies and gentlemen of the jury, I'm going to publish

20   your verdict.  That's a fancy law word for I'm going to read

21   it.  I do need to ask you to pay attention as I do that,

22   because Madam Clerk is then going to poll you, which is another

23   fancy law word for ask you, if this verdict represents your

24   individual verdict, to ensure it is unanimous.  Thank you.

25        As to Count One, Receipt of Child Pornography, on or about

April 4, 2019, in Monongalia County, in the Northern District of West Virginia, in violation of Title 18, U.S.C., Sections 2252A(a)(2)(A) and 2252A(b)(1), we, the jury, on the issue joined, find beyond a reasonable doubt that the Defendant, Christopher Harp, is guilty, signed and dated today.

As to Count Two, Receipt of Child Pornography, on or about September 18, 2020, in Monongalia County, in the Northern District of West Virginia, in violation of Title 18, U.S.C., Sections 2252A(a)(2)(A) and 2252A(b)(1), we, the jury, on the issue joined, find beyond a reasonable doubt that the Defendant, Christopher Harp, is guilty, and dated and signed today.

As to Count Three, Receipt of Child Pornography, on or about September 21, 2020, in Monongalia County, in the Northern District of West Virginia, in violation of Title 18, United States Code, Sections 2252A(a)(2)(A) and 2252A(b)(1), we, the jury, on the issue joined, find beyond a reasonable doubt that the Defendant, Christopher Harp, is guilty, signed and dated today.

As to Count Four, Possession of Child Pornography, on or about September 25, 2020, in Monongalia County, in the Northern District of West Virginia, in violation of Title 18, U.S.C., Sections 2252A(a)(5)(B) and 2252A(b)(2), we, the jury, on the issue joined, find beyond a reasonable doubt that the Defendant, Christopher Harp, is guilty, and again dated and

1    signed today.

2        Madam Clerk, could you poll the jury, please.

3            THE CLERK:  Juror Number 1, is this your verdict in

4    all respects?

5            JUROR NO. 1:  Yes, ma'am.

6            THE CLERK:  Juror Number 2, is this your verdict in

7    all respects?

8            JUROR NO. 2:  Yes, ma'am.

9            THE CLERK:  Juror Number 3, is this your verdict in

10   all respects?

11           JUROR NO. 3:  Yes.

12           THE CLERK:  Juror Number 4, is this your verdict in

13   all respects?

14           JUROR NO. 4:  Yes.

15           THE CLERK:  Juror Number 5, is this your verdict in

16   all respects?

17           JUROR NO. 5:  Yes.

18           THE CLERK:  Juror Number 6, is this your verdict in

19   all respects?

20           JUROR NO. 6:  Yes.

21           THE CLERK:  Juror Number 7, is this your verdict in

22   all respects?

23           JUROR NO. 7:  Yes, ma'am.

24           THE CLERK:  Juror Number 8, is this your verdict in

25   all respects?

 1              JUROR NO. 8:  Yes.

 2              THE CLERK:  Juror Number 9, is this your verdict in

 3  all respects?

 4              JUROR NO. 9:  Yes.

 5              THE CLERK:  Juror Number 10, is this your verdict in

 6  all respects?

 7              JUROR NO. 10:  Yes, ma'am.

 8              THE CLERK:  Juror Number 11, is this your verdict in

 9  all respects?

10              JUROR NO. 11:  Yes.

11              THE CLERK:  Juror Number 12, is this your verdict in

12  all respects?

13              JUROR NO. 12:  Yes, ma'am.

14              THE CLERK:  Thank you.

15              THE COURT:  All right.  Thank you, Madam Clerk.

16        Thank you, ladies and gentlemen.  Polling of the jury

17  confirming unanimity on each of the counts, the Court will

18  accept the verdict and adjudge the Defendant guilty on each of

19  the counts of conviction, Counts One through Four.

20        Ladies and gentlemen, I cannot thank you enough for your

21  time, your patience, and your service.  On behalf of the

22  parties and the Court, it's with our sincerest gratitude.  I

23  know it's been a difficult case dealing with difficult issues,

24  so we're certainly appreciative of your effort.

25        With that, that does conclude your service in this case.

1  If you wouldn't mind waiting for me for a moment so I can say

2  thank you in person, I'd appreciate it.  But if you need or

3  want to go, please feel free to do so.  You're under no

4  obligation to stay at this point.  But with that, again, with

5  my thanks, have a very, very pleasant evening, and you're free

6  to go.  Thank you.  And court security will show you through

7  that door there.  Thank you very much, ladies and gentlemen.

8          (Jury excused at 5:58 PM.)

9          THE COURT:  All right.  Thank you, everyone.  Please

10 be seated.

11     I'll ask Madam Clerk to file both the note indicating a

12 verdict was reached as well as the verdict form.  And the Court

13 will enter judgment finding Mr. Harp guilty.

14     Mr. Edwards, consistent with this Court's practice, if you

15 could let us know within a week, which would be next Thursday,

16 May 2nd, as to what deadline you'd like to set for any

17 post-trial motions.

18          MR. EDWARDS:  Yes, Your Honor.

19          THE COURT:  We will establish whatever deadline you

20 request.  If we don't hear from you by then, we'll arbitrarily

21 and capriciously select one of our own.

22          MR. EDWARDS:  Yes, Your Honor.

23          THE COURT:  Now that Mr. Harp stands convicted,

24 18 U.S.C. 3143 applies, and he shall be detained unless this

25 Court can make findings by clear and convincing evidence that

1    he's neither a flight risk nor a danger to the community.

2         Do you wish to be heard on that question, Mr. Edwards?

3              MR. EDWARDS:  Yes, Your Honor.

4         Your Honor, Mr. Harp has known about this charge for --

5    well, his home was searched, as this Court is well aware, on

6    September 25th, 2020.  He took no attempts to evade this

7    Court's jurisdiction or the jurisdiction of anywhere, and even

8    after he was indicted in November of 2023.  Thereafter, he has

9    cooperated.  And he is, of course, still being monitored.  He

10   is not a flight risk.  He has not made any attempts to be a

11   flight risk.  His family is here.  He has family in the area.

12   I don't believe that he poses a flight risk at all.  And I

13   would ask the Court to allow him to be -- remain out on bond.

14             THE COURT:  No.  Understood.

15        Any position from the Government?

16             MR. PERRI:  Your Honor, we don't have -- we wouldn't

17   have an objection to him remaining on bond given the

18   circumstances of the progression of this case.  I'm not sure

19   what conditions he's under right now, but I think that we would

20   definitely want a condition that indicates that he is not

21   permitted to be around children unsupervised, including his

22   own.  We would definitely request a condition like that.  If

23   that's not possible, then perhaps detention is then warranted.

24             THE COURT:  No.  Understood.

25        I would agree with you, Mr. Edwards.  I don't believe

1  there's any basis to believe that Mr. Harp presents a flight

2  risk here.  But the Court cannot, based on the convictions and

3  evidence during this trial, conclude by clear and convincing

4  evidence that he does not pose a danger to the community.

5  There are now four convictions in this case.  All of them

6  involve child pornography, three of which receipt, one of which

7  possession.  There's also evidence detailing nearly a decade

8  worth of child pornography, efforts to receive it and possess

9  it.

10       In light of the convictions, as well as the other evidence

11  in this case, again, the Court cannot conclude by clear and

12  convincing evidence that he does not pose a danger to the

13  safety of others in the community, and Mr. Harp shall be

14  detained pending sentencing.

15       Is there anything else we need to take up from the

16  Defendant's position at this point, Mr. Edwards?

17            MR. EDWARDS:  Not at this time, Your Honor.

18            THE COURT:  Understood.

19       Mr. Perri?

20            MR. PERRI:  Nothing, Your Honor.

21            THE COURT:  All right.  Mr. Harp, you'll be remanded

22  to the custody of the United States Marshals Service.  We

23  otherwise stand adjourned.  Thank you all very much.

24       (Proceedings concluded at 6:02 PM.)

25

1                                    CERTIFICATE

2

3        I, Rachel Kocher, a Registered Professional Reporter and

4   Official Reporter of the United States District Court for the

5   Northern District of West Virginia, do hereby certify that the

6   foregoing is a true and correct transcript of the proceedings

7   had in the above-styled action as reported by me

8   stenographically, all to the best of my skill and ability.

9        I certify that the transcript fees and format comply with

10  those prescribed by the Court and the Judicial Conference of

11  the United States.

12       Given under my hand this 5th day of September 2024.

13

14

15                           _____
                             Rachel Kocher, RPR/CRR
16

17

18

19

20

21

22

23

24

25