**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF WEST VIRGINIA**

**UNITED STATES OF AMERICA,**

v.                                                                   **Criminal No.  1:23CR69**

**CHRISTOPHER HARP,**

              **Defendant**.

**UNITED STATES' RESPONSE TO DEFENDANT CHRISTOPHER HARP'S MOTION TO VACATE JUDGMENT AND/OR GRANT A NEW TRIAL PURSUANT TO RULE 33 OF THE FEDERAL RULES OF CRIMINAL PROCEDURE**

    Comes now the United States of America, by and through Acting United States Attorney Randolph J. Bernard and Assistant United States Attorney Jennifer T. Conklin, and files this response to the defendant's motion to Vacate Judgement and/or Grant a New Trial Pursuant to Rule 33 of the Federal Rules of Criminal Procedure.  [Doc. 97].  For the reasons explained more fully below, Mr. Harp's motion should be denied.

**Procedural Facts**

    On November 7, 2023, the defendant was indicted for three counts of Receipt of Child Pornography occurring on or about April 4, 2019, September 18, 2020, and September 21, 2020, and one count of possession of child pornography occurring on September 25, 2020.  [Doc. 1].

    The case proceeded to trial on April 23, 2024, and lasted through April 25, 2024.  Prior to the start of trial, Mr. Harp, through his counsel, filed a witness list, naming four probable witnesses and one possible witness.  [Doc. 39].  In addition, an amended defense exhibit list was filed, listing a tax record from Monongalia County, reflecting that Jeremy Harp had a vehicle registered at the defendant's address in 2019.  [Doc. 51].  At trial, the government presented evidence that videos containing child pornography were downloaded to a computer via Shareaza, played on a media

1

player, and then sent to the recycle bin, that is, deleted from the active files but not permanently deleted.  The government also presented evidence that defendant Christopher Harp, and sometimes his wife Amy Harp, used the computer.  The totality of the evidence presented by the government, established that Christopher Harp owned the computer and that he used the computer to access, download, and view images of child pornography before deleting the videos.  The government also presented evidence pursuant to Federal Rule of Evidence 404(b) regarding prior use of the computer to download and view child pornography over several years, as well as evidence that child pornography was downloaded to the same computer at both the defendant's residence and at his in-laws' residence.  During trial, defense witnesses and the defendant testified that Jeremy Harp – the defendant's brother – was probably the person who downloaded, viewed and deleted the child pornography.  No one testified that Jeremy was present at the defendant's residence on the dates charged in the indictment.  No one testified that they saw him downloading child pornography on the computer.  Amy Harp testified that, on April 4, 2019, she was at the home she shared with her husband, the defendant, at the time the child pornography was being downloaded, and that he had already left the house that day, however, she did not testify that Jeremy Harp was at the residence.  [Doc. 90 at pp. 194-95].  Amy Harp further testified that when she returned home from buying a car on September 21, 2020 (another time child pornography was downloaded, as charged in the indictment), she did not see Jeremy Harp at her home.  [Doc. 90 at p. 202].  The defendant testified that he believed it was Jeremy Harp who was downloading the child pornography on his computer, and claimed that he confronted Jeremy Harp about it and Jeremy Harp "blew up" and left the area.  [Doc. 91 at p. 27].  The defendant testified that he did not remember if Jeremy Harp was staying at his residence around April 4, 2019, but that Jeremy Harp was not at his home on September 21, 2020, when he returned from the car dealership.  [Doc. 91

2

at p. 44, 55]. The defendant disclosed that he had contact with Jeremy Harp in January, after he was indicted but prior to the trial. [Doc. 91 at p. 46].

On April 25, 2024, the defendant was found guilty on all four counts. On June 13, 2024, the defendant moved for a Judgment of Acquittal and Motion for New Trial. [Doc. 84]. The government filed a response in opposition and this Court, after reviewing the record, denied the motion for new trial on December 9, 2024, finding that the evidence sustained the jury verdict. [Doc. 85, 92].

On August 23, 2024, the defendant filed a sentencing memorandum. [Doc. 87]. In that memorandum was a letter from Mr. Harp's father, indicating that, even though he had not heard any of the evidence, he thought that his son Jeremy Harp had probably done it, although Jeremy Harp had denied responsibility. [Attachment to Doc. 87 at p. 10].

On December 16, 2024, Jeremy Harp went to the law office of Cranston and Edwards, purportedly to take responsibility for downloading the child pornography. [Doc. 97-3]. Jeremy Harp was asked leading questions regarding his purported responsibility. When asked if he set up the Hewlett Packard computer (on which the child pornography was downloaded) he said, "I'm having a lot of trouble remembering it." [Doc. 97-3 at p. 8]. Jeremy Harp then stated he used Christopher Harp's computer "at his house and at his townhouse." [Doc. 97 at pp. 8-9]. When Jeremy Harp was asked if he downloaded child pornography and viewed it on the computer, he replied " It wasn't for viewing. It was to be used as a weapon." When counsel asked Jeremy Harp if he was the person "who actually downloaded it" Jeremy Harp initially did not give a discernable answer, but when asked by counsel what the answer was because it was not heard, Jeremy answered "I said yes." [Doc. 97-3 at p. 9]. Jeremy Harp was asked if he "did that" on multiple occasions and his answer was "Yep." [Doc. 97-3 at p. 9]. Jeremy Harp never discussed exactly

3

when or how he accessed the child pornography, or what type of child pornography was accessed. Jeremy was asked if anyone promised him anything in return for "giving this confession," or if anyone threatened him or someone he loved, and he denied both suggestions. [Doc. 97-3 at p. 10]. This actual questioning of Jeremy Harp via leading questions lasted just over a minute (although the whole "deposition" just over 4 minutes).

After this "deposition" was given, Jeremy Harp retrieved a firearm and effectively barricaded himself in the conference room. During that time, Jeremy Harp communicated with law enforcement, who pled with Jeremy Harp to put the gun down and leave the office without hurting himself. Much of that interaction was documented on body-worn camera. Government's Exhibit A (containing three sets of videos).

During this stand-off, Jeremy Harp was provided a cellular phone so he could communicate with Detective Ward from the Monongalia County Sheriff's Office, which occurred on speaker phone. Jeremy first explained that he believed his brother Christopher was framed by individuals trying to get to him (Monongalia 1, StephenCurrie_202412161547_VHC2009660_11922019.mp4 at approximately 1:21). Detective Ward tried to provide Jeremy Harp with a reason to stay alive and told him that Jeremy could only help his brother if he was alive to speak to a judge, to which Jeremy responded, "this was a f**king trap." *Id.* at 2:07 to 3:14. Jeremy Harp expressed his concern to Detective Ward that "they're gonna kill my entire family." *Id.* at 4:46. Detective Ward attempted to talk Jeremy Harp into putting the gun down and walking out and Jeremy said that Christopher would end up in prison or tortured for "shit" he didn't do. *Id.* at 7:19. Detective Ward, trying to calm Jeremy Harp down, told Jeremy he was doing a courageous thing and Jeremy replied "it wasn't courageous. . . I hate this stupid circus, it's just this stupid statistic circus." *Id.* at 9:00. Jeremy Harp then suggested

4

that this was all happening because of him. Jeremy Harp also stated, "Ever single person I love becomes this demented mirror image of themselves." *Id.* at 10:47, 11:22.

Jeremy Harp continued to explain that the attorney whose office he was in was his brother Christopher's attorney, that Jeremy Harp was "far beyond self-preservation," that he "want[ed] them to stop hurting [him]," and acknowledged that he sounded schizophrenic. (Monongalia 2, TimothyHunn_202412161559_WFN1000331_2012930.mp4 at 1:52 to 2:20). Jeremy Harp indicated to Detective Ward that he though if he was dead, maybe "they" would stop hurting them. *Id.* He said that he "received an improper and incorrect set of signals that caused [him] to do increasingly depraved and insane things out of fear that they're going to hurt [his] loved ones." *Id.* at 3:38 to 4:32. Jeremy Harp discussed some paranoid beliefs, indicated that he thought maybe he was being used as a weapon, and told Detective Ward that his "perception of reality [was] breaking down." *Id.* at 12:18 to 12:40. Jeremy Harp disclosed his motive for being at the law office: "I don't care if I was safe. I want Chris to be safe. Like the goal is to kill my f**king family." *Id.* at 15:54. Jeremy Harp stated "they're going to kill my brother. They're going to ruin his life. They're going to destroy his relationships." *Id.* at 16:05. Jeremy Harp also expressed the concerns that "they" were doing to drive his father to suicide. *Id.* at 16:10. During negotiations, Jeremy wanted Detective Ward to help him find out if somebody used [him] to cause the "suicide of a child." *Id.* at 19:35.

Later in the interactions, Detective Ward told Jeremy Harp that giving the statement wasn't enough and that Jeremy would have to testify before the grand jury, to which Jeremy said "But, oh, man, I didn't I, oh God. I, I did not do what I just said. The only reason I , the only reason I did that, ok is cause I thought it would stop. I thought it would make everything stop." *Id.* at 24:31 to 25:28. Jeremy Harp then said, "I can't be sure that this is just another layer to this intimately

5

complex plot to maneuver me into position, to dispose of me. . . . I did not. I did not frame my brother. I did not download this shit." *Id.* at 27:43. Jeremy Harp then told Detective Ward, "you understand how, how f**cked I am. I couldn't trust my own father." *Id.* at 28:10 to 28:16. Jeremy told Detective Ward, that the "pressure, the release valve" got hit two or three days before. *Id.* at 31:54 to 32:02. Jeremy Harp indicated that he wanted to speak to his father, but Detective Ward refused to provide the phone number and Jeremy Harp hung up on him. *Id.* at 36:00.

When Jeremy Harp answered the phone again, he discussed his concerns that his mother's death was a homicide and wondered if she tried to cut off her own oxygen supply. (Monongalia 3 TimothyHunn_202412161645_WFN1000331_2012931.mp4 at 8:18 to 9:31). Jeremy Harp discussed the concept of "slow kill" where someone drives another person to commit suicide. *Id.* at 10:45 to 11:38. He also wanted to determine if there was surveillance equipment in his house, and in his father's house. *Id.* at 13:50 to 12:30. Jeremy Harp then told Detective Ward "I'm scared about what Chris' sentence will be. And I that, that I can't just get over that. And that's, that's what drove me to, to f**king do this boneheaded as move because I, oh, God, God dammit man. . . . . I'm too psychologically fu**ked to do anything right at this point." *Id.* at 15:48 to 16:15. Jeremy Harp then stated, "This whole thing was just a f**king trick, wasn't it. . . . A trick by his lawyer. His lawyer told me that there's a very good possibility that he'll get out very quickly almost immediately if I did this." *Id.* at 29:49 to 30:45. Jeremy Harp then told Detective Ward "I am having another epiphany. He is hostile counsel. I was tricked into giving his lawyer everything his lawyer needs to frame me. . . . That means my dad, my dad was in on it." *Id.* at 33:40 to 34:37. Jeremy Harp explained his father was angry with him because Jeremy connected him with the "mastermind" and suggested that his father was trying to manipulate him. *Id.* at 45:14 to 46:02. Jeremy Harp told Detective Ward he needed to figure out what "Signal Zero" was and what caused

6

him to do something resulting in his own family trying to kill him. *Id.* at 47:08 to 47:50. Jeremy Harp told Detective Ward that he had not eaten for two days, that he might be experiencing the onset of schizophrenia, that he couldn't tell what was real anymore, and that he was ineffective. *Id.* at 49:13 to 58:13. Shortly thereafter, Jeremy Harp exited the room, leaving the firearm behind. Jeremy Harp was then transported to a psychiatric facility.

The United States Attorney's Office and the Monongalia County Sheriff's Office were each contacted by multiple individuals who know Jeremy Harp. Those individuals advised that they believed that Jeremy Harp had planned to falsely confess to downloading the child pornography before killing himself. The government will provide those names and any *Jencks* consistent with this Court's order. [Doc. 99].

## Legal Standard and Argument

The standard for determining whether a new trial should be granted based on "newly discovered" evidence pursuant to Rule 33(b)(1) of the Federal Rules of Criminal procedure is set forth in *United States v. Fulcher*, 250 F.3d 244, 249 (4th Cir. 2001) (citing *United States v. Custis*, 988 F.2d 1355, 1359 (4th Cir. 1989)). The district court must apply a five-part test:

> (a) the evidence must be, in fact, newly discovered, i.e., discovered since the trial; (b) facts must be alleged from which the court may infer diligence on the part of the movant; (c) the evidence relied on must not be merely cumulative or impeaching; (d) it must be material to the issues involved; and (e) it must be such, and of such nature, as that, on a new trial, the newly discovered evidence would probably produce an acquittal.

*Id.* When it comes to the fifth prong, the district court must make a credibility determination, either basing its determination on the affidavits or after an evidentiary hearing, to determine if the evidence is sufficient to produce an acquittal if a new trial was held. *United States v. Lighty*, 616 F.3d 321, 374 (4th Cir. 2010). If the district court does not find the witness credible, the district court could not then find that the witness's testimony would probably produce an acquittal at trial.

7

*Id.* The district court must view the "new" evidence against all the other evidence in the record, including all the evidence presented to the jury at the first trial. *Id.* The Fourth Circuit has "never allowed a new trial unless all five elements were established." *Fulcher*, 250 F.3d at 249, *see also United States v. Chavis*, 880 F.2d 788 (4th Cir. 1989). The trial court should use its discretion "sparingly" and only grant a new trial when the "evidence weighs heavily against the verdict." *United States v. Perry*, 355 F.3d 316, 320 (4th Cir. 2003). Because the purported "confession" of Jeremy Harp does not meet all five criteria, this Court should deny the motion for new trial.

(a) The evidence is not "newly discovered."

The evidence is not "newly discovered." The defense theory of the offense at trial was that Jeremy Harp was the person who committed the offense. Multiple defense witnesses testified that they had seen Jeremy Harp around the Christopher Harp residence. The defendant testified that Jeremy Harp had originally set up his computer and that Jeremy Harp would come to his residence and would have access to the computer. The defendant's testimony and Amy Harp's testimony suggested that Jeremy Harp was the person who downloaded, viewed, and deleted the child pornography. Jeremy Harp's statement is not "newly discovered." Courts have noted that there is a difference between something is "newly discovered" versus evidence that is "newly available." When a defendant is aware of the substance of possibly exculpatory testimony a witness could provide but that witness refuses to testify at trial, and then the witness later states that they would be willing to testify, that is "newly available" evidence, not "newly discovered" evidence. *See United States v. Griffin*, 489 F. App'x 679, 681 (4th Cir. 2012) (collecting cases) ("We decline to follow the First Circuit's approach because it is inconsistent with the plain and unambiguous term 'newly discovered evidence' found in Rule 33(b)(1). If the defendant knew about the evidence prior to the conclusion of his trial, by definition, the evidence cannot be newly discovered after

8

such trial."); *see also United States v. Mitchell*, 498 F. App'x 339, 341 (4th Cir. 2012); *United States v. Laffitte*, 2023 WL 2868471, at *2 (D.S.C. April 10, 2023) (Gergel, J.). The distinction between "newly discovered" and "newly available" has significance, and without this distinction, a defendant would be able to try one strategy at trial and, upon a guilty verdict, file a motion for a new trial because they have another witness who would testify to their innocence, or even allow one defendant to take responsibility for all in multi-defendant cases, where defendants come to agreements after a guilty verdict that one person would take responsibility for all, and therefore agree to give a new statement, accepting responsibility, so that the others may obtain a new trial. *Griffin*, 489 F. App'x at 681.; *see also United States v. Forbes*, 790 F.3d 403, 409 (2d Cir. 2015) ("Thus, if the reason that the testimonial evidence was unavailable at trial was the defendant's failure to call a witness that he knew could provide exculpatory testimony, a new trial on the basis of newly discovered evidence would not be warranted.").

Jeremy Harp's statement is not "newly discovered" in that he was a known individual to the defense and the entire defense strategy was to put the blame on Jeremy Harp. The defense had knowledge of where Jeremy Harp stayed and locations that he could be found, and even had direct contact with him on at least one occasion. Should the defense have wished to subpoena Jeremy Harp, they would have had the power of the U.S. Marshal Service to serve the subpoena on him. Fed. R. Crim. P. 17. Had Jeremy Harp been subpoenaed (or warranted) for trial, and chosen to invoke his fifth amendment right not to incriminate himself, and then after the statute of limitations ran out, given a written statement inculpating himself, that statement would be "newly available" evidence and insufficient to merit a new trial. *Id.*

The defense argues that Jeremy Harp's statement is "newly discovered" because he was difficult to locate, preventing the defense from securing his testimony at trial. [Doc. 97 at p. 5].

9

This statement, however, is rebutted by the ease with which the defense investigator was able to locate Jeremy Harp on at least one occasion. [Doc. 97-1]. Moreover, the defendant does not provide any information regarding any unsuccessful efforts to locate Jeremy Harp prior to trial. Again, difficult to serve does not make a witness newly discovered.

(b) The defense was diligent and knew about Jeremy Harp prior to trial.

As to the second element, the court must look at whether there are facts from which the court may infer diligence on the part of the movant to obtain the evidence. Again, Jeremy Harp was a known entity prior to trial. The defense theory was Jeremy Harp did it. There is no evidence of any efforts locate Jeremy Harp prior to the trial. But it appears to be a strategic decision whether to call Jeremy Harp as a witness. If the defense called Jeremy Harp and he denied downloading and viewing child pornography, the defense theory of the case would be less effective. Jeremy Harp, if called as a witness, would have been advised that he had the right to counsel prior to inculpating himself with a crime and the Court would have appointed counsel for him. A witness cannot be put on the stand just to have them invoke their right not to incriminate themselves. Again, if Jeremy Harp invoked his right against self-incrimination and did not testify, but later gave a statement admitting guilt, that would not be newly discovered evidence. Clearly, the defense was diligent in determining who possible witnesses could be, and also diligent in strategizing who to call at trial.

(c) The evidence is cumulative.

The third element contemplates whether the "newly discovered evidence" is "not merely cumulative or impeaching." While Jeremy Harp's statement is not "newly discovered evidence," the government will assume it is newly discovered, for the sake of argument, to address the other four prongs. If the evidence is assumed to be "newly discovered" the evidence is cumulative and

10

therefore does not merit a new trial. Evidence is cumulative "when it adds very little to the probative force of the other evidence in the case so that if it were admitted its contribution to the determination of truth would be out-weighed by its contribution to the length of trial." *Fulcher*, 250 F.3d at 550 (quoting *United States v. Kizeart*, 102 F.3d 320, 325 (7th Cir. 1996)). The defendant testified that Jeremy Harp set up the computer. Multiple defense witnesses testified that Jeremy Harp was often at the residence and had the ability to enter the residence and use the computer. The defendant said he was not the person who downloaded child pornography on the computer, but that it was Jeremy. The defense argues that Jeremy Harp confessed to using the computer, and downloading child pornography, not "for viewing. It was to be used as a weapon." [Doc. 97-3 at p.9]. This admission made, after Jeremy Harp indicated that he was having problems with his memory, and while exhibiting signs of mental distress, is just not reliable, and therefore not probative. Additionally, the admission contradicts the testimony of the defendant and Amy Harp: both the defendant and Amy Harp admitted that Jeremy Harp was not at the residence on two of the dates and times that the child pornography was being downloaded and viewed. Moreover, Jeremy Harp's statement is internally inconsistent with the evidence presented: Jeremy Harp, in the deposition, claimed that child pornography was downloaded "as a weapon" and not for viewing, yet at trial Mr. Hammer, the forensic analyst, and agent Thigpen, who reviewed the analysis, testified that various videos appeared in the "Most Recently Used" list, meaning they had been viewed.

      The defense also presented an affidavit from an investigator who stated that he located Jeremy Harp who admitted that he set up the HP computer, that he occasionally used the HP computer, that he helped the defendant and Amy move, and that he occasionally stayed at defendant and Amy Harp's house when they were not present. This information is consistent with

11

what the defendant and Amy Harp testified to. This evidence is cumulative and is not material. The affidavit goes on further to stated that "Jeremy Harp expressly denied being the individual responsible for downloading and viewing child pornography" at one meeting, but then the investigator states Jeremy Harp admitted to him that he was responsible for downloading child pornography on Christopher Harp's computer but he refused to provide a written statement. This affidavit contains contradictory statements and is unreliable evidence of Jeremy Harp's confession. Moreover, the affidavit is hearsay and inadmissible at trial, except to possibly impeach (although its use as impeachment is minimized because it contains conflicting statements).

(d) The purported "admission" would be material.

The fourth element the Court must consider is whether the newly discovered evidence is "material to the issues involved." Again, the government asserts that Jeremy Harp's "sworn statement" and "admission" to the investigator is not "newly discovered evidence." However, if any of Jeremy Harp's contradictory (and contradicted by trial evidence) statements were to be believed, and offered at trial, the statements would be material.

(e) The evidence is not of such a nature that it would likely produce an acquittal at trial.

The fifth element is whether the evidence is "such, and of such nature, as that, on a new trial, the newly discovered evidence would probably produce an acquittal." Again, Jeremy Harp's "statement" to defense counsel and Jeremy Harp's "statement" to the investigator taking responsibility for the downloading of child pornography is not credible.

Jeremy Harp's statement admitting responsibility is impeached by his denial of the admission and his allegations that he was tricked and framed a short time after the "admission" took place. What also is clear is that at the time Jeremy gave his "statement" to counsel, he was suffering significant psychological distress. Jeremy Harp indicated that he was having issues with

12

his memory. [Doc. 97-3 at p. 8]. He also stated that he downloaded the child pornography, not for viewing, but "to be used as a weapon." [Doc. 97-3 at p. 9]. Such a statement reflects Jeremy Harp's experiencing psychosis more accurately than it reflects the criminal act that he purportedly admitted to committing. Notably, Jeremy Harp's "confession" lacks any depth or detail or any corroboration.

Moreover, Jeremy Harp's purported "admission" to the investigator is hearsay and not admissible evidence. It would not likely produce an acquittal at trial because it would not be admissible at trial. In order for this "evidence" to be presented at trial, Jeremy Harp would have to take the stand, and there is no indication that Jeremy Harp, in a stable frame of mind and not experiencing psychosis, would admit to downloading the child pornography. Again, the trial court must judge the credibility of this evidence to determine whether the evidence would likely produce an acquittal at trial. *Lighty*, 616 F.3d at 374. Jeremy Harp's admission is impeachable with the multiple times he denied responsibility for the offense. [*See* Doc. 97-1 at p. 1]. His admission in the "deposition" is not credible. Furthermore, the reported "admissions" made to the investigator lack any detail which could be used to vet the reliability of the statement – or, even if we assume it to be true, to ascertain whether he was even responsible for all of the child pornography downloaded, given that he did not give any details.

Finally, after the defendant and Amy Harp's testimony that Jeremy Harp was not at the residence on two of the dates and times charged in the Indictment that child pornography was downloaded, Jeremy Harp's "admission" would be in direct contradiction to the defendant and his wife's sworn trial testimony. That would require the court to determine that either the defendant and his wife's testimony was not credible, or Jeremy Harp's "admission" during a psychotic break was not credible.

The defendant cannot demonstrate that Jeremy Harp's "confession" would be admissible at trial, that it is credible, and that it is of such an evidentiary quality, it would "probably produce and acquittal." The purported "admission" by Jeremy Harp is in contradiction to the evidence presented at trial and also in contradiction to the defendant's testimony as well as his witnesses' testimony.

The United States respectfully requests that this Court deny the defendant's motion for new trial as the defendant cannot demonstrate the five elements that would permit a court to grant a new trial. The evidence is not newly discovered, and would not produce an acquittal upon retrial.

        Respectfully submitted,

        RANDOLPH J. BERNARD
        ACTING UNITED STATES ATTORNEY

By:   /s/ Jennifer T. Conklin
        Jennifer T. Conklin
        Assistant United States Attorney
        WV Bar Number 14122
        1125 Chapline Street, Suite 3000
        Wheeling, WV 26003
        Telephone:  (304) 234-0100
        Fax:  (304) 234-0111

## CERTIFICATE OF SERVICE

I, Jennifer T. Conklin, Assistant United States Attorney for the Northern District of West Virginia, hereby certify that the foregoing UNITED STATES' RESPONSE TO MOTION TO VACATE JUDGMENT AND/OR GRANT A NEW TRIAL PURSUANT TO RULE 33 OF THE FEDERAL RULES OF CRIMINAL PROCEDURE was electronically filed with the Clerk of the Court using the CM/ECF system, and I hereby certify that the system has electronically sent this document to the following CM/ECF participant:

Bryan Edwards, Esq.
Cranston & Edwards, PLLC
1200 Dorsey Ave., Ste 11
Morgantown, WV 26501

Dated: January 24, 2025.

/s/ Jennifer T. Conklin
Jennifer T. Conklin
Assistant United States Attorney
WV Bar Number 14122
United States Attorney's Office
1125 Chapline Street, Suite 3000
Wheeling, West Virginia 26003
Telephone: (304) 234-0100
Fax: (304) 234-0111
E-mail: Jennie.Conklin@usdoj.gov