IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
AT CLARKSBURG

------------------------------x

UNITED STATES OF AMERICA,          :
                                   :
     Plaintiff,                    :
                                   :
  vs.                              : CRIMINAL ACTION NUMBER:
                                   : 1:23-CR-69
CHRISTOPHER HARP,                  :
                                   :
     Defendant.                    :

------------------------------x

Proceedings had in the motion hearing of the above-styled action on January 27, 2026, before the Honorable Thomas S. Kleeh, Chief District Judge.

APPEARANCES:

FOR THE UNITED STATES OF AMERICA:
    Jennifer T. Conklin, Esq.
    U.S. Attorney's Office
    1125 Chapline Street, Suite 3000
    Wheeling, WV 26003
    jennie.conklin@usdoj.gov

    David J. Perri, Esq.
    U.S. Attorney's Office
    P.O. Box 591
    Wheeling, WV 26003
    david.perri@usdoj.gov

FOR THE DEFENDANT:
    Craig P. Erhard, Esq.
    Law Offices of Craig P. Erhard, PLLC
    P.O. Box 1653
    Fairmont, WV 26555-1653
    cerhard@ma.rr.com

FOR JEREMY HARP:
    L. Richard Walker, Esq.
    Federal Public Defender Office
    230 West Pike Street, Suite 360
    Clarksburg, WV 26301
    richard_walker@fd.org

The Defendant was present in person.

Proceedings recorded by mechanical stenography.
Transcript produced by computer-aided transcription.

*Rachel Kocher, RMR, CRR*
*500 West Pike Street, Clarksburg, WV 26301*
*(304) 623-7179*

W I T N E S S E S

PAGE

**JEREMY HARP**

Direct Examination by Mr. Erhard                                    8

Cross-Examination by Ms. Conklin                                   27

Redirect Examination by Mr. Erhard                                37

**JOSH WARD**

Direct Examination by Mr. Erhard                                   40

Cross-Examination by Ms. Conklin                                   41

**JONATHAN SUITE**

Direct Examination by Ms. Conklin                                  44

Cross-Examination by Mr. Erhard                                     52

Redirect Examination by Ms. Conklin                                55

**JOSH WARD**

Direct Examination by Ms. Conklin                                  56

Cross-Examination by Mr. Erhard                                     63

**COREY THIGPEN**

Direct Examination by Ms. Conklin                                  64

Cross-Examination by Mr. Erhard                                     81

Redirect Examination by Ms. Conklin                                95

Recross-Examination by Mr. Erhard                                  98

EXHIBITS

| IDENTIFICATION | PAGE |
| --- | --- |
| Defendant's Exhibit 97-4D | 43 |
| Government's Exhibit 1 | 59 |
| Government's Exhibits 2A through 2Z | 70 |

Tuesday, January 27, 2026, 11:36 AM

- - -

THE COURT: Madam Clerk, would you be kind enough to call our next case, please.

THE CLERK: The United States of America versus Christopher Harp, Criminal Action Number 1:23-CR-69. Mr. Harp is present in person.

Will counsel please note your appearance for the record.

MS. CONKLIN: Jennifer Conklin and David Perri on behalf of the United States.

MR. ERHARD: Craig Erhard on behalf of Mr. Harp, Your Honor.

THE COURT: All right. Good morning, counsel. Good morning, Mr. Harp.

We scheduled this for -- to take up the renewed motion for new trial.

Mr. Erhard, I assumed that we would be hearing from some witnesses. Is that correct?

MR. ERHARD: Your Honor, the only -- the family hired a private investigator before I was appointed. You may be able to see his affidavit, which Mr. -- Attorney Edwards made an exhibit to his original motion. He is -- he has, throughout the pendency of my appointment, been hospitalized. He's fighting cancer. The last time I spoke with him, he -- he said he wasn't going to be able to -- he was going to have to

undergo surgery and is not going to appear.  So I've advised Ms. Conklin that he will not be here.

Really, the entirety of Mr. Harp's motion will be the deposition from Jeremy Harp.  And I think -- I think the case will go something like us discussing, some way or another, the contents of the deposition, and then the Government's position will be to challenge the reliability of that.

THE COURT:  All right.  Understood.

Ms. Conklin, Mr. Perri.

MS. CONKLIN:  Your Honor, just briefly.  We do have some witnesses.  Agent Thigpen is the case agent in the case, and he is appearing on Zoom.  Additionally, we had another witness, Jonathan Suite, who was going to be appearing this morning.  Unfortunately, his car got stuck coming out of his neighborhood, and he has had to walk back to his house.  He is available to appear by Zoom if we need to hear from him, if that's okay with the Court.  I know he was going to try and be here, but the snowpocalypse had other plans.  And we also have Detective Ward here as rebuttal witnesses, should any of that be necessary.

It's the Government's position, though, that there must be direct evidence from the defense in order to meet its burden. So I guess --

THE COURT:  Yeah.

MS. CONKLIN:  -- we'll have to see what the evidence

is.

THE COURT:  No.  Understood.

I think that's correct, Mr. Erhard.  It's your burden on this motion.  So if you're going to call any witnesses -- that would include the other Mr. Harp -- now is the time.

MR. ERHARD:  I'm sorry.  Could you repeat that, Your Honor?

THE COURT:  Sure.

I do think it is the defendant's burden with respect to this motion, so -- particularly with the grounds that are raised.  So if you're going to call any witnesses, now would be the time.  And that would include if you're going to call Jeremy Harp as a witness as well.

MR. ERHARD:  Defense calls Jeremy Harp, Your Honor.

THE COURT:  Okay.  Understood.

Mr. Harp, sir, can I ask you to step forward, please.

MR. WALKER:  Good morning, Judge.

THE COURT:  Good morning.

Good morning, Mr. Harp.  I'm going to ask you to pause right there so that Madam Clerk can swear you in.  Then you're going to take the witness stand.  Thank you.

(JEREMY HARP, DEFENDANT'S WITNESS, SWORN)

THE CLERK:  Thank you.  You can have a seat right over here.

THE COURT:  Yes, sir.  Thank you, Mr. Harp.  All

right.

Before you begin, Mr. Erhard.

Mr. Harp, obviously, you've been sworn in, so you are under oath.  So please keep in mind any false statements or false answers you give in response to any questions, that can -- that can result in criminal charges for false swearing or for perjury.

Do you understand that, sir?

THE WITNESS:  Yeah.

THE COURT:  All right.  This court has appointed Richard Walker, Mr. Walker, as your counsel in connection with this matter and your testimony in this matter.  And you're aware of that; correct, sir?

THE WITNESS:  Yeah.

THE COURT:  All right.  Mr. Walker is here this morning.  And if there's a question posed to you that you would like to talk to Mr. Walker about before you answer it, please just say so.  Mr. Walker, of course, will let us know as well.

Okay?  Do you understand all those things, sir?

THE WITNESS:  Yeah.

THE COURT:  Okay.  Thank you.

Mr. Erhard, go right ahead.

MR. ERHARD:  Thank you, Your Honor.

*J. Harp - Direct Examination (Mr. Erhard)*

DIRECT EXAMINATION

BY MR. ERHARD:

Q.    Mr. Harp, can you state your full name for the record?

A.    Jeremy Ray Harp.

Q.    And this will be similar to the -- the rules will be similar to the deposition you undertook with Attorney Edwards. There's a court reporter taking down what we say.  And so when you go to answer a question, do so as you've done for the Court, audibly rather than shaking your head or nodding.  Okay?

A.    Okay.

Q.    Are you related to Chris Harp?

A.    Yes.

Q.    How are you related to him?

A.    He's my brother.

Q.    Pardon me?

A.    He is my brother.

Q.    I -- you may be -- I should -- I should mention this.  I represent your brother now.  He's -- he was formerly represented by Bryan Edwards.

      Are you aware of that?

A.    Yeah.

Q.    You're aware that Chris went to trial on charges related to illicit child pornography on a laptop; is that correct?

A.    Now I am, yeah.

Q.    Okay.  When did you come to learn that?

*J. Harp - Direct Examination (Mr. Erhard)*

A.   Well, I didn't even -- I wasn't even aware that a federal court case had even happened until afterwards.  So I -- it's like -- it was like a couple of months afterwards, I'd say.  And I heard it from my dad.

Q.   Okay.

A.   Yeah.

Q.   I want to ask you some questions about where you lived during, like, 2018 to 2020.  Can you tell that -- tell the Court that?

A.   I lived in Toledo, Ohio, for a while.  I was homeless for a little while and was traveling around, traveling between Toledo and Morgantown.  I lived in Morgantown briefly, then back to Toledo, and then eventually we moved to Kentucky -- London, Kentucky, where I ended up living for -- just for -- until like 2023-2024, and then I was homeless again.

Q.   You live with your father there?

A.   Yeah.

Q.   Okay.  So is it fair to say you didn't really have a stable residence during that time period?

A.   Yeah.

Q.   Okay.  Was there a -- where did you live when you lived in Morgantown?

A.   I just set up a tent by the old mall, the Mountaineer Mall.  I think it's the Mountaineer Mall.  And --

Q.   Was it outdoors?  Was it in a tunnel?

*J. Harp - Direct Examination (Mr. Erhard)*

A.    Yeah, it was outdoors.

And I also lived briefly with a friend of mine for a little while in the winter.

Q.    And during any of that period of time, 2018 to 2020, would you come to Fairmont to visit Chris and his family or your father or anyone else?

A.    Fairmont?

Q.    I'm sorry.  To Morgantown.  Would you go to Chris's residence?

A.    Occasionally, yeah.

Q.    Okay.  Did -- how -- when you say occasionally, can you give me an approximate of how frequently that would happen?

A.    Well, I would normally just be traveling around Morgantown.  And I'd go to his house occasionally to visit him. He had me house-sit for him.  And other than that, it was, like, really infrequent.  So it's not like I would visit him every day.  It was like, you know, every so often I'd go to his house.

Q.    Did you -- did you -- did you -- how did you access the house if he wasn't there?  Did you have the garage code?  Or how did you do that?

A.    I only -- when -- I only had the garage code when he was having me house-sit.  I -- before, I didn't go there if they weren't there.

Q.    Did you know where his laptop was in the house?

*J. Harp - Direct Examination (Mr. Erhard)*

A.    No.

Q.    Did you ever use his laptop?

A.    I remember using it once to apply for a job, I think.  And he was actually -- he was right there watching me do it.

Q.    Did it have a password?

A.    It was already logged in.  So it's like I -- he already -- it was already logged in, so I didn't -- I didn't know what the password was.  I just used it.

Q.    Did you originally set that laptop up for Chris?

A.    I recall setting him up as -- I remember he -- him getting the laptop a long time ago.  And I gave him a user profile, and I gave him admin privileges on his own computer, and -- but I don't remember what he -- like, I don't remember what the password was.  I just had him set it.  So I don't remember what it was.

Q.    You gave him admin privileges.

A.    Yeah.  Because it's his computer, so obviously.

Q.    And it -- so you're familiar with the internet and how to set up a computer and things like that?

A.    Yeah.

Q.    At that time you were as well?

A.    Yeah.

Q.    Are you familiar with, say, peer-to-peer programs?

A.    Yeah.  I know how they work.  I usually avoid them because that's the fastest way to get malware.  So...

*J. Harp - Direct Examination (Mr. Erhard)*

Q.   Mr. Harp, were you a drug user during that period, 2018 to 2020?

A.   During that time, I was only occasionally using marijuana. I -- later on it escalated to harder drugs.  But during that time, I was only using weed occasionally.

Q.   Were you -- did you become, at some point, a meth user as well?

A.   Yeah.  Yeah.

Q.   Did -- did you -- were you ever -- did you ever try to break into WVU and take laptops from the school?

A.   No.

Q.   Okay.  Were you ever -- did law enforcement ever talk to you about that?

A.   No.

Q.   Okay.  I want to fast-forward a little bit to the deposition that you took for -- at Attorney Edwards' office. Do you remember that?

A.   I remember bits and pieces of it --

Q.   Do you know what a dep- --

A.   -- because, like --

Q.   I'm sorry.  Go ahead.

A.   I just remember bits and pieces of it, because, like, I was still using at the time, and I hadn't slept for about two days, and I was still tweaking.  And I -- you know, I remember, like -- I remember the night before, and I remember

*J. Harp - Direct Examination (Mr. Erhard)*

bits and pieces of that day, like getting arrested, and that's about it.

Q.   Do you know what a deposition is?

A.   Not in the way that a lawyer would understand it.

Q.   Okay.

A.   Like, I -- when you say deposition, it's like all I know is I get to go in there and say stuff, and that's it.  Like...

Q.   So --

A.   Sorry.

Q.   -- let me -- do you remember being put under oath, for example?

A.   No.

Q.   Like you were in court today.  Did someone have you raise your hand and --

A.   No.

Q.   Did you -- did you -- were you asked to provide a copy of your driver's license for an exhibit to the deposition?

A.   I don't think so, but...  Yeah.

Q.   You don't think so?

A.   No.  Because I -- that's -- I just don't really recall that.

Q.   Was -- and this was in December of 2024; is that right?

A.   Yeah.

Q.   Do you -- was Attorney Edwards there with you?

A.   He was in the room, yeah.

*J. Harp - Direct Examination (Mr. Erhard)*

Q.    Are you sure he didn't attend by phone?  Let me back up.

A.    Sorry.

Q.    No, no.  That's quite all right.

Before you -- before you went to Attorney Edwards' office -- you went there without an appointment; right?  You just -- you just came and --

A.    Yeah, I just kind of showed up one day.

Q.    Okay.  And is it -- is it your recollection that he was there or he wasn't there?

A.    I thought he was in the room.

Q.    Okay.

A.    I --

Q.    Do you remember it being video-recorded?

A.    No.  Or wait.  No.  I remember -- I -- man, I'm sorry.  I -- I remember someone talking to me over the internet, like over a computer.  Like, someone -- there were people in the room, and then there was someone on a projector.  And then that was it.

Q.    That person on the projector, was that a male?

A.    Yeah.  I remember -- I remember there were women in the room and then dudes on the -- dudes calling in via Zoom.  And that's about it.

Q.    In that deposition, you were asked a series of questions; correct?

A.    I remember being asked, like, one question.  But I

*J. Harp - Direct Examination (Mr. Erhard)*

don't...

Q.   What question was that?

A.   It was something about, like, whether I was -- whether I was, like, phys- -- whether I was at his house; right?  Or something like that.  At any point.

Q.   At Chris's house?

A.   Yeah.

Q.   Okay.  Did Attorney Edwards ask you whether -- whether you knew anything about the child porn images on Chris's laptop?

A.   I don't recall that.

Q.   Do you recall telling him that it was you who did it?

A.   No.

Q.   Do you recall -- so you don't recall whether you confessed to those crimes Chris was convicted of or not.

A.   No.

Q.   You don't remember?

A.   I mean, I was -- I hadn't slept for, like, two days before that, and I was tweaking on meth.  I'm sorry.  Like, I -- I'm an absolute mess and --

Q.   Let me ask you this.  Do you -- do you think, while you were at that deposition, you did your best to tell the truth?

A.   Did my best to tell the truth.  I don't even remember what I said, dude.

Q.   I -- like, I'm trying to --

A.   I'm sorry.

*J. Harp - Direct Examination (Mr. Erhard)*

Q.   -- accommodate that, sir.

A.   Yeah.  I'm sorry.

Q.   Do you --

No, no.  That's quite all right.

Would you have -- if -- if you were told that you had to tell the truth, would you have -- would you have done that?

A.   Yeah.  I mean, I would try to.  But it's like my understanding of what's happening is complete -- is complete -- like, I have a wildly incomplete picture of what's happening. All I know is that he's telling me, "I'm innocent and I'm being framed."

And I'm like, "That's really bad, and I care enough to try and help you."

But it's like I have a wildly incomplete picture of this. Like, I didn't even know this was happening until afterwards. So -- and, you know, I'm homeless and basically --

Being homeless is really hard, plus people are -- people are confusing me for him and, like, robbing me and stabbing me with syringes and stuff.  So it's like -- it's pretty wild. And I just wanted to make it stop.

MR. ERHARD:  Your Honor, by my count, I've got three exhibits that Attorney Edwards attached to his motion.  I don't believe that the video -- to my knowledge, the video was never marked.  But I'm given the understanding that it was emailed to the Court and to Ms. Conklin.  I'd like to mark it if it's not

*J. Harp - Direct Examination (Mr. Erhard)*

already marked.

THE COURT: Yeah. Certainly.

MR. ERHARD: I guess that would make it 97-4D. And Your Honor, I've got it cued up. I would like to play the video of Mr. Harp's deposition.

THE COURT: All right. Go right ahead.

Oh, let me ask. Any objection, Ms. Conklin?

MS. CONKLIN: Your Honor, the video deposition is hearsay. I don't believe that hearsay is sufficient to meet the burden in this case. I mean, I don't think he's laid the foundation for it. But, you know, I have no objection to the deposition in and of itself.

THE COURT: Okay. Understood.

Go ahead, Mr. Erhard.

MR. ERHARD: Thank you, Your Honor.

BY MR. ERHARD:

Q. Mr. Harp, can I ask you to look at the screen? Is that you?

A. Yeah.

Q. Does that jog your memory about -- does that appear to be the same environment you were in at Bryan Edwards' office?

A. Yeah. But I thought -- I thought he was there. But it's like I -- I'm sorry, man.

(Pause in proceedings.)

MS. CONKLIN: Judge, I know that defense counsel has

*J. Harp - Direct Examination (Mr. Erhard)*

previously provided this both to the Court and to me.  I really -- you know, it can be marked as evidence.  I don't know if we really necessarily need to play it again.

THE COURT:  I think he wants to walk through it with the witness.

You can go ahead, Mr. Erhard.

MR. ERHARD:  I'll close it and open it again, Your Honor.

THE COURT:  Okay.

(Video playing.)

BY MR. ERHARD:

Q.  Mr. Harp, were you able to pay attention to that video while it played?

A.  Yeah.

Q.  Do you recall -- do you recall being there at Bryan's office and giving that deposition?

A.  I recall bits and pieces of getting arrested.  And that's about it.

Q.  After -- after the deposition, what happened?

A.  I -- basically, I remember, like, absolutely freaking out. And then I wanted to -- like, I wanted to get attention somehow.  And I realized, like, I just got tricked into giving myself a fatal injury, and I needed attention.  And then after that, I absolutely freaked out.  I -- I pulled out a handgun, and I, like, put it to my own head and was, like -- and just

*J. Harp - Direct Examination (Mr. Erhard)*

said, "I'm not leaving this room."

And then I wanted to wait for a detective or something. And they ended up -- I ended up waiting for, like, a negotiator. And then I ex- -- I tried to explain to the negotiator what was going on. Because I had no other way of communicating what was happening, if that makes sense.

Q.   So after the deposition, you -- you pulled out a pistol?

A.   Yeah.

Q.   And you were -- you were threatening to commit suicide?

A.   Yeah. I was just like -- I was -- I was definitely there. I was just like, "Here, I'm going to sit here until I can figure -- until I get some information." Because --

Q.   So the negotiator you talked about, was he asking you to put the gun down?

A.   Yeah.

Q.   Did he ask you to come out of the room you were in?

A.   Yeah. And I didn't. I needed to -- I just needed someone to understand what was happening.

Q.   And that went on for a little while, didn't it?

A.   Oh, yeah. It went on for a long time. I don't remember how long.

Q.   Did you ultimately agree to put the gun down --

A.   Yeah.

Q.   -- and come out?

A.   Yeah.

*J. Harp - Direct Examination (Mr. Erhard)*

Q.   Did you -- do you remember telling the police that you needed to know something before you agreed to come out?

A.   Yeah.

Q.   What was that?

A.   I -- I needed to know that someone could understand what was happening.  Because the thing is, even though -- like, things were happening in my life that I thought were dealing with this.  Like, I was -- I was being offered money to do this.  And I had no way to communicate that.

Q.   Who was offering you money?

A.   Amy, ultimately.  It was Chris and Amy, but it's like I only -- I only managed to get -- I only managed to catch her making the -- making the actual offers.

Q.   How much money?

A.   I think it went up to -- I think it stopped at 10,000, I think.

Q.   You didn't mention that during the deposition; correct?

A.   No.  Because I had no way to communicate that to anyone.

Q.   When you -- when you were ready to come out of the room and you were still talking with the negotiator, do you recall asking him about suicidal children in Laurel County, Kentucky?

A.   What?

        MR. WALKER:  Objection.  I object.

        MS. CONKLIN:  Objection, Your Honor.

        THE COURT:  One at a time.

*J. Harp - Direct Examination (Mr. Erhard)*

Mr. Walker?

MR. WALKER:  I object.  This is beyond the scope of what he's been asked to come all the way to West Virginia to testify about.  Suicidal children are not part of the res gestae of this case, relevant in any way.  And I don't think it's appropriate for him to be questioned on matters that are so far beyond the scope of this criminal prosecution.

THE COURT:  Understood.

What's the relevance of this, Mr. Erhard?

MR. ERHARD:  Your Honor, I think it's much more probative than that.  And I'll get there.  But at the -- Mr. Harp inquired about very, very specific --

THE COURT:  Was this during the hostage situation?

MR. ERHARD:  Pardon me?

THE COURT:  Was this during the hostage situation?

MR. ERHARD:  Yes, it was, Your Honor.

THE COURT:  Okay.

MR. ERHARD:  It was right before he came out.  That was his last condition before coming out.  He wanted to know if they could check -- if the police could check Laurel County, Kentucky, for suicidal boys between -- boys who had committed suicide between the ages of three and eight years old in Laurel County, Kentucky, where he now lives.  I think he put a time frame on that of four to five years prior.

THE COURT:  Understood.

*J. Harp - Direct Examination (Mr. Erhard)*

Ms. Conklin, is there an additional objection from the Government?

MS. CONKLIN:  No, Your Honor.  I was going to object to relevance.

THE COURT:  Okay.

MS. CONKLIN:  It has nothing to do with the -- what was said during the deposition or whether there's evidence that Mr. Harp committed this crime that Christopher Harp was convicted of.

THE COURT:  No.  I understand that.  I'm going to overrule the objections.  However, I think it's probative as to credibility of the witness.

Go ahead, Mr. Erhard.  Ask your question again, sir.

MR. ERHARD:  Thank you, Your Honor.

BY MR. ERHARD:

Q.   Mr. Harp, do you remember -- you heard a little bit of the discussion about this.  Do you remember asking the detective you were talking with -- you said that you couldn't come out until after they -- the police checked suicides of boys three to eight years old in Laurel County, Kentucky, in the last four to five years?  Do you remember that?

A.   No.

Q.   Do you remember you -- do you remember telling the police you were going to kill yourself if you didn't -- if you -- if the answer to that was yes, there were suicides reported in

*J. Harp - Direct Examination (Mr. Erhard)*

Laurel County meeting your criteria?

A.    I didn't --

MR. WALKER:  Objection.

THE COURT:  One second.

MR. WALKER:  I object again, Judge, about comments about suicide.  This is just beyond the scope of what he offered in the deposition --

THE COURT:  Uh-huh.

MR. WALKER:  -- what he can offer today, and to any material questions that are presented to the Court by the motion for a new trial.  Thank you.

THE COURT:  No.  Understood.  Overruled for the same reasons.  I think it's probative of the witness's credibility.

Go ahead, Mr. Erhard.

THE WITNESS:  Dude, I got no idea what you're talking about.

BY MR. ERHARD:

Q.    Okay.

A.    All I remember is threatening to kill myself if I couldn't talk to people.  Like, I wanted to talk to -- I wanted to call my dad, and they wouldn't let me do that.  And he just wanted me to come out.  And it's like, "No.  I want to talk to him first."  And I remember that.  That was -- that was definitely there.  But I -- dude, I got no idea what you're talking about. I'm sorry.

*J. Harp - Direct Examination (Mr. Erhard)*

Q.   Well, do you remember telling the negotiator, "I need to know whether somebody used me to cause the suicide of a child"?

A.   No.

Q.   Okay.  You are living in Laurel County, Kentucky, now; right?

A.   No.

Q.   Pardon me?

A.   No.

Q.   That's where you -- is that where you came from?

A.   Yeah.

Q.   And your dad lives there?

A.   Yeah.

Q.   That's the Kentucky address you talked about earlier.

A.   Right.

Q.   After your deposition, did you also tell the -- tell the police that Chris was innocent of the charges?

A.   I told them that I thought he might be innocent but, then, I didn't know anything.  I just believed him.  He said, "I'm innocent and I was framed," and I just believed him.

Q.   Did you -- did you remember meeting Tom Gorgone, Chris's private investigator?

A.   Yeah.

Q.   Did -- do you remember if you told him that -- the same thing you said in the deposition, that it was you who did this?

A.   No.  No.  I remember that meeting.  I remember that

*J. Harp - Direct Examination (Mr. Erhard)*

meeting.  I remember telling Tom that I thought that -- that, like, I don't think he would do this and there's something -- there's something off here.

     And the first time I went into Edwards' office, I was sober and normal.  And I just told him, like, "No.  No, I have nothing to do with this."

Q.   Are you sober now, sir?

A.   Yeah.  Yeah, I don't do that anymore.  I'm trying to not do that.

Q.   If Tom Gorgone put -- wrote in an affidavit that you had confessed to him as well, would that be --

          MS. CONKLIN:  Objection, Your Honor.  Calls for speculation.

BY MR. ERHARD:

Q.   -- would that be a lie?

A.   Yeah.  I did not --

          THE COURT:  Overruled.

          THE WITNESS:  Sorry.  Sorry, Your Honor.

          THE COURT:  Why don't you ask that one more time, Mr. Erhard.

          THE WITNESS:  Sorry.

BY MR. ERHARD:

Q.   I want to ask you for a minute about your electronic devices, like cell phones.  How many cell phones have you had over the past, say, two years?

*J. Harp - Direct Examination (Mr. Erhard)*

A.    I'd say like three or four.  I don't know exactly.
It's...

Q.    And why so many?

A.    Well, they get broken or stolen or busted.  And, like, I
had one that got stolen.  I had one that got busted because I
dropped it.  I got another one for free from some random dude
in Toledo.  And my current cell phone came from my dad.

Q.    Did you tell your dad you destroy your cell phones?

A.    No.  I -- the one -- the one that I got rid of in Toledo I
stuck in one of those EcoATM things that gives you money for
them.

Q.    I'm sorry.  I couldn't -- I didn't understand you.  I
apologize.  Can you --

A.    You -- so they have these little things in shopping
centers where you can put your phone in them and it gives you
money for it.  And basically, if the phone is defunct, I just
put it in there.

Q.    Did you ever have illicit content on any of those devices?

A.    No.

Q.    Did you sell your laptop to your father?

A.    Yeah.

Q.    What happened to that laptop?

A.    He used it for a little while, and then I used it for a
little while, and then I noticed that it had malware on it that
I couldn't remove.  Like, I tried to remove it repeatedly, and

*J. Harp - Cross-Examination (Ms. Conklin)*

it just wouldn't go.  And I ended up destroying it.

Q.   Did you throw it in the river?

A.   Yeah.

Q.   When was that?

A.   I don't recall exactly when that was.

Q.   Was that in Kentucky?

A.   Yeah.

Q.   Was there peer-to-peer software on it?

A.   No.

MR. ERHARD:  Your Honor, that's all the questions that I have for now.  I would like to reserve the right to talk to the -- to call the negotiator regarding the comments that Mr. Harp couldn't -- couldn't recall about the suicides.

THE COURT:  I'm sure we'll hear about that.

Ms. Conklin, go ahead.

MS. CONKLIN:  I'll start cross-examination, Your Honor.

CROSS-EXAMINATION

BY MS. CONKLIN:

Q.   Good morning, Mr. Harp.  I have a question for you.  Did you ever download child pornography on Christopher Harp's laptop?

A.   No.

Q.   Okay.  Did you ever download child pornography on Christopher Harp's thumb drives --

*J. Harp - Cross-Examination (Ms. Conklin)*

A.    No.

Q.    -- when he was in college?

A.    No.

Q.    Let's talk a little bit about where you were living in 2023 and 2024 before Christopher Harp -- before you found out about Christopher Harp being convicted.

A.    Yeah.

Q.    Where were you living in like 2023-2024?

A.    I was staying at my parents' house.  And I was -- I would be there for a while, and then I'd just kind of go camp out somewhere and come back.  And then it's like when we discovered that Mom was terminally ill, I moved into the house and stayed with them.

Q.    So did -- did your family always know how to reach you?

A.    Yeah.

Q.    Okay.  So even if you were camping out and staying somewhere else, did they know how to get in touch with you?

A.    Yeah.  I had a phone at the time that worked, so...

Q.    Okay.  And you were able to communicate with Chris prior to him getting convicted of this case, back in 2023 and 2024?

A.    I remember talking to him once at the funeral home.

Q.    Okay.

A.    At the funeral home.

Q.    And that was prior to him going to jail for this case; right?

*J. Harp - Cross-Examination (Ms. Conklin)*

A.    Yeah.

Q.    Okay.  When -- how did you learn about the charges against Christopher?

A.    So I remember at the funeral home he mentioned something about the FBI investigating him.  But he didn't make it -- it -- the way he phrased it was like the FBI had just kind of showed up and asked him some questions.  And I had no idea that there was a full-on search warrant, dudes coming in -- you know, armed dudes taking stuff, that kind of thing.

And then I knew that -- from what he said, it's like, "Oh, the FBI came and asked me some questions."

And I said, "Okay.  Well, you're probably going to be okay."

And then there was just nothing.  And then it's like after -- after, you know, my mom went through her cancer and then died, then it's like -- I think about -- I think like two weeks after that is when I found out that all of this stuff had already happened.

Q.    Okay.  How did you find out about Bryan Edwards wanting you to do a deposition?

A.    I remember Chris calling me from jail and asking me to do it repeatedly.

Q.    Okay.  Did he tell you why he wanted you to do it?

A.    Well, yeah.  Because he told me he was innocent.

Q.    Okay.

*J. Harp - Cross-Examination (Ms. Conklin)*

A.    And he -- and that was basically it.  So...

Q.    Do you know if these calls that he made to you from the jail were recorded?

A.    Well, they -- they should have been.  Because pretty much all jail calls are recorded.  And we both knew that.

Q.    Okay.  Did you tell him that you never downloaded child pornography on his computer?

A.    Yeah, I told him I never did that.

Q.    Did you tell him that, like, more than once?

A.    Yeah.

Q.    Like, a bunch of times?

A.    Yeah.

Q.    Okay.  Did Chris's wife, Amy, call you?

A.    Yes.

Q.    And did she tell you that she wanted you to give a statement to the lawyer too?

A.    Yes.

Q.    Did she offer to give you the bulletproof vest that you were wearing in order to allow you to confess to the case?

A.    No.  I had owned that for a while --

Q.    Okay.

A.    -- because of the sheer number of death threats I get.

Q.    Was that vest at Christopher Harp's house?

A.    Briefly, yeah.  I let them -- I literally, like, let him have it for a while.

*J. Harp - Cross-Examination (Ms. Conklin)*

Q.   And did you wind up getting it back from Amy Harp?

A.   Yeah.  Yeah.  I asked them to ship it back to me because they weren't going to use it.

Q.   Did Amy Harp offer you money to confess to the crime?

A.   Yes.

Q.   How much money did she offer you?

A.   It started off in the thousands, and then it escalated to around 10,000, I think.  And I think it stopped at 10,000.  And I was also offered a plane ticket, firearms, and ammunition.

Q.   Okay.  And did you tell Amy Harp that you had never done it?

A.   Yeah.

Q.   Okay.  Let's talk about when the investigator came to talk to you.  Did you tell him that you never downloaded child pornography from the -- on the computer?

A.   Yeah.

Q.   Did you tell him that -- or did you give him a list of suspects or individuals that you thought that could be involved in the -- in setting Chris up?

A.   Yeah.  I gave him a list of people who are personally invested in, like, destroying my family and/or killing me.  And I just thought, like, hey, if -- like, what if he's -- what if he's innocent, and what if these people actually did try to systematically destroy my entire family?  Because I've had people actually try to kill me, like, multiple times.

*J. Harp - Cross-Examination (Ms. Conklin)*

Q.   Okay.

A.   And I thought that because of the negativity I was getting from these people, that's why I thought, like, hey, these people might actually be trying to, like, do my family.  So, you know what I mean?

Q.   Did Chris actually tell you on one of his calls to you that he thought that people were coming after him to get to you?  Does that sound --

A.   I don't recall that.  I don't -- no.

Q.   Okay.

A.   No.  I thought it was actually the other way around.  Like, people were -- people were, like, destroying my family to get to me.

Q.   Okay.  When you came to give your deposition to Mr. Edwards, were you in your right mind?

A.   Oh, no.

Q.   Okay.  Did you show up that day because you knew that everything was coming to a head at that point?

A.   I thought that -- I thought that everything would stop and that the threats and, like, weirdness directed towards my family would stop and that people would stop, like, trying to hurt me.  Because I -- there's just really weird stuff going on.

Q.   After you gave your statement, you barricaded yourself in the law office --

*J. Harp - Cross-Examination (Ms. Conklin)*

A.   Oh, yeah.

Q.   -- for a little while.

A.   Yep.

Q.   Did you tell the negotiator, Detective Ward, that you never downloaded the child pornography on the computer; that what you had given was a false statement?

A.   I remember trying to explain myself.  I think I said -- I think I did.  But the thing is when you're -- when you're having, like, a panic attack, it's like you can't hardly remember things.

And I remember -- I remember just telling him, like, "Please look into this a little bit more, because this doesn't -- this isn't characteristic.  There are people who have actually tried to actually end me, repeatedly, and these people may be involved in what happened."  And that's what I'm -- that's kind of what I'm trying to indicate, because nobody will listen to me.

Q.   Okay.  After that -- after that incident, once you came out, did you wind up going to a hospital and staying at a hospital for a little while?

A.   Yeah, I went to a mental hospital.

Q.   And after that -- after you went to the hospital, have you been taking medication?

A.   I -- the -- I was diagnosed with schizoaffective disorder and was given Risperidone and antidepressants.

*J. Harp - Cross-Examination (Ms. Conklin)*

Q.   And as we sit here today, are you, like, clear-headed? You're able to think clearly?

A.   Now I am, yeah.

Q.   Okay.  Would you say that on that day that you gave that statement that you weren't thinking clearly?

A.   No.  No.  I was not.  That was completely gone.

Q.   Okay.  Do you remember speaking to Agent Thigpen after you had been in jail?  Or, I guess, did you wind up going to jail for a while --

A.   Yeah.

Q.   -- after this whole incident?

A.   Yep.

Q.   And do you remember speaking to Agent Thigpen?

A.   Yeah.  I remember meeting with Agent Thigpen, you, and the other dude whose name I don't remember.  Sorry.

Q.   That's okay.

A.   And, yeah, I was -- I was -- I had a lot of time to think about things and talk to people.  I was on Risperidone, and Risperidone helped a little bit.  And I just had a lot of time to think and calm down a little bit.

Q.   And at that time, did you tell Agent Thigpen that you had not downloaded the child pornography on Christopher's computer?

A.   Yeah, I told him I didn't.

Q.   Okay.  And did you tell him that Amy had offered you money to confess and that you trusted your brother and that's why you

*J. Harp - Cross-Examination (Ms. Conklin)*

did what you did?

A.   Yeah.

Q.   And would you agree that it was part of Christopher's plan to get out of jail that you would take responsibility for the child pornography?

A.   I think that was a part of it.  Because they knew I was -- they knew I was circling the drain mentally.

MS. CONKLIN:  If I can have just a moment, Your Honor.

THE COURT:  You may.

MR. ERHARD:  No questions, Your Honor.

BY MS. CONKLIN:

Q.   Jeremy, do you feel hurt by the way that Christopher and your family has treated you?

A.   The wound does not heal.  It does not heal.  I -- it's forever.  I'm probably going to be on the streets for the rest of my life.  It's gone.  This shit is gone.  Sorry.

Q.   That's okay.

A.   It's over.  All right?

Q.   Do you feel that you've been betrayed by your family?

A.   Yeah.

MR. ERHARD:  Your Honor, I'm going to object as to relevance.

THE COURT:  Overruled.

*J. Harp - Cross-Examination (Ms. Conklin)*

BY MS. CONKLIN:

Q.   Jeremy, does the way that Christopher and Amy treated you make you feel that you're just, like, disposable or expendable; that they could just use you and throw you away?

A.   Yeah.  It was also my dad, too.  But it's like I -- that's kind of the feeling that I started to get.  Because it's like -- it's like you knew that -- you knew that I was just on the streets, like, wandering around; you knew that I was, like, breaking into abandoned buildings and stuff; you knew I was committing crimes; you knew I was doing drugs; you knew I was just having a hard time, and that's why -- that's why you wanted me to do this.  And I --

     Like, when you get attacked by a whole bunch of people from a whole bunch of different directions, you can't tell exactly what's happening.  So it's like I -- from my perspective, I think that people are attacking because of this. Like, because that -- it's like I feel like people are systematically destroying my family.  So it's, like, then you -- then you think, like, how do I make it stop?  Okay?  And that's basically it.

Q.   And just to clarify, you never downloaded child pornography on Christopher's computer?

A.   No.

Q.   Never downloaded child pornography on your computer.

A.   No.

*J. Harp - Redirect Examination (Mr. Erhard)*

Q.    Never downloaded child pornography on your cell phones.

A.    Nope.

Q.    Never downloaded child pornography ever.

A.    No.

        MS. CONKLIN:  I have nothing further, Your Honor.

        THE COURT:  Understood.

    Redirect, Mr. Erhard?

        MR. ERHARD:  Your Honor, may I have just a second?

        THE COURT:  You may.

        MR. ERHARD:  Just one question, Your Honor, if I may.

                        REDIRECT EXAMINATION

BY MR. ERHARD:

Q.    Mr. Harp, when you were -- you testified on direct examination that you were homeless for a period.  When you were homeless, did you receive assistance from your brother, Chris?

A.    No.  I mean, I -- once I -- I -- it was -- I think it was warm out.  I remember it was warm.  And I -- I slept in a -- in, like, a thicket.  And I ended up getting a whole bunch of, like, chigger and tick bites.  And I went to his house to get -- to get bandages and stuff.  And he drove me to an urgent care.  And I remember that.

    But it's like I didn't -- it's not like I got -- I didn't get, like, repeated financial assistance.  I didn't get money or anything.  He paid for me to go to urgent care once.  That was about it.

*J. Harp - Redirect Examination (Mr. Erhard)*

Q.   Where was the thicket that you had to stay in?

A.   It was by the Mountaineer Mall, like the -- you know the old mall in Morgantown?  And it was over in the woods beside it.  And I slept without a ground cloth and ended up getting massive amounts of bugs, so...

Q.   Were there times when you were outdoors like that that you would go to Chris for food or for money?

A.   I never went -- I never asked -- I don't recall asking for money.  I did go for -- I did ask him for food a couple times.  And I only remember going to -- remember him driving me to urgent care.  Just, yeah.

MR. ERHARD:  Nothing further, Your Honor.

THE COURT:  Any recross?

MS. CONKLIN:  I have nothing further, Your Honor.

THE COURT:  All right.  May the witness be excused?

MR. ERHARD:  Your Honor, I'd like to call --

THE COURT:  Well, hold on.  Let's -- can Mr. Harp be excused?

MR. ERHARD:  Oh, yes.  I'm sorry.

THE COURT:  Okay.

MR. ERHARD:  Yes, Your Honor.

MS. CONKLIN:  Yes.

THE COURT:  Mr. Harp, sir, thank you so much for being here.  You can step down.  You're free to go, sir.  Thank you.

*J. Harp - Redirect Examination (Mr. Erhard)*

Thank you, Mr. Walker.

MR. WALKER:  Yes, Judge.  Have a nice day.

THE COURT:  All right.  You can call your next witness, Mr. Erhard.

MR. ERHARD:  Thank you, Your Honor.  The defense calls Detective Ward.

MS. CONKLIN:  Just for the record, he is not on the defense witness list that the Government is aware of.  So...

THE COURT:  Okay.  Objection overruled.

(Pause in proceedings.)

THE COURT:  Does Detective Ward know we're waiting for him?

MS. CONKLIN:  I'll find out, Your Honor.

THE COURT:  All right.  Good afternoon, Detective. If I can ask you to make your way all the way to the front of the courtroom, sir.  You're going to pause with Madam Clerk. She'll swear you in.  Then you can take the witness stand. Thank you.

(JOSH WARD, DEFENDANT'S WITNESS, SWORN)

THE CLERK:  Thank you.  Please have a seat.

THE COURT:  Thank you, sir.

THE WITNESS:  Yes, sir.

THE COURT:  All right.  Go ahead, Mr. Erhard.

MR. ERHARD:  Thank you, Your Honor.

*J. Ward - Direct Examination (Mr. Erhard)*

DIRECT EXAMINATION

BY MR. ERHARD:

Q.   Detective Ward, I just want to ask you a question about -- you were the detective who did the negotiations with Jeremy after the deposition; correct?

A.   That's correct.

Q.   I just want to ask you about a part of the exchange you had with him at the end.  There was a point at which he -- his last request of you had to do with you running a criminal check in Laurel County, Kentucky.  Do you remember that?

A.   He asked us to check some type of records for him in Kentucky, yes.

Q.   Do you remember what those records were specifically?

A.   Something about a child committing suicide, I think.

Q.   And do you remember the ages or gender, anything like that?

A.   I don't remember gender.  Three to eight, maybe. Something along that range.  I can't recall off the top of my head, but it's somewhere in there.

Q.   And do you remember him blaming himself for that?

A.   He wanted to know if a child had committed suicide, if we knew anything about it.  I don't remember specifically if he blamed himself, but he said something along the lines of that it -- that he could have caused it or something.  Something like that.  I don't remember the specific language, though.

*J. Ward - Cross-Examination (Ms. Conklin)*

Q.   Okay.  Thank you, sir.  Nothing further.

THE COURT:  Any cross?

MS. CONKLIN:  Just very briefly.

THE COURT:  Uh-huh.

CROSS-EXAMINATION

BY MS. CONKLIN:

Q.   Do you remember whether Jeremy actually also talked about his mother being murdered as well?

A.   He did.

Q.   And did he talk about -- I'm not exactly sure how to say this -- conspiring -- people conspiring against him?

A.   He talked about a lot of things: getting signals in his brain, people conspiring to hurt him.  A lot of things.

Q.   Did he appear to be in his right mind at the time?

A.   He appeared to be experiencing a mental health crisis.

Q.   Okay.  Did he deny ever having downloaded child pornography?

A.   He did.

Q.   And did he say that he was being framed --

A.   He did say that.

Q.   -- to take responsibility for his brother's crime?

A.   That's correct.

Q.   Okay.

MS. CONKLIN:  I have no further cross, Your Honor.

THE COURT:  Understood.

Redirect, Mr. Erhard?

MR. ERHARD:  No follow-up.  Thank you, Your Honor. He can be excused.

THE COURT:  Are you going to recall the detective, Ms. Conklin?

MS. CONKLIN:  I will --

THE COURT:  Okay.

MS. CONKLIN:  -- if we do put on a case.

THE COURT:  Sure.  Understood.

You can step down for now, sir, but don't go far.

THE WITNESS:  Thank you.

THE COURT:  Thank you.

Next witness, Mr. Erhard.

MR. ERHARD:  We have no further witnesses, Your Honor.  Thank you.

THE COURT:  Okay.  Why don't we take five, and then the Government can call its first witness.  Okay?

MS. CONKLIN:  Sure.

THE COURT:  Let's do that.  All right.  We'll stand at ease for five minutes.  Thank you.

MS. CONKLIN:  And Judge.  I'm sorry.

THE COURT:  Yeah.

MS. CONKLIN:  Just logistically speaking, Mr. Suite -- we were going to call Mr. Suite to testify.  But again, he got stranded.

THE COURT:  Yeah.

MS. CONKLIN:  Would it be possible for him to log into the Zoom and testify via the Zoom?

THE COURT:  Any objection, Mr. Erhard?

MR. ERHARD:  No objection, Your Honor.

THE COURT:  Yeah, that's fine.

MS. CONKLIN:  Thank you.

THE COURT:  If you want to take care of those logistics while we take a break.

(Recess taken from 12:30 to 12:43 PM.)

THE COURT:  We ready to proceed, Ms. Conklin?

MR. ERHARD:  Your Honor, if I may.

THE COURT:  Yes.

MR. ERHARD:  I neglected to move exhibits into evidence, including the video deposition.

Thank you, Your Honor.

THE COURT:  Any objection?

MS. CONKLIN:  No, Your Honor.

THE COURT:  All right.  We'll receive that as part of today's record.

(Defendant's Exhibit 97-4D received in evidence.)

THE COURT:  Anything else, Mr. Erhard?  Any other exhibits?

MR. ERHARD:  Nothing further.  Thank you, your Honor.

THE COURT:  Ms. Conklin.

*J. Suite - Direct Examination (Ms. Conklin)*

MS. CONKLIN:  The United States would first call Jonathan Suite.  And I believe that he is logged in on the Zoom.

THE COURT:  All right.  Good afternoon, Mr. Suite. Can you hear us, sir?

THE WITNESS:  Yes, Your Honor, I can hear you.

THE COURT:  Okay.  Can you see us also?

THE WITNESS:  Yes, Your Honor, I can see everybody.

THE COURT:  Okay.  Great.  Thank you so much.  The next voice you're going to hear is Madam Clerk.  She's going to swear you in.  Then Ms. Conklin is going to ask you some questions.

(JONATHAN SUITE, GOVERNMENT'S WITNESS, SWORN)

THE CLERK:  Thank you.

THE COURT:  All right.  Go ahead, Ms. Conklin.

MS. CONKLIN:  Thank you.

DIRECT EXAMINATION

BY MS. CONKLIN:

Q.   Good afternoon, Mr. Suite.  And I -- again, I appreciate you appearing before the Court.  And again, I'm so sorry that you had to leave your car and walk back home.  I really do feel bad.

A.   Thanks.

Q.   If you could please state and spell your name for the record.

*J. Suite - Direct Examination (Ms. Conklin)*

A.   My name is Jonathan Suite; J-O-N-A-T-H-A-N, S-U-I-T-E.

Q.   And Jonathan, what is it that you do right now?

A.   Currently I work for West Virginia University in the International Students & Scholars Services Office.

Q.   And are you in school as well?

A.   That's correct.  I'm currently a 3L at WVU School of Law.

Q.   Okay.  Are you familiar with an individual named Jeremy Harp?

A.   Yes.  Quite familiar.

Q.   How do you know him?

A.   I believe I first met Jeremy around 2009 when I -- when we were both in high school.  He was a grade older than me, but we became friends because we both used to mountain bike.

Q.   Okay.  Have you maintained contact with him over the years?

A.   Yes.  Yes.  On and off.  Throughout high school and college, we were good friends.  But, you know, after we both graduated, we did lose contact for a while.  But, you know, we remained in touch on and off.

Q.   Okay.  I want to draw your attention to the summer of 2024.  Were you in contact with Jeremy Harp at that point?

A.   Yes, I was.  It had been a few years since we had spoken last; but in June of 2024, he called me.  I was pleased to hear from him.  But he was interested in using me as an alibi, and that's when I found out about the whole -- the whole matter at

*J. Suite - Direct Examination (Ms. Conklin)*

hand.

Q.   Okay.  So when he said that he wanted to use you as an alibi, can you tell us what he specifically was talking about?

A.   Yes.  So a few years before, Jeremy had been staying at his brother's house.  And I was living in Morgantown at that time, and he asked me to hang out and to help him transport some things to his storage unit.  So I did pick him up at Chris's house.  I did not go inside.  I did not see Jeremy inside the house.  And then we went to my house.  We went to his storage unit.  And I don't think I saw him again after that for quite a while.

Q.   Okay.  What did he want you to say about that time period?

A.   Well, I think he was just interested in determining what dates he was in Morgantown.  Because as I understand it, he was living in Kentucky at the time.

Q.   Okay.  In your communications with Jeremy that summer, did you learn that his brother, Christopher, Christopher Harp, had been charged with and convicted of possessing child pornography?

A.   Yes.  That's what I learned about that matter.

Q.   Okay.  Did Jeremy have questions for you at that point?

A.   Outside of searching for an alibi, he didn't have any questions related to that for me.

Q.   Okay.  Did he ever indicate to you that he was going to do something in order to help his brother?

*J. Suite - Direct Examination (Ms. Conklin)*

A.   Yes.  Yes.  After -- so after we had spoken on the phone -- I believe that was in June of 2024 where he requested information from me that he could use as an alibi -- he came to Morgantown.  And upon, you know, meeting with him, he stayed at my house briefly -- well, a few times, for periods of two or three days.  And he did let me know that he was considering, you know, making a false admission.

Q.   Okay.  Did he tell you why he was considering making a false admission?

A.   He said he felt very bad.  He was not convinced of his brother's guilt.  He seemed to believe he had less to lose than his brother did.  And also, there was a financial aspect.  I understood that he was offered money and guns.

Q.   Did you actually overhear a phone call that was made to Jeremy where someone offered him things to confess for the crime?

A.   Yes, I did.  This would be, I believe, in July of 2024.

Q.   Okay.

A.   And I was a third party to a phone conversation that Jeremy was having with someone where he was offered initially $10,000 and also guns --

Q.   And do you --

A.   -- in order to --

Q.   Sorry.  Do you know who he was on the phone with?

A.   I believe that it was Amy Harp.

*J. Suite - Direct Examination (Ms. Conklin)*

Q.   And why do you believe that it was Amy Harp?

A.   Throughout the call, Jeremy referred to her as Amy.  And he told me that it was Amy when the phone rang, before he answered it.

Q.   Okay.  Do you remember if Amy told him anything about whether he would get in trouble if he falsely confessed to the offense?

A.   Amy maintained that he would not be charged.  She said that if he admitted to the crimes, the prosecutors would be very embarrassed and they would not choose to pursue charges against him.

Q.   Okay.  Did you ever hear any other phone calls that were made to Jeremy Harp from other family members?

A.   Yes.  I heard a phone call that I believe was from Chris Harp.  It must have been that same day or just shortly afterwards.

Q.   And what did you overhear during that conversation?

A.   That conversation -- well, there were no explicit offers made, but Chris told Jeremy about what prison was like.  And Jeremy was very deeply affected by it.

Q.   Did it seem that Christopher Harp was kind of trying to pull on Jeremy's heartstrings?

A.   I would say so.  I think there was definitely, you know, that subtext present.

Q.   Okay.  In your experience with Jeremy Harp and your

*J. Suite - Direct Examination (Ms. Conklin)*

knowledge of him, when he came to spend time with you that summer in 2024, did you have a question as to his mental stability?

A.   Yes.  His mental state varied.  Oftentimes he was perfectly lucid and very intelligent.  Other times he was -- well, I don't possess the psychological terms, but he was very not well.

Q.   Okay.  Do you believe that his mental state combined with the phone call from Amy and from Christopher impacted his -- whether he would admit to committing a crime?

MR. ERHARD:  Your Honor, I'm going to object.  I'm not sure he's been tendered as an expert to make such an opinion.

THE COURT:  Sustained.  Maybe try that one again, Ms. Conklin.  Sustained.

BY MS. CONKLIN:

Q.   In knowing Jeremy, do you believe -- let me rephrase that. Did he ever indicate to you whether he had actually downloaded child pornography?

A.   Jeremy?

Q.   Yes.

A.   Yes.  He maintained that he had not.

Q.   Okay.  And did he tell you that he was going to make a false confession to help his brother out?

A.   At one point he did.  I was very much against that.  I

*J. Suite - Direct Examination (Ms. Conklin)*

tried to plead with him, and I told him that, you know, it would be very likely that, you know, he could get charged, you know, perhaps, or -- you know, I suppose.

And I actually called in a tip to the Morgantown Police Department after that because I wanted some form of record to exist in case Jeremy did make a false confession.

Q.   And actually, after this -- after the -- when Jeremy made -- did you become aware that Jeremy was a barricaded individual at one point?

A.   Yes.  Yes.

Q.   And after that happened, did you contact the police again?

A.   Yes, I did.

Q.   Okay.  And do you believe that Jeremy -- from your discussions with Jeremy and from your knowledge of Jeremy and from your interactions with Jeremy, do you believe that his actions were motivated by his relationship with his brother?

A.   Yes.

Q.   And do you believe that his actions might have also been motivated by the promises that you overheard Amy Harp making to Jeremy?

A.   Yes.  Yes.

MS. CONKLIN:  If I can have just one moment, Your Honor.

THE COURT:  You may.

(Pause in proceedings.)

*J. Suite - Direct Examination (Ms. Conklin)*

BY MS. CONKLIN:

Q.    Just briefly to go over the communication with Amy Harp. When Jeremy was talking to Amy Harp, was Amy on speakerphone?

A.    Yes.

Q.    Okay.

A.    Jeremy had put her on speakerphone.

Q.    Okay.  Do you remember speaking to Agent Thigpen before?

A.    Yes.

Q.    Okay.  And do you remember telling him about the conversation that you overheard between Jeremy and Amy; that Jeremy said -- that by asking -- by Amy asking him to confess to the crime that she was asking him to go to prison and that he didn't want to go to prison and that he would just have to kill himself instead if he falsely confessed?

A.    Yes, that's correct.  Jeremy made it sound like his option was to, you know, falsely confess and then immediately end his own life.

Q.    Okay.  And then when you had spoke -- when you mentioned that you had overheard a conversation between Christopher Harp and Jeremy, was that again on the speakerphone?

A.    Yes, that was also on speakerphone.

Q.    Okay.  And when Christopher --

        MR. ERHARD:  Objection to hearsay, Your Honor.

        THE COURT:  Overruled.

*J. Suite - Cross-Examination (Mr. Erhard)*

BY MS. CONKLIN:

Q.   And when he was on speakerphone, was Christopher asking Jeremy why he hadn't done it yet?

A.   Yes.  There was definitely -- it wasn't explicit.  But, you know, I did hear that subtext like "Why didn't you do it yet?" you know.

MS. CONKLIN:  Okay.  I have nothing further, Your Honor.

THE COURT:  Understood.

Mr. Erhard, any questions for Mr. Suite?

MR. ERHARD:  If I could just have a moment, Your Honor.

THE COURT:  You may.

One second, Mr. Suite.

MR. ERHARD:  Just briefly, Your Honor.  Thank you.

CROSS-EXAMINATION

BY MR. ERHARD:

Q.   Mr. Suite, my name is Craig Erhard.  I represent Christopher Harp.

Can you tell me, has Jeremy ever -- you testified that his mental wellness sort of fluctuates; is that correct?

A.   Yes, I would consider that correct.

Q.   Has he ever lied to you before about anything?

A.   No.

Q.   Has he ever said anything that you later found to not be

*J. Suite - Cross-Examination (Mr. Erhard)*

true?

A.   No.

Q.   Do you find that he -- does he talk with you about grand conspiracies or anything?

A.   A grand conspiracy?  Would you mind specifying what you mean by that?

Q.   How about conspiracies?

A.   I suppose sometimes the talk can air conspiratorial.

Q.   Is he -- is he ever the victim of that conspiracy?

A.   Well, he believed himself to be the victim of a conspiracy.

Q.   How many times would you say you've experienced that with him?

A.   I think at one point his mental health was very bad, shortly before the incident, and I believe it was then that, you know, it was more conspiratorial.

Q.   He testified that -- I'll represent to you that he testified he's been diagnosed as being schizophrenic.  Does that surprise you?

A.   That does not surprise me.

Q.   That's something you've grown accustomed to in the time you've known him?

A.   Well, I don't think that I saw any schizophrenic tendencies manifest until, you know, the summer of 2024.

     Prior to that, I think, you know, knowing what I know now,

*J. Suite - Cross-Examination (Mr. Erhard)*

there were perhaps some signs.  But he was not -- his mental health was much, much better prior -- it -- in the capacity that I knew him, prior to the summer of 2024.

Q.   Did he -- when you -- tell me again, if you would, when you first -- you've known him since high school; is that correct?

A.   That's correct.

Q.   Before 2024 -- in the years before 2024, did you -- did he wear a full-length camouflage outfit?

A.   Casually, I did not see him wearing anything like that.

Q.   What about in 2024?  Did he wear that all the time?

A.   Frequently, yes.

Q.   Okay.  Did you ever ask him about that?

A.   Yes, I did.

Q.   What did he say?

A.   He said he was wearing it because -- well, at the time, he was homeless and living on the streets.  And he was exposed to danger frequently, and it was a way to hide himself and protect himself.  He wore many layers.

Q.   When you asked him, why did you ask him?

A.   Well, because when he took off his coat, I noticed how many layers he had on.  And I was perplexed why he was wearing that.

        MR. ERHARD:  I have nothing further.  Thank you, Your Honor.

*J. Suite - Redirect Examination (Ms. Conklin)*

THE COURT:  Understood.

Any redirect, Ms. Conklin?

MS. CONKLIN:  Just very briefly.

REDIRECT EXAMINATION

BY MS. CONKLIN:

Q.   Mr. Suite, defense counsel asked you whether you knew of Jeremy saying that he was the victim of any conspiracies. Would you say that you actually observed him being the victim of a conspiracy between Christopher and Amy Harp --

MR. ERHARD:  Objection, Your Honor.

Q.   -- to have him falsely confess to a crime?

MR. ERHARD:  Calls for a legal conclusion.

THE COURT:  Overruled.

BY MS. CONKLIN:

Q.   You can answer.

A.   Yes, I -- I -- I interpreted the situation as a conspiracy.

MS. CONKLIN:  Nothing further.

THE COURT:  Recross, Mr. Erhard?

MR. ERHARD:  No.  Thank you, Your Honor.

THE COURT:  No?

May Mr. Suite be excused?

MS. CONKLIN:  Yes, Your Honor.

THE COURT:  All right.  Mr. Suite, thank you so much for joining us.  Good luck digging your car out, sir.

*J. Ward - Direct Examination (Ms. Conklin)*

THE WITNESS:  Thank you.

THE COURT:  Have a wonderful rest of your day.

THE WITNESS:  Thank you, Your Honor.

THE COURT:  No.  Thank you.

All right.  Ms. Conklin, you may call your next witness.

MS. CONKLIN:  The Government would next call Detective Ward.

THE COURT:  All right.

MS. CONKLIN:  I'm going to go get him.

THE COURT:  All right.  Hello, Detective.  I'll remind you, sir, you remain under oath.

THE WITNESS:  Yes, Your Honor.

THE COURT:  I'd ask you to take the same seat, please.  Thank you.

All right.  Ms. Conklin.

DIRECT EXAMINATION

BY MS. CONKLIN:

Q.   Good afternoon, Detective Ward.  Who do you work for?

A.   The Monongalia County Sheriff's Office.

Q.   And how long have you worked for them for?

A.   I've worked for the Monongalia County Sheriff's Office since 2014.  So approximately 12 years.

Q.   Okay.  And what are your responsibilities with the Monongalia Sheriff's Department?

A.   Currently I am assigned to our detective division where we

*J. Ward - Direct Examination (Ms. Conklin)*

investigate major crimes.  I also have a couple other specialty assignments, such as crisis negotiations.

Q.   Okay.  And do you actually handle crisis negotiations yourself?

A.   I do.

Q.   Okay.  I'd like to draw your attention to December 16th, 2024.  Were you called out to handle the report of an individual who was barricaded in the Cranston & Edwards law office?

A.   I was.

Q.   And did you learn that the person that barricaded himself in the attorney's office was Jeremy Harp?

A.   Yes.

Q.   Tell me a little bit about, I guess, what happened, what initially -- how you got the call that day, what you did.

A.   So we were called out by our road deputies.  They were dispatched to that address because Mr. Harp had been at the law firm to give some sort of deposition; after his deposition was through, he brandished a firearm, sat down at the table, and refused to leave, at which point the staff evacuated and called 911.  Our deputies responded, surrounded the area, created a perimeter, and then we were called in for the crisis negotiation.

Q.   Okay.  Was this all recorded on body-worn camera at the time?

*J. Ward - Direct Examination (Ms. Conklin)*

A.    Yes.

Q.    Okay.  And does that include from the time that you and other officers went into the office and through your communications with Jeremy Harp to when he was removed from the building?

A.    That's correct.  There might be some gaps in there when there was some lull in the conversation, maybe, where we weren't speaking with him.  But for the most part, yes.

Q.    Okay.  Now, earlier today did you look at videos that were on a thumb drive?

A.    I did.

Q.    Okay.  And those videos had officer names --

      Sorry.  There were five videos on that thumb drive; correct?

A.    I believe so, yes.

Q.    Okay.  And those videos were body cam recordings from which detectives or which officers?

A.    Stephen Currie, who was the secondary on the negotiation, we had his body camera.  And then once his died, I believe we used Sergeant Tim Hunn's.

Q.    Okay.  And in your viewing --

      MS. CONKLIN:  If I may approach the witness, Your Honor.

      THE COURT:  You may.

*J. Ward - Direct Examination (Ms. Conklin)*

BY MS. CONKLIN:

Q.   Detective Ward, I'll give that to you and go back to the mic.

Detective Ward, do you recognize that thumb drive?

A.   I do.

Q.   And is that the thumb drive that you observed had the videos of the body-worn camera interactions on it?

A.   It is.

MS. CONKLIN:  The United States seeks to move in Government's Exhibit -- Composite Exhibit 1 into evidence.

THE COURT:  Any objection?

MR. ERHARD:  The objection is as to the videos of the body cam itself?

MS. CONKLIN:  Yes.

MR. ERHARD:  No objection, Your Honor.

THE COURT:  All right.  One will be admitted.

(Government's Exhibit 1 received in evidence.)

MS. CONKLIN:  Okay.  And Your Honor, I'm moving them into evidence.  I don't know if the Court wants to show all hours of the body cam or, now that we just have it in evidence, the Court can peruse the videos at its leisure.

THE COURT:  We probably don't need to sit in here and watch that, Ms. Conklin.  But yes, it is part of the record. The Court will certainly review and consider it.

MS. CONKLIN:  Okay.

*J. Ward - Direct Examination (Ms. Conklin)*

THE COURT:  But if there are certain aspects of it that you need to explore with the detective, please go right ahead.

MS. CONKLIN:  Okay.

BY MS. CONKLIN:

Q.   Well, just generally speaking, in your interactions and in your negotiations with Jeremy, did you learn why Jeremy was there that day?

A.   Yes.

Q.   And why was he there?

A.   He said that he came there to give a deposition at Cranston & Edwards to take the blame for his brother's crimes in hopes that that would free his brother.

Q.   Okay.  When you told him that it wasn't quite as easy as that and that he would have to probably appear before a grand jury, to testify before a grand jury, and that his brother probably wasn't getting out right away, did he seem distressed by that?

A.   Yes.

Q.   Did he indicate whether his admitting to downloading child pornography was true?

A.   Eventually he said that it was not true.

Q.   Okay.  Did he say that he had made a false confession?

A.   He did.

Q.   Did he say that it appeared that other individuals had

*J. Ward - Direct Examination (Ms. Conklin)*

conspired to cause him to make the false confession?

A.    Yes.

Q.    Okay.  He asked you about some odd things on that day would you say?  Would you agree?

A.    Yes.

Q.    Okay.  You had previously testified as to Jeremy making statements asking about whether he had done something to cause the suicide of a child.  Did you ever do any follow-up in relation to that?

A.    So during any negotiation we are trained to look for what's called hooks and triggers.  Hooks are something that the person likes to talk about, and triggers are things that the person doesn't like to talk about.  Both of those things you need to listen to and you need to either stay away or go more in depth.

So when he obviously said that, I assigned one of our members of our team to start looking for what he asked: the obituaries, any headlines, anything like that coming out of the Laurel County, Kentucky, area.  They were unable to find anything.  Now, that's not to say that we did a full investigation into it.  But they were not able to find anything.  And I also asked that they call the authorities in Kentucky, and they called somewhere in Kentucky.  I can't say where because it was not me.  And we have not -- we have never received any kind of call back.

*J. Ward - Direct Examination (Ms. Conklin)*

Q.   Okay.  Did Jeremy also tell you that he believed that his mother, as she was dying of cancer, was trying to kill herself as well?

A.   He -- I remember him saying about his mother dying from cancer and something about the oxygen tube and people conspiring with his mother's death.  But I don't remember exact details.

Q.   So he -- would you agree that at that time that he had a lot of thoughts that various things were happening?

A.   Yes.

Q.   Okay.  When you started talking to him and when you started the negotiations, how would you describe Jeremy's demeanor?

A.   Manic.

Q.   Was he very impulsive and erratic?  Would that be fair to say as well?

A.   Yes.

Q.   Was he very hostile to you?

A.   I don't necessarily know towards me, but he was hostile in general.

Q.   Okay.  And by the time -- you spent a couple hours with him.

A.   I think it was six hours in total.

Q.   Okay.  By the time you finished talking to him and he was walking out of the law offices, had he calmed down at that

*J. Ward - Cross-Examination (Mr. Erhard)*

point?

A.    Yes.

Q.    Had his demeanor settled down a little bit?

A.    Yes.

Q.    And at that point, was he still saying that he had made a false confession and that he hadn't done anything wrong?

A.    Yes.

        MS. CONKLIN:  If I can just have one moment, Your Honor?

        THE COURT:  You may.

        MS. CONKLIN:  I have nothing further, Your Honor.   I'll just get the exhibit --

        THE COURT:  Thank you.

        MS. CONKLIN:  -- and give it to the clerk.  Thank you.

        THE COURT:  Cross, Mr. Erhard?

        MR. ERHARD:  Thank you, Your Honor.

                    CROSS-EXAMINATION

BY MR. ERHARD:

Q.    Detective Ward, just to be clear, your testimony about his demeanor all took place after the deposition; is that correct?

A.    Correct.

        MR. ERHARD:  That's all I have.  Thank you, Your Honor.

        THE COURT:  Anything else for the detective, then,

*C. Thigpen - Direct Examination (Ms. Conklin)*

Ms. Conklin?

MS. CONKLIN:  Nothing else for Detective Ward, Your Honor.

THE COURT:  All right.  Is he finally free to go?

MS. CONKLIN:  Yes, Your Honor.

THE COURT:  All right.  Thank you, sir.  You can step down.

THE WITNESS:  Thank you.

THE COURT:  Thank you.

MS. CONKLIN:  Thank you.

(Pause in proceedings.)

MS. CONKLIN:  I'm sorry, Your Honor.

THE COURT:  That's all right.

MS. CONKLIN:  The Government is going to next call Agent Thigpen.

THE COURT:  All right.  Special Agent, sir, can you hear us and see us okay?

THE WITNESS:  Yes, sir.  Can you hear me?

THE COURT:  Yes, I can.  Thank you so much.

Madam Clerk, would you mind swearing in the witness.

(COREY THIGPEN, GOVERNMENT'S WITNESS, SWORN)

THE CLERK:  Thank you.

DIRECT EXAMINATION

BY MS. CONKLIN:

Q.   Good afternoon, Agent Thigpen.  Who do you work for?

*C. Thigpen - Direct Examination (Ms. Conklin)*

A.    I work for the Federal Bureau of Investigation.

Q.    And how long have you worked for them?

A.    Approximately ten years.

Q.    And were you the lead investigator into the criminal charges against Christopher Harp?

A.    I was.

Q.    Okay.  And as part of that investigation, did you handle things that occurred after the conviction?

A.    I did.

Q.    Okay.  Did you become aware at one point that Jeremy Harp had gone to Cranston & Edwards to make a confession regarding the offense?

A.    Yes.

Q.    And then were you contacted and advised that he was a barricaded individual at the time?

A.    I was.

Q.    Okay.  As part of your investigation, did you talk to Detective Ward to find out, I guess, what had occurred that day?

A.    Yes.  I believe I spoke with him and maybe Detective Currie as well on that day.

Q.    Okay.  And after that, did you then resume your investigation into, I guess, this confession and what had been going on in this case?

A.    Yes, ma'am.

*C. Thigpen - Direct Examination (Ms. Conklin)*

Q.    Okay.  At some point did you -- did you make contact with Jeremy Harp?

A.    Yes.

Q.    Okay.  Tell me how that occurred.

A.    We -- after the entire incident had taken place, we arranged to set up an interview with Jeremy Harp in -- while he was in jail, with his defense attorney that had been assigned to him after this incident.

Q.    Okay.  And at the time -- was this some time period after this barricaded individual situation had occurred?

A.    Yes.  I believe we interviewed him on January 23rd.

Q.    Okay.  And at that point, did Jeremy Harp indicate that he was on medication?

A.    I believe he was, yes.

Q.    Did he indicate to you that he had been stabilized?

A.    Yes.

Q.    Okay.  Did he tell you how he wound up showing up at Cranston & Edwards to confess to Christopher's offense?

A.    Yes.  The first thing that he did when we were speaking to him was, you know, deny unequivocally that he did not do the things that he had confessed to or -- and did not download any sort of child pornography.

And eventually in the conversation, asking him what prompted him to go to Mr. Edwards' office, I believe he brought up the conversation that he had had with Amy Harp and that he

*C. Thigpen - Direct Examination (Ms. Conklin)*

had also spoken to his brother, who was in jail at the time, over the jail call system.

Q.   Okay.  Did he indicate to you that Amy Harp and Christopher Harp had asked him to falsely confess to the crime?

A.   Yes, they did.

Q.   Okay.  Did they -- did he tell you that they had made him any offers to get him to confess to the crime?

A.   He advised that Amy Harp had offered him I believe $10,000 and a plane ticket to confess to the crimes.

Q.   Okay.  And did he indicate anything about his communications with Christopher Harp asking him to confess about the crime?

A.   I know that he had spoken about Chris wanting him to come to Morgantown and give the statement to the attorney.  I don't remember exactly if he got into specifics about what -- you know, if Chris offered him anything to do that.  I know it was -- it was what Amy had offered him with the specifics.

Q.   And at that time that he had spoken to you about his communications with Christopher, did he indicate to you that his communications with Christopher were done via the jail calls?

A.   Yes.

Q.   Okay.  And as a result of that, did you wind up ordering jail calls from Christopher Harp?

A.   I did.

*C. Thigpen - Direct Examination (Ms. Conklin)*

Q.   Okay.  And actually, did Jeremy mention anything to you about an investigator coming to talk to him?

A.   He did, yes.

Q.   And what did he tell you about that investigator coming to talk to him?  Or let me rephrase that.

Did he ever tell you that he confessed to committing the offense of downloading child pornography to the investigator?

A.   No, he did not.  He indicated that he had spoken to Chris Harp's defense attorney, Mr. Edwards, several times and that he had also spoken to a gentlemen named Tom who was the investigator on the case.  And he indicated that he told them that he had nothing to do with it, that he did not download any child pornography, and that he had actually gone, I believe, to Morgantown before to do a deposition, during which he denied downloading any child pornography.

Q.   And that -- was that first -- was that a deposition where he denied downloading child pornography prior to the one where he became a barricaded individual after that?

A.   Correct.

Q.   So you had mentioned that you had then investigated whether Christopher Harp had made any calls via the jail calls to Jeremy Harp; is that correct?

A.   Yes.

Q.   Okay.  And as a result of that, did you pull the jail calls to Jeremy Harp?

*C. Thigpen - Direct Examination (Ms. Conklin)*

A.   I did.  I pulled, yes, all of Chris Harp's jail calls and then identified the conversations that he had had with Jeremy Harp.

Q.   And were you able to do that because you had received the phone number that Christopher Harp had used -- I mean -- I'm sorry -- that you had gotten Jeremy Harp's phone number from Jeremy Harp?

A.   I believe so.  And then once confirming on one jail call the number that he was speaking with Jeremy on, then I could go through and filter that number to identify additional calls.

Q.   And as a result of that, did you locate 26 calls from Christopher Harp to Jeremy Harp?

A.   Yes, I believe that's correct.

Q.   And let's talk briefly about jail calls.  Are jail calls made in the normal course of an individual's incarceration?  In other words, are all jail calls recorded?  To your knowledge.

A.   Yeah.  Yes.  They are recorded, and the inmates are advised as such when they place those calls.

Q.   Okay.  And in the jail calls that you obtained, do the file names for the jail calls contain both the date and the time and the phone number that the jail call was made to?

A.   Yes, they do.

Q.   Okay.  And did you provide those jail calls to the Government as well -- or to me and my office?

A.   Yes.

*C. Thigpen - Direct Examination (Ms. Conklin)*

Q.    Okay.

MS. CONKLIN:  Your Honor, the Government seeks to move in Exhibit -- Composite Exhibit 2C, which contains jail calls 2A through 2Z, subject to the Certificate of Authenticity of Domestic Records Pursuant to Federal Rules of Evidence 902(11) and 902(13) that was filed last week or the week before.

THE COURT:  Understood.

Any objection?

MR. ERHARD:  Your Honor, we stipulated as to authenticity, but I just reserve the right to -- and actually, I'd like to make a hearsay objection.

THE COURT:  No.  Understood.  Those exhibits Ms. Conklin identified will be received into evidence today.

(Government's Exhibits 2A through 2Z received in

evidence.)

BY MS. CONKLIN:

Q.    Now, did you review those jail calls between Christopher Harp and Jeremy Harp?

A.    I did.

Q.    And were those jail calls made between May 2024 and June 2024?

A.    Yes.

Q.    And did you recognize the voices of the individuals on those jail calls?

*C. Thigpen - Direct Examination (Ms. Conklin)*

A.    I did.

Q.    Are you familiar with Christopher Harp's voice?

A.    Yes, I am.

Q.    And besides the recording saying that "This is a jail call from Christopher Harp," did you recognize him as one of the individuals in the call?

A.    I did.  I had spoken to Mr. Harp previously and also heard him testify during the trial.

Q.    Okay.  And is it the same for Jeremy, that you're familiar with Jeremy Harp's voice?

A.    Yes.  I had recently interviewed Jeremy as well, so I was familiar with his voice.

Q.    Okay.  So let's talk about the first call that you found between Christopher Harp and Jeremy Harp from May 22nd, 2024. And that would be the call that is marked 2A.

      In that call, did Christopher Harp ask Jeremy Harp to disclose every bad thing he had ever done on the computer?

A.    Yes, I believe he asked him to detail every shady thing he had ever done on a computer.

Q.    Okay.  Did he ask Jeremy Harp about whether he had ever downloaded child pornography?

A.    I don't know if he specifically asked if he had ever downloaded child pornography.  I know he asked if he was ever involved in file sharing and torrenting and things like that, but I don't know that he specifically asked him about the child

*C. Thigpen - Direct Examination (Ms. Conklin)*

pornography.

Q.    Okay.

MS. CONKLIN:  If we could cue up Government's Exhibit 2A.  And if we could play Government's Exhibit 2A from the start until about six minutes in.

(Audio playing.)

MR. ERHARD:  Your Honor, if I could just have a continuing objection as to the calls so I don't interrupt. Thank you.

THE COURT:  Understood.  Overruled.

(Audio playing.)

MS. CONKLIN:  You can stop it there.  And we're at approximately 6:54 in.

BY MS. CONKLIN:

Q.    Does the rest of the jail call continue along the same lines?

A.    Yes.

Q.    Okay.  So let's talk about the second call, which is Government's Exhibit 2B.

Did Jeremy Harp ever take responsibility for downloading child pornography in that call?

A.    No.  He denied it multiple times throughout this call as well.

Q.    And in that call, did Christopher Harp tell Jeremy Harp that he needed to give a statement to the attorney taking

*C. Thigpen - Direct Examination (Ms. Conklin)*

responsibility for downloading the child pornography?

A.    Yes.  Chris Harp was telling Jeremy that he needed to coordinate with his dad to get to Morgantown so that he could make the statement.

Q.    And did Jeremy again tell Christopher Harp that he didn't do it and that he was just going to give a false confession to get out of custody?

A.    Yes.  He said that he did not do it but that he was going to come and give the statement regardless.

Q.    Was there also a discussion about Jeremy Harp getting possibly a bulletproof vest and trying to get a weapon from Christopher's house?

A.    Yeah.  So Jeremy asked Chris what he had done with the vest, and Chris told him that it was still at his house.  And then he asked what happened to all the firearms that were at Chris's house, and Chris said that he had moved them away from the home.  And Jeremy was asking about getting his hands on some of those, and Chris said that he was not going to -- not going to give him Chris's guns.

Q.    Okay.

        MS. CONKLIN:  If we can pull up Government's Exhibit 2B.  And if we can start it at approximately the five-minute mark.  Maybe 5:30.

        Okay.  Starting at 5:30.

        (Audio playing.)

*C. Thigpen - Direct Examination (Ms. Conklin)*

MS. CONKLIN:  And you can stop it there at -- we're at approximately nine minutes.

And then if we could fast-forward it to at the 12-minute mark.

BY MS. CONKLIN:

Q.   And does this recording continue to have Christopher Harp encouraging Jeremy Harp to make a statement?

A.   Yes.

MS. CONKLIN:  Okay.  If we could start again at the 12-minute mark.

(Audio playing.)

MS. CONKLIN:  All right.  We can stop it there at about 16:09.

BY MS. CONKLIN:

Q.   Now, let's talk about Government's Exhibit 2C.  Was that a call from June 2nd, 2024?

A.   Yes.

Q.   And in that call, did Jeremy talk to Chris about Amy's allegations that he was an extreme hacker?

A.   Yeah.  I believe that he said that they were pointing the finger, being Amy was pointing the finger, at him because she believed that Jeremy was some sort of elite hacker.  And he told Chris that he was not and that he had, like -- I think he said midrange computer skills.

Q.   Did he again say that he never downloaded child

*C. Thigpen - Direct Examination (Ms. Conklin)*

pornography?

A.   Yes.   That was a theme in pretty much every single call that I listened to.

Q.   Okay.   Did he again say that he would give a statement to get Chris out of custody?

A.   Yes, I believe so.

        MS. CONKLIN:  And Judge, I'm going to skip over playing all these jail recordings because --

        THE COURT:  Understood.

        MS. CONKLIN:  -- I know that they'll take quite a bit of time to go through them all.  But they're all in evidence if the Court wants to listen to them.

BY MS. CONKLIN:

Q.   Let's talk about Jail Call 2D.  Was that from June -- I think June 3rd?  Let me look at my list.

A.   June 3rd, yes.

Q.   Yes.  Okay.  Again, did you hear Jeremy -- or did you hear Christopher trying to manipulate Jeremy in that call?

A.   Yeah.  So there was kind of that air throughout a lot of the calls where Chris would tell Jeremy, you know, how hard it is, you know, being away from Amy and the kids and that, you know, he has to listen to them, you know, cry on the phone and that it's tearing him apart and that he just needs to get out to be back with his family.

Q.   And in that call, 2D, did he actually tell Jeremy that Amy

*C. Thigpen - Direct Examination (Ms. Conklin)*

was getting sick and that she had to have surgery and he had to be there for Amy's surgery?

A.    I know that he did -- that he did mention that in one of the calls, that she was getting worse.  And he had mentioned it in calls prior to that, that she was getting sick, and then whether it was this one or another one he mentioned that she was really going downhill and that she was going to need surgery and that he needed to be out of jail so that he could be there to take care of her.

Q.    So let's move down to Jail Call 2J, which I believe is from June 13th, 2024.  Is that correct?

A.    Yes.

Q.    Okay.  In that call, does Christopher start agreeing that there must be some sort of evil organization that's framed Christopher in order to get to Jeremy?

A.    Yeah.  I think -- I think that might be in 2L.

As I'm looking now, I believe 2J is the one where he tells Jeremy that there's a time crunch and that Amy is getting sicker and she needs surgery soon and that he needs to be out, you know, to take care of her.

And then as the jail calls go on -- and these are all chronological, right, from May through -- you know, going on through June, where Jeremy has indicated to Chris that he thinks there's a group or some conspiracy against him. Eventually you notice that Chris starts kind of agreeing with

*C. Thigpen - Direct Examination (Ms. Conklin)*

him and playing on that, that, "Yeah.  Well, why do you think they're doing this?" and, you know, kind of telling him that he now agrees that there is some sort of third party at work creating this kind of conspiracy.

Q.   Let's skip forward to Jail Call 2M as in Michael.  And that call was made on June 16th, 2024; is that correct?

A.   Correct.

Q.   And in that call, does Christopher tell Jeremy that he has a plan?

A.   Yes.  He tells Jeremy -- and he starts off by saying that he can't get into details on the phone but that he has what he called "a defensive plan" in place.

        MS. CONKLIN:  Okay.  If you can pull up Jail Call 2M as in Michael.  And if you could start that at approximately two minutes in.  2:05, something like that.  Two minutes, five seconds in.  We'll skip through the "This is a jail call" part.

        MS. WALTERS:  2:05?

        MS. CONKLIN:  Yeah.  2M, 2:05.

     (Audio playing.)

BY MS. CONKLIN:

Q.   Now, in the interest of time, does Christopher continue calling Jeremy Harp?

A.   Yes.

Q.   And does he continue calling Jeremy and asking Jeremy when he is going to execute the plan?

*C. Thigpen - Direct Examination (Ms. Conklin)*

A.    Yes.  Yeah.  He -- at some point he learns that Jeremy had, in fact, made his way to Morgantown, and he tells him, "All right.  It's time to execute the plan."

You know, Jeremy continues to be leery about it.  He brings it up with Chris in a call that he's aware that if he does this that he'd be committing perjury and that there could be other charges that stem from that.

And in response to those questions, Chris tells Jeremy, "Well, that's nothing compared to what I'm facing.  So we'll deal with that" -- basically, we'll deal with that later.

And, yeah, the theme of the calls is generally the same as it gets further on down the line into June, as, you know, Chris calling and saying, "When are you going to do it?  When are you going to do it?  When are you going to make your statement?" and Jeremy, you know, continuing to bring up issues with the plan and why he thinks that it's not going to work.

Q.    Okay.  If we can pull up Government's Exhibit 2T as in Thomas.

And that call was made on June 23rd, 2024, based on the file name; correct?

A.    Correct.

Q.    Okay.  If we can start that at the three-minute mark.

(Audio playing.)

BY MS. CONKLIN:

Q.    All right.  Do the rest of the jail calls continue with

*C. Thigpen - Direct Examination (Ms. Conklin)*

Christopher Harp telling Jeremy that he should go ahead and make a statement and that don't worry, nothing is going to happen to him?

A.    Yes, they do.

Q.    And does Christopher tell Jeremy that once he gives his statement to the attorney it's going to put the Government in a legal bind to which there's no escape?

A.    Yes.  I believe he says those exact words.

He goes on in some of the later jail calls to kind of outline the plan a little more.  He's very wary about giving specifics on the phone.  But, yeah, he lays out that the first step of his plan is for Jeremy to go give the confession and that step two is for Jeremy to lay low afterward, and then step three is that there was some sort of third party that he was going to invoke to basically tie the Government's hands to where the Government wouldn't be able to pursue prosecution of either of them.

Q.    In the jail calls, does Christopher Harp also tell Jeremy the details that he needs to confess to are the details in the indictment?

A.    Yeah.  So that's a big part as it goes later into the month is Jeremy is trying to get some details from Chris as to what he should say to make it believable.  Because he's basically telling Chris, you know, "I can't just walk in there and say I did it.  I have to -- they're going to ask me

*C. Thigpen - Direct Examination (Ms. Conklin)*

questions, and I need to be able to provide some information so that they believe me."

And so Chris directs him to the internet, basically, and says, "Well, it's available on the internet" and then at one point says, "Are you familiar with my indictment?"

And Jeremy says that -- I believe he had looked it up, you know, through open source. And he says yeah. And Chris says, "Well, there's your statement right there."

Q.   Is what you heard in these jail calls consistent with what Jeremy told you when you interviewed him when he was in the jail?

A.   Yes.

        MS. CONKLIN:  If I can have just a moment, Your Honor.

        THE COURT:  You may.

    (Pause in proceedings.)

BY MS. CONKLIN:

Q.   Agent Thigpen, did you ever find any evidence that Jeremy Harp downloaded child pornography?

A.   No.

        MS. CONKLIN:  I have nothing further, Your Honor.

        THE COURT:  Understood.

    Cross, Mr. Erhard?

        MR. ERHARD:  Thank you, Your Honor.

*C. Thigpen - Cross-Examination (Mr. Erhard)*

CROSS-EXAMINATION

BY MR. ERHARD:

Q.   Agent Thigpen, let me just start with the last question about whether you ever found that Jeremy was a suspect.  What did you undertake in your investigation to look into that?

A.   So basically, when our investigation happened and we submit our evidence to the CART unit, we ask them to look for any sort of evidence or digital footprint as to who may be responsible for the contents that are found on those digital devices.

     And in that investigation, until the trial where Jeremy was brought up, there was nothing in the investigation prior to that that linked Jeremy.

Q.   My recollection from the trial transcripts was that there were -- there were a couple of log-ons to Chris Harp's email or things like that, but none of those ever occurred contemporaneous with the download times.  Is that your recollection?

A.   I don't recall.  I don't have the trial transcript in front of me, so I couldn't -- I couldn't testify to that.

Q.   So what other evidence would you typically look for to link Jeremy?  I mean, there was testimony that he set the computer up.  What would be some identifying indicia that you would look for?

A.   Well, there was, I guess, conflicting testimony about

*C. Thigpen - Cross-Examination (Mr. Erhard)*

that.  There were numerous times in the jail calls where Jeremy was asking Chris about when he got the computer, where he got it from.  From listening to that, it seemed like Jeremy did not know when exactly Chris got it.  And I believe he testified today that he didn't set up the password for Chris.

But there was -- there's no way to -- I guess to look into somebody when there was -- where there was no evidence that that person was involved.  There was nothing that came up in our investigation that led us down a path to investigate Jeremy.

Q.   So he testified today as well that he used the laptop clear back when Chris was living at the townhouse.  Did you hear that testimony?

A.   I don't recall him saying that today.  Maybe he did say it today.  I'm sorry if he did.  Yeah.

Q.   The discussions about money and plane tickets and -- did you ever look into any of that?

A.   Well, just from what Jeremy said.  And then that was corroborated through Mr. Suite, that he had overheard that as well.  You know, there was -- obviously, those calls were made on private cell phones.  There's no way to, you know, get the content of those messages.  We just had what Jeremy said, and then that was corroborated by Jonathan Suite.

Independently, I believe Jonathan reported that maybe even before we had spoken to Jeremy about it.

*C. Thigpen - Cross-Examination (Mr. Erhard)*

Q.   In the earlier calls that you talked about on direct examination, the May 22nd call, you recall that Chris Harp was asking Jeremy to tell him the things that he had ever done that were shady on computers.  Do you remember that?

A.   Yes, sir.

Q.   And as you go through these, I think your testimony was that eventually it gets into this thing like a plan where Chris stops directly sort of being accusatory toward Jeremy; is that right?

A.   In that specific jail call?  Or are you talking about later on --

Q.   As you --

A.   -- in the month?

Q.   As you go forward from -- the calls, I think you -- you would agree that beginning in May --

A.   Correct.

Q.   -- the calls from Chris to Jeremy are more about -- more probative and more about "You did this.  You are responsible for this.  Tell me all the things you ever did on a computer that are nefarious."  Right?

A.   Correct.  Yes.  He asked him to detail all of the -- all of the shady things that he had done on a computer, you know, and asked him about the file sharing and the torrenting, which Jeremy said that he didn't do other than some music, I believe, and that he never did it on anybody else's computer.

*C. Thigpen - Cross-Examination (Mr. Erhard)*

But, yeah, that was the initial conversation that first time was to just kind of get Jeremy talking about anything that he had ever done on a computer that, in Chris's words, were shady.

And then, yeah, as it progressed, you know, then he devised this plan, as he called it, that he wanted Jeremy to carry out.

Q. In your years as an investigator, would you liken that to -- have you ever dealt with a case where a witness in the case suffers from some cognitive deficit like dementia, Alzheimer's, or what Jeremy is suffering from?  Have you ever dealt with somebody like that?

A. I have not, no.

Q. Do you think it's -- do you think it could be likened to dealing with an Alzheimer's patient, where when that Alzheimer's patient wakes up and you're getting them dressed and they tell you they've got to go to the Oval Office that day because they're President of the United States, you don't tell that person, "That's crazy"; right?  I mean, you just don't do that.  You don't talk to them that way; correct?

A. I mean, I couldn't -- I couldn't testify how you deal with Alzheimer's patients.  I believe he did, at some point during the jail calls, tell Jeremy -- I believe we heard a clip of it where he tries to reason with him and say, like, if somebody was coming after you, you know, X, Y, or Z.  I believe he did

*C. Thigpen - Cross-Examination (Mr. Erhard)*

speak about that a little bit.  But I've never had personal dealings with this sort of thing in a case before.

Q.   My point is just that these calls began with more pointed accusations from Chris; and then when Jeremy couldn't accept responsibility, Chris got into his world a bit to -- to --

Let me ask it this way.  If -- have you considered the possibility that everything you just read, that Chris Harp actually believes that Jeremy did this?

A.   No.  I mean, the way that I took it as --

Q.   Let me ask you this.

A.   -- I was listening --

Q.   And I'll give you a chance to follow up.

MS. CONKLIN:  Objection, Your Honor.  I would ask that the witness be able to finish.

THE COURT:  Overruled.  Overruled.  It's cross.

Go head, Mr. Erhard.

BY MR. ERHARD:

Q.   If -- if he -- how would it look -- how would it look different, in your opinion, if Chris didn't believe that Jeremy did this, but this was all a setup on Chris's part to fake it?

A.   I'm sorry.  I'm not following what you're asking.

Q.   If you look at this, everything you've just talked about in these phone calls, all you're really showing is this -- that Chris goes from initially blaming Jeremy and telling him he's responsible for it and he needs to do something about it;

*C. Thigpen - Cross-Examination (Mr. Erhard)*

correct?

A.    Correct.  Yes.  And then -- yes.

Q.    He even puts in measured remarks when Jeremy goes off the rails and says he's going to get a gun; he wants his guns.  And he says, "No, I'm not giving you my guns."  Right?

A.    He did say that, yes.

Q.    It would be a perfect defense if he gave a false confession and then blew his brains out, wouldn't it?

A.    Well, I believe that's what Jeremy actually discusses in those calls is after, you know, he tells Chris, you know, repeatedly that he didn't do it and that he was going to go give this false confession in order to get him out of jail, I think that Jeremy thought that was his only way out of it.  And I believe he speaks about that in the calls was that --

Q.    Jeremy did.

A.    -- he was going to commit some act of violence.

Q.    Jeremy did.  But Chris didn't countenance that, not in one call you referenced; correct?

A.    He didn't what now?

Q.    He didn't encourage that.  He did nothing but tell him not to do that; right?

A.    You're asking if he encouraged Jeremy to kill himself afterwards?

Q.    Yeah.

A.    No, he did not.  He did not --

*C. Thigpen - Cross-Examination (Mr. Erhard)*

Q.   Okay.  So --

A.   -- encourage Jeremy to kill himself.

Q.   So I'm asking about Chris.  I'm asking you about indicia of if you -- if you pulled back and looked at this impartially, I'm not sure these calls are as inculpatory as you think.

Have you considered that what if -- what if it's true?

MS. CONKLIN:  I'm objecting, Your Honor, on the basis that what Christopher believes was alleged at trial.  That's not the basis of this motion.  This motion is whether Jeremy Harp is exculpatory evidence.

THE COURT:  Yeah.  I understand.  Overruled.

Go ahead, Mr. Erhard.

BY MR. ERHARD:

Q.   One of the questions --

A.   Would you -- I'm sorry.

Q.   One of the questions that Chris asks Jeremy is whether he's ever had experience with file sharing and torrent and all those things.  And Jeremy says -- Jeremy says that he hasn't done that but he's done a lot of, like, hacking into Wi-Fi systems.  He actually talked about commandeering the security cameras of a gun store.

Do you call that midlevel computer knowledge?

A.   I can't testify to what kind of computer knowledge it takes to do anything like that.  He says that he attempted it twice and that the one time it was for that store and he just

*C. Thigpen - Cross-Examination (Mr. Erhard)*

wanted to look through the security cameras.  And then he said a second time he tried it, it did not work.  So I, you know --

Q.    And that was when he was in high school; right?

A.    I don't know if that was when he was in high school.  I know he started out saying that when he was in high school him and his friend would mess around with computer viruses, and then he continues on about the network stuff.  So --

Q.    And when they messed around with computer viruses, they would actually commandeer websites and alter the websites.  That's what he said; right?

A.    That's -- yes, that's what he says is that they would just mess with computer viruses and try to change things on websites, yes.

Q.    So is that what you would consider midlevel computer expertise?

A.    It very well could be.  I can't testify to the computer skills that it takes to do things like that.

Q.    At one point Chris asks him why he destroys computers.  Well, why would you ask that?  I mean, do you have any opinion about that?

A.    I don't have an opinion.  You heard Jeremy testify today as to why he did that on one instance.  I believe that was -- if that's what you're referring to.

Q.    I'm talking about the phone calls.  You're talking about his earlier testimony.  I'm talking about the phone calls with

*C. Thigpen - Cross-Examination (Mr. Erhard)*

Chris and Jeremy that you testified to.  Okay?

A.    Yes, sir.  Yes, he asked if -- why he destroyed his laptop.  And he stated in the calls that he had found either -- I have to look back at it -- either a virus or malware on it that he could not seem to get rid of, so he destroyed his computer.

Q.    The question was did he ask him about destroying computers.  And I think your answer is yes; right?

A.    Yes.

Q.    Why -- does that seem like a peculiar question to ask if you believe that he's about to orchestrate a false confession? Or does it sound like Chris actually believes that Jeremy is responsible for the underlying crimes?

A.    To me, I took that as he found out from somebody that Jeremy had destroyed a computer and was trying to elicit a response favorable to him as to why Jeremy would have done that.

Q.    Oh.  So he knew these calls were being recorded.  Is that your testimony?  Why would that be a favorable response?  In what -- in what way?  Explain that.

A.    Sir, I can't testify to what Chris was thinking when he asked these specific questions.  All I can testify to is what was spoken on the phone.

Q.    Well, you can pontificate.  You just said you thought he was asking that as a -- in a self-serving way, and I asked you

*C. Thigpen - Cross-Examination (Mr. Erhard)*

to, in this context, make that make sense for me. I don't understand why he would ask his brother whether -- whether he -- all of these things he's capable of doing with computers and why he destroys them. That sounds like someone who is innocent, which is a perspective you lack and so do I. It's actually personal to Chris. That's the only way I can think of why -- what would motivate someone to ask those kinds of questions.

MS. CONKLIN: Objection, Your Honor. Counsel is testifying. There's no question there.

THE COURT: Sustained. Let's try again, Mr. Erhard.

BY MR. ERHARD:

Q. Jeremy mentions a file sharing software by name in one of the calls you talked about, the -- he calls it "Share-za." Is that the same as the -- I don't know how you pronounce that -- Shareaza or Shareza? That was the peer-to-peer software used in Chris's prosecution; correct?

A. Yes. Jeremy said that he wasn't familiar with that program. He didn't know what program it was, so he had to ask Amy. And Amy had told him that it was Shareza -- Shareaza.

Q. At one point when Jeremy is talking on the phone with Chris, Chris says some of the things Jeremy is saying are not rational; right?

A. I don't know. Can you point me to a specific instance of that?

*C. Thigpen - Cross-Examination (Mr. Erhard)*

Q.   Well, that was after you skipped to the 12-minute mark on Exhibit 2V.

A.   2V as in Victor?

Q.   Yes, sir.

He asks Jeremy -- I'll just see if I can refresh your recollection.  He asks --

A.   Sure.

Q.   This is when he asks Chris if he can have his guns, if he can have access to his guns, and Jeremy [sic] says no.

A.   Oh.

Q.   And then they get into an argument after Chris says, "That's not rational.  You're not being rational."  And Jeremy wants to -- wants to explain to him why it is rational.

MS. CONKLIN:  Objection, Your Honor.  Again, counsel is testifying.

And I believe it's Exhibit 2B as in boy, not 2V as in Victor.

MR. ERHARD:  Oh, I apologize.  I wrote down V.

THE COURT:  Objection is overruled.

THE WITNESS:  All right.

MS. CONKLIN:  2B is the guns.

BY MR. ERHARD:

Q.   If you just remember the testimony about the -- when Jeremy was asking for access to Chris's guns.  That's where I'm referencing.

*C. Thigpen - Cross-Examination (Mr. Erhard)*

A.   Yes.

Q.   Okay.  And you remember Chris said, "You're not" --
"That's not rational."  Right?

A.   Yes.  I believe it was after Jeremy had made up a scenario
where he said, If people were trying to murder me and I asked
my brother for help that he should give me an AR-15.

And after that is when I believe Chris said, "That's not
rational."

Q.   Okay.  The call that takes place -- I think it's
Exhibit 2M.  You introduced that exhibit by saying that the
defendant tells Jeremy that he has a plan to make everything
right.

Do you remember that?

A.   Yes.

Q.   And a little while later in the exchange, Jeremy takes
issue with -- he wants to inquire what that means.  Do you
remember that?  "What do you mean make it right?"

A.   Yes.

Q.   Okay.  There's another part in the calls where he's asking
Chris what he should say in the confession.  And you testified
that Chris directs him to his own indictment; correct?

A.   Yes.  That's in -- I believe that's in a subsequent call.
That is -- I don't believe that's in 2M.

Q.   That's right.

A.   But yes.

*C. Thigpen - Cross-Examination (Mr. Erhard)*

Q.    That's right.

So is it fair to say he's directing him to the indictment for which Chris faced prosecution and saying to Jeremy, "That is the allegation from the Government.  That's what you're admitting to"?

A.    So Chris is directing him there because Jeremy -- and again, you know, I can only testify to what is said on the jail calls.  But if I was going to pontificate --

Q.    I'm not asking you to do that now.

A.    -- I would --

Q.    Do you remember that?  Do you remember that?  You testified about it.

A.    Yes.  Yes, I remember Jeremy asking Chris what he should say.  Because he didn't have any details of the case, and he wanted to make his story believable.  And Chris directed him to read the publicly available information about the case and the indictment so that Jeremy could have some details about what he should say in his confession to make it believable.

Q.    Do you think it's a reasonable inference that what Chris is saying is "What was charged you need to confess to"?

A.    I did not take it that way.  I took it as Jeremy not knowing what to confess to.

And in other jail calls, there were numerous conversations where he's trying to get details so that -- he bas- -- Jeremy is worried that they will not accept his deposition because he

*C. Thigpen - Cross-Examination (Mr. Erhard)*

is not --

Q.    I understand all that.

A.    -- admitting to any details.  He's not -- he basically says at one point, "Why can't I just have a hobo walk in off the street and confess to it?"  And he's asking for details about what he should say so that it is believable enough that the court will accept what he says as the truth.

Q.    And Chris points him to the charging instrument in his case; correct?

A.    Yes.  He says, "If you need details, look up the case, and you can get the details from that."

Q.    In one of the calls -- I think it's Exhibit 2M -- Jeremy talks about the implications of perjury.  And do you remember Chris responds saying that that's nothing compared to what he's facing?  Do you remember that?

A.    I do.  Give me one second.  I don't believe that was in 2M.

Q.    You don't have to restrict it to the exhibit.

A.    Oh.

Q.    Do you recall that -- playing that audio and testifying about it?

A.    I don't remember -- I don't think we've played that audio today where Jeremy makes the comments about perjury.

Q.    Well, do you remember when he's complaining about the implications of giving a confession and going to jail and Chris

*C. Thigpen - Redirect Examination (Ms. Conklin)*

says, "That's nothing compared to what I'm facing"?

A.   Again, I'm not sure if we've played that part today.  But I do remember in the jail calls, yes, where Jeremy is worried about committing perjury and that Chris says, "Well, that's nothing compared to what I'm facing."

Q.   So Chris doesn't say, "That's okay.  Just lie anyway."

He says, "That's nothing compared to what I'm facing," like a man who feels like Jeremy is to blame.

A.   Well, in that specific interaction right there, he does not -- does not say anything about that specifically.

In many other parts of the jail calls when Jeremy says, "Well, I just need to go basically lie to this guy" or "I need to give this false confession," Chris just says, "Yeah." That's part -- like, he says "Yes" and then continues on with his plan.

MR. ERHARD:  No more questions.  Thank you, Your Honor.

THE COURT:  Understood.

Any redirect?

MS. CONKLIN:  Very briefly.

REDIRECT EXAMINATION

BY MS. CONKLIN:

Q.   In these jail calls that you found from Christopher to Jeremy, would it be fair to say that there was, like, a range of Christopher's interactions with Jeremy?

*C. Thigpen - Redirect Examination (Ms. Conklin)*

A.    Yes.

Q.    At first did it seem like Christopher was trying to find every bit of bad information out he could about Jeremy to try and make it fit the narrative?

A.    Yes.  Initially it seemed like he was trying to, yes, uncover anything that Jeremy had done with computers or otherwise that would make him look worse.

Q.    So he was fishing -- would it be fair to say he was fishing for information that would fit Jeremy being responsible for the crime?

A.    Yes.

Q.    Okay.  And in those initial conversations, does he tell Jeremy that he knows Jeremy did it?

A.    Yes.  I think he says, "I know that you were responsible for what is happening to me."

Q.    Okay.  And as a response to that, is that when Jeremy starts talking about individuals trying to get -- or trying to hurt Chris in order to get back at him?

A.    Yes.

Q.    Okay.  And after that occurs during the jail calls, is that when Chris starts saying, "Yes, yes, it's the two of us. We have to team up against whoever is coming to hurt you"?

A.    Yes.  It seemed like it evolved, you know, as it -- as the calls went on from more accusatory to more, yeah, kind of agreeing with what -- "appeasing" I guess is the word -- from

*C. Thigpen - Redirect Examination (Ms. Conklin)*

accusatory to appeasing, and basically just -- it seemed like he was just trying to do whatever he could do to get Jeremy to come and give the false confession.

Q.   And again, in all those jail calls, did Jeremy ever admit to using Christopher's computer?

A.   No.  No.  He's --

Q.   Did he ever admit to downloading child pornography?

A.   No.  He denied that multiple times in pretty much every single call.

Q.   And again, when he testified today, did he testify that the only time that he ever used Jeremy's [sic] computer was when Jeremy was there to fill out a job application?

A.   Yeah, I believe he did, and that Chris was there with him when that was occurring.

Q.   Would that information that he said, that he only used the computer once to fill out a job application, not even saying which computer, would that be consistent with the evidence that you uncovered during trial?  Or --

A.   Yes.

Q.   -- prior to trial.

A.   Yes.

Q.   Would that be consistent with the evidence that was presented at trial?

A.   Yes.

          MS. CONKLIN:  If I could have just one moment, Your

*C. Thigpen - Recross-Examination (Mr. Erhard)*

Honor.

THE COURT:  You may.

MS. CONKLIN:  I have no further questions.

THE COURT:  Any recross?

MR. ERHARD:  Just one follow-up, Your Honor, if I may.

RECROSS-EXAMINATION

BY MR. ERHARD:

Q.   Agent Thigpen, you appear to be finding it's pretty significant that Jeremy always denied being engaged in the child porn that was alleged in Chris's case; right?

A.   I'm just telling you what he said.

Q.   Did Chris ever admit it?

A.   No.

MR. ERHARD:  Okay.  Thank you.

THE COURT:  Anything else?

MS. CONKLIN:  No, Your Honor.

THE COURT:  Okay.  Understood.  Special Agent, thank you, sir.

THE WITNESS:  Thank you, sir.

THE COURT:  Uh-huh.

Any other witnesses, Ms. Conklin?

MS. CONKLIN:  No, Your Honor.

THE COURT:  Okay.  Mr. Erhard, let me ask you a question, sir, with respect to the motion.

MR. ERHARD:  Certainly, Your Honor.

THE COURT:  How -- let's compartmentalize the deposition where Jeremy says that he undertook these acts.  How is that newly discovered?

MR. ERHARD:  You know, I think, Your Honor --

THE COURT:  And frankly, in light of the entire focus of the trial defense.

MR. ERHARD:  I understand that, Your Honor.  And I think the parties, Mr. Edwards and Ms. Conklin, clearly both addressed that head-on.

I think Mr. Edwards' perspective was that it wasn't through a lack of diligence that he tried to nail Jeremy down.

I think Jeremy's testimony was that he talked to Chris once at a funeral.  He was homeless and would -- it was hard to ever find out where he was.  So I think the evidence itself is new because the confession is new.  I think the confession is the evidence.

The pursuit of Jeremy or the presence or absence of sufficient due diligence I think is -- I don't think Attorney Edwards was dilatory about that.  I think he just didn't have an opportunity to speak with Jeremy.  I don't think he ever did speak with Jeremy.

It wasn't until after the conviction that the family hired a private investigator.  That was prior to my appointment, of course, Your Honor.

THE COURT:  Uh-huh.  Do you know the date that private investigator was retained by the family?

THE DEFENDANT:  In June of '24, I believe.

MR. ERHARD:  Perhaps June of 2024, Your Honor.

THE COURT:  Okay.

MR. ERHARD:  I can check the date on his affidavit. Maybe that will...

He says he had an August 6, 2024, meeting with Jeremy at paragraph 5E.  He signs the affidavit January 7, 2025.  So clearly, he was -- he was working and was able to track Jeremy down by that August 6, 2024, date.

THE COURT:  Okay.  All right.  It's your motion. I've read everything, of course, Mr. Erhard.  But if there's anything else we need to talk about.

MR. ERHARD:  Your Honor, I -- forgive me.  I can't give you personal knowledge with respect to the things that transpired prior to my appointment.  But I think the hearing --

The Court probably is also struggling with the question about if, indeed, the motion were granted, what would that look like at trial?  And I guess my only position on that is that I think the jurors have an opp- -- they're entitled to hear from Jeremy.

Reading the transcripts, it's clear that that was the theory of the defense.  It -- they just never had Jeremy to lock it in.  So I don't -- maybe that goes to your initial

question.  That was -- that was absolutely the theory.  That was a thread --

THE COURT:  Okay.

MR. ERHARD:  -- and common throughout the defense, in my opinion.  In speaking with Attorney Edwards, I think he just never had the opportunity to nail Jeremy down.  Or I shouldn't say never had the opportunity; never found him.

So I do think on the precise question of newly discovered evidence, I do think you sort of draw brackets around that deposition date.  And I think that -- looking at it that way --

Of course, the Government can disagree.

But I think looking at it that way, that is the new evidence.  So that date and time, December 16, 2024, was the date that evidence accrued.

You know, in the investigator's affidavit at that same paragraph, paragraph 5E, he does say that Jeremy denied being involved in CP.

THE COURT:  Uh-huh.

MR. ERHARD:  At the end, in the conclusory paragraph, is where he says that he had admitted it to him on multiple occasions.  I think --

Well, I don't want to go on, Your Honor.  Can I answer anything else to move the motion forward or to at least address any concerns you have?

THE COURT:  No.  I think that was the last question I

had, sir.  Thank you.

MR. ERHARD:  Thank you, Your Honor.

THE COURT:  Thank you, sir.

Ms. Conklin, anything else we need to --

MS. CONKLIN:  Just briefly, Your Honor.  It's somewhat illogical that the investigator was hired and retained to help track down Jeremy Harp, who is this homeless person that nobody can reach and nobody can find him, and yet we have all these jail calls from May and June and July 2024.  The same time period that Jeremy Harp is, quote, "unavailable and can't be located," he's calling Christopher Harp -- or Christopher Harp can reach him on a regular basis.  So the investigator's statement and what we know as reality is inconsistent.

Furthermore, Jeremy testified that he saw Chris prior to trial; when Christopher Harp's mother had passed away, they saw him at the funeral; that he was staying with his dad in Kentucky, and that his dad always had a way to reach him.  And that's what Jeremy Harp's testimony was when he testified here today, which is inconsistent with Jeremy Harp being away and in the wind and nobody knew where to find him and nobody could find him.

So, therefore, we don't have newly discovered evidence. This is something that could have been found with some due diligence.

What is clear from the case law is that there's a

difference between newly discovered and newly available. There's a big difference between the two. And the case law is clear that newly available evidence is when they believe that somebody would take responsibility or post-trial somebody says, "Yes, I'm going to take responsibility for the crime." And they give an affidavit, and they say, "Yes, I'm the person who committed the offense" after the statute of limitations has run out or something along those lines. And the courts have held that that's not newly discovered evidence. The fact that that person existed and the fact that everybody knew that that person was going to commit the crime, that's not newly discovered evidence. That's newly available evidence. And that's exactly what we have here. And it's not really even newly available evidence; it's newly fabricated evidence.

And I think what the totality of everything that the Government presented today is that Christopher Harp and Amy Harp engaged in conduct to manipulate a mentally ill person to take responsibility for a crime that he over and over and over and over and over again said he didn't do. There's no evidence that Jeremy was involved in the case, but that did not preclude the defense from presenting evidence that Jeremy Harp was responsible for this.

In order for the Court to grant a new trial based on this, quote, "newly discovered evidence," there must be evidence that is, in fact, newly discovered; the facts must be alleged from

which the Court may infer diligence on the part of the movant; the evidence relied on must not be merely cumulative or impeaching and must be material to the issues involved; and it must be such -- and of such nature as that on trial the newly discovered evidence would probably produce an acquittal.

What we have here is a statement admitting to the offense while under mental duress and under the influence of drugs that was recanted by the individual in hours after the offense occurred.

And the other evidence we have is that prior to this false statement and after this false statement, that individual who made the false statement says, "No, I've never downloaded child pornography.  No, this was a false statement.  I fabricated it. I did it because I wanted to get my brother out of custody." It's not credible.  This one brief statement under mental illness, under the influence of drugs, is not credible when coupled with 26 different jail calls where Jeremy Harp denies downloading and accessing child pornography and his testimony here today.  There's just no credible evidence.

And because this evidence isn't credible, the Court can't find that it's newly discovered evidence that would warrant a new trial.  So we would ask that the Court deny the motion.

THE COURT:  All right.  Understood.

MR. ERHARD:  Your Honor, if I may, just to clarify my answer to you.  I may have misunderstood.

THE COURT:  Yeah.  Go ahead.

MR. ERHARD:  I didn't mean -- the Government was talking about whether the evidence was available in 2024.

THE COURT:  Uh-huh.

MR. ERHARD:  I'm claiming that it was -- that it was newly discovered post-trial.  That's, I think, the relevant portion -- or relevant time period.  Thank you, Your Honor.

THE COURT:  No.  Understood.

And I'll concede, Mr. Erhard, it's, at a minimum, a very difficult, if not impossible, question to answer.  But I'm going to ask it to give you a chance to explain it to me.

We initially took the statement in a vacuum, in a silo.  At trial, of course, everything we've talked about here today, everything the Court has received in anticipation of today and we've admitted into evidence today, the jury would hear all that.  And that includes this one isolated statement where Jeremy Harp says he committed this offense.

How can the Court get to the point where I believe a jury could ignore all the other evidence and all the other times that Jeremy says this did not happen and, frankly, the obvious concerted effort that the defendant and his spouse undertook to secure this confession?  How do we get the fifth element of likelihood of producing an acquittal?

MR. ERHARD:  I mean, obviously, the cursory answer is that that statement was given under oath.  The other denials

were not.

But I would ask the Court to consider the discussion Jeremy had either on direct examination or with his brother on the phone about the laptop he destroyed and threw into the river in Kentucky. Similarly, he was -- he -- his explanation was that it somehow possessed software that he did not install on it.

THE COURT: Uh-huh.

MR. ERHARD: I -- my -- the point of my Alzheimer's hypothetical with Agent Thigpen was that I think at some point --

Let's say, for example, that Chris Harp is actually innocent and that Jeremy Harp is -- if he's not guilty, it is a sincerely held belief by Chris. I think it would go the same way in those calls.

And Agent Thigpen wrestled me a little bit on direct examination. But for the Government, he coughed up that the calls over the course of the timeline went from accusatory to appeasement. He draws a different inference from that than I do. But I think that if you are sitting in jail and you truly believe that and you're missing your family and you believe that Jeremy, but for his mental difficulties -- in spite of those that you believe he did that, I'm not sure it would go much different than it did.

I think that there are a lot of -- there are a lot of

issues in this case, Your Honor.  And in reading through the transcripts, there was a lot of -- a lot of collateral stuff. There was --

I wish I could answer this question better for you.  I -- I mean, I guess it's my position, if you have to draw attention to one nugget in the evidence from today, it would be -- it would be Jeremy's explanation with respect to his own laptop. He didn't say, "I put software on there and it messed up my computer so I threw it in the river."  Throwing it in the river is a peculiar way to dispose of it.  He did say that there was software he did not put on there.

So I don't know that we get to a Jeremy Harp that says I did anything; certainly, not this.  I don't know that it's realistic to expect a confession from him and to make the inference in the absence of that that, well, he's always maintained his innocence.  That's important to them.  The Court knows better than I how to consider and weigh these factors. But again, I think that one nugget of testimony is worth looking at.

I also think that in trying to compare and contrast the one deposition from everything else, I think the deposition was given under oath.  And his demeanor looked quite fine to me.  I know that the negotiator testified that his demeanor was all over the place.  That's, I think, beyond dispute.  But during the period of the deposition, he seemed very sedate, very calm.

I'm sure he was much different than that afterwards when the gun came out and everything else.  But I think for purposes of the deposition, it looked -- it looked much like any other deposition to me, Your Honor.  Thank you.

THE COURT:  Okay.  No.  Understood.  Understood.

All right.  We'll take the motion under advisement, and we'll get a ruling out as soon as we can.  Thank you all very much.  Safe travels.  We stand adjourned.

(Proceedings concluded at 2:41 PM.)

CERTIFICATE

I, Rachel Kocher, a Registered Merit Reporter and Official Reporter of the United States District Court for the Northern District of West Virginia, do hereby certify that the foregoing is a true and correct transcript of the proceedings had in the above-styled action as reported by me stenographically, all to the best of my skill and ability.

I certify that the transcript fees and format comply with those prescribed by the Court and the Judicial Conference of the United States.

Given under my hand this 29th day of January 2026.


*Rachel Kocher*

_____
Rachel Kocher, RMR, CRR