IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

UNITED STATES OF AMERICA,

       Plaintiff,

   v.                           CRIMINAL NO. 1:23-CR-69
                                     (KLEEH)

CHRISTOPHER HARP,

       Defendant.

## MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S RENEWED MOTION TO VACATE JUDGMENT AND/OR GRANT A NEW TRIAL [ECF NO. 97]

Pending is Defendant's renewed motion to vacate judgment and/or grant a new trial [ECF No. 97]. The Court hereby incorporates its *Memorandum Opinion and Order Denying Motion for Judgment of Acquittal Or, in the Alternative, for a New Trial* [ECF No. 92]. For the reasons discussed below, the renewed motion is also **DENIED.**

### I.    PROCEDURAL HISTORY

On November 7, 2023, the grand jury returned a four-count indictment charging Defendant Christopher Harp ("Christopher" or "Defendant") in Counts One through Three with Receipt of Child Pornography, in violation of 18 U.S.C. §§ 2252A(a)(2)(A) and 2252A(b)(1), and in Count Four with Possession of Child Pornography, in violation of 18 U.S.C. §§ 2252A(a)(5)(B) and 2252A(b)(2). Following a three-day trial, the jury found Defendant

USA V. HARP                                                            1:23-CR-69

**MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S RENEWED MOTION TO VACATE JUDGMENT AND/OR GRANT A NEW TRIAL [ECF NO. 97]**

guilty on all four counts.  The jury rejected Defendant's strategy of blaming the crimes on his brother, Jeremy Harp ("Jeremy").  On April 25, 2024, prior to the jury's deliberations and at the close of the Government's case-in-chief, Defendant, by counsel, moved for judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure.  The Court denied the motion.

On June 13, 2024, counsel for Defendant filed a motion for acquittal or, in the alternative, for a new trial.  On December 9, 2024, the Court denied the motion.  On December 16, 2024 (three days before the scheduled sentencing hearing), Jeremy appeared at the law office of Defendant's counsel, Brian Edwards ("Edwards").  Jeremy then provided a recorded "confession" and barricaded himself in Edwards's conference room with a firearm, all of which is discussed in more detail below.  Edwards filed a renewed Rule 33 motion based on the "confession."  See ECF No. 97.  The Court continued the sentencing hearing, ordered briefing on the renewed motion, and scheduled an evidentiary hearing for March 10, 2025.  Leading up to the evidentiary hearing, the Court directed the parties to file witness and exhibit lists, and the Court appointed counsel for Jeremy.  On March 7, 2025, three days before the evidentiary hearing, Edwards moved to withdraw as counsel.  The Court then converted the evidentiary hearing into a hearing on the

USA V. HARP                                                              1:23-CR-69

**MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S RENEWED MOTION TO VACATE JUDGMENT AND/OR GRANT A NEW TRIAL [ECF NO. 97]**

motion to withdraw, and the Court granted the motion to withdraw. On March 11, 2025, the Court appointed Craig Erhard ("Erhard") to represent Defendant, and the Court scheduled sentencing for June 9, 2025.  The Court denied Edwards's renewed motion without prejudice, with leave to refile.  The sentencing hearing was then continued multiple times for a variety of reasons.

On December 11, 2025, Erhard moved to renew Edwards's renewed Rule 33 motion.  Erhard did not submit any additional information for the Court to consider.  The Court granted him leave to renew the motion and, after a continuance, held the evidentiary hearing on January 27, 2026.  During the evidentiary hearing, the following individuals testified: Jeremy Harp, Detective Joshua Ward, Jonathan Suite, and FBI Agent Cory Thigpen.

## II.  FACTS

### Summary of Jail Calls

In response to the renewed Rule 33 motion, the Government attached recorded jail calls as an exhibit.  The jail calls are all between Christopher and Jeremy, and they span from May 22, 2024 (less than one month after Defendant's convictions), through June 30, 2024.  The theme throughout the calls is that Christopher is trying to push Jeremy to come to Morgantown, West Virginia, to meet with Edwards.  It is clear, through Jeremy's comments, that

USA V. HARP                                                    1:23-CR-69

**MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S RENEWED MOTION TO VACATE JUDGMENT AND/OR GRANT A NEW TRIAL [ECF NO. 97]**

the push is to get Jeremy to confess falsely to the charges in the indictment.  Jeremy repeatedly comments that he (Jeremy) "did not do this" and that it would be a "false confession," but he would be willing to do it to save his brother from prison.  Christopher comments about how hard it is for him to be away from his family and how much Amy (Christopher's wife) and his children are struggling.  Jeremy repeatedly tells Christopher that he (Jeremy) needs more time (to gather more money to travel, and to straighten out his story so that it makes sense).  Jeremy understands that his "confession" needs details if it is going to be believed.  At times, Jeremy appears to be on a mission to find the real perpetrator.  He often asks Christopher to call back with more details about certain evidence that was produced at trial.

    The calls indicate that Jeremy feels somewhat responsible for Christopher's situation.  He believes that Christopher has been set up by the people who are trying to "get" Jeremy.  While Jeremy vehemently denies downloading child pornography or doing anything "depraved," he believes that he is the cause of Christopher's problems, and he appears to believe that Christopher is innocent.  While Jeremy continues to try to figure out the true perpetrator or come up with a more detailed plan, Christopher pushes him to go meet with Edwards and says that everything can be sorted out later.

USA V. HARP                                                           1:23-CR-69

**MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S RENEWED MOTION TO VACATE JUDGMENT AND/OR GRANT A NEW TRIAL [ECF NO. 97]**

Christopher acts as if he has a secret plan in place by which neither of them will go to prison. At some point Christopher says that Amy Harp will give Jeremy their "vest" if he wants it. Jeremy expresses concern that he will face some type of criminal charge, regardless of whether his "confession" is believed, and Christopher responds that any charge against Jeremy would be more minor than what he (Christopher) is facing. By June 22, 2024, Jeremy was in Morgantown. After arriving in Morgantown, he became more emboldened. He told Christopher that he had been consulting with lawyers whom he knew, and he had decided that Christopher's plan was a bad one.

### Private Investigator and Failed "Confessions"

At some point, Christopher's family hired a private investigator to find Jeremy. During the evidentiary hearing, Christopher's counsel represented that the family hired the investigator in June 2024, despite the fact that Christopher had been talking to Jeremy on the phone as early as May 2024. Nonetheless, Defendant's motion states that the private investigator was "able to locate Jeremy," who was homeless. On August 6, 2024, the private investigator brought Jeremy to Edwards's office to be interviewed. During the interview, Jeremy denied being the individual who was responsible for downloading

USA V. HARP                                                    1:23-CR-69

**MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S RENEWED MOTION TO VACATE JUDGMENT AND/OR GRANT A NEW TRIAL [ECF NO. 97]**

child pornography on Defendant's laptop.  He did admit that he set up Christopher's laptop and used it when he was at Christopher's home, and that he was present at Christopher's home on different occasions when neither Christopher nor Amy were present.  Jeremy also admitted that he had helped Christopher and Amy move out of a townhome into Amy's parents' home, and then he helped them move out of Amy's parents' home into the home that Christopher and Amy built.

On September 24, 2024, Jeremy reached out to Edwards and stated that he was willing to confess to being the individual responsible for downloading child pornography on Christopher's laptop and that he would provide a statement under oath.  On October 4, 2024, Jeremy was scheduled to give a recorded statement under oath in London, Kentucky, but he failed to appear.  Jeremy called Edwards the next day and told him that he did not appear because his father told him "it wouldn't do any good."  Edwards had no further contact with Jeremy until the incident on December 16, 2024.

**"Confession" in December 2024**

On December 16, 2024, Jeremy appeared unannounced at Edwards's law firm.  He indicated that he wished to provide a sworn statement, which Edwards (who was out of town) proceeded to record

USA V. HARP                                                        1:23-CR-69

**MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S RENEWED MOTION TO VACATE JUDGMENT AND/OR GRANT A NEW TRIAL [ECF NO. 97]**

by Zoom, with a court reporter.  The transcript is attached as an exhibit to Christopher's renewed motion.  On the record, Edwards asked Jeremy if it was correct that he (Jeremy) was "the one who set up the subject Hewlett Packard computer and set the password for Chris."  Jeremy responded, "I mean, I don't remember any of that because I'm having a lot of trouble remembering it."  Jeremy stated that he used the laptop at Christopher's "house and at his townhouse."  Edwards asked him, "Did you download child pornography and view it on that computer?"  Jeremy responded, "It wasn't for viewing.  It was to be used as a weapon."  Edwards clarified:

> Q:  Okay.
>
>      But you were the one who actually
>      downloaded it; is that correct?
>
>      I'm sorry, I didn't hear an answer.
>
> A:  I said yes.
>
> Q:  Okay. I'm sorry.
>
>      And you did that on multiple occasions?
>
> A:  Yep.

Jeremy did not discuss when or how he downloaded or accessed child pornography, or what type of child pornography was accessed.  The entire back-and-forth lasted just over four minutes.  Jeremy was slow to respond to many of Edwards's questions and repeatedly placed his head in his hands.

**MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S RENEWED MOTION TO VACATE JUDGMENT AND/OR GRANT A NEW TRIAL [ECF NO. 97]**

After the "confession" was given, Jeremy retrieved a firearm and effectively barricaded himself in the law firm's conference room.  During that time, Jeremy communicated with law enforcement, who pleaded with Jeremy to put the gun down and leave the office without hurting himself.  Much of the interaction was documented on body camera.  During the stand-off, Jeremy was provided a cell phone so that he could communicate with Detective Joshua Ward ("Detective Ward") from the Monongalia County Sheriff's Office. The conversation occurred on speaker phone.  The body camera footage is split into three videos.

### "Monongalia 1" (Body Camera)

Jeremy first explained that he believed his brother Christopher was framed and should not have been convicted. Detective Ward tried to provide Jeremy with a reason to stay alive and told Jeremy that he could only help his brother if he was alive, to which Jeremy responded, "This was a f***ing trap." Jeremy expressed his concern that "they're gonna kill [his] entire family."  Detective Ward attempted to talk Jeremy into putting the gun down and walking out, and Jeremy said that there was "no way out," and Christopher would end up in prison or tortured for "shit" he didn't do.  Jeremy said that he needed to talk to his dad "while [he] still ha[d] the option to kill [him]self."  Detective Ward,

USA V. HARP                                                    1:23-CR-69

**MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S RENEWED MOTION TO VACATE JUDGMENT AND/OR GRANT A NEW TRIAL [ECF NO. 97]**

trying to calm Jeremy down, told Jeremy that he was doing a courageous thing, and Jeremy replied, "It wasn't courageous. . . . I hate this stupid circus, it's just this stupid sadistic circus." He said, "I must have done something horrible to deserve this." He said that he is not a good person. He said, "There's something wrong. Ah, . . . no human being could ever hate you that much unless you did something absolutely terrible and you weren't aware of it, and it's killing me . . . ." Detective Ward asked who hates him, and Jeremy said, "Whoever orchestrated this." He said, "Every single person I love became this demented mirror image of themselves."

### "Monongalia 2" (Body Camera)

Jeremy stated that he was "far beyond self-preservation" and that he "want[ed] them to stop hurting [him]" (hurting Jeremy, not Christopher). Jeremy acknowledged that he sounded schizophrenic. He indicated that maybe if he were dead, "they" would stop hurting "them." He said that he "received an improper and incorrect set of signals that caused [him] to do increasingly depraved and insane things out of fear that they're going to continue hurting [his] loved ones." He indicated that "they" kept the information to use against him later. He said, "Imagine a scenario where someone wants to destroy you so they abuse your trust of them to get you

USA V. HARP                                                      1:23-CR-69

## MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S RENEWED MOTION TO VACATE JUDGMENT AND/OR GRANT A NEW TRIAL [ECF NO. 97]

to do something depraved or insane that they can then use as a bargaining token to get somebody else to kill you." Jeremy stated that he was being used as a "human weapon," speaking about interpretation of signals, and told Detective Ward that his "perception of reality [was] breaking down." He said, "They f***ing raped my mind and used me as a weapon." Jeremy stated that he was "truly afraid." He said that he did not know who to blame and that there was "definitely somebody to f***ing blame." Jeremy stated, "I don't care if I'm safe. I want Chris to be safe. Like the goal is to kill my f***ing family." He acknowledged that he sounded "insane" but continued, "They're going to kill my brother. They're going to ruin his life. They're going to destroy his relationships. They're going to keep going." Jeremy expressed the concerns that "they" were going to drive his father to suicide. Jeremy wanted Detective Ward to help him find out if somebody "used [him] to cause the suicide of a child" so that Jeremy could decide whether to "off himself."

Detective Ward told Jeremy that the only way to help his brother was to testify before the grand jury, to which Jeremy said, "I did a stupid boneheaded move. Look, you have a confession, so the State has no burden of proof, right? Go ahead and hurt me. Hurt me instead. . . . But, oh, man, I didn't I, oh God. I, I

USA V. HARP                                                                 1:23-CR-69

**MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S RENEWED MOTION TO VACATE JUDGMENT AND/OR GRANT A NEW TRIAL [ECF NO. 97]**

did not do what I just said I did.  The only reason I, the only reason I did that, ok is cause I thought it would stop.  I thought it would make everything stop."  Then he said, "I can't be sure that this is just another layer to this intimately complex plot to maneuver me into position, to dispose of me. . . .  I did not.  I did not frame my brother.  I did not download this shit."  Jeremy then told Detective Ward, "You understand how, how f***ed I am.  I couldn't trust my own father."  He said that he exists every day in "perpetual grief."  Jeremy told Detective Ward that the "pressure, the release valve" got hit two or three days before.  He said, "I have regressed into a mental state I can't even describe."  Jeremy indicated that he wanted to speak to his father, but Detective Ward refused to provide the phone number, and Jeremy hung up on him.

### "Monongalia 3" (Body Camera)

When Jeremy answered the phone again, he discussed concerns that his mother's death was a homicide and wondered if she tried to cut off her own oxygen supply.  She was sick with cancer, and near the end, she was on an oxygen concentrator.  One day or night, both Jeremy and his dad caught her pinching her tube with one hand to block off her own supply of oxygen.  He said, "If my perception of time is correct, she died last winter."  Then he said,

USA V. HARP                                                              1:23-CR-69

**MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S RENEWED MOTION TO VACATE JUDGMENT AND/OR GRANT A NEW TRIAL [ECF NO. 97]**

"Obliterating the victim's memory prevents them from relaying information to anyone who can help them, which is another part of this absolutely perfect plan."

Jeremy discussed the concept of a "slow kill," such as, for instance, feeding someone small amounts of poison over time. He stated that another type of slow kill is driving a person to commit suicide. He wanted to determine why there was surveillance equipment in his house and in his father's house. He said that he could not tell if his dad was acting or being "real." He said that his father is "soulless." He said, "This was so perfectly executed." Jeremy told Detective Ward, "I'm scared of what Chris's sentence will be. And . . . that, that I can't just get over that. And that's, that's what drove me to, to f***ing do this boneheaded-ass move because I, oh, God, God dammit. . . . I'm too psychologically fu***ed to do anything right at this point because I probably should have shot myself because then it would make me look more guilty so that it would get him out of prison."

Jeremy said, "I went through all this shit to not achieve my goal of getting him out of jail." He said that he fears the "entire human race." Jeremy said, "This whole thing was just a f***ing trick, wasn't it. . . . A trick by his lawyer. . . . His lawyer told me that there's a very good possibility that he'll get

USA V. HARP                                                      1:23-CR-69

**MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S RENEWED MOTION TO VACATE JUDGMENT AND/OR GRANT A NEW TRIAL [ECF NO. 97]**

out very quickly, almost immediately, if I did this." Jeremy then told Detective Ward, "I am having another epiphany. . . . He is hostile counsel. I was tricked into giving his lawyer everything his lawyer needs to frame me. . . . That means my dad, my dad was in on it." Jeremy explained that his father was angry with him because Jeremy connected him with the "mastermind," and Jeremy suggested that his father was trying to manipulate him. He said that he "can't even form complete memories anymore," and his "recollection of events is becoming blurry." He told Detective Ward that he (Jeremy) needed to figure out who sent "Signal Zero," which ultimately caused his own family to attempt to kill him. Jeremy told Detective Ward that he had not eaten for two days, that he might be experiencing the onset of schizophrenia, and that he could not tell what was real anymore. Shortly thereafter, Jeremy exited the room, leaving the firearm behind. Jeremy was then transported to a psychiatric facility.

**Evidentiary Hearing Testimony**

<u>Jeremy Harp Testimony</u>

Jeremy testified that at the time of the hearing, he was thinking clearly and taking medications to address his schizoaffective disorder and other issues. He testified that he was not, however, thinking clearly when he gave his "confession."

USA V. HARP                                                          1:23-CR-69

**MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S RENEWED MOTION TO VACATE JUDGMENT AND/OR GRANT A NEW TRIAL [ECF NO. 97]**

Jeremy testified that he only remembers "bits and pieces" of the "confession" at Edwards's office.  At the time, he was still using drugs, had not slept in two days, and was "tweaking."

Jeremy testified that he was not aware that Christopher was facing federal criminal charges until after the trial.  He testified that between 2018 and 2020, he lived in Toledo, Ohio, and was homeless for a "while."  He lived in Morgantown briefly during that time.  When he lived in Morgantown, he would set up a tent by the old Mountaineer Mall.  Occasionally, he would go to Christopher's residence and would visit or housesit, but it was infrequent.  He testified that he did not know where Christopher's laptop was in the house.  He testified that he used Christopher's laptop once to apply for a job, that Christopher watched him do it, and that the laptop was already logged in.  Jeremy also testified that he previously sold a laptop to his father, and when he noticed it had malware on it, he (Jeremy) destroyed the laptop by throwing it in the river.  Jeremy testified that he saw Christopher at his mother's funeral in January 2024, and Christopher told him that the FBI was investigating him, but Jeremy did not know that there had been a raid or any criminal charges.

Jeremy testified that Amy Harp had, more than once, offered him money to confess to the child pornography offenses charged

14

USA V. HARP                                                     1:23-CR-69

**MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S RENEWED MOTION TO VACATE JUDGMENT AND/OR GRANT A NEW TRIAL [ECF NO. 97]**

against Christopher. The highest amount that Amy offered him was $10,000.00. He also testified that she offered him a plane ticket, firearms, and ammunition. Jeremy testified that at the time of the "confession," he believed that his brother was innocent and had been framed. Jeremy testified that he (Jeremy) never downloaded child pornography onto Christopher's laptop and never downloaded child pornography onto Christopher's thumb drives when Christopher was in college. He also testified that his family always knew how to reach him and that he had a phone. He testified that he told Christopher, Amy, and the investigator that he did not commit the child pornography crimes at issue. Jeremy feels that he has been betrayed by his family.

### Detective Ward

Detective Ward handles, among other things, crisis negotiations for the Monongalia County Sheriff's Department. He was called to handle the report of an individual barricaded at Edwards's office on December 16, 2024. After Jeremy gave Edwards his statement, Jeremy brandished a firearm, sat down in the conference room, and refused to leave.

Detective Ward testified that during the "stand-off," Jeremy asked him to check records for him in Kentucky. Detective Ward did not remember exact details, but he believed Jeremy's request

USA V. HARP                                                        1:23-CR-69

**MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S RENEWED MOTION
TO VACATE JUDGMENT AND/OR GRANT A NEW TRIAL [ECF NO. 97]**

related to a child committing suicide in Kentucky. Jeremy also talked about his mother being murdered. Detective Ward testified that Jeremy appeared to be experiencing a mental health crisis on the day of the "confession." Jeremy told law enforcement that he never downloaded child pornography and was being framed to take responsibility for his brother's crimes. Detective Ward spent six hours with Jeremy before Jeremy put down the firearm and walked out of the conference room.

### Jonathan Suite

Jonathan Suite ("Suite") is a third-year law student at the West Virginia University College of Law. He has known Jeremy since 2009, when they were both in high school. He and Jeremy were good friends in high school and college and have remained in contact off and on since then. Suite testified that he was in contact with Jeremy in the summer of 2024. At the time, Jeremy was interested in using Suite as an alibi. After Suite and Jeremy spoke on the phone, Jeremy came to Morgantown and stayed at Suite's house for two or three days. Jeremy told Suite that he was considering making a false admission. Jeremy told Suite that he was not convinced of his brother's guilt, and he (Jeremy) had less to lose than Christopher did. Jeremy was also offered money and firearms to confess. Suite overheard a conversation on speaker

USA V. HARP                                                              1:23-CR-69

**MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S RENEWED MOTION
TO VACATE JUDGMENT AND/OR GRANT A NEW TRIAL [ECF NO. 97]**

phone in July 2024 in which Jeremy was offered $10,000.00 and guns. Jeremy told Suite that the caller was Amy Harp and repeatedly referred to her as "Amy" during the call.  Amy told Jeremy that he would not be charged if he confessed.  She told Jeremy that if he confessed, the prosecutors would be "embarrassed" and would not choose to pursue charges against him.  Suite also overheard a conversation between Jeremy and Christopher on speaker phone. Christopher told Jeremy about what jail was like, and Jeremy was deeply affected by it.  Suite's impression of the conversation was that Christopher was trying to pull on Jeremy's heartstrings.

When Jeremy stayed with Suite in the summer of 2024, Jeremy's mental state varied.  Oftentimes he was lucid and intelligent, and at other times, he was unwell.  Jeremy, however, maintained to Suite that he had not downloaded child pornography.  Jeremy had told Suite that he would make a false confession to help his brother.  Suite disagreed with that approach and told Jeremy that he could be charged.  Jeremy made it sound to Suite as if his only option was to confess falsely and then end his own life because he did not want to go to prison.  Suite called in a tip to the Morgantown Police Department to make a record in case Jeremy ultimately did make a false confession. At some point Suite became aware that Jeremy had barricaded himself at Edwards's conference

17

**MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S RENEWED MOTION TO VACATE JUDGMENT AND/OR GRANT A NEW TRIAL [ECF NO. 97]**

room, and Suite called the police again.

On cross examination, Suite testified that Jeremy had never lied to him. He admitted that Jeremy's talk can "err on the side of conspiratorial" and that Jeremy did believe himself to be the victim of a conspiracy. Suite testified that prior to the summer of 2024, Jeremy's mental health was much better. In 2024 Jeremy began wearing a full length camouflage outfit because he was homeless and saw it as a way to protect himself.

### Agent Thigpen

Agent Thigpen is the lead case agent on Christopher's case. At some point Agent Thigpen became aware that Jeremy had gone to Edwards's office to "confess" and was barricaded in the conference room. He kept in contact with the detectives on the scene. Later, Agent Thigpen set up an interview with Jeremy and his attorney. During the interview, Jeremy indicated that he had been stabilized. The first thing Jeremy did during the interview was unequivocally deny that he committed the crimes to which he had "confessed." Jeremy indicated to Agent Thigpen that Amy and Christopher had asked him to confess falsely and that Amy had offered him $10,000.00 and a plane ticket to do so. Agent Thigpen then testified about the contents of specific jail calls, which are discussed above and also part of the record. Agent Thigpen

USA V. HARP                                                    1:23-CR-69

**MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S RENEWED MOTION TO VACATE JUDGMENT AND/OR GRANT A NEW TRIAL [ECF NO. 97]**

testified that the content of the jail calls is consistent with what Jeremy told him during the interview.  He testified that when the evidence in the case was collected from Christopher's home and submitted to the CART unit, there was nothing in it that linked Jeremy to the child pornography.

### III. DISCUSSION

Christopher has renewed his motion for a new trial under Rule 33 on the basis of newly discovered evidence.  The supposed newly discovered evidence is Jeremy's sworn "confession," described above.  Rule 33(a) of the Federal Rules of Criminal Procedure permits the Court to vacate a criminal conviction and "grant a new trial if the interest of justice so requires."  However, "a trial court should exercise its discretion to award a new trial sparingly, and a jury verdict is not to be overturned except in the rare circumstance when the evidence weighs heavily against it."  United States v. Smith, 451 F.3d 209, 217 (4th Cir. 2006) (citation and quotation marks omitted).

In order to succeed on a motion for a new trial based on newly discovered evidence, Christopher must establish each of the following:

> (a)  The evidence must be, in fact, newly discovered, i.e., discovered since the trial;

**MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S RENEWED MOTION TO VACATE JUDGMENT AND/OR GRANT A NEW TRIAL [ECF NO. 97]**

      (b)   facts must be alleged from which the court may infer diligence on the part of the movant;

      (c)   the evidence relied upon must not be merely cumulative or impeaching;

      (d)   it must be material to the issues involved; and

      (e)   it must be such, and of such nature, as that, on a new trial, the newly discovered evidence would probably produce an acquittal.

United States v. Fulcher, 250 F.3d 244, 249 (4th Cir. 2001) (citation omitted). The United States Court of Appeals for the Fourth Circuit has "never allowed a new trial unless all five elements were established." Id. Here, all five factors are not established, and a new trial is not warranted.

    **A.   Newly-discovered**

    "If the defendant knew about the evidence prior to the conclusion of his trial, by definition, the evidence cannot be newly discovered after such trial." United States v. Griffin, 489 F. App'x 679, 681 (4th Cir. 2012) (unpublished) (citation omitted). For example, when a defendant is aware of the substance of a possibly exculpatory testimony a witness could provide, but the witness refuses to testify at trial and later states that he would be willing to testify, that is "newly available" evidence, not "newly discovered" evidence. See id.

**MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S RENEWED MOTION TO VACATE JUDGMENT AND/OR GRANT A NEW TRIAL [ECF NO. 97]**

In Christopher's renewed motion, he argues that Jeremy's "confession" "could not have been discovered earlier through the exercise of due diligence" because "Jeremy's homelessness during the prosecution made him difficult to locate, further preventing the defense from securing his testimony during trial." A look at the entire record discredits this argument.

At trial, it was established that the defense had knowledge of where Jeremy sometimes stayed and locations where he could be found. If the defense wished to subpoena Jeremy, they could have utilized the United States Marshals Service to serve the subpoena on him. It was also established during the trial and in Jeremy's hearing testimony that Jeremy and Christopher saw one another at their mother's funeral in January 2024. Christopher was speaking to Jeremy on the phone in May 2024 (within one month of his convictions) and yet hired an "investigator" in June 2024 to locate Jeremy. It appears that the investigator found him with ease. Jeremy also testified during the evidentiary hearing that his family could always reach him and that he had a phone. It does not appear that hiring an investigator was necessary in order to locate Jeremy, but even if it were, Christopher could have hired an investigator prior to trial. The record does not indicate that Christopher ever attempted to locate Jeremy prior to trial. For

USA V. HARP                                                    1:23-CR-69

**MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S RENEWED MOTION TO VACATE JUDGMENT AND/OR GRANT A NEW TRIAL [ECF NO. 97]**

all of these reasons, the Court finds that Jeremy could have been located prior to trial. The "confession" is newly available, not newly discovered.

### B. Diligence

The law requires Christopher to allege facts "from which the court may infer diligence" on his part. Defendant argues that the evidence "could not have been discovered earlier through the exercise of due diligence" because "Jeremy's homelessness during the prosecution made him difficult to locate, further preventing the defense from securing his testimony during trial." The Government argues that the defense "knew about Jeremy Harp prior to trial" but made the tactical choice not to call him as a witness. Again, the Court finds Defendant's arguments unconvincing.

As discussed, the Harp family took it upon itself to hire a private investigator to locate Jeremy in June 2024, after Christopher was convicted. Christopher could have hired an investigator before trial, and he has presented no evidence as to why he did not. Further, Christopher has presented no evidence of attempts to contact Jeremy before trial. The jail calls to Jeremy in May 2024 (less than one month after the convictions and before hiring a private investigator) also undermine the idea that Jeremy was difficult to locate. Jeremy testified that his family always

USA V. HARP                                                              1:23-CR-69

**MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S RENEWED MOTION TO VACATE JUDGMENT AND/OR GRANT A NEW TRIAL [ECF NO. 97]**

knew how to reach him. Christopher saw Jeremy in January 2024, which was post-indictment and pre-trial. Accordingly, the Court finds that Christopher has not alleged facts from which the Court may infer diligence on his part, and the diligence prong is not satisfied.

### C.    Cumulative or Impeaching

To grant a new trial, the law requires that the newly-discovered evidence not be merely cumulative or impeaching. Christopher argues that the evidence is not merely cumulative or impeaching because it "directly exonerates Christopher and identifies the true perpetrator." The Government argues that it is cumulative, given the amount of evidence and argument regarding Jeremy that was produced at trial. While the jury heard much about Jeremy at trial, it did not hear a "confession." Accordingly, the Court agrees with Christopher that the evidence would not be cumulative, and the third prong is satisfied.

### D.    Materiality

To grant a new trial, the law require that the newly-discovered evidence be material to the issues involved. Christopher argues that it is material because it directly impacts the core issue in this case: whether Christopher knowingly received and possessed child pornography. The Government agrees that the

23

**MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S RENEWED MOTION TO VACATE JUDGMENT AND/OR GRANT A NEW TRIAL [ECF NO. 97]**

"confession" is material.  The Court agrees as well and finds that the materiality prong is satisfied.

### E.   Likelihood of Producing an Acquittal

The law requires that the evidence is "such, and of such nature, as that, on a new trial, the newly discovered evidence would probably produce an acquittal."  "[T]he district court is required to make a credibility determination as part of its probability-of-acquittal determination."  United States v. Wilson, 624 F.3d 640, 663 (4th Cir. 2010).  "Of course, if the district court does not find a witness credible, it follows that the district court would not find the witness sufficiently persuasive to enable the district court to conclude that the witness's testimony would probably produce an acquittal at a new trial." United States v. Lighty, 616 F.3d 321, 374 (4th Cir. 2010) (citation omitted).  "To make a determination under this standard, the district court cannot view the proffered testimony in a vacuum; it must weigh the testimony against all of the other evidence in the record, including the evidence already weighed and considered by the jury in the defendant's first trial."  Id. (citation omitted).

Here, first, at a new trial, the recorded "confession" is hearsay because "the declarant [did] not make [it] while testifying

24

USA V. HARP                                                      1:23-CR-69

**MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S RENEWED MOTION
TO VACATE JUDGMENT AND/OR GRANT A NEW TRIAL [ECF NO. 97]**

at the current trial," and Christopher would be "offer[ing] [it]
in evidence to prove the truth of the matter asserted in the
statement" (that Jeremy committed the child pornography offenses).
See Fed. R. Evid. 801(c).    Accordingly, for Christopher to
introduce Jeremy's "confession," Jeremy would need to take the
stand at trial and "confess" again.    This is unlikely, given that
Jeremy recanted his "confession" the same day that he gave it, and
since then, he has unequivocally denied committing any child
pornography offenses multiple times.    Even if Jeremy did confess
on the stand at trial, or even if the recorded "confession" were
admitted, the confession is impeachable with the many instances in
which he denied responsibility for the offenses.    Any confession
played or produced at trial would not be credible for many reasons:

> (1)    The content of the jail calls, in which
> Christopher pushes Jeremy to confess, and
> Jeremy states multiple times that any
> confession would be "false";
>
> (2)    Jeremy's and Suite's testimony that Amy
> Harp offered Jeremy a plane ticket,
> firearms, and $10,000.00 to confess;
>
> (3)    Jeremy's refusal to confess on August 6,
> 2024;
>
> (4)    Jeremy's refusal to confess on October 4,
> 2024;
>
> (5)    Jeremy's obvious psychological distress
> and memory issues during the "confession"
> on December 16, 2024;

USA V. HARP                                                        1:23-CR-69

**MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S RENEWED MOTION TO VACATE JUDGMENT AND/OR GRANT A NEW TRIAL [ECF NO. 97]**

(6)  Jeremy's statements to law enforcement on December 16, 2024 (including "I did not do what I just said I did.");

(7)  Jeremy's interview with Agent Thigpen, in which Jeremy denied committing child pornography offenses;

(8)  Jeremy's testimony that he was on drugs and "tweaking" at the time of his "confession" but clear-headed during the evidentiary hearing;

(9)  Jeremy's clear-headed testimony during the evidentiary hearing that he never committed child pornography offenses; and

(10) The evidence at trial, which did not prove that Jeremy was at the Harps' home on the dates charged in the indictment, which did not prove that anyone saw Jeremy viewing child pornography or even using the laptop after the date he set it up, which included Rule 404(b) evidence tying Christopher to child pornography for over 10 years, and which included other circumstantial evidence against Christopher (e.g., he kept an old laptop in his office, plugged in and ready to use, despite having newer devices in his home; the laptop was kept through at least two moves; Christopher repeatedly looked up to the loft while law enforcement executed search warrant).

During the evidentiary hearing, the Court asked defense counsel how this factor, the likelihood of acquittal, is satisfied. Counsel responded that the "confession" in December 2024 was given under oath, and the other denials were not. Jeremy's testimony at

USA V. HARP                                                          1:23-CR-69

**MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S RENEWED MOTION TO VACATE JUDGMENT AND/OR GRANT A NEW TRIAL [ECF NO. 97]**

the evidentiary hearing was also, of course, provided under oath. Counsel also asked the Court to consider the laptop that Jeremy threw into the river in Kentucky because it had malware on it. The laptop in Kentucky, however, bears no connection to the child pornography offenses charged here. It is insufficient to overcome the many reasons why Jermey Harp's "confession" in December 2024 is unconvincing.

For all of these reasons, Jeremy's "confession" on December 16, 2024, as well as any "confession" that could be (but would be unlikely to be) procured on the stand, is highly unpersuasive. Such a "confession" would not "probably" produce an acquittal. To the contrary, the Court finds that any "confession" admitted into evidence would not change the jury's verdict in this case.

## IV. CONCLUSION

For the reasons discussed above, Defendant's renewed motion is **DENIED** [ECF No. 97].

It is so **ORDERED**.

The Clerk is directed to transmit copies of this Memorandum Opinion and Order to counsel of record.

DATED: February 25, 2026

_Tom S Kleeh_
THOMAS S. KLEEH, CHIEF JUDGE
NORTHERN DISTRICT OF WEST VIRGINIA